**16-2523, 16-2524**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

◆◆

DSS TECHNOLOGY MANAGEMENT, INC.,

*Appellant,*

—v.—

APPLE INC.,

*Appellee.*

ON APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD IN IPR2015-00369 AND IPR2015-00373

## JOINT APPENDIX

ANDRIY LYTVYN
ANTON J. HOPEN
NICHOLAS PFEIFER
SMITH & HOPEN, PA
180 Pine Avenue North
Oldsmar, Florida 34677
(813) 925-8505

*Attorneys for Appellant*

DAVID K.S. CORNWELL
JON E. WRIGHT
JASON A. FITZSIMMONS
STERNE KESSLER GOLDSTEIN
   & FOX, PLLC
1100 New York Avenue, NW
Washington, DC 20005
(202) 772-8825

*Attorneys for Appellee*

# INDEX TO JOINT APPENDIX

| Filing Date | Description | Document No. | Pages |
|---|---|---|---|
| 06/17/16 | IPR2015-00369 - Final Written Decision | Paper 40 | Appx0001-0041 |
| " | IPR2015-00373 - Final Written Decision | Paper 39 | Appx0042-0082 |
| | U.S. Patent 6,128,290 | Ex. 1001 | Appx0083-0098 |
| 10/03/16 | Certified List | | Appx0101-0105 |
| **IPR2015-00369** | | | |
| 12/04/14 | Petition for IPR | Paper 1 | Appx0198-0217 Appx0235-0264 |
| 03/30/15 | Patent Owner's Preliminary Response | Paper 8 | Appx0281-0290 Appx0303-0311 |
| 06/25/15 | Decision to Institute IPR | Paper 9 | Appx0312-0333 |
| 10/05/15 | Patent Owner's Response to Petition | Paper 17 | Appx0382-0425 |
| 01/22/16 | Petitioner's Reply | Paper 24 | Appx0449-0477 |
| 05/31/16 | Record of Oral Hearing | Paper 39 | Appx0582-0675 |
| **IPR2015-00373** | | | |
| 12/04/14 | Petition for IPR | Paper 2 | Appx0679-0694 Appx0707-0734 Appx0743-0745 |
| 03/30/15 | Patent Owner's Preliminary Response | Paper 7 | Appx0759-0768 Appx0782-0790 |
| 06/25/15 | Decision to Institute IPR | Paper 8 | Appx0791-0813 |
| 10/05/15 | Patent Owner's Response to Petition | Paper 15 | Appx0862-0905 |
| 01/22/16 | Petitioner's Reply | Paper 23 | Appx0939-0968 |
| **Exhibits** | | | |
| 12/04/14 | US Pat. No. 5,241,542 (Natarajan) | Ex. 1003 | Appx1149-1165 |
| " | US Pat. No. 4,887,266 (Neve)[1] | Ex. 1004 | Appx1166-1180 |

---

[1] Appellant's opening brief, page 43, cites Neve, Appx1117—the correct citation is Neve, Appx1177.

| Filing Date | Description | Document No. | Pages |
|---|---|---|---|
| 12/04/14 | Declaration of Dr. Grimes | Ex. 1008 | Appx1581-1592<br>Appx1601-1609<br>Appx1627-1631<br>Appx1644-1649<br>Appx1667-1685 |
| 01/22/16 | Transcript of Mr. Dezmelyk's Deposition | Ex. 1011 | Appx1795-1799<br>Appx1866-1868 |
| " | The Schwartz Book | Ex. 1012 | Appx1942-1966 |
| " | Declaration of Dr. Hu[2] | Ex. 1014 | Appx1974-2018 |
| 10/06/15 | Dictionary Definition of "burst" | Ex. 2009 | Appx2212-2215 |
| " | Transcript of Dr. Grimes's Deposition | Ex. 2015 | Appx2272-2276<br>Appx2306-2308<br>Appx2318-2319<br>Appx2331-2332 |
| " | Declaration of Mr. Dezmelyk | Ex. 2016 | Appx2371-2373<br>Appx2378-2380 |
| 02/22/16 | Transcript of Dr. Hu's Deposition | Ex. 2018 | Appx2405-2407<br>Appx2427<br>Appx2480-2481<br>Appx2532-2533<br>Appx2548-2549<br>Appx2553-2554 |
| **Nonprecedential Opinions** | | | |
| | *Benton v. Merit Sys. Prot. Bd.*,<br>    2016 WL 4729510 (Fed. Cir. Sept. 12, 2016) | | Appx2555-2556 |
| | *Cutsforth, Inc. v. MotivePower, Inc.*,<br>    636 F. App'x. 575 (Fed. Cir. 2016) | | Appx2557-2560 |
| | *In re Lemay*,<br>    660 F. App'x 919 (Fed. Cir. 2016) | | Appx2561-2568 |

---

[2] Appellant's opening brief, page 40, cites Declaration of Dr. Hu at Appx1994 and also at Appx2039. Because these pages are duplicates, only Appx1994 is included in the Joint Appendix,

Trials@uspto.gov                                        Paper No. 40
571-272-7822                                    Entered:  June 17, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.,
Petitioner,

v.

DSS TECHNOLOGY MANAGEMENT, INC.,
Patent Owner.
_____

Case IPR2015-00369
Patent 6,128,290
_____

Before JAMESON LEE, MATTHEW R. CLEMENTS, and
CHARLES J. BOUDREAU, *Administrative Patent Judges*.

BOUDREAU, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2015-00369
Patent 6,128,290

# I. INTRODUCTION

## A. Background

Petitioner Apple Inc. ("Apple") filed a Petition (Paper 1, "Pet.") to institute *inter partes* review of claims 1–4 of U.S. Patent No. 6,128,290 to Carvey (Ex. 1001, "the '290 patent"). Patent Owner DSS Technology Management, Inc. ("DSS") filed a Preliminary Response (Paper 8, "Prelim. Resp."). On June 25, 2015, we instituted an *inter partes* review of claims 1–4 on one of two grounds of unpatentability presented in the Petition (Paper 9, "Dec.").

After institution of trial, DSS filed a Patent Owner Response (Paper 17, "PO Resp."), and Apple filed a Reply thereto (Paper 24, "Reply"). An oral hearing was held on March 15, 2016, and a transcript of the hearing is included in the record (Paper 39, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Based on the record before us, and for the reasons that follow, we determine that Apple has demonstrated, by a preponderance of the evidence, that each of claims 1–4 of the '290 patent is unpatentable.

## B. Related Matters

The '290 patent has been the subject of two district court actions: *DSS Technology Management, Inc. v. Apple, Inc.*, No. 5:14-cv-05330-LHK (N.D. Cal.), and *DSS Technology Management, Inc. v. Lenovo (United States), Inc.*, No. 6:14-cv-00525-JDL (E.D. Tex.). Pet. 3–4; Paper 4, 2. IPR2015-00373 also involves claims of the '290 patent and was argued together with this proceeding at the March 15, 2016, oral argument.

IPR2015-00369
Patent 6,128,290

*C. The Instituted Ground*

We instituted a trial as to claims 1–4 of the '290 patent under
35 U.S.C. § 103(a) as unpatentable over U.S. Patent No. 5,241,542 to
Natarajan et al. (Ex. 1003, "Natarajan") and U.S. Patent No. 4,887,266 to
Neve et al. (Ex. 1004, "Neve"). Dec. 13–21.

## II. ANALYSIS

*A. The '290 Patent*

The '290 patent, titled "Personal Data Network," issued October 3,
2000, from U.S. Patent Application No. 08/949,999 (Ex. 1005, 22–62,
"the '999 application"). The '999 application was filed October 14, 1997, as
a continuation-in-part of U.S. Patent Application No. 08/611,695 (Ex. 1006,
21–61, "the '695 application"), filed March 6, 1996, which matured into
U.S. Patent No. 5,699,357 (Ex. 2001, "the '357 patent"). *See* Ex. 1001, 1:6–
8.

The '290 patent relates to a data network for bidirectional wireless
data communications between a host or server microcomputer unit and a
plurality of peripheral units referred to as personal electronic accessories
(PEAs). Ex. 1001, 1:11–14, 2:15–18. Among the objects of the invention is
the provision of a data network that requires extremely low power
consumption, "particularly for the peripheral units," avoids interference
from nearby similar systems, and is relatively simple and inexpensive to
construct. *Id.* at 1:33–34, 1:39–45. Figure 1 of the '290 patent, reproduced
below, is illustrative of the described wireless data network system.



**FIG. 1**

Figure 1 is a block diagram of a wireless data network system linking a server microcomputer, referred to as personal digital assistant (PDA) 11, with a plurality of peripheral units, or PEAs, 21–29. *Id.* at 2:42–44, 2:66–3:15.

According to the '290 patent, "the server microcomputer unit and the several peripheral units which are to be linked are all in close physical proximity, e.g., within twenty meters, to establish, with very high accuracy, a common time base or synchronization." *Id.* at 1:50–54. "Using the common time base, code sequences are generated which control the operation of the several transmitters in a low duty cycle pulsed mode of operation." *Id.* at 1:57–59. "The server and peripheral unit transmitters are energized in low duty cycle pulses at intervals which are determined by a code sequence which is timed in relation to the synchronizing information initially transmitted from the server microcomputer." *Id.* at 2:35–39. "The low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals." *Id.* at 1:59–

4

IPR2015-00369
Patent 6,128,290

61. "In the intervals between slots in which a PEA is to transmit or receive, all receive and transmit circuits are powered down." *Id.* at 4:6–8.

### B. Illustrative Claim

Claim 1, the sole independent claim among the challenged claims, is reproduced below. Challenged claims 2–4 depend directly or indirectly from claim 1.

1. A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:

a server microcomputer unit;

a plurality of peripheral units which are battery powered and portable, which provide either input information from the user or output information to the user, and which are adapted to operate within short range of said server unit;

said server microcomputer incorporating an RF transmitter for sending commands and synchronizing information to said peripheral units;

said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also an RF transmitter for sending input information from the user to said server microcomputer;

said server microcomputer including a receiver for receiving input information transmitted from said peripheral units;

said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals determined by a code sequence which is timed in relation to said synchronizing information.

Ex. 1001, 11:61–12:18.

### C. Claim Construction

The '290 patent expired on March 6, 2016, twenty years from the filing date of the '695 application from which the '290 patent claims

5

IPR2015-00369
Patent 6,128,290

priority. 35 U.S.C. § 154(a)(2). We construe expired patent claims according to the standard applied by the district courts. *See In re Rambus Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012). Specifically, we apply the principles set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Only those terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

The words of a claim are generally given their ordinary and customary meaning, and that is the meaning the term would have to a person of ordinary skill at the time of the invention, in the context of the entire patent including the specification. *See Phillips*, 415 F.3d at 1312–13. Claims are not interpreted in a vacuum but are a part of and read in light of the specification. *See Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1116 (Fed. Cir. 1987). Although it is improper to read a limitation from the specification into the claims (*In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993)), the claims still must be read in view of the specification of which they are a part. *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004).

If the applicant for patent desires to be its own lexicographer, the purported definition must be set forth in either the specification or prosecution history. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359,

6

IPR2015-00369
Patent 6,128,290

1366 (Fed. Cir. 2002).  And such a definition must be set forth with reasonable clarity, deliberateness, and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Apple asked us in its Petition to construe two phrases: "within short range of said server unit," as recited in claim 1, and "code sequence," as recited in claims 1 and 3.  Pet. 9–11.  DSS responded to Apple's proposed construction of only the first of these phrases in its Preliminary Response, and additionally asked us to construe "energized in low duty cycle RF bursts," also recited in claim 1.  Prelim. Resp. 18–21.  DSS proposed, in particular, that the phrase "energized in low duty cycle RF bursts" be given its plain and ordinary meaning, or alternatively, in the event of any ambiguity, that it should be construed as "a pulsed operation that substantially reduces power consumption and facilitates the rejection of interfering signals."  *Id.* at 20 (boldface and italics omitted).

In our Decision on Institution, we construed the phrase "within short range" to mean "within a range in which the accuracy of synchronization is not appreciably affected by transit time delays, including at least the range of within 20 meters," but concluded that it was not necessary for our determination of whether to institute *inter partes* review of claims 1–4 of the '290 patent to construe expressly the phrases "code sequence" and "energized in low duty cycle RF bursts."  Dec. 7–10.  Because the '290 patent had not yet expired at the time of our Decision on Institution, we interpreted the claims under the broadest reasonable interpretation standard.  Dec. 6–7; *see* 37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012); *In re Cuozzo Speed Techs.,*

7

IPR2015-00369
Patent 6,128,290

*LLC*, 778 F.3d 1271, 1278–81 (Fed. Cir. 2015), *cert. granted sub nom.*

*Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 890 (mem.) (2016).

Notwithstanding that we now apply the *Phillips* standard, our
construction now for "within short range" is the same as our construction in
the Decision on Institution.  Neither party now challenges that construction
or our determination in the Decision on Institution that "code sequence"
does not require express construction.  Based on DSS's Patent Owner
Response, Apple's Reply, and the arguments presented at oral argument,
however, the construction of the phrase "energized in low duty cycle RF
bursts" is a central issue in this proceeding.

*"energized in low duty cycle RF bursts"*

Outside of the claims, the '290 patent recites the phrase "low duty
cycle" four times, as emphasized below:

> The data network disclosed herein utilizes ***low duty cycle*** pulsed
> radio frequency energy to effect bidirectional wireless data
> communication between a server microcomputer unit and a
> plurality of peripheral units . . . .  By establishing a tightly
> synchronized common time base between the units and by the
> use of sparse codes, timed in relation to the common time base,
> low power consumption and avoidance of interference between
> nearby similar systems is obtained.

Ex. 1001, Abst.

> Using the common time base, code sequences are generated
> which control the operation of the several transmitters in a ***low
> duty cycle*** pulsed mode of operation.  The ***low duty cycle*** pulsed
> operation both substantially reduces power consumption and
> facilitates the rejection of interfering signals."

*Id.* at 1:57–61.

> The server and peripheral unit transmitters are energized in ***low
> duty cycle*** pulses at intervals which are determined by a code

8

IPR2015-00369
Patent 6,128,290

> sequence which is timed in relation to the synchronizing
> information initially transmitted from the server microcomputer.

*Id.* at 2:35–39.

In its Patent Owner Response, DSS contends that a person of ordinary skill in the art would have understood the "duty cycle" of the server transmitter as "the ratio of actual duration during which the server transmitter is energized to the total duration designated for outbound transmissions." *Id.* at 10 (emphasis omitted). DSS contends that understanding is consistent with deposition testimony provided by Apple's expert, Dr. Jack Duane Grimes (*Id.* at 10–11 (citing Ex. 2015 ("Grimes Depo. Tr."), 41:7–9 ("The low-duty cycle refers to the ratio of the time spent transmitting versus the time spent nontransmitting."), 31:10–12 ("Low-duty cycle tells you that most of the time there's nothing being sent. And when there is something being sent, that's what's called a burst."), 46:12–15 ("[T]he key thing is that the burst is small—the time it takes is small relative to the overall time that the transmitter could have been transmitting."))). Citing both Dr. Grimes's deposition testimony and the declaration of its own expert, Robert Dezmelyk, DSS further contends that "the duty cycle of the server transmitter must be calculated over the total duration designated for the outbound transmissions," and that "[t]ime slots designated for the inbound data traffic are not taken into account because the server transmitter could not have been transmitting during these time slots." *Id.* at 11 (citing Ex. 2015, 60:19–22; Ex. 2016 ("Dezmelyk Decl.") ¶¶ 23, 27). DSS concludes, "[u]nder the broadest reasonable interpretation, a [person of ordinary skill in the art] would have understood that a server transmitter is energized in a low duty cycle when the server transmitter is energized for

IPR2015-00369
Patent 6,128,290

less than ten percent (10%) of the total duration designated for outbound transmissions." *Id.*[1]

DSS contends the "less than ten percent" range is consistent with the Specification of the '290 patent, including an example in which "a maximum of three RF bursts can occur" for outbound transmissions in sections that each include sixty-four slots, and another example in which transmitted synchronization beacons are described as consisting of eight RF bursts spread out over 252 slots. PO Resp. 11–12 (citing Ex. 1001, 7:22–33). According to DSS, the first example results in the server transmitter being energized for 4.688% (i.e., 3/64) of the transmission period, while in the second example, the server transmitter is energized in a duty cycle of 3.175% (i.e., 8/252). *Id.* at 12. DSS also cites five patents (Exs. 2004–2008) that it contends to be the first five "relevant" results "obtained on Google Patents through the query: 'low duty cycle e.g.' & network & percent" (*id.* at 12–13, 12 n.1, Table 1).[2] Those patents include exemplary "low duty cycle" ranges from "e.g., 0.5 percent" (Ex. 2006, 8:3) to "e.g., at an about 10 percent . . . duty cycle" (Ex. 2008, 10:5–6).

As to the phrase "RF bursts," DSS contends that "a [person of ordinary skill in the art] would have understood the phrase 'RF bursts' to mean '***a short period of intense activity on an otherwise quiet data channel***.'" PO Resp. 13 (citing definition of "burst" from CHAMBERS DICTIONARY OF SCI. & TECH. 155 (1999) (Ex. 2009)). DSS asserts that this

---

[1] DSS and Apple both confirmed during the oral hearing that their respective claim construction proposals for "low duty cycle" would be no different under the *Phillips* standard, as opposed to the broadest reasonable interpretation standard. Tr. 28:23–29:1, 39:7–11.

[2] DSS does not explain its criteria for determining "relevance."

IPR2015-00369
Patent 6,128,290

construction is consistent with Dr. Grimes's deposition testimony that "the key thing is that the burst is small—the time it takes is small relative to the overall time that the transmitter could have been transmitting" and with the '290 patent's illustration of 2 μsec burst slots. *Id.* at 13–14 (citing Ex. 2015, 34:2–8, 46:12–15; Ex. 1001, Fig. 6).

In its Reply, Apple responds that a "low duty cycle" of a transmitter should simply be interpreted as the transmitter being designed to be on only to satisfy the data communication needs over the communication cycle of the system. Reply 22. According to Apple, "DSS's proposed claim construction that 'low duty cycle' is less than 10% is arbitrary and unduly narrow." *Id.* at 20 (emphasis omitted). Apple contends that "[t]he 'examples' that DSS cites in Table 1 are cherry-picked results from a search premised on finding examples by including 'e.g.' in the search string," that "none of these references are contemporaneous with the '290 patent's filing date," and that one of those examples even "contradicts the proposed construction of '***less than*** ten percent,' providing a 'low duty cycle, e.g., ***at*** an ***about*** 10 percent (10%) duty cycle." *Id.* at 21 (quoting Ex. 2008, 10:5–6). Apple also contends that the deposition testimony of DSS's expert undermines DSS's proposed construction, as "Mr. Dezmelyk admits that the term 'low duty cycle' itself does not require an upper bound at 10%." *Id.* (citing Ex. 1011 ("Dezmelyk Depo. Tr."), 78:2–6).

Apple also points out that claim 8 of the '357 patent (i.e., the parent of the '290 patent), which was cited by Mr. Dezmelyk during his deposition as further support for the "10% limit," recites "said low duty cycle pulses comprise chips within the respective code sequences such that a transmitter is enerrgized [*sic*] less than 10% of the time during an allocated time slot."

11

IPR2015-00369
Patent 6,128,290

Reply 22.  According to Apple, "[b]ecause claim 8 depends ultimately from independent claim 6, it is *narrower* than the independent claim, meaning that the '357 patent contemplates a 'low duty cycle' *greater than* 10%." *Id.*

In the oral hearing, DSS retreated from insisting that "low duty cycle" should be limited to a duty cycle of "less than ten percent."  While maintaining that "[l]ow duty cycle is a term of art" and that "[i]n the context of wireless communications, 10 percent is a reasonable number," DSS conceded, "there is no hard value for the numbers."  Tr. 48:6–7, 48:22, 49:16–17.  DSS asserted:  "Anything below 10 percent is low duty cycle. Anything over 10 percent would be considered high duty cycle and—or at least it would not be considered a low duty cycle in the context of wireless communications technology."  *Id.* at 50:22–25.  DSS additionally suggested that a person of ordinary skill in the art would understand that, if there were more data than could be transmitted in three of sixty-four slots, the transmission of the data would be held by the transmitter for future frames, and that "low duty cycle" operation requires "kicking off mobile units" and introducing "additional complexity and additional inefficiency," merely so that a server transmitter can be depowered for the majority of a duty cycle regardless of whether there is more data waiting to be transmitted (*see id.* at 61:13–62:2, 71:9–72:5).

As an initial matter, we understand an "RF burst" to be "a short period of intense RF transmission activity on an otherwise quiet data channel," consistent with DSS's proposal (*see* PO Resp. 13).  That understanding is supported by the '290 patent and other evidence of record (*see* Ex. 1001, Fig. 1; Ex. 2009; Ex. 2015, 34:2–8, 46:12–15), and Apple does not provide any contrary argument.

IPR2015-00369
Patent 6,128,290

Nonetheless, we are unpersuaded by DSS's arguments concerning the proper interpretation of "low duty cycle." First, we agree with Apple that the term "duty cycle" should be calculated based on the total time it takes a system to go through a cycle of communication (*see* Reply 22–23), and is not limited to "the total duration designated for outbound transmissions," as asserted by DSS (*see* PO Resp. 10) (emphasis omitted). This interpretation is consistent with the Specification. *See* Ex. 1001, 11:46–51 ("Further, the utilization of low duty cycle pulse mode transmission particularly with the employment of uncorrelated codes in a TDMA context, leads to very low power consumption since the transmitters and receivers in each PEA are powered for only a small percentage of *the total time*."). We also agree with Apple that "the data requirements for the master station to broadcast to the peripherals change[], and the data requirements for the peripherals to transmit back to the master station change over time." Tr. 9:4–8. Accordingly, we understand the "duty cycle" of a transmitter to be the average ratio of the durations during which the transmitter is energized to the duration of communication cycles over the course of network operation.

We also agree with Apple that "low duty cycle" should not be limited to a duty cycle of less than 10% or to any other hard limit (Reply 20–22), and instead conclude, on this record, that "energized in low duty cycle RF bursts" simply means that a transmitter is not energized continuously over the course of network operation, but is depowered during at least two time periods of each communication cycle: first, in time slots in which the unit that includes the transmitter is assigned to receive data; and second, in time slots, if any, when the unit is assigned to transmit data but has no data to transmit.

13

IPR2015-00369
Patent 6,128,290

As DSS conceded at the oral hearing, there is "no hard value" recited in the '290 patent or elsewhere on the record (Tr. 49:16–17), and we are not persuaded on this record that we should infer from the examples in the '290 patent that Applicant intended thereby to limit the meaning of "low duty cycle" to transmitting in just three of sixty-four or eight of 252 time slots reserved for transmission, or anything on that order (*see* PO Resp. 12). We also find that DSS's suggestions regarding "kicking off" of mobile units and introduction of "complexity and "inefficiency" (*see* Tr. 61:13–62:2, 71:9–72:5) are inappropriate because they are new arguments raised for the first time at oral argument. Thus, those new arguments are not considered. *See Apple Inc. v. e-Watch, Inc.*, Case IPR2015-00412, slip op. at 40–41 (PTAB May 6, 2016) (Paper 50) (declining to consider arguments raised for the first time at oral argument).

We also are not persuaded by DSS's sampling in its Patent Owner Response of five unrelated patents (i.e., Exs. 2004–2008) that, by virtue of their use of the abbreviation "e.g.," explicitly provide only *examples* of low duty cycles (*see* Ex. 2002 (Black's Law Dictionary, definition of "e.g.")). PO Resp. 12–13. Indeed, although there may not be any evidence of record that the definition of "duty cycle" changed in the years between the filing date of the application for the '290 patent and the filing dates of the applications that issued as Exhibits 2004–2008 (*see* Tr. 50:5–7), the fact that none of those references predates the '290 patent casts doubt upon the weight to which that evidence is entitled in showing how a person of ordinary skill in the art would have understood low duty cycle in the context of the '290 patent (*see* Reply 21).

14

IPR2015-00369
Patent 6,128,290

In view of the foregoing, on the record before us, we conclude that the phrase "energized in low duty cycle RF bursts" means "energized, in short periods of intense RF transmission activity on an otherwise quiet data channel, only to the extent required to satisfy the data transmission needs over the course of a communication cycle."

### D.  Obviousness of Claims 1–4 over Natarajan and Neve

Apple contends that claims 1–4 of the '290 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Natarajan and Neve.

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  We resolve the question of obviousness on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.[3]  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

In an obviousness analysis, some reason must be shown as to why a person of ordinary skill would have combined or modified the prior art to achieve the patented invention.  *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 (Fed. Cir. 2008).  A reason to combine or modify the prior art may be found explicitly or implicitly in market forces, design

---

[3] The record does not contain any evidence of secondary considerations.

15

IPR2015-00369
Patent 6,128,290

incentives, the "interrelated teachings of multiple patents," "any need or problem known in the field of endeavor at the time of invention and addressed by the patent," or the background knowledge, creativity, and common sense of the person of ordinary skill. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–21 (2007)).

> 1. *Scope and Content of the Prior Art*
>
> a.      *Overview of Natarajan*

Natarajan is directed to power conservation in wireless communication, particularly battery efficient operation of wireless link adapters of mobile computers (also referred to, *inter alia*, as battery powered computers, hand held or laptop computers, mobile units, and mobile stations) as controlled by multiaccess protocols used in wireless communication. Ex. 1003, Abst., 1:7–13, 2:32. Figure 2 of Natarajan is reproduced below.



16

IPR2015-00369
Patent 6,128,290

Figure 2 is a block diagram of a digital data communication system of the type in which Natarajan's invention is implemented, illustrating the basic components of a mobile station and a base station. *Id.* at 1:67–2:3. As depicted in Figure 2, mobile stations 10, 12, 14, and 16 communicate with gateways (i.e., base stations 26, 28) connected with server 18, via wireless transceivers adapters 36, 44. *Id.* at 2:32–39, 2:51–52, 2:58–59, 2:65–67.

According to Natarajan:

> The scheduled access multiaccess protocol is implemented to effectively conserve battery power by suitable control of the state of the controller, the transmitter and receiver units at the wireless link adapter by scheduling when the adapter is in a normal running mode, or a standby mode in which power is conserved.

*Id.* at Abst.; *see also id.* at 3:66–4:1.

Natarajan discloses that "[a] desirable solution is one in which the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." *Id.* at 4:3–6. Natarajan further discloses that the scheduled multiaccess protocol divides time into "fixed-length frames, and frames are divided into slots." *Id.* at 4:20–23. The frames are divided into subframes for transmission of data from the base station to mobile units (outbound traffic) as well as transmission of data from mobile units to the base station (inbound traffic). *Id.* at 4:27–38. According to Natarajan, at least one slot is assigned to each mobile computer designated to communicate with the base station. *Id.* at 10:26–29. The battery power of the wireless link adapter for a given mobile computer is turned on to full power during the at least one assigned slot, and the battery power of the wireless link adapter is substantially reduced during the remaining time slots. *Id.* at 10:29–37.

17

IPR2015-00369
Patent 6,128,290

With respect to outbound traffic, Natarajan discloses that the base station broadcasts a header that includes a list of mobile users that will be receiving data packets from the base station in the current frame, the order in which the mobile users will receive the data packets, and the bandwidth allocated to each user. *Id.* at 4:45–53. According to Natarajan, a mobile unit that is not included in the header from the base station can turn its receiver "OFF" for the duration of the current subframe. *Id.* at 4:64–67. Additionally, the adapter of each receiving mobile unit can compute exactly when it should be ready to receive packets from the base station by adding up the slots allocated to all receiving units that precede it, power "ON" during that time slot to receive its data, and go back to sleep for the remainder of the subframe. *Id.* at 4:67–5:6.

For inbound traffic, Natarajan similarly discloses that the base station broadcasts a header that includes an ordered list of users that will be allowed to transmit packets to the base station in the current frame and the bandwidth allocated to each. *Id.* at 5:9–19. Using the information regarding the number of packets that each user can transmit, each mobile unit can compute exactly when it should begin its transmission. *Id.* at 5:20–22. Once each mobile station computes its exact time for transmission, it can shut both its transmitter and receiver "OFF" until the designated time, and then turn "ON" and transmit for a fixed period of time whose duration depends on the number of slots allocated to it. *Id.* at 5:23–29.

b.    *Overview of Neve*

Neve is directed to a communication system able to provide multiple path communication between a plurality of stations operating on a single channel. Ex. 1004, Abst. Neve discloses that one station, which is

18

IPR2015-00369
Patent 6,128,290

physically similar to the others but operates a different stored program, may be designated the "master" station and provides synchronization signals for all of the other stations (referred to as "'slave' stations") and controls access of the stations to the single radio channel. *Id.* at 4:10–15.

According to Neve, the stations are synchronized and a cyclically repeating series of time slots is defined. *Id.* at Abst. One time slot in each cycle is reserved for the transmission of synchronization information by the master station for reception by the slave stations and for maintaining synchronization therein. *Id.* Another time slot is reserved for any slave station to transmit a message indicating that it needs to communicate to another station, such indication preferably being by transmitting its own pre-assigned address code. *Id.* The remaining time slots are used for transmitting address information and data. *Id.*

Neve discloses that when data transfer is not taking place, the described devices can enter a lower power consumption state. *Id.* at 2:13–16. The system is designed automatically to re-enter the data transfer condition when either a signal is received from the device indicative of the need to transmit data or a predetermined code signal is received by the receiver circuit indicative of the need to receive data. *Id.* at 2:19–24. Neve discloses that the receiver has very low power consumption because only the internal timing circuitry is energized continuously, whereas the rest of the receiving circuit is energized only when its assigned time slot occurs. *Id.* at 2:39–41. More particularly, the receiver circuit includes a low power timing circuit that operates to energize the rest of the receiver circuit only for the time slot in which its address may occur and for the synchronization time slot, thereby enabling it to maintain synchronization with low power

19

IPR2015-00369
Patent 6,128,290

consumption. *Id.* at 4:43–48. Neve similarly discloses that the interface circuit is arranged to energize the transmitter circuit only when transmission is required. *Id.* at 2:45–47.

### 2. Level of Ordinary Skill in the Art

We determine that no express finding with regard to the level of ordinary skill in the art is necessary in this proceeding, as the level of ordinary skill in the art is reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978).

### 3. Differences Between the Prior Art and Claims 1–4; Reasons to Combine

#### a. Uncontested Claim Limitations

The features of Natarajan and Neve are summarized above. Regarding claim 1, we have considered Apple's evidence, including Dr. Grimes's testimony (Ex. 1008 ¶¶ 89–126), presented at pages 39–59 of the Petition, and make the following findings regarding matters not disputed in DSS's Patent Owner Response:

i. Natarajan and Neve are from the same field of endeavor—wireless network communication systems (*see* Ex. 1003, Abst.; Ex. 1004, Abst.);

ii. Both Natarajan and Neve disclose a data network system for effecting coordinated operation of a plurality of electronic devices, as recited in claim 1 (*see* Ex. 1003, 1:67–68, 6:48–54, Fig. 1; Ex. 1004, 4:6–9, Fig. 9);

iii. Both Natarajan and Neve are concerned with conserving battery power of battery powered, portable, wireless

20

IPR2015-00369
Patent 6,128,290

    devices (*see* Ex. 1003, Abst., 1:16–21; Ex. 1004, 1:29–34, 2:48–59);

iv. Both Natarajan and Neve disclose a server that communicates with a plurality of "peripheral units," where each device has an RF transmitter and receiver (*see* Ex. 1003, Abst., 2:40–45, Figs. 1, 2; Ex. 1004, Abst., 3:64–66, 4:10–15, Figs. 1, 4, 5, 9);

v. Natarajan's "base station" and Neve's "master station" are "server microcomputer[s] incorporating an RF transmitter for sending commands . . . to . . . peripheral units," as recited in claim 1 (*see* Ex. 1003, 2:51–58, 3:18–21, 4:20–5:19, 6:48–54, Figs. 2, 3; Ex. 1004, 3:26–28, 3:59–63, 7:46–49, Figs. 1, 3);

vi. Neve discloses that the server unit ("master station") sends "synchronizing information" to peripheral units, as recited in claim 1 (*see* Ex. 1004, Abst., 4:10–13, Fig. 2);

vii. Natarajan's "mobile units" and Neve's "slave units" are "peripheral units which are battery powered and portable, which provide either input information from the user or output information to the user, . . . which are adapted to operate within short range of said server unit," and which "each includ[e] an RF receiver for detecting said commands and synchronizing information and including also an RF transmitter for sending input information from the user to said server microcomputer," as recited in claim 1 (*see* Ex. 1003, Abst., 1:39–43, 2:1–3, 2:48–60,

21

IPR2015-00369
Patent 6,128,290

2:65–67, 3:28–30, 3:50–51, 4:30–38, 4:67–5:2, 5:20–26, 6:17–21, 6:32–34, 6:41–44, Figs. 1–3; Ex. 1004, Abst., 1:10–15, 1:34–40, 3:59–63, 7:46–49);

viii. Neve discloses that the server ("master unit") is physically similar to the peripheral units ("slave units") but operates a different stored program (*see* Ex. 1004, 2:49–55, 4:10–15);

ix. Natarajan and Neve reduce power consumption in similar ways, by scheduling transmission time slots and having devices operate in a low power mode when they are not transmitting or receiving data (*see* Ex. 1003, Abst., 3:66–4:7; Ex, 1004, Abst., 2:35–41);

x. Natarajan and Neve each disclose "peripheral transmitters being energized in low duty cycle RF bursts at intervals determined by a code sequence," as recited in claim 1; in particular, Natarajan discloses that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)," that "the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)," and that transmission intervals are determined by a code sequence (Ex. 1003, 3:59–4:6; 6:15–33, 6:59–68, Figs. 4, 5); and Neve discloses that "[t]he slave

22

stations operate in a low power condition except during one of the other time slots when they may receive their own address, or except when they need to transmit data" (Ex. 1004, Abst.), and that the interface circuit of each device is "arranged to energise the transmitter circuit only when transmission is required" (*id.* at 2:42–47); *see also id.* at 5:60–61 (disclosing "low power duty cycle").

xi.   Neve discloses that the master station provides synchronization signals for all of the other stations (*id.* at 4:10–13, Fig. 2).

b.    *"said server . . . transmitter[] being energized in low duty cycle RF bursts"*

As reproduced in Section II.B. *supra*, claim 1 recites, *inter alia*, "said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals determined by a code sequence which is timed in relation to . . . synchronizing information." The single substantive dispute in this proceeding is whether the combination of Natarajan and Neve teaches or suggests that the recited server transmitter is energized in low duty cycle RF bursts. *See* Pet. 52–54; PO Resp. 15–33; Reply 2–18.

In its Petition, Apple cited Natarajan's disclosure that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)" and that "the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)" as evidence of Natarajan's disclosure of "low duty cycle RF bursts."

23

IPR2015-00369
Patent 6,128,290

Pet. 52–53 (citing Ex. 1003, 3:59–4:6; Ex. 1008 ¶ 115). Apple additionally cited Natarajan's disclosure of a period "for the transfer of all **bursty** data traffic in a contention mode from mobile units to base station (inbound traffic)" and Neve's disclosure that "[t]he slave stations operate in a low power condition except during one of the other time slots when they may receive their own address, or except when they need to transmit data" and that the interface circuit of each device is "arranged to energise the transmitter circuit only when transmission is required," in support of its assertion that "Natarajan and Neve each disclose that the transmitters are 'energized in low duty cycle RF bursts.'" *Id.* at 53 (citing Ex. 1003, 4:36–38; Ex. 1004, Abst., 2:42–47; Ex. 1008 ¶ 115). Apple pointed further to Figures 4 and 5 and corresponding text of Natarajan, as disclosing transmission "intervals determined by a code sequence" as recited by claim 1. *Id.* at 53–54 (citing Ex. 1003, 4:20–23, 5:9–11, 5:20–29, 8:54–62, 6:15–33, 6:59–68, Figs. 4, 5).

In response to Apple's contentions, DSS argues that Natarajan does not teach or suggest that the server transmitter is energized in low duty cycle RF bursts. PO Resp. 15. According to DSS, "[a]lthough Natarajan teaches a system for reducing power consumption in mobile units, Natarajan is silent regarding the operation of the base unit's transmitter." *Id.* at 16. "Natarajan discloses that its objective is to provide energy savings for the mobile units, but does not teach or suggest that there are any energy savings associated with operation of the base unit's transmitter," and "[f]or this reason, the base unit's transmitter could operate continuously during the time slots designated for outbound traffic without undermining the objectives of Natarajan." *Id.* at 16–17 (citing Ex. 1003, 3:59–61, 10:14–37; Ex. 2016

¶¶ 32, 38). Moreover, according to DSS, "[i]t is well understood in the art that although the base unit and mobile units may be structured similarly, the base and mobile units operate under different schemes," and accordingly, a person of ordinary skill in the art "would not have concluded that base transmitters operate the same way as the mobile units." *Id.* at 16 (citing Ex. 1004, 4:10–12; Ex. 2016 ¶ 31). DSS concludes, "Natarajan does not disclose that the server transmitter is energized in a low duty cycle," and "[t]he logical conclusion is that in the data network system disclosed in Natarajan, the base transmitter is continuously energized during the time periods designated for outbound transmissions." *Id.* at 18–19.

In further support of its arguments, DSS points to disclosure in Natarajan that serial channels in the base unit's transmitter "encapsulate data and control information in an HDLC (high-level data link control) packet structure and provide the packet in serial form to the RF transceiver 54," and contends that "HDLC involves continuous transmissions in which special bit sequences—i.e. idle words—are transmitted when no data transmission is required." PO Resp. 20–21 (quoting Ex. 1003, 3:34–37) (emphasis omitted). According to DSS, "[t]he HDLC packet structure disclosed in Natarajan is inconsistent with a server transmitter being energized in low duty cycle RF bursts," and "[i]t is well-known in the art that HDLC is an example of a bit-oriented framing that involves a continuous outbound transmission rather than operation in low duty cycle RF bursts." *Id.* at 20 (emphasis omitted). In support of that assertion, DSS quotes the following excerpt from the McGraw Hill Encyclopedia of Networking & Telecommunications: "Bit-oriented framing . . . allows the sender to transmit a long string of bits at one time. . . . The beginning and end of a frame is signaled with a special

bit sequence (01111110 for HDLC). If no data is being transmitted, this same sequence is continuously transmitted so the end systems remain synchronized." Ex. 2010, 549 (quoted at PO Resp. 20–21). According to DSS, "Natarajan's disclosure of HDLC, which is used for transmitting 'long strings of data [*sic*] at one time,' directly contradicts the requirement of claim 1 of the '290 Patent that server transmitters be energized in RF bursts." PO Resp. 21. DSS concludes, "a continuous transmission is an antithesis of RF bursts" and "protocols involving transmission of idle words in an absence of active transmissions are inconsistent with server transmitter operating in a low-duty cycle." *Id.* at 21–22.

DSS further contends that Neve does not cure the alleged deficiencies of Natarajan. PO Resp. 27–33. In particular, according to DSS, Neve does not teach or suggest that server transmitter is energized in low duty cycle RF bursts. *Id.* at 30. DSS acknowledges our finding in the Decision on Institution that Neve does not suggest continuous transmission from the master station and, accordingly, does not teach away from the server transmitter being energized in low duty cycle RF bursts. *Id.* (citing Dec. 19–20). DSS contends, however, that "during the time slots designated for outbound transmissions, '[i]f no data is currently required to be transmitted, the master station transmits idle words'" (*id.* (quoting Ex. 1004, 4:48–50)), and argues, "[i]dle words are inconsistent with server transmitter being energized in low duty cycle RF bursts" (*id.*). Again citing Natarajan's disclosure that data is encapsulated into an HDLC packet structure for the RF transceiver and Neve's disclosure of idle word transmission, DSS concludes, "[w]hen Natarajan is considered in view of Neve, it becomes even more apparent that these references, either individually or in

IPR2015-00369
Patent 6,128,290

combination, do not teach or suggest that server transmitter is energized in low duty cycle RF bursts." *Id.* at 31–32 (citing Ex. 1003, 3:33–37; Ex. 1004, 4:48–50; Ex. 2016 ¶¶ 34, 35, 45).

In reply, Apple argues that a person of ordinary skill in the art would have understood from Natarajan that, when Natarajan's base station is not transmitting, its transmitter is powered off. Reply 2–3 (citing Ex. 1003, 6:41–44; Ex. 1008 ¶¶ 27, 115–116; Ex. 1014 ("Hu Decl.") ¶¶ 44–45; Ex. 2015, 68:5–12, 74:7–19, 75:21–76:3). Apple contends, "DSS acknowledges that Natarajan explicitly discloses that the mobile unit transmitters operate in 'low duty cycle RF bursts'" (*id.* at 3 (citing PO Resp. 16; Ex. 2016 ¶ 31)), "[s]o even if not expressly taught by Natarajan, it would have been plainly obvious to a [person of ordinary skill in the art] to have the base station operate in an analogous manner" (*id.* (citing Ex. 1014 ¶ 45)). In particular, according to Apple, "[t]he 'low duty cycle RF bursts' limitation of claim 1 is not novel," and "[b]ecause the base and mobile stations have the same physical structure, this would have been no more than using a known technique to improve similar devices in the same way." *Id.* (citing Ex. 1003, 3:7–8; Ex. 1014 ¶ 45).

Apple further points out that, not only is HDLC consistent with low duty cycle RF bursts, contrary to DSS's assertions, but the preferred embodiment in the '290 patent itself utilizes the HDLC protocol. Reply 3–4. According to Apple:

> The "basic scheme" of the '290 patent's frame structure is "a form of time division multiple access (TDMA)." ([Ex. 1001], 5:45-50.) The '290 patent states that "[a]s will be ***understood by those skilled in the art***, the TDMA system is greatly facilitated by the establishment of a common frame time base between PEA and PDA." (*Id.* at 7:63-65 (emphasis added).) This is

27

IPR2015-00369
Patent 6,128,290

> accomplished using synchronization beacons (SBs). (*Id.* at 7:65-
> 67.) Before receiving the SBs, a PEA is associated with the PDA
> using a succession of Attachment Beacons (ABs), which are
> "composed of RF bursts," broadcast from the PDA to the PEAs.
> (*Id.* at 9:8-16, 9:66-10:2.) "This succession of ABs ***forms an***
> ***HDLC channel*** using bit-stuffing to delineate the beginning and
> end of a packet." (*Id.* at 10:2-4 (emphasis added).)
>
> So, the '290 patent uses HDLC to transmit and receive RF
> bursts. ([Ex. 1014] ¶¶ 48-49.) Thus, the '290 patent itself shows
> that DSS's argument is fallacious.

*Id.* at 4.

Apple additionally contends that DSS's evidence and reliance on
Mr. Dezmelyk's testimony regarding HDLC should be disregarded for at
least the following four reasons:

First, Mr. Dezmelyk admitted in his deposition that he would not say
that he is an expert in the HDLC protocol, he is not inventor on any patents
related to the HDLC protocol, he has not received any industry awards,
related to the HDLC protocol, he has never lectured on the HDLC protocol,
and this and the related district court litigation are the only matters he
recollects working on that are even related more generally to wireless
communication. Reply 5 (citing Ex. 1011, 19:10–20:4, 21:1–22, 26:15–16).

Second, Mr. Dezmelyk did not consider the most logical reference for
information on Natarajan's HDLC protocol when forming his opinions.
Reply 6. In particular, Apple points out that Natarajan—indeed, in the very
next sentence after the one quoted by DSS as evidence of Natarajan's use of
the HDLC protocol—states as follows: "For more information on the HDLC
packet structure, see, for example, Mischa Schwartz, Telecommunication
Networks: Protocols, Modeling and Analysis, Addison-Wesley (1988)."
*Id.* (quoting Ex. 1004, 3:37–40). Apple contends that "the Schwartz book

28

IPR2015-00369
Patent 6,128,290

([Ex.] 1012) is the most logical resource for a [person of ordinary skill in the the art] to consult for information on Natarajan's HDLC packet structure," and "Mr. Dezmelyk acknowledged that a [person of ordinary skill] in the art would have access to Schwartz," and "[y]et Mr. Dezmelyk never looked at Schwartz when considering how Natarajan's HDLC packet structure operates." *Id.* (citing Ex. 1011, 71:11–13; Ex. 1014 ¶ 51).

Third, Schwartz not only demonstrates that Natarajan's HDLC protocol is consistent with low duty cycle communication, but also illustrates that RF transmissions occur in "bursts." Reply 7–9 (citing Ex. 1012, 135–36 ("When the transmitter reaches its maximum sequence number it is forced to stop transmitting until a frame in the reverse direction is received, acknowledging an outstanding packet."), Figs. 4–9, 4–13 (showing periods where the transmitter is idle between frames); Ex. 1015 ¶¶ 53, 54).

Fourth, the references that DSS and Mr. Dezmelyk "piece[d] together" in support of the argument that Natarajan does not teach low duty cycle RF bursts "do not support the asserted premise." Reply 9–15. Apple argues, for example, that DSS's reliance on the cited excerpt from the Encyclopedia of Networking & Telecommunications is misplaced. *Id.* at 10. According to Apple, whereas "DSS asserts that the cited definition of 'bit-oriented framing' shows that HDLC 'involves continuous outbound transmission,'" DSS neglects to acknowledge the very first sentence of the cited section, which indicates that the excerpt "refers to point-to-point wired communication, not to a ***point-to-multipoint wireless*** system as taught in Natarajan." *Id.* (citing Ex. 1014 ¶ 56; Ex. 2010, 549). Relying on Dr. Hu's testimony, Apple contends "[t]here are fundamental differences and unique

29

IPR2015-00369
Patent 6,128,290

challenges between point-to-point wired systems and point-to-multipoint wireless systems," and "the features are not simply interchangeable." *Id.* (citing Ex. 1014 ¶¶ 57–60). For example, Apple asserts, "continuous transmission of so-called 'idle words' to maintain synchronization when there is no data to transmit" may be "suitable for an isolated point-to-point wired connection," but "would be detrimental to a point-to-multipoint wireless connection because it would interfere with the carefully designed scheduling, waste power, decrease the system data rate, and pollute the wireless channel potentially shared by many devices." *Id.* (citing Ex. 1014 ¶ 59). Apple also points out, for example, that DSS significantly misquotes the cited portion of the Encyclopedia of Networking & Telecommunications (*id.* at 11 (citing PO Resp. 21; Ex. 2010, 549)); that other portions of that same Encyclopedia—not provided by DSS either to the Board or to Mr. Dezmelyk—corroborate Schwartz's description (*id.* at 11–12 (citing Ex. 1011, 101:4–102:7; Ex. 1012, 135; Ex. 1013, 582, Fig. H-2; Ex. 1014 ¶ 62)); and that other evidence relied upon by Mr. Dezmelyk similarly fails to show that Natarajan teaches continuous transmission and underscores his misunderstanding of HDLC (*id.* at 12–15 (citing, e.g., Ex. 1011, 69:17–71:1, 99:12–20; Ex. 1014 ¶¶ 57–60, 64–68; Ex. Ex. 2013, 2; Ex. 2014 § 2.5.6, 4; Ex. 2016 ¶ 35)).

Lastly, Apple contends that "DSS's 'idle words' argument is a red herring." Reply 15 (emphasis omitted). According to Apple, Neve was included in combination with Natarajan to show that synchronizing a base station and peripheral units was well-known to those of ordinary skill in the art, not to suggest that Natarajan operates identically to Neve with respect to the latter's use of idle words. *Id.* at 15–16.

30

IPR2015-00369
Patent 6,128,290

We are persuaded by each of Apple's arguments presented above, and conclude that it would have been obvious to a person of ordinary skill in the art to energize Natarajan's server transmitter in low duty cycle RF bursts, as recited in claim 1.  We find that Natarajan is expressly concerned with "power conservation due to wireless communication," and specifically, with "battery efficient operation of wireless link adapters of mobile computers as controlled by multiaccess protocols used in wireless communication." Ex. 1003, 1:7–13.  Although Natarajan describes explicitly only mobile stations as battery-powered devices such as laptop computers, Natarajan also discloses that the base units may be "conventional microcomputer[s]" (*id.* at 2:40–41) and that the mobile units are similarly provided with the same components—e.g., RF transceiver adapter 36, including "a spread spectrum transceiver of convention design" and antenna 38, in the base station; and transceiver adapter 44, including "a spread spectrum transceiver of similar design" and antenna 42, in each mobile unit (*id.* at 2:51–3:2).  We are persuaded that a person of ordinary skill in the art would have been motivated by Natarajan to apply the same power-conserving techniques to base units as it is disclosed with respect to mobile units, as well as that it would have been within the skill of the ordinarily skilled artisan to do so. There is no persuasive evidence of record that it would have been "uniquely challenging or difficult for one of ordinary skill in the art" to do so. *See Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (citing *KSR*, 550 U.S. at 418).  Indeed, as the Court explained in *KSR*, the skilled artisan is "a person of ordinary creativity, not an automaton."  550 U.S. at 420–21.

31

We also find that Natarajan's disclosure of the HDLC protocol is consistent with Natarajan's base units being energized in low duty cycle RF bursts, as that term is properly construed.  *See supra* Section II.C.  In that regard, the Schwartz reference (Ex. 1012), which was cited by Natarajan (*see* Ex. 1003, 3:37–40), is significantly more probative of how a person of ordinary skill in the art would have understood Natarajan's reference to HDLC than the Encyclopedia of Networking & Telecommunications excerpt (Ex. 2010) cited by DSS, which, by its own terms, describes HDLC within the context of a point-to-point network.  Mr. Dezmelyk's failure to consider Schwartz or other portions of the Encyclopedia of Networking & Telecommunications beyond those specifically provided to him by DSS (*see* Ex. 1011, 71:11–73:13, 101:4–102:7, 104:9–11), as well as his admitted lack of expertise regarding the HDLC protocol (*see id.* at 19:13–20:22, 26:15–16), call into question the credibility of his opinion on HDLC.  Accordingly, we do not find persuasive the testimony of Mr. Dezmelyk on that subject.  Additionally, the employment of an HDLC channel in the preferred embodiment of the '290 patent (Ex. 1001, 10:2–4) contradicts DSS's assertion that "[t]he HDLC packet structure is inconsistent with a server transmitter being energized in low duty cycle RF bursts" (PO Resp. 20–22).

Finally, because we are not persuaded by DSS's arguments that Natarajan is deficient, we are not persuaded by DSS's arguments that Neve does not cure the alleged deficiencies of Natarajan or that the combination of Neve and Natarajan does not teach or suggest that the server transmitter is energized in low duty cycle RF bursts.  PO Resp. 27–33.  In this proceeding, Apple relies on Neve only as evidence that it was well-known and would

IPR2015-00369
Patent 6,128,290

have been obvious to those of ordinary skill in the art for a base station transmitter to send "synchronizing information" to mobile units, as recited in claim 1, which feature Apple contends is suggested but not explicitly described by Natarajan. Pet. 55–56; Reply 15–16. In contrast, Apple relies on Natarajan alone—not Neve—for the suggestion of "said server . . . transmitter[] being energized in low duty cycle RF bursts." S*ee* Pet. 52–54; Reply 1–15. Accordingly, DSS's contentions that Neve does not separately teach or suggest "said server . . . transmitter[] being energized in low duty cycle RF bursts" are unavailing. *See In re Keller*, 642 F.2d 413, 426 (CCPA 1981) ("[O]ne cannot show non-obviousness by attacking references individually where, as here, the rejections are based on combinations of references."). Moreover, "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; . . . [r]ather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art." *Id.* at 425 (citations omitted). We are not persuaded that combination of Neve's teachings on synchronizing information with Natarajan's disclosure would necessitate incorporation of Neve's use of "idle words," let alone that it would require "continuous transmission" or be "inconsistent with server transmitter being energized in low duty cycle RF bursts." PO Resp. 30–33. As we explained in our Decision on Institution, we do not find Neve to suggest continuous transmission from its master station, but instead only transmission of idle words in the event that that there is no data required to be transmitted in the time slots specifically allocated for transmission by the server. Dec. 19–20.

33

IPR2015-00369
Patent 6,128,290

### 4. Conclusion of Obviousness

As explained above, we find, based on Apple's evidence, that the combination of Natarajan and Neve teaches each limitation of claim 1. We also find, based on Apple's evidence, that a skilled artisan would have had reasons, with rational underpinning, to combine these teachings to arrive at the invention of claim 1. We have considered DSS's arguments to the contrary and find them unpersuasive. The parties do not introduce or rely on objective indicia of nonobviousness. After weighing the evidence, we conclude that Apple has shown by a preponderance of the evidence that claim 1 would have been obvious over Natarajan and Neve.

Claims 2–4 depend from claim 1. Apple introduced evidence and argument as to the obviousness of each of these claims. Pet. 56–59. We have considered the evidence in the Petition and are persuaded, for the reasons presented by Apple, that Apple has shown by a preponderance of the evidence that claims 2–4 would have been obvious over Natarajan and Neve. DSS does not present separate arguments for claims 2–4. Rather, DSS argues that these claims are patentable for the reasons given for claim 1. PO Resp. 36. As explained above, these reasons are not persuasive. By not raising them in its Patent Owner Response, DSS has waived any additional argument regarding claims 2–4. Scheduling Order, Paper 10, 3 ("The patent owner is cautioned that any arguments for patentability not raised in the response will be deemed waived."); *see also* 37 C.F.R. § 42.23(a) ("Oppositions and replies . . . must include a statement identifying material facts in dispute. Any material fact not specifically denied may be considered admitted.").

## III.  MOTION TO EXCLUDE

Apple filed a Motion to Exclude DSS's Exhibits 2003–2008, 2011–2014, and 2017.  Paper 27 ("Mot. Excl.").  DSS filed an Opposition to Apple's Motion to Exclude (Paper 32, "Opp. Mot. Excl.")), and Apple filed a Reply to DSS's Opposition (Paper 33, "Reply Mot. Excl.").

In *inter partes* review proceedings, documents are admitted into evidence subject to an opposing party asserting objections to the evidence and moving to exclude the evidence.  37 C.F.R. § 42.64.  As movant, Apple has the burden of showing that an objected-to exhibit is not admissible.  37 C.F.R. § 42.20(c).

For the reasons discussed below, we deny Apple's Motion to Exclude as to all objected-to exhibits.

### A.  Relevance

Apple seeks to exclude Exhibits 2003–2008, 2012–2014, and 2017 under Fed. R. Evid. 401 as irrelevant.  Mot. Excl. 1–10.  First, Apple argues, Exhibits 2003–2008, 2012, and 2013 all bear copyright or filing dates well after the priority date of the '290 patent and, accordingly, are not remotely or sufficiently contemporaneous with the '290 patent to be relevant for the purposes for which they are proffered.  *Id.* at 2, 4, 6, 7.  Similarly, according to Apple, "Exhibit 2017 is undated, so its relevance also cannot be established because DSS cannot show that Exhibit 2014 is sufficiently contemporaneous with the '290 patent to be relevant."  *Id.* at 10.  Second, Apple argues, DSS does not cite Exhibits 2003 and 2012–2014 in its Patent Owner Response or identify with any particularity how those exhibits are relevant to this proceeding.  *Id.* at 3, 6–9.

IPR2015-00369
Patent 6,128,290

DSS responds that Petitioner's allegations are unavailing.  Opp. Mot. Excl. 4.  DSS points out Fed. R. Evid. 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action," and that "[b]oth the Federal Circuit and the Board have recognized that there is a 'low threshold for relevancy.'"  *Id.* (citing *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1407 (Fed. Cir. 1997); *Laird Techs., Inc. v. GrafTech Int'l Holdings, Inc.*, Case IPR2014-00025, slip op. at 44 (PTAB Mar. 25, 2015) (Paper 45)).  DSS also contends that Mr. Dezmelyk—who DSS proffers as an expert witness in this matter—relies on each of the objected-to exhibits in his declaration, and therefore, this evidence is relevant for the assessment of his credibility and for establishing the context for his testimony.  *Id.* at 6.

We agree with DSS on this issue.  In this case, we determine that Apple's arguments concerning the relevance of Exhibits 2003–2008, 2012–2013, and 2017 in view of their late or uncertain dates concern the weight that we should accord to those exhibits, rather than their admissibility.  As explained in *Laird Technologies*, "[a] motion to exclude . . . is not an appropriate mechanism for challenging the sufficiency of evidence or the proper weight that should be afforded an argument."  Case IPR2014-00025, slip op. at 42 (Paper 45).  Moreover, "[o]ur general approach for considering challenges to the admissibility of evidence was outlined in *Corning Inc. v. DSM IP Assets B.V.*, Case IPR2013-00053, slip op. at 19 (PTAB May 1, 2014)," which stated that, "similar to a district court in a bench trial, the Board, sitting as a non-jury tribunal with administrative expertise, is well-positioned to determine and assign appropriate weight to evidence

36

IPR2015-00369
Patent 6,128,290

presented." *Id.* (citing *Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 224 (8th Cir. 1941) ("One who is capable of ruling accurately upon the admissibility of evidence is equally capable of sifting it accurately after it has been received . . . .")).  Further, although DSS does not appear to cite Exhibits 2003 and 2012–2014 in its Patent Owner Response, we agree with DSS that those exhibits are relevant for the assessment of Mr. Dezmelyk's credibility to the extent that he has cited them in support of his opinions.

    *B.  Hearsay*

    Apple additionally seeks to exclude each of Exhibits 2003–2008, 2011–2014, and 2017 as inadmissible hearsay under Fed. R. Evid. 801 not subject to any exception.  Mot. Excl. 1–2, 4–8, 10.

    DSS responds that each of Exhibits 2003–2008, 2011–2014, and 2017 is admissible because they are offered for what they describe to a person of ordinary skill in the art, rather than for the truth of the matters asserted in them, and "[t]he law is well established that the Board will not exclude evidence that is proffered to show what a [person of ordinary skill in the art] would have known about the relevant field of art."  Opp. Mot. Excl. 2 (citing *Liberty Mut. Ins. Co. v. Progressive Cas. Ins.*, Case CBM2012-00010 (PTAB Feb. 24, 2014) (Paper 59)).

    In its Reply to DSS's Opposition, Apple argues that DSS and Mr. Dezmelyk simply provide quotations from the objected-to exhibits, rather than offering them "for what they describe to a person of ordinary skill in the art," and, thus, offer them "exactly for the impermissible purpose of proving the truth of the matter asserted therein."  Reply Mot. Excl. 1. Moreover, according to Apple, because Exhibits 2003–2008, 2012–2014,

37

IPR2015-00369
Patent 6,128,290

and 2017 all post-date the '290 patent or are undated, those exhibits "therefore <u>cannot</u> 'show what one with ordinary skill in the art ***would have known*** about technical features and developments in the pertinent art'" at the time the invention was made. *Id.* (quoting *Liberty Mut.*, slip op. at 37 (emphasis added by Apple)) (citing 35 U.S.C. § 103(a)).

We agree with DSS on this issue, as well. Although DSS has quoted certain phrases from the references, we understand DSS to have offered each of the objected-to exhibits for the effect that they would have had on the understanding of a person of ordinary skill in the art, rather than for the truth of the matters asserted. The portion of Exhibit 2004 cited by DSS, for example, states:

> [FIG. 2(a) is a flow chart of the steps performed by the adaptive duty cycle management system shown in FIG. 1] whereby a relatively high duty cycle, e.g. 25%, is applied and FIG. 2(b) is a flow chart showing the special case steps performed by the adaptive duty cycle management system whereby a relatively low duty cycle, e.g. 2%, is applied . . . .

Ex. 2004, 4:13–16 (cited at PO Resp. 12). We understand DSS to have cited this text only for the alleged effect that the statements "high duty cycle, e.g. 25%" and "low duty cycle, e.g. 2%" would have on the ordinarily skilled reader, in support of DSS's conclusion that a person of ordinary skill in the art "would have understood that a server transmitter is energized in a low duty cycle when the server transmitter is energized for less than ten percent (10%) of the total duration designated for outbound transmissions." PO Resp. 11. Whether or not it is "true" that Figures 2(b) and 2(b) of Exhibit 2004 are flow charts of systems whereby relatively high (e.g., 25%) and low (e.g., 2%) duty cycles are applied, respectively, has no discernable bearing on DSS's conclusion. We find that a similar analysis applies with

38

IPR2015-00369
Patent 6,128,290

respect to each of the other objected-to exhibits, with respect to which DSS's conclusions do not turn on whether the described systems truly operated according to the specified duty cycles (Exs. 2003, 2005–2008) or truly transmitted data in the manner specified (Exs. 2011–2014, 2017).

*C. Conclusion*

For the foregoing reasons, Apple's Motion to Exclude Exhibits 2003–2008, 2011–2014, and 2017 is denied.

## IV.  MOTION FOR OBSERVATION

DSS filed a Motion for Observation regarding Dr. Hu's cross-examination.  Paper 29 ("Obs.").  Apple, in turn, filed a Response.  Paper 31 ("Obs. Resp.").  To the extent DSS's Motion for Observation pertains to testimony purportedly impacting Dr. Hu's credibility, we have considered DSS's observations and Apple's responses in rendering this Final Written Decision, and accorded Dr. Hu's testimony appropriate weight where necessary.  *See* Obs. 2–6; Obs. Resp. 1–5.

## V.  CONCLUSION

Apple has demonstrated by a preponderance of the evidence that claims 1–4 of the '290 patent are unpatentable under 35 U.S.C. § 103(a) over Natarajan and Neve.

## VI.  ORDER

For the reasons given, it is

ORDERED, based on a preponderance of the evidence, that claims 1–4 of U.S. Patent No. 6,128,290 are held unpatentable;

IPR2015-00369
Patent 6,128,290

FURTHER ORDERED that Apple's Motion to Exclude is DENIED; and

FURTHER ORDERED, because this is a final written decision, that the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

40

IPR2015-00369
Patent 6,128,290

For PETITIONER:

David K.S. Cornwell
Jason A. Fitzsimmons
Mark W. Rygiel
Robert Greene Sterne
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
davidc-PTAB@skgf.com
jfitzsimmons-PTAB@skgf.com
mrygiel-PTAB@skgf.com
rsterne-PTAB@skgf.com


For PATENT OWNER:

Andriy Lytvyn
Anton J. Hopen
Nicholas Pfeifer
SMITH HOPEN PA
andriy.lytvyn@smithhopen.com
anton.hopen@smithhopen.com
nicholas.pfeifer@smithhopen.com

41

Appx0041

Trials@uspto.gov
571-272-7822

Paper No. 39
Entered: June 17, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.,
Petitioner,

v.

DSS TECHNOLOGY MANAGEMENT, INC.,
Patent Owner.
_____

Case IPR2015-00373
Patent 6,128,290
_____

Before JAMESON LEE, MATTHEW R. CLEMENTS, and
CHARLES J. BOUDREAU, *Administrative Patent Judges*.

BOUDREAU, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2015-00373
Patent 6,128,290

# I. INTRODUCTION

## A. Background

Petitioner Apple Inc. ("Apple") filed a Petition (Paper 2, "Pet.") to institute *inter partes* review of claims 6, 7, 9, and 10 of U.S. Patent No. 6,128,290 to Carvey (Ex. 1001, "the '290 patent"). Patent Owner DSS Technology Management, Inc. ("DSS") filed a Preliminary Response (Paper 7, "Prelim. Resp."). On June 25, 2015, we instituted an *inter partes* review of claims 6, 7, 9, and 10 on two of three grounds of unpatentability presented in the Petition (Paper 8, "Dec.").

After institution of trial, DSS filed a Patent Owner Response (Paper 15, "PO Resp."). DSS also filed a Notice of Filing of Statutory Disclaimer, notifying us of a statutory disclaimer of claims 6 and 7 of the '290 patent, pursuant to 37 C.F.R. § 1.321(a), that DSS had filed on October 5, 2015 (Paper 18). Subsequently, Apple filed a Reply to DSS's Patent Owner Response (Paper 23, "Reply"). An oral hearing was held on March 15, 2016, and a transcript of the hearing is included in the record (Paper 38, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Based on the record before us, and for the reasons that follow, we determine that Apple has demonstrated, by a preponderance of the evidence, that each of claims 9 and 10 of the '290 patent is unpatentable. Further, because we treat DSS's statutory disclaimer of claims 6 and 7 as a request for adverse judgment as those claims (*see* 37 C.F.R. § 42.73(b); Paper 20), we additionally enter judgment against DSS with respect to claims 6 and 7 of the '290 patent.

IPR2015-00373
Patent 6,128,290

### B.  Related Matters

The '290 patent has been the subject of two district court actions: *DSS Technology Management, Inc. v. Apple, Inc.*, No. 5:14-cv-05330-LHK (N.D. Cal.), and *DSS Technology Management, Inc. v. Lenovo (United States), Inc.*, No. 6:14-cv-00525-JDL (E.D. Tex.).  Pet. 2; Paper 5, 2.  IPR2015-00369 also involves claims of the '290 patent and was argued together with this proceeding at the March 15, 2016, oral argument.

### C.  The Instituted Grounds

We instituted a trial as to claims 6, 7, 9, and 10 of the '290 patent under 35 U.S.C. § 103(a) as unpatentable over U.S. Patent No. 5,241,542 to Natarajan et al. (Ex. 1003, "Natarajan") and U.S. Patent No. 4,887,266 to Neve et al. (Ex. 1004, "Neve"); and also as to claims 6 and 7 under § 103 over U.S. Patent No. 5,696,903 to Mahany.  Dec. 11–21.  As noted in Section I.A., *supra*, DSS subsequently disclaimed claims 6 and 7, leaving only claims 9 and 10 in trial on the single ground based on Natarajan and Neve.

## II.  ANALYSIS

### A.  The '290 Patent

The '290 patent, titled "Personal Data Network," issued October 3, 2000, from U.S. Patent Application No. 08/949,999 (Ex. 1005, 22–62, "the '999 application").  The '999 application was filed October 14, 1997, as a continuation-in-part of U.S. Patent Application No. 08/611,695 (Ex. 1006, 21–61, "the '695 application"), filed March 6, 1996, which matured into

3

IPR2015-00373
Patent 6,128,290

U.S. Patent No. 5,699,357 (Ex. 2001, "the '357 patent"). *See* Ex. 1001, 1:6–8.

The '290 patent relates to a data network for bidirectional wireless data communications between a host or server microcomputer unit and a plurality of peripheral units referred to as personal electronic accessories (PEAs). Ex. 1001, 1:11–14, 2:15–18. Among the objects of the invention is the provision of a data network that requires extremely low power consumption, "particularly for the peripheral units," avoids interference from nearby similar systems, and is relatively simple and inexpensive to construct. *Id.* at 1:33–34, 1:39–45. Figure 1 of the '290 patent, reproduced below, is illustrative of the described wireless data network system.



FIG. 1

Figure 1 is a block diagram of a wireless data network system linking a server microcomputer, referred to as personal digital assistant (PDA) 11, with a plurality of peripheral units, or PEAs, 21–29. *Id.* at 2:42–44, 2:66–3:15.

4

IPR2015-00373
Patent 6,128,290

According to the '290 patent, "the server microcomputer unit and the several peripheral units which are to be linked are all in close physical proximity, e.g., within twenty meters, to establish, with very high accuracy, a common time base or synchronization." *Id.* at 1:50–54. "Using the common time base, code sequences are generated which control the operation of the several transmitters in a low duty cycle pulsed mode of operation." *Id.* at 1:57–59. "The server and peripheral unit transmitters are energized in low duty cycle pulses at intervals which are determined by a code sequence which is timed in relation to the synchronizing information initially transmitted from the server microcomputer." *Id.* at 2:35–39. "The low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals." *Id.* at 1:59–61. "In the intervals between slots in which a PEA is to transmit or receive, all receive and transmit circuits are powered down." *Id.* at 4:6–8.

*B. Illustrative Claim*

Independent claim 9 is reproduced below. Claim 10 depends directly from claim 9.

> 9. A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:
>
> a server microcomputer unit, said server unit including an oscillator for establishing a time base;
>
> a plurality of peripheral units which provide either input information from the user or output information to the user, and which are adapted to operate within about 20 meters of said server unit;
>
> said server microcomputer incorporating an RF transmitter controlled by said oscillator for sending commands and synchronizing information to said peripheral units, said synchronizing information

IPR2015-00373
Patent 6,128,290

being carried by time spaced beacons characteristic of the particular
server unit;

said peripheral units each including an RF receiver for detecting
said commands and synchronizing information and including also a
local oscillator, each of said peripheral units being operative in a first
mode to receive said beacons independently of synchronization of the
respective local oscillator when that peripheral unit is in close
proximity to said server unit and to determine from the server unit its
characteristics, each of said peripheral units being operative in a
second mode to synchronize the respective local oscillator with the
server unit oscillator, each of said peripheral units also including an
RF transmitter operative in a third mode for sending input information
from the user to said server microcomputer,

said server microcomputer including a receiver for receiving input
information transmitted from said peripheral units;

said server and peripheral transmitters being energized in low duty
cycle RF bursts at intervals with said receivers being controlled by the
respective oscillators.

Ex. 1001, 13:25–14:10.

### C. Claim Construction

The '290 patent expired on March 6, 2016, twenty years from the
filing date of the '695 application from which the '290 patent claims
priority. 35 U.S.C. § 154(a)(2). We construe expired patent claims
according to the standard applied by the district courts. *See In re Rambus
Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012). Specifically, we apply the principles
set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005)
(en banc). "In determining the meaning of the disputed claim limitation, we
look principally to the intrinsic evidence of record, examining the claim
language itself, the written description, and the prosecution history, if in
evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d

6

IPR2015-00373
Patent 6,128,290

1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).  Only those terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

The words of a claim are generally given their ordinary and customary meaning, and that is the meaning the term would have to a person of ordinary skill at the time of the invention, in the context of the entire patent including the specification.  *See Phillips*, 415 F.3d at 1312–13.  Claims are not interpreted in a vacuum but are a part of and read in light of the specification.  *See Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1116 (Fed. Cir. 1987).  Although it is improper to read a limitation from the specification into the claims (*In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993)), the claims still must be read in view of the specification of which they are a part.  *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004).

If the applicant for patent desires to be its own lexicographer, the purported definition must be set forth in either the specification or prosecution history.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).  And such a definition must be set forth with reasonable clarity, deliberateness, and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Apple asked us in its Petition to construe "local oscillator," as recited in claims 6 and 9 (Pet. 6–8); and DSS asked us in its Preliminary Response to construe "energized in low duty cycle RF bursts," also recited in claims 6 and 9 (Prelim. Resp. 19–20).  DSS proposed, in particular, that the phrase "energized in low duty cycle RF bursts" be given its plain and ordinary

7

IPR2015-00373
Patent 6,128,290

meaning, or alternatively, in the event of any ambiguity, that it should be construed as "a pulsed operation that substantially reduces power consumption and facilitates the rejection of interfering signals." *Id.* (boldface and italics omitted).

In our Decision on Institution, we concluded that it was not necessary for our determination of whether to institute *inter partes* review of the challenged claims to construe expressly either "local oscillator" or "energized in low duty cycle RF bursts." Dec. 8–9. Because the '290 patent had not yet expired at the time of our Decision on Institution, we interpreted the claims under the broadest reasonable interpretation standard. Dec. 6–7; *see* 37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012); *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1278–81 (Fed. Cir. 2015), *cert. granted sub nom. Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 890 (mem.) (2016).

Neither party now challenges our determination in the Decision on Institution that "local oscillator" does not require express construction. Based on DSS's Patent Owner Response, Apple's Reply, and the arguments presented at oral argument, however, the construction of the phrase "energized in low duty cycle RF bursts" is a central issue in this proceeding.

*"energized in low duty cycle RF bursts"*

Outside of the claims, the '290 patent recites the phrase "low duty cycle" four times, as emphasized below:

> The data network disclosed herein utilizes **low duty cycle** pulsed radio frequency energy to effect bidirectional wireless data communication between a server microcomputer unit and a plurality of peripheral units . . . . By establishing a tightly synchronized common time base between the units and by the use of sparse codes, timed in relation to the common time base,

8

IPR2015-00373
Patent 6,128,290

> low power consumption and avoidance of interference between
> nearby similar systems is obtained.

Ex. 1001, Abst.

> Using the common time base, code sequences are generated
> which control the operation of the several transmitters in a ***low
> duty cycle*** pulsed mode of operation. The ***low duty cycle*** pulsed
> operation both substantially reduces power consumption and
> facilitates the rejection of interfering signals.

Id. at 1:57–61.

> The server and peripheral unit transmitters are energized in ***low
> duty cycle*** pulses at intervals which are determined by a code
> sequence which is timed in relation to the synchronizing
> information initially transmitted from the server microcomputer.

*Id.* at 2:35–39.

In its Patent Owner Response, DSS contends that a person of ordinary
skill in the art would have understood the "duty cycle" of the server
transmitter as "the ratio of actual duration during which the server
transmitter is energized to the total duration designated for outbound
transmissions." *Id.* at 11 (emphasis omitted). DSS contends that
understanding is consistent with deposition testimony provided by Apple's
expert, Dr. Jack Duane Grimes (*Id.* at 11 (citing Ex. 2015 ("Grimes Depo.
Tr."), 41:7–9 ("The low-duty cycle refers to the ratio of the time spent
transmitting versus the time spent nontransmitting."), 31:10–12 ("Low-duty
cycle tells you that most of the time there's nothing being sent. And when
there is something being sent, that's what's called a burst."), 46:12–15
("[T]he key thing is that the burst is small—the time it takes is small relative
to the overall time that the transmitter could have been transmitting."))).
Citing both Dr. Grimes's deposition testimony and the declaration of its own
expert, Robert Dezmelyk, DSS further contends that "the duty cycle of the

9

IPR2015-00373
Patent 6,128,290

server transmitter must be calculated over the total duration designated for the outbound transmissions," and that "[t]ime slots designated for the inbound data traffic are not taken into account because the server transmitter could not have been transmitting during these time slots." *Id.* at 11–12 (citing Ex. 2015, 60:19–22; Ex. 2016 ("Dezmelyk Decl.") ¶¶ 23, 27). DSS concludes, "[u]nder the broadest reasonable interpretation, a [person of ordinary skill in the art] would have understood that a server transmitter is energized in a low duty cycle when the server transmitter is energized for less than ten percent (10%) of the total duration designated for outbound transmissions." *Id.* at 12.[1]

DSS contends the "less than ten percent" range is consistent with the Specification of the '290 patent, including an example in which "a maximum of three RF bursts can occur" for outbound transmissions in sections that each include sixty-four slots, and another example in which transmitted synchronization beacons are described as consisting of eight RF bursts spread out over 252 slots. PO Resp. 12–13 (citing Ex. 1001, 7:22–33). According to DSS, the first example results in the server transmitter being energized for 4.688% (i.e., 3/64) of the transmission period, while in the second example, the server transmitter is energized in a duty cycle of 3.175% (i.e., 8/252). *Id.* DSS also cites five patents (Exs. 2004–2008) that it contends to be the first five "relevant" results "obtained on Google Patents through the query: 'low duty cycle e.g.' & network & percent" (*id.* at 13,

---

[1] DSS and Apple both confirmed during the oral hearing that their respective claim construction proposals for "low duty cycle" would be no different under the *Phillips* standard, as opposed to the broadest reasonable interpretation standard. Tr. 28:23–29:1, 39:7–11.

IPR2015-00373
Patent 6,128,290

13 n.1, Table 1).[2]  Those patents include exemplary "low duty cycle" ranges from "e.g., 0.5 percent" (Ex. 2006, 8:3) to "e.g., at an about 10 percent . . . duty cycle" (Ex. 2008, 10:5–6).

As to the phrase "RF bursts," DSS contends that "a [person of ordinary skill in the art] would have understood the phrase 'RF bursts' to mean '*a short period of intense activity on an otherwise quiet data channel*.'"  PO Resp. 14 (citing definition of "burst" from CHAMBERS DICTIONARY OF SCI. & TECH. 155 (1999) (Ex. 2009)).  DSS asserts that this construction is consistent with Dr. Grimes's deposition testimony that "the key thing is that the burst is small—the time it takes is small relative to the overall time that the transmitter could have been transmitting" and with the '290 patent's illustration of 2 μsec burst slots.  *Id.* at 14–15 (citing Ex. 2015, 34:2–8, 46:12–15; Ex. 1001, Fig. 6).

In its Reply, Apple responds that a "low duty cycle" of a transmitter should simply be interpreted as the transmitter being designed to be on only to satisfy the data communication needs over the communication cycle of the system.  Reply 23.  According to Apple, "DSS's proposed claim construction that 'low duty cycle' is less than 10% is arbitrary and unduly narrow."  *Id.* at 21 (emphasis omitted).  Apple contends that "[t]he 'examples' that DSS cites in Table 1 are cherry-picked results from a search premised on finding examples by including 'e.g.' in the search string," that "none of these references are contemporaneous with the '290 patent's filing date," and that one of those examples even "contradicts the proposed construction of '*less than* ten percent,' providing a 'low duty cycle, e.g., *at*

---

[2] DSS does not explain its criteria for determining "relevance."

11

IPR2015-00373
Patent 6,128,290

an **about** 10 percent (10%) duty cycle.'" *Id.* at 21–22 (quoting Ex. 2008, 10:5–6). Apple also contends that the deposition testimony of DSS's expert undermines DSS's proposed construction, as "Mr. Dezmelyk admits that the term 'low duty cycle' itself does not require an upper bound at 10%." *Id.* (citing Ex. 1011 ("Dezmelyk Depo. Tr."), 78:2–6).

Apple also points out that claim 8 of the '357 patent (i.e., the parent of the '290 patent), which was cited by Mr. Dezmelyk during his deposition as further support for the "10% limit," recites "said low duty cycle pulses comprise chips within the respective code sequences such that a transmitter is enerrgized [*sic*] less than 10% of the time during an allocated time slot." Reply 22–23. According to Apple, "[b]ecause claim 8 depends ultimately from independent claim 6, it is **narrower** than the independent claim, meaning that the '357 patent contemplates a 'low duty cycle' **greater than** 10%." *Id.* at 23.

In the oral hearing, DSS retreated from insisting that "low duty cycle" should be limited to a duty cycle of "less than ten percent." While maintaining that "[l]ow duty cycle is a term of art" and that "[i]n the context of wireless communications, 10 percent is a reasonable number," DSS conceded, "there is no hard value for the numbers." Tr. 48:6–7, 48:22, 49:16–17. DSS asserted: "Anything below 10 percent is low duty cycle. Anything over 10 percent would be considered high duty cycle and—or at least it would not be considered a low duty cycle in the context of wireless communications technology." *Id.* at 50:22–25. DSS additionally suggested that a person of ordinary skill in the art would understand that, if there were more data than could be transmitted in three of sixty-four slots, the transmission of the data would be held by the transmitter for future frames,

and that "low duty cycle" operation requires "kicking off mobile units" and introducing "additional complexity and additional inefficiency," merely so that a server transmitter can be depowered for the majority of a duty cycle regardless of whether there is more data waiting to be transmitted (*see id.* at 61:13–62:2, 71:9–72:5).

As an initial matter, we understand an "RF burst" to be "a short period of intense RF transmission activity on an otherwise quiet data channel," consistent with DSS's proposal (*see* PO Resp. 14). That understanding is supported by the '290 patent and other evidence of record (*see* Ex. 1001, Fig. 1; Ex. 2009; Ex. 2015, 34:2–8, 46:12–15), and Apple does not provide any contrary argument.

Nonetheless, we are unpersuaded by DSS's arguments concerning the proper interpretation of "low duty cycle." First, we agree with Apple that the term "duty cycle" should be calculated based on the total time it takes a system to go through a cycle of communication (*see* Reply 23–24), and is not limited to "the total duration designated for outbound transmissions," as asserted by DSS (*see* PO Resp. 11) (emphasis omitted). This interpretation is consistent with the Specification. *See* Ex. 1001, 11:46–51 ("Further, the utilization of low duty cycle pulse mode transmission particularly with the employment of uncorrelated codes in a TDMA context, leads to very low power consumption since the transmitters and receivers in each PEA are powered for only a small percentage of *the total time*."). We also agree with Apple that "the data requirements for the master station to broadcast to the peripherals change[], and the data requirements for the peripherals to transmit back to the master station change over time." Tr. 9:4–8. Accordingly, we understand the "duty cycle" of a transmitter to be the

13

IPR2015-00373
Patent 6,128,290

average ratio of the durations during which the transmitter is energized to the duration of communication cycles over the course of network operation.

We also agree with Apple that "low duty cycle" should not be limited to a duty cycle of less than 10% or to any other hard limit (Reply 20–22), and instead conclude, on this record, that "energized in low duty cycle RF bursts" simply means that a transmitter is not energized continuously over the course of network operation, but is depowered during at least two time periods of each communication cycle:  first, in time slots in which the unit that includes the transmitter is assigned to receive data; and second, in time slots, if any, when the unit is assigned to transmit data but has no data to transmit.

As DSS conceded at the oral hearing, there is "no hard value" recited in the '290 patent or elsewhere on the record (Tr. 49:16–17), and we are not persuaded on this record that we should infer from the examples in the '290 patent that Applicant intended thereby to limit the meaning of "low duty cycle" to transmitting in just three of sixty-four or eight of 252 time slots reserved for transmission, or anything on that order (*see* PO Resp. 12–13). We also find that DSS's suggestions regarding "kicking off" of mobile units and introduction of "complexity" and "inefficiency" (*see* Tr. 61:13–62:2, 71:9–72:5) are inappropriate because they are new arguments raised for the first time at oral argument.  Thus, those new arguments are not considered. *See Apple Inc. v. e-Watch, Inc.*, Case IPR2015-00412, slip op. at 40–41 (PTAB May 6, 2016) (Paper 50) (declining to consider arguments raised for the first time at oral argument).

We also are not persuaded by DSS's sampling in its Patent Owner Response of five unrelated patents (i.e., Exs. 2004–2008) that, by virtue of

14

IPR2015-00373
Patent 6,128,290

their use of the abbreviation "e.g.," explicitly provide only *examples* of low duty cycles (*see* Ex. 2002 (Black's Law Dictionary, definition of "e.g.")). PO Resp. 12–13. Indeed, although there may not be any evidence of record that the definition of "duty cycle" changed in the years between the filing date of the application for the '290 patent and the filing dates of the applications that issued as Exhibits 2004–2008 (*see* Tr. 50:5–7), the fact that none of those references predates the '290 patent casts doubt upon the weight to which that evidence is entitled in showing how a person of ordinary skill in the art would have understood low duty cycle in the context of the '290 patent (*see* Reply 22).

In view of the foregoing, on the record before us, we conclude that the phrase "energized in low duty cycle RF bursts" means "energized, in short periods of intense RF transmission activity on an otherwise quiet data channel, only to the extent required to satisfy the data transmission needs over the course of a communication cycle."

### D. *Obviousness of Claims 9 and 10 over Natarajan and Neve*

Apple contends that claims 9 and 10 of the '290 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Natarajan and Neve.

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." We resolve the question of obviousness on the basis of underlying factual determinations, including: (1) the scope and content of

15

IPR2015-00373
Patent 6,128,290

the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.[3]  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

In an obviousness analysis, some reason must be shown as to why a person of ordinary skill would have combined or modified the prior art to achieve the patented invention.  *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 (Fed. Cir. 2008).  A reason to combine or modify the prior art may be found explicitly or implicitly in market forces, design incentives, the "interrelated teachings of multiple patents," "any need or problem known in the field of endeavor at the time of invention and addressed by the patent," or the background knowledge, creativity, and common sense of the person of ordinary skill.  *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–21 (2007)).

>    *1. Scope and Content of the Prior Art*
>        *a.    Overview of Natarajan*

Natarajan is directed to power conservation in wireless communication, particularly battery efficient operation of wireless link adapters of mobile computers (also referred to, *inter alia*, as battery powered computers, hand held or laptop computers, mobile units, and mobile stations) as controlled by multiaccess protocols used in wireless communication.  Ex. 1003, Abst., 1:7–13, 2:32.  Figure 2 of Natarajan is reproduced below.

---

[3] The record does not contain any evidence of secondary considerations.

IPR2015-00373
Patent 6,128,290



Figure 2 is a block diagram of a digital data communication system of the type in which Natarajan's invention is implemented, illustrating the basic components of a mobile station and a base station. *Id.* at 1:67–2:3. As depicted in Figure 2, mobile stations 10, 12, 14, and 16 communicate with gateways (i.e., base stations 26, 28) connected with server 18, via wireless transceivers adapters 36, 44. *Id.* at 2:32–39, 2:51–52, 2:58–59, 2:65–67. According to Natarajan:

> The scheduled access multiaccess protocol is implemented to effectively conserve battery power by suitable control of the state of the controller, the transmitter and receiver units at the wireless link adapter by scheduling when the adapter is in a normal running mode, or a standby mode in which power is conserved.

*Id.* at Abst.; *see also id.* at 3:66–4:1.

Natarajan discloses that "[a] desirable solution is one in which the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." *Id.* at 4:3–6.

17

IPR2015-00373
Patent 6,128,290

Natarajan further discloses that the scheduled multiaccess protocol divides time into "fixed-length frames, and frames are divided into slots." *Id.* at 4:20–23. The frames are divided into subframes for transmission of data from the base station to mobile units (outbound traffic) as well as transmission of data from mobile units to the base station (inbound traffic). *Id.* at 4:27–38. According to Natarajan, at least one slot is assigned to each mobile computer designated to communicate with the base station. *Id.* at 10:26–29. The battery power of the wireless link adapter for a given mobile computer is turned on to full power during the at least one assigned slot, and the battery power of the wireless link adapter is substantially reduced during the remaining time slots. *Id.* at 10:29–37.

With respect to outbound traffic, Natarajan discloses that the base station broadcasts a header that includes a list of mobile users that will be receiving data packets from the base station in the current frame, the order in which the mobile users will receive the data packets, and the bandwidth allocated to each user. *Id.* at 4:45–53. According to Natarajan, a mobile unit that is not included in the header from the base station can turn its receiver "OFF" for the duration of the current subframe. *Id.* at 4:64–67. Additionally, the adapter of each receiving mobile unit can compute exactly when it should be ready to receive packets from the base station by adding up the slots allocated to all receiving units that precede it, power "ON" during that time slot to receive its data, and go back to sleep for the remainder of the subframe. *Id.* at 4:67–5:6.

For inbound traffic, Natarajan similarly discloses that the base station broadcasts a header that includes an ordered list of users that will be allowed to transmit packets to the base station in the current frame and the bandwidth

18

IPR2015-00373
Patent 6,128,290

allocated to each. *Id.* at 5:9–19. Using the information regarding the number of packets that each user can transmit, each mobile unit can compute exactly when it should begin its transmission. *Id.* at 5:20–22. Once each mobile station computes its exact time for transmission, it can shut both its transmitter and receiver "OFF" until the designated time, and then turn "ON" and transmit for a fixed period of time whose duration depends on the number of slots allocated to it. *Id.* at 5:23–29.

>    b.    *Overview of Neve*

Neve is directed to a communication system able to provide multiple path communication between a plurality of stations operating on a single channel. Ex. 1004, Abst. Neve discloses that one station, which is physically similar to the others but operates a different stored program, may be designated the "master" station and provides synchronization signals for all of the other stations (referred to as "'slave' stations") and controls access of the stations to the single radio channel. *Id.* at 4:10–15.

According to Neve, the stations are synchronized and a cyclically repeating series of time slots is defined. *Id.* at Abst. One time slot in each cycle is reserved for the transmission of synchronization information by the master station for reception by the slave stations and for maintaining synchronization therein. *Id.* Another time slot is reserved for any slave station to transmit a message indicating that it needs to communicate to another station, such indication preferably being by transmitting its own pre-assigned address code. *Id.* The remaining time slots are used for transmitting address information and data. *Id.*

Neve discloses that when data transfer is not taking place, the described devices can enter a lower power consumption state. *Id.* at 2:13–

19

16. The system is designed automatically to re-enter the data transfer condition when either a signal is received from the device indicative of the need to transmit data or a predetermined code signal is received by the receiver circuit indicative of the need to receive data. *Id.* at 2:19–24. Neve discloses that the receiver has very low power consumption because only the internal timing circuitry is energized continuously, whereas the rest of the receiving circuit is energized only when its assigned time slot occurs. *Id.* at 2:39–41. More particularly, the receiver circuit includes a low power timing circuit that operates to energize the rest of the receiver circuit only for the time slot in which its address may occur and for the synchronization time slot, thereby enabling it to maintain synchronization with low power consumption. *Id.* at 4:43–48. Neve similarly discloses that the interface circuit is arranged to energize the transmitter circuit only when transmission is required. *Id.* at 2:45–47.

### 2. *Level of Ordinary Skill in the Art*

We determine that no express finding with regard to the level of ordinary skill in the art is necessary in this proceeding, as the level of ordinary skill in the art is reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978).

### 3. *Differences Between the Prior Art and Claims 9 and 10; Reasons to Combine*

#### a. *Uncontested Claim Limitations*

The features of Natarajan and Neve are summarized above. Regarding claim 9, we have considered Apple's evidence, including Dr. Grimes's testimony (Ex. 1008 ¶¶ 89–94, 124–152), presented at pages

IPR2015-00373
Patent 6,128,290

27–35 and 41–51 of the Petition, and make the following findings regarding

matters not disputed in DSS's Patent Owner Response:

i.   Natarajan and Neve are from the same field of
     endeavor—wireless network communication systems
     (*see* Ex. 1003, Abst.; Ex. 1004, Abst.);

ii.  Both Natarajan and Neve disclose a data network system
     for effecting coordinated operation of a plurality of
     electronic devices, as recited in claim 9 (*see* Ex. 1003,
     1:67–68, 6:48–54, Fig. 1; Ex. 1004, 4:6–9, Fig. 9);

iii. Both Natarajan and Neve are concerned with conserving
     battery power of battery powered, portable, wireless
     devices (*see* Ex. 1003, Abst., 1:16–21; Ex. 1004, 1:29–
     34, 2:48–59);

iv.  Both Natarajan and Neve disclose a server that includes
     an oscillator for establishing a time base (*see* Ex. 1003,
     Abst., 2:40–45, 3:18–21, 7:10–27, Figs. 1–3; Ex. 1004,
     Abst., 3:64–66, 4:10–15, 5:24–28, 6:7–14, Figs. 1, 4,
     5, 9);

v.   Natarajan's "base station" and Neve's "master station"
     are "server microcomputer[s] incorporating an RF
     transmitter controlled by [an] oscillator for sending
     commands . . . to . . . peripheral units," as recited in claim
     9 (*see* Ex. 1003, 2:51–58, 3:18–21, 4:20–5:19, 6:48–54,
     Figs. 2, 3; Ex. 1004, 3:26–28, 3:59–63, 7:46–49, Figs. 1,
     3);

21

vi. Neve discloses that the server unit ("master station") provides "synchronization signals for all of the other stations" (*see* Ex. 1004, Abst., 4:10–13, Fig. 2);

vii. Natarajan's "mobile units" and Neve's "slave units" are "peripheral units which provide either input information from the user or output information to the user, . . . are adapted to operate within about 20 meters of said server unit," and "each includ[e] an RF receiver for detecting said commands and synchronizing information and including also a local oscillator," where each of said peripheral units is operative in various modes, as recited in claim 9 (*see* Ex. 1003, Abst., 1:39–43, 2:1–3, 2:32–39, 2:58–59, 2:65–67, 3:28–30, 3:41–46, 3:50–51, 4:30–38, 4:67–5:4, 6:17–21, 6:32–34, 6:41–44, 7:17–25, Figs. 1–3; Ex. 1004, Abst., 1:10–15, 1:34–40, 3:10–14, 3:59–63, 4:6–9, 4:38–43, 5:24–28, 6:7–14, 7:46–49, Figs. 4, 5);

viii. Neve discloses that the server ("master unit") is physically similar to the peripheral units ("slave units") but operates a different stored program (*see* Ex. 1004, 4:10–15, Fig. 9);

ix. Natarajan and Neve disclose that the server unit includes a receiver for receiving input information transmitted from the mobile units (*see* Ex. 1003, 2:51–59, 5:9–15, Figs. 2, 3; Ex. 1004, 3:59–63; 7:31–34, Figs. 1, 3);

x. Natarajan and Neve reduce power consumption in similar ways, by scheduling transmission time slots and having

22

devices operate in a low power mode when they are not transmitting or receiving data (*see* Ex. 1003, Abst., 3:66–4:7; Ex, 1004, Abst., 2:35–41);

xi. Natarajan and Neve each disclose "peripheral transmitters being energized in low duty cycle RF bursts," as recited in claim 9; in particular, Natarajan discloses that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)" and that "the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)" (*see* Ex. 1003, 3:66–4:6; 6:15–33, 6:59–68, Figs. 4, 5); and Neve discloses that "[t]he slave stations operate in a low power condition except during one of the other time slots when they may receive their own address, or except when they need to transmit data" (*see* Ex. 1004, Abst.), and that the interface circuit of each device is "arranged to energise the transmitter circuit only when transmission is required" (*see id.* at 2:42–47); *see also id.* at 5:60–61 (disclosing "low power duty cycle").

23

IPR2015-00373
Patent 6,128,290

> b.    *"said server . . . transmitter[] being energized in low*
> *duty cycle RF bursts"*

As reproduced in Section II.B. *supra*, claim 9 recites, *inter alia*, "said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals with said receivers being controlled by the respective oscillators."  The single substantive dispute in this proceeding is whether the combination of Natarajan and Neve teaches or suggests that the recited server transmitter is energized in low duty cycle RF bursts.  *See* PO Resp. 16–36; Reply 2–19.

In its Petition, Apple cited Natarajan's disclosure that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)" and that "the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)" as evidence of Natarajan's disclosure of "low duty cycle RF bursts."  Pet. 50 (citing Ex. 1003, 3:66–4:6; Ex. 1008 ¶ 150).  Apple additionally cited Natarajan's disclosure of a period "for the transfer of all ***bursty*** data traffic in a contention mode from mobile units to base station (inbound traffic)" and Neve's disclosure that "[t]he slave stations operate in a low power condition except during one of the other time slots when they may receive their own address, or except when they need to transmit data" and that the interface circuit of each device is "arranged to energise the transmitter circuit only when transmission is required," in support of its assertion that "Natarajan and Neve each disclose that the transmitters are 'energized in low duty cycle RF bursts.'"  *Id.* (citing Ex. 1003, 4:36–38; Ex. 1004, Abst., 2:42–47;

24

Ex. 1008 ¶ 150).  Apple pointed further to portions of Natarajan and Neve as disclosing that the devices each include an "oscillator," as recited by claim 9.  *Id.* at 50–51 (citing Ex. 1003, 7:17–25; Ex. 1004, 5:24–28, 6:7–14, Figs. 4, 5; Ex. 1008 ¶ 151).

In response to Apple's contentions, DSS argues that Natarajan does not teach or suggest that the server transmitter is energized in low duty cycle RF bursts.  PO Resp. 16.  According to DSS, "[a]lthough Natarajan teaches a system for reducing power consumption in mobile units, Natarajan is silent regarding the operation of the base unit's transmitter."  *Id.* at 17.  "Natarajan discloses that its objective is to provide energy savings for the mobile units, but does not teach or suggest that there are any energy savings associated with operation of the base unit's transmitter," and "[f]or this reason, the base unit's transmitter could operate continuously during the time slots designated for outbound traffic without undermining the objectives of Natarajan."  *Id.* at 17–18 (citing Ex. 1003, 3:59–61, 10:14–37; Ex. 2016 ¶¶ 32, 38).  Moreover, according to DSS, "[i]t is well understood in the art that although the base unit and mobile units may be structured similarly, the base and mobile units operate under different schemes," and accordingly, a person of ordinary skill in the art "would not have concluded that base transmitters operate the same way as the mobile units."  *Id.* at 17 (citing Ex. 1004, 4:10–12; Ex. 2016 ¶ 31).  DSS concludes, "Natarajan does not disclose that the server transmitter is energized in a low duty cycle," and "[t]he logical conclusion is that in the data network system disclosed in Natarajan, the base transmitter is continuously energized during the time periods designated for outbound transmissions."  *Id.* at 19.

25

IPR2015-00373
Patent 6,128,290

In further support of its arguments, DSS points to disclosure in Natarajan that serial channels in the base unit's transmitter "encapsulate data and control information in an HDLC (high-level data link control) packet structure and provide the packet in serial form to the RF transceiver 54," and contends that "HDLC involves continuous transmissions in which special bit sequences—i.e. idle words—are transmitted when no data transmission is required." PO Resp. 21–22 (quoting Ex. 1003, 3:34–37) (emphasis omitted). According to DSS, "[t]he HDLC packet structure disclosed in Natarajan is inconsistent with a server transmitter being energized in low duty cycle RF bursts," and "[i]t is well-known in the art that HDLC is an example of a bit-oriented framing that involves a continuous outbound transmission rather than operation in low duty cycle RF bursts." Id. at 20–21 (emphasis omitted). In support of that assertion, DSS quotes the following excerpt from the McGraw Hill Encyclopedia of Networking & Telecommunications: "Bit-oriented framing . . . allows the sender to transmit a long string of bits at one time. . . . The beginning and end of a frame is signaled with a special bit sequence (01111110 for HDLC). If no data is being transmitted, this same sequence is continuously transmitted so the end systems remain synchronized." Ex. 2010, 549 (quoted at PO Resp. 21–22). According to DSS, "Natarajan's disclosure of HDLC, which is used for transmitting 'long strings of data [sic] at one time,' directly contradicts the requirement of claim 9 of the '290 Patent that server transmitters be energized in RF bursts." PO Resp. 22. DSS concludes, "a continuous transmission is an antithesis of RF bursts" and "protocols involving transmission of idle words in an absence of active transmissions are inconsistent with server transmitter operating in a low-duty cycle." Id. at 22–23.

DSS further contends that Neve does not cure the alleged deficiencies of Natarajan.  PO Resp. 27–33.  In particular, according to DSS, Neve does not teach or suggest that server transmitter is energized in low duty cycle RF bursts.  *Id.* at 30.  DSS acknowledges our finding in the Decision on Institution that Neve does not suggest continuous transmission from the master station and, accordingly, does not teach away from the server transmitter being energized in low duty cycle RF bursts.  *Id.*; *see* Dec. 18. DSS contends, however, that "during the time slots designated for outbound transmissions, '[i]f no data is currently required to be transmitted, the master station transmits idle words'" (*id.* (quoting Ex. 1004, 4:48–50)), and argues, "[i]dle words are inconsistent with server transmitter being energized in low duty cycle RF bursts" (*id.*).  Again citing Natarajan's disclosure that data is encapsulated into an HDLC packet structure for the RF transceiver and Neve's disclosure of idle word transmission, DSS concludes, "[w]hen Natarajan is considered in view of Neve, it becomes even more apparent that these references, either individually or in combination, do not teach or suggest that server transmitter is energized in low duty cycle RF bursts." *Id.* at 31–32 (citing Ex. 1003, 3:33–37; Ex. 1004, 4:48–50; Ex. 2016 ¶¶ 34, 35, 45).

In reply, Apple argues that a person of ordinary skill in the art would have understood from Natarajan that, when Natarajan's base station is not transmitting, its transmitter is powered off.  Reply 3 (citing Ex. 1003, 6:41–44; Ex. 1008 ¶¶ 27, 115–116; Ex. 1014 ("Hu Decl.") ¶¶ 44–45; Ex. 2015, 68:5–12, 74:7–19, 75:21–76:3).  Apple contends, "DSS acknowledges that Natarajan explicitly discloses that the mobile unit transmitters operate in 'low duty cycle RF bursts'" (*id.* at 4 (citing PO Resp. 17; Ex. 2016 ¶ 31)),

IPR2015-00373
Patent 6,128,290

"[s]o even if not expressly taught by Natarajan, it would have been plainly

obvious to a [person of ordinary skill in the art] to have the base station

operate in an analogous manner" (*id.* (citing Ex. 1014 ¶ 45)).  In particular,

according to Apple, "[t]he 'low duty cycle RF bursts' limitation of claim 9 is

not novel," and "[b]ecause the base and mobile stations have the same

physical structure, this would have been no more than using a known

technique to improve similar devices in the same way."  *Id.* (citing Ex. 1003,

3:7–8; Ex. 1014 ¶ 45).

Apple further points out that, not only is HDLC consistent with low

duty cycle RF bursts, contrary to DSS's assertions, but the preferred

embodiment in the '290 patent itself utilizes the HDLC protocol.  Reply 4–5.

According to Apple:

> The "basic scheme" of the '290 patent's frame structure is
> "a form of time division multiple access (TDMA)." ([Ex. 1001],
> 5:45-50.)  The '290 patent states that "[a]s will be ***understood by
> those skilled in the art***, the TDMA system is greatly facilitated
> by the establishment of a common frame time base between PEA
> and PDA."  (*Id*. at 7:63-65 (emphasis added).)  This is
> accomplished using synchronization beacons (SBs).  (*Id*. at 7:65-
> 67.)  Before receiving the SBs, a PEA is associated with the PDA
> using a succession of Attachment Beacons (ABs), which are
> "composed of RF bursts," broadcast from the PDA to the PEAs.
> (*Id*. at 9:8-16, 9:66-10:2.)  "This succession of ABs ***forms an
> HDLC channel*** using bit-stuffing to delineate the beginning and
> end of a packet."  (*Id*. at 10:2-4 (emphasis added).)
>
> So, the '290 patent uses HDLC to transmit and receive RF
> bursts. ([Ex. 1014] ¶¶ 48-49.)  Thus, the '290 patent itself shows
> that DSS's argument is fallacious.

*Id.* at 5.

IPR2015-00373
Patent 6,128,290

Apple additionally contends that DSS's evidence and reliance on Mr. Dezmelyk's testimony regarding HDLC should be disregarded for at least the following four reasons:

First, Mr. Dezmelyk admitted in his deposition that he would not say that he is an expert in the HDLC protocol, he is not inventor on any patents related to the HDLC protocol, he has not received any industry awards, related to the HDLC protocol, he has never lectured on the HDLC protocol, and this and the related district court litigation are the only matters he recollects working on that are even related more generally to wireless communication. Reply 6 (citing Ex. 1011, 19:10–20:4, 21:1–22, 26:15–16).

Second, Mr. Dezmelyk did not consider the most logical reference for information on Natarajan's HDLC protocol when forming his opinions. Reply 7. In particular, Apple points out that Natarajan—indeed, in the very next sentence after the one quoted by DSS as evidence of Natarajan's use of the HDLC protocol—states as follows: "For more information on the HDLC packet structure, see, for example, Mischa Schwartz, Telecommunication Networks: Protocols, Modeling and Analysis, Addison-Wesley (1988)." *Id.* (quoting Ex. 1004, 3:37–40). Apple contends that "the Schwartz book ([Ex.] 1012) is the most logical resource for a [person of ordinary skill in the art] to consult for information on Natarajan's HDLC packet structure," and "Mr. Dezmelyk acknowledged that a [person of ordinary skill in the art] would have access to Schwartz," and "[y]et Mr. Dezmelyk never looked at Schwartz when considering how Natarajan's HDLC packet structure operates." *Id.* (citing Ex. 1011, 71:11–13; Ex. 1014 ¶ 51).

Third, Schwartz not only demonstrates that Natarajan's HDLC protocol is consistent with low duty cycle communication, but also

29

IPR2015-00373
Patent 6,128,290

illustrates that RF transmissions occur in "bursts."  Reply 8–10 (citing

Ex. 1012, 135–36 ("When the transmitter reaches its maximum sequence

number it is forced to stop transmitting until a frame in the reverse direction

is received, acknowledging an outstanding packet."), Figs. 4–9, 4–13

(showing periods where the transmitter is idle between frames); Ex. 1015

¶¶ 53, 54).

Fourth, the references that DSS and Mr. Dezmelyk "piece[d]"

together" in support of the argument that Natarajan does not teach low duty

cycle RF bursts "do not support the asserted premise."  Reply 10–16.  Apple

argues, for example, that DSS's reliance on the cited excerpt from the

Encyclopedia of Networking & Telecommunications is misplaced.  *Id.* at 11.

According to Apple, whereas "DSS asserts that the cited definition of 'bit-

oriented framing' shows that HDLC 'involves continuous outbound

transmission,'" DSS neglects to acknowledge the very first sentence of the

cited section, which indicates that the excerpt "refers to point-to-point wired

communication, not to a ***point-to-multipoint wireless*** system as taught in

Natarajan."  *Id.* (citing Ex. 1014 ¶ 56; Ex. 2010, 549).  Relying on Dr. Hu's

testimony, Apple contends "[t]here are fundamental differences and unique

challenges between point-to-point wired systems and point-to-multipoint

wireless systems," and "the features are not simply interchangeable."

*Id.* (citing Ex. 1014 ¶¶ 57–60).  For example, Apple asserts, "continuous

transmission of so-called 'idle words' to maintain synchronization when

there is no data to transmit" may be "suitable for an isolated point-to-point

wired connection," but "would be detrimental to a point-to-multipoint

wireless connection because it would interfere with the carefully designed

scheduling, waste power, decrease the system data rate, and pollute the

30

IPR2015-00373
Patent 6,128,290

wireless channel potentially shared by many devices." *Id.* (citing Ex. 1014 ¶ 59). Apple also points out, for example, that DSS significantly misquotes the cited portion of the Encyclopedia of Networking & Telecommunications (*id.* at 12 (citing PO Resp. 22; Ex. 2010, 549)); that other portions of that same Encyclopedia—not provided by DSS either to the Board or to Mr. Dezmelyk—corroborate Schwartz's description (*id.* at 12–13 (citing Ex. 1011, 101:4–102:7; Ex. 1012, 135; Ex. 1013, 582, Fig. H-2; Ex. 1014 ¶ 62)); and that other evidence relied upon by Mr. Dezmelyk similarly fails to show that Natarajan teaches continuous transmission and underscores his misunderstanding of HDLC (*id.* at 13–15 (citing, e.g., Ex. 1011, 69:17–71:1, 99:12–20; Ex. 1014 ¶¶ 57–60, 64–68; Ex. Ex. 2013, 2; Ex. 2014 § 2.5.6, 4; Ex. 2016 ¶ 35)).

Lastly, Apple contends that "DSS's 'idle words' argument is a red herring." Reply 16 (emphasis omitted). According to Apple, Neve was included in combination with Natarajan to show that synchronizing a base station and peripheral units was well-known to those of ordinary skill in the art, not to suggest that Natarajan operates identically to Neve with respect to the latter's use of idle words. *Id.* at 17.

We are persuaded by each of Apple's arguments presented above, and conclude that it would have been obvious to a person of ordinary skill in the art to energize Natarajan's server transmitter in low duty cycle RF bursts, as recited in claim 9. We find that Natarajan is expressly concerned with "power conservation due to wireless communication," and specifically, with "battery efficient operation of wireless link adapters of mobile computers as controlled by multiaccess protocols used in wireless communication." Ex. 1003, 1:7–13. Although Natarajan describes explicitly only mobile stations

31

IPR2015-00373
Patent 6,128,290

as battery-powered devices such as laptop computers, Natarajan also discloses that the base units may be "conventional microcomputer[s]" (*id.* at 2:40–41) and that the mobile units are similarly provided with the same components—e.g., RF transceiver adapter 36, including "a spread spectrum transceiver of convention design" and antenna 38, in the base station; and transceiver adapter 44, including "a spread spectrum transceiver of similar design" and antenna 42, in each mobile unit (*id.* at 2:51–3:2).  We are persuaded that a person of ordinary skill in the art would have been motivated by Natarajan to apply the same power-conserving techniques to base units as it is disclosed with respect to mobile units, as well as that it would have been within the skill of the ordinarily skilled artisan to do so.  There is no persuasive evidence of record that it would have been "uniquely challenging or difficult for one of ordinary skill in the art" to do so.  *See Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (citing *KSR*, 550 U.S. at 418).  Indeed, as the Court explained in *KSR*, the skilled artisan is "a person of ordinary creativity, not an automaton." 550 U.S. at 420–21.

We also find that Natarajan's disclosure of the HDLC protocol is consistent with Natarajan's base units being energized in low duty cycle RF bursts, as that term is properly construed.  *See supra* Section II.C.  In that regard, the Schwartz reference (Ex. 1012), which was cited by Natarajan (*see* Ex. 1003, 3:37–40), is significantly more probative of how a person of ordinary skill in the art would have understood Natarajan's reference to HDLC than the Encyclopedia of Networking & Telecommunications excerpt (Ex. 2010) cited by DSS, which, by its own terms, describes HDLC within the context of a point-to-point network.  Mr. Dezmelyk's failure to consider

32

IPR2015-00373
Patent 6,128,290

Schwartz or other portions of the Encyclopedia of Networking &
Telecommunications beyond those specifically provided to him by DSS (*see*
Ex. 1011, 71:11–73:13, 101:4–102:7, 104:9–11), as well as his admitted lack
of expertise regarding the HDLC protocol (*see id.* at 19:13–20:22, 26:15–
16), call into question the credibility of his opinion on HDLC. Accordingly,
we do not find persuasive the testimony of Mr. Dezmelyk on that subject.
Additionally, the employment of an HDLC channel in the preferred
embodiment of the '290 patent (Ex. 1001, 10:2–4) contradicts DSS's
assertion that "[t]he HDLC packet structure is inconsistent with a server
transmitter being energized in low duty cycle RF bursts" (PO Resp. 20–22).

Finally, because we are not persuaded by DSS's arguments that
Natarajan is deficient, we are not persuaded by DSS's arguments that Neve
does not cure the alleged deficiencies of Natarajan or that the combination of
Neve and Natarajan does not teach or suggest that the server transmitter is
energized in low duty cycle RF bursts. PO Resp. 27–33. In this proceeding,
Apple relies on Neve only as evidence that it was well-known and would
have been obvious to those of ordinary skill in the art for a base station
transmitter to send "synchronizing information" to mobile units, as recited in
claim 9, which feature Apple contends is suggested but not explicitly
described by Natarajan. Pet. 28–29, 40, 44; Reply 16. In contrast, Apple
relies on Natarajan alone—not Neve—for the suggestion of "said server . . .
transmitter[] being energized in low duty cycle RF bursts." S*ee* Pet. 50–51;
Reply 2–16. Accordingly, DSS's contentions that Neve does not separately
teach or suggest "said server . . . transmitter[] being energized in low duty
cycle RF bursts" are unavailing. *See In re Keller*, 642 F.2d 413, 426 (CCPA
1981) ("[O]ne cannot show non-obviousness by attacking references

IPR2015-00373
Patent 6,128,290

individually where, as here, the rejections are based on combinations of references."). Moreover, "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; . . . [r]ather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art." *Id.* at 425 (citations omitted). We are not persuaded that combination of Neve's teachings on synchronizing information with Natarajan's disclosure would necessitate incorporation of Neve's use of "idle words," let alone that it would require "continuous transmission" or be "inconsistent with server transmitter being energized in low duty cycle RF bursts." PO Resp. 30–33. As we explained in our Decision on Institution, we do not find Neve to suggest continuous transmission from its master station, but instead only transmission of idle words in the event that that there is no data required to be transmitted in the time slots specifically allocated for transmission by the server. Dec. 18.

### 4. *Conclusion of Obviousness*

As explained above, we find, based on Apple's evidence, that the combination of Natarajan and Neve teaches each limitation of claim 9. We also find, based on Apple's evidence, that a skilled artisan would have had reasons, with rational underpinning, to combine these teachings to arrive at the invention of claim 9. We have considered DSS's arguments to the contrary and find them unpersuasive. The parties do not introduce or rely on objective indicia of nonobviousness. After weighing the evidence, we conclude that Apple has shown by a preponderance of the evidence that claim 9 would have been obvious over Natarajan and Neve.

IPR2015-00373
Patent 6,128,290

Claim 10 depends from claim 9.  Apple introduced evidence and argument as to the obviousness of claim 10.  Pet. 41, 51.  We have considered the evidence in the Petition and are persuaded, for the reasons presented by Apple, that Apple has shown by a preponderance of the evidence that claim 10 would have been obvious over Natarajan and Neve. DSS does not present separate arguments for claim 10.  Rather, DSS argues that claim 10 is patentable for the reasons given for claim 9.  PO Resp. 36. As explained above, these reasons are not persuasive.  By not raising them in its Patent Owner Response, DSS has waived any additional argument regarding claim 10.  Scheduling Order, Paper 9, 3 ("The patent owner is cautioned that any arguments for patentability not raised in the response will be deemed waived."); *see also* 37 C.F.R. § 42.23(a) ("Oppositions and replies . . . must include a statement identifying material facts in dispute. Any material fact not specifically denied may be considered admitted.").

## III.  MOTION TO EXCLUDE

Apple filed a Motion to Exclude DSS's Exhibits 2003–2008, 2011–2014, and 2017.  Paper 26 ("Mot. Excl.").  DSS filed an Opposition to Apple's Motion to Exclude (Paper 31, "Opp. Mot. Excl.")), and Apple filed a Reply to DSS's Opposition (Paper 32, "Reply Mot. Excl.").

In *inter partes* review proceedings, documents are admitted into evidence subject to an opposing party asserting objections to the evidence and moving to exclude the evidence.  37 C.F.R. § 42.64.  As movant, Apple has the burden of showing that an objected-to exhibit is not admissible. 37 C.F.R. § 42.20(c).

35

IPR2015-00373
Patent 6,128,290

For the reasons discussed below, we deny Apple's Motion to Exclude as to all objected-to exhibits.

A. *Relevance*

Apple seeks to exclude Exhibits 2003–2008, 2012–2014, and 2017 under Fed. R. Evid. 401 as irrelevant. Mot. Excl. 1–10. First, Apple argues, Exhibits 2003–2008, 2012, and 2013 all bear copyright or filing dates well after the priority date of the '290 patent and, accordingly, are not remotely or sufficiently contemporaneous with the '290 patent to be relevant for the purposes for which they are proffered. *Id.* at 2, 4, 6, 7. Similarly, according to Apple, "Exhibit 2017 is undated, so its relevance also cannot be established because DSS cannot show that Exhibit 2014 is sufficiently contemporaneous with the '290 patent to be relevant." *Id.* at 10. Second, Apple argues, DSS does not cite Exhibits 2003 and 2012–2014 in its Patent Owner Response or identify with any particularity how those exhibits are relevant to this proceeding. *Id.* at 3, 6–9.

DSS responds that Petitioner's allegations are unavailing. Opp. Mot. Excl. 4. DSS points out Fed. R. Evid. 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action," and that "[b]oth the Federal Circuit and the Board have recognized that there is a 'low threshold for relevancy.'" *Id.* (citing *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1407 (Fed. Cir. 1997); *Laird Techs., Inc. v. GrafTech Int'l Holdings, Inc.*, Case IPR2014-00025, slip op. at 44 (PTAB Mar. 25, 2015) (Paper 45)). DSS also contends that Mr. Dezmelyk—who DSS proffers as an expert witness in this matter—relies on

36

IPR2015-00373
Patent 6,128,290

each of the objected-to exhibits in his declaration, and therefore, this evidence is relevant for the assessment of his credibility and for establishing the context for his testimony.  *Id.* at 6.

We agree with DSS on this issue.  In this case, we determine that Apple's arguments concerning the relevance of Exhibits 2003–2008, 2012–2013, and 2017 in view of their late or uncertain dates concern the weight that we should accord to those exhibits, rather than their admissibility.  As explained in *Laird Technologies*, "[a] motion to exclude . . . is not an appropriate mechanism for challenging the sufficiency of evidence or the proper weight that should be afforded an argument."  Case IPR2014-00025, slip op. at 42 (Paper 45).  Moreover, "[o]ur general approach for considering challenges to the admissibility of evidence was outlined in *Corning Inc. v. DSM IP Assets B.V.*, Case IPR2013-00053, slip op. at 19 (PTAB May 1, 2014)," which stated that, "similar to a district court in a bench trial, the Board, sitting as a non-jury tribunal with administrative expertise, is well-positioned to determine and assign appropriate weight to evidence presented."  *Id.* (citing *Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 224 (8th Cir. 1941) ("One who is capable of ruling accurately upon the admissibility of evidence is equally capable of sifting it accurately after it has been received . . . .")).  Further, although DSS does not appear to cite Exhibits 2003 and 2012–2014 in its Patent Owner Response, we agree with DSS that those exhibits are relevant for the assessment of Mr. Dezmelyk's credibility to the extent that he has cited them in support of his opinions.

IPR2015-00373
Patent 6,128,290

### B. Hearsay

Apple additionally seeks to exclude each of Exhibits 2003–2008, 2011–2014, and 2017 as inadmissible hearsay under Fed. R. Evid. 801 not subject to any exception.  Mot. Excl. 1–2, 4–8, 10.

DSS responds that each of Exhibits 2003–2008, 2011–2014, and 2017 is admissible because they are offered for what they describe to a person of ordinary skill in the art, rather than for the truth of the matters asserted in them, and "[t]he law is well established that the Board will not exclude evidence that is proffered to show what a [person of ordinary skill in the art] would have known about the relevant field of art."  Opp. Mot. Excl. 2 (citing *Liberty Mut. Ins. Co. v. Progressive Cas. Ins.*, Case CBM2012-00010 (PTAB Feb. 24, 2014) (Paper 59)).

In its Reply to DSS's Opposition, Apple argues that DSS and Mr. Dezmelyk simply provide quotations from the objected-to exhibits, rather than offering them "for what they describe to a person of ordinary skill in the art," and, thus, offer them "exactly for the impermissible purpose of proving the truth of the matter asserted therein."  Reply Mot. Excl. 1. Moreover, according to Apple, because Exhibits 2003–2008, 2012–2014, and 2017 all post-date the '290 patent or are undated, those exhibits "therefore <u>cannot</u> 'show what one with ordinary skill in the art *would have known* about technical features and developments in the pertinent art'" at the time the invention was made.  *Id.* (quoting *Liberty Mut.*, slip op. at 37 (emphasis added by Apple)) (citing 35 U.S.C. § 103(a)).

We agree with DSS on this issue, as well.  Although DSS has quoted certain phrases from the references, we understand DSS to have offered each of the objected-to exhibits for the effect that they would have had on the

38

IPR2015-00373
Patent 6,128,290

understanding of a person of ordinary skill in the art, rather than for the truth of the matters asserted.  The portion of Exhibit 2004 cited by DSS, for example, states:

> [FIG. 2(a) is a flow chart of the steps performed by the adaptive duty cycle management system shown in FIG. 1] whereby a relatively high duty cycle, e.g. 25%, is applied and FIG. 2(b) is a flow chart showing the special case steps performed by the adaptive duty cycle management system whereby a relatively low duty cycle, e.g. 2%, is applied . . . .

Ex. 2004, 4:13–16 (cited at PO Resp. 13).  We understand DSS to have cited this text only for the alleged effect that the statements "high duty cycle, e.g. 25%" and "low duty cycle, e.g. 2%" would have on the ordinarily skilled reader, in support of DSS's conclusion that a person of ordinary skill in the art "would have understood that a server transmitter is energized in a low duty cycle when the server transmitter is energized for less than ten percent (10%) of the total duration designated for outbound transmissions." PO Resp. 12.  Whether or not it is "true" that Figures 2(b) and 2(b) of Exhibit 2004 are flow charts of systems whereby relatively high (e.g., 25%) and low (e.g., 2%) duty cycles are applied, respectively, has no discernable bearing on DSS's conclusion.  We find that a similar analysis applies with respect to each of the other objected-to exhibits, with respect to which DSS's conclusions do not turn on whether the described systems truly operated according to the specified duty cycles (Exs. 2003, 2005–2008) or truly transmitted data in the manner specified (Exs. 2011–2014, 2017).

## C.  Conclusion

For the foregoing reasons, Apple's Motion to Exclude Exhibits 2003–2008, 2011–2014, and 2017 is denied.

39

IPR2015-00373
Patent 6,128,290

## IV.  MOTION FOR OBSERVATION

DSS filed a Motion for Observation regarding Dr. Hu's cross-examination.  Paper 28 ("Obs.").  Apple, in turn, filed a Response.  Paper 30 ("Obs. Resp.").  To the extent DSS's Motion for Observation pertains to testimony purportedly impacting Dr. Hu's credibility, we have considered DSS's observations and Apple's responses in rendering this Final Written Decision, and accorded Dr. Hu's testimony appropriate weight where necessary.  *See* Obs. 2–6; Obs. Resp. 1–5.

## V.  CONCLUSION

Apple has demonstrated by a preponderance of the evidence that claims 9 and 10 of the '290 patent are unpatentable under 35 U.S.C. § 103(a) over Natarajan and Neve.

## VI.  ORDER

For the reasons given, it is

ORDERED, based on a preponderance of the evidence, that claims 9 and 10 of U.S. Patent No. 6,128,290 are held unpatentable;

FURTHER ORDERED that judgment is entered against DSS with respect to claims 6 and 7 of U.S. Patent No. 6,128,290;

FURTHER ORDERED that Apple's Motion to Exclude is DENIED; and

FURTHER ORDERED, because this is a final written decision, that the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

40

IPR2015-00373
Patent 6,128,290

For PETITIONER:

David K.S. Cornwell
Mark W. Rygiel
Robert Greene Sterne
Jason A. Fitzsimmons
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
davidc-PTAB@skgf.com
mrygiel-PTAB@skgf.com
rsterne-PTAB@skgf.com
jfitzsimmons-PTAB@skgf.com


For PATENT OWNER:

Andriy Lytvyn
Anton J. Hopen
Nicholas Pfeifer
SMITH HOPEN PA
andriy.lytvyn@smithhopen.com
anton.hopen@smithhopen.com
nicholas.pfeifer@smithhopen.com



US006128290A

# United States Patent [19]

## Carvey

| [11] | Patent Number: | 6,128,290 |
| [45] | Date of Patent: | *Oct. 3, 2000 |

[54] **PERSONAL DATA NETWORK**

[75] Inventor: **Philip P. Carvey**, Bedford, Mass.

[73] Assignee: **BBN Corporation**, Cambridge, Mass.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/949,999**

[22] Filed: **Oct. 14, 1997**

**Related U.S. Application Data**

[63] Continuation-in-part of application No. 08/611,695, Mar. 6, 1996, Pat. No. 5,699,357.

[51] Int. Cl.⁷ ............................................. **H04B 7/212**
[52] U.S. Cl. .......................... **370/347**; 370/350; 370/442; 370/509; 455/89; 364/708.1
[58] Field of Search ................................... 370/347, 350, 370/442, 509, 512; 455/89; 364/708.1

[56] **References Cited**

U.S. PATENT DOCUMENTS

5,247,285   9/1993   Yokota et al. ........................... 361/680

| | | | |
|---|---|---|---|
| 5,297,142 | 3/1994 | Paggeot et al. | 370/461 |
| 5,307,297 | 4/1994 | Iguchi et al. | 364/708.1 |
| 5,371,734 | 12/1994 | Fischer | 370/311 |
| 5,481,265 | 1/1996 | Russell | 341/22 |
| 5,517,505 | 5/1996 | Buchholz et al. | 370/350 |
| 5,598,419 | 1/1997 | Weigand et al. | 370/514 |

*Primary Examiner*—Huy D. Vu
*Assistant Examiner*—Jasper Kwoh
*Attorney, Agent, or Firm*—Leonard Charles Suchyta; Floyd E. Anderson

[57] **ABSTRACT**

The data network disclosed herein utilizes low duty cycle pulsed radio frequency energy to effect bidirectional wireless data communication between a server microcomputer unit and a plurality of peripheral units located within short range of the server unit, e.g. within 20 meters. By establishing a tightly synchronized common time base between the units and by the use of sparse codes, timed in relation to the common time base, low power consumption and avoidance of interference between nearby similar systems is obtained.

**11 Claims, 8 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8

6,128,290

1

# PERSONAL DATA NETWORK

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation-in-part of application Ser. No. 08/611,695 filed on Mar. 6, 1996 now U.S. Pat. No. 5,699,357.

## BACKGROUND OF THE INVENTION

The present invention relates to a data network and more particularly to a data network which can effect bidirectional wireless data communications between a microcomputer unit and a plurality of peripheral units, all of which are adapted to be carried on the person of the user.

The size and power consumption of digital electronic devices has been progressively reduced so that personal computers have evolved from lap tops through so-called notebooks, into hand held or belt carriable devices commonly referred to as personal digital assistants (PDAs). One area which has remained troublesome however, is the coupling of peripheral devices or accessories to the main processing unit. With rare exception, such coupling has typically been provided by means of connecting cables which place such restrictions on the handling of the units that many of the advantages of small size and light weight are lost.

While it has been proposed to link a keyboard or a mouse to a main processing unit using infrared or radio frequency (RF) communications, such systems have been typically limited to a single peripheral unit with a dedicated channel of low capacity.

Among the several objects of the present invention may be noted the provision of a novel data network which will provide wireless communication between a host or server microcomputer unit and a plurality of peripheral units; the provision of a data network which provides highly reliable bidirectional data communication between the peripheral units and the server; the provision of such a data network which requires extremely low power consumption, particularly for the peripheral units; the provision of such a network system which avoids interference from nearby similar systems; and the provision of such a data network system which is highly reliable and which is of relatively simple and inexpensive construction. Other objects and features will be in part apparent and in part pointed out hereinafter.

## SUMMARY OF THE PRESENT INVENTION

The data network of the present invention utilizes the fact that the server microcomputer unit and the several peripheral units which are to be linked are all in close physical proximity, e.g., within twenty meters, to establish, with very high accuracy, a common time base or synchronization. The short distances involved means that accuracy of synchronization is not appreciably affected by transit time delays. Using the common time base, code sequences are generated which control the operation of the several transmitters in a low duty cycle pulsed mode of operation. The low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals.

In addition to conventional peripheral devices such as a keyboard or mouse, it should be understood that data communications in accordance with the present invention will also be useful for a wide variety of less conventional peripheral systems which can augment the usefulness of a microcomputer such as a PDA. For example, displays are

2

being developed which project a private image directly into an user's eye using a device which is mounted on a headband or eyeglasses. These displays are useful, for example, for providing combat information to military personnel and for realistic games. Likewise, so called virtual keyboards are being developed which use inertial or magnetic sensors attached to a users fingers in the manner of rings. Further, apart from more usual business type computer applications, the data network system of the present invention may also be useful for applications such as physiological monitoring where the peripheral units may be physiological sensors such as temperature, heartbeat and respiration rate sensors. As will be understood, such peripheral units may be useful for outpatient monitoring, monitoring for sudden infant death syndrome, and for fitness training. It is convenient in the context of this present description to refer to such conventional and inconventional peripheral units collectively as personal electronic accessories (PEAs).

Briefly stated, a data network system according to the present invention effects coordinating operation of a plurality of electronic devices carried on the person of the user. These devices include a server microcomputer and a plurality of peripheral units which are battery powered and portable and which provide input information from the user or output information to the user. The server microcomputer incorporates an RF transmitter for sending commands and synchronizing information to the peripheral units. The peripheral units, in turn, each include an RF receiver for detecting those commands and synchronizing information and include also respective RF transmitters for sending information from the peripheral unit to the server microcomputer. The server microcomputer includes a receiver for receiving that information transmitted from the peripheral units.

The server and peripheral unit transmitters are energized in low duty cycle pulses at intervals which are determined by a code sequence which is timed in relation to the synchronizing information initially transmitted from the server microcomputer.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an overall block diagram of a wireless data network system linking a personal digital assistant or server microcomputer with a plurality of peripheral units;

FIG. 2 is a block diagram of a modem circuitry employed in one of the peripheral units of FIG. 1;

FIG. 3 is a block diagram of a modem circuitry employed in the server microcomputer of FIG. 1;

FIG. 4 is a block diagram of the transmitter circuitry employed in the modem of FIG. 2;

FIG. 5 is a circuit diagram of receiver circuitry employed in the modem of FIG. 2; and

FIG. 6 is a diagram illustrating timing of RF signals which are transmitted between the server microcomputer and the various peripheral units;

FIG. 7 is a block diagram of the controller employed in the PEA modem; and

FIG. 8 is a block diagram of the digital matched filter employed in the PEA controller; and

Corresponding reference characters indicate corresponding parts throughout the several view of the drawings.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to FIG. 1, a server microcomputer of the type characterized as a personal digital assistant (PDA) is

6,128,290

**3**

designated generally be reference character **11**. The PDA may also be considered to be the HOST processor and the HUB of the local network. The PDA is powered by a battery **12** and may be adapted to be carried on the person of the user, e.g. in his hand or on a belt hook. Such PDAs typically accept options which are physically configured as an industry standard PCMCIA card. In accordance with the present invention such a card, designated by reference character **13** is implemented which includes a PCMCIA interface and PDA modem.

As is described in greater detail hereinafter, the network system of the present invention establishes wireless communication between PDA **11** and a plurality of peripheral units or PEAs designated generally by reference characters **21–29**. A PDA and a collection of PEAs associated with it are referred to herein as an "ensemble". The present invention allows the creation of a data network linking such an ensemble of elements with minimal likelihood of interference from similar ensembles located nearby. Each of the peripheral units is powered by a respective battery **30** and incorporates a PEA modem **31**. Further, each peripheral unit can incorporate a sensor **33**, which responds to input from the user or an actuator **37** which provides output to the user. Some peripheral units might also employ both sensors and actuators. As illustrated, each PEA modem preferably incorporates two antenna's, a dipole antenna **38** for reception and a loop antenna **39** for transmitting. The use of separate antennas for transmitting and receiving facilitates the utilization of impedance matching networks which in turn facilitates the operation at very low power.

Referring now to FIG. 2, the PDA modem illustrated there comprises five major components, a transmitter **40**, a receiver **41**, a local oscillator **42** which is shared by the transmitter and the receiver, a controller **43** which times and coordinates the operations of the transmitter, receiver, microprocessor and, finally, a voltage controlled crystal oscillator oscillator **44** which is utilized in maintaining a common time base with the host microcomputer. The oscillator **44** utilizes a crystal which operates at 4 Mhz.

As is described in greater detail hereinafter, the controller **43** sequences the operations necessary in establishing synchronization with the host system, adjusting the oscillator **44**, acquiring from the host appropriate code sequences to be used in data communications, in coupling received information from receiver **41** to a sensor/actuator interface, designated by reference character **46**, and in transmitting data from the interface **46** back to the host through transmitter **40**. The controller in one embodiment is partitioned into a commercially available general purpose microprocessor such as the PIC16C64, together with a special purpose logic integrated circuit (IC). The special purpose IC implements those functions which cannot be efficiently executed on the general purpose microprocessor. For example, the clock to the PIC16C64 is sourced by the special purpose IC because even in the microprocessor's so-called "sleep" mode, its power consumption is higher than acceptable.

As is explained in greater detail hereinafter, the general scheme of data transmission and reception is a form of time division multiple access (TDMA). This TDMA access is characterized by a frame interval, common to the host and all PEAs of 32.768 milliseconds, segmented into 16,384 time slots. Each time slot is further partitioned into four data bit intervals during which the RF carrier is modulated either above the nominal for a binary "one" or below the carrier for a binary "zero". The basic modulation scheme is frequency shift keying (FSK), well known to those skilled in digital radio transmission. However, as is explained in

**4**

greater detail hereinafter, the FSK tones are transmitted in only those slots indicated by a TDMA program. Both the host and all PEAs share a common TDMA program at one time. For each slot, this TDMA program indicates that a PEA or host is to transmit, or not, and whether it will receive, or not. In the intervals between slots in which a PEA is to transmit or receive, all receive and transmit circuits are powered down.

Referring now to FIG. 3, the PEA modem illustrated there comprises five major components, a transmitter **15**, a receiver **17**, a local oscillator **16** which is shared by the transmitter and the receiver, a controller **14** which times and coordinates the operations of the transmitter, receiver, and PCMCIA interface and, finally, a crystal oscillator **18** which is utilized in maintaining the network time base. The oscillator **18** utilizes a crystal which operates at 4 Mhz. There are no differences between the receiver, local oscillator, and transmitter in both the PEA and PDA modems. PDA controller **14** differs from the PEA modem in three ways. First it contains no synhronization capability as it serves as the network master. Secondly, it includes a PCMCIA interface rather than a sensor/transducer interface. Only the PEA modem is described in detail herein since it is includes all the novel capabilities of the PDA modem.

Referring now to FIG. 4, transmission is effected using the local oscillator **45** to drive the transmit antenna amplifier **50** whose output drives transmit antenna **51**. The local oscillator **45** is coupled to a tuning network **48** including a plurality of frequence adjusting varactors VR1–VR3. Operation of the varactors is controlled by switch pairs **52** and **53**. 500 nanoseconds before the start of transmission, the local oscillator **45** is powered up. During this period and during all receive intervals, frequency selection varactor switches **52** and **53** are opened and closed respectively. This frequency selection state is employed for all periods except those in which the local oscillator is used to drive the antenna amplifier. To transmit a "one", both switches **52** and **53** are opened. This causes the oscillator to oscillate above its nominal value. To transmit a "zero", both switches **52** and **53** are closed. This causes the oscillator to oscillate below its nominal value. The local oscillator output then drives amplifier **50**. In the preferred embodiment, the transmit antenna **51** is loop of wire two centimeters in diameter. During short periods in which data is not being received nor is being transmitted, the oscillator is powered and the varactor control voltage Vc is adjusted such that the oscillator frequency equals the carrier frequency.

Referring now to FIG. 5, the input signal from the receiving antenna **38** is applied, through an impedance matching network **61** to a low noise amplifier **62** and bandpass filter **63**. The received and amplified signal is combined with the local oscillator shifted 45 degrees in phase in mixer **65** to produce signal Im and combined with the local oscillator shifted –45 degrees in phase in mixer **66** to produce signal Qm. Im and Qm are the so-called "in-phase" and "quadrature-phase" signals commonly known to radio engineers. Both Im and Qm are centered at zero hertz rather than at an intermediate frequency. This scheme is commonly referred to as "direct conversion" because a direct conversion to baseband is effected rather than conversion to an intermediate frequency which is then converted to baseband. Direct conversion reduces power consumption, as no intermediate frequency circuits are employed and it allows use of low pass filters to effect selectivity. Lowpass filters **67** and **68**, preferably of the linear phase type, remove the unwanted mixing products and provide selectivity of signals Im and Qm respectively.

6,128,290

5

The filtered output signals If and Qf passed through blocking amplifiers 69 and 70 to form signals I and Q. The supply currents of amplifiers 69 and 70 are adjusted so that the parasitic output capacitance of these amplifiers effectively form a bandpass filter with gain. These amplifiers block frequencies below 100 KHz and above two MHz. This filtering adds to the overall selectivity and blocks any unwanted DC mixer byproduct common to direct conversion schemes.

Some conventional frequency discriminators create the signal $V=I*dQ/dt-Q*dI/dt$. When the frequency of the received signal is above the local oscillator frequency, V is greater than zero. Correspondingly, when the frequency of the received signal is below the local oscillator frequency, V is less than zero. This scheme has the advantages of being totally insensitive to both amplitude and phase errors between I and Q mixer stages. Its disadvantage is that it requires the creation of the time derivatives of I and Q. As is well known, precise derivative forming circuits are difficult to implement and power consumptive.

To circumvent the disadvantages of derivative forming networks and still keep the advantages of the frequency discrimination scheme, the receiver employs all pass phase shifters 71, 72, 73 and 74 to create the signals Ia, Qa, Qb and Qc respectively. Multipliers 75 and 76 together with adder 77 then form the signal $U=Ia*Qb-Ib*Qa$. The advantage is that U has the same desirable properties of a discriminator based on $I*dQ/dt-Q*dI/dt$ without requiring differentiation. It is only required that Ia and Ib be separated by 90 degrees and that Qa and Qb be separated by 90 degrees. As is well known, all pass networks consisting of a resistor and capacitor can be used to effect this phase separation. These networks produce an accurate 90 degree phase separation over a frequency range well in excess of the blocking amplifier bandpass and consume extremely low power consumption.

Limiter 78 then amplifies U to form signal Lim. Limiter circuits which can generate these signals are well known and have been integrated into integrated receiver chips for many years. Limiter output Lim is utilized by the controller 43 in both establishing the common time base and in recovering the data transmitted as described in greater detail hereinafter.

FRAME STRUCTURE

As indicated previously, the basic scheme for allowing multiple Personal Electronic Assessocies (PEAs) to communicate with the common server microcomputer (PDA) may be characterized as a form of time division multiple access (TDMA). A single virtual channel can be established between the PDA and any one PEA by assigning one or more slots within the 32.768 millisecond frame. In the preferred embodiment, four data bits are transmitted during each slot interval with the designation of a binary one or zero encoded by means of frequency modulation of the RF carrier as described previously. In slots where a PEA neither transmits nor receives, essentially all of the modem circuits are powered off, thus effecting a substantial power reduction. As is described in greater detail hereinafter, some slots are used to establish synchronization between PEA and PDA and others are used to implement a control channel. These slots are not assigned to a particular PEA but are rather shared amongst all PEAs.

In normal operation, each virtual channel is half duplex, transfering data either from PEA to PDA or from PDA to PEA. Assignment of a single slot per frame results in a virtual channel bandwidth of 122 bits per second. Virtual

6

channels requiring larger bandwidths are assigned a multiplicity of slots. For example, when ten slots are assigned, the virtual channel bandwidth is increased to 1220 bits per second. More than one virtual channel can be established between the PDA and a single PEA. If one channel is outgoing from PDA to PEA while the other channel is incoming from the PEA to the PDA, an effectively full duplex communication link is constructed. It is possible for each virtual channel to differentiate bandwidths. Another possible operational mode is for the data transfer direction of a single virtual channel to be changed dynamically. A control channel can be employed whose sole purpose is to indicate the data flow direction on the data channel. Changeover from one direction to another is typically affected at the frame boundary.

A single virtual channel may be shared amongst several PEAs under control of the PDA. In this operational mode, a control virtual channel is employed to indicate to the ensemble of PEAs sharing the channel which is to transmit at any given time. Still another operational mode occurs when a single virtual channel is used to broadcast information from PDA to multiple PEAs. While it is possible to establish virtual channels between two PEAs, the increased worst case separation possible from one PEA to another PEA may preclude establishment of a reliable radio link. Therefore PEA to PEA links are not present in the preferred embodiment. While all these operational modes appear different, they are essentially well known variants to the underlying time division multiple access technique.

TDMA allows an ensemble of PEAs and PDA to establish a wide assortment of non-conflicting, error free, virtual channels between PEAs and PDA. When two different ensembles of PEAs and PDA happen by chance to employ the same carrier frequency, it is possible for the RF bursts of one ensemble to overlap those of the other ensemble. This overlap can cause errors. If during a particular bit period, two RF bursts are being simultaneously received, one from a transmitter in the home ensemble and the other from a foreign ensemble, the receiver will "capture" only the data received from the stronger of two transmitters. This well known aspect of FM modulation, results in an error free channel when the stronger transmitter is part of the home ensemble and can result in errors when the stronger transmitter is part of a foreign ensemble. While it is very likely that the stonger transmitter is part of the home ensemble, there are circumstances in normal operation where the stonger transmitter will part of a foreign ensemble. Note that even when a foreign transmitter is of much greater power than the home transmitter, if the foreign RF bursts and home RF burst do not overlap, no error occurs.

As is well known, many channel errors can be corrected by employing Error Correction Codes (ECC). In this technique, data to be sent over a channel is segmented into words of length M. A checksum of length C is computed as the word is being transmitted and also sent across the channel. For the M bits of data, a total of $N=M+C$ bits of channel bandwidth are utilized. For a fixed word length, as the number of error bits which can be corrected increases, the channel efficiency decreases. As a general rule, as the channel's error rate increase, the channel bandwidth efficiency (needed to achieve a certain corrected error rate) decreases and the minimum wordsize increases. In one of the simplest error correction schemes, called majority coding, where data bit is transmitted three time ($M=1$, $C=2$), channel bandwidth is reduced to 33%.

In channels where errors occur in bursts, single error correction codes, even though they have high channel

6,128,290

7

efficiency, will yield poor after correction error rates. In interleaving, a well known scheme to handle burst errors, data is segmented into words which are then interleaved onto the channel. If the maximum error burst consists of four consecutive errors, then interleaving four words results in each burst occuring in a separate codeword. Since each codeword now has only one error after interleaving, it can be corrected.

Yet another means for correcting errors is to packetize the data and retransmit on detection of a checksum error. For virtual channels not requiring low latency, the highest channel efficiencies are possible. Hybrid schemes where error correction codes are employed together with retransmission of packets on checksum errors are also possible.

Error rates caused by the interference of RF bursts between two different ensembles can be significantly reduced by judicious assignment of slots in each ensemble. One assignment scheme that has desirable properties employs majority encoding and the use of so-called Optically Orthogonal Codes (OOCs). In this scheme, the 16384 slots are equally segmented into 256 intervals called sectors. A maximum of three RF bursts can occur in each section. The position of each burst is dictated by a one in an OOC codeword. Codewords have unity auto-correlation and cross-correlation with respect to rotation by an arbitrary number of slot positions within a sector. The codes are mostly zeros with three scattered ones representing the locations of the slots in which RF bursts are to be transmitted or received. There are ten OOC codewords with a sector length of 64 slots. In general, a sector can be assigned any one of the ten codewords with a rotation of from zero to 63 slot positions.

To assign slots in an ensemble, one of 640 different combinations of codeword and rotations is selected for the first sector. A codeword/rotation combination is selected for the second section such that 1) the last RF burst postion of the last sector codeword and the two RF burst postions of the new codeword do not form a codeword and 2) the last two RF burst positions of the last sector codeword and the first RF burst position of the new codeword do not form a codewords, and 3) the codeword/rotation has not been selected before. Each sector consists of three identical RF bursts (i.e a majority error correcting code is chosen).

At any instant of time, the frame structures of two ensembles will in general not be aligned. However, with their uncorrelated separate time bases, the frame structures will slip past one another and will become aligned. Every possible correlation between the two frames will thus eventually occur. Assuming each ensemble is using 100% of its bandwidth, then it is highly likely that at some time a codeword in each ensemble will be aligned. When codewords from separate ensembles are aligned, a receiver captures data from the stronger transmitter. In this case, the error correction coding serves no value since it perfectly corrects the data of the foreign transmitter. When this condition occurs, the probability that another sector is also aligned is about 0.002. Thus one sees a worst case uncorrectible error rate of about 0.001. As is well known, this uncorrectible error rate is sufficiently low that, by employing packetizing and retransmitting on checksum errors, an effectively error free channel can be obtained.

As will be understood by those skilled in the art, the TDMA system is greatly facilitated by the establishment of a common frame time base between PEA and PDA. In establishing this common time base, the present invention employs timing or synchronization beacons (SBs) transmit-

8

ted by the PDA. Each SB consists of eight RF bursts spread out over 252 slots. One of the SBs arbitrarily starts a frame. The positions of the remaining seven SBs are selected pseudo-randomly with two restrictions. First the maximum interval between two successive SBs is less than 6.144 milliseconds. Secondly, the positions must allow a unique frame determination based on the intervals between SBs. Thus for example, equidistantly spaced SBs are not allowed.

In accordance with one aspect of the present invention, the slot location of each RF burst within all SBs is identical for all ensembles. In a particular ensemble, the 32-bit data bit pattern of each SB will be identical. Between two different ensembles, however, the SB data bit pattern, chosen randomly, will be quasi-distinct. The combination of SB data bit pattern and SB locations allow every ensemble to be uniquely identified.

In the preferred embodiment illustrated in FIG. **6**, each of the eight SBs **100**–**107** is immediately followed by a sector assigned to the common Communication and Control Channel (CCC). The sector immediately following the first seven CCC sectors is assigned to the Attention Channels (ACs). The CCC sectors are designated by reference characters **110**–**117** in FIG. **6** while the Attention Channels are designated by reference characters **120**–**127**. As will be explained in greater detail later, the CCC and AC are used in maintaining the virtual channels between PDA and all PEAs.

Referring now to FIG. **7**, all PEA activities are activated and monitored by the PEA controller **43**. While the controller could be implemented in a single custom integrated circuit, the present embodiment partitions the controller into a commercially available microprocessor **90**, a PIC16C64, a special purpose logic integrated circuit IC **91**, voltage controlled crystal oscillator **44**, and a charge pump voltage generator **93**. Voltage controlled crystal oscillator (VCXO) **44** is controlled by voltage Vc, sourced by charge pump **93**. The controller IC **91** can cause the frequency of oscillation to change by activating charge pump. Varying the control voltage Vc from 0 to –6 volts changes the oscillator frequency by 50 parts per million. VCXO **44** is powered continuously and serves as the time base for all activities. The microprocessor chip includes 256 bytes of ROM which contains the program instructions needed for all activities and 256-bytes of SRAM used in program execution.

The controller IC **91** serves as the primary control agent for all activities. It contains registers, counters, Finite State Machines (FSMs), and as will be explained in more detail later, a Digital Matched Filter (DMF) used to detect synchronization and attachment beacons, and a 1024x16-bit SRAM used to store the usage sector assignments in the PEAs TDMA plan. While some of the activites are implemented without microprocessor intervention, most activities involve the microprocessor execution of short instruction sequences. Normally, the microprocessor clock, sourced by controller IC **91** is inactive, thus reducing power consumption. When microprocessor intervention is required, controller IC **91** activates the microprocessor clock and issues an 8-bit code over the interconnecting bus to indicate what activity the microprocessor is to perform. When the microprocessor has completed its program sequence, it issues a code to controller IC **91** indicating completion. Controller IC **91** then inactivates the microprocessor clock returning the micrprocessor into its minimum power consumption state.

To reduce power consumption by the controller IC **91**, only a very small percentage of the logic is clocked continuously. Clocks to all remaining sections of controller IC

6,128,290

**9**

91 are enabled only when required. As is common practice in low power designing, the supply voltage of all internal logic is reduced to one volt and implemented with special low voltage cell designs.

The PEA controller **43** operates in one of three major states: Unattached (U), Sleep (S), and Active (A). These states and the state change conditions are described below.

In the Unattached state, the controller has not been personalized by any particular PDA. It cannot function normally until it receives information contained in an attachment packet. This packet is sent over a communications link formed when the PDA modem broadcasts Attachment Beacons in response to the user's request. An Attachment Beacon (AB) is composed of RF bursts having the same interval spacings as Synchronization Beacons but with a particular bit pattern.

A pair of Digital Matched Filters (DMFs) implemented in controller IC **91** are the primary means for both receiving the attachment packet and for establishing synchronization. As shown in FIG. **8**, each DMF is composed of 1032-bit shift register **100**, 32-bit DMF Target register **101**, 32-comparitors **102–133**, a 32-input adder **134**, and two 6-bit comparitors **135** and **136**. Limiter **78** output sources data to each DMF. One DMF is clocked on the positive edge of a 2 MHz clock derived from VCXO **44** while the other is clocked on the negative edge. Each of the 32-taps on the shift register correspond to bit locations of Syncronization and Attachement Beacons. The 32-bits from the shift register are compared, bit for bit by exnor gates **102–133** with the target bit beacon bit-sequence held in DMF Target Register **101**. Adder **134** sums the number of comparitor matches. A sum equal to zero indicates that each shift register tap is exactly the compliment of the DMF Target Register **101** while a sum equal to thirty-two indicates that each shift register tap exactly matches the corresponding bit in the DMF Target Register **101**. As is understood by those skilled in the data communications arts, a more robust detection scheme results when detection allows a few errors to occur rather than requiring a perfect match. Accordingly, comparitor **135** detects a match when the sum is greater or equal to thirty while comparitor **136** detects an unmatch when the sum is less than or equal to two.

At the end of each 500 nanosecond bit period, the two DMF's thus indicate one of three conditions, target match, target compliment match, and no match. The DMF can thus form a communications channel between transmitter and receiver without the receiver being synchronized to the transmitter in the manner utilized after attachment, i.e. after the PEA has become part of the ensemble. A target match indicates a logic 'one' and digit received condition while a target compliment match indicates a logic 'zero' and digit received condition. With eight Attachment Beacons transmitted per frame, an asynchronous 244 bit per second communications channel can be formed between the PDA and an unattached PEA by detecting these Attachment Beacons or their compliments.

An Unattached PEA initiates an Attachment Beacon search procedure every 8 seconds. In this procedure, the controller enables the DMF to detect Attachment Beacons. It allows the search to continue, attempting to match the attachment bit pattern (or its compliment) every 250 nanoseconds. If no Attachment Beacon is detected during a search period of 6.144 milliseconds the PEA terminates the search and reenters its low power condition until the next search is initiated. When an Attachment Beacon AB or its compliment is detected, it then expects to quasi-periodically

**10**

receive additional AB each within a 6 millisecond period of the previously received AB. This succession of ABs forms an HDLC channel using bit-stuffing to delineate the beginning and end of a packet.

A single packet of information (the Attachment Packet) is transmitted over and over by the PDA during the attachment procedure, interleaved with Synchronization Beacons. This packet contains all information needed to establish a Command and Control Channel (CCC) connection between the PEA's microprocessor and the PDA's microprocessor. The packet contains the Synchronization Beacon code, the Synchronization Beacon interval spacings, and a 6-bit identification number issued to each PEA. A 16-bit checksum at the end of the packet allows the PEA to verify correct packet receipt. Total packet length, including the 8-bit start of packet flag is 84 bits. Receipt of an Attachment Packet thus requires a worst case of 0.69 seconds. Once an Attachment Packet has been received, the PEA enters the Sleep state.

In this state, the PEA has sufficient information to synchronize itself to the Synchronization Beacons (SB) normally broadcast by the PDA. It can synchronize itself to the home PDA since it has the Synchronization Beacon bit pattern and the intervals between Synchronization Beacons.

In the Sleep state, a PEA initiates a Synchronization Beacon search procedure every 8 seconds. This procedure is identical to that employed in attachment except that the Synchronization Beacon code contained in the Attachment Packet is stored in the DMF Target Registers. If a Synchronization Beacon is not detected within 6.144 milliseconds, it is assumed that the home PDA is not near enough for synchronization to proceed. It then powers off all circuits except the alarm clock circuits which reinitiates the Synchronization Beacon search procedure 8 seconds later.

Once a single Synchronization Beacon is detected, the PEA assumes that its home PDA is nearby and that it should acquire synchronization. It acquires synchronization in two stages. When the first Synchronization Beacon is detected, a 14-bit counter is cleared. This counter, clocked at the slot clock rate, then continues counting.

When the next Synchronization Beacon is detected, the upper 8-bits of the counter are stored in an interval register and the upper 6-bits of the counter are cleared. The lower 6-bits are then compared against zero. Under worst case clock tolerance, the low 6-bit value should be zero plus or minus 0.25 clock periods. If the low order counter bits are zero no action is taken. Charge pump **93** is activated to increase the VCXO frequency. The interval is compared against each of the seven interval values loaded in the Attachment Packet, no two of which are identical.

After the third Synchronization Beacon is detected, the process is repeated. This time, the interval is compared against the next interval in the Synchronization Beacon interval table with the assumed framing established from the first interval. Again the charge pump is activated to increase the VCXO frequency if needed. This process of comparing intervals and adjusting the crystal oscillator continues until the PEA has a reliable indication that framing has been established and that the crystal oscillator frequency is very close to that of the PDA. When this occurs the second phase of synchronization, called phase alignment, is entered.

In the phase alignment stage, the first four bursts of the Synchronization Beacon are used to adjust the phase of the VCXO. The bit pattern of the first four bursts of all Synchronization Beacons is either 0011 or 1100. This simplifies the phase adjustment process. VCXO frequency adjustment is one sided in that BCC can only increase frequency

6,128,290

<div style="column">

**11**

via the charge pump. Leakage currents in the charge pump cause the frequency to decrease. Thus by monitoring the percentage of time that the Syncronization Beacon transitions are ahead or behind the 2 MHz bit clock, the microprocessor can determine when synchronization is established.

After the PEA acquires synchronization, it sends a status code over the Attention Channel assigned to that PEA.

Each frame contains seven sectors assigned to Attention Channel groups. These sectors follow the sectors assigned to the Command and Control Channel sectors which immediately follow the eight Synchrnonization Beacons. Eight successive frames provide a total of 56 Attention Channels, one for each of the 56 possible PEAs. After the PEA acquires synchronization, it sends a status code over the Attention Channel assigned to the PEA indicating that it has just acquired synchronization and is requesting activation. Each PEA is required to send a status code in its respective Attention Channel once every eight frames. The PEA and PDA microprocessors then go through a protocol which checks that the PEAs TDMA plan is current. If the PEA's TDMA plan is not current, the PDA then loads the new TDMA plan into the PEA's TDMA memory and enables the PEA to enter the Active state.

The basic unit of the TDMA plan is a User Data Information Block (UDIB). Each UDIB contains 12 bits. When no error encoding is employed, each UDIB nets 12 user data bits. Majority error correction coding, where the sector contains three identical copies of the same RF burst nets four error corrected data bits. Majority coding is employed on all sectors comprising both the Command and Control Channel and Attention Channels.

On entry to the Active state, the PEA initializes registers and waits until the beginning of the next frame. At that time, it accesses its TDMA control memory, resident in the $1024 \times 16$ BCC SRAM, to determine 1) when it should transmit or receive data, 2) which sub-channel, and 3) which error correction to apply. The data then being transmitted and received by each PEA will then depend on its application or function within the ensemble, e.g. as a sensor, actuator or other type of component.

As will be understood by those skilled in the art, the use of sparse codes, pseudorandomly selected, together with error correction coding, renders the data communication provided by the present invention highly reliable and relatively unsusceptible to interference from similar networks operating nearby. Further, the utilization of low duty cycle pulse mode transmission particularly with the employment of uncorrelated codes in a TDMA context, leads to very low power consumption since the transmitters and receivers in each PEA are powered for only a small percentage of the total time.

In view of the foregoing it may be seen that several objects of the present invention are achieved and other advantageous results have been attained.

As various changes could be made in the above constructions without departing from the scope of the invention, it should be understood that all matter contained in the above description or shown in the accompanying drawings shall be interpreted as illustrative and not in a limiting sense.

What is claimed is:

1. A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:

   a server microcomputer unit;

   a plurality of peripheral units which are battery powered and portable, which provide either input information

**12**

   from the user or output information to the user, and which are adapted to operate within short range of said server unit;

   said server microcomputer incorporating an RF transmitter for sending commands and synchronizing information to said peripheral units;

   said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also an RF transmitter for sending input information from the user to said server microcomputer;

   said server microcomputer including a receiver for receiving input information transmitted from said peripheral units;

   said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals determined by a code sequence which is timed in relation to said synchronizing information.

2. A data network system as set forth in claim 1 wherein said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting.

3. A data network system as set forth in claim 2 wherein a code sequence for a given one of said units is transmitted within a respective time slot.

4. A data network system as set forth in claim 1 wherein said server microcomputer unit transmits RF synchronizing beacons at times within each of a predetermined sequence of frames which times vary in accordance with a code unique to the particular server microcomputer unit.

5. A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:

   a server microcomputer;

   a plurality of peripheral units which are battery powered and portable, which provide either input information from the user or output information to the user, and which are adapted to operate within about 20 meters of said server unit;

   said server microcomputer incorporating an RF transmitter for sending commands and synchronizing information to said peripheral units during allocated time slots within an overall time frame;

   said peripheral units including an RF receiver for detecting said commands and synchronizing information and including also an RF transmitter for sending input information from the user to said server microcomputer during respective allocated time slots within said overall time frame;

   said server microcomputer including a receiver for receiving input information transmitted from said peripheral units;

   said server and peripheral transmitters being energized in low duty cycle pulses at pseudo-random intervals within each of said allocated time slots, said pseudo-random intervals being determined by a code sequence which is timed in relation to said synchronizing information.

6. A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:

   a server microcomputer unit, said server unit including an oscillator for establishing a time base;

   a plurality of peripheral units which are battery powered and portable and which provide either input information from the user or output information to the user;

</div>

6,128,290

13

said server microcomputer incorporating an RF transmitter controlled by said oscillator for sending commands and synchronizing information to said peripheral units;

said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also a local oscillator which can be synchronized to said server unit oscillator using said synchronizing information and an RF transmitter controlled by said local oscillator for sending input information from the user to said server microcomputer;

said server microcomputer including a receiver controlled by said server unit oscillator for receiving input information transmitted from said peripheral units;

said server and peripheral transmitters being energized in low duty cycle RF bursts which are timed in relation to said synchronizing information.

**7.** A data network system as set forth in claim **6** wherein said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting.

**8.** A data network system as set forth in claim **6** wherein said input and output information is carried by frequency modulation of the respective transmitters and the receivers employ the respective oscillators for detecting the frequency modulation.

**9.** A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:

a server microcomputer unit, said server unit including an oscillator for establishing a time base;

a plurality of peripheral units which provide either input information from the user or output information to the user, and which are adapted to operate within about 20 meters of said server unit;

said server microcomputer incorporating an RF transmitter controlled by said oscillator for sending commands and synchronizing information to said peripheral units, said synchronizing information being carried by time spaced beacons characteristic of the particular server unit;

said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also a local oscillator, each of said peripheral units being operative in a first mode to receive said beacons independently of synchronization of the respective local oscillator when that peripheral unit is in close proximity to said server unit and to determine from the server unit its characteristics, each of said peripheral units being operative in a second mode to synchronize the respective local oscillator with

14

the server unit oscillator, each of said peripheral units also including an RF transmitter operative in a third mode for sending input information from the user to said server microcomputer,

said server microcomputer including a receiver for receiving input information transmitted from said peripheral units;

said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals with said receivers being controlled by the respective oscillators.

**10.** A data network system as set forth in claim **9** wherein said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting.

**11.** A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:

a server microcomputer unit, said server unit including an oscillator for establishing a time base;

a plurality of peripheral units which provide either input information from the user or output information to the user;

said server microcomputer incorporating an RF transmitter controlled by said oscillator for sending commands and synchronizing information to said peripheral units, said synchronizing information being carried by time spaced beacons;

said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also an RF transmitter for sending input information from the user to said server microcomputer;

said server microcomputer including a receiver for receiving input information transmitted from said peripheral units, said server microcomputer unit being operative to define a TDMA plan in which said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting;

each of said peripheral units being operative in a first mode to receive said beacons from said server unit independently of synchronization of the respective local oscillator when the peripheral unit is in close proximity to the server unit and to determine the respective TDMA plan, each of said peripheral units being operative in a second mode to exchange input and output information with said server unit in accordance with the determined TDMA plan.

* * * * *

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

October 3, 2016
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceedings identified below.

**DSS TECHNOLOGY MANAGEMENT, INC.**
**Patent Owner,**

v.

**APPLE, INC.**
**Petitioner.**

**IPRS 2015-00369 and 00373**
**Patent No. 6,128,290**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Certifying Officer*



**PROSECUTION HISTORY OF DSS TECHNOLOGY MANAGEMENT, INC. v. APPLE, INC.**
**IPR2015-00369 APPEAL NOS. 2016-2523 AND 2016-2524**

| DATE | DOCUMENT |
|---|---|
| 12/04/2014 | Petition for *Inter Partes* Review of U.S. Patent No. 6,128,290 |
| 12/04/2014 | Petitioner's Power of Attorney |
| 12/30/2014 | Patent Owner's Power of Attorney |
| 12/30/2014 | Mandatory Notice of the Patent Owner |
| 12/30/2014 | Expunged |
| 12/30/2014 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 03/30/2015 | Patent Owner's Updated Mandatory Notices |
| 03/30/2015 | Patent Owner's Preliminary Response |
| 06/25/2015 | Decision |
| 06/25/2015 | Scheduling Order |
| 07/09/2015 | Petitioner's Request for Rehearing |
| 07/31/2015 | Petitioner's ADR Statement |
| 08/12/2015 | Expunged |
| 08/12/2015 | Decision – Petitioner's Request for Rehearing |
| 08/18/2015 | Patent Owner's Notice of Deposition of Dr. Grimes |
| 09/16/2015 | Joint Stipulation to Modify the Scheduling Order |
| 10/05/2015 | Patent Owner's Response to Petition |
| 10/13/2015 | Petitioner's Objection to Evidence |
| 12/01/2015 | Petitioner's Notice of Deposition of Mr. Dezmelyk |
| 01/05/2016 | Joint Stipulation to Modify Due Date 2 |
| 01/11/2016 | Conduct of Proceeding |
| 01/22/2016 | Petitioner's Power of Attorney |
| 01/22/2016 | Petitioner's Updated Mandatory Notices |
| 01/22/2016 | Petitioner's Reply |
| 02/08/2016 | Joint Stipulation to Modify Due Dates 4 and 5 |
| 02/10/2016 | Patent Owner's Notice of Deposition of Dr. Hu |
| 02/22/2016 | Petitioner's Motion to Exclude |
| 02/22/2016 | Petitioner's Request for Oral Hearing |
| 02/22/2016 | Motion for Observation Regarding Cross-Examination of Dr. Hu |
| 02/22/2016 | Patent Owner's Request for Oral Argument |
| 02/26/2016 | Petitioner's Response to Patent Owner's Motion for Observation Regarding Cross-Examination |

**PROSECUTION HISTORY OF DSS TECHNOLOGY MANAGEMENT, INC. v. APPLE, INC.**
**IPR2015-00369 APPEAL NOS. 2016-2523 AND 2016-2524**

| | |
|---|---|
| 02/26/2016 | Patent Owner's Opposition to Motion to Exclude |
| 03/01/2016 | Petitioner's Reply to Opposition to Motion to Exclude |
| 03/02/2016 | Oral Trial Hearing |
| 03/02/2016 | Order Conduct of Proceeding |
| 03/11/2016 | Patent Owner's Demonstrative Exhibits |
| 03/11/2016 | Patent Owner's Demonstratives |
| 03/11/2016 | Petitioner's Demonstratives Transmittal |
| 05/31/2016 | Record of Oral Hearing |
| 06/17/2016 | Final Written Decision |

**PROSECUTION HISTORY OF DSS TECHNOLOGY MANAGEMENT, INC. v. APPLE, INC.**
**IPR2015-00373 APPEAL NOS. 2016-2523 AND 2016-2524**

| DATE | DOCUMENT |
|---|---|
| 12/04/2014 | Petitioner's Power of Attorney |
| 12/04/2014 | Petition for *Inter Partes* Review of U.S. Patent No. 6,128,290 |
| 12/30/2014 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 12/30/2014 | Patent Owner's Power of Attorney |
| 12/30/2014 | Mandatory Notice of the Patent Owner |
| 03/30/2014 | Patent Owner's Power of Attorney |
| 03/30/2015 | Patent Owner's Updated Mandatory Notices |
| 03/30/2015 | Patent Owner's Preliminary Response |
| 06/25/2015 | Decision |
| 06/25/2015 | Scheduling Order |
| 07/09/2015 | Petitioner's Request for Rehearing |
| 07/31/2015 | Petitioner's ADR Statement |
| 08/12/2015 | Decision – Petitioner's Request for Rehearing |
| 08/20/2015 | Patent Owner's Notice of Deposition of Dr. Grimes |
| 09/16/2015 | Joint Stipulation to Modify the Scheduling Order |
| 10/05/2015 | Patent Owner's Response to Petition |
| 10/13/2015 | Petitioner's Objection to Evidence |
| 12/01/2015 | Petitioner's Notice of Deposition of Mr. Dezmelyk |
| 01/05/2016 | Notice of Filing of Statutory Disclaimer |
| 01/05/2016 | Joint Stipulation to Modify Due Date 2 |
| 01/11/2016 | Conduct of Proceeding |
| 01/22/2016 | Petitioner's Power of Attorney |
| 01/22/2016 | Petitioner's Updated Mandatory Notices |
| 01/22/2016 | Petitioner's Reply |
| 02/08/2016 | Joint Stipulation to Modify Due Dates 4 and 5 |
| 02/10/2016 | Patent Owner's Notice of Deposition of Dr. Hu |
| 02/22/2016 | Petitioner's Motion to Exclude |
| 02/22/2016 | Petitioner's Request for Oral Hearing |
| 02/22/2016 | Motion for Observation Regarding Cross-Examination of Dr. Hu |
| 02/22/2016 | Patent Owner's Request for Oral Argument |
| 02/26/2016 | Petitioner's Response to Patent Owner's Motion for Observation Regarding Cross-Examination |

**PROSECUTION HISTORY OF DSS TECHNOLOGY MANAGEMENT, INC. v. APPLE, INC.**
**IPR2015-00373 APPEAL NOS. 2016-2523 AND 2016-2524**

| | |
|---|---|
| 02/26/2016 | Patent Owner's Opposition to Motion to Exclude |
| 03/01/2016 | Petitioner's Reply to Opposition to Motion to Exclude |
| 03/02/2016 | Oral Trial Hearing |
| 03/02/2016 | Order Conduct of Proceeding |
| 03/11/2016 | Patent Owner's Demonstrative Exhibits |
| 03/11/2016 | Patent Owner's Demonstratives |
| 03/11/2016 | Petitioner's Demonstratives Transmittal |
| 05/31/2016 | Record of Oral Hearing |
| 06/17/2016 | Final Written Decision |

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.
Petitioner

v.

DSS TECHNOLOGY MANAGEMENT, INC.
Patent Owner

_____

Case IPR: Unassigned
Patent 6,128,290

_____

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 6,128,290
UNDER 35 U.S.C. §§ 311-319 and 37 C.F.R. §§ 42.1-.80, 42.100-.123**

**Mail Stop PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................ 1

II.     MANDATORY NOTICES (37 C.F.R. § 42.8(a)(1)).................... 3

    A.      Real Party-In-Interest (37 C.F.R. § 42.8(b)(1)) ...................3
    B.      Notice of Related Matters (37 C.F.R. § 42.8(b)(2)).............3
    C.      Designation of Counsel (37 C.F.R. § 42.8(b)(3)) .................4
    D.      Notice of Service Information (37 C.F.R. § 42.8(b)(4)) .......4

III.    GROUNDS FOR STANDING (37 C.F.R. § 42.104(a))................. 4

IV.     STATEMENT OF THE PRECISE RELIEF REQUESTED AND THE
REASONS THEREFOR (37 C.F.R. § 42.22(a)) ......................... 5

V.      THE '290 PATENT ............................................................ 5

    A.      Overview of the '290 Patent.............................................5
    B.      Priority Date of the '290 Patent.......................................6
    C.      Level of Ordinary Skill in the Art ....................................8

VI.     CLAIM CONSTRUCTION ................................................... 8

    A.      "within short range of said server unit" ............................9
    B.      "code sequence" ..........................................................10

VII.    IDENTIFICATION OF CHALLENGE (37 C.F.R. § 42.104(b))............... 11

    A.      Statutory Grounds for the Challenge..................................11
    B.      Citation of Prior Art .....................................................12
    C.      The Proposed Grounds Are Not Redundant........................12

VIII.   GROUNDS OF REJECTION ................................................ 15

    A.      Ground 1: Claims 1-4 would have been obvious in view of
Barber. ......................................................................15
        1.      Overview of Barber................................................ 15
        2.      Independent claim 1 would have been obvious in view
of Barber. ........................................................... 18
        3.      Claim 2 would have been obvious in view of Barber.............. 31
        4.      Claim 3 would have been obvious in view of Barber.............. 31
        5.      Claim 4 would have been obvious in view of Barber.............. 32
    B.      Ground 2: Claims 1-4 would have been obvious over
Natarajan in view of Neve.................................................33
        1.      Overview of Natarajan .......................................... 33

i

|   | 2. | Overview of Neve ................................................................ 37 |
|---|----|-----|
|   | 3. | Overview of the Combination of Natarajan and Neve ............ 39 |
|   | 4. | Independent claim 1 would have been obvious over Natarajan in view of Neve. ........................................................ 42 |
|   | 5. | Claim 2 would have been obvious over Natarajan in view of Neve. ........................................................................ 56 |
|   | 6. | Claim 3 would have been obvious over Natarajan in view of Neve. ........................................................................ 57 |
|   | 7. | Claim 4 would have been obvious over Natarajan in view of Neve. ........................................................................ 58 |
| IX. | | CONCLUSION........................................................................... 60 |

Appx0200

# TABLE OF AUTHORITIES

**Cases**

*Alloc, Inc. v. Int'l Trade Comm'n,*
  342 F.3d 1361 (Fed. Cir. 2003) ...............................................................8

*Canon Inc. v. Intellectual Ventures I LLC,*
  IPR2014-00535, Paper 9 (P.T.A.B. Sept. 24, 2014) .............................13

*In re Cortright,*
  165 F.3d 1353 (Fed. Cir. 1999) ................................................................8

*KSR International Co. v. Teleflex Inc.,*
  550 U.S. 398 (2007) ........................................................................ 42, 48

*Liberty Mutual Ins. Co. v. Progressive Casualty Ins. Co.,*
  CBM2012-00003, Paper 7 (P.T.A.B. Oct. 25, 2012) .............................13

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ................................................................8

**Statutes**

35 U.S.C. § 102 ........................................................................................11

35 U.S.C. § 102(b) ........................................................................ 12, 13, 14

35 U.S.C. § 103 ................................................................... 11, 12, 13, 14

35 U.S.C. § 112 ..........................................................................................9

35 U.S.C. § 325(d) ....................................................................................12

**Rules**

37 C.F.R. § 42.10(b) ..................................................................................4

37 C.F.R. § 42.100(b) ................................................................................8

37 C.F.R. § 42.104(a) ................................................................................4

37 C.F.R. § 42.104(b) ..............................................................................11

37 C.F.R. § 42.106(a) ................................................................................4

37 C.F.R. § 42.22(a)..............................................................................................5

37 C.F.R. § 42.63(e)..............................................................................................4

37 C.F.R. § 42.8(a)(1))...........................................................................................3

37 C.F.R. § 42.8(b)(1)............................................................................................3

37 C.F.R. § 42.8(b)(2)............................................................................................3

37 C.F.R. § 42.8(b)(3)............................................................................................4

37 C.F.R. § 42.8(b)(4)............................................................................................4

iv

## I.     INTRODUCTION

Apple Inc. petitions for *inter partes* review of claims 1-4 of United States Patent No. 6,128,290 to Carvey, titled "Personal Data Network" ("the '290 patent") (APL 1001). The claims of the '290 patent recite nothing more than the combination of well-known concepts. Indeed, the '290 patent specification is little more than a recitation of well-known techniques patent owner admits are in the prior art. The '290 patent characterizes its alleged inventions by describing that "the general scheme of data transmission and reception is a form of time division multiple access (TDMA)." ('290 patent, 3:57-59.) The '290 patent plainly admits that its "basic modulation scheme is frequency shift keying (FSK), **well known** to those skilled in digital radio transmission." (*Id.* at 3:65-67 (emphasis added).) The '290 patent describes a litany of other "well-known" aspects of the alleged inventions, for example:

- The oscillator phase shift illustrated in FIG. 5 shows the Im and Qm signals, "the so-called 'in-phase' and 'quadrature-phase' signals **commonly known to radio engineers**" (*id.* at 4:51-57 (emphasis added));

- The "all pass phase shifters" disclosed were "well known" (*id.* at 5:21-33);

- The disclosed "limiter circuits" "are *well known* and have been integrated into integrated receiver chips *for many years*" (*id.* at 5:38-41 (emphasis added));

- In describing various operational modes, the '290 patent admits, "[w]hile all these operational modes *appear different, they are essentially well known variants* to the underlying time division multiple access technique" (*id.* at 6:16-29 (emphasis added));

- Capturing data from only the stronger "RF bursts" in TDMA schemes is a "*well known* aspect of FM modulation" (*id.* at 6:36-41 (emphasis added));

- "Interleaving" is "a *well known scheme* to handle burst errors" (*id.* at 7:1-4 (emphasis added)); and

- In describing the "error correction" that occurs "[w]hen *codewords* from separate ensembles are aligned", the '290 patent discloses that "*[a]s is well known*, this uncorrectible error rate is sufficiently low that…an effectively error free channel can be obtained." (*Id.* at 7:52-62 (emphasis added)).

The '290 patent purports to divert from well-known TDMA schemes because transmissions occur "in only those slots indicated by a TDMA program…For each slot, this TDMA program indicates that a PEA or host is to transmit, or not,

and whether it will receive, or not. In the intervals between slots in which a PEA is to transmit or receive, all receive and transmit circuits are powered down." (*Id.* at 3:67-4:8.) But this allegedly point of novelty was also well-known, as explained in detail below. Thus, none of the '290 patent's claims recite a patentable invention. Rather, the '290 patent has taken from the public technology that was already in the public domain or would have been obvious to one of skill in the art. The '290 patent should never have issued. Its uncommon and frankly ambiguous terms veil the well-known concepts described in the '290 patent and recited in the '290 patent's claims.

Accordingly, Apple respectfully requests *inter partes* review of claims 1-4 and that these claims be found invalid.

## II.    MANDATORY NOTICES (37 C.F.R. § 42.8(a)(1))

### A.    Real Party-In-Interest (37 C.F.R. § 42.8(b)(1))

The real party-in-interest is Petitioner Apple Inc.

### B.    Notice of Related Matters (37 C.F.R. § 42.8(b)(2))

The '290 patent is involved in the following cases that may affect or be affected by a decision in this proceeding: *DSS Technology Management, Inc. v. Apple Inc.*, 6:13-cv-00919-JDL[1] and *DSS Technology Management, Inc. v. Lenovo*

---

[1] A motion to transfer to Northern District of California has been granted.

- 3 -

*(United States), Inc.*, 6:14-cv-00525-JDL, both in the Eastern District of Texas. A Petition for *Inter Partes* Review of claims 6, 7, 9, and 10 of the '290 patent is concurrently filed.

### C.    Designation of Counsel (37 C.F.R. § 42.8(b)(3))

| Lead Counsel | Back-Up Counsel |
|---|---|
| David K.S. Cornwell (Reg. No. 31,944)<br>STERNE, KESSLER, GOLDSTEIN<br>& FOX P.L.L.C.<br>1100 New York Avenue, NW<br>Washington, DC 20005<br>202.772.8580 (telephone)<br>202.371.2540 (facsimile)<br>davidc-PTAB@skgf.com | Mark W. Rygiel (Reg. No. 45,871)<br>STERNE, KESSLER, GOLDSTEIN<br>& FOX P.L.L.C.<br>1100 New York Avenue, NW<br>Washington, DC 20005<br>202.772.8510 (telephone)<br>202.371.2540 (facsimile)<br>mrygiel-PTAB@skgf.com |

### D.    Notice of Service Information (37 C.F.R. § 42.8(b)(4))

Please direct all correspondence to lead counsel at the above address. Apple consents to email service at: davidc-PTAB@skgf.com and mrygiel-PTAB@skgf.com.

## III.    GROUNDS FOR STANDING (37 C.F.R. § 42.104(a))

Apple certifies pursuant to Rule 42.104(a) that the '290 patent is available for IPR, and that Apple is not barred or estopped from requesting IPR of any claim of the '290 patent on the grounds identified herein. This Petition is filed in accordance with 37 C.F.R. § 42.106(a). A Power of Attorney and Exhibit List pursuant to § 42.10(b) and § 42.63(e), respectively, are filed herewith. The required fee has been paid through online credit card payment. The Office is authorized to charge

- 4 -

fee deficiencies and credit overpayments to Deposit Acct. No. 19-0036 (Customer

ID No. 63,975).

## IV.    STATEMENT OF THE PRECISE RELIEF REQUESTED AND THE REASONS THEREFOR (37 C.F.R. § 42.22(a))

Apple requests IPR and cancellation of claims 1-4. Apple's full statement of

the reasons for the relief requested is set forth below.

## V.    THE '290 PATENT

### A.    Overview of the '290 Patent

The '290 patent describes a data network for "bidirectional wireless data

communications between a microcomputer unit and a plurality of peripheral units."

('290 patent, 1:11-15.) FIG. 1 of the '290 patent illustrates the server microcom-

puter (11) and associated peripheral units (21, 29). The '290 patent describes that

the "server microcomputer" can be a personal digital assistant ("PDA"). (*Id.* at

2:66-67.) The "peripheral units," referred to

generally as "personal electronic accesso-

ries (PEAs)," include "conventional" pe-

ripheral devices such as a keyboard and



FIG. 1

mouse, and also "a wide variety of less conventional" peripheral and input devices,

including body-mounted accessories such as displays "mounted on a headband or

eyeglasses," and "physiological sensors." (*Id.* at 1:62-2:18.) For example, the phys-

iological sensors can be temperature, heartbeat, and respiration sensors for patient

monitoring and fitness training. (*Id.* at 2:10-15.) The server microcomputer and pe-ripherals are linked "in close physical proximity, e.g., within twenty meters," to es-tablish a common time base or synchronization. (*Id.* at 1:50-55.)

The goal of the '290 patent is to "provide wireless communication between a host or server microcomputer unit and a plurality of peripheral units" that is "relia-ble," "low power," "avoids interference from nearby similar systems," and is "rela-tively simple." (*Id.* at 1:33-46.) This goal is purportedly achieved, in part, by gen-erating "code sequences" which control the operation of transmitters in a low duty cycle pulsed mode of operation. (*Id.* at 1:57-61, 2:35-39.) This allows the transmit-ters to only be active for short durations of time, which "substantially reduces power consumption and facilitates the rejection of interfering signals." (*Id.* at 1:59-61.) The '290 patent describes that "[t]he codes are mostly zeros with three scat-tered ones representing the locations of the slots in which RF bursts are to be transmitted or received." (*Id.* at 7:27-29.) ***Thus, the '290 patent's alleged point of novelty is using a code sequence to designate when devices are to transmit or re-ceive data.***

### B.    Priority Date of the '290 Patent

The '290 patent was filed on October 14, 1997 and assigned Application No. 08/949,999 ("the '999 application"). It is a continuation-in-part of U.S. Application No. 08/611,695, filed on March 6, 1996 ("the '695 application")(APL 1006). But

- 6 -

independent claim 1 of the '290 patent, and its dependent claims 2-4, are entitled only to the benefit of the '290 patent's October 14, 1997 filing date because they recite new matter added to the '999 application.

The specifications of the '999 application and the '695 application are nearly identical, except for two features that were added to the '999 application and specifically claimed in the '290 patent. The '999 application added *new disclosure* that the peripheral units are "located within short range of the server unit, e.g. within 20 meters." ('290 patent, Abstract.) Additionally, in comparison to the '695 application, the '999 application was changed as shown: "the server microcomputer unit and the several peripheral units which are to be linked are all in close physical proximity, e.g., ~~under two meters separation~~ within twenty meters". (*Compare* APL 1006, p. 25 *with* APL 1005, p. 25.) Thus, the '999 application *added* that the peripheral units are "located within short range of the server unit" and also *extended* the range of "close physical proximity" from "under two meters" to "within twenty meters".

The '290 patent *specifically claims the newly added features* first disclosed in the '999 application. Independent claim 1 recites "a plurality of peripheral units which are battery powered and portable, which provide either input information from the user or output information to the user, and *which are adapted to operate within short range of said server unit*". Therefore, independent claim 1 and its de-

- 7 -

pendent claims 2-4, are entitled only to the benefit of the '290 patent's October 14, 1997 filing date.

### C.    Level of Ordinary Skill in the Art

A person of ordinary skill in the art ("POSA") at the time of invention would have typically had an undergraduate degree in Electrical Engineering and 1-2 years of experience working with wireless network technology, or equivalent education and/or work experience. (Grimes Dec. ¶ 9.) Further, a POSA would have had knowledge of and understood commonly known devices, methods, and techniques in this field, for example, those described as "well known" in the '290 patent.

## VI.    CLAIM CONSTRUCTION

Under 37 C.F.R. § 42.100(b), the challenged claims must be given their broadest reasonable interpretations in light of the patent specification. Generally, claim terms are given their ordinary and customary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003). The broadest reasonable interpretation must also be consistent with the interpretation that those skilled in the art would reach. *In re Cortright*, 165 F.3d 1353, 1359 (Fed. Cir. 1999).

Apple presents herein interpretations of certain claim limitations under the broadest reasonable interpretation standard. Apple reserves the right to present different constructions in the District Court litigation where a different claim con-

struction standard applies, and in no way acquiesces to being bound in the District Court litigation by the claim construction presented in this Petition.

### A. "within short range of said server unit"

The term "within short range of said server unit" appears in challenged claim 1. The '290 patent added as new matter that the peripheral units are "located within short range of the server unit, e.g. within 20 meters." This feature was added only to the Abstract and then specifically claimed in claim 1. While the '290 patent uses "within 20 meters" as an example (by using "e.g."), this is the **only** indication in the '290 patent as to what the newly added term "short range" means. No other "examples" are provided. And the term "short range" has no commonly accepted meaning in the art. (Grimes Dec. ¶ 23.) Accordingly, a POSA would not have understood this term to have a meaning outside of the guidance provided by the specification. (*Id.*) Thus, if the example provided by the specification is ignored, the term "short range" is indefinite.[2] So the term must be construed in view of the specification. Since the **only** guidance in the '290 patent specification for this newly added feature is "within 20 meters", Apple submits that the broadest

---

[2] While Apple understands that indefiniteness under 35 U.S.C. § 112 cannot be raised in *inter partes* review, because this term would be indefinite on its own, it must be construed in view of the '290 patent specification.

- 9 -

reasonable interpretation of "within short range of said server unit" is "within 20 meters of said server unit."

**B.    "code sequence"**

The term "code sequence" appears in challenged claims 1 and 3. A "code sequence" is not a term of art and therefore must be construed in view of the '290 patent specification. The '290 patent describes that "[u]sing the common time base, ***code sequences*** are generated ***which control the operation of the several transmitters*** in a low duty cycle pulsed mode of operation." ('290 patent, 1:57-59 (emphasis added).) The '290 patent further describes that, "[t]he server and peripheral unit ***transmitters are energized*** in low duty cycle pulses ***at intervals which are determined by a code sequence*** which is timed in relation to the synchronizing information initially transmitted from the server microcomputer", which is similar to the language recited in claim 1. (*Id.* at 2:35-39 (emphasis added).) The '290 patent also discloses that the PEA controller is responsible for "acquiring from the host appropriate code sequences to be used in data communications." (*Id.* at 3:43-44.)

The phrase "code sequence" is not used anywhere else in the '290 patent, although the '290 patent also uses "Optically Orthogonal Codes" and "codewords." (*Id.* at 7:15-44.) "The ***codes are mostly zeros with three scattered ones*** representing the locations of the slots in which RF bursts are to be transmitted or received." (*Id.* at 7:26-29 (emphasis added).)

- 10 -

Therefore, a "code sequence" is a series of ones and zeros (i.e., values) representing possible transmission time slots. A "one" indicates that a unit will transmit in that time slot and, therefore, its transmitter will be energized. A "zero" indicates that a unit will not transmit, and so its transmitter will not be energized. Accordingly, Apple submits that the broadest reasonable interpretation of the term "code sequence" in view of the '290 patent specification is "a series of values, where each value in the series represents a time slot where a unit's transmitter is energized or a time slot where a unit's transmitter is depowered."

## VII.   IDENTIFICATION OF CHALLENGE (37 C.F.R. § 42.104(b))

### A.    Statutory Grounds for the Challenge

Petitioner requests review of claims 1-4 on two grounds:

**GROUND 1:** Claims 1-4 are unpatentable under 35 U.S.C. § 103 as obvious over by "BodyLAN[TM]: A Low-Power Communications System" by Thomas J. Barber Jr. ("Barber").[3]

---

[3] Although Apple believes claims 1-4 are also anticipated by Barber under 35 U.S.C. § 102, due to the page limit of this Petition, Apple presents herein that claims 1-4 are clearly obvious in view of Barber.

- 11 -

**GROUND 2:** Claims 1-4 are unpatentable under 35 U.S.C. § 103 as obvious over U.S. Patent No. 5,241,542 to Natarajan *et al.* ("Natarajan") in view of U.S. Patent No. 4,887,266 to Neve *et al.* ("Neve").

### B.    Citation of Prior Art

Petitioner cites the following prior art references:

**BodyLAN$^{TM}$: A Low-Power Communications System** by Thomas J. Barber Jr. (APL 1002) is prior art under at least 35 U.S.C. § 102(b) because it was published at least as early as April 11, 1996, more than one year prior to the proper priority date for claims 1-4 of the '290 patent, its October 14, 1997 filing date.

**U.S. Patent No. 5,241,542** to Natarajan *et al.* (APL 1003) is prior art under at least 35 U.S.C. § 102(b) because it issued on August 31, 1993, more than 2 years before the earliest possible priority date of the '290 patent.

**U.S. Patent No. 4,887,266** to Neve *et al.* (APL 1004) is prior art under at least 35 U.S.C. § 102(b) because it issued on December 12, 1989, more than 6 years before the earliest possible priority date of the '290 patent.

### C.    The Proposed Grounds Are Not Redundant

Apple recognizes that the Board may use its discretion under 35 U.S.C. § 325(d) to institute trial only on certain grounds when multiple grounds "are presented in a redundant manner by a petitioner who makes no meaningful distinction between them." *Liberty Mutual Ins. Co. v. Progressive Casualty Ins. Co.,*

- 12 -

CBM2012-00003, Paper 7, p. 2 (P.T.A.B. Oct. 25, 2012). The grounds presented here are not redundant and Apple discusses the distinction between them below. The Board has typically exercised its discretion when numerous proposed grounds are asserted against the same claims. For example, the Board recently exercised its discretion where all 31 claims of a patent were challenged and the petitioner presented at total of 49 grounds over multiple petitions. *See e.g.*, *Canon Inc. v. Intellectual Ventures I LLC,* IPR2014-00535, Paper 9, pp. 19-20 (P.T.A.B. Sept. 24, 2014). Such is not the case here. Only four claims are presented for *inter partes* review, challenged under just two distinct grounds.

In view of the reasonable number of challenged claims and grounds presented, Apple also points out that the Board may institute *inter partes* review on any and all grounds where the petitioner "articulate[s] relative strengths and weaknesses between references." *Liberty Mutual,* CBM2012-00003, Paper 7 at 3. Apple does so here.

The first ground presented is based on the Barber thesis. Barber is asserted under 35 U.S.C. § 103 as disclosing each of the claim limitations on its own in view of the knowledge of a POSA and what would have been obvious to a POSA. In this respect, this ground is stronger in that only a single reference is needed to render the claims obvious. Apple asserts that Barber qualifies as prior art under 35 U.S.C. § 102(b) because the claims against which Barber is asserted are entitled

- 13 -

only to the filing date of the '290 patent. These claims specifically recite new matter added to the application that became the '290 patent. In this respect, this ground is arguably weaker in that the patent owner may argue that Barber does not qualify as prior art because in the patent owner's view the '290 patent is entitled to an earlier priority date (even though it is not entitled to an earlier date).

The second ground of rejection is based on the Natarajan and Neve patents. This combination is asserted under 35 U.S.C. § 103 as rendering each of the challenged claims obvious. Both Natarajan and Neve qualify as prior art under 35 U.S.C. § 102(b) even based on the earliest possible priority date for the '290 patent. Thus, the combination of Natarajan and Neve is stronger in that the patent owner cannot even attempt to prove the claims are entitled to an earlier priority date to overcome these references. However, this ground is arguably weaker in that a combination of references is used, rather than a single reference, to demonstrate the obviousness of the challenged claims.

Apple would be prejudiced by the Board's decision to institute trial based *only* on Barber *or* the combination of Natarajan and Neve. If the Board institutes trial, for example, based only on Natarajan and Neve and thereby avoids addressing the '290 patent's lack of priority, Apple would be denied the opportunity to present what is arguably the "stronger" ground of rejection. Yet if the Board institutes trial based only on Barber and the patent owner somehow proves an earlier

priority date, Apple could lose the opportunity to challenge claims that are clearly unpatentable.

Accordingly, the totality of the circumstances here counsels that the Board should use its discretion to institute trial for each of the four challenged claims based on both presented grounds.

## VIII.  GROUNDS OF REJECTION

### A.    Ground 1: Claims 1-4 would have been obvious in view of Barber.

Each and every limitation of claims 1-4 is disclosed by Barber or would have been obvious to a POSA in view of Barber. Therefore, Barber renders obvious claims 1-4 of the '290 patent.

#### 1.    Overview of Barber

The Barber reference is a Master's thesis titled "BodyLAN$^{TM}$: A Low-Power Communications System." (Barber, p. 1.) Notably, the author, Thomas J. Barber Jr., thanks Phil Carvey of Bolt Barenek and Newman. (*Id.* at 3.) Philip Carvey is the named inventor on the '290 patent, assigned on its face to BBN Corporation.

Barber is directed to "a low-power wireless communications system designed to operate within the sphere of the body." (*Id.* at 9.) Barber discloses three possible network configurations, including the "Star" configuration, shown in Figure 1a of Barber, where all communications occur through a central node called the "Hub." (*Id.*) Barber describes that the other nodes



Figure 1a: Star Configuration

formation necessary to align the PEA local symbol clock with the Hub symbol clock "is transmitted to the PEA through synchronization beacons." (Barber, p. 26.) The "expected inter-arrival time" of the synchronization beacons is supplied by the Hub to the PEA "as part of the initial TDMA plan." (*Id.* at 27.) And Barber discloses that "the synchronization beacons are ***based on the code word*** transmitted to the PEA during the attachment mode, ***which is a code specific to that Hub*** rather than a universal code." (*Id.* (emphasis added).) Thus, Barber discloses "wherein said server microcomputer unit transmits RF synchronizing beacons at times within each of a predetermined sequence of frames which times vary in accordance with a code unique to the particular server microcomputer unit," as recited in claim 4. (Grimes Dec. ¶¶ 86-87.)

**B.    Ground 2: Claims 1-4 would have been obvious over Natarajan in view of Neve.**

Each and every limitation of claims 1-4 is disclosed by the combination of Natarajan and Neve or would have been obvious to a POSA in view thereof. Therefore, Natarajan and Neve render obvious claims 1-4 of the '290 patent.

**1.    Overview of Natarajan**

Natarajan is directed to battery power conservation in wireless communications of mobile computers controlled by multi-access protocols. (Natarajan, 1:6-12.) As shown in Figure 1, multiple mobile units (10, 12, 14, 16) communicate with base stations (26, 28) via wireless radio links. (*Id.* at 2:28-39, Figure 1.) The



base stations can be a "conventional microcomputer" and the mobile units can be a "hand held or laptop computer." (*Id.* at 2:40-43, 2:58-59.) Both the base stations and mobile units have an RF transceiver. (*Id.* at 2:51-52, 2:65-67.)

Natarajan states that "the main idea for minimizing battery power consumed by wireless link adapters at the mobile units" is that:

> [s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF). A desirable solution is one in which the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message).

(*Id.* at 3:59-4:6.)

Natarajan discloses that the scheduled multiaccess protocol divides time into "fixed-length frames, and frames are divided into slots." (*Id.* at 4:20-23, FIG. 4.) The frames are divided into subframes for transmission of data packets from the

- 34 -

base station to mobile units, contention-free transmission from mobile units to the base station, and "bursty data traffic" in a contention mode from mobile units to the base station. (*Id.* at 4:27-38.) The base station transmits a header AH to the mobile units that includes: a list of mobile units that will be receiving data packets from the base station, the order in which the mobile units will receive the data packets, and the number of data packets that will be transmitted to each mobile unit. (*Id.* at 4:45-53.)

Natarajan discloses that if a mobile unit is not included in the header AH from the base station, it can turn its receiver off during the base station's transmission time frame because that mobile unit will not be receiving any data. (*Id.* at 4:64-67, FIGS. 8A-8D.) A mobile unit that will be receiving data can compute when the transmission will occur based on its assigned time slot, power up during that time slot to receive its data, and go back to sleep for the remainder of the base station's transmission time frame after receiving its data. (*Id.* at 4:67-5:6.) Natarajan similarly discloses broadcasting another header BH for scheduling which mobile units will be allowed to transmit to the base station and the order they will transmit. (*Id.* at 5:9-19.) Each mobile unit can therefore compute when its designated transmission slot will occur, saving power by powering up only during that time slot. (*Id.* at 5:20-29.) Mobile units that will not be transmitting data to the base station can keep their transmitters powered off. (*Id.* at 6:35-38.)

Natarajan more specifically discloses that header AH includes "a coded description of mobile users that will receive data in the current frame. That is, it is a designation of which mobile users are to communicate with the base station during this frame." (*Id.* at 6:19-22.) Header BH similarly includes "a coded designation or description of mobile users that can transmit data in the current frame." (*Id.* at 6:31-33.) Natarajan discloses assigning each mobile unit an index number during a "registration period" which is "needed to associate each mobile unit in the network with the intended base station." (*Id.* at 6:48-54.) The header AH transmitted from the base station includes a "Receiving Users designation or Index message portion" that is a bit-vector sequence with a bit for each of the registered mobile units. (*Id.* at 6:55-58.) Natarajan discloses that:

> The content of each bit location signals the receiver activity of the user designated or indexed by the bit location. For example, reading left to right, a "1" in the 4'th, 8'th, 9'th, etc. bit location can be used to signal that the 4'th, 8'th, 9'th, etc. mobile unit is designated to receive one message in the current frame period. "0" in the 1'st, 2'nd, 3'rd, etc. bit location signals that the 1'th, 2'nd, 3'rd, etc. mobile unit is in-

```
         | G |AH|      A     |BH|   B   |CH|    C     |FT|
         |...|..||||||||||||||..|||||||||||..|||||||||||||| |
         |...|..|<------------>| |<--------->|..|<---------->|..|
 FIG.4        | Base to      |  | Mobile to| Contention  |  |
              | Mobiles      |  |   Base   | from Mobiles|  |
         ->| FH|  |<----TA----->|  |<---TB---->|  |<---TC------>| |
```

## FIG. 5

```
 | 00010001100000 .................... 1000000 |
 |<----------------------- 64 bits ----------------------->|
```

- 36 -

active (is not designated to receive any data) and can turn its receiver

power OFF until the beginning of Header BH.

(*Id.* at 6:59-68.) An analogous scheme is used in the header BH for transmission

from the mobile units to the base station. (Natarajan, 7:1-6.) This scheduled com-

munication scheme reduces power consumption by requiring that the mobile units

only be powered on during time slots where they will be receiving or transmitting

data. (*Id.* at 7:6-15.)

## 2.    Overview of Neve

Neve is directed to "[a] communication system able to provide multiple path

communication between a plurality of stations operating on a single channel. The

stations are synchronized and a cyclically repeating series of time slots is defined."

(Neve, Abstract.) In order to provide radio data communication, Neve discloses

that each device includes "a transmitter and receiver device (transceiver) 2 which

includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5." (*Id.* at 3:59-

63.) The transceiver is connected to a digital control processor, which controls data

transfer to and from the transmitter and receiver. (*Id.* at 3:64-68.)

Neve discloses that it is "desirable to provide a communications system in

which the transmitting and receiving apparatus is small, may be easily installed in

any location, and is of very low power consumption." (*Id.* at 1:29-34.) Thus,

Neve's system "enables a very low power consumption to be achieved in the cases

where the device requires to transmit data only rarely or the receiver receives the predetermined code signal only rarely…a device may need to transmit data for only a fraction of a second in many hours." (*Id.* at 2:25-31.)

Neve discloses that when data transfer is not taking place, the device can enter a lower power consumption state. (*Id.* at 2:13-16.) The system is designed "automatically to re-enter the data transfer condition when either a signal is received from the device indicative of the need to transmit data or a predetermined code signal is received by the receiver circuit indicative of the need to receive data." (*Id.* at 2:19-24.) Thus, the receiver has very low power consumption because only the internal timing circuitry is energized continuously, whereas the rest of the receiving circuit is energized only when its assigned time slot occurs. (*Id.* at 2:39-41.) Similarly, the transmitter only needs to be energized when transmission is required. (*Id.* at 2:45-47.)

Neve further discloses that "the system is a synchronous communication system with one station designated the master station providing system synchronisation signals, and defining a cyclic sequence of time slots." (*Id.* at 3:9-12.) The time slots include "at least one synchronisation time slot, at least one interrupt time slot, and a plurality of address or data time slots, wherein any other station can transmit a message to the master station during an interrupt time slot to indicate a request to communicate." (*Id.* at 3:12-17.) Neve discloses that the receiver circuit

- 38 -

"includes a low power timing circuit which operates to energise the rest of the receiver circuit only for the time slot in which its address may occur and for the synchronisation time slot thereby enabling it to maintain synchronisation with low power consumption." (*Id.* at 4:43-48.)

### 3.    Overview of the Combination of Natarajan and Neve

Natarajan and Neve are from the same field of endeavor—wireless network communication systems. (Grimes Dec. ¶ 89.) Each prior art reference is concerned with conserving battery power of wireless devices. (Natarajan, Abstract, 1:16-21; Neve, 1:29-34, 2:48-51.) The '290 patent allegedly addresses this same issue. ('290 patent, Abstract, 1:59-61.) Natarajan and Neve reduce power consumption in similar ways by scheduling transmission time slots and having the devices operate in a low power mode when they are not transmitting or receiving data. (Natarajan, Abstract, 3:66-4:7; Neve, Abstract, 2:35-41.) The '290 patent uses a similar technique. ('290 patent, 2:35-40.)

As is evident from these prior art references, many of the claimed elements in the '290 patent are merely standard components of wireless communications systems that are disclosed by both Natarajan and Neve. (Grimes Dec. ¶ 90.) For example, both references disclose a "server microcomputer" base unit that communicates with a plurality of "peripheral units", where each device has an RF

transmitter and receiver. (*See e.g.*, Natarajan, Abstract, FIGS. 1-2; Neve, Abstract, FIG. 1.)

Natarajan also discloses that the purported point of novelty of the '290 patent, a "code sequence" for determining transmission intervals, was well-known. (Grimes Dec. ¶ 91.) As discussed above, Natarajan discloses a coded description of mobile units that will receive and/or transmit data in a given time frame. (Natarajan, 6:15-33.) Natarajan discloses that a sequence of ones and zeros indicates whether or not a mobile unit is designated to receive (or transmit) data during a specified time slot. (*Id.* at 6:59-68.) A mobile unit that will not receive (or transmit) data can turn its receiver (or transmitter) power off. (*Id.* at 5:20-29, 6:66-68.)

Although Natarajan does not explicitly describe synchronizing the mobile units with the base station, Natarajan teaches that coordinated timing of transmissions is important. (Grimes Dec. ¶ 92.) First, Natarajan discloses a "registration period" where the base station indexes each of the mobile units. (Natarajan, 6:48-53.) "The *registration is needed to associate each mobile unit* in the network *with the intended base station*." (*Id.* at 6:53-54 (emphasis added).) Thus, Natarajan teaches "associating" the mobile units and the base station. Second, in order to carry out its scheduled access protocol, Natarajan discloses that the mobile units and base stations each have "a dedicated microprocessor 62 containing *high-resolution time interval determination hardware or 'timers'* typical of real-time microprocessor

- 40 -

systems." (*Id.* at 3:18-21, FIG 3.) The timers provide that "each receiving mobile

unit can compute exactly when it should be ready to receive packets from the base

station (add up the slots allocated to all receiving units that precede it). Each re-

ceiving mobile unit goes to sleep after scheduling to wake itself up at its designat-

ed time for receiving data." (*Id.* at 4:67-5:4.) Natarajan describes how this facili-

tates reduced power consumption by determining when to power on and off the

transmitter and receiver. (*Id.* at 7:7-38.) A POSA would have understood that in

order to execute the coordinated data transmission plan described in Natarajan, it

would have been beneficial to have the timers in the mobile units synchronized

with the base station. (Grimes Dec. ¶ 92.) Thus, a POSA would have been motivat-

ed to precisely synchronize the mobile units with the base unit. (*Id.*)

This would have led a POSA to Neve, which is in the same field of endeavor

as Natarajan and describes a well-known method in wireless communication sys-

tems for synchronizing multiple peripheral devices with a base station. (*Id.* at 93.)

Neve discloses "a synchronous communication system with one station designated

the master station providing system synchronisation signals, and defining a cyclic

sequence of time slots." (Neve, 3:9-12.) During a dedicated "synchronization time

slot," a "synchronization word" is transmitted by the master station. (*Id.* at 7:31-

33.) Neve discloses that the CPU is able to "adjust the phase of the clock used for

synchronous communication for correct reception of the incoming synchronous da-

ta." (*Id.* at 6:15-18.) Neve further discloses that the receivers are energized "only for the time slot in which its address may occur and for the synchronisation time slot thereby enabling it to maintain synchronisation with low power consumption." (*Id.* at 4:43-48.)

A POSA would have combined the synchronization technique described in Neve with the system of Natarajan because Neve is an example of a conventional synchronization technique for a time scheduled data communication system and Natarajan teaches that timing is important for data transmissions in its similar time scheduled communication system. (Grimes Dec. ¶ 94.) Thus, the combination of Natarajan and Neve would have been merely combining prior art elements according to known methods to yield predictable results and using a known technique to improve similar devices in the same way. (*Id.*; *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 416-17 (2007).)

> **4.    Independent claim 1 would have been obvious over Natarajan in view of Neve.**
>
> > **(a)    Natarajan and Neve each disclose "[a] data network system for effecting coordinated operation of a plurality of electronic devices," as recited in claim 1.**

Natarajan discloses a multiaccess protocol for a plurality of mobile electronic devices in "an indoor digital data communication system" where "registration is needed to associate each mobile unit in the network with the intended base station." (Natarajan, 1:67-68, 6:48-54, FIG. 1.) Neve similarly discloses "[a] commu-

nication system able to provide multiple path communication between a plurality of stations operating on a single channel." (Neve, Abstract.) "A large number of communication stations…may be provided in a communication network operating on the same radio frequency." (*Id.* at 4:6-9, FIG. 9.) Thus, Natarajan and Neve each disclose "[a] data network system for effecting coordinated operation of a plurality of electronic devices," as recited in claim 1. (Grimes Dec. ¶¶ 95-96.)

> **(b)** **Natarajan and Neve each disclose "a server microcomputer unit" as recited in claim 1.**

Natarajan discloses "a base station 26 or 28, which may be [a] conventional microcomputer" and that a "server" is "typically also a conventional microcomputer." (Natarajan, 2:40-45, FIGS. 1-2.) Neve similarly discloses that "[o]ne station, which is physically similar to the others but operates a different stored program, may be designated the master station and provides synchronisation signals for all of the other stations (referred to hereinafter as 'slave' stations) and controls access of the stations to the single radio channel." (Neve, 4:10-15, FIG. 9.) Each station includes "a digital control processor 8 controlled by a stored program in memory 9." (*Id.* at 3:64-66, FIGS. 1, 4, and 5.) Neve also describes that the units are portable. (*See e.g.*, *id.* at 2:49-55.) Thus, Natarajan and Neve each disclose "a server microcomputer unit" as recited in claim 1. (Grimes Dec. ¶¶ 97-98.)

> **(c)** **Natarajan and Neve in combination disclose "a plurality of peripheral units which are battery powered and portable, which provide either input information from the user or output information to the user, and which are adapted to operate within short range of said server unit" as recited in claim 1.**

Natarajan discloses a system with a plurality of "mobile units" that are designed "for conserving battery power in a wireless link adapter of a battery operated computer such as a portable laptop computer." (Natarajan, Abstract, FIG. 1.) Neve similarly discloses that the devices each have "a small primary battery" for a "complete self-contained data transmitting and receiving device [that] may be made in a package only a few centimeters in each dimension, allowing it to be mounted almost anywhere that communication is required" (i.e., "portable"). (Neve, 2:48-59.) Thus, Natarajan and Neve each disclose that the peripheral units are "battery powered and portable." (Grimes Dec. ¶ 99.)

Natarajan discloses that "[t]he mobile station may itself be a hand held or laptop computer such as an IBM PS/2 Model L40 SX laptop computer." (Natarajan, 2:58-60.) Natarajan further discloses that "computer 50 runs an operating system 70 which supports one or more user application programs 72." (*Id.* at 3:50-51.) A POSA would have understood that "user application programs" of a "hand held or laptop computer" would have been used to provide "input information from the user" *and* "output information to the user," as recited in claim 1. (Grimes Dec. ¶ 100.) The "user application programs" are the vehicle by which input is provided

- 44 -

from the user and output is provided to the user. (*Id.*) For example, Natarajan describes that during Period A, data is transmitted from the base station to the mobile unit. (Natarajan, 4:30-32.) And during Period B, data is transmitted from the mobile unit to the base station. (*Id.* at 4:33-35.) Transmissions occur according to a "Receiving Users Index" and a "Transmitting Users Index." (*Id.* at 6:17-21, 6:32-34.) Natarajan further describes that "[m]ost users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time for most applications." (*Id.* at 6:41-44.) In view of Natarajan's disclosure, a POSA would have understood that the user can be an active participant in supplying the "input information" and receiving the "output information" via the mobile units, for example, by using the "user application programs." (Grimes Dec. ¶ 100.) Thus, Natarajan discloses that the peripheral devices "provide either input information from the user or output information to the user." (*Id.*)

Natarajan further discloses that "[t]here has been recent work directed to the design of multiaccess protocols for ***portable mobile computer users***, as well as movable boundary protocols for supporting integrated voice/data users in ***mobile indoor radio networks***." (Natarajan, 1:39-43 (emphasis added).) A POSA would have understood that portable computers operating in an *indoor* network would have been "adapted to operate within short range of said server unit." (Grimes Dec. ¶ 101.) Similarly, Neve discloses that its system can be used in an industrial plant,

such as an oil refinery, where "there may typically be of the order of 4000 points between which it is desired to provide data communication for process control purposes…3000 sensors at various points in the plant and perhaps 1000 receiving devices, such as data recording devices or actuators." (Neve, 1:10-15, 1:34-40.) In this environment, the peripheral units would have been "adapted to operate within short range of said server unit." (Grimes Dec. ¶ 101.)

Accordingly, the combination of Natarajan and Neve discloses "a plurality of peripheral units which are battery powered and portable, which provide either input information from the user or output information to the user, and which are adapted to operate within short range of said server unit" as recited in claim 1. (*Id.* at 102.)

> **(d)    Natarajan and Neve in combination disclose "said server microcomputer incorporating an RF transmitter for sending commands and synchronizing information to said peripheral units" as recited in claim 1.**

Natarajan discloses that the base station has an RF transceiver, that is, both an RF transmitter and an RF receiver. (Natarajan, 2:51-58, FIGS. 2 and 3; Grimes Dec. ¶ 103.) Neve similarly discloses "a radio transmitter and receiver apparatus" which has "a transmitter and receiver device (transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-63, FIGS. 1 and 3.)

- 46 -

Natarajan discloses that the base station transmitter sends "commands" to the peripheral units, for example, the headers AH and BH discussed above containing information about which mobile units will receive (or transmit) data and the order in which they will do so. (Natarajan, 4:20-5:19; Grimes Dec. ¶ 104.) Neve similarly discloses that the master station allocates time slots for communication to the slave stations. (Neve, 3:26-28.) The instruction as to which time slot to communicate in is a "command" sent from the master station to the slave station. (Grimes Dec. ¶ 104.) Further, Neve discloses that the slave station "responds to commands on the channel and takes part in transmission and reception." (Neve, 7:46-49.) These "commands" would have been sent by the master station. (Grimes Dec. ¶ 104.) Thus, Natarajan and Neve each disclose that the server microcomputer sends commands to the peripheral units. (*Id.*)

As discussed above, Natarajan teaches that coordinated timing of transmissions is important. Natarajan teaches the need for a "registration period" to associate the mobile units with the base station (Natarajan, 6:48-54), "high-resolution time interval determination hardware" and "timers" (*id.* at 3:18-21, FIG 3), and that the receiving mobile units can compute exactly when to wake up to receive data packets from the base station (*id.* at 4:67-5:4). Thus, Natarajan clearly contemplates the need for precise timing of data transmissions between the base station and mobile units. (Grimes Dec. ¶ 105.) So, although Natarajan does not explicitly

- 47 -

disclose that the base station transmitter sends "synchronizing information" to the mobile units, this feature would have been obvious to a POSA in view of Neve. (*Id*.) Neve discloses that the master station "provides synchronisation signals for all of the other stations." (Neve, 4:10-13, FIG. 2.) Indeed, "[o]ne time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations, designated slave stations, and maintaining synchronization therein." (*Id.* at Abstract.) When the master and slave stations are synchronized, the respective transmitters and receivers can operate at the proper times to provide synchronized data communication. (Grimes Dec. ¶ 106.) The known synchronization technique disclosed in Neve would have improved Natarajan's similar system in this same way. (*Id.*; *KSR*, 550 U.S. at 416-17.)

Accordingly, Natarajan and Neve in combination disclose "said server microcomputer incorporating an RF transmitter for sending commands and synchronizing information to said peripheral units" as recited in claim 1. (Grimes Dec. ¶ 107.)

- 48 -

     **(e)**      **Natarajan and Neve in combination disclose "said pe-ripheral units each including an RF receiver for detect-ing said commands and synchronizing information and including also an RF transmitter for sending input in-formation from the user to said server microcomputer" as recited in claim 1.**

FIG. 2 of Natarajan illustrates "the basic components of a mobile station and a base station." (Natarajan, 2:1-3.) Natarajan describes that "[t]he laptop computer like the base station, is provided with an antenna 42 and a transceiver adapter 44." (*Id.* at 2:65-67, FIGS. 2 and 3.) Thus, the mobile units have an RF transceiver, that is, both an RF transmitter and an RF receiver. (Grimes Dec. ¶ 108.) Neve similarly discloses that the slave stations are "a radio transmitter and receiver apparatus" which has "a transmitter and receiver device (transceiver) 2 which includes an an-tenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-63, FIGS. 1 and 3.)

A POSA would have understood that the receivers in Natarajan and Neve would have been the component responsible for detecting the "commands and syn-chronizing information" described above. (Grimes Dec. ¶ 109.) Natarajan discloses that "[p]ackets received or to be sent are held in data storage 68 and communicated to or from the RF transceiver 54." (Natarajan, 3:28-30.) Natarajan further discloses that "each receiving mobile unit can compute exactly when it should be ready to receive packets from the base station" (*id.* at 4:67-5:2) and that "each mobile unit can compute exactly when it should begin its transmission…it can schedule to

wake up its transmitter at its designated time and then go to sleep (i.e., shut both its transmitter and receiver OFF)" (*id.* at 5:20-26). And Neve discloses that "[o]ne time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations, designated slave stations, and maintaining synchronization therein." (Neve, Abstract.) Neve further discloses that the slave station "responds to commands on the channel and takes part in transmission and reception." (*Id.* at 7:46-49.) These "commands" would have been detected by the slave station's receiver. (Grimes Dec. ¶ 109.) Thus, Natarajan and Neve each disclose that the peripheral units receive commands and synchronization information sent from the server microcomputer. (*Id.*)

Natarajan further discloses that the peripheral unit's RF transmitter "send[s] input information from the user to said server microcomputer." (*Id.* at 110.) Natarajan discloses that there are designated periods "for the contention-free transfer of all traffic from mobile units to base station (inbound traffic)" and "the transfer of all bursty data traffic in a contention mode from mobile units to base station." (Natarajan, 4:33-38.) A POSA would have understood that since the mobile units can be a "hand held or laptop computer" (*id.* at 2:58-59), the data transferred from the mobile units to the base station would have been "input information from the user," for example, via the "user application programs" (*id.* at 3:50-51; Grimes Dec.

¶ 110.) Natarajan further discloses that inbound transmissions from the mobile units occur according to a "Transmitting Users Index" (Natarajan, 6:32-34) and that "[m]ost users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time for most applications" (*id.* at 6:41-43). In view of Natarajan's disclosure, a POSA would have understood that the user can be an active participant in supplying the "input information" via the mobile units. (Grimes Dec. ¶ 110.) And a POSA would have understood that the RF transmitter of the mobile unit would have been responsible for sending this input information. (*Id.*) Thus, Natarajan discloses that the peripheral devices include "an RF transmitter for sending input information from the user to said server microcomputer." (*Id.*)

Accordingly, Natarajan and Neve in combination disclose "said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also an RF transmitter for sending input information from the user to said server microcomputer" as recited in claim 1. (*Id.* at 111.)

**(f)    Natarajan and Neve in combination disclose "said server microcomputer including a receiver for receiving input information transmitted from said peripheral units" as recited in claim 1.**

Natarajan discloses that the base station has an RF transceiver, that is, both an RF transmitter and an RF receiver. (Natarajan, 2:51-58, FIGS. 2 and 3; Grimes Dec. ¶ 112.) Neve similarly discloses "a radio transmitter and receiver apparatus" which has "a transmitter and receiver device (transceiver) 2 which includes an an-

tenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-63, FIGS. 1 and 3.)

Natarajan discloses that "[h]eader BH contains an ordered list of users that will be allowed to transmit to the base station in the current frame." (Natarajan, 5:9-11.) Neve similarly discloses that there is a designated time slot where "the master station receives" from the slave stations. (Neve, 7:31-34.) As discussed above, a POSA would have understood that since the mobile units in Natarajan can be a "hand held or laptop computer" (Natarajan, 2:58-29), the data transferred from the mobile units to the base station would have been "input information" and that the receivers in the base/master stations of Natarajan and Neve would have been the component responsible for receiving the "input information." (Grimes Dec. ¶ 113.)

Accordingly, Natarajan and Neve in combination disclose "said server microcomputer including a receiver for receiving input information transmitted from said peripheral units" as recited in claim 1. (*Id.* at 114.)

> **(g)** **Natarajan and Neve in combination disclose "said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals determined by a code sequence which is timed in relation to said synchronizing information" as recited in claim 1.**

Natarajan discloses that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state

- 52 -

of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)…the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." (Natarajan, 3:59-4:6.) This constitutes "low duty cycle RF bursts." (Grimes Dec. ¶ 115.) Natarajan also discloses that there is a period "for the transfer of all *bursty* data traffic in a contention mode from mobile units to base station (inbound traffic), with a header CH." (Natarajan, 4:36-38 (emphasis added).) Neve similarly discloses a "low power duty cycle." (Neve, 5:60-61.) Neve also discloses that "[t]he slave stations operate in a low power condition except during one of the other time slots when they may receive their own address, or except when they need to transmit data" (*id.* at Abstract) and that the interface circuit of each device is "arranged to energise the transmitter circuit only when transmission is required" (*id.* at 2:42-47). Thus, Natarajan and Neve each disclose that the transmitters are "energized in low duty cycle RF bursts." (Grimes Dec. ¶ 115.)

Natarajan also discloses transmission "intervals determined by a code sequence" as recited by claim 1. (*Id.* at 116.) FIG. 4 of Natarajan illustrates an example of a scheduled multiaccess protocol "in which time is divided into fixed-length frames, and frames are



FIG. 4



FIG. 5

divided into slots." (Natarajan, 4:20-23, FIG. 4.) As discussed above, Natarajan discloses that headers AH and BH are a coded description of mobile units that will receive and/or transmit data in a given time frame. (*Id.* at 6:15-33.) Natarajan discloses that a sequence of ones and zeros (i.e., a series of values) indicates whether or not a mobile unit is designated to receive (or transmit) data during a specified time slot. (*Id.* at 6:59-68.) For example, in header AH shown in FIG. 5, the "1" in the 4[th], 8th, and 9th bit locations indicates that the corresponding mobile units are designated to receive a message in their respective time slots. (*Id.*) Therefore, during these time slots, the base station's (server unit) transmitter is energized to transmit data to the mobile units. (Grimes Dec. ¶ 116.) Similarly, header BH designates which mobile stations are to transmit to the base station and when. (Natarajan, 5:9-11.) Each mobile station can compute exactly when it should begin its transmission, energize its transmitter during its respective time slot to transmit to the base station, and then power off its transmitter. (*Id.* at 5:20-29.) If a mobile station is not designated by header BH to transmit, its transmitter is depowered during its time slot. (*Id.* at 8:54-62.) Therefore, the "code sequence" disclosed by Natarajan is a series of values, where each value in the series represents a time slot where a unit's transmitter is energized or a time slot where a unit's transmitter is depowered.[5] (Grimes Dec. ¶ 116.)

---

[5] Should the Board adopt a broader construction of "code sequence," this

As discussed above, Natarajan teaches the need for a "registration period" to associate the mobile units with the base station (Natarajan, 6:48-54), "high-resolution time interval determination hardware" and "timers" (*id.* at 3:18-21, FIG 3), and that the transmitters can turn on only when it is their turn to transmit (*id.* at 3:66-4:6). Thus, although Natarajan does not explicitly disclose that the base station transmitter sends "synchronizing information" to the mobile units, this feature would have been obvious to a POSA in view of Neve. (Grimes Dec. ¶ 117.) In particular, a POSA would have found the "registration period" to be a logical time to transmit synchronization information, so that the timers were synchronized before the data transmission schedule began. (*Id.*)

The combination of Natarajan and Neve teaches that the "code sequence" is "timed in relation to said synchronizing information." (*Id.* at 118.) A POSA would have understood this broad term to mean that the "synchronizing information" is transmitted either before or after the "code sequence." (*Id.*) Neve discloses that the master station "provides synchronisation signals for all of the other stations." (Neve, 4:10-13, FIG. 2.) Indeed, "[o]ne time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations, designated slave stations, and maintaining synchronization therein." (*Id.* at Abstract.) A POSA would have found it logical to

feature would still be disclosed by Natarajan. (Grimes Dec. ¶ 120.)

transmit synchronization information as taught in Neve during the registration period disclosed in Natarajan in order to accurately synchronize the devices to carry out the data transmission schedule disclosed in Natarajan. (Grimes Dec. ¶ 118.) The code sequence would therefore be "timed in relation to said synchronizing information" in that it would have been transmitted after the timers were synchronized. (*Id.*)

Accordingly, Natarajan and Neve in combination disclose "said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals determined by a code sequence which is timed in relation to said synchronizing information" as recited in claim 1. (*Id.* at 119.)

### 5.  Claim 2 would have been obvious over Natarajan in view of Neve.

The above explanation pertaining to claim 1 also applies to claim 2, which depends therefrom. Natarajan and Neve each disclose the additional limitation of claim 2: *"wherein said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting."* Natarajan discloses "a scheduled multiaccess protocol is used in which time is divided into fixed-length frames, and frames are divided into slots" with "Period A for broadcast of packets from base station to mobile units (outbound traffic)" and "Period B for the contention-free transfer of all traffic from mobile units to base station (inbound traffic)." (Natarajan, 4:20-38, FIG. 4.) Neve similarly discloses that the master sta-

tion defines "a cyclic sequence of time slots" where the master station transmits a synchronization word to the slave stations during a synchronization time slot and the slave stations transmit to the master station in an interrupt time slot. (Neve, 3:9-17, 7:27:33.) Thus, Natarajan and Neve each disclose the limitation recited in claim 2. (Grimes Dec. ¶¶ 121-22.)

### 6. Claim 3 would have been obvious over Natarajan in view of Neve.

The above explanation pertaining to claims 1 and 2 also applies to claim 3, which depends therefrom. Natarajan and Neve in combination disclose the additional limitation of claim 3: *"wherein a code sequence for a given one of said units is transmitted within a respective time slot."* To the extent claim 3 includes a drafting error and should recite *"the* code sequence…is transmitted within a respective time slot,"* the discussion above for claim 1 applies to claim 3. More specifically, the header AH or BH is transmitted in a particular time slot. (*See* Natarajan, FIG. 4.) And although the code sequence is transmitted to all mobile units, it is also for "a given one of said units" because it contains either a one or zero to instruct each particular unit whether or not it will communicate with the base station. (Grimes Dec. ¶ 123.)

To the extent the recited "code sequence" is *another* "code sequence," Natarajan discloses that header AH or BH includes a one or zero in the bit location for each designated mobile unit and that "[t]he content of each bit location signals the

receiver activity of the user designated or indexed by the bit location." (Natarajan, 6:55-68.) Thus, the one or zero is the "code sequence for a given one of said units" and it is "transmitted within a respective time slot"—the header time slot—as recited by claim 3. (Grimes Dec. ¶ 124.) Thus, Natarajan and Neve in combination disclose the limitation recited in claim 3. (*Id.* at 125.)

### 7. Claim 4 would have been obvious over Natarajan in view of Neve.

The above explanation pertaining to claim 1 also applies to claim 4, which depends therefrom. Natarajan and Neve in combination disclose the additional limitation of claim 4: *"wherein said server microcomputer unit transmits RF synchronizing beacons at times within each of a predetermined sequence of frames which times vary in accordance with a code unique to the particular server microcomputer unit."* Neve discloses that the master station "provides synchronisation signals for all of the other stations" (Neve, 4:10-15) and that "[o]ne time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations" (*Id.* at Abstract). Neve also discloses that each receiver has "a pre-assigned address" for "uniquely identifying the device." (*Id.* at 4:38-43.) Natarajan similarly discloses that the receivers are able "to recognize a specific adaptor address as well as a broadcast address." (Natarajan, 3:41-46) Natarajan explains; "assume that there are N users in the system, say, N=64. Then the users can be indexed from 1 to 64 by the base sta-

tion in each user's initial registration period. The registration is needed to associate each mobile unit in the network with the intended base station." (Natarajan, 6:49-54.) As a result, each base station sends a unique code that registers and addresses a subset of the mobile units. (Grimes Dec. ¶ 126.) Thus, a POSA would have found it obvious to include "a code unique to the particular server microcomputer unit" because of the need to associate a group of mobile units with each base station. (*Id.*) Therefore, the limitation recited in claim 4 would have been obvious to a POSA. (*Id.*)

## IX. CONCLUSION

*Inter partes* review of claims 1-4 of U.S. Patent No. 6,128,290 is requested.

Respectfully submitted,
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.


/David K.S. Cornwell/


David K.S. Cornwell, Registration No. 31,944
Mark W. Rygiel, Registration No. 45,871

Date: December 4, 2014          Attorneys for Petitioner Apple

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

- 60 -

## APPENDIX A – EXHIBIT LIST

| Exhibit No. | Description |
| --- | --- |
| **APL 1001** | U.S. Patent No. 6,128,290 to Carvey ("the '290 patent") |
| **APL 1002** | T. J. Barber, Jr., "BodyLAN™: A Low Power Communications System," Master's Thesis at Massachusetts Institute of Technology, 1996 ("Barber") |
| **APL 1003** | U.S. Patent No. 5,241,542 to Natarajan ("Natarajan") |
| **APL 1004** | U.S. Patent No. 4,887,266 to Neve ("Neve") |
| **APL 1005** | Prosecution History of U.S. Application No. 08/949,999 (now U.S. Patent No. 6,128,290) ("the '999 application") |
| **APL 1006** | U.S. Application No. 08/611,695 (as-filed) ("the '695 application") |
| **APL 1007** | Apple's Claim Construction Brief in Case No. 6:13-cv-00919 JDL (EDTX) |
| **APL 1008** | Declaration of Jack D. Grimes, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 6,128,290 ("Grimes Dec.") |
| **APL 1009** | Curriculum Vitae of Jack D. Grimes, Ph.D. ("Grimes CV") |

## CERTIFICATION OF SERVICE (37 C.F.R. §§ 42.6(e), 42.105(a))

The undersigned hereby certifies that the above-captioned **PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 6,128,290**, Petitioner's power of attorney, and all associated exhibits were served in their entireties on December 4, 2014, on the following parties via FedEx®:

| | |
|---|---|
| THE CALDWELL FIRM, LLC<br>PO Box 59655<br>Dept. SVIPGP<br>Dallas, TX 75229<br>*Patent owner's correspondence address of record for U.S. Patent No. 6,128,290* | DSS TECHNOLOGY MANAGEMENT, INC.<br>1650 Tyson's Blvd, Suite 1580<br>Tyson's Corner, VA 22102<br>*Additional address known to Petitioner as likely to effect service* |
| THE CALDWELL FIRM, LLC<br>11680 Harry Hines Boulevard<br>Dallas, TX 75229<br>*Additional address known to Petitioner as likely to effect service* | BUETHER JOE & CARPENTER, LLC<br>1700 Pacific Avenue, Suite 4750<br>Dallas, TX 75201<br>*Additional address known to Petitioner as likely to effect service* |

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

/David K.S. Cornwell/

David K.S. Cornwell
Attorney for Petitioner Apple
Registration No. 31,944

Date: December 4, 2014

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

UNITED STATES PATENT AND TRADEMARK OFFICE
———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————————

APPLE, INC.,
Petitioners,

v.

DSS TECHNOLOGY MANAGEMENT, INC.,
Patent Owner.

———————————

Case: IPR2015-00369
U.S. Patent No. 6,128,290

———————————

# PATENT OWNER DSS TECHNOLOGY MANAGEMENT, INC.'S PRELIMINARY RESPONSE PURSUANT TO 37 C.F.R. §42.107

Patent No. 6,128,290
IPR2015-00369

_____

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     STATEMENT OF RELIEF REQUESTED......................................................... 2

III.    RELATED IPR PETITION ........................................................................... 2

IV.     OVERVIEW OF THE INVENTION CLAIMED IN THE '290 PATENT ........................ 2

        A.      Summary of the '290 Patent .......................................................... 2

        B.      Priority Date of the '290 Patent ..................................................... 5

                1.      The '695 Application satisfies the requirements of Section 112(a) for all
                        limitations of claim 1 of the '290 Patent........................................ 9

V.      CLAIM CONSTRUCTION.............................................................................. 18

        1.      Adapted to operate within a short range of [said server unit].................... 18

        2.      Low duty cycle RF bursts .............................................................. 18

VI.     PETITIONER HAS FAILED TO PROVE THAT THERE IS A REASONABLE
        LIKELIHOOD THAT AT LEAST ONE CLAIM OF THE '290 PATENT IS
        UNPATENTABLE ........................................................................................ 21

        A.      Challenge #1: Barber does not qualify as prior art against the '290 Patent............... 21

        B.      Challenge #2: There is no reasonable likelihood that claims 1-4 are obvious based on
                Natarajan in view of Neve ............................................................. 21

                1.      Natarajan does not disclose that the server transmitter is energized in low duty
                        cycle RF bursts......................................................................... 21

                2.      Neve teaches away from the server transmitter being energized in low duty
                        cycle RF bursts......................................................................... 24

VII.    CONCLUSION............................................................................................. 24

i

Patent No. 6,128,290
IPR2015-00369

---

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Commonwealth Sci. & Indus. Res. Organisation v. Buffalo Tech. (USA), Inc.,*
 542 F.3d 1363, 1380 (Fed. Cir. 2008) .............................................................. 10

*In re Wright,*
 999 F.2d 1557, 1561 ( Fed. Cir. 1993) ............................................................. 13

*In re Fine,*
 837 F.2d 1071, 1076 (Fed. Cir. 1988) .............................................................. 25

*KSR Int'l Co. v. Teleflex Inc.,*
 550 U.S. 398, 418 (2007) ..................................................................................... 21

*Mintz v. Dietz & Watson, Inc.,*
 679 F. 3d 1372, 1379 (Fed. Cir. 2012) ............................................................ 21

*Northern Telecom, Inc. v. Datapoint Corp.,*
 908 F.2d 931, 941 ( Fed. Cir. 1990) ................................................................. 13

*Ralston Purina Co. v. Far-Mar-Co., Inc.,*
 772 F.2d 1570, 1575 (Fed. Cir. 1985) .............................................................. 10

*Tech. Licensing Corp. v. Videotek, Inc.,*
 545 F.3d 1316, 1331 (Fed. Cir. 2008) .............................................................. 10

*Transco Prods., Inc. v. Performance Contracting, Inc.,*
 38 F.3d 551, 556 (Fed. Cir. 1994) ....................................................................... 6

*W.L. Gore & Associates, Inc. v. Garlock, Inc.,*
 721 F.2d 1540 (Fed. Cir. 1983)) ......................................................................... 24

*Waldemar Link GmbH & Co. v. Osteonics Corp.,*
 32 F.3d 556, 558 (Fed. Cir. 1994) ....................................................................... 6

**Decisions of the Patent Trail and Appeal Board**

Patent No. 6,128,290
IPR2015-00369

_____

*Ex parte Martin Reiffin,*
    2007 WL 2814119 (B.P.A.I. Sep. 25, 2007) .................................................. 6

## Federal Statutes

35 U.S.C. § 103 ............................................................................................... 2

35 U.S.C. § 120 ............................................................................................... 7

35 U.S.C. § 314(a) ........................................................................................... 1

35 U.S.C. § 324(a) ........................................................................................... 1

35 U.S.C. 112(a) ......................................................................................... 7, 13

## Federal Regulations

37 C.F.R. § 42.100(b) ..................................................................................... 18

37 C.F.R. § 42.108(c) ....................................................................................... 1

37 C.F.R. § 42.20(c) ....................................................................................... 21

37 C.F.R. § 42.207(a) ....................................................................................... 1

37 C.F.R. § 42.208(c) ....................................................................................... 1

37 C.F.R. §42.20(c) ....................................................................................... 21

iii

Patent No. 6,128,290
IPR2015-00369

---

## **PATENT OWNER'S LIST OF EXHIBITS**

DSS-2001    U.S. Patent No. 5,699,357

DSS-2002    Definition of "*e.g.*," Black's Law Dictionary (9th ed. 2009).

iv

## I.  INTRODUCTION

Pursuant to 37 C.F.R. § 42.207(a), the patent owner, DSS Technology Management, Inc., ("Patent Owner"), hereby submits the following Preliminary Response in response to the Petition for *Inter Partes* Review ("IPR") of U.S. Patent No. 6,128,290 ("the '290 Patent") (APL-1001).

The '290 Patent, entitled "Personal Data Network," issued on October 3, 2000 and has a priority date of March 6, 1996. The '290 Patent contains eleven (11) claims, of which claims 1, 5, 6, 9, and 15 are independent. Petitioner challenges validity of claims 1-4. Petitioner advances the following two invalidity challenges:

(1) obviousness of claims 1-4 under 35 U.S.C. §103 based on a Master's Thesis entitled "BodyLANTM: A Low-Power Communications System" by Thomas J. Barber Jr. ("Barber") (APL-1002); and

(2) obviousness of claims 1-4 under 35 U.S.C. §103 based on U.S. Patent No. 5,241,542 to Natarajan et al. ("Natarajan") (APL-1003) in view of U.S. Patent No. 4,887,266 to Neve et al. ("Neve") (APL-1004).

To institute an IPR review, Petitioner must satisfy its burden of establishing that there is a reasonable likelihood that at least one of the challenged claims of the '290 Patent is unpatentable. *See* 37 C.F.R. § 42.108(c). "The Director may not authorize an *inter partes* review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least one of the claims challenged in the petition." 35 U.S.C. § 314(a). Here, Petitioner failed to meet its burden, and therefore, the Patent Trial and

1

Patent No. 6,128,290
IPR2015-00369

_____

Appeal Board ("the Board") should deny the Petition in its entirety and decline to institute trial

against claims 1-4 of the '290 Patent.

## II.  STATEMENT OF RELIEF REQUESTED

Patent Owner respectfully requests the Board to deny the Petition for an IPR of claims 1-4

of the '290 Patent because Petitioner has failed to prove that there is a reasonable likelihood that

the challenged claims are unpatentable under 35 U.S.C. § 103.

## III.  RELATED IPR PETITION

Petitioner filed another IPR petition against claims 6, 7, 9, and 10 of the '290 Patent in case

IPR2015-00373. The Board's decision in the present case is likely to be pertinent to at least some

of the invalidity challenges advanced by Petitioner in case IPR2015-00373.

## IV.  OVERVIEW OF THE INVENTION CLAIMED IN THE '290 PATENT

In its summary of the '290 Patent, Petitioner omitted several material elements of the

claimed invention. The following overview provides a brief description of the data network system

disclosed and claimed in the '290 Patent, focusing on the elements Petitioner failed to discuss.

### A.  <u>Summary of the '290 Patent</u>

The '290 Patent discloses and claims a data network system that improves bidirectional

wireless data communications between a server microcomputer unit and a plurality of peripheral

units. *See* APL 1001, '290 Patent at 1:11-14. At the time of invention, two major issues hindered

widespread adoption of wireless data communication systems: (1) short battery life and (2)

2

interference from other wireless data systems operating nearby. *See id*. at Abstract. The '290 Patent advanced the state of the art by ameliorating both issues.

The '290 Patent discloses and claims a wireless data system, in which **both the server and peripheral transmitters** are energized in **low duty cycle RF bursts**. *See id*. at claim 1. This feature of the claimed invention achieves two important objectives: (1) it reduces power usage for both the server and the peripheral units because the server transmitter is only energized when the server must transmit data; and (2) it reduces likelihood of interference between nearby wireless ensembles because the server transmits signals only during scheduled communications with a peripheral unit. *See id*. at 1:59-61. The specification of the '290 Patent explains that "[i]f during a particular bit period, two RF bursts are being simultaneously received, one from a transmitter in the home ensemble and the other from a foreign ensemble, the receiver will 'capture' only the data received from the stronger of two transmitters." *Id*. at 6:36-40. Accordingly, by claiming a system in which both the server and peripheral transmitters operate in low duty cycle RF bursts, the '290 Patent significantly reduces the number of transmissions outgoing from the server unit, thereby decreasing the likelihood that nearby peripheral units belonging to a foreign ensemble will receive an unintended data signal from the server. *Id*. at 1:59-61.

At the time of filing of the '290 Patent, the accepted convention in wireless data systems technology was for a server transmitter to *continuously* transmit data, regardless of whether any peripheral units were receiving that data. *See, e.g.,* APL 1004, Neve at 4:48-50 (disclosing that the server unit transmits "idle words" when no active data transmission is scheduled). While the server transmitter is outputting a continuous data stream, the peripheral units schedule to wake themselves up at designated times to receive or transmit data and remain powered down at all other

Patent No. 6,128,290
IPR2015-00369

_____

times. *See, e.g.*, APL 1003, Natarajan at 5:2-4. In such a system, it is only necessary to ensure that

the peripheral receivers are energized at an appropriate time to receive the designated data segment

within the continuous data stream. This scheme is advantageous because it does not require the

server transmitter to be separately energized for each individual transmission to a peripheral unit—

instead, the server must only be energized once to initiate the continuous transmission of the data

stream, and the peripheral units are timed to listen in at appropriate times. If no data has to be

transmitted, the server remains energized and transmits idle signals. *See* APL 1004, Neve at 4:48-

50.

   In sharp contrast, the '290 Patent claims a system in which the server transmitter does not

send a continuous data stream, but instead is energized in RF bursts only when active data

transmission between the server unit and a peripheral unit is scheduled to occur. *See id*. at 1:59-

61. The data network system disclosed in the '290 Patent employs a complex synchronization

scheme to achieve a functioning system in which *both* the server and peripheral transmitters are

energized in low duty cycle RF bursts. See id. at 10:5-11:8. The server unit must initiate a separate

transmission to each unit at the exact time as the peripheral unit's receiver is tuning in to listen.

This scheme introduces complexities to the data network system because the server must be very

closely synchronized with the peripheral units. For this reason, the '290 Patent discloses a complex

synchronization scheme in which the peripheral units are equipped with voltage controlled crystal

oscillators, whose frequency must be aligned with the frequency of the server's oscillator to

establish precise synchronization between the server unit and the peripheral unit. *See id*. at 10:35-

61. The '290 Patent introduces these complexities into a wireless data system to allow both the

4

Patent No. 6,128,290
IPR2015-00369

_____

server and peripheral transmitters to be energized only when an active data transmission must occur and remain powered down at all other times.

In conclusion, the '290 Patent explicitly states that its objectives include "provision of such a data network which requires extremely low power consumption" and "avoids interference from nearby similar systems." *Id.* at 1:39-44. The '290 Patent achieves these objectives by creating a data network system in which, *inter alia*, both "***server and peripheral transmitters [are] energized in low duty cycle RF burst***s." *Id.* at claim 1 (emphasis added); *see also id.* at 1:59-61 ("The low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals.").

## B. Priority date of the '290 Patent

The '290 Patent issued from Application No. 08/949,999 ("the '999 application") (APL 1005) filed on October 14, 1997. The '290 Patent claims the benefit of priority from the U.S. Application No. 08/611,695 ("the '695 Application") (APL 1006) on a basis of being continuation-in-part thereof. The '695 Application was filed on March 6, 1996 and issued into the U.S. Patent No. 5,699,357 ("the '357 Patent) (DSS-2001). Challenged claims 1-4 are fully supported by the original disclosure of the '695 Application for the reasons provided below, and therefore, are entitled to the priority date of the '695 Application.

Petitioner alleges that claim 1 recites new matter not disclosed in the '695 Application. *See* Petition at pg. 6. This is not true. Petitioner fails to recognize that the '695 Application discloses and claims a data network system having the ***exact same structure*** as the system claimed in the '290 Patent, and therefore, all functional capabilities of the system claimed in the '290 Patent are

5

Patent No. 6,128,290
IPR2015-00369

250 nanoseconds. The 125-nanosecond transit time corresponds to a distance of approximately 37 meters.[3]

Both the '290 Patent and the '695 Application expressly provide that the operable range of the system to enable the protocol is constrained by the distance at which the "accuracy of synchronization is not appreciably affected by transit time delays." A POSA would appreciate that the claimed system, as disclosed identically in both the '290 and '695 Applications, has a maximum operational range that is greater than the non-limiting examples of two meters and twenty meters disclosed in the '695 Application the '290 Patent respectively.

In conclusion, the '695 Application discloses every limitation of claim 1, including the disputed limitation "peripheral units . . . adapted to operate within *short range* of said server unit" in a manner that satisfies the requirements of 35 U.S.C. § 112. Accordingly, the Board should find that claims 1-4 of the '290 Patent are entitled to March 6, 1996 priority date of the '695 Application.

## V.   CLAIM CONSTRUCTION

The Board generally interprets the claims of an unexpired patent according to the broadest reasonable interpretation ("BRI") standard. *See* 37 C.F.R. § 42.100(b).

### 1.   *Adapted to operate within a short range of [said server unit]*

The phrase "adapted to operate within a short range of [said server unit]" is defined in the specification of the '290 Patent as a distance that does not meaningfully affect the radio frequency

---

[3] The time of flight for the signals is determined by the speed of light in air, which is approximately 1 meter per 3.33 nanoseconds. In 125 nanoseconds, a signal will travel 37.54 meters.

Patent No. 6,128,290
IPR2015-00369

_____

transmission transit time. *See* APL 1001, '290 Patent at 1:50-56. Patent Owner proposes that this

phrase be construed as "***adapted to operate within a range where the transmission transit time***

***does not meaningfully affect the accuracy of synchronization***." This construction is precisely

how the inventor defined it: "[t]he short distances involved means that accuracy of synchronization

is not appreciably affected by transit time delays." *See* APL 1001, '290 Patent at 1:50-56.

Petitioner's proposed construction is based on a non-limiting example provided in the '290

specification. Petitioner contends that short range has no common meaning in the art, and thus,

reasons that "short range" should be construed in view of the specification. *See* Petition at pg. 9.

Petitioner further states that "[t]he '290 patent is clear that short range is 'close physical proximity,

e.g., within twenty meters.'" Petition at pg. 29 (*citing* APL 1001, '290 patent at 1:50-56). Petitioner

fails to disclose the complete passage relating to "close physical proximity" on which it relies in

defining "short range" as "within twenty meters." The complete passage is as follows:

> The data network of the present invention utilizes the fact that
> the server microcomputer unit and the several peripheral
> units which are linked are all in close physical proximity,
> ***e.g.***, *within twenty meters*, <u>to establish</u>, with very high
> accuracy, <u>a common time base or synchronization</u>. The <u>short
> distances</u> involved [sic] <u>means</u> that accuracy of the
> <u>synchronization</u> is not appreciably affected by <u>transit time
> delays</u>.

> *See* APL 1001, '290 Patent, at 1:50-56 (emphasis added).

Accordingly, the '290 Patent teaches that the peripheral and server units must be in close physical

proximity to establish a common time base so that the synchronization is not appreciably affected

by transit time delays.

The term "*e.g.*" means "for example." DSS-2002. The use of the terms "for example"

specifically signifies the broader scope than encompassed by the example. Any distance, so long

19

Patent No. 6,128,290
IPR2015-00369

as "the accuracy of the synchronization is not appreciably affected by transit time delays" is within the operable range of the invention. Lacking clear disclaimer, the phrase "within a short range" should be given the broader definition, which complies with the BRI standard, provided by the inventor and proposed here by the Patent Owner.

Furthermore, as explained in Part IV.B.1, *supra*, a POSA would understand that the term "short range" is not limited by an exemplary operable range, but instead, is constrained by the technical aspects of the invention. Specifically, the '290 Patent explicitly required that the "short distances" involved are such that synchronization is not appreciably affected by transit time delays. As shown in Part IV.B.1(c), *supra*, the maximum operational range of the disclosed data network system extends beyond the twenty-meter example. *See* Part IV.B.1., *supra*. Accordingly, under the BRI standard, the Board should construe the limitation "*adapted to operate within a short range*" as "*a distance at which the accuracy of the synchronization is not appreciably affected by transit time delays*."

### 2. *Energized in low duty cycle RF bursts*

Patent Owner proposes that the claim language "*energized in low duty cycle RF bursts*" be given its plain and ordinary meaning. Alternatively, if the Board finds any ambiguity, the specification of the '290 Patent states that "[t]he low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals." APL 1001, '290 Patent at 1:59-61. Accordingly, the limitation "*energized in low duty cycle RF bursts*" should be construed as "*a pulsed operation that substantially reduces power consumption and facilitates the rejection of interfering signals*."

20

Patent No. 6,128,290
IPR2015-00369

_____

Although Petitioner did not provide an explicit construction for this claim term, both Petitioner and Petitioner's expert stated that a transmitter is energized in **_low duty cycle RF bursts_** if the transmitter "**_consumes power only when it is actively transmitting a message._**" *See* Petition at pg. 54; *see also* APL 1008 at ¶115.

Patent Owner believes that the Board's decision on whether to institute trial will be the same under either construction.

## VI.  PETITIONER HAS FAILED TO PROVE THAT THERE IS A REASONABLE LIKELIHOOD THAT AT LEAST ONE CLAIM OF THE '290 PATENT IS UNPATENTABLE

### A.   Challenge #1: Barber does not qualify as prior art against the '290 Patent

As established in Part IV.B., *supra*, claims 1-4 of the '290 Patent are entitled to March 6, 1996 priority date. Barber did not become publicly available at least until April 11, 1996. For this reason, Barber does not qualify as prior art against claims 1-4 of the '290 Patent. Accordingly, the Board should deny Petitioner's invalidity challenge based on this reference.

### B.  Challenge #2: There is no reasonable likelihood that claims 1-4 are obvious based on Natarajan in view of Neve

In a trial before the Board, Petitioner "has the burden of proof to establish that it is entitled to the requested relief." *See* 37 C.F.R. §42.20(c). In this case, Petitioner has not met this burden because the combination of the cited prior art references does not teach or suggest all limitations of challenged claim 1.

#### 1.  Natarajan does not disclose that the server transmitter is energized in low duty cycle RF bursts

21

Patent No. 6,128,290
IPR2015-00369

_____

It is well established in the United States patent law that challenges on obviousness grounds cannot be sustained by mere conclusory statements. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Instead, "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id*. As the Federal Circuit eloquently stated: "[o]bviousness requires a court to walk a tightrope blindfolded (to avoid hindsight) – an enterprise best pursued with the safety net of objective evidence." *See Mintz v. Dietz & Watson, Inc.*, 679 F. 3d 1372, 1379 (Fed. Cir. 2012).

In its invalidity challenge based on Natarajan in view of Neve, Petitioner ignores a material limitation of claim 1: "***said _server_ and peripheral transmitters being energized in low duty cycle RF bursts***." APL 1001, '290 Patent at claim 1. Petitioner profusely quotes disclosures of Natarajan and Neve teaching that the transmitters of the ***_peripheral units_*** (*i.e.* mobile units, portable units, slave stations) are energized only when they are actively transmitting data. *See* Petition at pg. 53. Petitioner, however, does not provide any objective evidence that could reasonably lead to a conclusion that these references also disclose that the transmitter of the ***_server unit_*** (*i.e.* base, hub, master) is energized in low duty cycle RF bursts.

Based on its analysis of Natarajan and Neve's descriptions of how the peripheral units operate, Petitioner concludes that "Natarajan and Neve each disclose that ***the transmitters*** are 'energized in low duty cycle RF bursts.'" *Id*. (emphasis added). Petitioner, therefore, completely ignores the fact that claim 1 does not merely recite "***transmitters***," but rather, it explicitly requires "said ***_server_ and** peripheral **transmitters being energized in low duty cycle RF bursts***." APL 1001, '290 Patent at claim 1. In fact, other than the excerpt quoted below, Part VIII.B.4(g) of the Petition

22

Patent No. 6,128,290
IPR2015-00369

---

provides no reasoning as to why the cited prior art could render obvious the limitation of claim 1 requiring the **server** transmitter to be energized in ***low duty cycle RF bursts***:

> For example, in header AH shown in FIG. 5, the "1" in the 4th, 8th, and 9th bit locations indicates that the corresponding mobile units are designated to receive a message in their respective time slots. (*Id.*) Therefore, <u>during these time slots</u>, the base station's (***server unit***) <u>transmitter is energized</u> to transmit data to the mobile units. (Grimes Dec. ¶ 116.)
>
> Petition at pg. 54 (emphasis added)

Patent Owner does not dispute the correctness of this assertion. However, the premise that the server transmitter is energized during the time slots at which the mobile units are scheduled to receive data <u>does not</u> logically lead to a conclusion that the server transmitter is powered OFF during the remaining time slots when no active transmission between the server and peripheral units occurs. According to Petitioner, to satisfy the "low duty cycle" limitation of claim 1, the transmitter must be powered ON ***only*** during data transfer and powered OFF at all other times. *See* Petition at pg. 53; *see also* APL 1008, Grimes Dec. at ¶115. Natarajan and Neve <u>do not</u> disclose that the **server** transmitter operates in such a way. Therefore, even under Petitioner's interpretation of the terms "energized in low duty cycle RF bursts," Natarajan and Neve fail to teach or suggest that the transmitter of the server unit is energized in low duty cycle RF bursts.

Natarajan discloses in detail the scheduling plan according to which "[e]ach receiving ***mobile unit*** goes to sleep after scheduling to wake itself up at its designated time for receiving data. After receiving its packets, the mobile unit goes to sleep for the remainder of period A." APL 1003, Natarajan at 5:2-6. Notably, Natarajan states nothing about the ***server*** transmitter turning itself OFF and scheduling to wake up at an appropriate time to transmit data to the receiving mobile

23

Patent No. 6,128,290
IPR2015-00369

---

units. In fact, when Natarajan calculates the power savings provided by its system, it only takes into account the savings associated with the mobile unit operating in low duty cycle RF bursts. *See id*. at 7:22-58. Natarajan neither teaches nor suggests that the operation of the server unit provides any power savings, thereby further buttressing a conclusion that, unlike the mobile units, the server transmitter <u>does not</u> operate in low duty cycle RF bursts.

For the reasons set forth above, the Petition lacks any reasoning or objective evidence that could reasonably establish that Natarajan and Neve teach or suggest that "said ***server*** and peripheral ***transmitters are energized in low duty cycle RF bursts.***"

## 2.  <u>Neve teaches away from the server transmitter being energized in low duty cycle RF bursts</u>

It has become axiomatic that "[a] prior art reference must be considered in its entirety, i.e., as a whole, including portions that would lead away from the claimed invention." *W.L. Gore & Associates, Inc. v. Garlock, Inc*., 721 F.2d 1540 (Fed. Cir. 1983)). Neve explicitly discloses that the server unit remains energized even when it is not actively transmitting any data to the peripheral units. *See* APL 1004, Neve at 4:48-50. ("If no data is currently required to be transmitted, ***the master station transmits idle words***.") (emphasis added). Neve explains that "***the master station*** has to allocate the various virtual circuits to the time slots in a manner avoiding interference between the data paths whilst utilizing the available time slots efficiently. An ***idle word is transmitted if no other transmission is needed***." *See id*. at 7:14-19. Accordingly, Neve discloses a server transmitter that is constantly ON, even when no active data transfer is scheduled between the server unit and a peripheral unit. For this reason, Neve not only lacks disclosure of "said ***server***

24

Patent No. 6,128,290
IPR2015-00369

---

and peripheral ***transmitter being energized in low duty cycle RF bursts***," but in fact, <u>teaches away</u> from this limitation of claim 1.

For the reasons set forth above, Natarajan in view of Neve do not render claim 1 obvious. Claims 2-4 depend from patentable claim 1, and therefore are patentable as a matter of law. *See In re Fine*, 837 F.2d 1071, 1076 (Fed. Cir. 1988). Accordingly, the Board should deny Petitioner's challenge of claims 1-4 based on obviousness over Natarajan in view of Neve.

### VII. CONCLUSION

For the reasons set forth above, Petitioner failed to show that there is a reasonable likelihood that Petitioner would prevail in an IPR trial with respect to a single claim of the '290 Patent based on the two challenges advanced in the Petition. Accordingly, the Board should deny the Petition in its entirety and decline to institute the IPR trial of the '290 Patent.

Date: March 30, 2015                                        Respectfully submitted,

<u>/andriy lytvyn/</u>

Andriy Lytvyn
Lead Counsel for Patent Owner
Registration No. 65,166

**SMITH & HOPEN, PA**

180 Pine Avenue North
Oldsmar, FL 34677
Tel: 813-925-8505
Fax: 800-726-1491
Email: andriy.lytvyn@smithhopen.com

Patent No. 6,128,290
IPR2015-00369

---

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, in accordance with 37 C.F.R. § 42.6(e), the above

Preliminary Response of the Patent Owner and a copy of the Exhibits were served via electronic

mail on March 30, 2015, in their entirety upon the following:


David K.S. Cornwell, Lead Counsel for Petitioner
davidc-PTAB@skgf.com

Mark W. Rygiel, Back-Up Counsel for Petitioner
mrygiel-PTAB@skgf.com



Date: March 30, 2015                              /andriy lytvyn/
                                                  Andriy Lytvyn
                                                  Lead Counsel for Patent Owner
                                                  Registration No. 65,166

                                                  **SMITH & HOPEN, P.A.**
                                                  180 Pine Avenue North
                                                  Oldsmar, FL 34677
                                                  (813) 925-8505

26

Trials@uspto.gov                                              Paper No. 9
571-272-7822                                        Entered:  June 25, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.,
Petitioner,

v.

DSS TECHNOLOGY MANAGEMENT, INC.,
Patent Owner.
_____

Case IPR2015-00369
Patent 6,128,290
_____

Before JAMESON LEE, MATTHEW R. CLEMENTS, and
CHARLES J. BOUDREAU, *Administrative Patent Judges*.

BOUDREAU, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2015-00369
Patent 6,128,290

# I. INTRODUCTION

On December 4, 2014, Petitioner Apple Inc. ("Apple") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–4 of U.S. Patent No. 6,128,290 (Ex. 1001, "the '290 patent"). On March 30, 2015, Patent Owner DSS Technology Management, Inc. ("DSS") timely filed a Preliminary Response (Paper 8, "Prelim. Resp."). We have jurisdiction under 35 U.S.C. § 314, which provides that *inter partes* review may not be instituted "unless . . . there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Upon consideration of the Petition, Preliminary Response, and the proffered evidence, we conclude that Apple has established a reasonable likelihood that it would prevail in challenging the patentability of claims 1–4 of the '290 patent under 35 U.S.C. § 103(a) on one of the grounds presented. Accordingly, we institute *inter partes* review of those claims.

## A. Related Matters

The parties inform us that the '290 patent is the subject of two district court actions: *DSS Technology Management, Inc. v. Apple, Inc.*, No. 5:14-cv-05330-LHK (N.D. Cal.), and *DSS Technology Management, Inc. v. Lenovo (United States), Inc.*, No. 6:14-cv-00525-JDL (E.D. Tex.). Pet. 3–4; Paper 4, 2. Additionally, claims 6, 7, 9, and 10 of the '290 patent are the subject of a concurrently filed petition for *inter partes* review, IPR2015-00373.

## B. The '290 Patent (Ex. 1001)

The '290 patent, titled "Personal Data Network," issued October 3, 2000, from U.S. Patent Application No. 08/949,999 (Ex. 1005, 22–62, "the

2

IPR2015-00369
Patent 6,128,290

'999 application"). The '999 application was filed October 14, 1997, as a
continuation-in-part ("CIP") of U.S. Patent Application No. 08/611,695 (Ex.
1006, 21–61, "the '695 application"), filed March 6, 1996, which matured
into U.S. Patent No. 5,699,357 (Ex. 2001, "the '357 patent"). *See* Ex. 1001,
col. 1, ll. 6–8.

 The '290 patent relates to a data network for bidirectional wireless
data communications between a host or server microcomputer unit and a
plurality of peripheral units referred to as personal electronic accessories
(PEAs). Ex. 1001, col. 1, ll. 11–14, col. 2, ll. 15–18. Among the objects of
the invention is the provision of a data network that requires extremely low
power consumption, "particularly for the peripheral units," avoids
interference from nearby similar systems, and is of relatively simple and
inexpensive construction. *Id.* at col. 1, ll. 33–34, 39–45. Figure 1 of the
'290 patent, reproduced below, is illustrative of the described wireless data
network system.



FIG. 1

3

IPR2015-00369
Patent 6,128,290

Figure 1 is a block diagram of a wireless data network system linking a server microcomputer, referred to as "personal digital assistant (PDA) 11," with a plurality of peripheral units, or PEAs, 21–29. *Id.* at col. 2, ll. 42–44, col. 2, l. 66–col. 3, l. 15.

According to the '290 patent, "the server microcomputer unit and the several peripheral units which are to be linked are all in close physical proximity, e.g., within twenty meters, to establish, with very high accuracy, a common time base or synchronization." *Id.* at col. 1, ll. 50–54. "Using the common time base, code sequences are generated which control the operation of the several transmitters in a low duty cycle pulsed mode of operation." *Id.* at col. 1, ll. 57–59. "The server and peripheral unit transmitters are energized in low duty cycle pulses at intervals which are determined by a code sequence which is timed in relation to the synchronizing information initially transmitted from the server microcomputer." *Id.* at col. 2, ll. 35–39. "The low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals." *Id.* at col. 1, ll. 59–61. "In the intervals between slots in which a PEA is to transmit or receive, all receive and transmit circuits are powered down." *Id.* at col. 4, ll. 6–8.

### C. Illustrative Claim

As noted above, Apple challenges claims 1–4 of the '290 patent. Claim 1, the sole independent claim challenged, is reproduced below. Challenged claims 2–4 depend directly or indirectly from claim 1.

1. A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:

a server microcomputer unit;

IPR2015-00369
Patent 6,128,290

a plurality of peripheral units which are battery powered and portable, which provide either input information from the user or output information to the user, and which are adapted to operate within short range of said server unit;

said server microcomputer incorporating an RF transmitter for sending commands and synchronizing information to said peripheral units;

said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also an RF transmitter for sending input information from the user to said server microcomputer;

said server microcomputer including a receiver for receiving input information transmitted from said peripheral units;

said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals determined by a code sequence which is timed in relation to said synchronizing information.

Ex. 1001, col. 11, l. 61–col. 12, l. 18.

## D. Evidence of Record

Apple relies on the following references, as well as the Declaration of Jack D. Grimes, Ph.D. (Ex. 1008):

| Reference | Exhibit |
|---|---|
| Thomas J. Barber Jr., BODYLAN<sup>TM</sup>: A LOW-POWER COMMUNICATION SYSTEM (M.S. thesis, Massachusetts Institute of Technology) ("Barber") | 1002 |
| Natarajan (U.S. Patent No. 5,241,542; issued Aug. 31, 1993) | 1003 |
| Neve (U.S. Patent No. 4,887,266; issued Dec. 12, 1989) | 1004 |

5

IPR2015-00369
Patent 6,128,290

### E. *Asserted Grounds of Unpatentability*

Apple challenges the patentability of the challenged claims on the following two grounds:

| Reference(s) | Basis | Claims Challenged |
|---|---|---|
| Barber | § 103(a) | 1–4 |
| Natarajan and Neve | § 103(a) | 1–4 |

## II. DISCUSSION

### A. *Claim Interpretation*

In *inter partes* review proceedings, claims of an unexpired patent are given their broadest reasonable interpretation in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012); *see In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1278–82 (Fed. Cir. 2015). Under this standard, we interpret claim terms using "the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the applicant's specification." *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997). We presume that claim terms have their ordinary and customary meaning. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks omitted). A patentee, however, may rebut this presumption by acting as his own lexicographer, providing a definition of the term in the specification with "reasonable

IPR2015-00369
Patent 6,128,290

clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Apple asks us to construe two phrases: "within short range of said server unit," as recited in claim 1, and "code sequence," as recited in claims 1 and 3. Pet. 9–11. DSS responds to Apple's proposed construction of only the first of these phrases and additionally asks us to construe "energized in low duty cycle RF bursts," also recited in claim 1. Prelim. Resp. 18–21.

*(1) "within short range of said server unit"*

Outside of claim 1, the phrase "short range" appears only in the Abstract of the '290 patent, where it is stated that the peripheral units are located "within short range of the server unit, e.g. within 20 meters." Apple argues that "[w]hile the '290 patent uses 'within 20 meters' as an example (by using 'e.g.'), this is the ***only*** indication in the '290 patent as to what the newly added term 'short range' means." Pet. 9. Moreover, according to Apple, "the term 'short range' has no commonly accepted meaning in the art," and a person of ordinary skill in the art "would not have understood this term to have a meaning outside of the guidance provided by the specification." *Id.* Accordingly, Apple proposes that the broadest reasonable interpretation of "within short range of said server unit" is "within 20 meters of said server unit." *Id.* at 9–10.

DSS counters that "[t]he phrase 'adapted to operate within a [sic] short range of [said server unit]' is defined in the specification of the '290 Patent as a distance that does not meaningfully affect the radio frequency transmission time" and proposes that the phrase instead be construed as "adapted to operate within a range where the transmission transit time does not meaningfully affect the accuracy of synchronization." Prelim. Resp. 18–

7

IPR2015-00369
Patent 6,128,290

19 (citing Ex. 1001, col. 1, ll. 50–56) (third alteration in original) (boldface and italics omitted).  According to DSS:

> Petitioner's proposed construction is based on a non-limiting example provided in the '290 specification.  Petitioner contends that short range has no common meaning in the art, and thus, reasons that "short range" should be construed in view of the specification.  *See* Petition at pg. 9.  Petitioner further states that "[t]he '290 patent is clear that short range is 'close physical proximity, e.g., within twenty meters.'"  Petition at pg. 29 (*citing* [Ex.] 1001, '290 patent at 1:50–56).  Petitioner fails to disclose the complete passage relating to "close physical proximity" on which it relies in defining "short range" as "within twenty meters." The complete passage is as follows:

> > The data network of the present invention utilizes the fact that the server microcomputer unit and the several peripheral units which are linked are all in close physical proximity, **_e.g._**, *within twenty meters*, to establish, with very high accuracy, a common time base or synchronization. The short distances involved [sic] means that accuracy of the synchronization is not appreciably affected by transit time delays.

> > *See* [Ex.] 1001, '290 Patent, at 1:50–56 (emphasis added).

> > . . . .

> > The term "*e.g.*" means "for example."  [Ex.] 2002.  The use of the terms "for example" specifically signifies the broader scope than encompassed by the example.  Any distance, so long as "the accuracy of the synchronization is not appreciably affected by transit time delays" is within the operable range of the invention.  Lacking clear disclaimer, the phrase "within a short range" should be given the broader definition, which complies with the BRI standard, provided by the inventor and proposed here by the Patent Owner.

*Id.* at 19–20.

8

IPR2015-00369
Patent 6,128,290

We are unable to locate the purported quotation from page 29 of the Petition cited by DSS. Regardless, the passage identified by Apple from the Abstract of the '290 patent, which actually uses the phrase "within short range," is more directly probative of the construction of "within short range of said server unit" than is the passage quoted by DSS from column 1, lines 50–56, of the '290 patent, which instead relates to the phrase "close physical proximity." Claim 1 does not recite "close physical proximity." Given, however, that the '290 patent also associates the phrase "close physical proximity" to an exemplary range of "within twenty meters" (Ex. 1001, col. 1, ll. 50–53), similar to the phrase "within short range" (Ex. 1001, Abstract), there is at least an appearance that "within short range" and "close physical proximity" are used interchangeably. The association of "close physical proximity" to "within twenty meters" also supports construing "within short range" as meaning "within twenty meters."

As stated above, the phrases "within 20 meters" and "within twenty meters" are preceded in both the Abstract and column 1 of the '290 patent with "e.g." (*see* Ex. 1001, Abst., col. 1, l. 53). We accordingly look elsewhere in the Specification for additional indication of what "within short range" means. Any description related to the benefit achieved by the "within short range" feature is apposite. In that regard, the Specification, at column 1, lines 54–56, states: "The short distances involved means that accuracy of synchronization is not appreciably affected by transit time delays." On this record, we construe "within short range" to mean "within a range in which the accuracy of synchronization is not appreciably affected by transit time delays, including at least the range of within 20 meters."

IPR2015-00369
Patent 6,128,290

*(2) "code sequence" and "energized in low duty cycle RF bursts"*

Apple contends that "[a] 'code sequence' is not a term of art and therefore must be construed in view of the '290 patent specification." Pet. 10. Citing three instances of the phrase "code sequence" in the Specification of the '290 patent, Apple proposes that the broadest reasonable interpretation of that phrase in view of the Specification is "a series of values, where each value in the series represents a time slot where a unit's transmitter is energized or a time slot where a unit's transmitter is depowered." *Id.* at 10–11 (citing Ex. 1001, col. 1, ll. 57–59, col. 2, ll. 35–39, col. 3, ll. 43–44). DSS neither responds to Apple's proposal nor offers any alternative interpretation.

DSS proposes that the phrase "energized in low duty cycle RF bursts" be given its plain and ordinary meaning, or alternatively, in the event of any ambiguity, that it should be construed as "a pulsed operation that substantially reduces power consumption and facilitates the rejection of interfering signals." Prelim. Resp. 20 (boldface and italics omitted).

We conclude that it is not necessary for our determination of whether to institute *inter partes* review of claims 1–4 of the '290 patent to construe expressly the phrases "code sequence" and "energized in low duty cycle RF bursts." Only those terms which are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

*B. Obviousness of Claims 1–4 over Barber*

Apple contends that claims 1–4 of the '290 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Barber, which Apple asserts was published "at least as early as April 11, 1996." Pet. 12, 15, 18–33.

10

IPR2015-00369
Patent 6,128,290

According to Apple, claims 1–4 recite features first disclosed in the '999 application, and accordingly, are entitled only to the benefit of the '999 application's October 14, 1997 filing date, rather than the March 6, 1996 filing date of the '695 parent application. *Id.* at 7. Because April 11, 1996, was more than one year prior to October 14, 1997, Apple asserts that Barber is prior art under at least 35 U.S.C. § 102(b). *Id.* at 12. DSS counters that claims 1–4 are fully supported by the original disclosure of the '695 application and are, therefore, entitled to the benefit of the March 6, 1996 filing date of the '695 application. Prelim. Resp. 5.

For the reasons explained below, we are not persuaded that Apple has established a reasonable likelihood that it would prevail on this ground with respect to each of claims 1–4, regardless of whether claims 1–4 are entitled to the '695 application's March 6, 1996 filing date or only to the '999 patent's October 14, 1997 filing date.

As the Board has previously explained, to qualify as a printed publication within the meaning of § 102, "a reference 'must have been sufficiently accessible to the public interested in the art' before the critical date." *Actavis, Inc. v. Research Corp. Techs., Inc.*, Case IPR2014-01126, slip op. at 9 (PTAB Jan. 9, 2015) (Paper 22) (quoting *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989). Whether a reference is publicly accessible is determined on a case-by-case basis, based on the "facts and circumstances surrounding the reference's disclosure to members of the public." *In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009). A reference is considered publicly accessible if it was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it. *Id.* Having reviewed

11

IPR2015-00369
Patent 6,128,290

Apple's arguments and proffered evidence, we determine that Apple has not satisfied its burden to prove that Barber qualifies as prior art.

Apple merely asserts, without any citation of evidence, that Barber "was published at least as early as April 11, 1996." Pet. 12. Apple's expert, Dr. Grimes, likewise asserts, without citing any additional evidence, that Barber was "submitted January 30, 1996, [and] archived in Massachusetts Institute of Technology Libraries April 11, 1996" (Ex. 1008, 6).

We acknowledge that the cover page of Barber includes a stamp reading "ARCHIVES MASSACHUSETTS INSTITUTE OF TECHNOLOGY APR 11 1996 LIBRARIES." Ex. 1002, 1. That stamped date, however, would appear to be a hearsay statement to the extent that it would be offered for its truth (*see* Fed. R. Evid. 801). Further, even if Apple could establish either that the statement is excluded from hearsay or that an exception to the rule against hearsay should apply, such that we would admit the stamped date as evidence of when the thesis was archived, the stamp does not establish when, if ever, the thesis became publicly accessible.

We must decide whether to institute a trial based on "the information presented in the petition" (35 U.S.C. § 314(a)). In this case, Apple has not identified sufficient evidence on the record before us to qualify Barber as prior art. Apple has submitted no evidence, for example, to establish that the thesis was indexed, cataloged, and shelved in the university library prior to the filing of the '999 application. *See Cronyn*, 890 F.2d at 1161; *cf. In re Hall*, 781 F.2d 897 (Fed. Cir. 1986). We conclude, therefore, that Apple has not demonstrated a reasonable likelihood that it would prevail at trial in challenging claims 1–4 of the '290 patent under 35 U.S.C. § 103(a) over Barber. Because our conclusion does not turn on whether claims 1–4 are

12

IPR2015-00369
Patent 6,128,290

entitled to the priority date of the '695 application or only that of the '999 application, we further conclude that it is not necessary for our determination of whether to institute *inter partes* review of claims 1–4 of the '290 patent to decide that issue.

### C. Obviousness of Claims 1–4 over Natarajan and Neve

Apple contends that claims 1–4 of the '290 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Natarajan and Neve. Pet. 33, 42–59. We are persuaded that Apple has established a reasonable likelihood that it would prevail on this ground with respect to each of claims 1–4, for the reasons explained below.

### (1) Natarajan

Natarajan is directed to power conservation in wireless communication, particularly battery efficient operation of wireless link adapters of mobile computers (also referred to, inter alia, as battery powered computers, hand held or laptop computers, mobile units, and mobile stations) as controlled by multiaccess protocols used in wireless communication. Ex. 1003, col. 1, ll. 7–13, col. 2, l. 32, Abst. Figure 2 of Natarajan is reproduced below.

13

IPR2015-00369
Patent 6,128,290



Figure 2 is a block diagram of a digital data communication system of the type in which Natarajan's invention is implemented, illustrating the basic components of a mobile station and a base station. *Id.* at col. 1, l. 67–col. 2, l. 3. As depicted in Figure 2, mobile stations 10, 12, 14, and 16 communicate with gateways (i.e., base stations 26, 28) connected with server 18, via wireless transceivers adapters 36, 44. *Id.* at col. 2, ll. 32–39, 51–52, 58–59, 65–67. According to Natarajan:

> The scheduled access multiaccess protocol is implemented to effectively conserve battery power by suitable control of the state of the controller, the transmitter and receiver units at the wireless link adapter by scheduling when the adapter is in a normal running mode, or a standby mode in which power is conserved.

*Id.*, Abst; *see also id.* at col. 3, l. 66–col. 4, l. 1.

Natarajan discloses that "[a] desirable solution is one in which the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." *Id.* at 4:3–6.

14

IPR2015-00369
Patent 6,128,290

Natarajan further discloses that the scheduled multiaccess protocol divides time into "fixed-length frames, and frames are divided into slots." *Id.* at col. 4, ll. 20–23. The frames are divided into subframes for transmission of data from the base station to mobile units (outbound traffic) as well as transmission of data from mobile units to the base station (inbound traffic). *Id.* at col. 4, ll. 27–38. According to Natarajan, at least one slot is assigned to each mobile computer designated to communicate with the base station. *Id.* at col. 10, ll. 26–29. The battery power of the wireless link adapter for a given mobile computer is turned on to full power during the at least one assigned slot, and the battery power of the wireless link adapter is substantially reduced during the remaining time slots. *Id.* at col. 10, ll. 29–37.

With respect to outbound traffic, Natarajan discloses that the base station broadcasts a header that includes a list of mobile users that will be receiving data packets from the base station in the current frame, the order in which the mobile users will receive the data packets, and the bandwidth allocated to each user. *Id.* at col. 4, ll. 45–53. According to Natarajan, a mobile unit that is not included in the header from the base station can turn its receiver "OFF" for the duration of the current subframe. *Id.* at col. 4, ll. 64–67. Additionally, the adapter of each receiving mobile unit can compute exactly when it should be ready to receive packets from the base station by adding up the slots allocated to all receiving units that precede it, power "ON" during that time slot to receive its data, and go back to sleep for the remainder of the subframe. *Id*. at col. 4, l. 67–col. 5, l. 6.

For inbound traffic, Natarajan similarly discloses that the base station broadcasts a header that includes an ordered list of users that will be allowed

<div align="center">15</div>

IPR2015-00369
Patent 6,128,290

to transmit packets to the base station in the current frame and the bandwidth allocated to each. *Id.* at col. 5, ll. 9–19. Using the information regarding the number of packets that each user can transmit, each mobile unit can compute exactly when it should begin its transmission. *Id.* at col. 5, ll. 20–22. Once each mobile station computes its exact time for transmission, it can shut both its transmitter and receiver "OFF" until the designated time, and then turn "ON" and transmit for a fixed period of time whose duration depends on the number of slots allocated to it. *Id.* at col. 5, ll. 23–29.

*(2) Neve*

Neve is directed to a communication system able to provide multiple path communication between a plurality of stations operating on a single channel. Ex. 1004, Abst. Neve discloses that one station, which is physically similar to the others but operates a different stored program, may be designated the "master" station and provides synchronization signals for all of the other stations (referred to as "slave stations") and controls access of the stations to the single radio channel. *Id.* at 4:10–15.

According to Neve, the stations are synchronized and a cyclically repeating series of time slots is defined. *Id.* at Abst. One time slot in each cycle is reserved for the transmission of synchronization information by the master station for reception by the slave stations and for maintaining synchronization therein. *Id.* Another time slot is reserved for any slave station to transmit a message indicating that it needs to communicate to another station, such indication preferably being by transmitting its own pre-assigned address code. *Id.* The remaining time slots are used for transmitting address information and data. *Id.*

16

IPR2015-00369
Patent 6,128,290

Neve discloses that when data transfer is not taking place, the described devices can enter a lower power consumption state. *Id.* at col. 2, ll. 13–16. The system is designed automatically to re-enter the data transfer condition when either a signal is received from the device indicative of the need to transmit data or a predetermined code signal is received by the receiver circuit indicative of the need to receive data. *Id.* at col. 2, ll. 19–24. Neve discloses that the receiver has very low power consumption because only the internal timing circuitry is energized continuously, whereas the rest of the receiving circuit is energized only when its assigned time slot occurs. *Id.* at col. 2, ll. 39–41. More particularly, the receiver circuit includes a low power timing circuit that operates to energize the rest of the receiver circuit only for the time slot in which its address may occur and for the synchronization time slot, thereby enabling it to maintain synchronization with low power consumption. *Id.* at col. 4, ll. 43–48. Neve similarly discloses that the interface circuit is arranged to energize the transmitter circuit only when transmission is required. *Id.* at col. 2, ll. 45–47.

*(3) Analysis*

Apple contends that Natarajan discloses all limitations of claims 1–4, with the exception of explicit disclosure of the server unit sending "synchronizing information" to the mobile units, as recited in claim 1, and "synchronizing beacons," as recited in claim 4. Pet. 42–59. Apple further contends that Neve discloses those elements not disclosed explicitly by Natarajan. *Id.* Upon review of the Petition, we are persuaded that Apple has shown a reasonable likelihood that it would prevail in establishing the unpatentability of claims 1–4 on this ground.

17

IPR2015-00369
Patent 6,128,290

DSS makes two principal arguments regarding Natarajan and Neve in the Preliminary Response. First, DSS argues that Natarajan does not disclose that the server transmitter is energized in low duty cycle RF bursts. Prelim. Resp. 21. According to DSS, Apple "profusely quotes disclosures of Natarajan and Neve teaching that the transmitters of the ***peripheral units*** (*i.e.* mobile units, portable units, slave stations) are energized only when they are actively transmitting data," but "does not provide any objective evidence that could reasonably lead to a conclusion that these references also disclose that the transmitter of the ***server unit*** (*i.e.* base, hub, master) is energized in low duty cycle RF bursts." *Id.* at 22. DSS does not dispute that, during time slots in which Natarajan's mobile units are designated to receive a message, the base station's (i.e., the server unit's) transmitter is energized to transmit data to the mobile units. *Id.* at 23 (quoting Pet. 54). DSS contends, however, that the server transmitter's being energized during the time slots at which the mobile units are scheduled to receive data "does not logically lead to a conclusion that the server transmitter is powered OFF during the remaining time slots when no active transmission between the server and peripheral units occurs" (*id.*).

Based on the record before us, we are persuaded that the disclosure of Natarajan pertaining to a scheduled multi-access protocol in which time is divided into fixed-length frames, along with Natarajan's description of frames being divided into slots and multiple subframes, is sufficient to demonstrate a reasonable likelihood that Natarajan discloses "said server and peripheral transmitters being energized in low duty cycle RF bursts," as recited in claim 1. Claims 1–4 do not recite any requirement that the server transmitter must be "powered OFF" during the time slots when no active

18

IPR2015-00369
Patent 6,128,290

transmission between the server and peripheral units occurs; nor is such required by the plain and ordinary meaning of the claim phrase "energized in low duty cycle RF bursts." Regardless, by disclosing, for example, that "a scheduled multi-access protocol is used in which time is divided into fixed-length frames" and that "frame[s] [are] divided into multiple subframes," including different periods for broadcast of packets from base station to mobile units (outbound traffic) and for transfer of traffic from mobile units to base station (inbound traffic) (*see, e.g.*, Ex. 1003, col. 4, ll. 20–22, 28–38), we are persuaded for purposes of this Decision that Natarajan conveys that both the receivers and the transmitters in the base station, as well as in the mobile units, are energized only in low duty cycle RF bursts.

Second, DSS argues that Neve teaches away from the server transmitter being energized in low duty cycle RF bursts. Prelim. Resp. 24. According to DSS, "Neve explicitly discloses that the server unit remains energized even when it is not actively transmitting any data to the peripheral units" and "[f]or this reason, Neve not only lacks disclosure of 'said ***server*** and peripheral ***transmitter*** [sic] ***being energized in low duty cycle RF bursts***,' but in fact, <u>teaches away</u> from this limitation of claim 1." *Id.* at 24–25. In support of that contention, DSS cites portions of Neve stating "[i]f no data is currently required to be transmitted, ***the master station transmits <u>idle words</u>***" and "[a]n ***<u>idle word</u> is transmitted if no other transmission is needed***." *Id.* at 24 (quoting Neve 4:48–50, 7:17–19 (emphasis added by DSS)).

Based on the record before us, we are not persuaded that Neve teaches away from the server transmitter being energized in low duty cycle RF bursts. When the sentences quoted by DSS are read in the context of the full

19

IPR2015-00369
Patent 6,128,290

disclosure of Neve, those sentences do not suggest continuous transmission from the master station, but instead transmission of idle words in the event that there is no data required to be transmitted in the time slots specifically allocated for transmission by the server. Neve explicitly discloses that the described synchronous communication system, which includes "one station designated the master station," "allows stations to remain in an inactive condition when they are not communicating." Ex. 1004, col. 3, ll. 9–20. Neve also discloses that the master station performs different functions during different time slots, only certain of which involve transmission:

> After the master station is powered up it scans its table of time slot allocations. . . . If the time slot is a synchronisation time slot the synchronisation word is transmitted. *If it is an interrupt time slot the master station receives*. If a valid address is received this is entered into the table of active slave stations requiring communication. *During the other time slots either a housekeeping operation is performed* as previously described or the master station takes part in a communication operation *or the master station monitors the channel* if the time slot has been allocated to communication between two slave stations. If the time slot is unassigned the idle word is transmitted.

Ex. 1004, col. 7, ll. 27–42 (emphases added).

Because, on this record, Apple has identified sufficient evidence to support its contention that the combination of Natarajan and Neve would have rendered obvious the subject matter of claims 1–4 of the '290 patent, we conclude that Apple has established a reasonable likelihood that it would prevail at trial in challenging those claims under 35 U.S.C. § 103(a) over the combination of Natarajan and Neve.

20

IPR2015-00369
Patent 6,128,290

## III. CONCLUSION

We conclude that Apple has shown a reasonable likelihood that it would prevail at trial in demonstrating that claims 1–4 of the '290 patent are unpatentable under 35 U.S.C. § 103(a).

At this stage of the proceeding, the Board has not made a final determination as to the patentability of any challenged claim or the construction of any claim term.

## IV. ORDER

Upon consideration of the record before us, it is, therefore,

ORDERED that an *inter partes* review is instituted as to claims 1–4 of the '290 patent under 35 U.S.C. § 103(a) as unpatentable over Natarajan and Neve;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '290 patent is hereby instituted commencing on the entry date of this Decision, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial;

FURTHER ORDERED that no other grounds set forth in the Petition as to claims 1–4 of the '290 patent are authorized.

21

IPR2015-00369
Patent 6,128,290

PETITIONER:

David K.S. Cornwell
davidc-PTAB@skgf.com


Mark W. Rygiel
mrygiel-PTAB@skgf.com



PATENT OWNER:

Andriy Lytvyn
andriy.lytvyn@smithhopen.com

Anton J. Hopen
anton.hopen@smithhopen.com

Nicholas Pfeifer
nicholas.pfeifer@smithhopen.com

22

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE, INC.,
Petitioners,

v.

DSS TECHNOLOGY MANAGEMENT, INC.,
Patent Owner.

_____

Case: IPR2015-00369
U.S. Patent No. 6,128,290

_____

**PATENT OWNER DSS TECHNOLOGY, INC.'S
RESPONSE TO PETITION**

Patent No. 6,128,290
IPR2015-00369

## TABLE OF CONTENTS

I.    INTRODUCTION................................................................................1

II.   RELATED IPR PETITION ...............................................................1

III.  OVERVIEW OF THE INVENTION CLAIMED IN THE '290 PATENT ......1

      A.   Summary of the prior art .........................................................2

      B.   Summary of the '290 Patent and its advancement over the prior art ........5

IV.   CLAIM CONSTRUCTION ...............................................................8

V.    PETITIONER HAS FAILED TO PROVE THAT CLAIMS 1-4 OF THE '290 PATENT ARE UNPATENTABLE................................................................15

      A.   Claims 1-4 are not rendered obvious by Natarajan in view of Neve .......15

           1.   Natarajan does not teach or suggest that the server transmitter is energized in low duty cycle RF bursts...........................................15

                a.   Natarajan is silent with respect to operation of server transmitter during outbound data traffic periods ..............15

                b.   The HDLC packet structure disclosed in Natarajan is inconsistent with a server transmitter being energized in low duty cycle RF bursts..................................................20

                c.   Natarajan's disclosure of "bursty traffic" during the contention period does not teach or suggest that the server transmitter is energized in RF bursts................................22

                d.   Petitioner failed to meet its burden of establishing that Natarajan in view of Neve teaches or suggests that the server transmitter is energized in low duty cycle RF bursts ......................................................................24

i

Patent No. 6,128,290
IPR2015-00369

2.    Combining Natarajan with Neve does not cure deficiencies of Natarajan and further suggests that the combination of these references does not teach or suggest that server transmitter is energized in low duty cycle RF bursts ............................................27

    a.    Petitioner's expert distinguished Neve from transmissions involving RF bursts ........................................................27

    b.    Neve does not teach or suggest that server transmitter is energized in low duty cycle RF bursts .............................30

    c.    Neve reinforces the conclusion that Natarajan does not teach or suggest the server transmitter being energized in low duty cycle RF bursts ...................................................31

3.    The Board should not give any weight to Petitioner's expert's testimony pertaining to the issue of whether Natarajan in view of Neve teaches or suggests that server transmitters be energized in low duty cycle RF bursts ................................................................33

VI.  CONCLUSION ................................................................................36

Appx0384

Patent No. 6,128,290
IPR2015-00369

_____

## TABLE OF AUTHORITIES

**Federal Cases**

*KSR Int'l Co. v. Teleflex Inc.*,
 550 U.S. 398, 418 (2007) ..................................................... 15, 25

*Microsoft Corp. v. Proxyconn, Inc.*,
 789 F.3d 1292, 1298 (Fed. Cir. 2015) ...........................................9

*Mintz v. Dietz & Watson, Inc.*,
 679 F. 3d 1372, 1379 (Fed. Cir. 2012) .......................................16

*In re Fine*,
 837 F.2d 1071, 1076 (Fed. Cir. 1988). .......................................36


**Decisions of the Patent Trail and Appeal Board**

*Liberty Mutual Insurance Co. v. Progressive Casualty Insurance Co.*,
 CBM2013-00009, Final Written Decision at pg. 47 (Feb. 11, 2014). ..........33


**Federal Statutes**

35 U.S.C. §103(a) ..................................................................1


**Federal Regulations**

37 C.F.R. § 42.100(b) ...........................................................8

37 C.F.R. § 42.6(e)...............................................................38

iii

Patent No. 6,128,290
IPR2015-00369

---

## PATENT OWNER'S LIST OF EXHIBITS

DSS-2001    U.S. Patent No. 5,699,357

DSS-2002    Definition of "*e.g.*," Black's Law Dictionary (9th ed. 2009)

DSS-2003    Myk Dormer, *Low Duty Cycle?*, Electronics World Magazine, Dec. 2008, *available at* http://www.radiometrix.com/files/additional/Low-Duty-Cycle.pdf

DSS-2004    U.S. Pat. No. 7,558,232

DSS-2005    U.S. Pat. No. 7,092,762

DSS-2006    U.S. Pat. No. 7,049,620

DSS-2007    U.S. Pat. No. 8,837,653

DSS-2008    U.S. Pat. No. 8,727,561

DSS-2009    Definition of "burst," Chambers Dictionary of Science and Technology (1st ed. 1999)

DSS-2010    Tom Sheldon, *Encyclopedia of Networking & telecommunications*, 549, (Lisa Wolters-Broder ed., McGraw Hill 2001)

DSS-2011    U.S. Pat. No. 3,598,914

DSS-2012    U.S. Pat. No. 6,983,031

DSS-2013    Yurcik, William J., *Serial and Parallel Transmission*. Computer Sciences. 2002. Encyclopedia.com, *available at* http://www.encyclopedia.com

DSS-2014    *Asynchronous HDLC MC68360 ASYNC HDLC Protocol Microcode User's Manual*, 8, (Freescale Semiconductor, Inc. 1996)

DSS-2015    Transcript of 08-27-2015 Deposition Testimony of Dr. Jack Duane Grimes

Patent No. 6,128,290
IPR2015-00369

_____

DSS-2016    Declaration of Mr. Robert Dezmelyk

DSS-2017    Wmat Auppu, *AIF Inter DSP Communication*, 1, *available at*
            http://processors.wiki.ti.com/index.php/AIF_Inter_DSP_Communica
            tion

v

Patent No. 6,128,290
IPR2015-00369

_____

## I.  INTRODUCTION

On June 25, 2015, the Board instituted trial with respect to claims 1-4 of the U.S. Patent No. 6,128,290 ("the '290 Patent") (APL 1001) owned by DSS Technology Management, Inc., ("Patent Owner"). Specifically, the Board instituted trial based on a single ground:

(1) obviousness of claims 1-4 under 35 U.S.C. §103(a) based on U.S. Pat. No. ("Natarajan") (APL 100) in view of U.S. Pat. No ("Neve") (APL 100);

Patent Owner submits this Response to the invalidity challenge listed above. For the reasons set forth below, the Board should find claims 1-4 patentable over Natarajan in view of Neve.

## II.  RELATED IPR PETITION

Petitioner filed another IPR petition against claims 6, 7, 9, and 10 of the '290 Patent in case IPR2015-00373. The Board's decision in the present case is likely to be pertinent to case IPR2015-00373.

## III.  OVERVIEW OF THE INVENTION CLAIMED IN THE '290 PATENT

In its summary of the '290 Patent, Petitioner omitted several material elements of the claimed invention. The following overview provides a brief summary of the

1

prior art and a concise description of the data network system disclosed and claimed in the '290 Patent, focusing on the elements Petitioner failed to discuss.

### A. <u>Summary of the prior art</u>

At the time of filing of the '290 Patent, wireless data networks had several major shortcomings. The accepted convention in wireless data networks was to partition a multiaccess protocol into fixed-length frames, wherein each frame is further divided into the following subframes: (1) outbound transmission period for broadcast of data from server unit to Peripheral units, (2) inbound contention-free traffic for the contention-free transfer of all transmissions from Peripheral units to the server unit, and (3) inbound contention traffic for the transfer of data traffic in a contention mode from Peripheral units to the server unit. *See* APL 1003, Natarajan at 4:30-38. A server unit would transmit to peripheral units during the outbound transmission period and receive transmissions from peripheral units during the time periods designated for inbound data traffic. *See id*.

During the outbound transmission period, the server would transmit a continuous data stream which comprises data packets addressed to peripheral units and idle words when no other transmission is needed. *See, e.g.,* DSS 2010, Encyclopedia of Networking, at pg. 549 ("If no data is being transmitted, this same

sequence is continuously transmitted so the end systems remain synchronized."); *see also* APL 1004, Neve at 4:48-50 (disclosing that the server unit transmits "idle words" when no active data transmission is scheduled); DSS-2016, Dezmelyk Dec. at ¶ 38. Idle words are important to operability of such systems because idle transmissions maintain synchronization between the server unit and the Peripheral units. *See* DSS-2010, Encyclopedia of Networking, at pg. 549; *see also* DSS-2015, Grimes Cross-Exam at 43:20-22 – 44:1-7. The following is a brief explanation of the idle word transmissions and the advantages they provide:

> idle words are injected by the terminal whenever there are no data words available to be transmitted. In some applications, this approach is found to be desirable because it avoids the necessity of bringing the transmitting and receiving ends of the signaling channel into synchronization each time the stream of actual data words is interrupted as when there is no data to be sent. Since the system is in continuous operation, delays occasioned by the need to resynchronize may largely be avoided.

> DSS-2011 at 1:14-22.

In such data networks, the server transmitter would transmit a continuous data stream during the outbound transmission period. *See* DSS-2016, Dezmelyk Dec. at ¶ 28. The peripheral units would schedule to wake themselves up at designated times

to receive data segments within the data stream addressed to them and power down after the data is received. *See, e.g.*, APL 1003, Natarajan at 5:2-4. In such a system, it is only necessary to ensure that each peripheral receiver is energized at an appropriate time to receive the designated data segment within the continuous data stream. *See* DSS-2016, Dezmelyk Dec. at ¶ 28. This scheme is advantageous because it does not require that the server transmitter be energized at the exact time for each individual transmission—instead, the server transmitter remains energized for the duration of the outbound transmission period, and the peripheral units are timed to listen in at appropriate times. *See id.* If no data has to be transmitted in a particular time slot, the server transmits idle signals. *See* APL 1004, Neve at 4:48-50.

The data networks that existed prior to the '290 Patent had two major drawbacks. First, a server-PEA ensemble in which the server transmitter operates in a continuous or a high duty cycle is likely to interfere with nearby foreign ensembles. *See* DSS-2016, Dezmelyk Dec. at ¶ 19. By transmitting idle words when no data transmission is necessary, the likelihood of collisions between the transmission of two nearby ensembles increases: the longer the duration during which the transmitter is energized, the higher the likelihood that at some point during that transmission period a signal coming from a nearby second ensemble will interfere with the signal transmitted by the first ensemble. *See id.* Second, in applications where the server

4

_____

unit is battery-operated, transmission of idle words, in addition to an active

transmission of useful data packets, significantly increases power consumption

making the data network unsuitable for low-power applications. *See id.* at ¶ 29; *see*

*also* APL-1002 at pg. 11.

### B. Summary of the '290 Patent and its advancement over the prior art

The '290 Patent discloses and claims a data network system that improves

bidirectional wireless data communications between a server microcomputer unit

and a plurality of peripheral units. *See* APL 1001, '290 Patent at 1:11-14. At the time

of invention, two major issues hindered widespread adoption of wireless data

communication systems: (1) short battery life and (2) interference from other

wireless data systems operating nearby. *See id.* at Abstract. The '290 Patent

advanced the state of the art by ameliorating both issues.

The '290 Patent discloses and claims a wireless data system, in which both

the server and peripheral transmitters are energized in low duty cycle RF bursts. *See*

*id.* at claim 1. This feature of the claimed invention achieves two important

objectives: (1) it reduces power usage for both the server and the peripheral units

because the server transmitter is only energized when the server must transmit data;

and (2) it reduces the likelihood of interference between nearby wireless ensembles

5

because the server transmits signals only during scheduled communications with a peripheral unit. *See id*. at 1:59-61. The specification of the '290 Patent explains that "[i]f during a particular bit period, two RF bursts are being simultaneously received, one from a transmitter in the home ensemble and the other from a foreign ensemble, the receiver will 'capture' only the data received from the stronger of two transmitters." *Id*. at 6:36-40. Accordingly, by claiming a system in which both the server and peripheral transmitters operate in low duty cycle RF bursts, the '290 Patent significantly reduces the number of transmissions outgoing from the server unit, thereby decreasing the likelihood that a nearby foreign ensemble will receive an unintended data signal. *Id*. at 1:59-61.

In sharp contrast to the data network systems described in Section III.A., *supra*, the '290 Patent claims a system in which the server transmitter does not transmit a continuous data stream, but, instead, is energized in low duty cycle RF bursts only when active data transmissions between the server unit and a peripheral units are scheduled to occur. *See id*. at 1:59-61; *see also* DSS-2015, Grimes Cross-Exam at 44:9-11 ("[T]he patent only talks about transmissions that are done for the purpose of conveying useful data to the receiving entity."). The data network system disclosed in the '290 Patent employs a complex synchronization scheme to achieve a functioning system in which both the server and peripheral transmitters are

6

energized in low duty cycle RF bursts. *See* APL 1001, '290 Patent at 10:5-11:8; *see also* DSS-2016, Dezmelyk Dec. at ¶ 20. The '290 Patent discloses a synchronization scheme in which the peripheral units are equipped with voltage controlled crystal oscillators, whose frequencies are aligned with the frequency of the server's oscillator to establish precise synchronization between the server unit and the peripheral unit. *See* APL 1001, '290 Patent at 10:35-61. The synchronization scheme disclosed in the '290 Patent makes it possible for both the server and peripheral transmitters to be energized only when an active data transmission must occur and remain powered down at all other times, thereby achieving "low power consumption and avoidance of interference between nearby similar systems." *See id*. at Abstract; *see also* DSS-2016, Dezmelyk Dec. at ¶ 21. This advancement over the prior art is captured in the following limitation of claim 1: "said server and peripheral transmitters being energized in *low duty cycle RF bursts*."

The '290 Patent explicitly states that its objectives include "provision of such a data network which requires extremely low power consumption" and "avoids interference from nearby similar systems." APL 1001, '290 Patent at 1:39-44. The '290 Patent achieves these objectives by creating a data network system in which, *inter alia*, both "*server and peripheral transmitters [are] energized in low duty cycle RF bursts*," wherein"[t]he low duty cycle pulsed operation both substantially

7

Patent No. 6,128,290
IPR2015-00369

---

reduces power consumption and facilitates the rejection of interfering signals." *Id*.

at claim 1 (emphasis added) and at 1:59-61.

## IV. CLAIM CONSTRUCTION

The Board generally interprets the claims of an unexpired patent according to

the broadest reasonable interpretation ("BRI") standard. *See* 37 C.F.R. § 42.100(b).

In *Microsoft Corp. v Proxyconn, Inc.*, the Federal Circuit provided the following

guidance pertaining to proper application of the BRI standard to claim terms in the

context of an IPR:

> [T]he protocol of giving claims their broadest reasonable
> interpretation does not include giving claims a legally
> incorrect interpretation. Rather, claims should always be
> read in light of the specification and teachings in the
> underlying patent. The PTO should also consult the
> patent's prosecution history in proceedings in which the
> patent has been brought back to the agency for a second
> review. Even under the broadest reasonable interpretation,
> **the Board's construction cannot be divorced from the**
> **specification and the record evidence, and must be**
> **consistent with the one that those skilled in the art would**
> **reach**. A construction that is unreasonably broad and
> which does not reasonably reflect the plain language and
> disclosure will not pass muster.

8

Patent No. 6,128,290
IPR2015-00369

---

> *Microsoft Corp. v Proxyconn, Inc.*, 789 F.3d 1292, 1298
> (Fed. Cir. 2015) (internal quotations omitted) (emphasis
> added).

### 1.  Claim construction the Board applied in the Institution Decision

In the Institution Decision, the Board held that: "it is not necessary for our determination of whether to institute *inter partes* review of claims 1–4 of the '290 patent to construe expressly the phrases 'code sequence' and 'energized in low duty cycle RF bursts.'" Institution Decision at pg. 10. The Board also found that "Claims 1–4 do not recite any requirement that the server transmitter must be "powered OFF" during the time slots when no active transmission between the server and peripheral units occurs; nor is such required by the plain and ordinary meaning of the claim phrase 'energized in low duty cycle RF bursts.'" Institution Decision at pg. 18-19. This finding is inconsistent with the record before the Board because this finding contradicts construction proposed by Patent Owner, Petitioner's statements, and testimonies of both parties' experts.

Although Petitioner did not provide an explicit construction for "low duty cycle RF bursts," both Petitioner and Petitioner's expert stated the following: "the transmitter (or receiver) *consumes power <u>only</u> when it is <u>actively</u> transmitting a message* (or actively receiving a message). ***This constitutes low duty cycle RF***

9

*bursts*.")" *See* Petition at pg. 54 and APL 1008 at ¶115 (internal quotations omitted) (emphasis added). Mr. Dezmelyk, the expert for Patent Owner, also testified that the server transmitter remaining energized when it is not actively transmitting data to the peripheral units is inconsistent with a low duty cycle operation. *See* DSS-2016, Dezmelyk Dec. at ¶ 35. Therefore, although claims 1-4 do not explicitly require that the server transmitter be energized only when it is actively transmitting a message and powered down when there is no data to transmit, this requirement is imposed by the "energized in low duty cycle RF bursts limitation." *See* Petition at pg. 54; *see also* APL 1008 at ¶115; DSS-2016, Dezmelyk Dec. at ¶ 36.

### 2. *Low duty cycle*

"Low duty cycle" is a term of art in wireless communication data networks. Under broadest reasonable interpretation, a POSITA would have understood "***duty cycle***" of the server transmitter as "***the ratio of actual duration during which the server transmitter is energized to the total duration designated for outbound transmissions***."

This construction is consistent with the one provided by Petitioner's expert: "[t]he low-duty cycle refers to the ratio of the time spent transmitting versus the time spent nontransmitting." DSS-2015, Grimes Cross-Exam at 41:7-9. "Low-duty

10

cycle tells you that most of the time there's nothing being sent. And when there is something being sent, that's what's called a burst." *Id*. at 31:10-12. "[T]he key thing is that the burst is small -- the time it takes is small relative to the overall time that the transmitter *could have been transmitting*." *Id*. at 46:12-15 (emphasis added); *see also* DSS-2016, Dezmelyk Dec. at ¶ 27. Accordingly, the duty cycle of the server transmitter must be calculated over the total duration designated for the outbound transmissions. *See* DSS-2016, Dezmelyk Dec. at ¶ 23. Time slots designated for the inbound data traffic are not taken into account because the server transmitter could not have been transmitting during these time slots. *See* DSS-2015, Grimes Cross-Exam at 60:19-22 ("[W]hen the units are receiving information, their respective transmitters can't be operating. If they were, they would not be able to receive information."); *see also* DSS-2016, Dezmelyk Dec. at ¶ 23.

Under the broadest reasonable interpretation, a POSITA would have understood that a server transmitter is energized in a low duty cycle when the server transmitter is energized for less than ten percent (10%) of the total duration designated for outbound transmissions. *See* DSS-2016, Dezmelyk Dec. at ¶ 24. This range is consistent with the specification of the '290 Patent. *See id*. For example, for the outbound transmissions involving Optically Orthogonal Codes,

11

Patent No. 6,128,290
IPR2015-00369

the '290 patent discloses that "a maximum of three RF bursts can occur in each section," wherein each section comprises sixty-four (64) slots. *See* APL 1001, '290 Patent at 7:23-33, *see also* DSS-2016, Dezmelyk Dec. at ¶ 26. This scheme results in the server transmitter being energized for 4.688% of the transmission period, which falls well within the low-duty cycle range of 10%. *See* APL-1001 at 7:22-32. Another example of outbound transmission disclosed in the '290 Patent involves transmission of synchronization beacons (SBs): "[e]ach SB consists of eight RF bursts spread out over 252 slots." Since each burst equals to one slot, the server transmitter is energized in the duty cycle of 3.175%, which also falls within the low duty cycle range of 10%.

Furthermore, Table 1 provided below, contains results of a survey of exemplary ranges for "low duty cycle" as this term is used in the art, which is evidence of how a POSITA would interpret the terms "low duty cycle."[1]

*Table 1. Exemplary ranges of "low duty cycle" in third party patents*

| Exhibit | Patent No. | Duty cycle (%) | Citation |
|---------|-----------|----------------|----------|
| DSS-2004 | U.S. 7,558,232 | "low duty cycle, e.g. 2%" "high duty cycle, e.g. 25%" | 4:13-16 |
| DSS-2005 | U.S. 7,092,762 | "low duty cycle, e.g., 4% or less" | 2:21-22 |
| DSS-2006 | U.S. 7,049,620 | "low duty cycle, e.g., 0.5 percent" | 8:3 |

---

[1] **Search Methodology:** Table 1 provides the first five (5) relevant results obtained on Google Patents through the query: "low duty cycle e.g." & network & percent.

| DSS-2007 | U.S. 8,837,653 | "low duty cycle (e.g., a duty cycle of less than 10 percent, 1 one percent, 0.1 percent or 0.02 percent)" | 10:52-53 |
| DSS-2008 | U.S. 8,727,561 | "low duty cycle, e.g., at an about 10 percent (10%) duty cycle" | 10:5-6 |

### 3. RF bursts

"RF bursts" is a term of art in the field of wireless data networks. Under the broadest reasonable interpretation, a POSITA would have understood the phrase "RF bursts" to mean "*a short period of intense activity on an otherwise quiet data channel*." *See* DSS-2009.

This construction is consistent with the one provided by Petitioner's expert: "the key thing is that the burst is small -- the time it takes is small relative to the overall time that the transmitter could have been transmitting." *See* DSS-2015, Grimes Cross-Exam at 46:12-15 (emphasis added). Furthermore, this construction is also consistent with the specification of the '290 Patent. For example, FIG. 6 shows that three (3) RF bursts are transmitted during an outbound transmission sector having 64 time slots, wherein each RF burst slot is 2 μs.[2] *See* APL-1001 at

---

[2] It should be noted that prosecution history of the '290 Patent illustrates the original informal drawings stated that RF burst slot = 2 μsec, when the drawings were formalized, "μsec" was changed to "MSEC." See APL 1005 at pg. 76.

Fig. 6; *see also* DSS-2015, Grimes Cross-Exam at 34:2-8 ("[T]here's a Figure 6 in

the specification that shows how these bursts occur and gives you kind of a spatial

image of the -- of these bursts. And you can see from looking at the picture that

most of the time nothing is being transmitted, nothing is being received.").



FIG. 6

In the exemplary embodiment depicted in Fig. 6, the duration of a single RF

burst accounts for $\frac{1}{64} \times 100\% = 1.563\%$ of the outbound transmission section,

thereby satisfying the construction of the term "RF burst" provided herein. *See*

DSS-2016, Dezmelyk Dec. at ¶ 26. The duty cycle of the embodiment depicted in

Fig. 6 can be calculated as $\frac{3}{64} \times 100\% = 4.688\%$, which also satisfies the low duty

14

Patent No. 6,128,290
IPR2015-00369

_____

cycle requiremnt. *See id*. at ¶ 24. Therefore, the constructions for "low duty cycle" and "RF bursts" provided herein are supported by the specification of the '290 Patent. *See id*. at ¶ 24-26.

## V.  PETITIONER HAS FAILED TO PROVE THAT CLAIMS 1-4 OF THE '290 PATENT ARE UNPATENTABLE

### A.  Claims 1-4 are not rendered obvious by Natarajan in view of Neve

The Board instituted this trial on the ground that there is a reasonable likelihood that claims 1-4 of the '290 Patent are rendered obvious by Natarajan in view of Neve. For the reasons that follow, the Board should uphold validity of all challenged claims.

#### 1.  Natarajan does not teach or suggest that the server transmitter is energized in low duty cycle RF bursts

##### a.  Natarajan is silent with respect to operation of server transmitter during outbound data traffic periods

It is well established in the United States patent law that challenges on obviousness grounds cannot be sustained by mere conclusory statements. *See KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Instead, "there must be some articulated reasoning with

15

Patent No. 6,128,290
IPR2015-00369

some rational underpinning to support the legal conclusion of obviousness." *Id*. As the Federal Circuit eloquently stated: "[o]bviousness requires a court to walk a tightrope blindfolded (to avoid hindsight) – an enterprise best pursued with the safety net of objective evidence." *See Mintz v. Dietz & Watson, Inc.*, 679 F. 3d 1372, 1379 (Fed. Cir. 2012).

Natarajan does not contain any disclosure of the server transmitter being energized in low duty cycle. *See* DSS-2016, Dezmelyk Dec. at ¶ 31. Although Natarajan teaches a system for reducing power consumption in mobile units, Natarajan is silent regarding the operation of the base unit's transmitter. *See id*. It is well understood in the art that although the base unit and mobile units may be structured similarly, the base and mobile units operate under different schemes. *See, e.g.*, APL 1004, Neve, at 4:10-12 ("One station, which is physically similar to the others but operates a different stored program, may be designated the master station and provides synchronisation signals for all of the other stations (referred to hereinafter as "slave" stations) and controls access of the stations to the single radio channel."). Accordingly, a POSITA would not have concluded that base transmitters operate the same way as the mobile units. *See* DSS-2016, Dezmelyk Dec. at ¶ 31. Indeed, Natarajan discloses that its objective is to provide energy savings for the mobile units, but does not teach or suggest that there are any energy savings

16

_____

associated with operation of the base unit's transmitter. *See* APL 1003 at 3:59-61

and 10:14-37, *See* DSS-2016, Dezmelyk Dec. at ¶ 32. For this reason, the base unit's

transmitter could operate continuously during the time slots designated for outbound

traffic without undermining the objectives of Natarajan. *See id.* at ¶ 38.

Natarajan discloses a multi-access protocol in which time is divided into

fixed-length frames that are further subdivided in three (3) subframes:

> Period A for broadcast of packets from base station to
> mobile units (outbound traffic), with a header AH for
> period A. Period B for the contention-free transfer of all
> traffic from mobile units to base station (inbound traffic),
> with a header BH for period B. Period C for the transfer of
> all bursty data traffic in a contention mode from mobile
> units to base station (inbound traffic), with a header CH.

APL 1004, Natarajan at 4:30-38.

An example of a frame is provided in FIG. 4 of Natarajan, which is reproduced

below:



FIG. 4 depicts a single frame of the multi-access protocol, which begins with

a header G of fixed length FH. *See id.* at 4:27-28. Natarajan discloses that outbound

transmission from the base unit to the mobile units takes place during time Period A. *See id*. at 4:30-32. Period B is designated for inbound data traffic from mobile units to the base unit. *See id*. at 4:33-35. During Period C, mobile units transmit data to the base unit in a contention mode, and, responsive to a mobile unit's transmission, the base unit transmits an outbound ACK/NAK message. *See id*. at 9:30-34. Accordingly, the base transmitter must be energized during header durations AH and BH, during outbound transmission Period A, and also when sending ACK/NAK messages during Period C. The only subframe during which the base transmitter is not transmitting is Period B. *See* DSS-2016, Dezmelyk Dec. at ¶ 32.

Without additional information regarding "the relative amount of time consumed by transmission versus nontransmission"—which Natarajan does not provide—the disclosure pertaining to partitioning of multi-access protocol into frames and subframes does not teach or suggest that base transmitter operates in a low-duty cycle. *See* DSS-2015, Grimes Cross-Exam at 40:21-22 – 41:1 ("So low-duty cycle is simply a statement about the relative amount of time consumed by transmission versus nontransmission."); *see also* DSS-2016, Dezmelyk Dec. at ¶ 36. Natarajan is bereft of any disclosure pertaining to the duty cycle of the server transmitter. *See id*. at ¶ 38. Specifically, Natarajan does not disclose that the server transmitter is energized in a low duty cycle. The logical conclusion is that in the data

network system disclosed in Natarajan, the base transmitter is continuously energized during the time periods designated for outbound transmissions—which is how a POSITA would interpret Natarajan for the reasons provided in Section V.1.b., *infra*. Therefore, a POSITA would conclude that Natarajan suggests that the server transmitter is not energized in low duty cycle RF bursts. See DSS-2016, Dezmelyk Dec. at ¶ 38.

In the absence of an express disclosure stating that the base transmitter operates in a low duty cycle, it is necessary to know "the relative amount of time consumed by transmission versus nontransmission" to determine whether the duty cycle of the base transmitter falls within the range that a POSITA would consider as low duty cycle. *See* DSS-2015, Grimes Cross-Exam at 40:21-22 – 41:1. Natarajan lacks this information. *See* DSS-2016, Dezmelyk Dec. at ¶ 32. The description of the only exemplary embodiment disclosed in Natarajan would lead a POSITA to a conclusion that at least in that exemplary embodiment, the base unit transmitter is not energized in a low duty cycle. *See id*. at ¶ 35. Accordingly, Natarajan neither teaches that the base transmitter operates in a low duty cycle nor provides sufficient information that would suggest to a POSITA the base transmitter is energized in a low duty cycle.

_____

        b.  <u>The HDLC packet structure disclosed in Natarajan is</u>
<u>inconsistent with a server transmitter being energized in low</u>
<u>duty cycle RF bursts.</u>

As explained in Section V.A.1.a., *supra*, Natarajan is devoid of disclosure

pertaining to operation of base unit's transmitter. However, Natarajan does provide

some insight into how the base unit's transmitter operates in the following

description:

> Packets received or to be sent are held in data storage 68
> and communicated to or from the RF transceiver 54 via
> interface 58 under control of serial channels and a direct
> memory access (DMA) controller (not shown) which is
> part of the microprocessor 62. The function of these serial
> channels is to ***encapsulate data and control information***
> ***in an HDLC (high-level data link control) packet***
> ***structure and provide the packet in serial form to the RF***
> ***transceiver*** 54.

> APL 100x, Natarajan at …

It is well-known in the art that HDLC is an example of a bit-oriented framing

that involves a continuous outbound transmission rather than operation in low duty

cycle RF bursts. The following is an excerpt from Encyclopedia of Networking &

Telecommunications pertaining to bit-oriented framing:

> **Bit-oriented framing** This type of framing allows the
> sender to transmit a ***<u>long string</u> of bits at one time***. IBM's
> SDLC (Synchronous Data Link Control) and HDLC (High
> Level Data Link Control) are examples of bit-oriented
> protocols. Most LANs use bit-oriented framing. There is

usually a maximum frame size. For example, Ethernet has a maximum frame size of 1,526 bytes. The beginning and end of a frame is signaled with a special bit sequence (01111110 for HDLC). ***If no data is being transmitted, this same sequence is <u>continuously transmitted</u> so the end systems remain synchronized***.

DSS-2010, Encyclopedia of Networking at pg. 549.

As the excerpt quoted above indicates, HLDC packet structure is used to transmit "***long*** strings of data at one time." *See id*. When asked to define an "RF burst," Petitioner's expert explained that "the key thing is that the burst is ***small*** -- the time it takes is small relative to the overall time that the transmitter could have been transmitting." DSS-2015, Grimes Cross-Exam at 46:12-15. Accordingly, Natarajan's disclosure of HDLC, which is used for transmitting "long strings of data at one time," directly contradicts the requirement of claim 1 of the '290 Patent that server transmitters be energized in RF bursts.

Moreover, HDLC involves continuous transmissions in which special bit sequences—i.e. idle words—are transmitted when no data transmission is required. *See* DSS-2010, Encyclopedia of Networking at pg. 549. This undermines the Petitioner's challenge of claims 1-4 for two reasons. First, a continuous transmission is an antithesis of RF bursts. *See id*. (contrasting bit-oriented framing involving continuous transmissions and clock-oriented framing involving pulsed

21

transmissions); *see also* DSS-2016, Dezmelyk Dec. at ¶ 34. Second, protocols involving transmission of idle words in an absence of active transmissions are inconsistent with server transmitter operating in a low-duty cycle because such protocols extend the duration during which the server transmitter is energized. *See, e.g.*, APL-1002 at pg. 11 (stating that continuous transmission protocols are "unsuitable for low-power applications" because "[m]aintaining these continuous links while there is no data transmission causes the power dissipation to be higher");[3] *see also* Petition at pg. 53 ("[T]he transmitter (or receiver) consumes power ***only when it is _actively_ transmitting a message*** (or actively receiving a message). This constitutes low duty cycle RF bursts.") (internal quotations omitted) (emphasis added).

c. <u>Natarajan's disclosure of "bursty traffic" during the contention period does not teach or suggest that the server transmitter is energized in RF bursts</u>

In support of Petitioner's contention that Natarajan in view of Neve teaches or suggests the server and peripheral transmitters being energized in RF bursts,

---

[3] It should be noted, that the "continuous transmission" discussed in this section pertains to outbound transmission subframe during Period A disclosed in Natarajan. Patent Owner acknowledges that the operation of the base transmitter is not continuous over the entire frame because the base transmitter is powered down during inbound traffic in Period B. However, just because the base transmitter is powered down during a certain subframe, does not mean that the base transmitter is "energized in low duty cycle RF bursts."

Petitioner stated the following: "Natarajan also discloses that there is a period "for the transfer of all ***bursty*** data traffic in a contention mode from mobile units to base station (inbound traffic), with a header CH." Petition at pg. 53 (quoting Natarajan) (emphasis in original). This disclosure of Natarajan, however, does not teach or suggest that that the server transmitter is energized in RF bursts at least for two reasons. First, Natrajan's disclosure of "bursty data traffic" pertains to the contention period which is designated for inbound traffic from mobile units to the base unit, and therefore, does not teach or suggest that this type of traffic also applies to the outbound data traffic. See DSS-2016, Dezmelyk Dec. at ¶ 37.

Second, arguendo, even if the "bursty data traffic" pertained to the outbound data traffic, just because the traffic is bursty does not mean that the transmitter is energized in RF bursts. *See id*. In fact, "the easiest approach to implement bursty traffic would be to have the AIF transmitter ***continuously send dummy data***, and insert useful data when there is actually something to send." DSS-2017 at pg. 1. This approach closely aligns with the HDLC protocol, which also involves server transmitter continuously sending out a data stream wherein idle words are transmitted when there is no actual data to transmit. *See* Section V.A.1.c., *supra*. Accordingly, Natarajan's disclosure of "bursty data traffic" does not teach or suggest

23

Patent No. 6,128,290
IPR2015-00369

_____

that the server transmitter is energized in RF bursts. *See* DSS-2016, Dezmelyk Dec. at ¶ 37.

> d. Petitioner failed to meet its burden of establishing that Natarajan in view of Neve teaches or suggests that the server transmitter is energized in low duty cycle RF bursts

Petitioner failed to satisfy its burden of establishing that Natarajan in view of Neve teaches or suggest server transmitter being energized in low duty cycle RF bursts. The Petition does not adequately address a material limitation of claim 1: "**said _server_** and peripheral **_transmitters being energized in low duty cycle RF bursts_**." APL 1001, '290 Patent at claim 1. Petitioner quotes disclosures of Natarajan and Neve teaching that the transmitters of the peripheral units (*i.e.* mobile units, slave stations) are energized in low duty cycles. *See* Petition at pg. 53. Petitioner, however, does not provide any objective evidence that could reasonably lead to a conclusion that these references also disclose that the transmitter of the server unit (*i.e.* base unit, master station) is also energized in low duty cycle RF bursts.

Based on Petitioner's analysis of Natarajan's and Neve's disclosures pertaining to operation of the peripheral units, Petitioner concludes that "Natarajan and Neve each disclose that **_the transmitters_** are 'energized in low duty cycle RF bursts.'" *Id*. (emphasis added). Petitioner, therefore, completely ignores the fact that claim 1 does not merely recite "**_transmitters_**," but rather, it explicitly requires "said

24

Patent No. 6,128,290
IPR2015-00369

_____

*server* and peripheral *transmitters being energized in low duty cycle RF bursts*."

APL 1001, '290 Patent at claim 1. Neve discloses that although the server unit and

peripheral units may have similar structures, their functionalities are different. *See*

APL 1004, Neve at 4:10-15 ("One station, which is physically similar to the others

***but operates a different stored program***, may be designated the master station and

provides synchronisation signals for all of the other stations (referred to hereinafter

as "slave" stations) and controls access of the stations to the single radio channel.")

(emphasis added); *id*. at FIGS. 6 and 7. Accordingly, it is improper to conclude that

just because the peripheral transmitters operate in a low duty cycle, the server

transmitter also operates in a low duty cycle. *See* DSS-2016, Dezmelyk Dec. at ¶ 39.

The U.S. Supreme Court set forth that "there must be some articulated

reasoning with some rational underpinning to support the legal conclusion of

obviousness." *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 418 (2007). Petitioner's

arguments fall far short of this legal standard. In fact, other than the excerpt quoted

below, Petitioner provides no reasoning as to why Natarajan in view of Neve would

render obvious the limitation of claim 1 requiring the ***server*** transmitter to be

energized in ***low duty cycle RF bursts***:

> For example, in header AH shown in FIG. 5, the "1" in the
> 4th, 8th, and 9th bit locations indicates that the
> corresponding mobile units are designated to receive a

25

Patent No. 6,128,290
IPR2015-00369

message in their respective time slots. (*Id*.) Therefore, during these time slots, the base station's (***server unit***) transmitter is energized to transmit data to the mobile units. (Grimes Dec. ¶ 116.)

Petition at pg. 54 (emphasis added)

Although the statement quoted above is factually correct, it does not establish that Natarajan teaches or suggests that the server transmitters operate in a low duty cycle. *See* DSS-2016, Dezmelyk Dec. at ¶ 41. In fact, Petitioner's statement is consistent with the analysis provided in Sections V.A.1.a.-b, *supra*, which establishes that Natarajan suggests that during the transmission period the server transmitter is continuously transmitting data, and therefore, does not operate in a low duty cycle. *See* Sections V.A.1.a.-b, *supra*.

Petitioner states that a data network in which "the transmitter (or receiver) consumes power ***only*** when it is ***actively*** transmitting a message (or actively receiving a message) . . . constitutes 'low duty cycle RF bursts.'" *See* Petition at pg. 53 (emphasis added); *see also* APL 1008, Grimes Dec. at ¶115. Even under this construction, Natarajan and Neve do not provide disclosure sufficient to render obvious claim limitation requiring that server transmitter is "energized in low duty cycle RF bursts." *See* DSS-2016, Dezmelyk Dec. at ¶ 43. In fact, Natarajan teaches using HDLC, the functionality of which is summarized in the Encyclopedia of

Patent No. 6,128,290
IPR2015-00369

---

Networking and Telecommunications: "[i]f **no data** is being transmitted, **this same sequence is _continuously_ transmitted** so the end systems remain synchronized." DSS-2010, Encyclopedia of Networking at pg. 549. Neve discloses a similar data network protocol in which "[i]f no data is currently required to be transmitted, **the master station transmits _idle words_**." APL 1004, Neve at 4:48-50. Accordingly, even under Petitioner's construction, Natarajan and Neve do not disclose server transmitter operating in low duty cycles because in both Natarajan and Neve, the server transmitter consumes power not only while it is actively transmitting a message, but also when it is transmitting idle signals to maintain synchronization. *See* DSS-2016, Dezmelyk Dec. at ¶ 45.

For the reasons set forth above, the Petition lacks any reasoning or objective evidence that could reasonably establish that Natarajan and Neve teach or suggest that "said **_server_** and peripheral **transmitters are energized in low duty cycle RF bursts**."

      **2.**  **Combining Natarajan with Neve does not cure deficiencies of Natarajan and further suggests that the combination of these references does not teach or suggest that server transmitter is energized in low duty cycle RF bursts**

            a.  Petitioner's expert distinguished Neve from transmissions involving RF bursts

27

Patent No. 6,128,290
IPR2015-00369

_____

Claim 1 of the '290 Patent unambiguously requires that server transmitter be

"energized in low duty cycle RF bursts." During the cross-examination, Petitioner's

expert distinguished data networks using "idle words"—such as the one disclosed in

Neve—from RF bursts:

> Q.    Is there any other type of transmission **_besides_** RF
> bursts?
>
> MR. CORNWELL: Objection. Foundation.
> Objection. Form.
>
> A.    There are sometimes in some systems where you
> can have a transmission -- in other words, the transmitter
> is transmitting, but there's no information being
> transmitted.
>
> The Neve reference refers to that as an idle word, if
> you will. And the idle word means that the transmitter is
> transmitting but there's no information being transmitted.
> Or another way of saying it is that the information that's
> being transmitted is that there's no information there.
>
> DSS-2015, Grimes Cross-Exam at 42:9-22 (emphasis
> added).

The above testimony of Petitioner's expert reinforces that Neve does not teach

or suggest that server transmitter operates in RF bursts. Instead, the expert testimony

reinforces that Neve discloses a data network in which the server transmitter send

out idle words if no other transmission is needed rather than being energized in RF

Patent No. 6,128,290
IPR2015-00369

---

bursts only when a data packet must be transmitted to a peripheral unit. *See* APL

1004, Neve at 4:48-50.

Petitioner's expert further testified that although idle transmissions may be

necessary to maintain synchronization in the some data networks, this not how the

'290 Patent operates. *See* DSS-2015, Grimes Cross-Exam at 43:20-22 – 44:1-11.

Petitioner's expert stated the following in response to a question about the purpose

of idle words:

> It could be -- it could have to do with synchronization. It could have to do with, you know, the transmitter saying, I'm still here.
>
> I mean, in some sense, that's information. But if you look at ***the data stream, there's no content to the data stream***. It's just simply you know the transmitter is transmitting, but that's all you know.
>
> Now, in some cases, that turns out to be important to know. ***But in the case of this system here, the patent, it's not discussed***.
>
> ***So the patent <u>only</u> talks about transmissions that are done for the purpose of conveying useful data to the receiving entity***.
>
> *Id.* (emphasis added).

The testimony of Petitioner's expert reinforces that Neve and the '290 Patent

operate under functionally different protocols: claim 1 of the '290 Patent requires

29

Patent No. 6,128,290
IPR2015-00369

---

that the server transmitter be energized in low duty cycle RF bursts only when an active data transmission is required, whereas Neve discloses that the server transmitter (master station) transmits a data stream in which idle words are transmitted when no data transmission is required. *See* APL 1004, Neve at 4:48-50, 7:17-19, and 7:41-42.

b. Neve does not teach or suggest that server transmitter is energized in low duty cycle RF bursts

In the Institution Decision, the Board found that Neve does not teach away from the server transmitter being energized in low duty cycle RF bursts because the disclosure of Neve does not suggest continuous transmission from the master station. *See* Institution Decision at pg. 19-20. The Board's finding is correct insofar as the server transmitter is not transmitting during every time slot. *See* DSS-2016, Dezmelyk Dec. at ¶ 44. However, during the time slots designated for outbound transmissions, "[i]f no data is currently required to be transmitted, the master station transmits idle words." *See* APL 1004, Neve at 4:48-50.

Idle words are inconsistent with server transmitter being energized in low duty cycle RF bursts for the following two reasons. First, the server transmitter must be energized while it is actively transmitting data to peripheral units, and additionally, it must also be energized during transmission of idle words. See DSS-2015, Grimes

30

Cross-Exam at 38:2-6 ("[B]eing energized simply means that the transmitter is transmitting. The transmitter is either transmitting or it's not transmitting. When it's transmitting, it's energized."). Transmission of idle words, therefore, increases the power consumption of the server transmitter and reduces its battery life. *See* DSS-2016, Dezmelyk Dec. at ¶ 38. Second, transmission of idle signals may interfere with the signals transmitted by nearby foreign ensembles, which could disrupt the operation of both data networks. *See id*. at ¶ 19. At least for these reasons, protocols involving idle words are inconsistent with the server operating in low duty cycle RF bursts because transmission of idle words undermines the following objectives of low duty cycle RF bursts: "[t]he low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals." APL 1001, '290 Patent at 1:59-61

c. <u>Neve reinforces the conclusion that Natarajan does not teach or suggest the server transmitter being energized in low duty cycle RF bursts</u>

When Natarajan is considered in view of Neve, it becomes even more apparent that these references, either individually or in combination, do not teach or suggest that server transmitter is energized in low duty cycle RF bursts. *See* DSS-2016, Dezmelyk Dec. at ¶ 45. Neve discloses that the master station transmits idle words when no other transmission is required. *See* APL 1004, Neve at 4:48-50.

31

---

Natarajan discloses that data is encapsulated into HDLC packet structure that used

to provide the packet in serial form to the RF transceiver. *See* APL 1003, Natarajan

at 3:33-37. Both idle words and HDLC are characteristic to bit-oriented framing:

> **Bit-oriented framing** This type of framing allows the sender to transmit a long string of bits at one time. IBM's SDLC (Synchronous Data Link Control) and ***HDLC*** (High Level Data Link Control) are examples of bit-oriented protocols. Most LANs use bit-oriented framing. There is usually a maximum frame size. For example, Ethernet has a maximum frame size of 1,526 bytes. The beginning and end of a frame is signaled with a special bit sequence (01111110 for HDLC). ***If no data is being transmitted, this same sequence is continuously transmitted so the end systems remain synchronized***.
>
> DSS 2010, Encyclopedia of Networking, at pg. 549.

As established in Section V.A.1.b, *supra*, bit-oriented framing is inconsistent

with a server transmitter being energized in low duty cycle RF bursts for the

following reasons. First, under bit-oriented framing, the server transmitter transmits

"*long* strings of bits at one time," which contradicts RF bursts. *See* DSS-2016,

Dezmelyk Dec. at ¶ 34. Second, the server transmitter continuously transmits idle

signals when no data is being transmitted, thereby contradicting a low duty cycle

operation. *See id*. at ¶ 35.

The Petition states that a data transmission protocol in which "the transmitter

(or receiver) consumes power ***only*** when it is ***actively*** transmitting a message (or

32

Patent No. 6,128,290
IPR2015-00369

_____

actively receiving a message) . . . constitutes 'low duty cycle RF bursts.'" *See* Petition at pg. 53 (emphasis added); *see also* APL 1008, Grimes Dec. at ¶115. Accordingly, even under Petitioner's interpretation of "low duty cycle RF bursts," data network systems disclosed in Natarajan and Neve in which the server transmitter is energized when no data is being transmitted do not teach or suggest that server transmitter be energized in low duty cycle RF bursts.

### 3. **The Board should not give any weight to Petitioner's expert's testimony pertaining to the issue of whether Natarajan in view of Neve teaches or suggests that server transmitters are energized in low duty cycle RF bursts**

"The Board is capable of taking into account the baselessness of a witness's testimony, if any, when weighing all of the testimony of the witness." *Liberty Mutual Insurance Co. v. Progressive Casualty Insurance Co.*, CBM2013-00009, Final Written Decision at pg. 47 (Feb. 11, 2014). The Manual of Patent Examining Procedure ("MPEP") provides that "[t]he person of ordinary skill in the art is a hypothetical person who is ***presumed to have known the relevant art*** at the time of the invention." MPEP 2141.03.I. In this case, Dr. Grimes, Petitioner's expert, cannot be considered a person of ordinary skill in the art at least because he has admitted his unfamiliarity with several key elements of Natarajan and Neve.

33

Patent No. 6,128,290
IPR2015-00369

_____

Specifically, when asked about whether he was familiar with HDLC, Dr. Grimes replied: "I have **passing familiarity** with HDLC. I've certainly heard of it." DSS-2015, Grimes Cross-Exam at 51:6-10. Passing familiarity with a key element of the prior art is insufficient to render a reliable and well-informed opinion on whether the prior art renders obvious a patent claim. Dr. Grimes further admitted that he is unfamiliar with the terms "idle words," despite this concept being explicitly discussed in Neve:

> Q.    Is it possible the transmitter could be sending an idle word during that time?

> MR. CORNWELL: Objection. Form.

> A.    That's not disclosed at all in Natarajan.

> BY MR. LYTVYN:

> Q.    But that's within the knowledge of an ordinary person skilled in the art at that time; is that correct?

> A.    This notion of idle words is **a weird concept** that **I have not run into before**, so I'm not sure that that would be understood by a person of ordinary skill in the art.

34

Patent No. 6,128,290
IPR2015-00369

_____

When I saw that in Neve, I thought to myself, what is this? And I did a little bit of research to try and figure it out, and *it's weird*.

Apparently, it refers to -- according to -- in Neve, refers to some kind of a mechanism to let you know that the transmitter is still working, even though it's transmitting not useful information.

It's just transmitting a sequence of 1s or something like that.

Q.    So your opinion is that a person of ordinary skill in the art would not be familiar with that scheme at the time of the invention in 1997?

MR. CORNWELL: Objection. Form.

A.    Yes. That was *a new term* for me. *I certainly have never heard this term "idle word" before*.

I don't believe that a person of ordinary skill would understand what it means either.

DSS-2015, Grimes Cross-Exam at 68:13-22 – 69:1-20 (emphasis added)

In this case, determination of whether Natarajan in view of Neve teaches or suggests the server transmitters being energized in low duty cycle RF bursts hinges on proper understanding of "HDLC" and "idle words"—both of which are explicitly

35

disclosed in the prior art cited against claims 1-4 of the '290 Patent. See Sections V.A.1-2, *supra*. In the testimony quoted above, Dr. Grimes admitted that the concepts of "idle words" and "HDLC" fall outside the boundaries of his expertise. Because Dr. Grimes admittedly does not have requisite knowledge and understanding of these concepts, he could not have competently analyzed whether the server transmitter in Natarajan is send out idle words when no active transmission is required. Accordingly, the testimony of Dr. Grimes on the issue of whether Natarajan in view of Neve teaches or suggests "said server and peripheral transmitters being energized in low duty cycle RF bursts" limitation of claim 1 is unreliable and should not be given any weight.

For the reasons set forth above, Natarajan in view of Neve do not render claim 1 obvious. Claims 2-4 depend from patentable claim 1, and therefore are patentable as a matter of law. *See In re Fine*, 837 F.2d 1071, 1076 (Fed. Cir. 1988). Accordingly, the Board should deny Petitioner's challenge of claims 1-4 based on obviousness over Natarajan in view of Neve.

## VI. CONCLUSION

For the reasons set forth above, Petitioner failed to prove by preponderance of evidence that the challenged claims are unpatentable based on the asserted

Patent No. 6,128,290
IPR2015-00369

---

grounds for invalidity. Accordingly, the Board should affirm the validity of all

claims 1-4 of the '084 Patent.


Date: October 5, 2015                          Respectfully submitted,


                                               /andriy lytvyn/

                                               Andriy Lytvyn
                                               Lead Counsel for Patent Owner
                                               Registration No. 65,166

                                               Nicholas Pfeifer
                                               Back-up Counsel for Patent Owner
                                               Registration No. 41,849

                                               Anton Hopen
                                               Back-up Counsel for Patent Owner
                                               Registration No. 70,568

**SMITH & HOPEN, PA**

180 Pine Avenue North
Oldsmar, FL 34677
Tel: 813-925-8505
Fax: 800-726-1491
Email: andriy.lytvyn@smithhopen.com

Patent No. 6,128,290
IPR2015-00369

_____

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that, in accordance with 37 C.F.R. §

42.6(e), the above Patent Owner's Response and a copy of the Exhibits were

served via electronic mail on October 5, 2015, in their entirety upon the following:


David K.S. Cornwell, Lead Counsel for Petitioner
davidc-PTAB@skgf.com

Mark W. Rygiel, Back-Up Counsel for Petitioner
mrygiel-PTAB@skgf.com



Date: October 5, 2015                          /andriy lytvyn/_____
                                               Andriy Lytvyn
                                               Lead Counsel for Patent Owner
                                               Registration No. 65,166

                                               **SMITH & HOPEN, P.A.**
                                               180 Pine Avenue North
                                               Oldsmar, FL 34677
                                               (813) 925-8505

38

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.
Petitioner

v.

DSS TECHNOLOGY MANAGEMENT, INC.
Patent Owner

_____

Case IPR2015-00369
Patent 6,128,290

_____

**PETITIONER'S REPLY TO PATENT OWNER RESPONSE**

*Mail Stop "PATENT BOARD"*
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

IPR2015-00369
U.S. Pat. No. 6,128,290

## EXHIBIT LIST

| Apple Exhibit No. | Description |
|---|---|
| APL 1001 | U.S. Patent No. 6,128,290 to Carvey ("the '290 patent") |
| APL 1002 | T. J. Barber, Jr., "BodyLAN™: A Low Power Communications System," Master's Thesis at Massachusetts Institute of Technology, 1996 ("Barber") |
| APL 1003 | U.S. Patent No. 5,241,542 to Natarajan ("Natarajan") |
| APL 1004 | U.S. Patent No. 4,887,266 to Neve ("Neve") |
| APL 1005 | Prosecution History of U.S. Application No. 08/949,999 (now U.S. Patent No. 6,128,290) ("the '999 application") |
| APL 1006 | U.S. Application No. 08/611,695 (as-filed) ("the '695 application") |
| APL 1007 | Apple's Claim Construction Brief in Case No. 6:13-cv-00919 JDL (EDTX) |
| APL 1008 | Declaration of Jack D. Grimes, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 6,128,290 ("Grimes Dec.") |
| APL 1009 | Curriculum Vitae of Jack D. Grimes, Ph.D. ("Grimes CV") |
| APL 1010 | INTENTIONALLY BLANK |
| APL 1011 | Deposition Transcript of Robert Dezmelyk, IPR2015-00369 and IPR2015-00373, December 15, 2015 ("Dezmelyk Depo.") |
| APL 1012 | Mischa Schwartz, Telecommunications Networks: Protocols, Modeling and Analysis, Addison-Wesley, 1988 ("Schwartz") |
| APL 1013 | Tom Sheldon, Encyclopedia of Networking & Telecommunications, Lisa Wolters-Broder ed., McGraw Hill, 2001 (other excerpts submitted as DSS 2010) |
| APL 1014 | Declaration of Dr. Jing Hu ("Hu Dec.") |
| APL 1015 | *Curriculum Vitae* of Dr. Jing Hu |

i

## TABLE OF CONTENTS

I.   Introduction ................................................................. 1

II.  Natarajan teaches or suggests a server transmitter operating in "low duty cycle RF bursts," as recited in claim 1 of the '290 patent. ...................................... 2

III. HDLC is consistent with low duty cycle RF bursts. ....................................... 3

    A.   The preferred embodiment in the '290 patent uses HDLC. .................4

    B.   DSS relies on the testimony of Mr. Dezmelyk, who admits he is not an expert in HDLC. ...............................................5

    C.   A POSA would have looked to Schwartz for information on Natarajan's HDLC protocol and understood that it is consistent with low duty cycle RF bursts. ...............................6

        1.   Mr. Dezmelyk did not consider Schwartz–the most logical reference for information on Natarajan's HDLC protocol–when forming his opinions. .......................... 6

        2.   Natarajan's HDLC protocol is consistent with low duty cycle RF burst communication. ........................ 7

    D.   DSS and Mr. Dezmelyk concoct inaccurate piecemeal arguments from excerpts of unrelated references that are inconsistent with each other and inconsistent with the operation of HDLC. .............................................9

    E.   DSS's "idle words" argument is a red herring. ..................................15

        1.   Neve is cited to expressly show that synchronizing a base station and peripheral units was well-known. ................ 15

        2.   Natarajan's HDLC protocol does not use idle words. ............ 16

IV.  DSS's "low duty cycle" argument is meritless. ........................................... 18

    A.   Mr. Dezmelyk's definition of "duty cycle" is nonsensical. ................18

    B.   DSS's proposed claim construction that "low duty cycle" is less than 10% is arbitrary and unduly narrow. ..................................20

    C.   DSS improperly truncates the time period for calculating Natarajan's duty cycle. ...................................................22

V.   The Board should not give any weight to Mr. Dezmelyk's testimony. ....... 23

    A.   Mr. Dezmelyk's testimony lacks credibility. .....................................23

    B.   Mr. Dezmelyk admits he is not an expert in HDLC. .........................24

    C.   Mr. Dezmelyk bases his opinions on inaccurate assumptions. ...........24

VI.  Conclusion ................................................................ 25

ii

## I.    Introduction

Claims 1-4 of the '290 patent at issue in this *inter partes* review are merely a combination of well-known concepts. Each and every limitation is either expressly disclosed in the prior art or would have been plainly obvious to a person of ordinary skill in the art ("POSA").

DSS's sole argument in its Patent Owner's Response is that the combination of Natarajan and Neve does not teach or suggest a server transmitter that operates in "low duty cycle RF bursts." Although this term was not commonplace, the technical features it describes were well-known to those of ordinary skill in the art.

DSS's argument is flawed for at least four reasons. First, Natarajan teaches or suggests a server transmitter operating in "low duty cycle RF bursts." Second, DSS bases its argument on the inaccurate premise that HDLC is inconsistent with low duty cycle RF bursts. In particular, DSS erroneously assumes that HDLC uses idle words. Third, DSS uses faulty logic to define "low duty cycle" and imposes an arbitrary 10% maximum threshold. And fourth, DSS bases its positions on the testimony Mr. Dezmelyk, which lacks credibility, particularly because he admits that he is not an expert in HDLC.

Accordingly, DSS's argument is meritless. Apple has shown by a preponderance of the evidence that claims 1-4 of the '290 patent are unpatentable and the Board should enter judgment in accordance therewith.

**II.    Natarajan teaches or suggests a server transmitter operating in "low duty cycle RF bursts," as recited in claim 1 of the '290 patent.**

The vague term "low duty cycle RF bursts" is not defined in the '290 patent. As the Board correctly recognized in the Institution Decision, under the broadest reasonable interpretation of this term, Natarajan's "scheduled multi-access protocol in which time is divided into fixed-length frames, along with Natarajan's description of frames being divided into slots and multiple subframes" demonstrates that Natarajan discloses "said server and peripheral transmitters being energized in low duty cycle RF bursts." (Institution Decision, p. 18; Hu Dec. ¶ 43.) Indeed, like the '290 patent, Natarajan discloses that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)…the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." (Natarajan, 3:59-4:6.) This type of communication operates in "low duty cycle RF bursts." (Grimes Dec. ¶ 115; Hu Dec. ¶ 43.)

DSS argues that Natarajan only describes that the mobile units operate in this manner. (POR, p. 16.) But a POSA would have understood that, similarly, when the base station is not transmitting, its transmitter is powered off. (Grimes Dec. ¶¶ 27, 115-116; Grimes Depo. (DSS 2015), 68:5-12, 74:7-19, 75:21-76:3; Hu Dec. ¶ 44.) In Natarajan, "*[m]ost users are very likely to be inactive* (both Trans-

mit-Inactive and Receive-Inactive) *most of the time* for most applications. This is primarily due to the ***bursty nature*** of data communication traffic." (Natarajan, 6:41-44 (emphasis added).) A POSA would have understood this to mean that Natarajan's base station and mobile units operate in low duty cycle RF bursts. (Hu Dec. ¶ 45.)

Moreover, DSS acknowledges that Natarajan explicitly discloses that the mobile unit transmitters operate in "low duty cycle RF bursts." (POR, p. 16; Dezmelyk Dec. ¶ 31.) So even if not expressly taught by Natarajan, it would have been plainly obvious to a POSA to have the base station operate in an analogous manner. (Hu Dec. ¶ 45.) Because the base and mobile stations have the same physical structure, this would have been no more than using a known technique to improve similar devices in the same way. (Natarajan, 3:7-8; Hu Dec. ¶ 45.) The "low duty cycle RF bursts" limitation of claim 1 is not novel. (Hu Dec. ¶ 45.)

**III.   HDLC is consistent with low duty cycle RF bursts.**

DSS alleges that the High-Level Data Link Control (HDLC) packet structure disclosed in Natarajan is inconsistent with a server transmitter being energized in low duty cycle RF bursts. (POR, pp. 20-22.) This is false. First, the '290 patent's preferred embodiment uses HDLC. Second, DSS relies on testimony from Mr. Dezmelyk, who admits he is not an expert in HDLC. Third, a POSA would have been directed to Schwartz for information on Natarajan's HDLC protocol and un-

derstood that HDLC is consistent with low duty cycle RF bursts. Fourth, DSS concocts inaccurate, piecemeal arguments that are inconsistent with the HDLC protocol. And fifth, Natarajan's HDLC protocol does not use idle words.

### A.    The preferred embodiment in the '290 patent uses HDLC.

DSS's argument that HDLC is inconsistent with low duty cycle RF bursts is meritless because the preferred embodiment of the '290 patent itself discloses using HDLC for communication between the PDA and PEAs. If DSS's argument is believed, then the '290 patent's preferred embodiment would not be enabled.

The "basic scheme" of the '290 patent's frame structure is "a form of time division multiple access (TDMA)." ('290 patent, 5:45-50.) The '290 patent states that "[a]s will be **understood by those skilled in the art**, the TDMA system is greatly facilitated by the establishment of a common frame time base between PEA and PDA." (*Id.* at 7:63-65 (emphasis added).) This is accomplished using synchronization beacons (SBs). (*Id.* at 7:65-67.) Before receiving the SBs, a PEA is associated with the PDA using a succession of Attachment Beacons (ABs), which are "composed of RF bursts," broadcast from the PDA to the PEAs. (*Id.* at 9:8-16, 9:66-10:2.) "This succession of ABs **forms an <u>HDLC</u> channel** using bit-stuffing to delineate the beginning and end of a packet." (*Id.* at 10:2-4 (emphasis added).)

So, the '290 patent uses HDLC to transmit and receive RF bursts. (Hu Dec. ¶¶ 48-49.) Thus, the '290 patent itself shows that DSS's argument is fallacious.

- 4 -

**B.    DSS relies on the testimony of Mr. Dezmelyk, who admits he is not an expert in HDLC.**

DSS relies on Mr. Dezmelyk's testimony to support its argument that HDLC is inconsistent with a server transmitter operating in low duty cycle RF bursts. (*See e.g.,* POR, pp. 21-22 (citing Dezmelyk Dec. ¶ 34.).) But Mr. Dezmelyk ***admits he is <u>not</u> an expert in HDLC***.

Q.  Are you an expert in the HDLC protocol?

A.  No. I would not say I am an expert in that area.

(Dezmelyk Depo., 26:15-16.)

Mr. Dezmelyk is not an inventor on any patents related to HDLC protocol; he has not received any industry awards related to HDLC protocol; and he has never lectured on HDLC protocol. (*Id.* at 19:10-20:4.) In fact, this IPR and the related district court case are the only matters he recollects working on that are even related more generally to wireless communication (*id.* at 21:1-22), which he asserts is "a hugely broad topic area" (*id.* at 26:1-2). Although his standard practice is to attach his *Curriculum Vitae* with a declaration, he did not here. (*Id.* at 16:5-7.) There is no evidence that Mr. Dezmelyk is qualified to opine on HDLC. To the contrary, by his own admission, Mr. Dezmelyk is not an expert in HDLC. And his understanding of the HDLC protocol is factually inaccurate. (Hu Dec. ¶ 50.) Accordingly, DSS's reliance on his testimony on HDLC must be disregarded.

- 5 -

IPR2015-00369
U.S. Pat. No. 6,128,290

**C.    A POSA would have looked to Schwartz for information on Natarajan's HDLC protocol and understood that it is consistent with low duty cycle RF bursts.**

**1.    Mr. Dezmelyk did not consider Schwartz–the most logical reference for information on Natarajan's HDLC protocol–when forming his opinions.**

A POSA need not look any further than Natarajan itself for direction on more specifics about Natarajan's HDLC protocol. Natarajan describes that information packets are transmitted between the base station and mobile stations:

> Packets received or to be sent are held in data storage 68 and communicated to or from the RF transceiver 54 via interface 58 under control of serial channels…. The function of these serial channels is to encapsulate data and control information in an HDLC (high-level data link control) packet structure and provide the packet in serial form to the RF transceiver 54. ***For more information on the HDLC packet structure, see, for example, Mischa Schwartz, Telecommunication Networks: Protocols, Modeling and Analysis, Addison-Wesley (1988).***

(Natarajan at 3:28-40 (emphasis added).)

So, the Schwartz book (APL 1012) is the most logical resource for a POSA to consult for information on Natarajan's HDLC packet structure. (Hu Dec. ¶ 51.) Indeed, Mr. Dezmelyk acknowledged that a POSA would have access to Schwartz. (Dezmelyk Depo., 72:12-22.) Yet Mr. Dezmelyk never looked at Schwartz when considering how Natarajan's HDLC packet structure operates. (*Id.* at 71:11-73:13.) Nor does DSS reference Schwartz. Instead, DSS forgoes logic, formulating a convoluted argument that defies technical accuracy. (*See infra*, Section III.D.)

**2.      Natarajan's HDLC protocol is consistent with low duty cycle RF burst communication.**

Schwartz provides a concise summary of the HDLC frame format:

The standard frame format for HDLC (ADCCP and SDLC have the same format) appears in Fig. 4-9. Note that the number of overhead (control) bits is $\ell' = 48$, just the number used earlier for calculations. The *eight-bit flag sequence* 01111110 that appears at the beginning and end of a frame *is used to establish and maintain synchronization*. Because the flag appears at the beginning and end of the frame there is no need to prescribe an information field structure. The *information field (packet)* delivered from the network layer above *can be any desired number of bits*. Extended versions of the frame structure of Fig. 4-9 are available as well: The address, control, and block-check fields can all be increased to allow additional addressing, improved error detection, and increased sequence numbers. *Since the flags* appearing at the beginning and end of a frame *contain six consecutive ones, that sequence may not appear anywhere else in the frame*. Bit stuffing is used to eliminate this possibility: a zero is inserted at the transmitter any time that five ones appear outside the F fields. The zeros are removed at the receiver. *If seven ones appear anywhere in the frame (six ones followed by an additional one), the frame is declared in error*.



**Figure 4-9** HDLC standard frame format

(Schwartz, pp. 135-136 (emphasis added), Fig. 4-9.)

Schwartz also describes that "[w]hen the transmitter reaches its maximum sequence number ***it is forced to stop transmitting*** until a frame in the reverse direction is received, acknowledging an outstanding packet." (*Id.* at 136 (emphasis added).) Thus, the transmitter ***does <u>not</u> continuously transmit*** under HDLC protocol. (Hu Dec. ¶ 53.) The discontinuous transmission of the HDLC protocol is also shown in Schwartz's throughput calculation illustrated in Figure 4-13, showing periods (e.g., between I10 and I30) where the transmitter is idle (i.e., not transmitting). (*Id.*) Figure 4-13 illustrates the *maximum* throughput, so the amount of time the transmitter is not transmitting is at a minimum. (Schwartz, p. 142 ("This station is assumed in addition to be in a saturated state: It *always* has frames to send. As noted earlier, this provides the maximum possible throughput." (emphasis original)); Hu Dec. ¶ 53.) When the primary station is not saturated, there will be additional periods where the transmitter is not transmitting. (Hu Dec. ¶ 53.)



**Figure 4-13** Example of error-recovery procedures, version of HDLC, $M = 4$

**Annotated Figure 4-13 of Schwartz**

Thus, the HDLC protocol described in Schwartz is consistent with low duty cycle communication. (Hu Dec. ¶ 54.) Moreover, as illustrated, for example by the I-frames I00-I30 in Figure 4-13, the transmissions occur in "bursts." (*Id.*)

Schwartz also describes the three modes of operation for the HDLC protocol. (Schwartz, pp. 137-138.) The asynchronous balanced mode (ABM) is for point-to-point transmission only, and therefore inapplicable to Natarajan, which is point-to-multipoint communication. (*Id.*; Hu Dec. ¶ 55.) The normal response mode (NRM) and asynchronous response mode (ARM) are used for point-to-multipoint operation. (Schwartz, p. 137; Hu Dec. ¶ 55.)

A POSA would have understood that Natarajan operates using the ARM. (Hu Dec. ¶ 55.) ARM provides that "the secondary station does not need permission from the primary station to initiate transmission." (Schwartz, p. 137.) This occurs in Period C in Natarajan, which allows for "bursty data traffic *in a contention mode from mobile units* to base station." (Natarajan, 4:36-37 (emphasis added); Hu Dec. ¶ 55.) In Period C, the mobile units initiate transmission without permission from the base station. (Hu Dec. ¶ 55.)

### D.    DSS and Mr. Dezmelyk concoct inaccurate piecemeal arguments from excerpts of unrelated references that are inconsistent with each other and inconsistent with the operation of HDLC.

DSS and Mr. Dezmelyk did not consider the most logical reference–Schwartz–for information on Natarajan's HDLC protocol. Instead, they piece to-

gether a patchwork of references in an ill-fated effort alleging that Natarajan does not teach low duty cycle RF bursts because it employs HDLC. (POR, pp. 20-22; Dezmelyk Dec. ¶¶ 34-35.) This argument is meritless because the disparate references do not support the asserted premise. (Hu Dec. ¶ 56.)

First, DSS's reliance on the excerpt from DSS 2010 is misplaced. DSS asserts that the cited definition of "bit-oriented framing" shows that HDLC "involves continuous outbound transmission." (POR, pp. 20-21.) But DSS neglects to acknowledge the very first sentence of the cited section, stating that "[a] *point-to-point connection* between two computers or devices consists of *a wire* in which data is transmitted as a stream of bits." (DSS 2010, p. 549 (emphasis added).) DSS 2010 refers to point-to-point wired communication, not to a *point-to-multipoint wireless* system as taught in Natarajan. (Hu Dec. ¶ 56.) There are fundamental differences and unique challenges between point-to-point wired systems and point-to-multipoint wireless systems–the features are not simply interchangeable. (*Id.* at 57-60.) For example, a continuous transmission of so-called "idle words" to maintain synchronization when there is no data to transmit–suitable for an isolated point-to-point wired connection for design simplicity and reliability–would be detrimental to a point-to-multipoint wireless connection because it would interfere with the carefully designed scheduling, waste power, decrease the system data rate, and pollute the wireless channel potentially shared by many devices. (*Id.* at 59.)

- 10 -

DSS also asserts that the "HLDC [*sic*] packet structure is used to transmit '***long*** strings of data at one time,'" and therefore is inconsistent with "small" RF bursts. (POR, p. 21 (emphasis original).) DSS misquotes this passage, which actually states: "[t]his type of framing ***allows*** the sender to transmit ***a long string of bits at one time***." (DSS 2010, p. 549 (emphasis added).) A POSA would have understood that this does not mean that HDLC only sends a long string of bits; nor does it suggest that transmitting a string of bits is not a "burst." (Hu Dec. ¶ 61.) Rather, a sender with data bits to transmit "at one time" does not have to break the string into smaller packets before the string of bits reach the data link layer. (*Id*.)

Moreover, this same reference discloses that the number of bits in the Information Field of an HDLC frame is "variable." (APL 1013, p. 582, Figure H-2.) Mr. Dezmelyk, however, did not consider any portion of this reference other than what DSS provided to him.[1] (Dezmelyk Depo., 101:4-102:7.)

---

[1] Regarding DSS 2010, Mr. Dezmelyk asserts he was "trying to get [a reference] in the right time frame" (Dezmelyk Depo., 101:18-19), but the copyright date for this reference is 2001–well after the '290 patent's filing date.

IPR2015-00369
U.S. Pat. No. 6,128,290



**Annotated Figure H-2 of APL 1013**

This portion of DSS 2010 (APL 1013)–uncited by DSS–corroborates Schwartz. (Schwartz, p. 135 ("The **_information field (packet)_** delivered from the network layer above **_can be any desired number of bits_**.") (emphasis added).) So, the HDLC frame format is compatible with a "burst" transmission. (Hu Dec. ¶ 62.)

Next, Mr. Dezmelyk tries to tie the excerpt from DSS 2010 with an excerpt from DSS 2013, proposing that Natarajan teaches continuous transmission, which it does not. Mr. Dezmelyk notes that Natarajan's HDLC packets are in "serial form." (Dezmelyk Dec. ¶ 35 (citing APL 1003 at 3:36-37).) He alleges that serial communication systems "include a server transmitter transmitting idle words when no useful data is being transmitted." (Dezmelyk Dec. ¶ 35.) But nowhere does DSS 2013 use the term "idle words."[2] Mr. Dezmelyk instead provides a quote: "In **_synchronous transmission_**, groups of bits are combined into frames and frames are sent continuously with or without data to be transmitted." (_Id._ (quoting DSS 2013, p. 2 (emphasis added)).) But this does not describe Natarajan's HDLC protocol,

---

[2] Importantly, Natarajan's system does not use idle words. (Section III.E., _infra_.)

which is *asynchronous*. (Hu Dec. ¶ 64.) Mr. Dezmelyk is wrong that a POSA would not have known whether Natarajan operates under a synchronous or asynchronous protocol. (Dezmelyk Depo., 99:12-20; Hu Dec. ¶ 64.) His assertion underscores his misunderstanding of HDLC, a subject on which he admits he is <u>not</u> an expert. (Dezmelyk Depo., 26:15-16; Hu Dec. ¶ 50.) As discussed above in Section III.C.2, a POSA would have understood that Natarajan operates under the asynchronous response mode (ARM) of HDLC. (Hu Dec. ¶ 64.)

The very next sentences in DSS 2013 distinguish that "[i]n *asynchronous transmission*, groups of bits are sent as independent units with *start/stop flags* and no data link synchronization, to allow for arbitrary size *gaps between frames*. However, *start/stop bits maintain* physical bit level *synchronization* once detected." (DSS 2013, p. 2 (emphasis added).) These "start/stop flags" for synchronization corroborate Schwartz, that an "eight-bit flag sequence 01111110 that appears at the beginning and end of a frame is used to establish and maintain synchronization." (Schwartz, p. 135; Hu Dec. ¶ 65.) Thus, in HDLC, transmission is <u>not</u> continuous, as DSS asserts; rather, there are *gaps between frames*. (Hu Dec. ¶ 65.)

Finally, Mr. Dezmelyk pieces an excerpt from DSS 2014 together with the excerpts from DSS 2010 and DSS 2013. (Dezmelyk Dec. ¶ 35 (quoting DSS 2014 at Section 2.5.6. ("When transmitting, the Asynchronous HDLC controller will transmit IDLE characters (characters consisting of only "1"s) when no data is

available for transmission.")).) This association is inapt for two reasons. First, DSS 2014 relates to point-to-point communications, not point-to-multipoint communications as in Natarajan. (DSS 2014, p. 4 ("This protocol is typically used as the physical layer for the Point-to-Point (PPP) protocol."); Hu Dec. ¶ 66.) As discussed above, a point-to-point wired connection and a point-to-multipoint wireless connection are two fundamentally different types of data communication with distinct design challenges and principles. (*See supra*, Section III.D; Hu Dec. ¶¶ 57-60, 66.) Second, DSS 2014 is a technical manual for a proprietary Motorola product, which uses a modified "HDLC-like" protocol. (Hu Dec. ¶ 66.) This is evident because it can repeatedly transmit "characters consisting of only '1's." (*Id*.) This violates the standard HDLC protocol, where "[i]f *seven ones appear anywhere* in the frame (six ones followed by an additional one), the frame is *declared in error*." (Schwartz, p. 136 (emphasis added); *see also* APL 1013, p. 582 ("If any portion of the data in the frame contains more than five 1 bits, a zero-bit insertion technique inserts a 0 bit to ensure that data is not mistaken for a flag.").)

Thus, DSS 2014 does not disclose the standard HDLC protocol and so it cannot be used to support DSS's position. (Hu Dec. ¶¶ 67-68.) Yet Mr. Dezmelyk relies on this document as supposedly disclosing "the HDLC spec," which it does not. (Dezmelyk Depo., 69:17-71:1; Hu Dec. ¶ 68.) Because Mr. Dezmelyk bases his opinions on DSS 2014, which does not disclose the standard HDLC protocol,

his opinions on HDLC are unsupported. (Hu Dec. ¶ 68.)

The piecemeal argument cobbled together by DSS and Mr. Dezmelyk provides misinformation about how HDLC operates. Indeed, excluded portions of the very references they cite belie their contentions regarding HDLC, and thus their assertions regarding Natarajan. Accordingly, DSS's arguments are baseless.

### E.    DSS's "idle words" argument is a red herring.

#### 1.    Neve is cited to expressly show that synchronizing a base station and peripheral units was well-known.

Apple's Petition includes Neve in combination with Natarajan because "Natarajan does not explicitly describe synchronizing the mobile units with the base station." (Petition, p. 40.) However, Natarajan teaches numerous reasons that "coordinated timing of transmissions is important". (*See id.* at 40-41 (citing Grimes Dec. ¶ 92); Hu Dec. ¶ 69.) Thus, a POSA would have been motivated to precisely synchronize the mobile units and base unit, leading a POSA to Neve–an example of a conventional synchronization technique. (Petition, pp. 41-42; Hu Dec. ¶ 69.)

Indeed, although Natarajan does not explicitly disclose synchronizing the mobile units with the base station, the HDLC protocol, for example as described in Schwartz, explains that the "standard frame format for HDLC" has an "eight-bit flag sequence 01111110 that appears at the beginning and end of a frame [that] is used *to establish and maintain synchronization*." (Schwartz, p. 135 (emphasis added).) Thus, Natarajan's HDLC protocol contemplates a synchronization mech-

- 15 -

anism. (Hu Dec. ¶ 70.) To make clear that synchronization was well-known, Neve is combined with Natarajan. As Mr. Dezmelyk acknowledges, synchronization was within the skill of a POSA. (Dezmelyk Depo., 93:6-16; Hu Dec. ¶ 70.)

### 2.    Natarajan's HDLC protocol does not use idle words.

Again, Apple cites Neve to make clear that synchronization was conventional in communication networks before the '290 patent's priority date. DSS uses Neve as a distraction, conjuring a theory that Natarajan uses idle words, as disclosed in Neve. DSS's theory is unfounded. (Hu Dec. ¶¶ 71-72.)

To begin with, even Neve's master station does not continuously transmit idle words. (*Id.* at 71.) The Board correctly found that Neve "*do[es] not suggest continuous transmission* from the master station, but instead transmission of idle words in the event that there is no data required to be transmitted in the time slots specifically allocated for transmission by the server" and that "the master station performs different functions during different time slots, only certain of which involve transmission." (Institution Decision, p. 20 (emphasis added); Hu Dec. ¶ 71.) Idle words are not continuously transmitted in Neve. (Hu Dec. ¶ 71.)

DSS contorts the inclusion of Neve as somehow suggesting that Natarajan operates identically, which it does not. (*Id.* at 72.) In particular, DSS suggests that Natarajan transmits idle words (POR, pp. 32-33), which it does not. (Hu Dec. ¶ 72.) Indeed, neither Natarajan, nor Schwartz's discussion of HDLC for that matter,

mention idle words. This is likely because using idle words in Natarajan would be pointless. (*Id*. at 73.) First, HDLC has a mechanism–start/stop flags–for synchronization, so idle words would be redundant. (*Id*.) Second, if Natarajan used idle words, they would be transmitted "out into the air and there is ***nobody really paying attention to it***." (Dezmelyk Depo., 84:22-85:1 (emphasis added).) This is illogical. (Hu Dec. ¶ 73.) Mr. Dezmelyk tries to reconcile, asserting that when receivers turned back on, they could synchronize onto the stream of idle words. (Dezmelyk Depo., 85:2-14.) But Natarajan discloses that "each receiving mobile unit can compute ***exactly when*** it should be ready to receive packets from the base station…to wake itself up at its designated time for receiving data." (Natarajan, 4:67-5:3 (emphasis added).) Thus, a POSA would understand that Natarajan does not operate in the manner Mr. Dezmelyk suggests. (Hu Dec. ¶ 73.)

Mr. Dezmelyk even acknowledges that Natarajan does not actually disclose continuous transmission: "…using the Natarajan example, there is a period of time for outbound data traffic. There will be ***effectively, <u>if</u> there is a lot of data sent***, continuous transmission over across that interval." (Dezmelyk Depo., 62:3-6 (emphasis added).) And although he is factually inaccurate because the HDLC protocol does not use idle words, Mr. Dezmelyk asserts that HDLC only "typically" uses idle words. (*Id.* at 69:10-16.)

Moreover, Mr. Dezmelyk asserts that systems using idle words can have, for example, ten consecutive 1's. (Dezmelyk Depo., 98:1-13.) Again, Mr. Dezmelyk is wrong. (Hu Dec. ¶ 74.) HDLC cannot have more than six consecutive 1's, otherwise an error is declared. (Schwartz, p. 135-136; Hu Dec. ¶ 74.) That is why, according to the book cited by DSS, "[i]f any portion of the data in the frame contains more than five 1 bits, a zero-bit insertion technique inserts a 0 to ensure that data is not mistaken for a flag," which is 01111110. (APL 1013, p. 582.)

Nothing in Natarajan or the HDLC protocol suggests using idle words. (Hu Dec. ¶ 75.) And, in fact, a POSA would understand that HDLC does <u>not</u> use idle words. (*Id*.) DSS's argument on this point is meritless.

## IV. DSS's "low duty cycle" argument is meritless.

### A. Mr. Dezmelyk's definition of "duty cycle" is nonsensical.

Mr. Dezmelyk asserts in his declaration that "duty cycle" should be construed to mean "the ratio of the duration during which the server transmitter is energized to the total duration designated for outbound transmissions–from the server unit to the peripheral units." (Dezmelyk Dec. ¶ 23.) But in his deposition, he provides two different, yet equally confounding, explanations for determining duty cycle. In each case, the '290 patent would have a 100% duty cycle.

First, in his redirect testimony, Mr. Dezmelyk asserts that "duty cycle is measured based on when you are transmitting." (Dezmelyk Depo., 116:8-9.) He

asserts that Natarajan has a 100% duty cycle because "if you measure during what periods of time it is transmitting it is transmitting at 100 percent duty cycle." (Dezmelyk Depo., 69:7-9.) But of course, if the only times used to calculate duty cycle are when the transmitter is actually transmitting, the duty cycle will always be 100%. (Hu Dec. ¶ 80.) Using Mr. Dezmelyk's example from the '290 patent, if transmissions occur in 3 out of 64 slots and "if you measure during what periods of time it is transmitting" (i.e., the 3 transmissions slots), the '290 patent transmits at a 100% duty cycle. (Dezmelyk Dec. ¶¶ 24, 26; *see also* Dezmelyk Depo., 116:10-14 ("So if there was enough data to occupy two slots then the question is:  What is the duty cycle of the RF transmitter during that period of time of those two slots. Or the aggregate time of those two slots if they weren't adjacent to one another."); Hu Dec. ¶ 80.) Under Mr. Dezmelyk's interpretation, if a particular time slot is filled by a transmission, the duty cycle is 100%. (Hu Dec. ¶ 80.)

Second, Mr. Dezmelyk doubles down on this peculiar interpretation, asserting that duty cycle is calculated based on the sub-portion of a time slot taken up by a transmission. Mr. Dezmelyk asserts that:

> if you had -- you are using in essence two slots out of the 10 that are available, and particular slots have a fixed width, then that ***period of time of the two slots that you actually have something to transmit in gives you the kind of what you are dividing by, the time you are dividing by to calculate the duty cycle***. You are looking at the percent-

age of time that the transmitter is active during the period in time when, in essence when a transmission is called for.

(Dezmelyk Depo., 116:20-117:6 (emphasis added).)

Put another way by Mr. Dezmelyk, "the question is, what **percentage of _that slot time_** is taken up by the transmission." (Dezmelyk Depo., 106:2-4 (emphasis added).) So, Mr. Dezmelyk's interpretation requires determining the percentage of a single transmission slot used for transmission. (Hu Dec. ¶ 82.) Again, Mr. Dezmelyk's calculation for the '290 patent accounts for transmission during the entirety of the 3 time slots (out of the 64 total slots), which would be a 100% duty cycle under his interpretation. (_See_ '290 patent at 4:2-6 ("**For each slot**, this TDMA program indicates that a PEA or host is to **transmit, or not**, and whether it will receive, or not."); Hu Dec. ¶ 82.)

Neither of Mr. Dezmelyk's interpretations of duty cycle are consistent with the '290 patent. (Hu Dec. ¶ 82.) And only under this inaccurate interpretation of duty cycle is he able to allege that Natarajan has a 100% duty cycle. So too, however, would the '290 patent. Because Mr. Dezmelyk's interpretation is erroneous, his testimony on duty cycle and DSS's reliance thereon should be ignored.

**B.    DSS's proposed claim construction that "low duty cycle" is less than 10% is arbitrary and unduly narrow.**

DSS proposes that the broadest reasonable interpretation for a server transmitter energized in a "low duty cycle" is that "the server transmitter is energized

for *less than ten percent* (10%) of the total duration designated for outbound transmissions." (POR, p. 11 (emphasis added).) But DSS's proffered evidence does not support a ceiling of 10% for a low duty cycle. (Hu Dec. ¶ 76.)

The "examples" that DSS cites in Table 1 are cherry-picked results from a search premised on finding examples by including "e.g." in the search string. (POR, pp. 12-13.) Yet none of these references are contemporaneous with the '290 patent's filing date. One of DSS's own examples contradicts the proposed construction of "*less than* ten percent," providing a "low duty cycle, e.g., *at* an *about* 10 percent (10%) duty cycle." (POR, p. 13 (quoting DSS 2008 at 10:5-6) (emphasis added).) So, the duty cycle could be at or even slightly above 10%, which is <u>not</u> "less than ten percent," as DSS proposes. Thus, DSS's own example demonstrates that its proposed construction is inappropriate. (Hu Dec. ¶ 77.)

DSS cites Mr. Dezmelyk's declaration in support of its interpretation (POR, p. 11), but his deposition testimony undermines the proposed construction. First, Mr. Dezmelyk admits that the term "low duty cycle" itself does not require an upper bound at 10%. (Dezmelyk Depo., 78:2-6; *see* Hu Dec. ¶ 77.) While Mr. Dezmelyk asserts that "we are quibbling over whether it is 9.9 or 10.1," it is he who places a strict upper bound on a low duty cycle. (Dezmelyk Depo., 80:11-12; Dezmelyk Dec. ¶ 24.)

- 21 -

Second, Mr. Dezmelyk asserts for the first time that the 10% limit is actually based on claim 8 of U.S. Patent No. 5,699,357. (*See* Dezmelyk Depo., 79:12-81:3.) DSS does not cite the '357 patent in its claim construction or in Table 1. Mr. Dezmelyk states that he "probably missed the citation to it in here because I was plowing away in a hurry." (*Id.* at 80:6-7.) But claim 8 of the '357 patent is irrelevant because it does not support a 10% limit either. Claim 8 recites "…said low duty cycle pulses comprise chips within the respective code sequences such that a transmitter is enerrgized [*sic*] less than 10% of the time during an allocated time slot." Because claim 8 depends ultimately from independent claim 6, it is ***narrower*** than the independent claim, meaning that the '357 patent contemplates a "low duty cycle" ***greater than*** 10%. (Hu Dec. ¶ 78.)

Apple does not propose a specific upper threshold for "low duty cycle;" however, it is evident that DSS's proposed upper bound of 10% is unsupported. So, under the broadest reasonable interpretation standard, a "low duty cycle" of a transmitter should simply be interpreted as the transmitter being designed to be on only to satisfy the data communication needs over the communication cycle of the system. (*See* Grimes Depo., 40:16-19; Hu Dec. ¶ 79.)

## C.    DSS improperly truncates the time period for calculating Natarajan's duty cycle.

DSS focuses only on the period for "outbound transmissions" for calculating Natarajan's duty cycle. (POR, p. 11; Dezmelyk Dec., ¶ 23.) This is improper. (Hu

Dec. ¶ 83.) A POSA would calculate the duty cycle over the period of time that it takes a system to go through a cycle of communication. (*Id*.) DSS's methodology improperly manipulates that time period. (*Id*.)

A POSA would calculate Natarajan's duty cycle over all of Periods A, B, and C. (Hu Dec. ¶ 84.) To limit the calculation only to Period A, as Mr. Dezmelyk suggests (Dezmelyk Dec. ¶ 32), reads the word "cycle" out of the term "duty cycle." (Hu Dec. ¶ 84.) The communication "cycle" in Natarajan includes all of Periods A-C. (*Id*.) Once the transmissions between the base station and mobile stations cycle through Periods A-C, the cycle begins again with Period A for the next frame. (*Id*. at 85.) Thus, Natarajan's duty cycle must be calculated over Periods A-C. (*Id*.) Indeed, Natarajan's communication cycle, where "[m]ost users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time," is a low duty cycle. (Natarajan, 6:41-44; Hu Dec. ¶ 85.) Further still, even under DSS's improper limitations for duty cycle, Natarajan's system would be capable of operating at a duty cycle less than 10% in Period A. (Hu Dec. ¶¶ 86-88.)

## V.    The Board should not give any weight to Mr. Dezmelyk's testimony.

### A.    Mr. Dezmelyk's testimony lacks credibility.

Mr. Dezmelyk asserts that he read his declaration "[m]any, many, many times." (Dezmelyk Depo., 27:18.) And yet he did not notice that the very first page after the caption states "DECLARATION OF CHRIS A. MACK, PH.D." (*Id*. at

26:21-27:18.) Nor did he notice that there are two paragraphs numbered 15 and two paragraphs numbered 16. (*Id.* at 27:19-28:3.)

Even if the duplicative paragraph numbers resulted from "Microsoft Word at work where it has got strange issues of paragraph numbering" (*id.* at 28:5-7), this error casts doubt on how thoroughly he reviewed the statements in his declaration. More importantly, the fact that Mr. Dezmelyk did not notice someone else's name on his sworn declaration clouds the credibility and veracity of his entire testimony. Thus, the Board should not give any weight to Mr. Dezmelyk's declaration.

### B.    Mr. Dezmelyk admits he is not an expert in HDLC.

As discussed above in Section III.B., Mr. Dezmelyk admits he is not an expert in HDLC. At a minimum, his testimony on that topic must be discounted.

### C.    Mr. Dezmelyk bases his opinions on inaccurate assumptions.

Mr. Dezmelyk bases his opinions on the inaccurate assumption that Natarajan's system uses idle words. (*See supra*, Section III.E.) Because Natarajan does not use idle words, Mr. Dezmelyk's opinions are meritless. Mr. Dezmelyk also bases his opinions on an arbitrary and unduly narrow construction of "low duty cycle" and improperly truncating the time period for calculating Natarajan's duty cycle. (*See supra*, Section IV.) So again, Mr. Dezmelyk's opinions are meritless.

- 24 -

## VI.    Conclusion

Apple has demonstrated by a preponderance of the evidence that claims 1-4 of U.S. Patent No. 6,128,290 are unpatentable and respectfully requests that the Board enter judgment in accordance therewith.

<div style="margin-left:40%">

Respectfully submitted,
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

/Mark W. Rygiel/

Mark W. Rygiel, Registration No. 45,871
David K.S. Cornwell, Registration No. 31,944
Robert Greene Sterne, Registration No. 28,912
Jason A. Fitzsimmons, Registration No. 65,367

Attorneys for Petitioner Apple
</div>

Date: January 22, 2016

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

IPR2015-00369
U.S. Pat. No. 6,128,290

## <u>CERTIFICATION OF SERVICE (37 C.F.R. §§ 42.6(e))</u>

The undersigned hereby certifies that the above-captioned **PETITIONER'S**

**REPLY TO PATENT OWNER RESPONSE** and all associated exhibits were

served in their entirety via e-mail on January 22, 2016, upon the following counsel

of record for the Patent Owner:

Andriy Lytvyn (Lead Counsel)
Anton J. Hopen (Back-up Counsel)
Nicholas Pfeifer (Back-up Counsel)

SMITH & HOPEN, P.A.
180 Pine Avenue North
Oldsmar, FL 34677

andriy.lytvyn@smithhopen.com
anton.hopen@smithhopen.com
nicholas.pfeifer@smithhopen.com

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

/Mark W. Rygiel/

Mark W. Rygiel
Attorney for Petitioner Apple Inc.
Date: January 22, 2016          Registration No. 45,871

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

trials@uspto.gov

571-272-7822

IPR2015-00369, Paper No. 39
IPR2015-00373, Paper No. 38
May 31, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

APPLE INC.,
Petitioner,

v.

DSS TECHNOLOGY MANAGEMENT, INC.,
Patent Owner.
————————

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290
————————

Held: March 15, 2016
————————

BEFORE:  JAMESON LEE, MATTHEW R. CLEMENTS, and
CHARLES J. BOUDREAU, Administrative Patent Judges.


    The above-entitled matter came on for hearing on Tuesday,
March 15, 2016, commencing at 1:02 p.m., at the U.S. Patent and
Trademark Office, 600 Dulany Street, Alexandria, Virginia.

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

APPEARANCES:

ON BEHALF OF THE PETITIONER:

        ROBERT GREENE STERNE, ESQUIRE
        DAVID K.S. CORNWELL, ESQUIRE
        MARK W. RYGIEL, ESQUIRE
        JASON A. FITZSIMMONS, ESQUIRE
        Sterne Kessler Goldstein Fox
        1100 New York Avenue, N.W.
        Washington, D.C. 20005

ON BEHALF OF THE PATENT OWNER:

        ANTON J. HOPEN, ESQUIRE
        ANDRIY LYTVYN, ESQUIRE
        Smith & Hopen
        180 Pine Avenue North
        Oldsmar, Florida 34677

2

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1              P R O C E E D I N G S

2                      -   -   -   -   -

3         JUDGE LEE:  Good afternoon.  Please be seated.

4         Judge Boudreau will be conducting today's session and

5    he and Judge Clements will appear on the screen from San Jose,

6    California.  So if we could all wait a few minutes, I would

7    appreciate that.  Thank you.

8         JUDGE BOUDREAU:  Good afternoon.  This is the

9    oral hearing in Cases IPR2015-00369 and IPR2015-00373

10   involving U.S. Patent Number 6,128,290.

11        Can counsel please state your names for the record?

12        MR. STERNE:  Good afternoon, Your Honor.  Robert

13   Sterne for Petitioner Apple Inc.

14        JUDGE BOUDREAU:  Thank you, Mr. Sterne.

15        MR. HOPEN:  Good afternoon, Your Honor.  My name

16   is Anton Hopen.  I am counsel for the Patent Owner.  With me

17   here is my colleague, Andriy Lytvyn, as well.

18        JUDGE BOUDREAU:  Thank you, Mr. Hopen.

19        Per the trial hearing order in this case, each party will

20   have 60 minutes of total time to present arguments.  The order of

21   presentation will be that the Petitioner will go first and present its

22   case regarding the challenged claims.  You may reserve time for

23   rebuttal.  Patent Owner will then respond to Petitioner's

24   presentation and, finally, Petitioner may use any remaining time

25   to respond to Patent Owner's presentation.

3

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        Just a few reminders, before you begin, one is to ensure

2    that the transcript is clear and because we have two judges here in

3    a different office, please try to refer to your demonstratives by

4    slide number.

5        Also, if either party believes that something the other

6    party is arguing is a new argument in substance that was not

7    made in the party's briefs, I would ask you to please raise that

8    during your presentation rather than interrupting the other side.

9        Any questions from either party before we begin?

10    MR. HOPEN:  No, sir.

11    JUDGE BOUDREAU:  All right.  Thank you.

12    Counsel for the Petitioner, you may begin.  And do you

13    plan to reserve time for rebuttal?

14    MR. STERNE:  Yes, Your Honor.  I'd like to reserve 15

15    minutes, if I may.

16    JUDGE BOUDREAU:  Okay.  Thank you.

17    MR. STERNE:  Before I begin, I would like to

18    approach Judge Lee and give him a hard copy of the slides.

19    JUDGE LEE:  I would like that very much.  Thank you.

20    MR. STERNE:  And for our judges in San Jose, I've got

21    hard copies for you that you can either get through Judge Lee or

22    use the electronic versions.

23    JUDGE BOUDREAU:  Thank you.  And just to be

24    clear, the electronic versions that you filed two days ago are the

25    same as what you just provided Judge Lee?

4

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          MR. STERNE:  That's correct.

2          JUDGE BOUDREAU:  Okay.  Thank you.

3          MR. STERNE:  So, Your Honor, it's my understanding

4    that if I am looking at the camera above Judge Lee's head that I

5    will be look directly at you; is that correct?

6          JUDGE BOUDREAU:  That is correct, yes.  Thank

7    you.

8          MR. STERNE:  Thank you.

9          So good afternoon, Your Honors, and may it please the

10   Board, Robert Sterne for Petitioner Apple Inc.  With me at

11   counsel table is my colleague, Jason Fitzsimmons, who's on my

12   right.  Also from my firm present are David Cornwell and Mark

13   Rygiel and also joining us from California is trial counsel, David

14   Alberti, and they are in the back of the room.

15         Let me begin.  Six challenged claims remain at issue.

16   This Board properly instituted trial based on the combination of

17   Natarajan and Neve patents.  As we will discuss today, these

18   claims are unpatentable on this ground.  So let me summarize, if I

19   can begin with, five key points that I will be addressing more

20   today.

21         First, Patent Owner has not disputed that a vast majority

22   of the claim limitations are disclosed in the combination of

23   Natarajan and Neve under any reasonable claim construction.

24         Number two, Patent Owner disputes only a single

25   limitation of the claims related to the term low duty cycle.  Your

5

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    Honors, I have had Mr. Fitzsimmons display slide 1 of our slide

2    deck and also slide 2, which show Claims 1 and 9, respectively,

3    and also break out the single limitation that we will be addressing

4    today, which is said server transmitters being energized in low

5    duty cycle RF bursts.

6          Third, Patent Owner's argument that Natarajan does not

7    disclose a quote, low duty cycle, as required by the claims,

8    requires this Board to improperly focus only on period A of the

9    relevant time cycle in Natarajan and ignore periods B and C of

10   this time cycle.

11         Number four, but even if you, the Board, consider just

12   Period A of Natarajan, Natarajan still discloses a low duty cycle

13   as required by the claims.

14         And, number five, Patent Owner's position on period A

15   is premised entirely on an argument about the HDLC protocol

16   that is contradicted by its own '290 patent.

17         Patent Owner argues that the HDLC protocol is

18   inconsistent with a "low duty cycle" and incompatible with their

19   very own '290 patent, but yet the only disclosed embodiments of

20   the '290 patent uses the HDLC packet protocol.  In essence, we

21   submit Patent Owner's argument requires the Board to ignore the

22   teachings of its own patent.

23         So turning now to claim construction, the only issue

24   termed -- the only claim term here at issue appears in both

6

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   Independent Claims 1 and 9 and, as I've said before, we have

2   highlighted those in our slides 1 and 2 of the slide deck.

3          A reasonable claim construction for low duty cycle is

4   found at paragraph 79 of Dr. Hu's declaration, which I have now

5   reproduced for the Board's convenience.  This is slide 11 of our

6   slide deck.  And what did Dr. Hu state in 79?  And I'll read this

7   into the record to complete the record.

8          Accordingly, it is my opinion that the term "low duty

9   cycle" does not impose an upper limit of 10 percent for the duty

10  cycle.  Under the broadest reasonable interpretation standard, a

11  "low duty cycle" of a transmitter should simply be interpreted as

12  the transmitter being carefully designed to be on only to satisfy

13  the data communication needs over the communication cycle of

14  the system.  Moreover, a transmitter that is off for more time than

15  it is on over the communication cycle of the system would be an

16  example of a low duty cycle.

17         JUDGE LEE:  Mr. Sterne, I have a question.  I'm a little

18  confused by the terminology low duty cycle.  It isn't defined in

19  the spec and it wasn't construed in your petition at first either, but

20  right now it seems to be at the focal point of the dispute.

21         I'm wondering if the transmitter is energized for more

22  than half the time that it could be energized, maybe even 80 or 90

23  percent of the time.  Could that possibly still be deemed low duty

24  cycle if there is such a need to transmit?  If it has a need to

7

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   transmit to everybody and it takes all of that time, would that still

2   be considered low duty cycle?

3           MR. STERNE:  Yes, it would be, Your Honor, because

4   you're looking at -- well, there's a lot of parts to my answer to

5   your question, but the simple answer is regardless of any

6   reasonable claim construction here, whether we focus just on

7   period A, as has been argued by the Patent Owner, or if we

8   impose a 10 percent cap on the transmitter at the master station

9   being the maximum, it can be on during time frame A.  Under

10   any reasonable construction, even that one which we say is

11   unreasonable in the record, the Natarajan and Neve combination

12   renders those claims unpatentable as obvious.

13           And if you want, I can go through the claim

14   construction arguments or I can approach this from the

15   perspective of the Natarajan and Neve patents.  But regardless of

16   what reasonable claim construction is done here, our position in

17   the record -- this is not a new argument -- is that the claims are

18   unpatentable over the two U.S. patents that are the combination.

19           JUDGE LEE:  I understand that, but it would be nice if

20   we know what the term actually means.

21           MR. STERNE:  Right.  And Dr. Hu in her paragraph 79

22   says under the broadest reasonable interpretation a low duty cycle

23   of a transmitter should simply be interpreted as the transmitter

24   being carefully designed to be on only to satisfy the data

8

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

 1  communication needs over the communication cycle of the

 2  system.

 3          And what she's driving at here is the communication

 4  cycle of the system, the data requirements for the master station

 5  to broadcast to the peripherals changes, and the data requirements

 6  for the peripherals to transmit back to the master station change

 7  over time, and Natarajan and Neve teach what is required by the

 8  claim and, therefore, you know, the claims are unpatentable.

 9          The Patent Owner has argued that there is a 10 percent

10  cap when the transmitter can be -- there's a 10 percent cap in

11  terms of low duty cycle and you only focus on period A when the

12  master station is transmitting to the remote stations.

13          If we could go and look perhaps at Figure 4 of the

14  Natarajan patent so that I can put this in better context.  By the

15  way, this is slide 4 in our slide deck and I'm looking at Figures 4

16  and 5 of the Natarajan patent.  As we -- and we're also looking at

17  an excerpt from the Natarajan patent that comes from column 4,

18  lines 20 to 26.

19          So if we look at Figure 4, we see there are three

20  subframes A, B, and C.  In subframe A the base station or the

21  server, as it's used in the claim, Judge Lee, is transmitting to the

22  mobile devices.  This is a point to multipoint RF communication

23  system using a time domain multiple access protocol with an

24  HDLC packet structure.  We'll get more into that in a minute.

9

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    But essentially for this conversation at this point is

2    there's a subframe A, a subframe B and a subframe C. Subframe

3    A is when the base station is transmitting to the mobiles as

4    indicated and each of the mobile devices in those various slots

5    shown in subframe A are turned and off based on the code in

6    Figure 5 during that period A.

7    So when the transmitter is transmitting in each of -- or

8    in some or each or none of those slots during subframe A,

9    depending on what the data is that's going to be transmitted from

10   the master station to the peripherals, the receivers in the remote

11   devices turn themselves on based on the control information that

12   they have received from the period AH. AH is a header in the

13   frame and AH provides control information and synchronization

14   information for that particular frame.

15   After the transmitter from the base station transmits to

16   the mobile devices, you enter another control period. BH is

17   shown in Figure 4. In BH you, again, have control signals and

18   synchronization signals according to Natarajan and at that point

19   the peripheral devices, were all listening to BH, because they're

20   all synchronized to the master, know when they are going to be

21   allowed to transmit from their device to the base station and so

22   they're off, their transmitters are off until they need to transmit

23   according to this framing format specified on a frame-by-frame

24   basis.

10

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          After that occurs, as shown in shown in Figure 4, you

2    have another control period and synchronization period, CH, as

3    described in Natarajan, and then we enter subframe C, which is

4    the contention period.  During the contention period, some or all

5    or none of the mobile devices can raise their hand, so to speak,

6    and send a packet to the master station and many times there will

7    be a couple stations transmitting at once, which is why it's called

8    contention.

9          The transmitter at the master station sends back what's

10   called an acknowledgment frame, which is in one of the slots in

11   C, when it picks up a particular request from a particular

12   peripheral station and in that way there's a handshaking that goes

13   on between the peripheral station that's sent a packet that is

14   received by the master and the master acknowledges that with a

15   return transmission in one of the slots later in C and tells that

16   particular peripheral device that it has received its contention

17   message, and then the whole thing repeats itself after we have this

18   footer FT, which again synchronizes the end of the frame.

19         So regardless of whether you look at subframes A, B,

20   and C, which is our position, for determining duty cycle or

21   whether you look just at subframe A, which we contend is not

22   proper, but even if you were to do that and under any claim

23   construction that is being advanced in this proceeding, including

24   the one from the Patent Owner of limiting duty cycle to 10

11

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    percent, as we've laid out carefully in the record they -- all of

2    these variants are obvious in view of Natarajan and Neve.

3            That's essentially our position.  And if you'd like, I can

4    go through the specifics of that.

5            JUDGE LEE:  Well, my question is, what does any of

6    this have to do with the specific number --

7            JUDGE BOUDREAU:  Are you referring to the

8    examples that Dr. Hu provided in her declaration where she

9    ended up with duty cycles of -- let's see, this is paragraph 86 of

10   her declaration.  It says 8.57 percent.  Paragraph 87, she ended up

11   with a calculation of 9.09 percent.

12           MR. STERNE:  Yes, Your Honor.  Judge Boudreau, if

13   we look at her paragraph 86 and we have only reproduced the

14   beginning of it because there's more detail as you know that

15   comes after, but the portion that we have highlighted on slide 13

16   of our slide deck states under 86, using the proper calculation

17   over periods A through C for duty cycle in Natarajan, even under

18   DSS's incorrect interpretation of "low duty cycle" being less than

19   10 percent, Natarajan can operate in a manner that satisfies the

20   proposed interpretation, and then she shows you some

21   representative examples.

22           JUDGE BOUDREAU:  And what is the basis for those

23   examples?  I see in paragraph 86 it says, "[b]y way of example, if

24   the base station transmits to 1 mobile unit during period A, 30

12

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    mobile units transmit to the base station during period B, and 2

2    mobile units transmits to the base station during period C. . . ."

3          Where do those 1, 30 and 2 come from?

4          MR. STERNE:  They are representative examples that

5    Dr. Hu has proposed as representative of a frame that could easily

6    occur in the communication cycle of a normal system.

7          As you can imagine, Judge Boudreau, as I said before,

8    the data that's being transmitted from the base station to the

9    specified peripherals changes over time and the data that's being

10   transmitted by the respective peripherals back to the base station

11   change over time because these are RF LANs point to multipoint.

12   So what Dr. Hu has done here is advanced particular examples of

13   how the system could operate, and what I would like to do, Your

14   Honor, before I go any further is go back to my slide that shows

15   Figure 4.

16          JUDGE BOUDREAU:  Okay.  My question, though, is

17   whether those have any basis in examples that are actually

18   disclosed in Natarajan?

19          MR. STERNE:  No, Your Honor.  Those are not

20   specific examples disclosed in Natarajan, but they're based on the

21   -- they are based on the statement that I wanted to point to, if I

22   may, which is critical.  The critical point in this whole discussion

23   is what is stated specifically in Natarajan and it says at column 4,

24   lines 20 through 26, in the scheme described here, a scheduled

25   multiaccess protocol is used in which time is divided into

13

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    fixed-length frames, and frames are divided into slots as shown in

2    Figure 4.

3         It is to be appreciated the different frame divisions and

4    header lengths and content -- remember content, that's what we're

5    talking about here -- content may be utilized in the practice of the

6    invention, and the scheme set forth here is merely exemplary.

7         So you can see that a person of ordinary skill in the art

8    in 1997 reading Natarajan, which was filed in 1991 and issued in

9    1993, could understand that the content could change, the header

10   lengths could change, the frame divisions could change.  All is

11   contemplated by a person of ordinary skill in the art.

12        And the reason this is important is because the system

13   needs to conserve battery power.  And in order to conserve

14   battery power both at the base station and at the peripherals, you

15   only want to be transmitting on either side of that when you need

16   to.  You don't want to be sending the same message more than

17   once unless you have to.  You don't want to be sending idle words

18   because you don't need to.  And the point is, battery power is

19   primarily regulated and conserved by reducing the unneeded

20   transmissions that occur.

21        The receiver, of course, uses some power when it's on

22   and the logic of both the peripheral and the base stations are on

23   all the time because they have to be keeping track of when to turn

24   on the transmitters and the receivers based on the framing that has

25   information that's been received in this TDMA approach.

14

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        But the real power consumption, as is well understood

2  in the art, comes from the transmitter and it's the transmitters at

3  the base station and at the peripheral devices that are consuming

4  the power and, also, you don't want the transmitters running

5  unnecessarily because they produce interference with other

6  systems that are being operated in the same frequency spectrum.

7        So the goals of the '290 patent are the same as what's

8  shown in Natarajan and they're both point to multipoint systems

9  as is the system in Neeve or Neve and, therefore, it's our position

10  that the combinations are legitimate and fully supported and that

11  the combinations render the challenged claims that remain in the

12  case unpatentable.

13        Your Honor, I would like to talk, if I may, about some

14  of the other things that are important to know.  I would point to

15  Dr. Hu's deposition.

16        JUDGE LEE:  Before you go on, let me ask a follow-up

17  a little bit on claim construction.  Under the broadest reasonable

18  construction rule, would it be sufficient to simply say that as long

19  as the transmitter is not transmitting idle data, that's enough to be

20  low duty cycle, or is that too broad?

21        MR. STERNE:  No.  I think -- Your Honor, the way the

22  claim is written -- if we go back to Claim 1, what we're talking

23  about is it's in the context of this combination.  So in order for the

24  server transmitter to be in the low duty cycle range, the server

25  transmitter needs to -- according to the '290 patent, the server

15

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  transmitter needs to be transmitting when it has to transmit

2  for that particular frame.

3          JUDGE LEE:  It doesn't want to be transmitting all the

4  time.

5          MR. STERNE:  Well, it doesn't want to be transmitting

6  more than once per frame for that particular peripheral device

7  would be one way to look at it.  In other words, it doesn't want to

8  be transmitting redundantly, which is what would be going on

9  when you are using this idle word construction that has been

10  advanced by Patent Owner where you're just sending idle words

11  that have no data.  You have synchronization.  It's produced by

12  the frame structure and by the use of the HDLC frame protocol

13  and, therefore --

14          JUDGE LEE:  Yeah, but that's in the spec.  Just on the

15  claim itself, the claim doesn't call for slots or frames.

16          MR. STERNE:  Right.

17          JUDGE LEE:  And I think somewhere in the patent it

18  distinguishes over the art by saying, well, in the prior art there's

19  transmission of idle data, which is bad for the battery and bad for

20  interference.

21          MR. STERNE:  Right, that's correct.

22          JUDGE LEE:  So I'm thinking whether it would be

23  unreasonably broad simply to say low duty cycle just means don't

24  have the transmitter transmit idle data when there's nothing to

25  transmit.

16

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1       MR. STERNE:  That could be a possible construction.

2  Under any of the constructions that have been advanced in this

3  proceeding, even if you were as I said before to adopt this 10

4  percent ceiling, the combination renders the claims obvious.

5       JUDGE LEE:  I know that, but I'm trying to figure out

6  exactly what the term means.  I'm positing different constructions

7  to see what the parties' views are and one possible construction

8  simply is we don't want the transmitter to be transmitting

9  unnecessarily because that's the broad idea.  It's bad for battery,

10  bad for interference.

11       So is it unreasonably broad simply to say it meets low

12  duty cycle if you limit the transmitter such that it does not

13  transmit idle data just to fill up its total frame?

14       MR. STERNE:  Yeah, that would be one example.

15  Your Honor, as you probably know, but let me make it clear for

16  the record the patent expired on March 6.  Okay.  So throughout

17  the proceedings we've used BRI, broadest reasonable

18  interpretation.

19       The patent expired on March 6, so it could be argued

20  that -- I don't believe there's a precedential decision from the

21  Board on this issue yet.  I know there is in reexamination, in inter

22  partes reexamination, but when you -- when the patent expires

23  during a proceeding like a reexam, inter partes reexam, you

24  convert over to the Phillips standard.

17

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    This, of course, was not raised in this proceeding.  But

2    when the patent expired, we would, of course, arguably be under

3    the Phillips standard.  Well, it doesn't matter under Phillips

4    because the claim construction is the same because there was no

5    prosecution history, no amendments made during the prosecution

6    of this patent dealing with low duty cycle, so the low duty cycle

7    limitation doesn't change from BRI to Phillips.

8    JUDGE LEE:  But let me ask you another possible

9    construction, which is not as broad, and that would be you divide

10    up a frame into slots and then you assign slots to each of the

11    peripherals for the server.  So each unit has its own designated

12    slot in which to transmit or not to transmit.  And unless it's in that

13    slot, it should power off.

14    Is that -- could that be a proper construction for low

15    duty cycle?

16    MR. STERNE:  Well, I mean, I'm answering this

17    hypothetically, but if the -- if during that frame where you've got

18    these assigned slots for each peripheral unit and then each

19    peripheral unit has an assigned slot to transmit back to the base

20    station, as you say, so it's not dynamic at all, depending on the

21    data requirements in the system at that moment in time, it would

22    be low duty cycle because you wouldn't be transmitting the same

23    information twice I would submit that was the requirement during

24    that frame.

18

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        You would transmit it and then if you had to transmit it

2   again, you'd have to transmit it in a subsequent frame or frames.

3        JUDGE LEE:  Right, and then it's powered off --

4        MR. STERNE:  Powered off.

5        JUDGE LEE:  -- between the time of the assigned slots.

6        MR. STERNE:  Right.  And because you have

7   synchronization on a frame-by-frame basis between the master

8   and the peripherals, the master and the slaves, you would -- the

9   slaves would know or the peripherals would know when to turn

10  their receivers on and off, when to turn their transmitters on and

11  off and the same would apply for the master.

12       The only difference would be that the master would not

13  know if a particular peripheral was going to need to transmit

14  during that frame.  It would assume that that peripheral would

15  have reserved a dedicated reserve to transmit slots.

16       JUDGE LEE:  Right.  So the server would have to be

17  powered on to listen because the peripheral might transmit.

18       MR. STERNE:  Right, and the beauty of the '290 patent

19  and the beauty of Natarajan and Neve is they're dynamic in that

20  sense so they can know -- on the master side you don't have to be

21  listening unless you know that something is supposed to be

22  transmitted by that peripheral.

23       Now, of course, we have that contention period in

24  Natarajan where they can set it up for the next frame or frames,

25  but there would be times that the master station in your

19

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  configuration would be listening and there would be no signal

2  that would be transmitted by the peripheral dedicated to that slot.

3        JUDGE LEE:  So you don't object to that construction,

4  because I'm also reading from the abstract.  Just a few lines after

5  low duty cycle appears, it says by establishing a tightly

6  synchronized common time base between the units and by the use

7  of sparse codes, timed in relation to the common time base, lower

8  power consumption and avoidance of interference between

9  nearby similar systems is obtained.

10        So that seems to indicate that, to be low duty cycle, all

11  you need is a synchronized frame in which different units are

12  assigned transmission time or receiving time.  We don't need any

13  particular number, 10 percent, 20 percent, 30, 40, 50.  That

14  doesn't matter.  That's the way I'm reading this.

15        MR. STERNE:  Yeah, there's nothing -- as you

16  correctly point out, there's nothing in the spec that defines low

17  duty cycle.  The term low duty cycle is given its ordinary

18  meaning and, therefore, a person of ordinary skill in the art

19  reading the objectives or I guess we used to call them the objects

20  of the invention would understand that the goal is to achieve

21  those two objectives that you keep pointing out, which is low

22  battery consumption and reducing interference, and that I believe

23  would be accomplished by your construction.

24        That's not been the specific constructions advanced here

25  because we've been more focused, frankly, on what is shown in

20

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   Natarajan and what is shown in Neve. So we're trying to show

2   that what is shown in those two references either individually or

3   combined would meet the limitations of claims -- of the

4   challenged claims.

5           JUDGE LEE: I understand you probably never heard of

6   it before today, but we've got to figure out what the term means.

7   We can't say whatever the term means the art meets it. It's not the

8   better way to go, but I'm just proposing this and see what the

9   parties think about it.

10          MR. STERNE: Right.

11          JUDGE LEE: So you don't think that's too narrow or

12  too broad? Let's apply the Phillips standard. Would that be a

13  reasonable construction, that if you have synchronized time slots

14  for transmission and receiving, that would constitute utilizing low

15  duty cycle.

16          MR. STERNE: I would say that the concept of low

17  duty cycle there would be met based on what I can appreciate

18  your hypothetical to be. It would be encompassed I submit by the

19  '290 patent's disclosure. The examples that they use are not bad,

20  but the claims in terms of their broad meaning and the objectives

21  of the embodiments that are shown to the public and disclosed to

22  the public and being interpreted by a person reading the patent

23  could encompass that.

24          JUDGE LEE: The Petitioner has no objection to that

25  construction.

21

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1      MR. STERNE:  No.  No, I don't have an objection to

2    that.  Obviously what we have built our whole case around is

3    what's laid out in the record and I want to make sure the record is

4    understood, as I said a couple of times, that regardless of the

5    claim constructions that are currently in the record, the

6    combinations render the claims obvious.

7      I don't know where my time is.  I realize that I probably

8    -- I reserved 15 minutes.  I'd like to talk a little bit about the --

9    two things I guess.

10      JUDGE BOUDREAU:  Mr. Sterne, if I could just ask

11    one more question before you move on.  Even if you energize the

12    server transmitter only when you need to transmit, doesn't the

13    duty cycle necessarily depend on how many of the peripheral

14    units need to receive data?

15      MR. STERNE:  The duty cycle is from the focus of the

16    transmitter in the base station or master station to the peripherals,

17    that's correct, Judge Boudreau, in my opinion.  And in Natarajan,

18    for example, you have a transmitter that's on both in subframe A

19    when it's transmitting data from the master station to the

20    designated receivers as indicated by Figure 5 the code that's used.

21      And then in the contention period in subframe C, you

22    also have acknowledgments from the transmitter at the master

23    station to the peripheral devices whose requests have been heard.

24    So you have transmitting both in subframe A and subframe C in

25    Natarajan.

22

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1         Does that answer your questions?

2         JUDGE BOUDREAU:  So, in other words, if you had

3    30 peripheral units that each have a slot and all 30 of those

4    peripheral units are trying to download, say, something very

5    resource intensive, maybe a high-resolution video, wouldn't that

6    require that the server transmitter be energized for essentially a

7    hundred percent of the -- I guess we'll call it period A of

8    Natarajan?

9         MR. STERNE:  Well, Your Honor, the claims don't

10   require that this duty cycle be met during the entire transmission

11   in that sense.  This is -- the duty cycle is over time.  Dr. Hu brings

12   this out in her deposition.  If I could point the Board's attention,

13   please, to page 147 of Dr. Hu's deposition and she states, the low

14   duty cycle -- the duty cycle is calculated over a cycle of

15   communications, a cycle of communications that will include

16   subframes A, B, and C.

17        And then she goes on to state, as well as over time how

18   transmitter and receiver works in these cycles and a person of

19   ordinary skill in the art would understand that the duty cycle

20   should be calculated in this manner because from reading the

21   Natarajan and Neve patents.

22        So the point here is this, you have a dynamic

23   requirement for data to be transmitted from the transmitter at the

24   base station to the receivers and that's going to change over time

25   and there will be times where there will be no transmissions and

23

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    there will be times when there will be some and there will be

2    times when all the available transmissions will occur, depending

3    on what the system dynamics are.

4        And, remember, it's bidirectional because you have a

5    point to multipoint system, Judge Boudreau, so things are going

6    to be changing over time.  The claims don't require that the low

7    duty cycle, which if interpreted by this Board means that if the

8    transmitter is transmitting all the time, it's not low duty cycle is

9    not met.  The claims would still be met because you have to look

10   at this in the context of its operation.

11       This is a system claim, not a method claim, and this

12   system is contemplated in terms of its operation by Natarajan and

13   Neve in terms of the way they describe to a person of ordinary

14   skill in the art their system and how it operates over time.

15       Does that answer your question?

16       JUDGE BOUDREAU:  Yeah, it does.  I'm just trying to

17   figure out how we could ever put a numerical limitation on the

18   term.

19       MR. STERNE:  Well, that's what we're faced with here

20   with these claims.  I mean, in the litigation they have been

21   asserted against Bluetooth, so we're just trying deal with that

22   issue.

23       I do want to save time for my rebuttal.  I don't know

24   how much time I have left.

24

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        JUDGE BOUDREAU:  It looks like you have about 10

2   minutes left in your initial presentation, so.

3        MR. STERNE:  Okay.  So maybe I should deal with a

4   few more issues that we should get into the record.

5        Dr. Hu's deposition, Your Honors, the base station

6   transmitter and low duty cycle I would like you to -- based on the

7   presentation being made here to consider her deposition at pages

8   76 and 77.

9        The issue that has been argued by Patent Owner is

10  subframes being dynamic or being static.  In the Natarajan patent,

11  clearly they can be static as Dr. Hu states in her deposition at 149

12  to 150.  If you want a more simpler system, for example, you

13  would fix those subframes along the lines of what doctor -- what

14  Judge Lee has been stating in his hypothetical and, of course, we

15  have -- we need to look at Dr. Hu's declaration at paragraph 88.

16       Idle words are not needed for synchronization, Your

17  Honors.  This is frankly -- maybe this isn't the best way to

18  describe it, but it's kind of a red herring argument.  It's the

19  headers, it's the headers that maintain synchronization.

20       So I'm now looking at Dr. Hu's declaration at paragraph

21  73, which is on slide 20 of our slide deck, and we've reproduced

22  the beginning of that.  It says, to be clear, neither Natarajan nor

23  Schwartz's discussion of HDLC mention idle words.  In my

24  opinion, this is likely because the use of continuous idle words in

25

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  Natarajan, which DSS asserts would assist with synchronization,

2  would be pointless in HDLC.

3        First, HDLC has its own mechanism, the start/stop

4  flags, and we'll go look at those in a moment, for synchronization.

5  And, second, as Mr. Dezmelyk acknowledges -- and he's the

6  declarant for Patent Owner -- if Natarajan used idle words, they

7  would be transmitted "out into the air and there is nobody really

8  paying to it."  A POSA would have found it illogical to transmit

9  idle words that were not received by any of the mobile devices.

10        So if we could go back to the slide that shows the

11  HDLC frame for a moment and then I want to go back to Figure

12  4.  So if we -- we are now back at slide 17, which shows the

13  Schwartz patent that is referenced specifically in Natarajan, and

14  we're looking at pages 135 to 136 of Schwartz, which is part of

15  the record.

16        And I quote from Schwartz, the standard frame format

17  for HDLC (ADCCP and SDLC have the same format) appears in

18  Figure 4-9.  Note that the number of overhead (control) bits is L

19  prime equal 48, just the number used earlier for calculations.

20  And then this is the important part in regard to synchronization,

21  the eight-bit flag sequence 01111110 that appears at the

22  beginning and end of a frame is used to establish and maintain

23  synchronization.  Those are the flags you see in Figure 4-9 that's

24  also reproduced of the HDLC standard frame format at the

25  beginning and the end of the frame.

26

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   Now let's go back, if we would, to Figure 4.  Again, I do

2 want to save some time for rebuttal.

3   If we look at Figure 4, the argument from Patent Owner

4 is that during Frame A when the base station is transmitting to the

5 mobile units, if there is no data that has to be transmitted during

6 that time frame, it will transmit idle words, and they argue that

7 Neve teaches continuous transmission of idle words, which we

8 say is false, and Dr. Hu deals with that.

9   But assume for purposes of analysis, just for analysis,

10 that during those slots in A where there is no data to be

11 transmitted to a particular mobile unit that you transmit an idle

12 word, which would turn the transmitter on throughout all of

13 subframe A and, therefore, the argument is that is not low duty

14 cycle.

15   The reason Natarajan would not do this, as Dr. Hu

16 explains carefully and rebuts what Mr. Dezmelyk states would be

17 something that could occur, is that the receivers, the receivers in

18 the mobile devices have been told in the control header AH when

19 to turn themselves on and when to turn themselves off to receive

20 their designated transmissions of frames, HDLC packets as

21 they're called, from the base station to the mobile devices.

22   So a receiver already knows from AH, because it's

23 synchronized, a receiver in a mobile device knows from AH

24 when it needs to listen and when it needs to sleep.  It knows to

25 listen when a slot in subframe A is going to contain a

27

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   transmission for it, but Mr. Dezmelyk argues that we could get

2   extra synchronization perhaps if we transmitted during the unused

3   slots with idle words and the idea being that those receivers at the

4   remote units would turn themselves on earlier to get that added

5   synchronization that they would somehow achieve by listening

6   early and listening late around their slot.

7           That makes no sense.  There would be no reason to be

8   transmitting these idle words out into space if the receivers were

9   not on and they should not be on based on the information they've

10  received at AH until they need to be on.  This use of this idle

11  word concept makes no sense and even Mr. Dezmelyk states that

12  you would be transmitting these words out into space and no one

13  would be listening, meaning none of the peripheral devices would

14  be listening.

15          And I refer the Board to the -- to Dr. Hu's declaration at

16  paragraph 73 on these two points and also Dr. Hu's declaration at

17  paragraph 59.

18          So that's all I have for now, Your Honors.  I will reserve

19  the rest of my time, if I may, for rebuttal.

20          JUDGE LEE:  I have some questions and this won't

21  count to your rebuttal time.

22          MR. STERNE:  Okay.

23          JUDGE LEE:  I just want to confirm that your claim

24  construction arguments in your papers don't change whether we

25  apply BRI or Phillips; is that right?

28

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1      MR. STERNE:  Correct, and the reason for that, Your

2  Honor, as I stated earlier, is there was no prosecution on the low

3  duty cycle term.

4      JUDGE LEE:  Thank you.  And I know that you've

5  taken the position that whatever the term means, A or B, that the

6  reference meets it.  I heard you say that a few times.

7      MR. STERNE:  Yes, sir.

8      JUDGE LEE:  I understand that.  Do you think the

9  Board could or should issue an opinion that said it all?  We don't

10  know what the term means.  If it means A, the claim would have

11  been rendered obvious.  If it means B, it would have been

12  obvious.  If it means C, the claim is anticipated, so the claim is

13  unpatentable.

14      Essentially the Board is saying we don't know what it

15  means, but the claim is unpatentable over the art.  Should the

16  Board do that?

17      MR. STERNE:  I'm not sure, Your Honor.  I think that

18  you have a public responsibility.  These claims are at issue in

19  litigation, and under that public responsibility, if the claims can

20  be read in the way the Patent Owner is arguing and they're being

21  read the way we argued them in the record and they're

22  unpatentable and there still could be even a broader construction,

23  I think that under the most narrow construction advanced by the

24  Patent Owner that would be controlling because they would still

25  be obvious under that very narrow construction.

29

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1      JUDGE LEE:  It's a really simple question, though.

2   Should the Board essentially articulate that we don't know what it

3   means, but the claim is unpatentable and invalidate it, the claim?

4      MR. STERNE:  The claims are clearly unpatentable and

5   if that's what the Board comes to as the conclusion about its claim

6   construction requirement, then I don't see a problem with that.

7      JUDGE LEE:  And you have no problem with the

8   Board doing that or should the Board say we don't know what to

9   do with this claim because on the record it can't be construed.

10  There's not enough information.  We either possibly terminate or

11  maybe some other avenue.  I'm just asking --

12     MR. STERNE:  No, Your Honor, we request that the

13  claims be found unpatentable because we've clearly shown that.

14  If the Patent Owner cannot satisfy your requirement as to the

15  outermost bounds of duty cycle, even under their narrowest

16  interpretation of duty cycle, they're still unpatentable and we

17  would request that the claims be found unpatentable.

18     JUDGE LEE:  Thank you.

19     MR. STERNE:  Thank you.

20     MR. HOPEN:  Your Honors, while I'm setting up, I

21  would like to pre-apologize for one thing.  We've been calling --

22  we've been saying Natarajan and not Natarajan.  So if I say it in

23  the wrong way, I'll just go ahead and apologize at this point right

24  now.

30

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        Anton Hopen for the Patent Owner right now.  I would
2   like to ask the Board if it's all right that I make some initial
3   statements and point out our position, but also leave open the
4   opportunity for my colleague, Andriy Lytvyn, who is technically
5   the lead counsel in this case, to be able to come on line with the
6   Board and answer any technical questions and contribute.  Is that
7   okay with the Board?
8        JUDGE BOUDREAU:  Yes, that's fine.  Thank you.
9        MR. HOPEN:  All right.  Thank you.
10        I tried to put myself in the position of the Board and
11   how they could make a straightforward and unambiguous
12   decision in this case.  And from the dialogue with Judge Lee and
13   my colleague over here, I can see that he's troubled by anything
14   that's uncertain and this Board just wants to do a good job and
15   come up with a decision that is based on the record without
16   uncertainty.
17        So to that case, what I would like to do is establish our
18   case entirely on the testimony of the Petitioner's expert witnesses
19   and not necessarily rely on our own and the reason for that is
20   because an expert witness that we hire is inherently going to be a
21   bit self-serving to their employer.
22        So if I can establish the case of patentability in this
23   matter and I am relying entirely on the statements and testimony
24   of Petitioner's expert witnesses, I'm trying to put the Board in a

31

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   position where they are comfortable with the decision that I'm
2   going to be seeking you to make.
3        The three things that I would like to talk about are the
4   Institution Decision itself and we would like to revisit that.  My --
5   Petitioner didn't seem to address that, but I wanted to address that
6   just briefly with the Board and particularly what the term
7   energized means and how that should be construed.
8        The second part of my presentation is I'd like to talk
9   about Natarajan's base station and what it actually teaches versus
10  what Petitioner's experts have opined.
11       And the third thing that I'd like to talk about is the duty
12  cycle itself and Petitioner has already brought up some of the
13  issues there, and I've taken some notes and I'd like to clarify a few
14  things to the Board.
15       So if we go to the Institution Decision itself, and I'm
16  looking at Patent Owner slide 4, and this is PTAB Paper 9,
17  Institution Decision, page 18, lines 10 through 18.  The Board
18  picked up on a statement that the Patent Owner made.  The Patent
19  Owner made -- picked up on a statement that Patent Owner made
20  in its initial response and it's right there at the top line.
21       It says, DSS does not dispute that during time slots to
22  which Natarajan's mobile units are designated to receive a
23  message, the base station, i.e. the server unit's transmitter, is
24  energized to transmit data to the mobile units.

32

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        Well, energized as a term can have two connotations.

2  Energize can be an adjective and, Judge Lee, we're looking up at

3  the lights here and the lights above us are in an energized state.

4  Energized can also be a verb and that when our proceeding came

5  in here, one of the assistants turned on the light switch and

6  energized the lighting circuit to illuminate this room.

7        And in the case, I just wanted to be clear this has not

8  been really a bone of contention it appears with the Petitioner, but

9  it did form a basis for the Institution Decision that when we state

10  that we did not dispute something, we were saying that we don't

11  dispute that Natarajan's base station is actually on, but we did not

12  concede that Natarajan's base station was powered up.

13        So as an adjective, energize means changing the state

14  from being off to turning on.  We were not using it to describe the

15  current state.

16        So if we go to continue to the Institution Decision, we're

17  at page 18 and 19, the Board found Claims 1 through 4 of the '290

18  patent do not recite any requirement that the server transmitter

19  must be powered off during time slots when no active

20  transmission between the server and peripheral units occur.

21        Well, in actuality -- and I'm not sure Petitioner has got a

22  rebuttal.  They may disagree with this point.  But in the proper

23  construction, the term using energized is powering up does mean

24  by inverse that ours was powered down during that time.

33

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1      So, again, this does not seem to be something that was

2  hit on very hard in the trial itself, but I wanted to be very clear

3  that the '290 claim construction when we say energized, we are

4  saying something is powered up in low duty RF cycle bursts.

5      Now, the other thing we want to do, again, is I just don't

6  want this to be attorney argument. So if we look at Apple

7  Exhibit 1007 --

8      JUDGE LEE: Excuse me.

9      MR. HOPEN: Oh, I'm sorry.

10      JUDGE LEE: Based on what you say then, if I have a

11  time frame that's divided into 10 slots and I have 10 people

12  waiting to receive from me, so, according to you then, I have to

13  power up, transmit to the first person, power down at the end of

14  the first slot and power up again in the second slot, transmit to the

15  second person, then power up. Is that what you're saying --

16      MR. HOPEN: No, sir.

17      JUDGE LEE: -- energize up, energize down in each

18  slot?

19      MR. HOPEN: No, sir, because that's a continuous

20  transmission. If all my -- if I'm going slot to slot to slot to slot

21  and it's completely filled up, then I'm not meeting the limitation

22  of first low duty cycle and I'm not meeting a burst, which is a

23  short transmission that is then concluded.

24      So there needs to be a cycle here. And if you construct

25  a situation -- and that's a great question, Your Honor, and I'm

34

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  going to come to that when we talk about Natarajan -- that if all

2  your slots are filled up and you are continuously transmitting, you

3  have not met the limitation of low duty cycle.

4       JUDGE BOUDREAU:  So does that mean that the '290

5  patent is inconsistent with having, say, 10 peripheral units that are

6  all waiting to receive?

7       MR. HOPEN:  If you -- well, the '290 patent, if you

8  have a time period and all your peripherals have taken up all the

9  time slots that you can possibly do, there's no energy savings to

10  be had.  You're transmitting the entire time.

11       So in that hypothetical case, you know, Carvey is no

12  better than the prior state of the art.  Where Carvey shines is

13  when you have receiver units that don't need anything and you

14  have that empty time slot, you don't need to transmit anything,

15  well, let's go ahead and power down the base station in

16  Natarajan's lexicon or the server unit in the '290 lexicon.

17       JUDGE LEE:  Well, I really don't understand this now

18  because that means I can turn the system into a low duty cycle by

19  introducing inefficiency.  I say even though I have 10 people on

20  the list in front of me, I just kick one of them off, so I've saved

21  myself one empty slot in which I don't do anything and I just let

22  that person go to the back of the line.

23       In that case I'll only be transmitting 9 slots out of 10 and

24  I'm now suddenly on low duty cycle.  I'm saving interference, I'm

35

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   saving battery time, but in effect I really just kicked the person

2   off when I should be transmitting to them.

3          MR. HOPEN:  Well, you compromise the

4   communication because you've kicked that person off.

5          JUDGE LEE:  But that doesn't make any sense.  What

6   you're saying is that that's not low duty cycle, but you can turn it

7   into low duty cycle simply by asking one of the 10 to move to the

8   end of the line.

9          JUDGE BOUDREAU:  Or asking 9 of the 10 to move

10  to the end of the line if we want to get below the 10 percent.

11         JUDGE LEE:  Yeah, exactly.

12         MR. HOPEN:  Oh, well, you know, let me come back

13  to this, Your Honor, on that question.

14         Two of the things that I'm not going to bring up in my

15  presentation and we don't need to bring up are HDLC.  The Patent

16  Owner does not need to establish that and I'm not going to ask

17  this Board to make any determination of what HDLC teaches or

18  what it does not teach.  It's a communication protocol, it's not a

19  power protocol and the Board doesn't need to find one thing or

20  the other on HDLC.

21         And the other thing that Patent Owner is not going to

22  ask this Board to do is to assign any numerical value to the term

23  low duty cycle.

24         JUDGE LEE:  Well, didn't you argue it's got to be

25  below 10 percent?

36

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1       MR. HOPEN:  But, Your Honor, the presentation that

2  we're going to put forward today, we don't need you to even find

3  that.  I'm not going to even argue it.

4       JUDGE LEE:  So you want to take it back or you still

5  want to maintain it?

6       MR. HOPEN:  I want to be silent on that issue because I

7  can see -- first of all, I do not want to put this Board in a position

8  where it has to make a judgment call or determination based on

9  the opinions of one expert versus the opinions of another expert.

10  And as I get farther into my presentation, Your Honor, I think I'll

11  be able to show you that low duty cycle, assigning it a number

12  value to it, is not going to be necessary for this Board to find

13  these claims are valid.

14       JUDGE LEE:  So you still maintain all the positions

15  you've taken in your brief; is that right?

16       MR. HOPEN:  I do, I do, but --

17       JUDGE LEE:  So if we want to, we could address that

18  and say it makes sense or it makes no sense to have a numerical

19  cap.

20       MR. HOPEN:  You are welcome to do that as a Board.

21  It's certainly your judgment, but we would like to give you the

22  low-lying fruit in this case and not have to expend yourself to

23  make a decision one way or the other.

24       JUDGE BOUDREAU:  In your preliminary response

25  you had suggested a construction that was a pulsed operation that

37

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   substantially reduces power consumption and facilitates the

2   rejection of interfering signals.  Do you still stand by that

3   proposed construction?

4       MR. HOPEN:  Yes, sir.  Yes, sir.  So if I can --

5       JUDGE BOUDREAU:  How do you reconcile that with

6   the modified construction that you had in the Patent Owner

7   response which was energized for less than 10 percent of the total

8   duration designated for outbound transmissions?

9       MR. HOPEN:  I'm sorry, Your Honor, could you state

10  that again?

11      JUDGE BOUDREAU:  I'm just asking whether or not

12  you can reconcile the originally proposed construction with the

13  later proposed construction.

14      MR. HOPEN:  I think we --

15      JUDGE BOUDREAU:  Originally you had said a

16  pulsed operation that's substantially reduces power consumption

17  and facilitates the rejection of interference signals and then later

18  you proposed energized for less than 10 percent of the total

19  duration designated for outbound transmissions.

20      MR. HOPEN:  Right.  Well, as far as reconciling it, I

21  think we can reconcile it, but again, Your Honor, I have a limited

22  period of time and the 10 percent limitation, there are clear

23  teachings in Natarajan and clear limitations in the '290 patent that

24  don't need us to get to that point.  So I don't mean to try and duck

38

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  the question, Your Honor, but I don't think that we even need to

2  decide that.

3        JUDGE BOUDREAU:  All right.  Well, I'll let you

4  move on to that and if there are still questions at the end --

5        MR. HOPEN:  Okay.  Very good.

6        JUDGE CLEMENTS:  Mr. Hopen, before we move on,

7  both of those constructions that were proposed were proposed

8  under the BRI standard.  Suppose we use the Phillips standard

9  now for the final written decision.  Are either of those

10  constructions changed from Patent Owner's point of view?

11        MR. HOPEN:  No.

12        JUDGE CLEMENTS:  Okay.

13        MR. HOPEN:  So if we go to Apple Exhibit -- and we

14  are on slide 5 here and I just, again, want to conclude this one

15  issue with the Institution Decision and just put a couple things on

16  the record.

17        This is Apple Exhibit 1007 and this is Dr. Hu's District

18  Court declaration at page 28 or paragraph 28 I should say.  And if

19  we go probably about two-thirds down, it starts, the 64 values in

20  the sequence correspond to a sequence of time slots.  In this

21  example, the first, fourth, and seventh time slot in the unit's

22  transmitter would be energized.  In all the other 61 time slots, the

23  unit's transmitter would be depowered.

24        That is Dr. Hu talking about the '290 server transmitter

25  and specifically saying when it's not transmitting that information

39

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    it is depowered, and I'm only bringing that up in the context of

2    the Board's finding in the Institution Decision.

3         And then I would also point, just for completeness of

4    the record, Dr. Grimes' declaration.  Dr. Grimes' declaration --

5    and this is paragraph -- this is Apple Exhibit 1008.  This is

6    paragraph 25, and these are between pages 14 and 15.  And Dr.

7    Grimes declares a zero indicates that the unit will not transmit

8    and so the transmitter will not be energized, i.e., it is depowered.

9    Accordingly, it is my opinion that the broadest reasonable

10   interpretation of the term code sequence in view of the '290 patent

11   specification is a series of values which each value in the series

12   represents a time slot where the unit's transmitter is energized or a

13   time slot for the unit's transmitter is depowered.

14        So in this case just to revisit the Institution Decision,

15   there is, according to two of Apple's expert witnesses, when the

16   '290 patent is not actively transmitting it does require the server to

17   be depowered.

18        So moving on.  The next slide would be number 7 and

19   this is Apple Exhibit 1003.  This is Natarajan and what we've

20   done is combined in this slide Figure 2 of Natarajan and also

21   some discussion of Figure 2, which is in column 2, lines 40

22   through 47.

23        So the purpose of bringing this up is to measure this

24   against the testimony and the statements of Apple's expert witness

40

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   regarding the motivation and the market need to conserve

2   batteries, battery power at the base station.

3            JUDGE LEE:  Mr. Hopen, can you address the meaning

4   of low duty cycle first, because none of this means very much

5   unless we know what low duty cycle means.

6            MR. HOPEN:  If you'd like, I can skip to that.  I can

7   skip to that.  So we can go to page 14 or slide 14 and talk about

8   low duty cycle and this is Figure 6 of Natarajan, which is Apple

9   Exhibit 1003.

10           JUDGE LEE:  Why are you referring to -- or I want to

11  go to your patent.  Tell us what the term means in the context of

12  your own patent.

13           MR. HOPEN:  Well, in the context of our own patent,

14  low duty cycle means in the specific limitation at issue here,

15  which is the server transmitter, low duty cycle means the time in

16  which the transmitter is transmitting versus when it was able to

17  transmit.

18           I'll just give you one analogy.  So you have a soccer

19  game and you --

20           JUDGE LEE:  Analogies don't count.  We have a lot of

21  examples.  I need something definitive.  If you're the judge here

22  and you're writing an opinion, what would you write?

23           MR. HOPEN:  If I was a judge and I was writing an

24  opinion on what low duty cycle means, I would basically say that

25  it is for that transmitter the time which it is capable of

41

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   transmitting versus how much it actually does transmit and how

2   much it is powered.  It's not transmission.  It's actually powered

3   on.  It's energized in low duty cycle RF bursts.

4        So it is that time that which it is energized and

5   transmitting versus the time when that transmitter is capable of

6   doing its job.

7        JUDGE LEE:  Well, when you say energize here, do

8   you mean it in the adjective form or do you mean it in the verb

9   form?

10       MR. HOPEN:  No, sir.  I most certainly mean it in the

11  verb form, that is powered up.

12       JUDGE LEE:  But in the other instance you meant the

13  adjective form because you wanted us to believe you're switching

14  it on, but here you're taking the other out.  You want us to say,

15  well, do you mean the fact that it's on means it's energized?  Are

16  you switching to --

17       MR. HOPEN:  No, sir.  No, sir.  The '290 patent is

18  always energized from a low power to -- or off to a power state.

19  And then even according to Petitioner's expert witnesses, both of

20  them, that when it is not actively transmitting, it is depowered.

21  They use that term.

22       JUDGE LEE:  No, but a little earlier you informed us

23  that in order to be energized you require a switch going from off

24  to on.

42

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          MR. HOPEN:  Oh, that was just my example of this

2     turning the lights on.

3          JUDGE LEE:  Right.  So if we listen to you, then

4     energize would have to require the switch, but here in your

5     definition of low duty cycle that seems to be out the door.

6          MR. HOPEN:  Well, the switch itself, Your Honor,

7     would be the intelligence of the device itself knowing when to

8     power up and when to power down according to the

9     synchronization.

10         JUDGE LEE:  So in your construction do you require

11    the actual switching or is it enough that the device is energized, is

12    in the powered state without the need to go through the off to on

13    switch?

14         MR. HOPEN:  It has to go from off to on or it would

15    not be conserving battery power at the transmitter side.  I

16    apologize if I'm not following this.

17         JUDGE BOUDREAU:  Does it need to turn off

18    completely or can it just go into a low power state between

19    transmissions?

20         MR. HOPEN:  I would only speculate on that, Your

21    Honor, but I know that you cannot energize something that's

22    already on.  So if you are energizing something in low duty cycle

23    RF bursts according to the '290 patent, you're powering it up.

24    And even according to the Petitioner's experts, when it's not

25    doing that, it's depowered down.  That's -- you know, my

43

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1 testimony doesn't matter.  They're the experts and they've

2 conceded that.

3          JUDGE LEE:  Yes, but your argument on what the

4 claim term means does matter.  So based on your construction, it

5 doesn't require any particular percentage of transmission time

6 versus the total possible transmission energization time.  All it

7 takes is some period of time in which it is powered off.

8          MR. HOPEN:  Your Honor, yes, and I think that's all

9 the Board is going to need to find in this case.

10          JUDGE LEE:  So could you --

11          MR. HOPEN:  Yes, absolutely.

12          JUDGE LEE:  -- articulate it one more time with all of

13 that?

14          MR. HOPEN:  Absolutely.  I do have to point to Figure

15 6 and explain Figure 6 to get you there.

16          JUDGE LEE:  No.  Point only to your own patent.  Let's

17 don't get confused over what the art says.  In your own patent

18 what does low duty cycle mean?

19          MR. HOPEN:  In our own patent low duty cycle -- I

20 mean, is this -- are you asking to refer to our patent?

21          JUDGE LEE:  That's your patent.

22          MR. HOPEN:  Okay.  Very good.  Very good.  All

23 right.  I didn't know if it was my opinion or the patent itself.  Low

24 duty cycle has to be read within the context of the claim and the

25 context of the specification and the entire specification is talking

44

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    about conserving battery power, not just on the peripheral, but the

2    server units themselves.

3         So low duty cycle, you know, in the trial itself both

4    sides had some tension over could we assign a numerical value to

5    this, but in all cases low duty cycle -- it's fairly unequivocal that

6    low duty cycle means that we are energized on less than a full

7    amount.

8         And there are -- like in Neve there are instances where

9    you have examples of a transmitter that can be powered on while

10   waiting to transmit a message.  In fact, Natarajan even describes

11   that situation.

12        JUDGE LEE:  The Petitioner didn't have any problem

13   with the other proposed construction I mentioned that was

14   synchronized transmission times, meaning sometimes the unit is

15   assigned a time to be energized and transmit or receive and in

16   other times it's off.  So that would meet your criteria for low duty

17   cycle.

18        MR. HOPEN:  There is nothing in Natarajan, though,

19   that teaches --

20        JUDGE LEE:  No, I'm not into the prior art yet.

21        MR. HOPEN:  I see.

22        JUDGE LEE:  I'm just working on what the term

23   means, because the abstract says tightly synchronized common

24   time base between the units.  So could low duty cycle simply

45

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    mean each unit has its own assigned time in which to be

2    energized and at other times it should not be energized?

3            MR. HOPEN:  When you say unit are you talking about

4    the base station or the server?

5            JUDGE LEE:  Whichever unit is subject to the low duty

6    cycle limitation.  It should have its own assigned time to power

7    up and other times it should not be powered up.

8            MR. HOPEN:  Okay.  Is it possible -- I know that Mr.

9    Lytvyn is specifically knowledgeable about this.  Would the

10   Board allow me to allow him to speak on this?

11           JUDGE LEE:  Of course.

12           MR. HOPEN:  Okay.

13           MR. LYTVYN:  Your Honors, my name is Andriy

14   Lytvyn.  I am the lead counsel for Patent Owner DSS and may it

15   please the Board, the question that Your Honors keep asking is

16   what is low duty cycle.

17           If you look at Figure 6 of the '290 patent, that's Apple

18   Exhibit 1001, this is what a low duty cycle looks like

19   schematically.  Here is the description from Dr. Grimes,

20   Petitioner's expert, on what this figure represents.  In fact, there's

21   a Figure 6 in the specification that shows how these bursts occur

22   and gives you kind of spatial image of these bursts.

23           You can see from looking at the picture that most of the

24   time nothing is being transmitted, nothing is being received.

25   That's exactly what the burst is and that's what low duty cycle --

46

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1       JUDGE LEE:  I'm sorry, but we don't have a picture

2  claim unless you want us to read in everything from Figure 6 into

3  your claim.

4       MR. LYTVYN:  I'm just trying to explain what a low

5  duty cycle --

6       JUDGE LEE:  It's just one example.

7       MR. LYTVYN:  Sure.

8       JUDGE LEE:  What I'm trying to get at, what is the

9  outer bounds of a low duty cycle?  Is it enough simply to have the

10  peripheral unit powered on some of the time and off some other

11  time?

12       MR. LYTVYN:  No.  That is inconsistent with an

13  understanding of a person of ordinary skill in the art of what low

14  duty cycle would be.  If we had to assign a numerical value and,

15  again, we don't require the Board to assign and the examples

16  provided in our Patent Owner response is simply exemplary, 10

17  percent sounds like a reasonable --

18       JUDGE LEE:  No, let's not go to the numbers.

19       MR. LYTVYN:  Sure.  Okay.  Well, duty cycle is a

20  percentage.  Duty cycle is a percentage.  That's what duty cycle

21  is.  That's how it's calculated.  So duty cycle is inherently a

22  percentage.  It's a ratio.  It doesn't matter if you're talking about

23  transmitters or if you're talking about welding apparatus, anything

24  that has a duty cycle.  Duty cycle is a ratio and that ratio -- it's a

47

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    ratio of when that particular component is operational versus the

2    time, versus the total time that it could be operational.

3              JUDGE LEE:  So is anything less than a hundred low?

4              MR. LYTVYN:  In some, in some applications it could

5    be.  I can't really speculate what low duty cycle would be

6    considered outside of this technology.  In the context of wireless

7    communications, 10 percent is a reasonable number.  We're not

8    going to ask the Board to accept 10 percent as the low bound, but

9    that's a reasonable exemplary.

10             JUDGE LEE:  Well, I'm talking about the upper bound.

11   Is 95 percent enough to constitute low duty cycle because five

12   percent of the time it will be powered off.

13             MR. LYTVYN:  There's nothing on the record that

14   would indicate that 95 percent would be considered to be a low

15   duty cycle in context of --

16             JUDGE LEE:  Yeah, but there's nothing to indicate it's

17   not.  You don't exclude it.  The only explanation you have here in

18   your abstract is that there's a synchronized common time base.

19   So if that explains low duty cycle, then it's enough for the unit to

20   be off sometimes and sometimes it could be five percent.  Why is

21   that not a reasonable interpretation?

22             MR. LYTVYN:  Low duty cycle is a term of art.  We

23   have some expert opinion on it.  I'm going -- I'm going to cite to

24   Exhibit 1007.  That's Petitioner's exhibit.  Page 50 of that exhibit

48

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  is actually page 10 of Dr. Hu's declaration submitted in District

2  Court.

3          Here's how she defined low duty cycle, because the

4  number of slots when a unit's transmitter is depowered is

5  substantially greater than the number of slots when the unit's

6  transmitter is energized, the unit is said to have a low duty cycle.

7  So that substantially greater indicates what the low duty cycle is.

8          If in your hypothetical where it's powered off for five

9  percent of the time and energized 95 percent of the time, that is

10  definitely not substantially greater powered down than it is

11  energized.  Therefore, it would not be a low duty cycle.

12          JUDGE LEE:  Well, you say it's a term of art.  That's

13  not a very definitive term of art if the testimony is substantially

14  greater.  Can you be more exact?  Has any witness testified that

15  low duty cycle means here this is the cutoff?

16          MR. LYTVYN:  Unfortunately, there is no hard value

17  for the numbers.  There's nothing on the record --

18          JUDGE LEE:  It's not a term of art, is it, as far as the

19  percentage number goes?

20          MR. LYTVYN:  I think what the term of art is it's just a

21  low duty cycle and none of the experts offered an exact upper

22  boundary.  What Patent Owner did provide is in our response.

23  We provide a number of examples of how this term is used in the

24  art and what these references, which are all issued United States

49

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   patent within this technology field have used for duty cycles.  So

2   some example is --

3          JUDGE LEE:  Why isn't any of that predating the

4   applications?

5          MR. LYTVYN:  Well, there's no evidence that the

6   definition of duty cycle changed between then and when these

7   patents were issued or filed.

8          JUDGE LEE:  No, but you're the party alleging the term

9   of art and why do you search only for terms that postdate the

10  patent?

11        MR. LYTVYN:  Just to be clear, the burden is on the

12  Petitioner to establish that the claims are obvious.  It's not our

13  burden to establish that they would be obvious.  We offer

14  testimony from Dr. Dezmelyk who says that a person of ordinary

15  skill in the art would understand that 10 percent is a reasonable

16  range and that is the best evidence we have from either party of

17  what would constitute a low duty cycle.

18        JUDGE LEE:  I'm not getting that.  You know, 10

19  percent sounds low, but that's not testimony on what's the upper

20  limit.  Are they testifying to an upper limit?

21        MR. LYTVYN:  Yes.  10 percent is the upper limit.

22  Anything below 10 percent is low duty cycle.  Anything over 10

23  percent would be considered high duty cycle and -- or at least it

24  would not be considered a low duty cycle in the context of

25  wireless communications technology.

50

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        And, in fact, if you look at Natarajan, Natarajan

2    operates at a hundred percent duty cycle.  So even in your

3    hypothetical where you just articulated where it's 95 percent of

4    the time, Natarajan it's not 95 percent.  It's a hundred percent of

5    the time.  Therefore, no matter what number you take to be the

6    upper boundary for the low duty cycle, Natarajan still does not

7    satisfy it.

8        And if you will allow me to proceed to the next slide, I

9    will show you why.

10        JUDGE LEE:  The Patent Owner's position is you still

11    urge that low duty cycle requires a powered-on ratio of no greater

12    than 10 percent.

13        MR. LYTVYN:  10 percent is an exemplary value.

14    That is what our expert, Robert Dezmelyk, stated and we still

15    stand behind it.

16        JUDGE LEE:  Well, now you're shifting on me.  First,

17    you said it's a hard value, a hard number, it's a hard limit and now

18    you're saying it's an exemplary value.

19        MR. LYTVYN:  I've never said it.  I said it's -- there's

20    no hard limit on the record.  There's no hard value on the record.

21    Everything that's provided is exemplary and the best evidence we

22    have of an actual numerical value, Dr. Hu said it's substantially

23    greater.  Again, it doesn't give the Board much clarity --

24        JUDGE LEE:  Well, is their claim indefinite if no one

25    can tell us what the line is?

51

1        MR. LYTVYN:  But indefinite -- indefinite is --

2  whether it's definite or not, indefinite, that's not the issue that is

3  being decided in this IPR.  That's an issue for a different judicial

4  body to address.  I understand the burden of --

5        JUDGE LEE:  So even the Patent Owner doesn't know

6  where the line is.  Do you know where the cutoff is?

7        MR. LYTVYN:  We don't.  It's a vague term of art.  In

8  this particular art, low duty cycle is used and there's a number of

9  values and the best we could do to show what this number is, is to

10  provide examples of --

11        JUDGE LEE:  So it's a moving target?  One day it's this

12  and the next day it's that, depending on who you ask?

13        MR. LYTVYN:  You have to consult an expert in the

14  technology.  Based on what our expert --

15        JUDGE LEE:  And you still can't give us anything

16  definitive.  It's all exemplary.

17        MR. LYTVYN:  Sure.  10 percent is our example.

18  That's what our expert stated.  We stand behind this.  So 10

19  percent is our position.  So 10 percent of the duty cycle is the

20  ratio of when the transmitter is powered on versus the entire

21  duration during which it could be powered on.

22        JUDGE LEE:  So Patent Owner is unable to tell us an

23  upper limit for low duty cycle as far as a ratio goes?

24        MR. LYTVYN:  It's 10 percent according to Robert

25  Dezmelyk's testimony.  So 10 percent, that's what Patent Owner's

52

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  expert testified.  We stand behind it, so the upper boundary is 10

2  percent.

3          JUDGE LEE:  Well, now you're shifting back.  Which

4  way is it?  Are they all exemplary or are you taking a hard line on

5  what the limit is?

6          MR. LYTVYN:  I'm saying the Board does not need

7  to --

8          JUDGE LEE:  Regardless of whether we need to, I'm

9  asking you, does the Patent Owner take a position on what the

10  upper limit is, or you can simply tell us that you don't know, the

11  Patent Owner does not know what this term means in the context

12  of its claim as far as a hard limit goes.

13          MR. LYTVYN:  Based on the testimony of our

14  expert --

15          JUDGE LEE:  I don't care who it's based on.  What is

16  the Patent Owner's position?  Yes or no, is there an upper limit

17  for low duty cycle?

18          MR. LYTVYN:  There's no hard numerical value.  It's

19  not on the record under either broadest reasonable interpretation

20  --

21          JUDGE LEE:  I don't care whether it's on the record or

22  not.  What is the Patent Owner's position regarding this claim

23  term?  It's nebulous or you do have a hard value beyond which it

24  would not be deemed low duty cycle.

25          MR. LYTVYN:  If I could refer to the testimony of --

53

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          JUDGE LEE:  No.  Just give a quick answer, yes or no.

2          MR. LYTVYN:  No.  We don't have a hard value and

3    the best -- I'm not an expert in the technology, but --

4          JUDGE LEE:  No.  But I'm not asking you to be an

5    expert.  I'm just asking you as lead counsel for Patent Owner,

6    what is Patent Owner's position on the meaning of this term?

7          MR. LYTVYN:  10 percent.

8          JUDGE LEE:  As exemplary or simply -- or as a hard

9    limit?

10          MR. LYTVYN:  There's no hard limit.  10 percent is

11    exemplary.  So anywhere within the ball park --

12          JUDGE LEE:  All right.  So I can take that to the bank,

13    there's no hard limit on what low duty cycle means.

14          MR. LYTVYN:  There's nothing on the record that

15    provides a hard number.

16          JUDGE LEE:  Please don't deviate.  Just yes or no.  I'm

17    trying to pin you down on something that's clear and we can

18    handle it.

19          MR. LYTVYN:  10 percent is --

20          JUDGE LEE:  Is not a hard limit or is it just exemplary?

21    Or if there's no hard limit, just say there's no hard limit.

22          MR. LYTVYN:  There's no hard limit.

23          JUDGE LEE:  You can't articulate any hard limits,

24    right?

54

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1      MR. LYTVYN:  I cannot articulate a hard limit at this

2   time.  The best evidence we have on the record, again, is our

3   expert's testimony, which is what I'm relying on and he did not

4   articulate a hard limit.

5      JUDGE LEE:  You know, hypothetically if we think

6   your claim can't be construed, what should we do?

7      MR. LYTVYN:  How can you find something obvious

8   that you cannot construe?  And, in fact, there is precedent where

9   IPRs were dismissed because the Board simply could not

10   interpret a claim.  I mean, that's -- if that's what we are facing,

11   that's what we are facing.  How can you render a claim obvious

12   that cannot be construed?

13      JUDGE LEE:  So where will we be?  What would the

14   Patent Owner urge that we do?

15      MR. LYTVYN:  If the decision is really inconclusive,

16   it's better to err on the side of caution and find that based on the

17   evidence on the record Petitioner has not met its burden of

18   showing that this claim is obvious.  Because under construction,

19   there's no conclusive construction, all these claims at least to

20   conclusion.

21      But if you allow me to proceed to the next slide, I can

22   show you that if you agree with me that low duty cycle is

23   anything less than a hundred percent -- I think anybody can agree

24   that hundred percent is as high as it gets.  So anything less than a

25   hundred percent is low duty cycle.  Even if you establish this

55

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    hypothetical boundary, which is beyond what reasonable

2    interpretation would be, I can still show you why Natarajan does

3    not satisfy the limitations of the claim.

4         Would you like me to do that?  I can proceed to the next

5    slide.

6         JUDGE LEE:  Well, as soon as you answer what the

7    Patent Owner would like us to do, maybe to terminate the

8    proceeding because the claim can't be construed?

9         MR. LYTVYN:  Sure.  I can -- I mean, no one in their

10   reasonable mind could ask the Board to render a claim obvious

11   that could not -- that the Board cannot issue a concrete

12   construction.  So if the Board cannot construe a claim and there is

13   such construction that would render the claim either obvious or

14   not, then the Board would like to terminate the meeting -- the

15   proceeding.  However, in this case it doesn't matter what the

16   numerical value for low duty cycle is.  The art on record does not

17   meet --

18        JUDGE LEE:  What about determining that the claims

19   are indefinite?

20        MR. LYTVYN:  That's not an issue before the Board.

21        JUDGE LEE:  Yes, but we could determine the claims

22   are indefinite by saying that it cannot be determined what they

23   mean.  In effect, that will be a ruling on the claim.  We wouldn't

24   say -- we wouldn't hold the claims unpatentable for

25   indefiniteness.  We would terminate the proceeding.

56

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          MR. LYTVYN:  And the Board has done this before.

2    There's precedent for that.  And if that's the decision the Board

3    arrives to, then that's the decision --

4          JUDGE LEE:  So Patent Owner would be fine with that.

5          MR. LYTVYN:  We would not be fine with that

6    outcome of the case.  Under any construction, even if you

7    construe 99 percent to be the upper boundary of the low duty

8    cycle, so anything under 99 percent is low duty cycle, Natarajan

9    still does not render this claim obvious.

10          The Board does not need to assign a numerical value, as

11    my colleague just articulated, in order to find this claim obvious

12    or not and I can show you exactly why.

13          If you look at slide 6 -- slide 14, sorry, Figure 6 on

14    Natarajan.  Natarajan, first of all, does not disclose anything

15    about how the base transmitter operates.  Here right now we are

16    focused on a single limitation.  Server transmitters energized in

17    low duty cycle RF bursts.

18          Natarajan does not provide anything about how the base

19    unit operates.  Natarajan says 81 times that conserving power is

20    important, yet every time it's used in the context of the mobile

21    unit.  The only thing in Natarajan that actually shows how the

22    base unit operates is provided in Figure 6 and disclosure

23    explaining Figure 6 provided below.

24          If you look at this example -- and this is the only

25    example provided in Natarajan.  In this particular example there

57

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  are 64 mobile units.  So Your Honors previously provided a

2  hypothetical where something is very data intensive and in that

3  particular frame transmission happens to be continuous.  Well,

4  let's like look at this example in Natarajan.

5          There are 64 mobile units, yet only four of these units

6  need to receive information at this particular frame.  So the

7  subframe A here is allocated such that it only has 15 slots because

8  it's all that's necessary to accomplish transmission.  Each one of

9  those 15 slots is assigned to a peripheral unit and here is an

10  accurate -- a very detail description, three slots for the first unit,

11  five for the second, three for the third, and four for the fourth.

12          And the transmission from the base side to the receiver

13  happens continuously during time period TA.  If you look at time

14  period TA, the base transmitter is on for the transmission to the

15  first period, it's on for the second, it's on for the third, and it's on

16  for the fourth.  Accordingly, the base --

17          JUDGE BOUDREAU:  I'm sorry, where does it say that

18  it's continuous?

19          MR. LYTVYN:  If you look at Figure 6 -- and actually

20  let me -- sorry.  If you look at Dr. Hu's cross examination

21  transcript, if you look at page 144, she was asked the exact

22  question that you just asked me and here is your answer.  So let

23  me start with the question.

24          Referring to Figure 6 of Natarajan, during time period A

25  -- and I'm reading from this is Exhibit 2018, page 144, line 9.  So

58

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  here's the question, referring to Figure 6 on Natarajan, during

2  time period A, are there any empty slots during which

3  transmission does not occur?  Opposing counsel objected.  Dr. Hu

4  answered.  In this particular example of an example embodiment

5  in Natarajan, this particular instance in time there is no slot left

6  after they are in period A, subframe A after they are allocated to

7  the four receivers.

8        Question, so in this embodiment, is the transmitter of

9  the base unit energized for the entire duration of time period A?

10  Answer, in this particular example at this particular instance of

11  time, the transmitter of the base station is on for the subframe A.

12        This is testimony of Dr. Hu, Petitioner's expert during

13  cross examination.  She does not dispute that the transmitter of

14  the base unit is on continuously during the entire time period TA.

15        Why it's important?  Two reasons.  First, when one

16  unambiguously requires that the server transmitter be energized

17  in bursts, here the transmission is continuous for the entire 15

18  slots.  That is not a burst in transmission.  It's a continuous

19  transmission.  It's antithetical to what a burst is.

20        Second, Claim 1 also unambiguously requires that the

21  server transmitter be energized in low duty cycle RF bursts.

22  Here, we have a hundred percent duty cycle.  There are 15 slots to

23  which the transmitter could have been transmitting and the

24  transmitter is transmitting during the entire 15 slots.  That is a

25  hundred percent duty cycle.  That is not low under any

59

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  construction.  That is a hundred percent duty cycle.  That's the

2  only example that Natarajan provides of how the base unit

3  operates, how the transmitter of the base unit operates.

4      Your Honors asked a question earlier pertaining to

5  paragraphs 86 through 88 of Dr. Hu's declaration where she

6  fabricates some examples of what Natarajan could do.  The last

7  time I checked, we don't analyze a reference for what it could do.

8  We analyze a reference for what it teaches or suggests.

9      Here, Natarajan clearly teaches and suggests that the

10  server transmitter is on through the entire duration of time period

11  TA and this is, again, there are 64 mobile units and only four of

12  them are designated to receive information.  Based on this figure

13  and based on this disclosure, what a person of ordinary skill in the

14  art would conclude the time period TA is such that every slot is

15  occupied by transmission and the transmission happens in a

16  continuous manner.

17      The receiver is powered down and turned on whenever

18  they need to receive a particular packet within that data stream,

19  but the data stream happens during the 15 slots of the outbound

20  transmission TA.  Dr. Hu conceded this.  This is the only example

21  in Natarajan that pertains to operation of the base transmitter.

22  The remaining disclosure of Natarajan pertains only to what

23  happens in the mobile unit side.

24      Again, this Board does not need to address this issue.

25  The only issue that needs to be addressed here is whether the

60

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  server transmitters are energized at low duty cycle RF bursts.

2  Here, they are energized continuously, so it's not RF bursts.  This

3  is -- the Board can dispose of this proceeding based on this

4  ground alone without even going to the duty cycle.

5       Second, even if the Board looks at the duty cycle, the

6  duty cycle here is continuous.  There is no time during which the

7  transmitter is powered off.  There is no time transmission to

8  which it's energized in bursts.  It's energized and it stays

9  continuously on during that entire duration.

10      JUDGE LEE:  So if a system assigns all of its time slots

11 out, then it cannot possibly be low duty cycle.

12      MR. LYTVYN:  Exactly, and this is what Carvey

13 addresses and this is what Carvey solves.  In going back to the

14 first question that Your Honors asked my colleague about kicking

15 out systems and introducing inefficiencies in the system to

16 achieve low duty cycle, this is exactly what Carvey does.

17      In Carvey this is a scheme for transmissions.  The

18 channel is quiet and there are low duty cycle RF bursts.  During

19 64 slots if you look down where there's a sector, there's 64 slots.

20      By the way, in District Court Dr. Hu used this exact

21 figure to determine what a low duty cycle is.  The server is

22 energized for three out of these 64 slots.  That's a low duty cycle

23 transmission.  If there's more transmissions that needs to be

24 taking place, it happens during other frames.  So, yes, it is an

61

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    inefficiency and that's why it would have been so

2    counterintuitive.

3            The reason why this inefficiency is introduced into the

4    system, which prolongs a communication and it takes a longer

5    period of time because now you're subdividing your transmission

6    to where you're only transmitting in a low duty cycle, and your

7    transmission bursts is for two reasons and these reasons are

8    articulated in the '290 patent.

9            JUDGE BOUDREAU:  If we're looking at Figure 6.

10           MR. LYTVYN:  Yes.

11           JUDGE BOUDREAU:  If the base didn't have any data

12   to transmit to mobile unit S2, is there any indication that --

13           MR. LYTVYN:  You're talking about Natarajan now,

14   correct?

15           JUDGE BOUDREAU:  I'm talking about Natarajan,

16   yeah.

17           MR. LYTVYN:  Yes.

18           JUDGE BOUDREAU:  Is there any indication that the

19   base would still be powered up during those five time slots that

20   are associated with S2?

21           MR. LYTVYN:  That's a good question and it has a

22   very easy answer.  If you look, there are 64 mobile units.  So, in

23   fact, 60 of them don't have any data to transmit.  So the

24   transmission time period is subdivided among the units that

25   actually have data to receive.

62

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          So in this particular instance, it's not just that the unit S2

2    doesn't have any data to receive, there are 60 such units that don't

3    have any data to receive.  And as we see in Natarajan, there are

4    no empty slots.  Each slot is occupied by a transmission.

5    Natarajan --

6          JUDGE BOUDREAU:  But isn't that just because

7    there's data to be transmitted?  I'm struggling to understand why

8    you would power up a transmitter if you don't have any data to be

9    transmitted.

10          MR. LYTVYN:  If you don't have any data to be

11    transmitted, the transmitter is off and you can't calculate any data

12    cycle because the transmitter is not operating at all.  If there's no

13    data to transmit, if this system is sitting on a shelf and it's turned

14    off and it's not transmitting any data, it provides no utilities.

15          The only time this is useful and why Natarajan and

16    Neve and Carvey were awarded patents to this technology is

17    because it's designed to transmit data.  That's the only time you

18    need to analyze it.  If it's not transmitting any data, we don't have

19    a communication cycle, we don't have -- if there's no data to

20    transmit, the system is powered off and it doesn't have any duty

21    cycle at all.  There are no bursts.  It's definitely not powered on

22    and bursts is just powered off continuously and there's no duty

23    cycle to calculate.  It's just powered off.  It's not operational.

24          JUDGE BOUDREAU:  So if we can look at Figure 5 of

25    Natarajan.  Let me find the -- yeah, if we look at Figure 5, we

63

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  concluded that there were slots here -- slot 4, slot 8, slot 9, and it

2  looks like it's probably slot 58 -- that have data to be transmitted

3  to peripheral units.

4       If all of those had been zeros, such that there weren't

5  any receivers that needed to receive data, is it your position that

6  Natarajan would still remain powered on throughout the entirety

7  of frame A?

8       MR. LYTVYN:  That's a speculation.  That's one

9  possibility.  It could be operating under one of these idle word

10  schemes, which we don't need to address.  Another possibility is

11  that it's completely turned off and it's not sending any data.  There

12  is absolutely no indication that if there is no data to transmit and

13  all these numbers are zero that the transmitter would be powered

14  on in RF bursts.

15       There is absolutely no indication in Natarajan that you

16  would power on the transceiver in a burst when there's no data to

17  transmit.  Why would that be done?  That seems wasteful to me.

18  Why would you turn on --

19       JUDGE BOUDREAU:  But isn't that the basis of your

20  argument, though, that it's transmitting continuously?

21       MR. LYTVYN:  Yes, and there's data to transmit.  In

22  your hypothetical which, again, is outside of the boundaries of

23  what Natarajan actually teaches, if there were no -- if there was

24  no data to transmit and in Figure 5 all of these values were zeros,

25  then the transmitter would be powered off during the entire

64

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   duration.  It would not be energized in RF bursts.  I don't see a

2   reason why Natarajan would energize its transmitter in RF bursts

3   when it's not transmitting any data at all.

4          JUDGE BOUDREAU:  Okay.  Thank you.

5          MR. LYTVYN:  And, again, let's talk about Figure 5.

6   I'm glad you brought it up.  Petitioner brought it up.  What does

7   Figure 5 actually provide?  I'm looking at Natarajan, column 6,

8   and if you look at line 16 through 23.

9          In period A, before the base station broadcasts messages

10  to receivers, it includes a receiving user index in the header AH

11  section of the frame.  A receiving user index is a coded

12  description of mobile users that will receive data in the current

13  frame.  That is, it is a designation of which mobile users are to

14  communicate with the base station during that time.

15         And, again, if you look at column 6, skipping down to

16  line 59, we're still talking the concept of Figure 5.  The content of

17  each bit location signals the receiver activity of the user

18  designated or indexed by the bit location.  So, again, Figure 5

19  only shows which receivers need to be powered on and which

20  receivers need to stay off on the mobile unit side.

21         Figure 5 provides absolutely no information about what

22  happens on the server transmitter side.

23         JUDGE BOUDREAU:  But why would it ever make

24  sense for the server transmitter to be energized if there aren't any

25  peripheral units to be communicated with?

65

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          MR. LYTVYN:  It wouldn't.  It would simply be turned

2    off.  It would not be turned on -- it would not be energized in low

3    duty cycle RF bursts.  It would remain off.  So if there's no data to

4    transmit, it will be turned off.  If any one of these units --

5          JUDGE BOUDREAU:  Why isn't that a low duty cycle?

6          MR. LYTVYN:  Because the system is not operational.

7    A person of ordinary skill in the art would not calculate the --

8    would not calculate the duty cycle when the transmitter could not

9    have been transmitting.  So we only need to look at the

10   transmission period.

11         So the transmission period in this particular instance we

12   have four units out of 64 and it's 15.  If you had only one unit, the

13   transmission period would be three units and the transmitter

14   would be on during those entire three slots to transmit

15   information to the mobile unit.  So it still would be transmitting

16   continuously during those three slots and that would power it off.

17   It would still be a hundred percent duty cycle and would still not

18   be a burst.

19         And if there's no data to transmit, then the server

20   transmitter would be powered down completely and we wouldn't

21   have a transmission period, the outbound transmission period,

22   and we would not be able to calculate any kind of duty cycle

23   because the system would simply be nonoperational.

66

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          JUDGE BOUDREAU:  But you're saying that if S1

2     were the only peripheral unit that was receiving data, then the

3     base unit would power down for the remaining 12 slots?

4          MR. LYTVYN:  No.  What I'm saying is based on this

5     -- well, first of all, Natarajan does not really say what would

6     happen.  Based on this example, there are 15 slots worth of data

7     to transmit.  If you only had three slots worth of data to transmit,

8     the only reason to conclude the transmission period TA would not

9     have been 15.  It would be three.

10         So instead of looking at the entire where you have S1

11    on, on, on, on, you would have a single period TA would have

12    been truncated to three slots.  There's absolutely no hard

13    requirement in Natarajan that transmission period is limited to 15

14    slots and if the transmission takes less time than the 15 slots, it's

15    any of the slots aren't assigned.

16         There's simply no teaching in Natarajan that would lead

17    a person of ordinary skill in the art to conclude that any of these

18    slots are ever unassigned.

19         In fact, if you look in Natarajan, this is the language

20    cited by the Board.  If you look at column 4 starting with line 20,

21    wherein Natarajan explains what happens, in the scheme

22    described here, a scheduled multiaccess protocol is used in which

23    time frame is divided into fixed-length frames, and the frames are

24    divided into slots as shown in Figure 4.

67

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          So when we look here, before each frame is issued, the
2     system calculates how much slots it needs for transmission, how
3     many slots it needs for reception and how many slots allocated
4     for the contention period and these slots are fixed at the beginning
5     of each frame.
6          So the system can adjust itself to eliminate waste and
7     transmit only during the time slots where transmission needs to
8     be taking place.  Hypothetically -- and, again, this is outside of
9     Natarajan, but just for the completeness of the answer, if all 64
10    mobile units had to receive information, the time period TA
11    would not be 15 slots.  The time period TA would have been
12    adjusted so that all 64 of these units can receive the information
13    that they need to receive.
14         In this particular instance only four of them are
15    receiving information, therefore, the slot is allocated to ensure
16    that that transmission happens to these four units.  If more units
17    need to receive data, that window would have been larger, but the
18    key point is that the server transmitter would have been energized
19    for the entire duration of that window.
20         There is absolutely nothing in Natarajan that teaches or
21    suggests that any of the slots during time designated for outbound
22    transmission would be simply unassigned and left vacant and,
23    second, there's absolutely no suggestion in Natarajan that even if
24    that were to happen, that the transmitter is powered off during
25    unassigned slots.

68

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    These two premises are fabricated by Petitioner.
2    They're explained in Dr. Hu's examples in 86 through 88 where
3    she premises every single example on what Natarajan could do
4    and not what Natarajan actually teaches or suggests, the only
5    example that shines any light on how base unit transmitter
6    operates in Natarajan is illustrated in Figure 6 and provided and
7    explained in this short paragraph here.
8    In this instance, this exemplary embodiment, Natarajan
9    is operational for a hundred percent of its outbound transmission
10   period.  It's a hundred percent duty cycle under any construction
11   of low duty cycle.  Hundred percent cannot be low.  That I think
12   everybody can agree with that.
13   And, second, the transmission is not -- the transmitter of
14   the base unit is not energized in bursts.  The transmission is
15   continuous throughout the entire transmission period.  We have
16   Dr. Hu's testimony, again Exhibit 2018, pages 144-145, where
17   she opined that, indeed, in this example the transmission is
18   continuous.
19   This is the only example Natarajan provides that
20   communicates anything to the person of ordinary skill in the art
21   about how the base unit transmitter operates.  And in this
22   example, it's continuous.  There are no other examples provided.
23   And just because somebody provided an example A and B in
24   their specification doesn't mean that they also disclosed, taught or
25   suggested example C.

69

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1       And, here, all other examples are completely extrinsic

2   to Natarajan and they are fabricated by Petitioner's hired expert

3   and premised with a statement Natarajan could do this or could

4   do this.  Well, here's what Natarajan actually does.

5       JUDGE BOUDREAU:  But I'm trying to understand

6   how Figure 6 would look different if Figure 6 -- if Natarajan had

7   implemented a low duty cycle at the base stations.

8       MR. LYTVYN:  Sure.  So in Figure 6 -- and, again, this

9   is speculation because this is outside of the scope of Natarajan,

10  but if I were hypothetically to change the disclosure of Natarajan

11  to make base transmitter operate in low duty cycle RF bursts, the

12  transmitter would have a scheme similar to the one disclosed in

13  Carvey.  So what you would see is you would see -- where you

14  see on, on, on, on during the entire time, it will be powered on for

15  a slot and it would be dedicated to S1 and then the transmitter

16  would be powered off for duration and the transmitter would --

17      JUDGE BOUDREAU:  I can't see the screen that you're

18  looking at.  Which --

19      MR. LYTVYN:  I am so sorry, I apologize.  I'm looking

20  at -- before I switched.  So let's look at 13, slide 13, and I

21  apologize, Your Honor, for not indicating this earlier.

22      If you look at slide 13, we have a sector at the bottom

23  that has 64 slots and, again, just to reiterate, this is exactly the

24  figure that was used by Dr. Hu in District Court to decide what a

25  duty cycle is and why Carvey operates in low duty cycle.

70

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          The first sector has 64 slots.  Only three of them have

2    any transmission taking place.  That's a low duty cycle operation.

3    So to translate to what Natarajan teaches, if you look at Figure 6,

4    it's on, on, on, on during the entire 15 slots.  So in order for it to

5    operate in low duty cycle RF bursts, the transmitter of the base

6    unit would have to be powered on and then you would see a long

7    off, off, off, off and then it will be powered on again and then you

8    would see off, off, off, off.

9          Again, Your Honors are absolutely correct that this is

10   inefficient.  You're kicking off mobile units, you're extending the

11   time required for transmission and in some ways it's

12   counterintuitive.

13         And for Natarajan it wasn't a concern because Natarajan

14   discloses a base station that is cabled to a LAN outlet.  There is

15   absolutely no disclosure in Natarajan that the base station is

16   battery power operated.  There is no disclosure that energy

17   conservation on the base unit transmitter side is a concern.

18   Natarajan wasn't terse about articulating how a mobile unit

19   operates and the conservation and industrial applicability of

20   Natarajan on the mobile unit side.

21         If you look here, Natarajan is clearly focused on

22   portable units and here is an industrial applicability section of

23   Natarajan, power savings on the mobile computer side, which are

24   mobile units.  There is absolutely no concern about a transmitter

71

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   operating low duty cycle and, therefore, the transmission is

2   continuous.

3           In Carvey we introduce additional complexity and

4   additional inefficiency into the system where the transmissions

5   are restricted to low duty cycle bursts.  In this particular example

6   we have three bursts for 64 slots --

7           JUDGE CLEMENTS:  I have a question.

8           MR. LYTVYN:  Yes.

9           JUDGE CLEMENTS:  Let's go back to your slide 14.

10  It's Figure 6 of Natarajan.

11          MR. LYTVYN:  Yes.

12          JUDGE CLEMENTS:  And I just want to understand

13  what you were saying earlier.  So this period TA that's illustrated

14  sort of grows and shrinks, depending on which -- depending on

15  how many units have to receive data from the base station during

16  that time period, right?

17          So here we've got illustrated S1, S2, S3, S4 receiving

18  things and then if, for example, there was another situation where

19  there was no S3 and S4, that period TA would shrink to be only

20  the eight slots there.  Am I understanding that?

21          MR. LYTVYN:  Yeah, that is one possible

22  interpretation of Natarajan.  Again, this is not disclosed in

23  Natarajan, so all these hypotheticals are speculative, but that is

24  one way to interpret in Natarajan is that that transmission window

25  would be shrunk.  Because according to the example that

72

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    Natarajan does provide, that transmission only happens -- that the

2    window is such that it satisfies the transmission requirements of

3    that particular cycle.

4        So if this cycle only has 64 units and only four of them

5    receive data, the cycle is allocated to be 15 slots.  If that number

6    of designated -- if the number of mobile units changed, what the

7    amount of data that the mobile unit needs to receive -- if you see,

8    the time is not just merely equally divided among units.  Each

9    unit is allocated a certain number of slots based on the size of the

10   transmission that needs to happen, that it is reasonable to

11   conclude that that time window TA would shrink or expand based

12   on data requirements of that particular communication cycle.

13       JUDGE CLEMENTS:  So if we had, for example, 64

14   mobile units requiring two slots in each, that time period TA

15   would be 128 slots?

16       MR. LYTVYN:  Again, that is a reasonable

17   interpretation on Natarajan.  That's how we would interpret it and

18   --

19       JUDGE CLEMENTS:  That is the interpretation that

20   you're urging is correct?

21       MR. LYTVYN:  Yes.  That's an interpretation I'm

22   urging is correct.  Again, I understand that this interpretation is

23   based on our interpretation, Patent Owner's interpretation of

24   Natarajan, and Natarajan is silent about what would actually

25   happen.

73

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          JUDGE CLEMENTS:  Let's assume it's correct.

2          MR. LYTVYN:  Yes.

3          JUDGE CLEMENTS:  I've got a question about the

4    next step.  So as TA grows or shrinks, depending on how much

5    data needs to be transmitted, isn't TA changing as a percentage of

6    the overall time of that entire fixed-length frame?  So, in other

7    words, if you only have S1 needing three slots and then the

8    remainder of that frame is devoted to TB and TC, why wouldn't

9    that be transmitting at a low duty cycle because TA is a small

10   percentage of the overall time, TA plus TB plus TC?

11         MR. LYTVYN:  Excellent question and let me explain

12   to you why Period B and Period C are irrelevant for calculating

13   the duty cycle of the transmitter.  Again, I want to base my

14   presentation, as my colleague has stated, entirely or almost

15   entirely on the declaration of Petitioner's experts.

16         So if you'll look --

17         JUDGE CLEMENTS:  Did you say B and C are

18   relevant or irrelevant?

19         MR. LYTVYN:  Irrelevant for calculation of the server

20   transmitter's duty cycle.  So when we're talking about server

21   transmitter duty cycle, duty cycle is an intrinsic property of a

22   transmitter.  So when we look at that figure, only time

23   transmission TA is relevant to calculate the duty cycle and let me

24   explain to you why.

74

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        First, with regard to Period C, Period C -- and I'm going

2  on read from Natarajan, column 9, lines 19 through 23, and this is

3  where Natarajan discusses Period C.  A determination is made at

4  decision block 116 whether or not the given mobile station has

5  any packets to transmit in the random access mode, which is

6  Period C.

7        Again, Petitioner accurately described time period C as

8  a period during which mobile units kind of chime in and

9  sometimes talk over one another and the only transmission that

10  happened during time period C is the acknowledgement

11  transmission that the server transmitter sends upon receiving of a

12  message from a mobile unit.

13        So now why is this relevant?  Let's got to Claim 1 and

14  this is slide 2, Your Honors.  This is Claim 1 of the '290 patent.

15  Said server and peripheral transmitters being energized in low

16  duty cycle RF bursts at intervals determined by a code sequence.

17  So when we go back -- and I'm going back to slide 14.

18        The code sequence is transmitted during period AH.

19  The code sequence is transmitted during period BH.  These slots

20  are allocated for transmission.  During the contention period, the

21  transmitter is not energized in any particular slot.  It's a random

22  access mode during which the transmission happens only in

23  response to the base station receiving a message from the base

24  unit.  These transmissions are not done in accordance with a code

75

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   sequence.  Therefore, this period can be disqualified just based on

2   this alone.

3        Now let's look at period B.  During period B, the

4   transmitter is powered down.  Okay.  The system is in reception

5   mode.  Let's look at testimony of Dr. Grimes pertaining to RF

6   bursts and duty cycles.  So -- and I'm going to read.  This is

7   DSS-2015, page 46, lines 12 through 15.

8        When asked about what an RF burst is, Dr. Grimes,

9   expert of the Petitioner, said the following, the key thing is that

10  the burst is small.  The time it takes is small relative to the overall

11  time that the transmitter could have been transmitting.  During

12  time period B the transmitter could not have been transmitting

13  because there's no transmission taking place.

14       There's -- Dr. Grimes also opined and this is DSS-2015,

15  page 60, 19 through 22.  When the units are receiving

16  information, their respective transmitters can't be operating.  If

17  they were, they would not be able to receive information.

18  According to time period B, and I think Petitioner contests this on

19  the record, is that the base unit is in the receive mode, so the

20  transmitter is powered off.

21       Again, even based on the definition of what a burst is

22  provided by Petitioner's own expert, we only need to look at the

23  time when the transmitter could have been transmitting.  During

24  time period B the transmitter could not have been transmitting at

25  all because the transmitter is in reception mode.  The receiver,

76

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1  part of the transceiver circuit, is powered on and no transmission

2  takes place.  Again, that's why this period is irrelevant.

3      When new transmissions take place, the transmissions

4  take place during time period TA.  What happens during time

5  period TA, we have continuous operation at a hundred percent

6  duty cycle.  A hundred percent is not low under any claim

7  construction and continuous is antithetical to RF bursts.

8      JUDGE LEE:  So you don't see any bursts in period A.

9      MR. LYTVYN:  No.  It's energized continuously.

10  There are 15 slots and the transmitter is transmitting continuously

11  during those 15 slots and this is not what I see.  I'm not an expert.

12  Dr. Hu who is an expert, that is what she opined when asked

13  about what happens in Figure 6.  That's Patent Owner Exhibit

14  2018, pages 144-145.

15      Question -- and I read this before.  I'll read it again just

16  to be clear.  So in this embodiment, is the transmitter of the base

17  unit energized for the entire duration of time period A?  Answer,

18  in this particular example at this particular instance of time, the

19  transmitter of the base station is on for the subframe A.  This is

20  testimony of Dr. Hu, Petitioner's expert.

21      I don't see any bursts happening during TA, during time

22  period TA, and neither does their expert.

23      JUDGE LEE:  How many bursts should there be

24  according to Claim 1 because it has the word bursts --

77

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1       MR. LYTVYN:  Sure.  Now we're getting back to the

2  value of low duty -- what low duty cycle is.  So if you look at the

3  example -- and, again, to stay within what we have on the record,

4  the '290 patent provided this example where we have one sector

5  in which there are 64 slots and transmission happens during three

6  slots, so that's a burst.

7       In the second sector we have 64 slots.  Transmission

8  happens during five out 64 slots.

9       JUDGE LEE:  What if the slots are consecutive?  So

10  that means it's transmitting consecutively for five slots.  Is that

11  five bursts or is that --

12       MR. LYTVYN:  Now, the whole point Carvey is that

13  the system is designed in such a way to where these bursts -- and

14  that's the whole point of claiming a burst.  This is the

15  advancement over the art that these slots are distributed in such a

16  way that they are spread out.  That's why -- that's exactly what the

17  claim limitation RF bursts requires.  It's energized in bursts.

18       You can't -- under the system of Carvey, you can't have

19  five consecutive slots during which the system would be

20  energized.  If that system existed, it would not infringe Claim 1

21  because it would not meet this limitation.  It's a narrow limitation

22  that Patent Owner conceded on and is limited by on the

23  infringement side, but it's also the limitation that advanced the art.

24  These slots are spread out.  They're not consecutive.

78

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        When you look at Figure 6, each slot is two

2  microseconds long.

3        JUDGE LEE:  And if it was together, it wouldn't meet

4  the claim.

5        MR. LYTVYN:  It would not meet the claim,

6  absolutely.  It would not be RF bursts.  So even if it still satisfied

7  the low -- let's say these three slots in that one sector were lumped

8  together, it would still be a low duty cycle because sector 64 slots

9  is energized only during three, but it would definitely not meet

10  the burst limitation.  Because now instead of having these slots

11  spread out where --

12        JUDGE LEE:  I see.  So you actually have two different

13  limitations.

14        MR. LYTVYN:  Yes, absolutely, and that's what we've

15  been arguing and that's why -- and I'm going to slide 14 now.

16  There are two reasons why the Board can find for Patent Owner

17  and uphold validity of claims -- of all challenged claims without

18  addressing what number we need to assign to a duty cycle.

19        If you look at Figure 6 again, the only figure in which

20  Natarajan illustrates how the base transmitter operates, it's on

21  continuously for the entire duration of A.  There are two reasons

22  why this disclosure actually, in fact, does teach away from Claim

23  1.

24        One, the transmitter is energized continuously, so

25  definitely it does not satisfy the RF burst limitation and, again,

79

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    the continuous transmission is admitted by Dr. Hu in her

2    interpretation of Figure 6 through the eyes of a person of ordinary

3    skill in the art.

4          Second, as I articulated many, many times already, it's

5    on -- the transmitter of the base unit is on for 15 out of 15 slots.

6    That's hundred percent duty cycle.  So there are two separate

7    reasons why the Board can find -- can uphold validity of all

8    challenged claims without even putting a numerical value on

9    what a duty cycle is.

10         JUDGE LEE:  Can you clarify a little bit of what Mr.

11    Hopen said earlier?  What's the difference between energized and

12    transmitting?

13         MR. LYTVYN:  Absolutely.  So we have -- and this is

14    an interesting issue that's really not -- okay.  So let's -- so this is

15    state of the art.  This is what Mr. Hopen was referring to.  This is

16    the background section on Natarajan.  This is slide 10.  This is

17    Natarajan, column 3, lines 59 -- column 59, lines 4 -- sorry,

18    column 3, line 59 through the end, it looks like 68, and then

19    beginning of column 4, 1 through 19.

20         The transmitter can be in the off state and on state and

21    then active on state.  And if you look at the bottom line, this is

22    what I want you to refer to, a transmitter might consume power

23    while waiting to transmit a packet.

24         So a transmitter may be energized, even when it's not

25    transmitting.  So a transmission and something being energized,

80

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    there's not necessarily direct correlation between the two and it's

2    possible that there are idle transmissions, which is something to

3    be provided where a transmitter is energized, yet it's not sending

4    data, actual data to peripheral units.

5            There are some systems and, in fact, there are some

6    multiaccess protocol systems under which this is what happens

7    and this is the state of the art at the time Natarajan was filed.  So

8    to answer to your question, Claim 1 does not require anything

9    pertaining to transmission.

10           Claim 1 requires a transmitter being energized in low

11   duty cycle RF bursts.  So that's another issue that the Board does

12   not need consider what happens when it's energized.  It just needs

13   to go from a depowered state and, again, both Dr. Grimes and Dr.

14   Hu stated that the full state is de-energized and then it's energized

15   in low duty cycle where it's brought up to this higher energy state

16   for a burst and then it's brought down again.

17           This is inherent in this limitation.  This is what the term

18   bursts mean.  This is what energized means.  In order to energize

19   something, it has to be in an off state transmission into an on

20   state.  That's what the plain meaning of the term energize is.

21           JUDGE LEE:  So according to you, there has to be

22   enough power down period as a whole in order to achieve the low

23   duty cycle limitation.

24           MR. LYTVYN:  The server transmitter needs to be

25   powered off.

81

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        JUDGE LEE:  Enough to meet the low duty cycle.

2        MR. LYTVYN:  During the times it could have been

3   transmitting and this is, again, not according to me.  It's according

4   to Dr. Grimes.  This is also according to Dr. Hu who said that in

5   order to satisfy the low duty limitation, the transmitter of the base

6   unit needs to be powered off for an amount of time substantially

7   greater than the time period in which it's energized.

8        And Dr. Grimes said that in order to evaluate whether

9   something is a burst, the key thing is that the burst is small as

10  comparison to the time period during which the transmitter could

11  have been transmitting, and I just paraphrased his testimony.  I

12  just wanted to be clear for the record, I did not -- that was not a

13  direct quote.

14       JUDGE BOUDREAU:  All right, counsel.  We're

15  already about 15 minutes over your time.  I know that we've been

16  asking a lot of questions.  So unless the panel has any further

17  questions, we'll just give you two minutes to sum up.

18       MR. LYTVYN:  Any questions?

19       JUDGE LEE:  How about the BRI standard or Phillips,

20  does any of your positions change, depending on whether it's BRI

21  or Phillips or is it the same?

22       MR. LYTVYN:  Our position is actually stronger under

23  Phillips.  If you'll look -- and, again, you -- I think you, again, the

24  questions for my colleague was this line is Natarajan discloses its

25  objectives and why it introduces this low duty cycle RF burst

82

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   limitation is to provide battery savings and eliminate these

2   constant transmissions that could be interfering with nearby

3   signals.

4       So if you actually interpret this claim even more so in

5   light of the specification, it becomes clear that in order to achieve

6   this, you have a system which is disclosed in the '290 patent in

7   Figure 6 and not the one which is shown in Figure 6 of Natarajan.

8       Does that answer your question?  Thank you.  So thank

9   you so much time for your time.  I know we went a little bit over.

10  I hope I answered all of your questions in a satisfactory manner

11  and, again, the Board should find that all the challenged claims

12  are not obvious in light of Natarajan and Neve.

13      Because, first, Natarajan is silent with respect to how

14  the base unit operates.  Two, the only time that Natarajan shows

15  us how the base unit operates is Figure 6 and in that figure it is

16  both continuous, which does not satisfy their RF burst limitation,

17  and the transmission is also in a hundred percent duty cycle,

18  which does not satisfy a low duty cycle limitation.

19      For these reasons, I ask the Board to uphold validity of

20  Claims 1 through 4 and also Claims 9 and 10 on the '290 patent.

21  Thank you so much for your time.

22      JUDGE BOUDREAU:  Thank you, Mr. Lytvyn.

23      Mr. Sterne, by my calculation you had 18 minutes left

24  from your original hour, but we'll give you additional time if you

25  need it given that we went over with Mr. Lytvyn.

83

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    I'd like you to start, though, by addressing Mr. Lytvyn's

2    points with respect with Figure 6 of Natarajan.

3    MR. STERNE:  Yes, Your Honor.  We are addressing

4    these proceedings from the perspective of a person of ordinary

5    skill in the art as of the 1997 time frame in terms of what the

6    claims cover and in terms of what the prior art teaches and

7    suggests.  I feel like these proceedings were just thrown into

8    quicksand.  These arguments relating to Figure 6 clearly are

9    beyond the record.  They're new arguments, but I will address

10   them anyway.

11   We are told that a burst is not a packet of information,

12   and we'll come to that in a minute, but let's start with the ad

13   hominem attacks about fabrication by Dr. Hu.

14   First of all, let's look at Mr. Dezmelyk who is the

15   declarant for DSS.  He admits that he is not an expert on the

16   HDLC protocol, whereas Dr. Hu not only is an expert in wireless

17   data communications, but also on HDLC protocol.  The

18   arguments that were presented today want to focus entirely on the

19   subframe A in Figure 6.  I don't have Figure 6 to display to you in

20   a slide, but if we all look at our hard copies of the Natarajan

21   patent, in Figure 6 it's very similar in terms of what's shown in

22   Figure 4, but it shows a specific example where we have the S1,

23   S2, S3, and S4.

24   Each packet that is transmitted in a slot in subframe A is

25   a burst.  That's what the HDLC packetized system uses.  It's the

84

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1   same system of packetized transmission that is shown in Figure 6

2   of the '290 patent and it's stated as in the '290 patent as follows,

3   when an attachment beacon AB or its complement is detected, it

4   then expects to quasi-periodically receive additional AB within a

5   six-millisecond period of the previously received AB.  This

6   succession of ABs forms an HDLC channel using bit stuffing to

7   delineate the beginning and end of each packet.

8          HDLC packet is used in the '290 patent.  It's the only

9   disclosed packet structure used in the '290 patent and now we're

10  supposed to understand that that does not apply anymore, that

11  we're going to say that each of the packets transmitted in the slots

12  of Figure 6 of the Natarajan patent is not a burst, but, in fact, they

13  all smear together to form a single transmission.

14         That is not what occurs technically.  That's not what a

15  person of ordinary skill in the art would understand from reading

16  the '290 patent or from reading the Natarajan patent.

17         The argument that we heard just now, this new

18  argument about Figure 6, basically says that Figure 6 is only used

19  in terms of its length, depending on the amount of bursts of

20  packets in the various slots that are needed for the particular

21  peripheral devices that are going to receive them and one specific

22  example is shown where the frame is dynamic for terminal A and

23  we know that subframe -- excuse me, subframe A, subframe B,

24  and subframe C together must add up to the fixed time frame for

25  the frame that they -- that they're part of along with the control

85

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    and synchronization segments AH, BH, and CH that are shown

2    both in Figure 4 and Figure 6.  Both Figure 4 and Figure 6 use the

3    same structure of the frame.  There is no deviation there.  Just one

4    example is shown.

5        So the question was asked by Judge Clements what

6    happens if there is no transmission at all in subframe A, which

7    could happen, clearly could happen if based on the

8    communications load in Natarajan, the mobile stations are going

9    to be transmitting to the base station for the whole time for that

10    frame, and the answer is, well, there would be no transmission.

11    So in that situation subframe A would have a zero duty cycle

12    because it's not transmitting at all.

13        Let's take that example one step further.  Let's say that

14    not only is the base station not transmitting to any of the

15    peripheral stations, but that in the contention subframe C, one or

16    more of the peripherals say that they -- during one of those slots

17    in subframe C contention period that they want to transmit.

18        Now, they do transmit and, as we know from column 9,

19    lines 15 through 36, it states that during the contention cycles for

20    mobile stations relative to transmission to the base station, the

21    header CH for period TC, Figures 4, 6 and 7, is received by the

22    given mobile station 10 in block 114 and the receiver is turned off

23    for the duration of period C.

24        A determination is made at the decision block 116

25    whether or not the given mobile station 10 has any packets to

86

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    transmit to the random -- to transmit in the random access mode

2    (period C).  If the answer is no as indicated at point 118, proceed

3    to block 134 of Figure 8D.  The function of the block 134 is

4    explained shortly.  If the determination at block 116 is yes,

5    proceed to block 120 where transmission is scheduled in a slot T.

6        The transmitter is turned off for the times other than slot

7    T as indicated at block 122.  The transmitter is then turned on at

8    slot T as indicated at block 124.  The receiver is turned on at

9    block 126 to receive an ACK/NAK -- that's spelled ACK/NAK --

10    message at slot T plus delta from the base station.  The delta is

11    equal to a delay sufficient for the base station to send, and the

12    mobile station to receive the ACK/NAK message.  If a NAK

13    message is received, packet is rescheduled for repeat

14    transmission.  The receiver is then put back to sleep.

15        Let's go to the HDLC frame format shown in Schwartz.

16    So why is the Natarajan system so effective?  Why is the '290

17    system so effective?  And it's because in this HDLC format, you

18    have what is called the block check.  We see the block check in

19    Figure 4-9.

20        What does the block check tells us?  It is error

21    correction and detection technology well-known at the time of

22    filing of the Natarajan patent.  It's referred to in Schwartz in the

23    '88 treatise.  It's well-known obviously in the '290 patent because

24    they used HDLC as well for the same purpose.

87

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1        The block check is used to indicate to the receiver at the

2    peripheral device that the particular information in the packet

3    received cannot be error corrected and, therefore, needs to be

4    retransmitted as just explained by the transmitter at the base

5    station to the mobile device.

6        So as we see, you cannot ignore in the Natarajan

7    disclosure the critical aspect of the base station transmitting the

8    acknowledgement, the acknowledgements, to these mobile

9    devices that they have that the base station has received the

10    message in the form of an HDLC packet during the subframe C

11    that that particular base station has determined that it needs a new

12    transmission of the same packet that it received previously.

13        The reason it needs the new transmission is because at

14    the peripheral device the block check indicates that it cannot

15    effectively decode the data without error.  So we see that the

16    transmitter in the base station is transmitting this

17    acknowledgement during the contention period to the peripheral

18    devices in every single situation where the peripherals are

19    utilizing the subframe C in a particular portion of the

20    communication cycle.

21        So to say that the transmitter is only operating in

22    subframe A when there is no transmission in subframe A or there

23    is a transmission in subframe A is not correct technically.  A

24    person of ordinary skill in the art reading this would understand

25    this.

88

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          If we could see paragraph 88 of Dr. Hu's declaration.

2    So this is slide 13, Your Honors, and we have seen this before.

3    Furthermore, should the Board decide, wrongly in my opinion,

4    only to look at period A in Natarajan for calculating the duty

5    cycle, it is my opinion that a POSA would understand that period

6    A of Natarajan could operate in a low duty cycle, even at less

7    than 10 percent.

8          And then she goes on -- Dr. Hu goes on to state, for

9    example, a POSA would have understood that period A of

10   Natarajan could be of fixed length, for example, having a time

11   slot reserved for each of 30 mobile units, as was common in

12   TDMA schemes.  If the base station transmits to two of the 30

13   time slots, this would represent a 6.67 percent duty cycle.  The

14   transmitter would be off for the remainder of period A because,

15   as discussed above, Natarajan's HDLC protocol does not use idle

16   words when there is no data to transmit.

17         During these proceedings we have been told repeatedly

18   that if during period -- during subframe A there is -- there are

19   slots where data does not need to be transmitted to the peripheral

20   devices, Mr. Dezmelyk has stated on the record that idle words

21   could be transmitted in a continuous fashion.

22         This shows two things, number one, that the DSS

23   arguments are walking away completely from that, because now

24   they're saying that we're not talking about idle words now.  We're

25   saying that the only time transmission occurs is in the example

89

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    shown in Figure 6 and that's the only way the system works in
2    Natarajan that it's always transmitting in every single slot in
3    Figure A, except when it's transmitting in no slots.
4        And it also says that because Figure 6 is the way you
5    must look at Natarajan's teaching from a suggestion point of view
6    to a person of ordinary skill in the art, a person of ordinary skill in
7    the art would not realize that there is also transmissions required
8    in subframe C for the acknowledgements to the receivers to the
9    transmissions from the peripheral devices that have utilized slots
10   in subframe C to indicate retransmission.  So all of this is going
11   back and forth and around about.
12       So I want to also say for the record that clearly idle
13   words is no longer an argument in these proceedings.  Each
14   packet is a burst of information.  HDLC is contemplated by the
15   '290 patent.  HDLC is clearly what is used.  It's the only packet
16   example shown in the '290 patent.  It provides the
17   synchronization.  You do not need idle words for synchronization
18   and, therefore, the argument presented with respect to Figure 6
19   does not hold up.
20       I would also like to address the argument that I think
21   was made that the base station of Natarajan does not meet the
22   requirements of the claim.  But before I get there, it seems that an
23   argument was made that we can't define low duty cycle in the
24   claims, so we need to read in limitations such as inefficient and
25   counterintuitive.

90

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          A person of ordinary skill in the art reading the claims

2    in this patent is going to look at the example shown, but they're

3    going to read these claims as they must, as any member of the

4    public must, from the context of whether or not they are

5    infringing them and I do not understand how the public would

6    know that the examples shown in Figure 6 of the '290 patent

7    delimits the claims.

8          I don't think that that is a proper claim construction and

9    these proceedings should not be based on this new argument that

10   we're going to now limit the claims to the examples shown in

11   Figure 6 of the '290 patent, we're going to advance this new

12   argument concerning Figure 6 of Natarajan that says that in

13   subframe A you have transmission the whole time.

14         Dr. Hu has refuted that.  It's clear to anyone looking at

15   this, anybody would understand that there will be times when

16   there will be slots in subframe A where there will be no

17   transmissions from the master station to the receivers in the

18   mobile units.

19         With regard to battery operation of the base station,

20   which was argued in the record and we have to limit ourselves to

21   the record as we know and not to these new arguments that were

22   advanced first today, first of all, if we look at Natarajan at column

23   -- lines 16 through 18, quote in order to obtain true portability in

24   microcomputers and workstations, battery powered operation is

25   essential.

91

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1          And then if we look at Natarajan at column 2, lines 40
2    to 41, it states, a base station 26 or 28 which may be conventional
3    microcomputer.
4          Dr. Hu in her deposition at page 22 -- can you give me
5    page 22, please -- states that a -- excuse me, Dr. Hu in her
6    deposition at page 23 states -- at line 12 she states, it is my
7    opinion that a person of ordinary skill in the art at the time frame
8    of '96 and '97, reading the Natarajan reference, will consider the
9    base station, described as a conventional microcomputer, can be
10    battery powered and portable.  True portability is a goal for -- in
11    the design of such conventional microcomputers.
12          So there is no suggestion whatsoever in Natarajan that
13    the base station cannot be battery powered and, in fact, a person
14    of ordinary skill in the art in the '91 time frame would clearly
15    understand that microcomputers, laptops and so forth were
16    battery powered.
17          Furthermore, the combination of unpatentability
18    includes the Neve reference.  Neve has -- includes a master
19    station and remote stations that are all battery powered, Your
20    Honors.  Let me point you to column 4, lines 10 through 12, and I
21    quote, one station, which is physically similar to the others but
22    operates a different stored program, may be designated the master
23    station.
24          And then, furthermore, at column 2, lines 49 through
25    59, a practical example of the invention provided with a small

92

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    primary battery.  A complete self-contained data transmitting and

2    receiving device may be made in a package only a few

3    centimeters in each dimension, allowing it to be mounted almost

4    anywhere.

5         So it seems that DSS is arguing now that Natarajan can

6    never be a battery powered base station.  This is clearly

7    unsupported by the record.  It's obvious they're trying to convert

8    this ground of unpatentability to one under anticipation.

9         Your Honors, I also need to clarify the record in two

10   other places.  Let's look back at the Natarajan patent at column 4

11   and I believe that this was cited in your Institution Decision at

12   column 4, line 3, where you state a desirable solution is one in

13   which the transmitter (or receiver) consumes power only when it

14   is actively transmitting a message.

15        And we all know that from our cellphone usage, Your

16   Honor, it's when you're transmitting, when you're speaking on

17   your cellphone, that's when the battery goes down most rapidly,

18   not when you're receiving, going back to this quote, consumes

19   power only when it is actively transmitting a message (or actively

20   receiving a message).

21        And then it goes on to state, traditional multiaccess

22   protocols do not have the above desirable characteristics because,

23   and then they go to the statement that my opponent quoted at the

24   end of his oral argument, which is found at line 18 of column 14

93

Cases IPR2015-00369 and IPR2015-00373
Patent 6,128,290

1    which it states, a transmitter may consume power while waiting

2    to transmit a packet.

3            Now, clearly that is not what Natarajan is doing.  That

4    is what was in the prior art.  So to say that that's how Natarajan is

5    operating is not correct.

6            So in closing, in closing, we were told in these

7    proceedings that the HDLC packet structure was not used in the

8    '290 patent, that it could not be used in the '290 patent.  That's

9    clearly not the case.  We were told that the HDLC packet

10    structure required additional synchronization in the form of

11    packet words.  That's clearly not the case.  We were told that the

12    examples shown in Natarajan must be strictly limited to exactly

13    what they are characterized as being by DSS.  That is not the

14    case.

15            All of this needs to be looked at through the eyes of the

16    person of ordinary skill in the art as of 1997.  Clearly the record

17    supports that the claims that are being challenged in these two

18    proceedings are unpatentable as being obvious.  Thank you very

19    much.

20            JUDGE BOUDREAU:  Okay.  Thank you, counsel.

21            This concludes the hearing for cases IPR2015-00369

22    and IPR2015-00373.  The cases are submitted.  Thank you.

23            (Concluded at 3:30 p.m.)

94

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.
Petitioner
v.
DSS TECHNOLOGY MANAGEMENT, INC.
Patent Owner

———————————

CASE IPR: <u>Unassigned</u>
Patent 6,128,290

———————————

## PETITION FOR *INTER PARTES* REVIEW
## OF U.S. PATENT NO. 6,128,290
## UNDER 35 U.S.C. §§ 311-319 and 37 C.F.R. §§ 42.1-.80, 42.100-.123

**Mail Stop PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

# **TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................. 1

II.    MANDATORY NOTICES (37 C.F.R. § 42.8(a)(1)) ................................. 2

    A.     Real Party-In-Interest (37 C.F.R. § 42.8(b)(1)) ................2
    B.     Notice of Related Matters (37 C.F.R. § 42.8(b)(2)).............2
    C.     Designation of Counsel (37 C.F.R. § 42.8(b)(3)) ...............3
    D.     Notice of Service Information (37 C.F.R. § 42.8(b)(4)) ........3

III.   GROUNDS FOR STANDING (37 C.F.R. § 42.104(a)) ............................. 3

IV.    PRECISE RELIEF REQUESTED (37 C.F.R. § 42.22(a)) .......................... 3

V.     THE '290 PATENT ............................................................ 4

    A.     Overview of the '290 Patent...................................4
    B.     Priority Date of the '290 Patent..............................5
    C.     Level of Ordinary Skill in the Art ...........................6

VI.    CLAIM CONSTRUCTION ........................................................ 6
    A.     "local oscillator"...........................................6

VII.   IDENTIFICATION OF CHALLENGE (37 C.F.R. § 42.104(b)) ...................... 8

    A.     Statutory Grounds for the Challenge...........................8
    B.     Citation of Prior Art ........................................9
    C.     The Proposed Grounds Are Not Redundant........................9

VIII.  GROUNDS OF REJECTION ..................................................... 11

    A.     Ground 1: Claims 9 and 10 would have been obvious in
           view of Barber. ..............................................11
           1.     Overview of Barber................................... 11
           2.     Independent claim 9 would have been obvious in view
                of Barber. ......................................... 13
           3.     Claim 10 would have been obvious in view of Barber........... 23
    B.     Ground 2: Claims 6, 7, 9, and 10 would have been obvious
           over Natarajan in view of Neve...............................24
           1.     Overview of Natarajan ............................... 24
           2.     Overview of Neve .................................... 26
           3.     Overview of the Combination of Natarajan and Neve ........... 27
           4.     Independent claim 6 would have been obvious over
                Natarajan in view of Neve. .......................... 30

i

5.      Claim 7 would have been obvious over Natarajan in
        view of Neve. .................................................................. 41
6.      Independent claim 9 would have been obvious over
        Natarajan in view of Neve. ............................................ 41
7.      Claim 10 would have been obvious over Natarajan in
        view of Neve. .................................................................. 51
C.  Ground 3: Claims 6 and 7 would have been obvious over
    Mahany. .....................................................................................51
1.      Overview of Mahany ...................................................... 51
2.      Independent claim 6 would have been obvious over
        Mahany ............................................................................ 52
3.      Claim 7 would have been obvious over Mahany.................... 60
IX.   CONCLUSION............................................................................ 60

# TABLE OF AUTHORITIES

**Cases**

*Alloc, Inc. v. Int'l Trade Comm'n,*
  342 F.3d 1361 (Fed. Cir. 2003) ................................................................6

*Canon Inc. v. Intellectual Ventures I LLC,*
  IPR2014-00535, Paper 9 (P.T.A.B. Sept. 24, 2014) ............................10

*In re Cortright,*
  165 F.3d 1353 (Fed. Cir. 1999) ..............................................................6

*KSR International Co. v. Teleflex Inc.,*
  550 U.S. 398 (2007) .......................................................................... 30, 35

*Liberty Mutual Ins. Co. v. Progressive Casualty Ins. Co.,*
  CBM2012-00003, Paper 7 (P.T.A.B. Oct. 25, 2012) ..........................10

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ..............................................................6

**Statutes**

35 U.S.C. § 102(b) ....................................................................... 9, 10, 11

35 U.S.C. § 102(e) ............................................................................ 9, 11

35 U.S.C. § 103 .................................................................................. 9, 11

35 U.S.C. § 325(d) ...................................................................................9

**Rules**

37 C.F.R § 42.10(b) .................................................................................3

37 C.F.R. § 42.100(b) ..............................................................................6

37 C.F.R. § 42.104(a) ..............................................................................3

37 C.F.R. § 42.104(b) ..............................................................................8

37 C.F.R. § 42.106(a) ..............................................................................3

37 C.F.R. § 42.63(e) .................................................................................3

37 C.F.R. § 42.8(a)(1) ................................................................................ 2

37 C.F.R. § 42.8(b)(1) ................................................................................ 2

37 C.F.R. § 42.8(b)(2) ................................................................................ 2

37 C.F.R. § 42.8(b)(3) ................................................................................ 3

37 C.F.R. § 42.8(b)(4) ................................................................................ 3

## I. INTRODUCTION

Apple Inc. petitions for *inter partes* review of claims 6, 7, 9, and 10 of U.S. Patent No. 6,128,290 to Carvey, titled "Personal Data Network" ("the '290 patent") (APL 1001). The claims of the '290 patent recite nothing more than the combination of well-known concepts. Indeed, the '290 patent specification discloses little more than well-known techniques patent owner admits are in the prior art. The '290 patent characterizes its alleged inventions by describing that "the general scheme of data transmission and reception is a form of time division multiple access (TDMA)." ('290 patent, 3:57-59.) The '290 patent plainly admits that its "basic modulation scheme is frequency shift keying (FSK), ***well known*** to those skilled in digital radio transmission." (*Id.* at 3:65-67 (emphasis added).) The '290 patent describes a litany of other "well-known" concepts, for example, the oscillator phase shifts in FIG. 5 were "***commonly known*** to radio engineers". (*Id.* at 4:51-57 (emphasis added).) And while the "operational modes ***appear different, they are essentially well known variants*** to the underlying time division multiple access technique." (*Id.* at 6:16-29 (emphasis added).) Still further, capturing only the strongest "RF bursts" in TDMA schemes was a "***well known*** aspect of FM modulation." (*Id.* at 6:36-41 (emphasis added).)

The '290 patent purports to divert from well-known TDMA schemes because transmissions occur "in only those slots indicated by a TDMA program…For

each slot, this TDMA program indicates that a PEA or host is to transmit, or not, and whether it will receive, or not. In the intervals between slots in which a PEA is to transmit or receive, all receive and transmit circuits are powered down." (*Id.* at 3:67-4:8.) But this allegedly point of novelty was also well-known, as explained in detail below. Thus, none of the '290 patent's claims recite a patentable invention. Its uncommon and ambiguous terms veil the well-known concepts described and claimed in the '290 patent. Accordingly, Apple respectfully requests *inter partes* review of claims 6, 7, 9, and 10, and that these claims be found invalid.

## II. MANDATORY NOTICES (37 C.F.R. § 42.8(a)(1))

### A. Real Party-In-Interest (37 C.F.R. § 42.8(b)(1))

The real party-in-interest is Petitioner Apple Inc.

### B. Notice of Related Matters (37 C.F.R. § 42.8(b)(2))

The '290 patent is involved in the following cases that may affect or be affected by a decision in this proceeding: *DSS Technology Management, Inc. v. Apple Inc.*, 6:13-cv-00919-JDL[1] and *DSS Technology Management, Inc. v. Lenovo (United States), Inc.*, 6:14-cv-00525-JDL, both in the Eastern District of Texas. A Petition for IPR of claims 1-4 of the '290 patent is concurrently filed.

---

[1] Motion to transfer to the Northern District of California has been granted.

## C. Designation of Counsel (37 C.F.R. § 42.8(b)(3))

| Lead Counsel | Back-Up Counsel |
|---|---|
| David K.S. Cornwell (Reg. No. 31,944) STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C. 1100 New York Avenue, NW Washington, DC 20005 202.772.8580 (telephone) 202.371.2540 (facsimile) davidc-PTAB@skgf.com | Mark W. Rygiel (Reg. No. 45,871) STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C. 1100 New York Avenue, NW Washington, DC 20005 202.772.8510 (telephone) 202.371.2540 (facsimile) mrygiel-PTAB@skgf.com |

### D.     Notice of Service Information (37 C.F.R. § 42.8(b)(4))

Please send correspondence to lead counsel at the above address. Apple consents to email service at: davidc-PTAB@skgf.com and mrygiel-PTAB@skgf.com.

## III.    GROUNDS FOR STANDING (37 C.F.R. § 42.104(a))

Apple certifies that the '290 patent is available for IPR. Apple is not barred or estopped from requesting IPR of any claim of the '290 patent on the grounds identified herein. This Petition is filed in accordance with 37 C.F.R. § 42.106(a). A Power of Attorney and Exhibit List under § 42.10(b) and § 42.63(e), respectively, are filed herewith. The required fee has been paid through online credit card payment. The Office is authorized to charge fee deficiencies and credit overpayments to Deposit Acct. No. 19-0036 (Customer ID No. 63,975).

## IV.    PRECISE RELIEF REQUESTED (37 C.F.R. § 42.22(a))

Apple requests IPR and cancellation of claims 6, 7, 9, and 10. Apple's full statement of the reasons for the relief requested is set forth below.

## V. THE '290 PATENT

### A. Overview of the '290 Patent

The '290 patent describes a network for "bidirectional wireless data communications between a microcomputer unit and a plurality of peripheral units." ('290 patent, 1:11-15.) FIG. 1 illustrates a server microcomputer (11) and associated peripheral units (21, 29). The server microcomputer can be a personal digital assistant ("PDA"). (*Id.* at 2:66-67, FIG. 1.) The "peripheral units," or "personal electronic accessories (PEAs)," include "conventional" peripheral devices like a keyboard and mouse, and "a wide variety of less conventional" peripheral and input devices, like displays on a headband or glasses and "physiological sensors." (*Id.* at 1:62-2:18.) The sensors can be temperature, heartbeat, and respiration sensors for patient monitoring or fitness training. (*Id.* at 2:10-15.) The microcomputer and peripherals are linked "in close physical proximity, e.g., within twenty meters," to establish a common time base or synchronization. (*Id.* at 1:50-55.)

The '290 patent seeks to "provide wireless communication between a host or server microcomputer unit and a plurality of peripheral units" that is reliable, low power, avoids interference, and relatively simple. (*Id.* at 1:33-46.) This is purportedly achieved by a low duty cycle pulsed operation mode, where transmitters are active for short durations of time, which "substantially reduces power consumption and facilitates the rejection of interfering signals." (*Id.* at 1:57-61, 2:35-39.)

- 4 -

**B. Priority Date of the '290 Patent**

The '290 patent was filed on October 14, 1997 and assigned Application No. 08/949,999 ("the '999 application") (APL 1005) as a continuation-in-part of Application No. 08/611,695, filed on March 6, 1996 ("the '695 application") (APL 1006). At least claims 9 and 10 are only entitled to the '290 patent's October 14, 1997 filing date because they recite new matter added to the '999 application. The '695 and '999 specifications are nearly identical, but the '999 application *added new disclosure* that the peripheral units are "located within short range of the server unit, e.g. within 20 meters." ('290 patent, Abstract.) And in comparison to the '695 application, the '999 application recites: "the server microcomputer unit and the several peripheral units which are to be linked are all in close physical proximity, e.g., ~~under two meters separation~~ within twenty meters", *changing* the range of "close physical proximity" from "under two meters" to "within twenty meters". (*Compare* APL 1006, p. 25 *with* APL 1005, p. 25.)

Claim 9 *specifically claims the newly added features*, reciting "a plurality of peripheral units which provide either input information from the user or output information to the user, and *which are adapted to operate* **within about 20 meters of said server unit.**" Thus, at least independent claim 9, and its dependent claim 10, are entitled only to the benefit of the '290 patent's October 14, 1997 filing date.

### C. Level of Ordinary Skill in the Art

A person of ordinary skill in the art ("POSA") at the time of invention would have typically had an undergraduate degree in Electrical Engineering and 1-2 years of experience working with wireless network technology, or equivalent education and/or work experience. (Grimes Dec. ¶ 9.)

## VI.   CLAIM CONSTRUCTION

Under 37 C.F.R. § 42.100(b), the challenged claims must be given their broadest reasonable interpretations ("BRI") in light of the patent specification. Generally, claim terms are given their ordinary and customary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003). The broadest reasonable interpretation must also be consistent with the interpretation a POSA would reach. *In re Cortright*, 165 F.3d 1353, 1359 (Fed. Cir. 1999).

Apple presents interpretations of certain claim limitations under the BRI standard. Apple reserves the right to present different constructions in the District Court litigation where a different claim construction standard applies, and does not acquiesce to being bound in the litigation by claim construction presented herein.

### A.  "local oscillator"

The term "local oscillator" appears in challenged claims 6 and 9. Yet its use in the claims is at odds with the '290 patent specification. In claim 6, the peripheral units include "a local oscillator which can be synchronized to said server unit oscil-

- 6 -

lator using said synchronizing information." In claim 9, each peripheral unit has a "local oscillator" and "a second mode to synchronize the respective local oscillator with the server unit oscillator." So, in the claims, the "local oscillator" of the peripheral unit is synchronized with the server unit oscillator.

The '290 patent teaches otherwise—the PDA and PEA modems *each* have a "crystal oscillator" *and* a "local oscillator." (*See e.g.*, '290 patent, FIGS. 2-3.) The PDA modem has "a crystal oscillator 18 which is utilized in maintaining the network time base." (*Id.* at 4:14-15, FIG. 3.) The PDA modem *also* has "a local oscillator 16 which is shared by the transmitter and the receiver." (*Id.* at 4:11-12, FIG. 3.) Similarly, the PEA modem has "a voltage controlled crystal oscillator oscillator [*sic*] 44 which is utilized in maintaining a common time base with the host microcomputer." (*Id.* at 3:36-38; *see also id.* at 8:40-41, FIG. 2.) The PEA modem *also* has "a local oscillator 42 which is shared by the transmitter and the receiver." (*Id.* at 3:33-34, FIG. 2.) In FIG. 4, "transmission is effected using the local oscillator 45 to drive the transmit antenna amplifier 50 whose output drives transmit antenna 51." (*Id.* at 4:25-27; *see also id.* at 4:30-32.)

So the '290 patent discloses that the "crystal oscillators"—CXO (18) of the PDA (server unit) and VCXO (44) of the PEA (peripheral unit)—maintain a common time base (synchronization). And the "local oscillators" drive the transmit antennas. This is how a POSA would have understood the oscillators to work.

(Grimes Dec. ¶ 25.) In particular, "local oscillator" is a term of art and its usage in the '290 specification to denote a component that drives the transmitter/receiver is consistent with its commonly understood meaning. (*Id*.) But this does not square with the claims, which require that the "local oscillator" of the peripheral unit is synchronized to the server unit oscillator (i.e., a crystal oscillator "for establishing a time base).

The ambiguity of the claims and their discord with the specification creates a peculiar situation. Interpreted literally and consistently with "local oscillator" in the specification, the claims are unsupported by the specification. In the District Court litigation, the patent owner recognized this defect and concocted a construction where "local oscillator" simply means "an oscillator located in a peripheral unit," using "local" as an adjective for the oscillator's location—in the peripheral unit. (Claim Constr. Brief, pp. 22-24) (APL 1007.) This makes a "local oscillator" *any* oscillator in the peripheral unit. This cannot be the case and Apple disagrees this can be the broadest reasonable interpretation of "local oscillator" ***in view of the specification***, as required. If the Board adopts this impermissibly broad interpretation of "local oscillator," the prior art discloses this feature as shown herein.

## VII.   IDENTIFICATION OF CHALLENGE (37 C.F.R. § 42.104(b))

### A. Statutory Grounds for the Challenge

Petitioner requests review of claims 6, 7, 9, and 10:

**GROUND 1:** Claims 9 and 10 are unpatentable under 35 U.S.C. § 103 as obvious over by "BodyLAN$^{TM}$: A Low-Power Communications System" by Thomas J. Barber Jr. ("Barber").

**GROUND 2:** Claims 6, 7, 9, and 10 are unpatentable under 35 U.S.C. § 103 as obvious over U.S. Patent No. 5,241,542 to Natarajan *et al.* ("Natarajan") in view of U.S. Patent No. 4,887,266 to Neve *et al.* ("Neve").

**GROUND 3:** Claims 6 and 7 are unpatentable under 35 U.S.C. § 103 as obvious over U.S. Patent No. 5,696,903 to Mahany ("Mahany").

## B. Citation of Prior Art

**Barber** (APL 1002) is prior art under at least 35 U.S.C. § 102(b). It was published at least as early as April 11, 1996, more than 1 year before the priority date for claims 9 and 10 of the '290 patent, its October 14, 1997 filing date.

**Natarajan** (APL 1003) is prior art under at least § 102(b), issuing on August 31, 1993, more than 2 years before the '290 patent's earliest possible priority date.

**Neve** (APL 1004) is prior art under at least § 102(b), issuing on December 12, 1989, more than 6 years before the '290 patent's earliest possible priority date.

**Mahany** (APL 1010) is prior art under at least § 102(e). It was filed on April 29, 1994, almost 2 years before the '290 patent's earliest possible priority date.

## C. The Proposed Grounds Are Not Redundant

Apple recognizes the Board may use its discretion under 35 U.S.C. § 325(d)

- 9 -

to institute trial only on certain grounds when multiple grounds "are presented in a redundant manner by a petitioner who makes no meaningful distinction between them." *Liberty Mutual Ins. Co. v. Progressive Casualty Ins. Co.,* CBM2012-00003, Paper 7, p. 2 (P.T.A.B. Oct. 25, 2012). The grounds here are not redundant and Apple discusses the distinctions below. The Board typically exercises its discretion when numerous grounds are asserted against the same claims. *See e.g.*, *Canon Inc. v. Intellectual Ventures I LLC,* IPR2014-00535, Paper 9, pp. 19-20 (P.T.A.B. Sept. 24, 2014) (all 31 claims challenged, total of 49 grounds over multiple petitions). Here, IPR is requested for only four claims, with just two grounds for each claim. For this reasonable number of challenged claims and grounds, the Board may institute *inter partes* review on all grounds when the petitioner "articulate[s] relative strengths and weaknesses between references." *Liberty Mutual,* CBM2012-00003, Paper 7 at 3. Apple does so here.

Ground 1 is based on Barber under § 103. Barber alone discloses each claim limitation in view of a POSA's knowledge and what would have been obvious to a POSA. This ground is stronger in that only a single reference is needed for obviousness. Barber qualifies as prior art under § 102(b) because claims 9-10 recite new matter added to the '290 patent and are entitled only to the '290 patent's filing date. This ground is arguably weaker in that the patent owner may argue that Barber does not qualify as prior art because in the patent owner's view the '290 patent

is entitled to an earlier priority date (even though it is not). Similarly, Ground 3, based Mahany alone under § 103, qualifies as prior art under § 102(e), so the patent owner may argue an earlier conception date.

Ground 2 is based on Natarajan and Neve under § 103. Both references qualify as prior art under § 102(b) even against the '290 patent's earliest possible priority date. This ground is stronger in that the patent owner cannot attempt to prove an earlier priority date to overcome the references. This ground is arguably weaker in that a combination of references is used, rather than a single reference, to demonstrate obviousness.

Apple would be prejudiced if the Board institutes trial based only on one ground for each claim. If the Board institutes trial, for example, based only on Ground 2 and avoids addressing the '290 patent's lack of priority, Apple would be denied the opportunity to present an arguably "stronger" ground. Yet if the Board institutes trial based only Ground 1, the patent owner might attempt to argue that the '290 patent is entitled to an earlier priority date (although it is not) to overcome Barber. Thus, the totality of the circumstances counsels that the Board should institute trial for each of the four challenged claims based on both presented grounds.

## VIII. GROUNDS OF REJECTION

### A. Ground 1: Claims 9 and 10 would have been obvious in view of Barber.

#### 1. Overview of Barber

Barber is a Master's thesis titled "BodyLAN[TM]: A Low-Power Communica-

Barber discloses the limitation of claim 10: *"wherein said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting."* (*Id.* at 86.) This is a standard feature of TDMA. (*Id.*) In Barber, TDMA is preferred for the BodyLAN™. (Barber, p. 12.) Barber explains that in its TDMA system, "each node has a scheduled time to use the channel and is inactive during all other times." (*Id.* at 11.) "During the TDMA mode the PEA and the Hub have an established communications link and are both transmitting and receiving regularly according to the TDMA plan stored in the memory." (*Id.* at 29-30.)

### B. Ground 2: Claims 6, 7, 9, and 10 would have been obvious over Natarajan in view of Neve.

#### 1. Overview of Natarajan

Natarajan describes battery power conservation in wireless communications of mobile computers controlled by multi-access protocols. (Natarajan, 1:6-12.) Multiple mobile units communicate with base stations via wireless radio links. (*Id.* at 2:28-39, Figures 1-2.) The base stations can be a "conventional microcomputer" and the mobile units can be a "hand held or laptop computer." (*Id.* at 2:40-43, 2:58-59.) Both the base stations and mobile units have an RF transceiver. (*Id.* at 2:51-52, 2:65-67.) Battery power consumption is minimized using a scheduled multiaccess protocol where a transmitter (or receiver) is turned on only to transmit (or receive). (*Id.* at 3:59-4:6.)

The scheduled multiaccess protocol divides time into "fixed-length frames,

- 24 -

and frames are divided into slots." (*Id.* at 4:20-23, FIG. 4.) There are subframes for transmitting data packets from the base station to mobile units, contention-free transmission from mobile units to the base station, and "bursty data traffic" in a contention mode from mobile units to the base station. (*Id.* at 4:27-38.) The base station transmits a header AH to the mobile units with: a list of mobile units that will receive data packets from the base station, the order the mobile units will receive the data packets, and the number of data packets for each mobile unit. (*Id.* at 4:45-53.) If a mobile unit is not included in the header AH, it will not be receiving data and can turn its receiver off during the base station's transmission time frame. (*Id.* at 4:64-67, FIGS. 8A-8D.) A mobile unit that will receive data can compute when the transmission will occur based on its assigned time slot, power up during that time slot to receive its data, and then go back to sleep for the remainder of the base station's transmission time frame. (*Id.* at 4:67-5:6.) A similar header BH is broadcast to schedule which mobile units will transmit to the base station and their transmission order. (*Id.* at 5:9-29, 6:35-38.)

Each mobile unit is assigned an index number during a "registration period" which is "needed to associate each mobile unit in the network with the intended base station." (*Id.* at 6:48-54.) The header AH from the base station includes a "Receiving Users designation or Index message portion"—a bit-vector sequence with a bit for each of the registered mobile units. (*Id.* at 6:55-58.) A "1" indicates

- 25 -

that the mobile unit will receive a message and a "0" means that it will not and it can turn off its receiver. (*Id.* at 6:59-68.) Header BH has an analogous scheme. (*Id.* at 7:1-6.) This scheduled communication reduces power consumption because devices are only powered on when receiving or transmitting data. (*Id.* at 7:6-15.)

### 2. Overview of Neve

Neve discloses "[a] communication system able to provide multiple path communication between a plurality of stations operating on a single channel. The stations are synchronized and a cyclically repeating series of time slots is defined." (Neve, Abstract.) Each device has "a transmitter and receiver device (transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5" for radio communication. (*Id.* at 3:59-63.) A processor connected to the transceiver controls data transfer to and from the transmitter and receiver. (*Id.* at 3:64-68.)

Neve's system "enables a very low power consumption to be achieved in the cases where the device requires to transmit data only rarely or the receiver receives the predetermined code signal only rarely…a device may need to transmit data for only a fraction of a second in many hours." (*Id.* at 2:25-31.) When data transfer is not taking place, the device enters a lower power consumption state. (*Id.* at 2:13-16.) The system is designed "automatically to re-enter the data transfer condition when either a signal is received from the device indicative of the need to transmit data or a predetermined code signal is received by the receiver circuit indicative of

- 26 -

the need to receive data." (*Id.* at 2:19-24.) Power consumption is low because only the internal timing circuitry is energized continuously, while the rest of the receiving circuit is energized only during its assigned time slot. (*Id.* at 2:39-41.) Similarly, the transmitter is only energized when transmission is required. (*Id.* at 2:45-47.)

Further, Neve's "system is a synchronous communication system with one station designated the master station providing system synchronisation signals, and defining a cyclic sequence of time slots." (*Id.* at 3:9-12.) The time slots include "at least one synchronisation time slot, at least one interrupt time slot, and a plurality of address or data time slots, wherein any other station can transmit a message to the master station during an interrupt time slot to indicate a request to communicate." (*Id.* at 3:12-17.) The receiver circuit is energized only during its time slot and "the synchronisation time slot thereby enabling it to maintain synchronisation with low power consumption." (*Id.* at 4:43-48.)

### 3. Overview of the Combination of Natarajan and Neve

Natarajan and Neve are from the same field of endeavor—wireless network communication systems. (Grimes Dec. ¶ 89.) Both are concerned with conserving battery power of wireless devices. (Natarajan, Abstract, 1:16-21; Neve, 1:29-34, 2:48-51.) The '290 patent allegedly addresses this same issue. ('290 patent, Abstract, 1:59-61.) Natarajan and Neve reduce power consumption in similar ways, by scheduling transmission time slots and having devices operate in a low power

- 27 -

mode when they are not transmitting or receiving. (Natarajan, Abstract, 3:66-4:7; Neve, Abstract, 2:35-41.) The '290 patent uses a similar technique. ('290 patent, 2:35-40.) Many of the claimed elements in the '290 patent are merely standard components of wireless communications systems disclosed by both Natarajan and Neve. (Grimes Dec. ¶ 90.) For example, both disclose a "server microcomputer" base unit communicating with a plurality of "peripheral units," where each device has an RF transmitter and receiver. (*See e.g.*, Natarajan, Abstract, FIGS. 1-2; Neve, Abstract, FIG. 1.)

Although Natarajan does not explicitly describe synchronizing the mobile units and base station, it teaches that coordinated timing of transmissions is important. (Grimes Dec. ¶ 92.) In the "registration period," the base station indexes each mobile unit, which is "***needed to associate each mobile unit*** in the network ***with the intended base station***." (Natarajan, 6:53-54 (emphasis added).) The mobile units and base stations each have "a dedicated microprocessor 62 containing ***high-resolution time interval determination hardware or 'timers'*** typical of real-time microprocessor systems." (*Id.* at 3:18-21, FIG 3 (emphasis added).) The timers provide that "each receiving mobile unit can compute exactly when it should be ready to receive packets from the base station (add up the slots allocated to all receiving units that precede it). Each receiving mobile unit goes to sleep after scheduling to wake itself up at its designated time for receiving data." (*Id.* at 4:67-5:4.)

This scheduling reduces power consumption. (*Id.* at 7:7-38.) A POSA would have understood that Natarajan's coordinated data transmission would have benefitted from synchronizing the timers in the mobile units and the base station, and therefore been motivated to do so. (Grimes Dec. ¶ 92.)

This would have led a POSA to Neve, which is in the same field of endeavor and describes a well-known method in wireless communication for synchronizing peripheral devices with a base station. (*Id.* at 93.) Neve discloses "a synchronous communication system with one station designated the master station providing system synchronisation signals, and defining a cyclic sequence of time slots." (Neve, 3:9-12.) During a dedicated "synchronization time slot," a "synchronization word" is transmitted by the master station. (*Id.* at 7:31-33.) The CPU is able to "adjust the phase of the clock used for synchronous communication for correct reception of the incoming synchronous data." (*Id.* at 6:15-18.) The receivers are energized "only for the time slot in which its address may occur and for the synchronisation time slot thereby enabling it to maintain synchronisation with low power consumption." (*Id.* at 4:43-48.)

A POSA would have combined the synchronization technique described in Neve with the system of Natarajan because Neve is an example of a conventional synchronization technique for a time scheduled data communication system and Natarajan teaches that timing is important for data transmissions in its similar time

- 29 -

scheduled communication system. (Grimes Dec. ¶ 94.) Thus, the combination of Natarajan and Neve would have been merely combining prior art elements according to known methods to yield predictable results and using a known technique to improve similar devices in the same way. (*Id.*; *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 416-17 (2007).)

### 4. Independent claim 6 would have been obvious over Natarajan in view of Neve.

#### (a) "A data network system for effecting coordinated operation of a plurality of electronic devices"

Natarajan discloses a multiaccess protocol for a plurality of mobile electronic devices in "an indoor digital data communication system" where "registration is needed to associate each mobile unit in the network with the intended base station." (Natarajan, 1:67-68, 6:48-54, FIG. 1.) Neve similarly discloses "[a] communication system able to provide multiple path communication between a plurality of stations operating on a single channel." (Neve, Abstract.) "A large number of communication stations…may be provided in a communication network operating on the same radio frequency." (*Id.* at 4:6-9, FIG. 9.) Thus, Natarajan and Neve each disclose limitation (a) of claim 6. (Grimes Dec. ¶¶ 95-96.)

#### (b) "a server microcomputer unit, said server unit including an oscillator for establishing a time base"

Natarajan discloses "a base station 26 or 28, which may be [a] conventional microcomputer" and that a "server" is "typically also a conventional microcomput-

er." (Natarajan, 2:40-45, FIGS. 1-2.) Neve similarly discloses that "[o]ne station, which is physically similar to the others but operates a different stored program, may be designated the master station and provides synchronisation signals for all of the other stations (referred to hereinafter as 'slave' stations) and controls access of the stations to the single radio channel." (Neve, 4:10-15, FIG. 9.) Each station includes "a digital control processor 8 controlled by a stored program in memory 9." (*Id.* at 3:64-66, FIGS. 1, 4, and 5.) Neve also describes that the units are portable. (*See id.* at 2:49-55.) Thus, Natarajan and Neve each disclose "a server microcomputer unit." (Grimes Dec. ¶ 97.)

Natarajan and Neve also each disclose that the server microcomputer unit includes "an oscillator for establishing a time base." (Grimes Dec. ¶ 98.) Natarajan discloses "high-resolution time interval determination hardware" and "timers" (Natarajan, 3:18-21, FIG 3) and that the "internal timer and oscillator" affect the power consumption of the transceiver (*id.* at 7:10-27). Specifically, the devices use the HPC microcontroller 46400E, which has an "internal timer and oscillator." (*Id.* at 7:17-25.) A POSA would have understood that the oscillator was "for establishing a time base." (Grimes Dec. ¶ 98.) Neve discloses that each device includes "a crystal oscillator." (Neve, 5:24-28, (27) in FIGS. 4-5.) A "synchronization clock" is always active and "[t]he fundamental frequency of the oscillator is used as the system clock for the CPU." (*Id.* at 6:7-14.) A POSA would have understood that the

- 31 -

clock and oscillator were "for establishing a time base." (Grimes Dec. ¶ 98.) Thus, Natarajan and Neve each disclose limitation (b) of claim 6. (*Id.* at 99.)

### (c) "a plurality of peripheral units which are battery powered and portable and which provide either input information from the user or output information to the user"

Natarajan's system has a plurality of "mobile units" designed "for conserving battery power in a wireless link adapter of a battery operated computer such as a portable laptop computer." (Natarajan, Abstract, FIG. 1.) Neve discloses devices with "a small primary battery" and a "complete self-contained data transmitting and receiving device [that] may be made in a package only a few centimeters in each dimension, allowing it to be mounted almost anywhere that communication is required" (i.e., "portable"). (Neve, 2:48-59.) Thus, Natarajan and Neve each disclose peripheral units that are "battery powered and portable." (Grimes Dec. ¶ 100.)

Natarajan discloses that "[t]he mobile station may itself be a hand held or laptop computer." (Natarajan, 2:58-59.) Further, "computer 50 runs an operating system 70 which supports one or more user application programs 72." (*Id.* at 3:50-51.) A POSA would have understood that "user application programs" of a "hand held or laptop computer" would have been used to provide "input information from the user" *and* "output information to the user." (Grimes Dec. ¶ 101.) For example, during Period A, data is transmitted from the base station to the mobile units. (Na-

- 32 -

tarajan, 4:30-32.) During Period B, data is transmitted from the mobile units to the base station. (*Id.* at 4:33-35.) Transmissions occur according to a "Receiving Users Index" and a "Transmitting Users Index." (*Id.* at 6:17-21, 6:32-34.) "Most users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time for most applications." (*Id.* at 6:41-44.) A POSA would have understood that the user can be an active participant in supplying the "input information" and receiving the "output information" via the "user application programs" of the mobile units. (Grimes Dec. ¶ 101.) So, Natarajan discloses that the peripheral devices "provide either input information from the user or output information to the user." (*Id.*) Thus, the combination of Natarajan and Neve discloses limitation (c) of claim 6. (*Id.* at 102.)

> **(d) "said server microcomputer incorporating an RF transmitter controlled by said oscillator for sending commands and synchronizing information to said peripheral units"**

Natarajan discloses that the base station has an RF transceiver, i.e., both an RF transmitter and an RF receiver. (Natarajan, 2:51-58, FIGS. 2-3; Grimes Dec. ¶ 103.) Neve discloses "a radio transmitter and receiver apparatus" with "a transmitter and receiver device (transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-63, FIGS. 1, 3.) A POSA would have understood the RF transmitter of the server microcomputer was "controlled by" the oscillator because an oscillator's standard function is to control the trans-

mitter and receiver. (Grimes Dec. ¶ 104.) For example, the transmitter and receiver frequency (i.e. carrier frequency) is controlled by the oscillator frequency. (*Id.*)

Natarajan discloses that the base station transmitter sends "commands" to the peripheral units, for example, the "headers" AH and BH discussed above containing information about which mobile units will receive (or transmit) data and the order for doing so. (Natarajan, 4:20-5:19; Grimes Dec. ¶ 105.) Neve similarly discloses that the master station allocates time slots for communication to the slave stations. (Neve, 3:26-28.) The instruction as to which time slot to communicate in is a "command" sent from the master station to the slave station. (Grimes Dec. ¶ 105.) Neve also discloses that the slave station "responds to commands on the channel and takes part in transmission and reception." (Neve, 7:46-49.) These "commands" would have been sent by the master station. (Grimes Dec. ¶ 105.)

As discussed above, Natarajan teaches the need for a "registration period" to associate the mobile units with the base station (Natarajan, 6:48-54), "high-resolution time interval determination hardware" and "timers" (*id.* at 3:18-21, FIG 3), and that the receiving mobile units can compute exactly when to wake up to receive data packets from the base station (*id.* at 4:67-5:4). Thus, Natarajan contemplates the need for precise timing of data transmissions. (Grimes Dec. ¶ 106.) So, although Natarajan does not explicitly disclose that the base station sends "synchronizing information" to the mobile units, this feature would have been obvious

- 34 -

to a POSA in view of Neve. (*Id.*) Neve discloses that the master station "provides synchronisation signals for all of the other stations." (Neve, 4:10-13, FIG. 2.) "One time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations, designated slave stations, and maintaining synchronization therein." (*Id.* at Abstract.) When the master and slave stations are synchronized, the respective transmitters and receivers operate at the proper times for synchronized data communication. (Grimes Dec. ¶ 107.) The known synchronization technique in Neve would have improved Natarajan's similar system in this same way. (*Id.*; *KSR*, 550 U.S. at 416-17.) Thus, limitation (d) of claim 6 would have been obvious in view of Natarajan and Neve. (Grimes Dec. ¶ 108.)

> **(e)  "said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also a local oscillator which can be synchronized to said server unit oscillator using said synchronizing information and an RF transmitter controlled by said local oscillator for sending input information from the user to said server microcomputer"**

FIG. 2 of Natarajan illustrates "the basic components of a mobile station and a base station." (Natarajan, 2:1-3.) "The laptop computer like the base station, is provided with an antenna 42 and a transceiver adapter 44." (*Id.* at 2:65-67, FIGS. 2 and 3.) Thus, the mobile units have an RF transceiver, i.e., both an RF transmitter and an RF receiver. (Grimes Dec. ¶ 109.) Neve discloses that the slave stations are "a radio transmitter and receiver apparatus" with "a transmitter and receiver device

- 35 -

(transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-63, FIGS. 1 and 3.)

A POSA would have understood that the receivers in Natarajan and Neve would have been responsible for detecting the "commands and synchronizing information" described above. (Grimes Dec. ¶ 110.) In Natarajan, "[p]ackets received or to be sent are held in data storage 68 and communicated to or from the RF transceiver 54." (Natarajan, 3:28-30.) Further, "each receiving mobile unit can compute exactly when it should be ready to receive packets from the base station." (*Id.* at 4:67-5:4.) Neve discloses that "[o]ne time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations, designated slave stations, and maintaining synchronization therein." (Neve, Abstract.) Neve also discloses that the slave station "responds to commands on the channel and takes part in transmission and reception." (*Id.* at 7:46-49.) The "commands" and "synchronization information" would have been detected by the slave station's receiver. (Grimes Dec. ¶ 110.) Thus, Natarajan and Neve in combination disclose that the peripheral units detect commands and synchronizing information. (*Id.*)

Natarajan also discloses that the peripheral unit's RF transmitter "send[s] input information from the user to said server microcomputer." (*Id.* at 111.) There are designated periods "for the contention-free transfer of all traffic from mobile

units to base station (inbound traffic)" and "the transfer of all bursty data traffic in a contention mode from mobile units to base station." (Natarajan, 4:33-38.) A POSA would have understood that since the mobile units can be a "hand held or laptop computer" (*id.* at 2:58-59), the data transferred from the mobile units to the base station was "input information from the user," for example, via the "user application programs." (*Id.* at 3:50-51; Grimes Dec. ¶ 111.) Indeed, inbound transmissions from the mobile units are based on a "Transmitting Users Index" (Natarajan, 6:32-34) and "[m]ost users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time for most applications." (*Id.* at 6:41-44.) Thus, a POSA would have understood that the user can be an active participant in supplying the "input information" via the mobile units. (Grimes Dec. ¶ 111.) The RF transmitter of the mobile unit would have been responsible for sending this input information. (*Id.*)

Further, as discussed above, Natarajan and Neve disclose that each device includes an oscillator. (Natarajan, 7:17-25; Neve, 5:24-28, 6:7-14, FIGS. 4-5; Grimes Dec. ¶ 112.) Because there is an oscillator in the peripheral unit, each peripheral unit has a "local oscillator." (Grimes Dec. ¶ 112.) A POSA would have understood that the "synchronization information" in Neve would have been for synchronizing the "local oscillator" with the "server unit oscillator." (*Id.*) And as discussed above for the server unit transmitter, a POSA would have understood

- 37 -

that the RF transmitter of the peripheral units was "controlled by" the oscillator because an oscillator's standard function is to control the transmitter and receiver. (*Id.*) For example, the transmitter and receiver frequency (i.e. carrier frequency) is controlled by the oscillator frequency. (*Id.*) Thus, Natarajan and Neve in combination disclose limitation (e) of claim 6. (*Id.* at 113.)

**(f) "said server microcomputer including a receiver controlled by said server unit oscillator for receiving input information transmitted from said peripheral units"**

Natarajan discloses that the base station has an RF transceiver, i.e., both an RF transmitter and an RF receiver. (Natarajan, 2:51-58, FIGS. 2-3; Grimes Dec. ¶ 114.) Neve discloses "a radio transmitter and receiver apparatus" with "a transmitter and receiver device (transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-63, FIGS. 1 and 3.) As discussed above, Natarajan and Neve each disclose that the server microcomputer includes an oscillator. A POSA would have understood that the receiver is "controlled by" the oscillator because an oscillator's standard function is to control the transmitter and receiver. (Grimes Dec. ¶ 116.) For example, the transmitter and receiver frequency (i.e. carrier frequency) is controlled by the oscillator frequency.

As also discussed above, a POSA would have understood that since Natarajan's mobile units can be a "hand held or laptop computer" (Natarajan, 2:58-29) with "user application programs" (*id.* at 3:50-51), the data transferred from the

mobile units to the base station was "input information." (Grimes Dec. ¶ 115.) For example, "[h]eader BH contains an ordered list of users that will be allowed to transmit to the base station in the current frame." (Natarajan, 5:9-15.) Neve discloses a designated time slot where "the master station receives" from the slave stations. (Neve, 7:31-34.) A POSA would have understood that the "receiver" of the base/master stations was responsible for receiving "input information." (Grimes Dec. ¶ 115.) Thus, Natarajan and Neve in combination disclose limitation (f) of claim 6. (*Id.* at 117.)

### (g) "said server and peripheral transmitters being energized in low duty cycle RF bursts which are timed in relation to said synchronizing information"

Natarajan discloses that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)…the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." (Natarajan, 3:66-4:6.) This constitutes "low duty cycle RF bursts." (Grimes Dec. ¶ 118.) Natarajan also discloses a period "for the transfer of all ***bursty*** data traffic in a contention mode from mobile units to base station (inbound traffic), with a header CH." (Natarajan, 4:36-38 (emphasis added).) Neve also discloses a "low power duty cycle." (Neve, 5:60-61.) "The slave stations operate in a low power condition

- 39 -

except during one of the other time slots when they may receive their own address, or except when they need to transmit data" (*id.* at Abstract) and the interface circuit of each device is "arranged to energise the transmitter circuit only when transmission is required" (*id.* at 2:42-47). Thus, Natarajan and Neve each disclose that the transmitters are "energized in low duty cycle RF bursts." (Grimes Dec. ¶ 118.)

As discussed above, Natarajan teaches the need for a "registration period" to associate the mobile units with the base station (Natarajan, 6:48-54), "high-resolution time interval determination hardware" and "timers" (*id.* at 3:18-21, FIG 3), and that the transmitters can turn on only when it is their turn to transmit (*id.* at 3:66-4:6). Thus, although Natarajan does not explicitly disclose that the base station sends "synchronizing information" to the mobile units, this would have been obvious in view of Neve. (Grimes Dec. ¶ 119.)

In Neve, the master station "provides synchronisation signals for all of the other stations." (Neve, 4:10-13, FIG. 2.) "One time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations, designated slave stations, and maintaining synchronization therein." (*Id.* at Abstract.) A POSA would have found Natarajan's "registration period" to be a logical time to transmit synchronization information as taught in Neve so that the timers were synchronized before the data transmission schedule began. (Grimes Dec. ¶ 119.) The "RF bursts" would be

transmitted in their designated time slots *after* the timers were synchronized, and therefore "timed in relation to said synchronizing information." (*Id*. at 120.) Thus, Natarajan and Neve in combination disclose limitation (g) of claim 6. (*Id*. at 121.)

### 5. Claim 7 would have been obvious over Natarajan in view of Neve.

The explanation for claim 6 also applies to claim 7, depending therefrom. Natarajan and Neve disclose the limitation of claim 7: *"wherein said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting."* (*Id*. at 122.) Natarajan discloses "a scheduled multiaccess protocol is used in which time is divided into fixed-length frames, and frames are divided into slots" with "Period A for broadcast of packets from base station to mobile units (outbound traffic)" and "Period B for the contention-free transfer of all traffic from mobile units to base station (inbound traffic)." (Natarajan, 4:20-38, FIG. 4) Neve similarly discloses that the master station defines "a cyclic sequence of time slots" where the master station transmits a synchronization word to the slave stations during a synchronization time slot and the slave stations transmit to the master station in an interrupt time slot. (Neve, 3:9-17, 7:27:33.)

### 6. Independent claim 9 would have been obvious over Natarajan in view of Neve.

#### (a) "A data network system for effecting coordinated operation of a plurality of electronic devices"

This limitation is ***exactly*** the same as recited in claim 6. Therefore, the discussion above in Section VIII.B.4.(a) applies to limitation (a) of claim 9 as well.

- 41 -

(*See also* Grimes Dec. ¶¶ 124-25.)

> **(b)"a server microcomputer unit, said server unit including an oscillator for establishing a time base"**

This limitation is ***exactly*** the same as recited in claim 6. Therefore, the discussion above in Section VIII.B.4.(b) applies to limitation (b) of claim 9 as well. (*See also id.* at 126-28.)

> **(c) "a plurality of peripheral units which provide either input information from the user or output information to the user, and which are adapted to operate within about 20 meters of said server unit"**

Natarajan discloses a system with a plurality of "mobile units" that wirelessly communicate with a base station. (Natarajan, 2:32-39, FIG. 1.) Neve similarly discloses "[a] large number of communication stations each comprising a transceiver 2 and interface circuit 7 and any necessary interface 10 may be provided in a communication network operating on the same radio frequency." (Neve, 4:6-9)

Natarajan discloses that "[t]he mobile station may itself be a hand held or laptop computer." (Natarajan, 2:58-59.) Further, "computer 50 runs an operating system 70 which supports one or more user application programs 72." (*Id.* at 3:50-51.) As discussed above, POSA would have understood that "user application programs" of a "hand held or laptop computer" would have provided "input information from the user" *and* "output information to the user." (Grimes Dec. ¶ 130.) For example, during Period A, data is transmitted from the base station to the mo-

- 42 -

bile unit (Natarajan, 4:30-32), and vice versa during Period B (*id.* at 4:33-35). Transmissions occur according to a "Receiving Users Index" and a "Transmitting Users Index." (*Id.* at 6:17-21, 6:32-34.) "Most users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time for most applications." (*Id.* at 6:41-44.) A POSA would have understood that the user can be an active participant in supplying "input information" and receiving "output information" via the "user application programs" of the mobile units. (Grimes Dec. ¶ 130.) So, Natarajan discloses that the peripheral devices "provide either input information from the user or output information to the user." (*Id.*)

Natarajan also discloses that "[t]here has been recent work directed to the design of multiaccess protocols for ***portable mobile computer users***, as well as movable boundary protocols for supporting integrated voice/data users in ***mobile indoor radio networks***." (Natarajan, 1:39-43 (emphasis added).) Portable computers operating in an *indoor* network would have been "adapted to operate within about 20 meters of said server unit." (Grimes Dec. ¶ 131.) Similarly, Neve discloses that thousands of devices can be used in an industrial plant, such as an oil refinery. (Neve, 1:10-15, 1:34-40.) In this environment, the peripheral units would have been "adapted to operate within about 20 meters of said server unit." (Grimes Dec. ¶ 131.) Thus, the combination of Natarajan and Neve discloses limitation (c) of claim 9. (*Id.* at 132.)

**(d)"said server microcomputer incorporating an RF transmitter controlled by said oscillator for sending commands and synchronizing information to said peripheral units, said synchronizing information being carried by time spaced beacons characteristic of the particular server unit**

Like claim 6, claim 9 *identically* recites "said server microcomputer incorporating an RF transmitter controlled by said oscillator for sending commands and synchronizing information to said peripheral units." Therefore, the discussion above in Section VIII.B.4.(d) applies to limitation (d) of claim 9 as well. (*See also* Grimes Dec. ¶¶ 133-137.)

Claim 9 additionally recites "said synchronizing information being carried by time spaced beacons characteristic of the particular server unit." Neve discloses that synchronizing information is "carried by time spaced beacons." (*Id.* at 138.) The master station "provides synchronisation signals for all of the other stations" (Neve, 4:10-15) and "[o]ne time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations" (Neve, Abstract). Because Neve discloses a "cyclically repeating series of consecutive time slots," where one slot is reserved for synchronization information, the synchronization signals (i.e. "beacons") are "time spaced." (Neve, 1:61-62, FIG. 2; Grimes Dec. ¶ 138.)

Neve also discloses that each receiver has "a pre-assigned address" for "uniquely identifying the device" (Neve, 4:38-43) and that the data word format

- 44 -

includes an address/data flag bit (*id.* at 4:25-27, FIG. 2). Natarajan similarly discloses that the receivers are able "to recognize a specific adaptor address as well as a broadcast address." (Natarajan, 3:41-46.) A POSA would have found it obvious to include an address of the transmitting master station with the synchronization information so that the synchronization beacon was "characteristic of the particular server unit." (Grimes Dec. ¶ 139.) Thus, limitation (d) of claim 9 would have been obvious to a POSA in view of Natarajan and Neve. (*Id.* at 140.)

> **(e) "said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also a local oscillator, each of said peripheral units being operative in a first mode to receive said beacons independently of synchronization of the respective local oscillator when that peripheral unit is in close proximity to said server unit and to determine from the server unit its characteristics, each of said peripheral units being operative in a second mode to synchronize the respective local oscillator with the server unit oscillator, each of said peripheral units also including an RF transmitter operative in a third mode for sending input information from the user to said server microcomputer"**

The combination of Natarajan and Neve discloses limitation (e) of claim 9. (*Id.* at 141.) FIG. 2 of Natarajan illustrates "the basic components of a mobile station and a base station." (Natarajan, 2:1-3.) "The laptop computer like the base station, is provided with an antenna 42 and a transceiver adapter 44." (*Id.* at 2:65-67, FIGS. 2-3.) Thus, the mobile units have an RF transceiver, i.e., both an RF transmitter and an RF receiver. (Grimes Dec. ¶ 141.) Neve discloses that the slave stations are "a radio transmitter and receiver apparatus" with "a transmitter and re-

ceiver device (transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-63, FIGS. 1 and 3.)

A POSA would have understood that the receivers in Natarajan and Neve would have been responsible for detecting the "commands and synchronizing information" discussed above. (Grimes Dec. ¶ 142; *see also* Section VIII.B.4.(d).) In Natarajan, "[p]ackets received or to be sent are held in data storage 68 and communicated to or from the RF transceiver 54." (Natarajan, 3:28-30.) Further, "each receiving mobile unit can compute exactly when it should be ready to receive packets from the base station." (*Id.* at 4:67-5:4.) Neve discloses that "[o]ne time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations, designated slave stations, and maintaining synchronization therein." (Neve, Abstract.) Neve also discloses that the slave station "responds to commands on the channel and takes part in transmission and reception." (Neve, 7:46-49.) These "commands" and "synchronizing information" would have been detected by the receiver. (Grimes Dec. ¶ 142.) Thus, Natarajan and Neve in combination disclose that the peripheral units detect commands and synchronizing information. (*Id.*)

The combination of Natarajan and Neve discloses a "first mode to receive said beacons independently of synchronization of the respective local oscillator." (*Id.* at 143.) Neve discloses "the master station providing system synchronisation

- 46 -

signals, and defining a cyclic sequence of time slots comprising at least one synchronisation time slot." (Neve, 3:10-14.) A POSA would have understood that prior to synchronizing the devices, the slave station receives the synchronization signal "independently of synchronization." (*Id.* at 143.) As discussed above, Neve discloses that each receiver has "a pre-assigned address" for "uniquely identifying the device" (*id.* at 4:38-43) and Natarajan discloses that the receivers are able "to recognize a specific adaptor address as well as a broadcast address" (Natarajan, 3:41-46). So it would have been obvious to a POSA that the peripheral units could "determine from the server unit its characteristics." (Grimes Dec. ¶ 143.) As also discussed above, Natarajan discloses portable computers operating in an *indoor* network (Natarajan, 1:39-43) and Neve discloses that its system could be used in an industrial plant, such as an oil refinery (Neve, 1:10-15, 1:34-40). So, the peripheral unit would have been "in close proximity to said server unit." (Grimes Dec. ¶ 143.)

Neve also discloses the "second mode." (*Id.* at 144.) "One time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations, designated slave stations, and maintaining synchronization therein." (Neve, Abstract.) Neve and Natarajan disclose that each device includes an oscillator. (Natarajan, 7:17-25; Neve, 5:24-28, 6:7-14, FIGS. 4-5; Grimes Dec. ¶ 144.) Thus, each peripheral unit in-

cludes a "local oscillator." (*Id.*) A POSA would have understood that the "synchronization information" disclosed in Neve was for synchronizing the "local oscillator" with the "server unit oscillator." (*Id.*)

Finally, Neve discloses that "[a]nother time slot is reserved for any slave station to transmit a message that it requires to communicate to another station." (Neve, Abstract.) And Natarajan discloses that the peripheral unit's RF transmitter "send[s] input information from the user to said server microcomputer." (Grimes Dec. ¶ 145.) For example, there are designated periods "for the contention-free transfer of all traffic from mobile units to base station (inbound traffic)" and "the transfer of all bursty data traffic in a contention mode from mobile units to base station." (Natarajan, 4:33-38.) A POSA would have understood that since the mobile units are a "hand held or laptop computer" (*id.* at 2:58-59), the data transferred from the mobile units to the base station would have been "input information from the user," for example, via the "user application programs" (*id.* at 3:50-51). (Grimes Dec. ¶ 145.) Because inbound transmissions from the mobile units are based on a "Transmitting Users Index" (*id.* at 6:32-34) and "[m]ost users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time for most applications" (*id.* at 6:41-44), a POSA would have understood that the user can be an active participant in supplying the "input information" via the mobile units. (Grimes Dec. ¶ 145.) And a POSA would have understood that the

- 48 -

RF transmitter of the mobile unit would have been responsible for sending this input information. (*Id.*) Thus, the combination of Natarajan and Neve discloses "a third mode for sending input information from the user to said server microcomputer." (*Id.*)

### (f) "said server microcomputer including a receiver for receiving input information transmitted from said peripheral units"

Natarajan discloses that the base station has an RF transceiver, i.e., both an RF transmitter and an RF receiver. (Natarajan, 2:51-58, FIGS. 2-3; Grimes Dec. ¶ 147.) Neve similarly discloses "a radio transmitter and receiver apparatus" with "a transmitter and receiver device (transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-63, FIGS. 1 and 3.)

As discussed above, a POSA would have understood that since Natarajan's mobile units can be a "hand held or laptop computer" (Natarajan, 2:58-29) with "user application programs" (*id.* at 3:50-51), the data transferred from the mobile units to the base station was "input information." (Grimes Dec. ¶ 148.) And Natarajan discloses that "[h]eader BH contains an ordered list of users that will be allowed to transmit to the base station in the current frame." (Natarajan, 5:9-15.) Neve similarly discloses a designated time slot where "the master station receives" from the slave stations. (Neve, 7:31-34.) A POSA would have understood that the receiver of the base/master stations would have been responsible for receiving the "input information." (Grimes Dec. ¶ 148.) Thus, Natarajan and Neve in combina-

tion disclose limitation (f) of claim 9. (*Id.* at 149.)

> **(g)"said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals with said receivers being controlled by the respective oscillators"**

Natarajan discloses that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)…the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." (Natarajan, 3:66-4:6.) This constitutes "low duty cycle RF bursts." (Grimes Dec. ¶ 150.) Further, there is a period "for the transfer of all *bursty* data traffic in a contention mode from mobile units to base station (inbound traffic), with a header CH." (Natarajan, 4:36-38 (emphasis added).) Neve similarly discloses a "low power duty cycle." (Neve, 5:60-61.) Further, "[t]he slave stations operate in a low power condition except during one of the other time slots when they may receive their own address, or except when they need to transmit data" (*id.* at Abstract) and the interface circuit is of each of the devices is "arranged to energise the transmitter circuit only when transmission is required" (*id.* at 2:42-47). Thus, Natarajan and Neve each disclose that the transmitters are "energized in low duty cycle RF bursts." (Grimes Dec. ¶ 150.)

As discussed above, Natarajan and Neve each disclose that the devices each

include an oscillator. (Natarajan, 7:17-25; Neve, 5:24-28, 6:7-14, FIGS. 4-5; Grimes Dec. ¶ 151.) A POSA would have understood that the receivers are "controlled by" the oscillators because an oscillator's standard function is to control the transmitter and receiver. (*Id.*) For example, the transmitter and receiver frequency (i.e. carrier frequency) is controlled by the oscillator frequency. (*Id.*) Thus, Natarajan and Neve in combination disclose limitation (f) of claim 9. (*Id.* at 152.)

### 7.  Claim 10 would have been obvious over Natarajan in view of Neve.

The explanation for claim 9 also applies to claim 10, depending therefrom. The limitation of claims 10 is ***exactly*** the same as recited in claim 7. Therefore, the discussion above in Section VIII.B.5 also applies to claim 10. (*See also* Grimes Dec. ¶¶ 153-54.)

## C.  Ground 3: Claims 6 and 7 would have been obvious over Mahany.

### 1.  Overview of Mahany

Mahany discloses a "local area network [that] allows for radio communication between a portable computer device and peripheral devices with built-in transceivers utilized by the portable computer device" where communication is "controlled by a reservation access communication protocol." (Mahany, Abstract, FIGS. 1b and 1c.) The devices have "a voltage controlled oscillator (VCO) (3601)," where "the VCO is stabilized by connecting it in a phase locked loop to a narrowband reference, such as a crystal reference oscillator (3603)." (*Id.* at 55:11-17, FIG. 38.) "The oscillator (3603) outputs a signal of a fixed or reference fre-

POSA would have understood that the "bursts" are "timed in relation to said synchronization information." (*Id.*) For example, the SYNC information is transmitted first at (2101) and subsequently—therefore "timed in relation to"—data is transmitted, for example, in the TDMA slots. (Mahany, FIG. 22; Grimes Dec. ¶ 178.) Thus, Mahany discloses limitation (g) of claim 6. (Grimes Dec. ¶ 179.)

### 3. Claim 7 would have been obvious over Mahany.

The explanation for claim 6 also applies to claim 7, depending therefrom. Mahany discloses the limitation of claim 7: *"wherein said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting."* (*Id.* at 180.) For example, Mahany discloses that after the SYNC header is sent, a reservation phase (203) follows that provides the peripheral devices an opportunity to reserve a communication slots during sessions frame (205), followed by a frame (207) for optional TDMA slots in order to accommodate scheduled services. (Mahany, 13:1-22, FIG. 2.)

## IX.    CONCLUSION

*Inter partes* review of claims 6, 7, 9, and 10 of the '290 patent is requested.

Respectfully submitted,
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

/David K.S. Cornwell/

David K.S. Cornwell, Registration No. 31,944
Mark W. Rygiel, Registration No. 45,871
Date: 12/4/2014                Attorneys for Petitioner Apple

- 60 -

## APPENDIX A – EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| **APL 1001** | U.S. Patent No. 6,128,290 to Carvey ("the '290 patent") |
| **APL 1002** | T. J. Barber, Jr., "BodyLAN™: A Low Power Communications System," Master's Thesis at Massachusetts Institute of Technology, 1996 ("Barber") |
| **APL 1003** | U.S. Patent No. 5,241,542 to Natarajan ("Natarajan") |
| **APL 1004** | U.S. Patent No. 4,887,266 to Neve ("Neve") |
| **APL 1005** | Prosecution History of U.S. Application No. 08/949,999 (now U.S. Patent No. 6,128,290) ("the '999 application") |
| **APL 1006** | U.S. Application No. 08/611,695 (as-filed) ("the '695 application") |
| **APL 1007** | Apple's Claim Construction Brief in Case No. 6:13-cv-00919 JDL (EDTX) |
| **APL 1008** | Declaration of Jack D. Grimes, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 6,128,290 ("Grimes Dec.") |
| **APL 1009** | Curriculum Vitae of Jack D. Grimes, Ph.D. ("Grimes CV") |
| **APL 1010** | U.S. Patent No. 5,696,903 to Mahany ("Mahany") |

**CERTIFICATION OF SERVICE (37 C.F.R. §§ 42.6(e), 42.105(a))**

The undersigned hereby certifies that the above-captioned **PETITION**

**FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 6,128,290**, petition-

er's powers of attorney, and all associated exhibits were served in their entireties

on December 4, 2014, on the following parties via FedEx®:

THE CALDWELL FIRM, LLC
PO Box 59655
Dept. SVIPGP
Dallas, TX 75229

*Patent owner's correspondence address of record for U.S. Patent No. 6,128,290*

DSS TECHNOLOGY
MANAGEMENT, INC.
1650 Tyson's Blvd, Suite 1580
Tyson's Corner, VA 22102

*Additional address known to Petitioner as likely to effect service*

THE CALDWELL FIRM, LLC
11680 Harry Hines Boulevard
Dallas, TX 75229

*Additional address known to Petitioner as likely to effect service*

BUETHER JOE & CARPENTER, LLC
1700 Pacific Avenue, Suite 4750
Dallas, TX 75201

*Additional address known to Petitioner as likely to effect service*

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.


/David K.S. Cornwell/


David K.S. Cornwell
Attorney for Petitioner Apple
Registration No. 31,944

Date: December 4, 2014

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

UNITED STATES PATENT AND TRADEMARK OFFICE
———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————————

APPLE, INC.,
Petitioners,

v.

DSS TECHNOLOGY MANAGEMENT, INC.,
Patent Owner.

———————————

Case: IPR2015-00373
U.S. Patent No. 6,128,290

———————————

# PATENT OWNER DSS TECHNOLOGY MANAGEMENT, INC.'S PRELIMINARY RESPONSE PURSUANT TO 37 C.F.R. §42.107

Patent No. 6,128,290
IPR2015-00373

_____

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF RELIEF REQUESTED.......................................................... 2

III.  RELATED IPR PETITION .......................................................................... 2

IV.   OVERVIEW OF THE INVENTION CLAIMED IN THE '290 PATENT ......................... 2

      A.    Summary of the '290 Patent ................................................................ 2

      B.    Priority date of the '290 Patent ........................................................... 5

            1.    The '695 Application satisfies the requirements of Section 112(a) for all
                  limitations of claim 9 of the '290 Patent......................................... 10

V.    CLAIM CONSTRUCTION ......................................................................... 19

      1.    Energized in low duty cycle RF bursts .................................................. 19

VI.   PETITIONER HAS FAILED TO PROVE THAT THERE IS A REASONABLE
      LIKELIHOOD THAT AT LEAST ONE CLAIM OF THE '290 PATENT IS
      UNPATENTABLE ................................................................................... 20

      A.    Ground 1: Barber does not qualify as prior art against the '290 Patent..................... 20

      B.    Ground 2: There is no reasonable likelihood that claims 6, 7, 9, and 10 are obvious
            based on Natarajan in view of Neve ........................................................ 20

            1.    Natarajan does not disclose that the server transmitter is energized in low duty
                  cycle RF bursts................................................................... 21

            2.    Neve teaches away from the server transmitter being energized in low duty
                  cycle RF bursts................................................................... 24

      C.    Ground 3: Petitioner fails to show that claims 6 and 7 are obvious over Mahany ..... 25

VII.  CONCLUSION.................................................................................... 26

i

Patent No. 6,128,290
IPR2015-00373

---

## TABLE OF AUTHORITIES

**Federal Cases**

*Commonwealth Sci. & Indus. Res. Organisation v. Buffalo Tech. (USA), Inc.*,
 542 F.3d 1363, 1380 (Fed. Cir. 2008) ............................................................. 11

*In re Fine*,
 837 F.2d 1071, 1076 (Fed. Cir. 1988) ........................................................ 24, 25

*In re Wright*,
 999 F.2d 1557, 1561 ( Fed. Cir. 1993) ............................................................ 14

*KSR Int'l Co. v. Teleflex Inc.*,
 550 U.S. 398, 418 (2007) ................................................................... 20, 21, 24

*Mintz v. Dietz & Watson, Inc.*,
 679 F. 3d 1372, 1379 (Fed. Cir. 2012) ............................................................ 21

*Northern Telecom, Inc. v. Datapoint Corp.*,
 908 F.2d 931, 941 ( Fed. Cir. 1990) ................................................................ 14

*Ralston Purina Co. v. Far-Mar-Co., Inc.*,
 772 F.2d 1570, 1575 (Fed. Cir. 1985) ............................................................. 11

*Tech. Licensing Corp. v. Videotek, Inc.*,
 545 F.3d 1316, 1331 (Fed. Cir. 2008) ............................................................. 11

*Transco Prods., Inc. v. Performance Contracting, Inc.*,
 38 F.3d 551, 556 (Fed. Cir. 1994) ..................................................................... 6

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*,
 721 F.2d 1540 (Fed. Cir. 1983)) ..................................................................... 23

*Waldemar Link GmbH & Co. v. Osteonics Corp.*,
 32 F.3d 556, 558 (Fed. Cir. 1994) ..................................................................... 6

**Decisions of the Patent Trail and Appeal Board**

ii

Patent No. 6,128,290
IPR2015-00373

*Ex parte Martin Reiffin*,
    2007 WL 2814119 (B.P.A.I. Sep. 25, 2007) .................................................. 6

**Federal Statutes**

35 U.S.C. § 103 ......................................................................................................... 2

35 U.S.C. § 120 ......................................................................................................... 7

35 U.S.C. § 314(a) .................................................................................................... 2

35 U.S.C. § 324(a) .................................................................................................... 2

35 U.S.C. 112(a) ................................................................................................ 7, 14

**Federal Regulations**

37 C.F.R. § 42.100(b) ............................................................................................. 19

37 C.F.R. § 42.108(c) ............................................................................................... 1

37 C.F.R. § 42.20(c) ............................................................................................... 20

37 C.F.R. § 42.207(a) ............................................................................................... 1

37 C.F.R. § 42.208(c) ............................................................................................... 1

37 C.F.R. §42.20(c) ............................................................................................... 20

**Manual of Patent Examining Other Authorities**

MPEP § 2142 .......................................................................................................... 24

iii

Patent No. 6,128,290
IPR2015-00373

---

## **PATENT OWNER'S LIST OF EXHIBITS**

DSS-2001      U.S. Patent No. 5,699,357

DSS-2002      Definition of "*e.g.*," Black's Law Dictionary (9th ed. 2009).

iv

Patent No. 6,128,290
IPR2015-00373

_____

## I.  INTRODUCTION

Pursuant to 37 C.F.R. § 42.207(a), the patent owner, DSS Technology Management, Inc., ("Patent Owner"), hereby submits the following Preliminary Response in response to the Petition for *Inter Partes* Review ("IPR") of U.S. Patent No. 6,128,290 ("the '290 Patent") (APL-1001).

The '290 Patent, entitled "Personal Data Network," issued on October 3, 2000 and has a priority date of March 6, 1996. The '290 Patent contains eleven (11) claims, of which claims 1, 5, 6, 9, and 15 are independent. Petitioner challenges validity of claims 6, 7, 9, and 10. Petitioner advances the following invalidity challenges:

(1) obviousness of claims 9 and 10 under 35 U.S.C. §103 based on a Master's Thesis entitled "BodyLANTM: A Low-Power Communications System" by Thomas J. Barber Jr. ("Barber") (APL-1002);

(2) obviousness of claims 6, 7, 9, and 10 under 35 U.S.C. §103 based on U.S. Patent No. 5,241,542 to Natarajan et al. ("Natarajan") (APL-1003) in view of U.S. Patent No. 4,887,266 to Neve et al. ("Neve") (APL-1004); and

(3) obviousness of claims 6, 7, 9, and 10 under 35 U.S.C. §103 based on U.S. Patent No. 5,696,903 to Mahany ("Mahany") (APL-1010).

To institute an IPR review, Petitioner must satisfy its burden of establishing that there is a reasonable likelihood that at least one of the challenged claims of the '290 Patent is unpatentable. *See* 37 C.F.R. § 42.108(c). "The Director may not authorize an *inter partes* review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least one of the claims challenged in the petition." 35

1

_____

U.S.C. § 314(a). Here, Petitioner failed to meet its burden, and therefore, the Patent Trial and

Appeal Board ("the Board") should deny the Petition in its entirety and decline to institute trial

against claims 6, 7, 9, and 10 of the '290 Patent.

## II.   STATEMENT OF RELIEF REQUESTED

Patent Owner respectfully requests the Board to deny the Petition for an IPR of claims 6,

7, 9, and 10 of the '290 Patent because Petitioner has failed to prove that there is a reasonable

likelihood that the challenged claims are unpatentable under 35 U.S.C. § 103.

## III.   RELATED IPR PETITION

Petitioner filed another IPR petition against claims 1-4 of the '290 Patent in case IPR2015-

00369. The Board's decision in the present case is likely to be highly pertinent to the invalidity

challenges advanced by Petitioner in case IPR2015-00369.

## IV.   OVERVIEW OF THE INVENTION CLAIMED IN THE '290 PATENT

In its summary of the '290 Patent, Petitioner omitted several material elements of the

claimed invention. The following overview provides a brief description of the data network system

disclosed and claimed in the '290 Patent, focusing on the elements Petitioner failed to discuss.

### A.   <u>Summary of the '290 Patent</u>

The '290 Patent discloses and claims a data network system that improves bidirectional

wireless data communications between a server microcomputer unit and a plurality of peripheral

units. *See* APL 1001, '290 Patent at 1:11-14. At the time of invention, two major issues hindered

widespread adoption of wireless data communication systems: (1) short battery life and (2)

2

interference from other wireless data systems operating nearby. *See id*. at Abstract. The '290 Patent advanced the state of the art by ameliorating both problems.

The '290 Patent discloses and claims a wireless data system, in which **both the server and peripheral transmitters** are energized in **low duty cycle RF bursts**. *See id.* at claims 6 and 9. This feature of the claimed invention achieves two important objectives: (1) it reduces power usage for both the server and the peripheral units because the server transmitter is only energized when the server must transmit data; and (2) it reduces likelihood of interference between nearby wireless ensembles because the server transmits signals only during scheduled communications with a peripheral unit. *See id*. at 1:59-61. The specification of the '290 Patent explains that "[i]f during a particular bit period, two RF bursts are being simultaneously received, one from a transmitter in the home ensemble and the other from a foreign ensemble, the receiver will 'capture' only the data received from the stronger of two transmitters." *Id*. at 6:36-40. Accordingly, by claiming a system in which both the server and peripheral transmitters operate in low duty cycle RF bursts, the '290 Patent significantly reduces the number of transmissions outgoing from the server unit, thereby decreasing the likelihood that nearby peripheral units belonging to a foreign ensemble will receive an unintended data signal from the server. *Id*. at 1:59-61.

At the time of filing of the '290 Patent, the accepted convention in wireless data systems technology was for a server transmitter to *continuously* transmit data, regardless of whether any peripheral units were receiving that data. *See, e.g.,* APL 1004, Neve at 4:48-50 (disclosing that the server unit transmits "idle words" when no active data transmission is scheduled). While the server transmitter is outputting a continuous data stream, the peripheral units schedule to wake themselves up at designated times to receive or transmit data and remain powered down at all other

3

Patent No. 6,128,290
IPR2015-00373

---

times. *See, e.g.*, APL 1003, Natarajan at 5:2-4. In such a system, it is only necessary to ensure that

the peripheral receivers are energized at an appropriate time to receive the designated data segment

within the continuous data stream. This scheme is advantageous because it does not require the

server transmitter to be separately energized for each individual transmission to a peripheral unit—

instead, the server must only be energized once to initiate the continuous transmission of the data

stream, and the peripheral units are timed to listen in at appropriate times. If no data has to be

transmitted, the server remains energized and transmits idle signals. *See* APL 1004, Neve at 4:48-

50.

In sharp contrast, the '290 Patent discloses a system in which the server transmitter does

not send a continuous data stream, but instead is energized in RF bursts only when active data

transmission between the server unit and a peripheral unit is scheduled to occur. *See id*. at 1:59-

61. The data network system disclosed in the '290 Patent employs a complex synchronization

scheme to achieve a functioning system in which *both* the server and peripheral transmitters are

energized in low duty cycle RF bursts. See id. at 10:5-11:8. The server unit must initiate a separate

transmission to each unit at the exact time as the peripheral unit's receiver is tuning in to listen.

This scheme introduces complexities to the data network system because the server must be very

closely synchronized with the peripheral units. For this reason, the '290 Patent discloses a complex

synchronization scheme in which the peripheral units are equipped with voltage controlled crystal

oscillators, whose frequency must be aligned with the frequency of the server's oscillator to

establish precise synchronization between the server unit and the peripheral unit. *See id*. at 10:35-

61. The '290 Patent introduces these complexities into a wireless data system to allow both the

4

Patent No. 6,128,290
IPR2015-00373

_____

server and peripheral transmitters to be energized only when an active data transmission must occur and remain powered down at all other times.

In conclusion, the '290 Patent explicitly states that its objectives include "provision of such a data network which requires extremely low power consumption" and "avoids interference from nearby similar systems." *Id*. at 1:39-44. The '290 Patent achieves these objectives by creating a data network system in which, *inter alia*, both "***server and peripheral transmitters [are] energized in low duty cycle RF burst***s." *Id*. at claims 6 and 9 (emphasis added); *see also id*. at 1:59-61 ("The low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals.").

### B.  <u>Priority date of the '290 Patent</u>

The '290 Patent issued from Application No. 08/949,999 ("the '999 application") (APL 1005) filed on October 14, 1997. The '290 Patent claims the benefit of priority from the U.S. Application No. 08/611,695 ("the '695 Application") (APL 1006) on a basis of being continuation-in-part thereof. The '695 Application was filed on March 6, 1996 and issued into the U.S. Patent No. 5,699,357 ("the '357 Patent) (DSS-2001). Challenged claims 6, 7, 9, and 10 are fully supported by the original disclosure of the '695 Application for the reasons provided below, and therefore, are entitled to the priority date of the '695 Application.

Petitioner alleges that claims 9 and 10 recite new matter not disclosed in the '695 Application. *See* Petition at pg. 5. This is not true. Petitioner fails to recognize that the '695 Application discloses and claims a data network system having the exact same structure as the system claimed in the '290 Patent, and therefore, all functional capabilities of the system claimed

5

250 nanoseconds. The 125-nanosecond transit time corresponds to a distance of approximately 37 meters.[3]

Both the '290 Patent and the '695 Application expressly provide that the operable range of the system to enable the protocol is constrained by the distance at which the "accuracy of synchronization is not appreciably affected by transit time delays." A POSA would appreciate that the claimed system, as disclosed identically in both the '290 and '695 Applications, has a maximum operational range that is greater than the non-limiting examples of two meters and twenty meters disclosed in the '695 Application the '290 Patent respectively.

In conclusion, the '695 Application discloses every limitation of claim 1, including the disputed limitation "peripheral units . . . adapted to operate within ***about 20 meters*** of said server unit" in a manner that satisfies the requirements of 35 U.S.C. § 112. Accordingly, the Board should find that claims 9 and 10 of the '290 Patent are entitled to March 6, 1996 priority date of the '695 Application.

## V.   CLAIM CONSTRUCTION

The Board generally interprets the claims of an unexpired patent according to the broadest reasonable interpretation ("BRI") standard. *See* 37 C.F.R. § 42.100(b).

### 1.   *Energized in low duty cycle RF bursts*

Patent Owner proposes that the claim language "***energized in low duty cycle RF bursts***" be given its plain and ordinary meaning. Alternatively, if the Board finds any ambiguity, the

---

[3] The time of flight for the signals is determined by the speed of light in air, which is approximately 1 meter per 3.33 nanoseconds. In 125 nanoseconds, a signal will travel 37.54 meters.

19

Patent No. 6,128,290
IPR2015-00373

_____

specification of the '290 Patent states that "[t]he low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals." APL 1001, '290 Patent at 1:59-61. Accordingly, the limitation "*energized in low duty cycle RF bursts*" should be construed as "*a pulsed operation that substantially reduces power consumption and facilitates the rejection of interfering signals*."

Although Petitioner did not provide an explicit construction for this claim term, both Petitioner and Petitioner's expert stated that a transmitter is energized in *low duty cycle RF bursts* if the transmitter "*consumes power only when it is actively transmitting a message.*" *See* Petition at pg. 39; *see also* APL 1008 at ¶118.

Patent Owner believes that the Board's decision on whether to institute trial will be the same under either construction.

## VI. PETITIONER HAS FAILED TO PROVE THAT THERE IS A REASONABLE LIKELIHOOD THAT AT LEAST ONE CLAIM OF THE '290 PATENT IS UNPATENTABLE

### A.  Ground 1: Barber does not qualify as prior art against the '290 Patent

As established in Part IV.B., *supra*, claims 9 and 10 of the '290 Patent are entitled to March 6, 1996 priority date. Barber did not become publicly available at least until April 11, 1996. For this reason, Barber does not qualify as prior art against claims 9 and 10 of the '290 Patent. Accordingly, the Board should deny Petitioner's invalidity challenge based on this reference.

### B.  Ground 2: There is no reasonable likelihood that claims 6, 7, 9, and 10 are obvious based on Natarajan in view of Neve

20

Patent No. 6,128,290
IPR2015-00373

---

In a trial before the Board, Petitioner "has the burden of proof to establish that it is entitled to the requested relief." *See* 37 C.F.R. §42.20(c). In this case, Petitioner has not met this burden because the combination of the cited prior art references does not disclose all limitations of challenged claim 1.

### 1. <u>Natarajan does not disclose that the server transmitter is energized in low duty cycle RF bursts</u>

It is well established in the United States patent law that challenges on obviousness grounds cannot be sustained by mere conclusory statements. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Instead, "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id*. As the Federal Circuit eloquently stated: "[o]bviousness requires a court to walk a tightrope blindfolded (to avoid hindsight) – an enterprise best pursued with the safety net of objective evidence." *See Mintz v. Dietz & Watson, Inc.*, 679 F. 3d 1372, 1379 (Fed. Cir. 2012).

In its invalidity challenge based on Natarajan in view of Neve, Petitioner ignores a material limitation of claim 1: "***said <u>server</u> and peripheral transmitters being energized in low duty cycle RF bursts***." APL 1001, '290 Patent at claims 6 and 9. Petitioner profusely quotes disclosures of Natarajan and Neve teaching that the transmitters of the ***<u>peripheral units</u>*** (*i.e.* mobile units, portable units, slave stations) are energized only when they are actively transmitting data. *See* Petition at pg. 39. Petitioner, however, does not provide any objective evidence that could reasonably lead to a conclusion that these references also disclose that the transmitter of the ***<u>server</u> <u>unit</u>*** (*i.e.* base, hub, master) is energized in low duty cycle RF bursts.

21

Patent No. 6,128,290
IPR2015-00373

_____

Petitioner's argument with respect to "energized in low duty cycle RF bursts" limitation is reproduced below in its entirety with emphasis added to illustrate that Petitioner only discusses the operation of peripheral units, and completely ignores that claims 6 and 9 require that ***server transmitters*** be also energized in low duty cycle RF bursts:

> Natarajan discloses that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units ***at the portable units*** (i.e., by scheduling when they should be turned ON or OFF)…the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." (Natarajan, 3:66-4:6.) This constitutes "low duty cycle RF bursts." (Grimes Dec. ¶ 118.) Natarajan also discloses a period "for the transfer of all ***bursty*** data traffic in a contention mode ***from mobile units*** to base station (inbound traffic), with a header CH." (Natarajan, 4:36-38 (emphasis added).) Neve also discloses a "low power duty cycle." (Neve, 5:60-61.) "The ***slave stations*** operate in a low power condition except during one of the other time slots when they may receive their own address, or except when they need to transmit data" (*id.* at Abstract) and the interface circuit of each device is "arranged to energise the transmitter circuit only when transmission is required" (*id.* at 2:42-47). Thus, Natarajan and Neve each disclose that ***the transmitters*** are "energized in low duty cycle RF bursts." (Grimes Dec. ¶ 118.)

Petition at pg. 39-40 (emphasis added).

Based on this analysis of Natarajan and Neve, Petitioner concludes that "Natarajan and Neve each disclose that ***the transmitters*** are 'energized in low duty cycle RF bursts.'" *Id.* (emphasis added). Petitioner, therefore, completely ignores the fact that claims 6 and 9 do not merely recite "***transmitters***," but rather, they explicitly require "said ***server and*** peripheral ***transmitters being energized in low duty cycle RF bursts.***" APL 1001, '290 Patent at claims 6 and 9. Petitioner provides no objective evidence and no reasoning that could reasonably establish that Natarajan and Neve teach or suggest this limitation of claims 6 and 9.

22

Petitioner contends that to satisfy the "low duty cycle" limitation, the transmitter must be powered ON only during data transfer and powered OFF at all other times. *See* Petition at pg. 39; *see also* APL 1008, Grimes Dec. at ¶118. Natarajan and Neve <u>do not</u> disclose that the ***server transmitter*** operates in such a way.

Natarajan discloses in detail the scheduling plan according to which "[e]ach receiving ***mobile unit*** goes to sleep after scheduling to wake itself up at its designated time for receiving data. After receiving its packets, the mobile unit goes to sleep for the remainder of period A." APL 1003, Natarajan at 5:2-6. Natarajan, however, states nothing about the ***server*** transmitter turning itself OFF and scheduling to wake up at an appropriate time to transmit data to a designated mobile unit. In fact, when Natarajan calculates the power savings achieved by its system, Natarajan only takes into account the power savings associated with the mobile unit operating in low duty cycle. *See id*. at 7:22-58. Natarajan neither teaches nor suggests that the operation of the server unit provides any power savings, thereby further buttressing a conclusion that, unlike the mobile units, the *server transmitter <u>does not</u> operate in low duty cycle RF bursts*.

Neve does not cure deficiencies of Natarajan and, in fact, teaches away from the limitation of claims 6 and 9 requiring the ***server*** transmitter to be energized in low duty cycle RF bursts. *See* Part VI.B.2, *infra*. Neve teaches that a server transmits a continuous data stream, and "[i]f no data is currently required to be transmitted, ***the master station transmits <u>idle words</u>***." *See* APL 1004, Neve at 4:48-50 (emphasis added). Therefore, even under Petitioner's interpretation of the terms "energized in low duty cycle RF bursts," Natarajan in view of Neve fails to teach or suggest that the transmitter of the ***server unit*** is energized in low duty cycle RF bursts.

Patent No. 6,128,290
IPR2015-00373

_____

For the reasons set forth above, the Petition lacks any reasoning or objective evidence that could reasonably establish that Natarajan and Neve teach or suggest that "said ***server*** and peripheral ***transmitters are energized in low duty cycle RF bursts.***"

### 2.    Neve teaches away from the server transmitter being energized in low duty cycle RF bursts

It is axiomatic that "[a] prior art reference must be considered in its entirety, i.e., as a whole, including portions that would lead away from the claimed invention." *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983)). Neve explicitly discloses that the server unit remains energized even when it is not actively transmitting any data to the peripheral units. *See* APL 1004, Neve at 4:48-50. ("If no data is currently required to be transmitted, ***the master station transmits idle words***.") (emphasis added). Neve explains that "***the master station*** has to allocate the various virtual circuits to the time slots in a manner avoiding interference between the data paths whilst utilizing the available time slots efficiently. An ***idle word is transmitted if no other transmission is needed***." *See id.* at 7:14-19. Accordingly, Neve discloses a server transmitter that is constantly ON, even when no active data transfer is scheduled between the server unit and a peripheral unit. For this reason, Neve not only lacks disclosure of "said ***server*** and peripheral ***transmitter being energized in low duty cycle RF bursts***," but in fact, <u>teaches away</u> from this limitation of claims 6 and 9.

For the reasons set forth above, Natarajan in view of Neve does not render claims 6 and 9 obvious. Claims 7 and 10 are, therefore, nonobvious as a matter of law. *See In re Fine*, 837 F.2d

1071, 1076 (Fed. Cir. 1988). Accordingly, the Board should deny Petitioner's invalidity challenge based on obviousness over Natarajan in view of Neve in its entirety.

## C. **Ground 3: Petitioner fails to show that claims 6 and 7 are obvious over Mahany**

Petitioner fails to establish that claims 6 and 7 are obvious over Mahany. "The key to supporting any [challenge] under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious." MPEP § 2142. Challenges on obviousness grounds cannot be sustained by mere conclusory statements. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). "[T]here must be some **articulated reasoning** with some **rational underpinning** to support the legal conclusion of obviousness." *Id*. (emphasis added).

Petitioner's challenge of claim 6 based on Mahany does not satisfy the legal standard for obviousness the U.S. Supreme Court established in *KSR Int'l Co. v. Teleflex Inc.* In Part VIII.C.2(g) of the Petition, Petitioner concludes that Mahany discloses the limitation of claim 6 requiring that "***said server and peripheral transmitters are energized in low duty cycle***." *See* Petition at pg. 59-60. Petitioner provides <u>no reasoning</u> in support of this conclusion and, instead, quotes a single sentence of Mahany: "***[a] sleeping device*** with no transmission requirements may sleep for eight 20 ms access intervals, and wake only for the SYNC and Reservation Poll…to monitor pending messages before returning to the sleep state, for a duty cycle of less than 5%." *See* Petition at pg. 59 (quoting Mahany at 35:48-52) (emphasis added). Petitioner does not articulate any reasoning as to why this sentence, which discloses a single sleeping device, establishes that Mahany teaches that both the ***server <u>and</u> peripheral transmitters*** *are energized in low duty cycles*. Accordingly,

25

Patent No. 6,128,290
IPR2015-00373

---

Petitioner's challenge with respect to this limitation lacks rational underpinning and fails to establish that Mahany renders claim 6 obvious.

For the reasons set forth above, the Board should deny Petitioner's challenge of claim 6 based on obviousness over Mahany. Claim 7 depends from claim 6 and, therefore, is also nonobvious. *See In re Fine*, 837 F.2d at 1076.

### VII. CONCLUSION

For the reasons set forth above, Petitioner failed to show that there is a reasonable likelihood that Petitioner would prevail in an IPR trial with respect to a single claim of the '290 Patent based on the three challenges advanced in the Petition. Accordingly, the Board should deny the Petition in its entirety and decline to institute the IPR trial of the '290 Patent.

Date: March 30, 2015                                         Respectfully submitted,


                                                             /andriy lytvyn/_____

                                                             Andriy Lytvyn
                                                             Lead Counsel for Patent Owner
                                                             Registration No. 65,166



**SMITH & HOPEN, PA**

180 Pine Avenue North
Oldsmar, FL 34677
Tel: 813-925-8505
Fax: 800-726-1491
Email: andriy.lytvyn@smithhopen.com

Patent No. 6,128,290
IPR2015-00373

---

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, in accordance with 37 C.F.R. § 42.6(e), the above

Preliminary Response of the Patent Owner and a copy of the Exhibits were served via electronic

mail on March 30, 2015, in their entirety upon the following:


David K.S. Cornwell, Lead Counsel for Petitioner
davidc-PTAB@skgf.com

Mark W. Rygiel, Back-Up Counsel for Petitioner
mrygiel-PTAB@skgf.com



Date: March 30, 2015                              /andriy lytvyn/_____
                                                  Andriy Lytvyn
                                                  Lead Counsel for Patent Owner
                                                  Registration No. 65,166

                                                  **SMITH & HOPEN, P.A.**
                                                  180 Pine Avenue North
                                                  Oldsmar, FL 34677
                                                  (813) 925-8505

27

Trials@uspto.gov
571-272-7822

Paper No. 8
Entered:  June 25, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

APPLE INC.,
Petitioner,

v.

DSS TECHNOLOGY MANAGEMENT, INC.,
Patent Owner.
————————

Case IPR2015-00373
Patent 6,128,290
————————

Before JAMESON LEE, MATTHEW R. CLEMENTS, and
CHARLES J. BOUDREAU, *Administrative Patent Judges*.

BOUDREAU, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2015-00373
Patent 6,128,290

## I. INTRODUCTION

On December 4, 2014, Petitioner Apple Inc. ("Apple") filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 6, 7, 9, and 10 of U.S. Patent No. 6,128,290 (Ex. 1001, "the '290 patent"). On March 30, 2015, Patent Owner DSS Technology Management, Inc. ("DSS") timely filed a Preliminary Response (Paper 7, "Prelim. Resp."). We have jurisdiction under 35 U.S.C. § 314, which provides that *inter partes* review may not be instituted "unless . . . there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Upon consideration of the Petition, Preliminary Response, and the proffered evidence, we conclude that Apple has established a reasonable likelihood that it would prevail in challenging the patentability of claims 6, 7, 9, and 10 of the '290 patent under 35 U.S.C. § 103(a) on certain of the grounds presented. Accordingly, we institute *inter partes* review of those claims.

### A. *Related Matters*

The parties inform us that the '290 patent is the subject of two district court actions: *DSS Technology Management, Inc. v. Apple, Inc.*, No. 5:14-cv-05330-LHK (N.D. Cal.), and *DSS Technology Management, Inc. v. Lenovo (United States), Inc.*, No. 6:14-cv-00525-JDL (E.D. Tex.). Pet. 2; Paper 5, 2. Additionally, claims 1–4 of the '290 patent are the subject of a concurrently filed petition for *inter partes* review, IPR2015-00369.

### B. *The '290 Patent (Ex. 1001)*

The '290 patent, titled "Personal Data Network," issued October 3, 2000, from U.S. Patent Application No. 08/949,999 (Ex. 1005, 22–62, "the '999 application"). The '999 application was filed October 14, 1997, as a

2

IPR2015-00373
Patent 6,128,290

continuation-in-part ("CIP") of U.S. Patent Application No. 08/611,695 (Ex. 1006, 21–61, "the '695 application"), filed March 6, 1996, which matured into U.S. Patent No. 5,699,357 (Ex. 2001, "the '357 patent"). *See* Ex. 1001, col. 1, ll. 6–8.

The '290 patent relates to a data network for bidirectional wireless data communications between a host or server microcomputer unit and a plurality of peripheral units referred to as personal electronic accessories (PEAs). Ex. 1001, col. 1, ll. 11–14, col. 2, ll. 15–18. Among the objects of the invention is the provision of a data network that requires extremely low power consumption, "particularly for the peripheral units," avoids interference from nearby similar systems, and is of relatively simple and inexpensive construction. *Id.* at col. 1, ll. 33–34, 39–45. Figure 1 of the '290 patent, reproduced below, is illustrative of the described wireless data network system.



FIG. 1

Figure 1 is a block diagram of a wireless data network system linking a server microcomputer, referred to as "personal digital assistant (PDA) 11,"

3

IPR2015-00373
Patent 6,128,290

with a plurality of peripheral units, or PEAs, 21–29. *Id.* at col. 2, ll. 42–44, col. 2, l. 66–col. 3, l. 15.

According to the '290 patent, "the server microcomputer unit and the several peripheral units which are to be linked are all in close physical proximity, e.g., within twenty meters, to establish, with very high accuracy, a common time base or synchronization." *Id.* at col. 1, ll. 50–54. "Using the common time base, code sequences are generated which control the operation of the several transmitters in a low duty cycle pulsed mode of operation." *Id.* at col. 1, ll. 57–59. "The server and peripheral unit transmitters are energized in low duty cycle pulses at intervals which are determined by a code sequence which is timed in relation to the synchronizing information initially transmitted from the server microcomputer." *Id.* at col. 2, ll. 35–39. "The low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals." *Id.* at col. 1, ll. 59–61. "In the intervals between slots in which a PEA is to transmit or receive, all receive and transmit circuits are powered down." *Id.* at col. 4, ll. 6–8.

## C. *Illustrative Claims*

As noted above, Apple challenges claims 6, 7, 9, and 10 of the '290 patent. Claims 6 and 9, the independent claims challenged, are reproduced below. Challenged claims 7 and 10 depend from claims 6 and 9, respectively.

4

IPR2015-00373
Patent 6,128,290

6. A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:

a server microcomputer unit, said server unit including an oscillator for establishing a time base;

a plurality of peripheral units which are battery powered and portable and which provide either input information from the user or output information to the user;

said server microcomputer incorporating an RF transmitter controlled by said oscillator for sending commands and synchronizing information to said peripheral units;

said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also a local oscillator which can be synchronized to said server unit oscillator using said synchronizing information and an RF transmitter controlled by said local oscillator for sending input information from the user to said server microcomputer;

said server microcomputer including a receiver controlled by said server unit oscillator for receiving input information transmitted from said peripheral units;

said server and peripheral transmitters being energized in low duty cycle RF bursts which are timed in relation to said synchronizing information.

9. A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:

a server microcomputer unit, said server unit including an oscillator for establishing a time base;

a plurality of peripheral units which provide either input information from the user or output information to the user, and which are adapted to operate within about 20 meters of said server unit;

said server microcomputer incorporating an RF transmitter controlled by said oscillator for sending commands and synchronizing information to said peripheral units, said synchronizing information being carried by time spaced beacons characteristic of the particular server unit;

said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also a local

5

IPR2015-00373
Patent 6,128,290

oscillator, each of said peripheral units being operative in a first mode to receive said beacons independently of synchronization of the respective local oscillator when that peripheral unit is in close proximity to said server unit and to determine from the server unit its characteristics, each of said peripheral units being operative in a second mode to synchronize the respective local oscillator with the server unit oscillator, each of said peripheral units also including an RF transmitter operative in a third mode for sending input information from the user to said server microcomputer,

said server microcomputer including a receiver for receiving input information transmitted from said peripheral units;

said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals with said receivers being controlled by the respective oscillators.

Ex. 1001, col. 12, l. 59–col. 13, l. 16, col. 13, l. 25–col. 14, l. 10.

### D.  Evidence of Record

Apple relies on the following references, as well as the Declaration of Jack D. Grimes, Ph.D. (Ex. 1008):

| Reference | Exhibit |
|---|---|
| Thomas J. Barber Jr., BODYLAN™: A LOW-POWER COMMUNICATION SYSTEM (M.S. thesis, Massachusetts Institute of Technology) ("Barber") | 1002 |
| Natarajan (U.S. Patent No. 5,241,542; issued Aug. 31, 1993) | 1003 |
| Neve (U.S. Patent No. 4,887,266; issued Dec. 12, 1989) | 1004 |

6

### E.  Asserted Grounds of Unpatentability

Apple challenges the patentability of the challenged claims on the following three grounds:

| Reference(s) | Basis | Claims Challenged |
|---|---|---|
| Barber | § 103(a) | 9, 10 |
| Natarajan and Neve | § 103(a) | 6, 7, 9, 10 |
| Mahany | § 103(a) | 6, 7 |

## II. DISCUSSION

### A.  Claim Interpretation

In *inter partes* review proceedings, claims of an unexpired patent are given their broadest reasonable interpretation in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012); *see In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1278–82 (Fed. Cir. 2015). Under this standard, we interpret claim terms using "the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the applicant's specification."  *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997).  We presume that claim terms have their ordinary and customary meaning.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question." (internal quotation marks omitted).  A patentee,

7

IPR2015-00373
Patent 6,128,290

however, may rebut this presumption by acting as his own lexicographer, providing a definition of the term in the specification with "reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Apple asks us to construe the phrase "local oscillator" recited in claims 6 and 9. Pet. 6–8. DSS asks us to construe "energized in low duty cycle RF bursts," also recited in claims 6 and 9. Prelim. Resp. 19–20.

*(1) "local oscillator"*

Claim 6 and 9 each recite peripheral units "including an RF receiver for detecting [] commands and synchronizing information and including also a local oscillator" that can be synchronized with a server unit oscillator. In claim 6, the peripheral units also include an RF transmitter "controlled by said local oscillator." We have considered Apple's arguments that "local oscillator" is a term of art, that the term's usage in portions of the Specification is consistent with its commonly understood meaning, and that the term's usage in the claims is "at odds with" those portions of the Specification (see Pet. 6–8), but conclude that the word "local" appears to be used in claims 6 and 9 only as an adjective to designate the location of the recited oscillator. Notably, Apple does not propose any specific construction for "local oscillator" in the Petition. Nor does Apple point to any special definition set forth in the Specification for "local oscillator" that is inconsistent with or otherwise contrary to the plain meaning of "local." We, therefore, see no need for any express construction of "local oscillator."

*(2) "energized in low duty cycle RF bursts"*

DSS proposes that the phrase "energized in low duty cycle RF bursts" be given its plain and ordinary meaning, or alternatively, in the event of any

8

IPR2015-00373
Patent 6,128,290

ambiguity, that it should be construed as "a pulsed operation that substantially reduces power consumption and facilitates the rejection of interfering signals." Prelim. Resp. 20 (boldface and italics omitted).

We conclude that it is not necessary for our determination of whether to institute *inter partes* review of claims 6, 7, 9, and 10 of the '290 patent to construe expressly the phrase "energized in low duty cycle RF bursts." Only those terms which are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999).

### B. Obviousness of Claims 9 and 10 over Barber

Apple contends that claims 9 and 10 of the '290 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Barber, which Apple asserts was published "at least as early as April 11, 1996." Pet. 9, 11, 13–24. According to Apple, claims 9 and 10 recite features first disclosed in the '999 application, and accordingly, are entitled only to the benefit of the '999 application's October 14, 1997 filing date, rather than the March 6, 1996 filing date of the '695 parent application. *Id.* at 5. Because April 11, 1996, was more than one year prior to October 14, 1997, Apple asserts that Barber is prior art under at least 35 U.S.C. § 102(b). *Id.* at 9. DSS counters that claims 9 and 10 are fully supported by the original disclosure of the '695 application and are, therefore, entitled to the benefit of the March 6, 1996 filing date of the '695 application. Prelim. Resp. 5.

For the reasons explained below, we are not persuaded that Apple has established a reasonable likelihood that it would prevail on this ground with respect to each of claims 9 and 10, regardless of whether claims 9 and 10 are

IPR2015-00373
Patent 6,128,290

entitled to the '695 application's March 6, 1996 filing date or only to the '999 patent's October 14, 1997 filing date.

As the Board has previously explained, to qualify as a printed publication within the meaning of § 102, "a reference 'must have been sufficiently accessible to the public interested in the art' before the critical date." *Actavis, Inc. v. Research Corp. Techs., Inc.*, Case IPR2014-01126, slip op. at 9 (PTAB Jan. 9, 2015) (Paper 22) (quoting *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989). Whether a reference is publicly accessible is determined on a case-by-case basis, based on the "facts and circumstances surrounding the reference's disclosure to members of the public." *In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009). A reference is considered publicly accessible if it was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it. *Id.* Having reviewed Apple's arguments and proffered evidence, we determine that Apple has not satisfied its burden to prove that Barber qualifies as prior art.

Apple merely asserts, without any citation of evidence, that Barber "was published at least as early as April 11, 1996." Pet. 9. Apple's expert, Dr. Grimes, likewise asserts, without citing any additional evidence, that Barber was "submitted January 30, 1996, [and] archived in Massachusetts Institute of Technology Libraries April 11, 1996" (Ex. 1008, 6).

We acknowledge that the cover page of Barber includes a stamp reading "ARCHIVES MASSACHUSETTS INSTITUTE OF TECHNOLOGY APR 11 1996 LIBRARIES." Ex. 1002, 1. That stamped date, however, would appear to be a hearsay statement to the extent that it would be offered for its truth (*see* Fed. R. Evid. 801). Further, even if Apple

10

IPR2015-00373
Patent 6,128,290

could establish either that the statement is excluded from hearsay or that an exception to the rule against hearsay should apply, such that we would admit the stamped date as evidence of when the thesis was archived, the stamp does not establish when, if ever, the thesis became publicly accessible.

We must decide whether to institute a trial based on "the information presented in the petition" (35 U.S.C. § 314(a)). In this case, Apple has not identified sufficient evidence on the record before us to qualify Barber as prior art. Apple has submitted no evidence, for example, to establish that the thesis was indexed, cataloged, and shelved in the university library prior to the filing of the '999 application. *See Cronyn*, 890 F.2d at 1161; *cf. In re Hall*, 781 F.2d 897 (Fed. Cir. 1986). We conclude, therefore, that Apple has not demonstrated a reasonable likelihood that it would prevail at trial in challenging claims 9 and 10 of the '290 patent under 35 U.S.C. § 103(a) over Barber. Because our conclusion does not turn on whether claims 9 and 10 are entitled to the priority date of the '695 application or only that of the '999 application, we further conclude that it is not necessary for our determination of whether to institute *inter partes* review of claims 9 and 10 of the '290 patent to decide that issue.

*C. Obviousness of Claims 6, 7, 9, and 10 over Natarajan and Neve*

Apple contends that claims 6, 7, 9, and 10 of the '290 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Natarajan and Neve. Pet. 24, 30–51. We are persuaded that Apple has established a reasonable likelihood that it would prevail on this ground with respect to each of claims 6, 7, 9, and 10, for the reasons explained below.

11

IPR2015-00373
Patent 6,128,290

*(1) Natarajan*

Natarajan is directed to power conservation in wireless communication, particularly battery efficient operation of wireless link adapters of mobile computers (also referred to, inter alia, as battery powered computers, hand held or laptop computers, mobile units, and mobile stations) as controlled by multiaccess protocols used in wireless communication. Ex. 1003, col. 1, ll. 7–13, col. 2, l. 32, Abst. Figure 2 of Natarajan is reproduced below.



Figure 2 is a block diagram of a digital data communication system of the type in which Natarajan's invention is implemented, illustrating the basic components of a mobile station and a base station. *Id.* at col. 1, l. 67–col. 2, l. 3. As depicted in Figure 2, mobile stations 10, 12, 14, and 16 communicate with gateways (i.e., base stations 26, 28) connected with server 18, via wireless transceivers adapters 36, 44. *Id.* at col. 2, ll. 32–39, 51–52, 58–59, 65–67. According to Natarajan:

12

IPR2015-00373
Patent 6,128,290

> The scheduled access multiaccess protocol is implemented to
> effectively conserve battery power by suitable control of the
> state of the controller, the transmitter and receiver units at the
> wireless link adapter by scheduling when the adapter is in a
> normal running mode, or a standby mode in which power is
> conserved.

*Id.*, Abst; *see also id.* at col. 3, l. 66–col. 4, l. 1.

Natarajan discloses that "[a] desirable solution is one in which the
transmitter (or receiver) consumes power only when it is actively
transmitting a message (or actively receiving a message)." *Id.* at 4:3–6.
Natarajan further discloses that the scheduled multiaccess protocol divides
time into "fixed-length frames, and frames are divided into slots." *Id.* at
col. 4, ll. 20–23. The frames are divided into subframes for transmission of
data from the base station to mobile units (outbound traffic) as well as
transmission of data from mobile units to the base station (inbound traffic).
*Id.* at col. 4, ll. 27–38. According to Natarajan, at least one slot is assigned
to each mobile computer designated to communicate with the base station.
*Id.* at col. 10, ll. 26–29. The battery power of the wireless link adapter for a
given mobile computer is turned on to full power during the at least one
assigned slot, and the battery power of the wireless link adapter is
substantially reduced during the remaining time slots. *Id.* at col. 10, ll. 29–
37.

With respect to outbound traffic, Natarajan discloses that the base
station broadcasts a header that includes a list of mobile users that will be
receiving data packets from the base station in the current frame, the order in
which the mobile users will receive the data packets, and the bandwidth
allocated to each user. *Id.* at col. 4, ll. 45–53. According to Natarajan, a
mobile unit that is not included in the header from the base station can turn

13

IPR2015-00373
Patent 6,128,290

its receiver "OFF" for the duration of the current subframe. *Id.* at col. 4, ll. 64–67. Additionally, the adapter of each receiving mobile unit can compute exactly when it should be ready to receive packets from the base station by adding up the slots allocated to all receiving units that precede it, power "ON" during that time slot to receive its data, and go back to sleep for the remainder of the subframe. *Id.* at col. 4, l. 67–col. 5, l. 6.

For inbound traffic, Natarajan similarly discloses that the base station broadcasts a header that includes an ordered list of users that will be allowed to transmit packets to the base station in the current frame and the bandwidth allocated to each. *Id.* at col. 5, ll. 9–19. Using the information regarding the number of packets that each user can transmit, each mobile unit can compute exactly when it should begin its transmission. *Id.* at col. 5, ll. 20–22. Once each mobile station computes its exact time for transmission, it can shut both its transmitter and receiver "OFF" until the designated time, and then turn "ON" and transmit for a fixed period of time whose duration depends on the number of slots allocated to it. *Id.* at col. 5, ll. 23–29.

*(2) Neve*

Neve is directed to a communication system able to provide multiple path communication between a plurality of stations operating on a single channel. Ex. 1004, Abst. Neve discloses that one station, which is physically similar to the others but operates a different stored program, may be designated the "master" station and provides synchronization signals for all of the other stations (referred to as "slave stations") and controls access of the stations to the single radio channel. *Id.* at 4:10–15.

According to Neve, the stations are synchronized and a cyclically repeating series of time slots is defined. *Id.* at Abst. One time slot in each

14

IPR2015-00373
Patent 6,128,290

cycle is reserved for the transmission of synchronization information by the master station for reception by the slave stations and for maintaining synchronization therein. *Id.* Another time slot is reserved for any slave station to transmit a message indicating that it needs to communicate to another station, such indication preferably being by transmitting its own pre-assigned address code. *Id.* The remaining time slots are used for transmitting address information and data. *Id.*

Neve discloses that when data transfer is not taking place, the described devices can enter a lower power consumption state. *Id.* at col. 2, ll. 13–16. The system is designed automatically to re-enter the data transfer condition when either a signal is received from the device indicative of the need to transmit data or a predetermined code signal is received by the receiver circuit indicative of the need to receive data. *Id.* at col. 2, ll. 19–24. Neve discloses that the receiver has very low power consumption because only the internal timing circuitry is energized continuously, whereas the rest of the receiving circuit is energized only when its assigned time slot occurs. *Id.* at col. 2, ll. 39–41. More particularly, the receiver circuit includes a low power timing circuit that operates to energize the rest of the receiver circuit only for the time slot in which its address may occur and for the synchronization time slot, thereby enabling it to maintain synchronization with low power consumption. *Id.* at col. 4, ll. 43–48. Neve similarly discloses that the interface circuit is arranged to energize the transmitter circuit only when transmission is required. *Id.* at col. 2, ll. 45–47.

*(3) Analysis*

Apple contends that Natarajan discloses all limitations of claims 6, 7, 9, and 10, with the exception of explicit disclosure of the server unit sending

15

IPR2015-00373
Patent 6,128,290

"synchronizing information" to the mobile units, as recited in claims 6 and 9, and "said synchronizing information being carried by time spaced beacons," as recited in claim 9. Pet. 30–51. Apple further contends that Neve discloses those elements not disclosed explicitly by Natarajan. *Id.* Upon review of the Petition, we are persuaded that Apple has shown a reasonable likelihood that it would prevail in establishing the unpatentability of claims 6, 7, 9, and 10 on this ground.

DSS makes two principal arguments regarding Natarajan and Neve in the Preliminary Response. First, DSS argues that Natarajan does not disclose that the server transmitter is energized in low duty cycle RF bursts. Prelim. Resp. 21. According to DSS, Apple "profusely quotes disclosures of Natarajan and Neve teaching that the transmitters of the ***peripheral units*** (*i.e.* mobile units, portable units, slave stations) are energized only when they are actively transmitting data," but "does not provide any objective evidence that could reasonably lead to a conclusion that these references also disclose that the transmitter of the ***server unit*** (*i.e.* base, hub, master) is energized in low duty cycle RF bursts." *Id.* DSS contends that "Natarajan . . . says nothing about the ***server*** transmitter turning itself OFF and scheduling to wake up at an appropriate time to transmit data to a designated mobile unit" and that "Natarajan neither teaches nor suggests that the operation of the server unit provides any power savings." *Id.* at 23.

Based on the record before us, we are persuaded that the disclosure of Natarajan pertaining to a scheduled multi-access protocol in which time is divided into fixed-length frames, along with Natarajan's description of frames being divided into slots and multiple subframes, is sufficient to demonstrate a reasonable likelihood that Natarajan discloses "said server and

16

IPR2015-00373
Patent 6,128,290

peripheral transmitters being energized in low duty cycle RF bursts," as recited in claims 6 and 9.  Claims 6, 7, 9, and 10 do not recite any requirements that the server transmitter must turn itself OFF and schedule to wake up at an appropriate time to transmit data to a designated mobile unit or that the operation of the server unit must provide any "power savings"; nor is such required by the plain and ordinary meaning of the claim phrase "energized in low duty cycle RF bursts."  Regardless, by disclosing, for example, that "a scheduled multi-access protocol is used in which time is divided into fixed-length frames" and that "frame[s] [are] divided into multiple subframes," including different periods for broadcast of packets from base station to mobile units (outbound traffic) and for transfer of traffic from mobile units to base station (inbound traffic) (*see, e.g.*, Ex. 1003, col. 4, ll. 20–22, 28–38), we are persuaded for purposes of this Decision that Natarajan conveys that both the receivers and the transmitters in the base station, as well as in the mobile units, are energized only in low duty cycle RF bursts.

Second, DSS argues that Neve teaches away from the server transmitter being energized in low duty cycle RF bursts.  Prelim. Resp. 24.  According to DSS, "Neve explicitly discloses that the server unit remains energized even when it is not actively transmitting any data to the peripheral units" and "[f]or this reason, Neve not only lacks disclosure of 'said ***server*** and peripheral ***transmitter*** [sic] ***being energized in low duty cycle RF bursts***,' but in fact, <u>teaches away</u> from this limitation of claims 6 and 9."  *Id.*  In support of that contention, DSS cites portions of Neve stating "[i]f no data is currently required to be transmitted, ***the master station transmits <u>idle</u>***

17

IPR2015-00373
Patent 6,128,290

_**words**_" and "[a]n _**idle word is transmitted if no other transmission is needed**_." _Id._ (quoting Neve 4:48–50, 7:17–19 (emphasis added by DSS)).

Based on the record before us, we are not persuaded that Neve teaches away from the server transmitter being energized in low duty cycle RF bursts. When the sentences quoted by DSS are read in the context of the full disclosure of Neve, those sentences do not suggest continuous transmission from the master station, but instead transmission of idle words in the event that there is no data required to be transmitted in the time slots specifically allocated for transmission by the server. Neve explicitly discloses that the described synchronous communication system, which includes "one station designated the master station," "allows stations to remain in an inactive condition when they are not communicating." Ex. 1004, col. 3, ll. 9–20. Neve also discloses that the master station performs different functions during different time slots, only certain of which involve transmission:

> After the master station is powered up it scans its table of time slot allocations. . . . If the time slot is a synchronisation time slot the synchronisation word is transmitted. _If it is an interrupt time slot the master station receives_. If a valid address is received this is entered into the table of active slave stations requiring communication. _During the other time slots either a housekeeping operation is performed_ as previously described or the master station takes part in a communication operation _or the master station monitors the channel_ if the time slot has been allocated to communication between two slave stations. If the time slot is unassigned the idle word is transmitted.

Ex. 1004, col. 7, ll. 27–42 (emphases added).

Because, on this record, Apple has identified sufficient evidence to support its contention that the combination of Natarajan and Neve would have rendered obvious the subject matter of claims 6, 7, 9, and 10 of the

18

IPR2015-00373
Patent 6,128,290

'290 patent, we conclude that Apple has established a reasonable likelihood that it would prevail at trial in challenging those claims under 35 U.S.C. § 103(a) over the combination of Natarajan and Neve.

### D. Obviousness of Claims 6 and 7 over Mahany

Apple contends that claims 6 and 7 of the '290 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Mahany. Pet. 51–60. We are persuaded that Apple has established a reasonable likelihood that it would prevail on this ground with respect to each of claims 6 and 7, for the reasons explained below.

### (1) Mahany

Mahany is directed to a "hierarchical communication system . . . in which two wireless local area networks exhibiting substantially different characteristics are employed to link inherently portable or mobile computer devices." Ex. 1010, Abst. As explained by Apple, Mahany discloses that one of the local area networks "allows for radio communication between a portable computer device and peripheral devices with built-in transceivers utilized by the portable computer device" where communication is "controlled by a reservation access communication protocol." *Id.* The devices have a "voltage controlled oscillator (VCO)" that is "stabilized by connecting it in a phase locked loop to a narrowband reference, such as a crystal reference oscillator." *Id.* at col. 55, ll. 11–17. The crystal reference oscillator outputs a signal of a fixed or reference frequency $F_{REF}$, and if the output of the VCO begins to drift out of phase of the reference frequency, a "phase detector" provides a corrective output to adjust the center frequency of the VCO back into phase. *Id.* at col. 55, ll. 17–33. Mahany also describes "Access Intervals," each having a "SYNC header" generated by a base

19

IPR2015-00373
Patent 6,128,290

device and "[a] timing character for synchronization of device local clocks to the NET clock contained within the Control Point device," that are used to synchronize communications between the mobile computing devices and peripheral devices. *Id.* at col. 15, ll. 55–67, col. 40, ll. 26–28.

*(2) Analysis*

Apple presents its positions on why Mahany renders obvious each of claims 6 and 7, at pages 52–60 of the Petition. Focusing specifically on the words "said server and peripheral transmitters are energized in low duty cycle" recited in claim 6, DSS contends that Apple's challenge based on Mahany does not satisfy the legal standard for obviousness established in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). Prelim. Resp. 25. DSS argues that Apple provides no reasoning in support its conclusion that Mahany discloses the recited limitation. Instead, according to DSS, Apple:

> quotes a single sentence of Mahany: "***[a] sleeping device*** with no transmission requirements may sleep for eight 20 ms access intervals, and wake only for the SYNC and Reservation Poll . . . to monitor pending messages before returning to the sleep state, for a duty cycle of less than 5%" [and] does not articulate any reasoning as to why this sentence, which discloses a single sleeping device, establishes that Mahany teaches that both the ***server and peripheral transmitters*** are energized in low duty cycles.

*Id.* (citing Pet. 59 (quoting Ex. 1010, col. 35, ll. 48–52)) (emphases added by DSS). DSS concludes Apple's challenge with respect to this limitation "lacks rational underpinning and fails to establish that Mahany renders claim 6 obvious." *Id.* at 26.

Notwithstanding DSS's contentions, we are persuaded that Apple has shown a reasonable likelihood that it would prevail on this ground with

IPR2015-00373
Patent 6,128,290

respect to claims 6 and 7. DSS has truncated the final clause of claim 6 following the adjective phrase "low duty cycle." That clause reads in full, "said server and peripheral transmitters being energized in low duty cycle RF bursts which are timed in relation to said synchronizing information." Ex. 1001, col. 13, ll. 14–16. In support of the conclusion that Mahany discloses the limitations set forth in that clause, Apple not only quotes from column 35, lines 48–52 of Mahany, as DSS contends, but also explains in the Petition that:

> FIGS. 21 and 22, for example, also show that RF transmissions occur in "bursts." (Grimes Dec. ¶ 178.) A POSA would have understood that the "bursts" are "timed in relation to said synchronization information." (*Id.*) For example, the SYNC information is transmitted first at (2101) and subsequently— therefore "timed in relation to"—data is transmitted, for example, in the TDMA slots. (Mahany, FIG. 22; Grimes Dec. ¶ 178.) Thus, Mahany discloses limitation (g) of claim 6. (Grimes Dec. ¶ 179.)

*Id.* at 59–60. Based on the record before us, we are persuaded that the disclosure of Mahany pertaining to devices transmitting in TDMA slots following the transmission of SYNC information is sufficient to demonstrate a reasonable likelihood that Mahany discloses "said server and peripheral transmitters being energized in low duty cycle RF bursts which are timed in relation to said synchronizing information," as recited in claim 6.

Because, on this record, Apple has identified sufficient evidence to support its contention that Mahany would have rendered obvious the subject matter of claims 6 and 7 of the '290 patent, we conclude that Apple has established a reasonable likelihood that it would prevail at trial in challenging those claims under 35 U.S.C. § 103(a) over Mahany.

21

IPR2015-00373
Patent 6,128,290

## III. CONCLUSION

We conclude that Apple has shown a reasonable likelihood that it would prevail at trial in demonstrating that claims 6, 7, 9, and 10 of the '290 patent are unpatentable under 35 U.S.C. § 103(a).

At this stage of the proceeding, the Board has not made a final determination as to the patentability of any challenged claim or the construction of any claim term.

## IV. ORDER

Upon consideration of the record before us, it is, therefore,

ORDERED that an *inter partes* review is instituted as to claims 6, 7, 9, and 10 of the '290 patent on the following grounds:

(1) Claims 6, 7, 9, and 10 under 35 U.S.C. § 103(a) as unpatentable over Natarajan and Neve, and

(2) Claims 6 and 7 under 35 U.S.C. § 103(a) as unpatentable over Mahany;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '290 patent is hereby instituted commencing on the entry date of this Decision, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial;

FURTHER ORDERED that no other grounds set forth in the Petition as to claims 6, 7, 9, and 10 of the '290 patent are authorized.

22

IPR2015-00373
Patent 6,128,290

PETITIONER:

David K.S. Cornwell
davidc-PTAB@skgf.com


Mark W. Rygiel
mrygiel-PTAB@skgf.com



PATENT OWNER:

Andriy Lytvyn
andriy.lytvyn@smithhopen.com

Anton J. Hopen
anton.hopen@smithhopen.com

Nicholas Pfeifer
nicholas.pfeifer@smithhopen.com

23

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE, INC.,
Petitioners,

v.

DSS TECHNOLOGY MANAGEMENT, INC.,
Patent Owner.

————————————

Case: IPR2015-00373
U.S. Patent No. 6,128,290

————————————

**PATENT OWNER DSS TECHNOLOGY, INC.'S
RESPONSE TO PETITION**

Patent No. 6,128,290
IPR2015-00373

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................1

II.   RELATED IPR PETITION ................................................1

III.  PATENT OWNER DISCLAIMED CLAIMS 6 AND 7 ..................2

IV.  OVERVIEW OF THE INVENTION CLAIMED IN THE '290 PATENT ......2

    A.   Summary of the prior art ........................................................2

    B.   Summary of the '290 Patent and its advancement over the prior art ........5

V.   CLAIM CONSTRUCTION ................................................................8

VI.  PETITIONER HAS FAILED TO PROVE THAT CLAIMS 9 AND 10 OF THE '290 PATENT ARE UNPATENTABLE.................................16

    A.   Claims 9 and 10 are not rendered obvious by Natarajan in view of Neve ...........................................................................16

        1.   Natarajan does not teach or suggest that the server transmitter is energized in low duty cycle RF bursts ..........................................16

            a.   Natarajan is silent with respect to operation of server transmitter during outbound data traffic periods .........16

            b.   The HDLC packet structure disclosed in Natarajan is inconsistent with a server transmitter being energized in low duty cycle RF bursts.............................................20

            c.   Natarajan's disclosure of "bursty traffic" during the contention period does not teach or suggest that the server transmitter is energized in RF bursts................23

            d.   Petitioner failed to meet its burden of establishing that Natarajan in view of Neve teaches or suggests that the server transmitter is energized in low duty cycle RF bursts ........................................................25

i

Patent No. 6,128,290
IPR2015-00373

2.    Combining Natarajan with Neve does not cure deficiencies of Natarajan and further suggests that the combination of these references does not teach or suggest that server transmitter is energized in low duty cycle RF bursts ...........................................27

a.    Petitioner's expert distinguished Neve from transmissions involving RF bursts ...........................27

b.    Neve does not teach or suggest that server transmitter is energized in low duty cycle RF bursts...................30

c.    Neve reinforces the conclusion that Natarajan does not teach or suggest the server transmitter being energized in low duty cycle RF bursts ......................31

3.    The Board should not give any weight to Petitioner's expert's testimony pertaining to the issue of whether Natarajan in view of Neve teaches or suggests that server transmitters are energized in low duty cycle RF bursts.......................................................................33

VII. CONCLUSION ..............................................................36

Patent No. 6,128,290
IPR2015-00373

_____

## TABLE OF AUTHORITIES

**Federal Cases**

*KSR Int'l Co. v. Teleflex Inc.*,
      550 U.S. 398, 418 (2007) ...................................................................... 15, 25

*Microsoft Corp. v. Proxyconn, Inc.*,
      789 F.3d 1292, 1298 (Fed. Cir. 2015) .............................................................9

*Mintz v. Dietz & Watson, Inc.*,
      679 F. 3d 1372, 1379 (Fed. Cir. 2012) .........................................................16

*In re Fine*,
      837 F.2d 1071, 1076 (Fed. Cir. 1988). .........................................................36

**Decisions of the Patent Trail and Appeal Board**

*Liberty Mutual Insurance Co. v. Progressive Casualty Insurance Co.*,
      CBM2013-00009, Final Written Decision at pg. 47 (Feb. 11, 2014). ..........33

**Federal Statutes**

35 U.S.C. §103(a) .....................................................................................................1

**Federal Regulations**

37 C.F.R. § 1.321(a)..................................................................................................2

37 C.F.R. § 42.100(b) ...............................................................................................8

37 C.F.R. § 42.6(e)..................................................................................................38

iii

Patent No. 6,128,290
IPR2015-00373

---

## PATENT OWNER'S LIST OF EXHIBITS

DSS-2001    U.S. Patent No. 5,699,357

DSS-2002    Definition of "*e.g.*," Black's Law Dictionary (9th ed. 2009)

DSS-2003    Myk Dormer, *Low Duty Cycle?*, Electronics World Magazine, Dec. 2008, *available at* http://www.radiometrix.com/files/additional/Low-Duty-Cycle.pdf

DSS-2004    U.S. Pat. No. 7,558,232

DSS-2005    U.S. Pat. No. 7,092,762

DSS-2006    U.S. Pat. No. 7,049,620

DSS-2007    U.S. Pat. No. 8,837,653

DSS-2008    U.S. Pat. No. 8,727,561

DSS-2009    Definition of "burst," Chambers Dictionary of Science and Technology (1st ed. 1999)

DSS-2010    Tom Sheldon, *Encyclopedia of Networking & telecommunications*, 549, (Lisa Wolters-Broder ed., McGraw Hill 2001)

DSS-2011    U.S. Pat. No. 3,598,914

DSS-2012    U.S. Pat. No. 6,983,031

DSS-2013    Yurcik, William J., *Serial and Parallel Transmission*. Computer Sciences. 2002. Encyclopedia.com, *available at* http://www.encyclopedia.com

DSS-2014    *Asynchronous HDLC MC68360 ASYNC HDLC Protocol Microcode User's Manual*, 8, (Freescale Semiconductor, Inc. 1996)

DSS-2015    Transcript of 08-27-2015 Deposition Testimony of Dr. Jack Duane Grimes

iv

Patent No. 6,128,290
IPR2015-00373

_____

DSS-2016    Declaration of Mr. Robert Dezmelyk

DSS-2017    Wmat Auppu, *AIF Inter DSP Communication*, 1, *available at*
http://processors.wiki.ti.com/index.php/AIF_Inter_DSP_Communica
tion

v

---

## I.  INTRODUCTION

On June 25, 2015, the Board instituted trial with respect to claims 6, 7, 9, and 10 of the U.S. Patent No. 6,128,290 ("the '290 Patent") (APL 1001) owned by DSS Technology Management, Inc., ("Patent Owner"). Specifically, the Board instituted trial based on a single ground:

(1) obviousness of claims 6, 7, 9, and 10 under 35 U.S.C. §103(a) based on U.S. Pat. No. ("Natarajan") (APL 1003) in view of U.S. Pat. No ("Neve") (APL 1004);

(2) obviousness of claims 6 and 7 under 35 U.S.C. §103(a) based on U.S. Pat. No. 5,696,903 ("Mahany") (APL 1010).

Patent Owner submits this Response to the invalidity challenge listed above. For the reasons set forth below, the Board should find claims 9 and 10 patentable over Natarajan in view of Neve.

## II.  RELATED IPR PETITION

Petitioner filed another IPR petition against claims 1-4 of the '290 Patent in case IPR2015-00369. The Board's decision in the present case is likely to be pertinent to case IPR2015-00369.

1

_____

## III.    PATENT OWNER DISCLAIMED CLAIMS 6 AND 7

On October 5, 2015, Patent Owner filed a disclaimer under 37 C.F.R. 1.321(a) disclaiming claims 6 and 7 of the '290 Patent. Accordingly the challenges to these claims are rendered moot. Patent Owner disclaimed claims 6 and 7 to increase administrative efficiency of this proceeding. The disclaimer is not an admission that claims 6 and 7 were rendered obvious by either Natarajan in view of Neve or Mahany.

## IV.  OVERVIEW OF THE INVENTION CLAIMED IN THE '290 PATENT

In its summary of the '290 Patent, Petitioner omitted several material elements of the claimed invention. The following overview provides a brief summary of the prior art and a concise description of the data network system disclosed and claimed in the '290 Patent, focusing on the elements Petitioner failed to discuss.

### A. <u>Summary of the prior art</u>

At the time of filing of the '290 Patent, wireless data networks had several major shortcomings. The accepted convention in wireless data networks was to partition a multiaccess protocol into fixed-length frames, wherein each frame is further divided into the following subframes: (1) outbound transmission period for broadcast of data from server unit to Peripheral units, (2) inbound contention-free

2

_____

traffic for the contention-free transfer of all transmissions from Peripheral units to the server unit, and (3) inbound contention traffic for the transfer of data traffic in a contention mode from Peripheral units to the server unit. *See* APL 1003, Natarajan at 4:30-38. A server unit would transmit to peripheral units during the outbound transmission period and receive transmissions from peripheral units during the time periods designated for inbound data traffic. *See id*.

During the outbound transmission period, the server would transmit a continuous data stream which comprises data packets addressed to peripheral units and idle words when no other transmission is needed. *See, e.g.,* DSS 2010, Encyclopedia of Networking, at pg. 549 ("If no data is being transmitted, this same sequence is continuously transmitted so the end systems remain synchronized."); *see also* APL 1004, Neve at 4:48-50 (disclosing that the server unit transmits "idle words" when no active data transmission is scheduled); DSS-2016, Dezmelyk Dec. at ¶ 38. Idle words are important to operability of such systems because idle transmissions maintain synchronization between the server unit and the Peripheral units. *See* DSS-2010, Encyclopedia of Networking, at pg. 549; *see also* DSS-2015, Grimes Cross-Exam at 43:20-22 – 44:1-7. The following is a brief explanation of the idle word transmissions and the advantages they provide:

3

idle words are injected by the terminal whenever there are no data words available to be transmitted. In some applications, this approach is found to be desirable because it avoids the necessity of bringing the transmitting and receiving ends of the signaling channel into synchronization each time the stream of actual data words is interrupted as when there is no data to be sent. Since the system is in continuous operation, delays occasioned by the need to resynchronize may largely be avoided.

DSS-2011 at 1:14-22.

In such data networks, the server transmitter would transmit a continuous data stream during the outbound transmission period. *See* DSS-2016, Dezmelyk Dec. at ¶ 28. The peripheral units would schedule to wake themselves up at designated times to receive data segments within the data stream addressed to them and power down after the data is received. *See, e.g.*, APL 1003, Natarajan at 5:2-4. In such a system, it is only necessary to ensure that each peripheral receiver is energized at an appropriate time to receive the designated data segment within the continuous data stream. *See* DSS-2016, Dezmelyk Dec. at ¶ 28. This scheme is advantageous because it does not require that the server transmitter be energized at the exact time for each individual transmission—instead, the server transmitter remains energized for the duration of the outbound transmission period, and the peripheral units are timed to

4

Patent No. 6,128,290
IPR2015-00373

---

listen in at appropriate times. *See id*. If no data has to be transmitted in a particular time slot, the server transmits idle signals. *See* APL 1004, Neve at 4:48-50.

The data networks that existed prior to the '290 Patent had two major drawbacks. First, a server-PEA ensemble in which the server transmitter operates in a continuous or a high duty cycle is likely to interfere with nearby foreign ensembles. *See* DSS-2016, Dezmelyk Dec. at ¶ 19. By transmitting idle words when no data transmission is necessary, the likelihood of collisions between the transmission of two nearby ensembles increases: the longer the duration during which the transmitter is energized, the higher the likelihood that at some point during that transmission period a signal coming from a nearby second ensemble will interfere with the signal transmitted by the first ensemble. *See id*. Second, in applications where the server unit is battery-operated, transmission of idle words, in addition to an active transmission of useful data packets, significantly increases power consumption making the data network unsuitable for low-power applications. *See id.* at ¶ 29; *see also* APL-1002 at pg. 11.

**B.  <u>Summary of the '290 Patent and its advancement over the prior art</u>**

The '290 Patent discloses and claims a data network system that improves bidirectional wireless data communications between a server microcomputer unit

5

and a plurality of peripheral units. *See* APL 1001, '290 Patent at 1:11-14. At the time of invention, two major issues hindered widespread adoption of wireless data communication systems: (1) short battery life and (2) interference from other wireless data systems operating nearby. *See id*. at Abstract. The '290 Patent advanced the state of the art by ameliorating both issues.

The '290 Patent discloses and claims a wireless data system, in which both the server and peripheral transmitters are energized in low duty cycle RF bursts. *See id.* at claim 9. This feature of the claimed invention achieves two important objectives: (1) it reduces power usage for both the server and the peripheral units because the server transmitter is only energized when the server must transmit data; and (2) it reduces the likelihood of interference between nearby wireless ensembles because the server transmits signals only during scheduled communications with a peripheral unit. *See id*. at 1:59-61. The specification of the '290 Patent explains that "[i]f during a particular bit period, two RF bursts are being simultaneously received, one from a transmitter in the home ensemble and the other from a foreign ensemble, the receiver will 'capture' only the data received from the stronger of two transmitters." *Id*. at 6:36-40. Accordingly, by claiming a system in which both the server and peripheral transmitters operate in low duty cycle RF bursts, the '290 Patent significantly reduces the number of transmissions outgoing from the server

6

unit, thereby decreasing the likelihood that a nearby foreign ensemble will receive an unintended data signal. *Id*. at 1:59-61.

In sharp contrast to the data network systems described in Section III.A., *supra*, the '290 Patent claims a system in which the server transmitter does not transmit a continuous data stream, but, instead, is energized in low duty cycle RF bursts only when active data transmissions between the server unit and a peripheral units are scheduled to occur. *See id*. at 1:59-61; *see also* DSS-2015, Grimes Cross-Exam at 44:9-11 ("[T]he patent only talks about transmissions that are done for the purpose of conveying useful data to the receiving entity."). The data network system disclosed in the '290 Patent employs a complex synchronization scheme to achieve a functioning system in which both the server and peripheral transmitters are energized in low duty cycle RF bursts. *See* APL 1001, '290 Patent at 10:5-11:8; *see also* DSS-2016, Dezmelyk Dec. at ¶ 20. The '290 Patent discloses a synchronization scheme in which the peripheral units are equipped with voltage controlled crystal oscillators, whose frequencies are aligned with the frequency of the server's oscillator to establish precise synchronization between the server unit and the peripheral unit. *See* APL 1001, '290 Patent at 10:35-61. The synchronization scheme disclosed in the '290 Patent makes it possible for both the server and peripheral transmitters to be energized only when an active data transmission must occur and

remain powered down at all other times, thereby achieving "low power consumption and avoidance of interference between nearby similar systems." *See id*. at Abstract; *see also* DSS-2016, Dezmelyk Dec. at ¶ 21. This advancement over the prior art is captured in the following limitation of claim 9: "said server and peripheral transmitters being energized in *low duty cycle RF bursts*."

The '290 Patent explicitly states that its objectives include "provision of such a data network which requires extremely low power consumption" and "avoids interference from nearby similar systems." APL 1001, '290 Patent at 1:39-44. The '290 Patent achieves these objectives by creating a data network system in which, *inter alia*, both "<u>server and peripheral transmitters [are] energized in <u>low duty cycle RF bursts</u></u>," wherein "[t]he low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals." *Id*. at claim 9 (emphasis added) and at 1:59-61.

## V.  CLAIM CONSTRUCTION

The Board generally interprets the claims of an unexpired patent according to the broadest reasonable interpretation ("BRI") standard. *See* 37 C.F.R. § 42.100(b). In *Microsoft Corp. v Proxyconn, Inc.*, the Federal Circuit provided the following guidance pertaining to proper application of the BRI standard to claim terms in the context of an IPR:

8

Patent No. 6,128,290
IPR2015-00373

_____

> [T]he protocol of giving claims their broadest reasonable interpretation does not include giving claims a legally incorrect interpretation. Rather, claims should always be read in light of the specification and teachings in the underlying patent. The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review. Even under the broadest reasonable interpretation, *the Board's construction cannot be divorced from the specification and the record evidence, and must be consistent with the one that those skilled in the art would reach*. A construction that is unreasonably broad and which does not reasonably reflect the plain language and disclosure will not pass muster.

> *Microsoft Corp. v Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (internal quotations omitted) (emphasis added).

### 1. Claim construction the Board applied in the Institution Decision

In the Institution Decision, the Board held that: "it is not necessary for our determination of whether to institute *inter partes* review of claims 1–4 of the '290 patent to construe expressly the phrases 'code sequence' and 'energized in low duty cycle RF bursts.'" Institution Decision at pg. 10. The Board also found that "Claims

9

1–4 do not recite any requirement that the server transmitter must be "powered OFF" during the time slots when no active transmission between the server and peripheral units occurs; nor is such required by the plain and ordinary meaning of the claim phrase 'energized in low duty cycle RF bursts.'" Institution Decision at pg. 18-19. This finding is inconsistent with the record before the Board because this finding contradicts construction proposed by Patent Owner, Petitioner's statements, and testimonies of both parties' experts.

Although Petitioner did not provide an explicit construction for "low duty cycle RF bursts," both Petitioner and Petitioner's expert stated the following: "the transmitter (or receiver) *consumes power <u>only</u> when it is <u>actively</u> transmitting a message* (or actively receiving a message). **This constitutes low duty cycle RF bursts**.")" *See* Petition at pg. 39 and APL 1008 at ¶115 (internal quotations omitted) (emphasis added). Mr. Dezmelyk, the expert for Patent Owner, also testified that the server transmitter remaining energized when it is not actively transmitting data to the peripheral units is inconsistent with a low duty cycle operation. *See* DSS-2016, Dezmelyk Dec. at ¶ 35. Therefore, although claims 9 and 10 do not explicitly require that the server transmitter be energized only when it is actively transmitting a message and powered down when there is no data to transmit, this requirement is

Patent No. 6,128,290
IPR2015-00373

imposed by the "energized in low duty cycle RF bursts limitation." *See* Petition at

pg. 39; *see also* APL 1008 at ¶115; DSS-2016, Dezmelyk Dec. at ¶ 36.


### 2.  *Low duty cycle*

"Low duty cycle" is a term of art in wireless communication data networks.

Under broadest reasonable interpretation, a POSITA would have understood "***duty***

***cycle***" of the server transmitter as "***the ratio of actual duration during which the***

***server transmitter is energized to the total duration designated for outbound***

***transmissions***."

This construction is consistent with the one provided by Petitioner's expert:

"[t]he low-duty cycle refers to the ratio of the time spent transmitting versus the

time spent nontransmitting." DSS-2015, Grimes Cross-Exam at 41:7-9. "Low-duty

cycle tells you that most of the time there's nothing being sent. And when there is

something being sent, that's what's called a burst." *Id*. at 31:10-12. "[T]he key thing

is that the burst is small -- the time it takes is small relative to the overall time that

the transmitter ***could have been transmitting***." *Id*. at 46:12-15 (emphasis added);

*see also* DSS-2016, Dezmelyk Dec. at ¶ 27. Accordingly, the duty cycle of the

server transmitter must be calculated over the total duration designated for the

outbound transmissions. *See* DSS-2016, Dezmelyk Dec. at ¶ 23. Time slots

11

Patent No. 6,128,290
IPR2015-00373

_____

designated for the inbound data traffic are not taken into account because the server transmitter could not have been transmitting during these time slots. *See* DSS-2015, Grimes Cross-Exam at 60:19-22 ("[W]hen the units are receiving information, their respective transmitters can't be operating. If they were, they would not be able to receive information."); *see also* DSS-2016, Dezmelyk Dec. at ¶ 23.

Under the broadest reasonable interpretation, a POSITA would have understood that a server transmitter is energized in a low duty cycle when the server transmitter is energized for less than ten percent (10%) of the total duration designated for outbound transmissions. *See* DSS-2016, Dezmelyk Dec. at ¶ 24. This range is consistent with the specification of the '290 Patent. *See id*. For example, for the outbound transmissions involving Optically Orthogonal Codes, the '290 patent discloses that "a maximum of three RF bursts can occur in each section," wherein each section comprises sixty-four (64) slots. *See* APL 1001, '290 Patent at 7:23-33, *see also* DSS-2016, Dezmelyk Dec. at ¶ 26. This scheme results in the server transmitter being energized for 4.688% of the transmission period, which falls well within the low-duty cycle range of 10%. *See* APL-1001 at 7:22-32. Another example of outbound transmission disclosed in the '290 Patent involves transmission of synchronization beacons (SBs): "[e]ach SB consists of

12

eight RF bursts spread out over 252 slots." Since each burst equals to one slot, the server transmitter is energized in the duty cycle of 3.175%, which also falls within the low duty cycle range of 10%.

Furthermore, Table 1 provided below, contains results of a survey of exemplary ranges for "low duty cycle" as this term is used in the art, which is evidence of how a POSITA would interpret the terms "low duty cycle."[1]

*Table 1. Exemplary ranges of "low duty cycle" in third party patents*

| Exhibit | Patent No. | Duty cycle (%) | Citation |
|---------|-----------|----------------|----------|
| DSS-2004 | U.S. 7,558,232 | "low duty cycle, e.g. 2%" "high duty cycle, e.g. 25%" | 4:13-16 |
| DSS-2005 | U.S. 7,092,762 | "low duty cycle, e.g., 4% or less" | 2:21-22 |
| DSS-2006 | U.S. 7,049,620 | "low duty cycle, e.g., 0.5 percent" | 8:3 |
| DSS-2007 | U.S. 8,837,653 | "low duty cycle (e.g., a duty cycle of less than 10 percent, 1 one percent, 0.1 percent or 0.02 percent)" | 10:52-53 |
| DSS-2008 | U.S. 8,727,561 | "low duty cycle, e.g., at an about 10 percent (10%) duty cycle" | 10:5-6 |

### 3.  RF bursts

---

[1] **Search Methodology:** Table 1 provides the first five (5) relevant results obtained on Google Patents through the query: "low duty cycle e.g." & network & percent.

Patent No. 6,128,290
IPR2015-00373

---

"RF bursts" is a term of art in the field of wireless data networks. Under the broadest reasonable interpretation, a POSITA would have understood the phrase "RF bursts" to mean "*a short period of intense activity on an otherwise quiet data channel*." *See* DSS-2009.

This construction is consistent with the one provided by Petitioner's expert: "the key thing is that the burst is small -- the time it takes is small relative to the overall time that the transmitter could have been transmitting." *See* DSS-2015, Grimes Cross-Exam at 46:12-15 (emphasis added). Furthermore, this construction is also consistent with the specification of the '290 Patent. For example, FIG. 6 shows that three (3) RF bursts are transmitted during an outbound transmission sector having 64 time slots, wherein each RF burst slot is 2 μs.[2] *See* APL-1001 at Fig. 6; *see also* DSS-2015, Grimes Cross-Exam at 34:2-8 ("[T]here's a Figure 6 in the specification that shows how these bursts occur and gives you kind of a spatial image of the -- of these bursts. And you can see from looking at the picture that most of the time nothing is being transmitted, nothing is being received.").

---

[2] It should be noted that prosecution history of the '290 Patent illustrates the original informal drawings stated that RF burst slot = 2 μsec, when the drawings were formalized, "μsec" was changed to "MSEC." See APL 1005 at pg. 76.

14

Patent No. 6,128,290
IPR2015-00373



FIG. 6

In the exemplary embodiment depicted in Fig. 6, the duration of a single RF burst accounts for $\frac{1}{64} \times 100\% = 1.563\%$ of the outbound transmission section, thereby satisfying the construction of the term "RF burst" provided herein. *See* DSS-2016, Dezmelyk Dec. at ¶ 26. The duty cycle of the embodiment depicted in Fig. 6 can be calculated as $\frac{3}{64} \times 100\% = 4.688\%$, which also satisfies the low duty cycle requiremnt. *See id.* at ¶ 24. Therefore, the constructions for "low duty cycle" and "RF bursts" provided herein are supported by the specification of the '290 Patent. *See id.* at ¶ 24-26.

15

---

# VI. PETITIONER HAS FAILED TO PROVE THAT CLAIMS 9 AND 10 OF THE '290 PATENT ARE UNPATENTABLE

## A. <u>Claims 9 and 10 are not rendered obvious by Natarajan in view of Neve</u>

The Board instituted this trial on the ground that there is a reasonable likelihood that claims 9 and 10 of the '290 Patent are rendered obvious by Natarajan in view of Neve. For the reasons that follow, the Board should uphold validity of all challenged claims.

### 1. <u>Natarajan does not teach or suggest that the server transmitter is energized in low duty cycle RF bursts</u>

#### a. <u>Natarajan is silent with respect to operation of server transmitter during outbound data traffic periods</u>

It is well established in the United States patent law that challenges on obviousness grounds cannot be sustained by mere conclusory statements. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Instead, "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id*. As the Federal Circuit eloquently stated: "[o]bviousness requires a court to walk a tightrope blindfolded (to avoid hindsight) – an enterprise best pursued with the safety

net of objective evidence." *See Mintz v. Dietz & Watson, Inc.*, 679 F. 3d 1372, 1379 (Fed. Cir. 2012).

Natarajan does not contain any disclosure of the server transmitter being energized in low duty cycle. *See* DSS-2016, Dezmelyk Dec. at ¶ 31. Although Natarajan teaches a system for reducing power consumption in mobile units, Natarajan is silent regarding the operation of the base unit's transmitter. *See id*. It is well understood in the art that although the base unit and mobile units may be structured similarly, the base and mobile units operate under different schemes. *See, e.g.*, APL 1004, Neve, at 4:10-12 ("One station, which is physically similar to the others but operates a different stored program, may be designated the master station and provides synchronisation signals for all of the other stations (referred to hereinafter as "slave" stations) and controls access of the stations to the single radio channel."). Accordingly, a POSITA would not have concluded that base transmitters operate the same way as the mobile units. *See* DSS-2016, Dezmelyk Dec. at ¶ 31. Indeed, Natarajan discloses that its objective is to provide energy savings for the mobile units, but does not teach or suggest that there are any energy savings associated with operation of the base unit's transmitter. *See* APL 1003 at 3:59-61 and 10:14-37, *See* DSS-2016, Dezmelyk Dec. at ¶ 32. For this reason, the base unit's

17

Patent No. 6,128,290
IPR2015-00373

_____

transmitter could operate continuously during the time slots designated for outbound

traffic without undermining the objectives of Natarajan. *See id.* at ¶ 38.

Natarajan discloses a multi-access protocol in which time is divided into

fixed-length frames that are further subdivided in three (3) subframes:

> Period A for broadcast of packets from base station to
> mobile units (outbound traffic), with a header AH for
> period A. Period B for the contention-free transfer of all
> traffic from mobile units to base station (inbound traffic),
> with a header BH for period B. Period C for the transfer of
> all bursty data traffic in a contention mode from mobile
> units to base station (inbound traffic), with a header CH.

APL 1004, Natarajan at 4:30-38.

An example of a frame is provided in FIG. 4 of Natarajan, which is reproduced

below:

```
        | G |AH|      A       |BH|     B    |CH|    C      |FT|
        |···|··||||||||||||||||··||||||||||||··||||||||||||  |
        |···|··|<------------>| |<--------->|··|<---------->|··|
                | Base to     | |  Mobile to|  | Contention |  |
FIG.4           | Mobiles     | |   Base    |  | from Mobiles|  |
              ->| FH|  |<------TA----->|  |<---TB---->|  |<---TC------>|  |
```

FIG. 4 depicts a single frame of the multi-access protocol, which begins with

a header G of fixed length FH. *See id.* at 4:27-28. Natarajan discloses that outbound

transmission from the base unit to the mobile units takes place during time Period

A. *See id.* at 4:30-32. Period B is designated for inbound data traffic from mobile

18

---

units to the base unit. *See id*. at 4:33-35. During Period C, mobile units transmit data to the base unit in a contention mode, and, responsive to a mobile unit's transmission, the base unit transmits an outbound ACK/NAK message. *See id*. at 9:30-34. Accordingly, the base transmitter must be energized during header durations AH and BH, during outbound transmission Period A, and also when sending ACK/NAK messages during Period C. The only subframe during which the base transmitter is not transmitting is Period B. *See* DSS-2016, Dezmelyk Dec. at ¶ 32.

Without additional information regarding "the relative amount of time consumed by transmission versus nontransmission"—which Natarajan does not provide—the disclosure pertaining to partitioning of multi-access protocol into frames and subframes does not teach or suggest that base transmitter operates in a low-duty cycle. *See* DSS-2015, Grimes Cross-Exam at 40:21-22 – 41:1 ("So low-duty cycle is simply a statement about the relative amount of time consumed by transmission versus nontransmission."); *see also* DSS-2016, Dezmelyk Dec. at ¶ 36. Natarajan is bereft of any disclosure pertaining to the duty cycle of the server transmitter. *See id*. at ¶ 38. Specifically, Natarajan does not disclose that the server transmitter is energized in a low duty cycle. The logical conclusion is that in the data network system disclosed in Natarajan, the base transmitter is continuously energized during the time periods designated for outbound transmissions—which is

19

how a POSITA would interpret Natarajan for the reasons provided in Section V.1.b.,

*infra*. Therefore, a POSITA would conclude that Natarajan suggests that the server

transmitter is not energized in low duty cycle RF bursts. See DSS-2016, Dezmelyk

Dec. at ¶ 38.

In the absence of an express disclosure stating that the base transmitter

operates in a low duty cycle, it is necessary to know "the relative amount of time

consumed by transmission versus nontransmission" to determine whether the duty

cycle of the base transmitter falls within the range that a POSITA would consider as

low duty cycle. *See* DSS-2015, Grimes Cross-Exam at 40:21-22 – 41:1. Natarajan

lacks this information. *See* DSS-2016, Dezmelyk Dec. at ¶ 32. The description of

the only exemplary embodiment disclosed in Natarajan would lead a POSITA to a

conclusion that at least in that exemplary embodiment, the base unit transmitter is

not energized in a low duty cycle. *See id*. at ¶ 35. Accordingly, Natarajan neither

teaches that the base transmitter operates in a low duty cycle nor provides sufficient

information that would suggest to a POSITA the base transmitter is energized in a

low duty cycle.

> b. The HDLC packet structure disclosed in Natarajan is
> inconsistent with a server transmitter being energized in low
> duty cycle RF bursts.

20

_____

As explained in Section V.A.1.a., *supra*, Natarajan is devoid of disclosure pertaining to operation of base unit's transmitter. However, Natarajan does provide some insight into how the base unit's transmitter operates in the following description:

> Packets received or to be sent are held in data storage 68 and communicated to or from the RF transceiver 54 via interface 58 under control of serial channels and a direct memory access (DMA) controller (not shown) which is part of the microprocessor 62. The function of these serial channels is to ***encapsulate data and control information in an HDLC (high-level data link control) packet structure and provide the packet in serial form to the RF transceiver*** 54.
>
> APL 1003, Natarajan at 3:28-37 (emphasis added).

It is well-known in the art that HDLC is an example of a bit-oriented framing that involves a continuous outbound transmission rather than operation in low duty cycle RF bursts. The following is an excerpt from Encyclopedia of Networking & Telecommunications pertaining to bit-oriented framing:

> **Bit-oriented framing** This type of framing allows the sender to transmit a ***long string of bits at one time***. IBM's SDLC (Synchronous Data Link Control) and HDLC (High Level Data Link Control) are examples of bit-oriented protocols. Most LANs use bit-oriented framing. There is usually a maximum frame size. For example, Ethernet has a maximum frame size of 1,526 bytes. The beginning and end of a frame is signaled with a special bit sequence

21

> (01111110 for HDLC). ***If no data is being transmitted,
> this same sequence is <u>continuously transmitted</u> so the
> end systems remain synchronized***.
>
> DSS-2010, Encyclopedia of Networking at pg. 549.

As the excerpt quoted above indicates, HLDC packet structure is used to transmit "***long*** strings of data at one time." *See id*. When asked to define an "RF burst," Petitioner's expert explained that "the key thing is that the burst is ***small*** -- the time it takes is small relative to the overall time that the transmitter could have been transmitting." DSS-2015, Grimes Cross-Exam at 46:12-15. Accordingly, Natarajan's disclosure of HDLC, which is used for transmitting "long strings of data at one time," directly contradicts the requirement of claim 9 of the '290 Patent that server transmitters be energized in RF bursts.

Moreover, HDLC involves continuous transmissions in which special bit sequences—i.e. idle words—are transmitted when no data transmission is required. *See* DSS-2010, Encyclopedia of Networking at pg. 549. This undermines the Petitioner's challenge of claims 9 and 10 for two reasons. First, a continuous transmission is an antithesis of RF bursts. *See id*. (contrasting bit-oriented framing involving continuous transmissions and clock-oriented framing involving pulsed transmissions); *see also* DSS-2016, Dezmelyk Dec. at ¶ 34. Second, protocols involving transmission of idle words in an absence of active transmissions are

_____

inconsistent with server transmitter operating in a low-duty cycle because such protocols extend the duration during which the server transmitter is energized. *See, e.g.*, APL-1002 at pg. 11 (stating that continuous transmission protocols are "unsuitable for low-power applications" because "[m]aintaining these continuous links while there is no data transmission causes the power dissipation to be higher");[3] *see also* Petition at pg. 39 ("[T]he transmitter (or receiver) consumes power ***only*** ***when it is <u>actively</u> transmitting a message*** (or actively receiving a message). This constitutes low duty cycle RF bursts.") (internal quotations omitted) (emphasis added).

  c. <u>Natarajan's disclosure of "bursty traffic" during the contention period does not teach or suggest that the server transmitter is energized in RF bursts</u>

   In support of Petitioner's contention that Natarajan in view of Neve teaches or suggests the server and peripheral transmitters being energized in RF bursts, Petitioner stated the following: "Natarajan also discloses that there is a period "for the transfer of all ***bursty*** data traffic in a contention mode from mobile units to base

_____

[3] It should be noted, that the "continuous transmission" discussed in this section pertains to outbound transmission subframe during Period A disclosed in Natarajan. Patent Owner acknowledges that the operation of the base transmitter is not continuous over the entire frame because the base transmitter is powered down during inbound traffic in Period B. However, just because the base transmitter is powered down during a certain subframe, does not mean that the base transmitter is "energized in low duty cycle RF bursts."

Patent No. 6,128,290
IPR2015-00373

_____

station (inbound traffic), with a header CH." Petition at pg. 39 (quoting Natarajan) (emphasis in original). This disclosure of Natarajan, however, does not teach or suggest that that the server transmitter is energized in RF bursts at least for two reasons. First, Natrajan's disclosure of "bursty data traffic" pertains to the contention period which is designated for inbound traffic from mobile units to the base unit, and therefore, does not teach or suggest that this type of traffic also applies to the outbound data traffic. See DSS-2016, Dezmelyk Dec. at ¶ 37.

Second, arguendo, even if the "bursty data traffic" pertained to the outbound data traffic, just because the traffic is bursty does not mean that the transmitter is energized in RF bursts. *See id*. In fact, "the easiest approach to implement bursty traffic would be to have the AIF transmitter ***continuously send dummy data***, and insert useful data when there is actually something to send." DSS-2017 at pg. 1. This approach closely aligns with the HDLC protocol, which also involves server transmitter continuously sending out a data stream wherein idle words are transmitted when there is no actual data to transmit. *See* Section V.A.1.c., *supra*. Accordingly, Natarajan's disclosure of "bursty data traffic" does not teach or suggest that the server transmitter is energized in RF bursts. *See* DSS-2016, Dezmelyk Dec. at ¶ 37.

24

Patent No. 6,128,290
IPR2015-00373

_____

> d. <u>Petitioner failed to meet its burden of establishing that Natarajan in view of Neve teaches or suggests that the server transmitter is energized in low duty cycle RF bursts</u>

Petitioner failed to satisfy its burden of establishing that Natarajan in view of Neve teaches or suggest server transmitter being energized in low duty cycle RF bursts. The Petition does not adequately address a material limitation of claim 9: "***said <u>server</u>*** and peripheral ***transmitters being energized in low duty cycle RF bursts***." APL 1001, '290 Patent at claim 9. Petitioner quotes disclosures of Natarajan and Neve teaching that the transmitters of the peripheral units (*i.e.* mobile units, slave stations) are energized in low duty cycles. *See* Petition at pg. 39-40. Petitioner, however, does not provide any objective evidence that could reasonably lead to a conclusion that these references also disclose that the transmitter of the server unit (*i.e.* base unit, master station) is also energized in low duty cycle RF bursts.

Based on Petitioner's analysis of Natarajan's and Neve's disclosures pertaining to operation of the peripheral units, Petitioner concludes that "Natarajan and Neve each disclose that ***the transmitters*** are 'energized in low duty cycle RF bursts.'" *Id.* (emphasis added). Petitioner, therefore, completely ignores the fact that claim 9 does not merely recite "***transmitters***," but rather, it explicitly requires "said ***<u>server</u>*** and peripheral *transmitters being energized in low duty cycle RF bursts*." APL 1001, '290 Patent at claim 9. Neve discloses that although the server unit and

25

Patent No. 6,128,290
IPR2015-00373

_____

peripheral units may have similar structures, their functionalities are different. *See*

APL 1004, Neve at 4:10-15 ("One station, which is physically similar to the others

***but operates a different stored program***, may be designated the master station and

provides synchronisation signals for all of the other stations (referred to hereinafter

as "slave" stations) and controls access of the stations to the single radio channel.")

(emphasis added); *id*. at FIGS. 6 and 7. Accordingly, it is improper to conclude that

just because the peripheral transmitters operate in a low duty cycle, the server

transmitter also operates in a low duty cycle. *See* DSS-2016, Dezmelyk Dec. at ¶ 39.

Petitioner states that a data network in which "the transmitter (or receiver)

consumes power ***only*** when it is ***actively*** transmitting a message (or actively

receiving a message) . . . constitutes 'low duty cycle RF bursts.'" *See* Petition at pg.

39 (emphasis added); *see also* APL 1008, Grimes Dec. at ¶115. Even under this

construction, Natarajan and Neve do not provide disclosure sufficient to render

obvious claim limitation requiring that server transmitter is "energized in low duty

cycle RF bursts." *See* DSS-2016, Dezmelyk Dec. at ¶ 43. In fact, Natarajan teaches

using HDLC, the functionality of which is summarized in the Encyclopedia of

Networking and Telecommunications: "[i]f ***no data*** is being transmitted, ***this same***

***sequence is continuously transmitted*** so the end systems remain synchronized."

DSS-2010, Encyclopedia of Networking at pg. 549. Neve discloses a similar data

26

Patent No. 6,128,290
IPR2015-00373

---

network protocol in which "[i]f no data is currently required to be transmitted, ***the master station transmits idle words***." APL 1004, Neve at 4:48-50. Accordingly, even under Petitioner's construction, Natarajan and Neve do not disclose server transmitter operating in low duty cycles because in both Natarajan and Neve, the server transmitter consumes power not only while it is actively transmitting a message, but also when it is transmitting idle signals to maintain synchronization. *See* DSS-2016, Dezmelyk Dec. at ¶ 45.

The U.S. Supreme Court set forth that "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Petitioner's arguments fall far short of this legal standard and, therefore, are insufficient to establish that claims 9 is rendered obvious by Natarajan in view of Neve.

### 2. Combining Natarajan with Neve does not cure deficiencies of Natarajan and further suggests that the combination of these references does not teach or suggest that server transmitter is energized in low duty cycle RF bursts

#### a. Petitioner's expert distinguished Neve from transmissions involving RF bursts

Claim 9 of the '290 Patent unambiguously requires that server transmitter be "energized in low duty cycle RF bursts." During the cross-examination, Petitioner's

27

Patent No. 6,128,290
IPR2015-00373

---

expert distinguished data networks using "idle words"—such as the one disclosed in

Neve—from RF bursts:

> Q.    Is there any other type of transmission ***besides*** RF bursts?
>
> MR.    CORNWELL:    Objection.    Foundation. Objection. Form.
>
> A.    There are sometimes in some systems where you can have a transmission -- in other words, the transmitter is transmitting, but there's no information being transmitted.
>
> The Neve reference refers to that as an idle word, if you will. And the idle word means that the transmitter is transmitting but there's no information being transmitted. Or another way of saying it is that the information that's being transmitted is that there's no information there.
>
> DSS-2015, Grimes Cross-Exam at 42:9-22 (emphasis added).

The above testimony of Petitioner's expert reinforces that Neve does not teach

or suggest that server transmitter operates in RF bursts. Instead, the expert testimony

reinforces that Neve discloses a data network in which the server transmitter send

out idle words if no other transmission is needed rather than being energized in RF

bursts only when a data packet must be transmitted to a peripheral unit. *See* APL

1004, Neve at 4:48-50.

28

Patent No. 6,128,290
IPR2015-00373

_____

Petitioner's expert further testified that although idle transmissions may be necessary to maintain synchronization in the some data networks, this not how the '290 Patent operates. *See* DSS-2015, Grimes Cross-Exam at 43:20-22 – 44:1-11. Petitioner's expert stated the following in response to a question about the purpose of idle words:

> It could be -- it could have to do with synchronization. It could have to do with, you know, the transmitter saying, I'm still here.
>
> I mean, in some sense, that's information. But if you look at ***the data stream, there's no content to the data stream***. It's just simply you know the transmitter is transmitting, but that's all you know.
>
> Now, in some cases, that turns out to be important to know. ***But in the case of this system here, the patent, it's not discussed***.
>
> ***So the patent <u>only</u> talks about transmissions that are done for the purpose of conveying useful data to the receiving entity***.
>
> *Id.* (emphasis added).

The testimony of Petitioner's expert reinforces that Neve and the '290 Patent operate under functionally different protocols: claim 9 of the '290 Patent requires that the server transmitter be energized in low duty cycle RF bursts only when an active data transmission is required, whereas Neve discloses that the server

29

Patent No. 6,128,290
IPR2015-00373

_____

transmitter (master station) transmits a data stream in which idle words are transmitted when no data transmission is required. *See* APL 1004, Neve at 4:48-50, 7:17-19, and 7:41-42.

### b. Neve does not teach or suggest that server transmitter is energized in low duty cycle RF bursts

In the Institution Decision, the Board found that Neve does not teach away from the server transmitter being energized in low duty cycle RF bursts because the disclosure of Neve does not suggest continuous transmission from the master station. *See* Institution Decision at pg. 19-20. The Board's finding is correct insofar as the server transmitter is not transmitting during every time slot. *See* DSS-2016, Dezmelyk Dec. at ¶ 44. However, during the time slots designated for outbound transmissions, "[i]f no data is currently required to be transmitted, the master station transmits idle words." *See* APL 1004, Neve at 4:48-50.

Idle words are inconsistent with server transmitter being energized in low duty cycle RF bursts for the following two reasons. First, the server transmitter must be energized while it is actively transmitting data to peripheral units, and additionally, it must also be energized during transmission of idle words. See DSS-2015, Grimes Cross-Exam at 38:2-6 ("[B]eing energized simply means that the transmitter is transmitting. The transmitter is either transmitting or it's not transmitting. When it's

30

transmitting, it's energized."). Transmission of idle words, therefore, increases the

power consumption of the server transmitter and reduces its battery life. *See* DSS-

2016, Dezmelyk Dec. at ¶ 38. Second, transmission of idle signals may interfere with

the signals transmitted by nearby foreign ensembles, which could disrupt the

operation of both data networks. *See id*. at ¶ 19. At least for these reasons, protocols

involving idle words are inconsistent with the server operating in low duty cycle RF

bursts because transmission of idle words undermines the following objectives of

low duty cycle RF bursts: "[t]he low duty cycle pulsed operation both substantially

reduces power consumption and facilitates the rejection of interfering signals." APL

1001, '290 Patent at 1:59-61

> c. <u>Neve reinforces the conclusion that Natarajan does not teach
> or suggest the server transmitter being energized in low duty
> cycle RF bursts</u>

When Natarajan is considered in view of Neve, it becomes even more

apparent that these references, either individually or in combination, do not teach or

suggest that server transmitter is energized in low duty cycle RF bursts. *See* DSS-

2016, Dezmelyk Dec. at ¶ 45. Neve discloses that the master station transmits idle

words when no other transmission is required. *See* APL 1004, Neve at 4:48-50.

Natarajan discloses that data is encapsulated into HDLC packet structure that used

31

to provide the packet in serial form to the RF transceiver. *See* APL 1003, Natarajan

at 3:33-37. Both idle words and HDLC are characteristic to bit-oriented framing:

> **Bit-oriented framing** This type of framing allows the sender to transmit a long string of bits at one time. IBM's SDLC (Synchronous Data Link Control) and ***HDLC*** (High Level Data Link Control) are examples of bit-oriented protocols. Most LANs use bit-oriented framing. There is usually a maximum frame size. For example, Ethernet has a maximum frame size of 1,526 bytes. The beginning and end of a frame is signaled with a special bit sequence (01111110 for HDLC). ***If no data is being transmitted, this same sequence is continuously transmitted so the end systems remain synchronized***.
>
> DSS 2010, Encyclopedia of Networking, at pg. 549.

As established in Section V.A.1.b, *supra*, bit-oriented framing is inconsistent

with a server transmitter being energized in low duty cycle RF bursts for the

following reasons. First, under bit-oriented framing, the server transmitter transmits

"*long* strings of bits at one time," which contradicts RF bursts. *See* DSS-2016,

Dezmelyk Dec. at ¶ 34. Second, the server transmitter continuously transmits idle

signals when no data is being transmitted, thereby contradicting a low duty cycle

operation. *See id*. at ¶ 35.

The Petition states that a data transmission protocol in which "the transmitter

(or receiver) consumes power ***only*** when it is ***actively*** transmitting a message (or

actively receiving a message) . . . constitutes 'low duty cycle RF bursts.'" *See*

32

Patent No. 6,128,290
IPR2015-00373

_____

Petition at pg. 39 (emphasis added); *see also* APL 1008, Grimes Dec. at ¶115. Accordingly, even under Petitioner's interpretation of "low duty cycle RF bursts," data network systems disclosed in Natarajan and Neve in which the server transmitter is energized when no data is being transmitted do not teach or suggest that server transmitter be energized in low duty cycle RF bursts.

### 3. The Board should not give any weight to Petitioner's expert's testimony pertaining to the issue of whether Natarajan in view of Neve teaches or suggests that server transmitters are energized in low duty cycle RF bursts

"The Board is capable of taking into account the baselessness of a witness's testimony, if any, when weighing all of the testimony of the witness." *Liberty Mutual Insurance Co. v. Progressive Casualty Insurance Co.*, CBM2013-00009, Final Written Decision at pg. 47 (Feb. 11, 2014). The Manual of Patent Examining Procedure ("MPEP") provides that "[t]he person of ordinary skill in the art is a hypothetical person who is ***presumed to have known the relevant art*** at the time of the invention." MPEP 2141.03.I. In this case, Dr. Grimes, Petitioner's expert, cannot be considered a person of ordinary skill in the art at least because he has admitted his unfamiliarity with several key elements of Natarajan and Neve.

Specifically, when asked about whether he was familiar with HDLC, Dr. Grimes replied: "I have ***passing familiarity*** with HDLC. I've certainly heard of it."

33

Patent No. 6,128,290
IPR2015-00373

_____

DSS-2015, Grimes Cross-Exam at 51:6-10. Passing familiarity with a key element

of the prior art is insufficient to render a reliable and well-informed opinion on

whether the prior art renders obvious a patent claim. Dr. Grimes further admitted

that he is unfamiliar with the terms "idle words," despite this concept being explicitly

discussed in Neve:

> Q.    Is it possible the transmitter could be sending
> an idle word during that time?

> MR. CORNWELL: Objection. Form.

> A.    That's not disclosed at all in Natarajan.

> BY MR. LYTVYN:

> Q.    But that's within the knowledge of an
> ordinary person skilled in the art at that time; is that
> correct?

> A.    This notion of idle words is **_a weird concept_**
> that **_I have not run into before_**, so I'm not sure that that
> would be understood by a person of ordinary skill in the
> art.

> When I saw that in Neve, I thought to myself, what
> is this? And I did a little bit of research to try and figure it
> out, and **_it's weird_**.

34

Apparently, it refers to -- according to -- in Neve, refers to some kind of a mechanism to let you know that the transmitter is still working, even though it's transmitting not useful information.

It's just transmitting a sequence of 1s or something like that.

Q.    So your opinion is that a person of ordinary skill in the art would not be familiar with that scheme at the time of the invention in 1997?

MR. CORNWELL: Objection. Form.

A.    Yes. That was **a new term** for me. **I certainly have never heard this term "idle word" before**.

I don't believe that a person of ordinary skill would understand what it means either.

DSS-2015, Grimes Cross-Exam at 68:13-22 – 69:1-20 (emphasis added)

In this case, determination of whether Natarajan in view of Neve teaches or suggests the server transmitters being energized in low duty cycle RF bursts hinges on proper understanding of "HDLC" and "idle words"—both of which are explicitly disclosed in the prior art cited against claims 9 and 10 of the '290 Patent. See Sections V.A.1-2, *supra*. In the testimony quoted above, Dr. Grimes admitted that

Patent No. 6,128,290
IPR2015-00373

_____

the concepts of "idle words" and "HDLC" fall outside the boundaries of his expertise. Because Dr. Grimes admittedly does not have requisite knowledge and understanding of these concepts, he could not have competently analyzed whether the server transmitter in Natarajan is send out idle words when no active transmission is required. Accordingly, the testimony of Dr. Grimes on the issue of whether Natarajan in view of Neve teaches or suggests "said server and peripheral transmitters being energized in low duty cycle RF bursts" limitation of claim 9 is unreliable and should not be given any weight.

For the reasons set forth above, Natarajan in view of Neve do not render claim 9 obvious. Claim 10 depend from patentable claim 9, and therefore are patentable as a matter of law. *See In re Fine*, 837 F.2d 1071, 1076 (Fed. Cir. 1988). Accordingly, the Board should deny Petitioner's challenge of claims 9-10 based on obviousness over Natarajan in view of Neve.

## VII.   CONCLUSION

For the reasons set forth above, Petitioner failed to prove by preponderance of evidence that the challenged claims are unpatentable based on the asserted grounds for invalidity. Accordingly, the Board should affirm the validity of all claims 9 and 10 of the '084 Patent.

36

Patent No. 6,128,290
IPR2015-00373

_____

Date: October 5, 2015                    Respectfully submitted,


                                         /andriy lytvyn/

                                         Andriy Lytvyn
                                         Lead Counsel for Patent Owner
                                         Registration No. 65,166

                                         Nicholas Pfeifer
                                         Back-up Counsel for Patent Owner
                                         Registration No. 41,849

                                         Anton Hopen
                                         Back-up Counsel for Patent Owner
                                         Registration No. 70,568

**SMITH & HOPEN, PA**

180 Pine Avenue North
Oldsmar, FL 34677
Tel: 813-925-8505
Fax: 800-726-1491
Email: andriy.lytvyn@smithhopen.com

Patent No. 6,128,290
IPR2015-00373

---

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, in accordance with 37 C.F.R. §

42.6(e), the above Patent Owner's Response and a copy of the Exhibits were

served via electronic mail on October 5, 2015, in their entirety upon the following:


David K.S. Cornwell, Lead Counsel for Petitioner
davidc-PTAB@skgf.com

Mark W. Rygiel, Back-Up Counsel for Petitioner
mrygiel-PTAB@skgf.com


Date: October 5, 2015                              /andriy lytvyn/
                                                   Andriy Lytvyn
                                                   Lead Counsel for Patent Owner
                                                   Registration No. 65,166

                                                   **SMITH & HOPEN, P.A.**
                                                   180 Pine Avenue North
                                                   Oldsmar, FL 34677
                                                   (813) 925-8505

38

UNITED STATES PATENT AND TRADEMARK OFFICE
———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————————————

APPLE INC.
Petitioner

v.

DSS TECHNOLOGY MANAGEMENT, INC.
Patent Owner

———————————————

Case IPR2015-00373
Patent 6,128,290

———————————————

**PETITIONER'S REPLY TO PATENT OWNER RESPONSE**

***Mail Stop "PATENT BOARD"***
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

IPR2015-00373
U.S. Pat. No. 6,128,290

## EXHIBIT LIST

| Apple Exhibit No. | Description |
|---|---|
| **APL 1001** | U.S. Patent No. 6,128,290 to Carvey ("the '290 patent") |
| **APL 1002** | T. J. Barber, Jr., "BodyLAN™: A Low Power Communications System," Master's Thesis at Massachusetts Institute of Technology, 1996 ("Barber") |
| **APL 1003** | U.S. Patent No. 5,241,542 to Natarajan ("Natarajan") |
| **APL 1004** | U.S. Patent No. 4,887,266 to Neve ("Neve") |
| **APL 1005** | Prosecution History of U.S. Application No. 08/949,999 (now U.S. Patent No. 6,128,290) ("the '999 application") |
| **APL 1006** | U.S. Application No. 08/611,695 (as-filed) ("the '695 application") |
| **APL 1007** | Apple's Claim Construction Brief in Case No. 6:13-cv-00919 JDL (EDTX) |
| **APL 1008** | Declaration of Jack D. Grimes, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 6,128,290 ("Grimes Dec.") |
| **APL 1009** | Curriculum Vitae of Jack D. Grimes, Ph.D. ("Grimes CV") |
| **APL 1010** | U.S. Patent No. 5,696,903 to Mahany ("Mahany") |
| **APL 1011** | Deposition Transcript of Robert Dezmelyk, IPR2015-00369 and IPR2015-00373, December 15, 2015 ("Dezmelyk Depo.") |
| **APL 1012** | Mischa Schwartz, Telecommunications Networks: Protocols, Modeling and Analysis, Addison-Wesley, 1988 ("Schwartz") |
| **APL 1013** | Tom Sheldon, Encyclopedia of Networking & Telecommunications, Lisa Wolters-Broder ed., McGraw Hill, 2001 (other excerpts submitted as DSS 2010) |
| **APL 1014** | Declaration of Dr. Jing Hu ("Hu Dec.") |
| **APL 1015** | *Curriculum Vitae* of Dr. Jing Hu |

i

## TABLE OF CONTENTS

I.    Introduction.................................................................................... 1

II.   DSS's statutory disclaimer of claims 6 and 7 is effective as a request for adverse judgment against those claims. .................................................. 2

III.  Natarajan teaches or suggests a server transmitter operating in "low duty cycle RF bursts," as recited in claim 9 of the '290 patent. ...................................... 2

IV.   HDLC is consistent with low duty cycle RF bursts. ..................................... 4

    A.    The preferred embodiment in the '290 patent uses HDLC..................5

    B.    DSS relies on the testimony of Mr. Dezmelyk, who admits he is not an expert in HDLC...................................................5

    C.    A POSA would have looked to Schwartz for information on Natarajan's HDLC protocol and understood that it is consistent with low duty cycle RF bursts................................7

        1.    Mr. Dezmelyk did not consider Schwartz–the most logical reference for information on Natarajan's HDLC protocol–when forming his opinions. ............................ 7

        2.    Natarajan's HDLC protocol is consistent with low duty cycle RF burst communication. ......................................... 8

    D.    DSS and Mr. Dezmelyk concoct inaccurate piecemeal arguments from excerpts of unrelated references that are inconsistent with each other and inconsistent with the operation of HDLC.................................................................10

    E.    DSS's "idle words" argument is a red herring. ...................................16

        1.    Neve is cited to expressly show that synchronizing a base station and peripheral units was well-known. ................. 16

        2.    Natarajan's HDLC protocol does not use idle words. ............. 17

V.    DSS's "low duty cycle" argument is meritless. ......................................... 19

    A.    Mr. Dezmelyk's definition of "duty cycle" is nonsensical. ................19

    B.    DSS's proposed claim construction that "low duty cycle" is less than 10% is arbitrary and unduly narrow....................................21

    C.    DSS improperly truncates the time period for calculating Natarajan's duty cycle. ........................................................................23

VI.   The Board should not give any weight to Mr. Dezmelyk's testimony. ........ 24

    A.    Mr. Dezmelyk's testimony lacks credibility. ....................................24

    B.    Mr. Dezmelyk admits he is not an expert in HDLC. ..........................25

    C.    Mr. Dezmelyk bases his opinions on inaccurate assumptions.............25

VII.  Conclusion ................................................................................. 25

## I.      Introduction

Claims 6, 7, 9 and 10 of the '290 patent at issue in this *inter partes* review are merely a combination of well-known concepts. Each and every limitation is either expressly disclosed in the prior art or would have been plainly obvious to a person of ordinary skill in the art ("POSA").

DSS's sole argument in its Patent Owner's Response is that the combination of Natarajan and Neve does not teach or suggest a server transmitter that operates in "low duty cycle RF bursts." Although this term was not commonplace, the technical features it describes were well-known to those of ordinary skill in the art.

DSS's argument is flawed for at least four reasons. First, Natarajan teaches or suggests a server transmitter operating in "low duty cycle RF bursts." Second, DSS bases its argument on the inaccurate premise that HDLC is inconsistent with low duty cycle RF bursts. In particular, DSS erroneously assumes that HDLC uses idle words. Third, DSS uses faulty logic to define "low duty cycle" and imposes an arbitrary 10% maximum threshold. And fourth, DSS bases its positions on the testimony Mr. Dezmelyk, which lacks credibility, particularly because he admits that he is not an expert in HDLC.

Accordingly, DSS's argument is meritless. Apple has shown by a preponderance of the evidence that claims 6, 7, 9 and 10 of the '290 patent are unpatentable and the Board should enter judgment in accordance therewith.

**II.  DSS's statutory disclaimer of claims 6 and 7 is effective as a request for adverse judgment against those claims.**

DSS asserts in its Patent Owner's Response that claims 6 and 7 were disclaimed. (POR, p. 2.) On January 5, 2016, DSS filed a Notice of Filing of Statutory Disclaimer (Paper 18) along with a copy of a "Disclaimer in Patent Under 37 CFR 1.321(a)" dated October 5, 2015, indicating the same. As reflected in the Board's Order of January 11, 2016 (Paper 20), the parties had a conference call with the Board on January 7, 2016 to discuss this matter. The Board indicated that "the disclaimer works as an effective cancellation of claims 6 and 7 upon which Petitioner can rely in preparing its Reply to Patent Owner's Response." (Paper 20, p. 2.) Accordingly, Apple does not address claims 6 and 7 herein, as DSS's statutory disclaimer is effective as requesting adverse judgment against these claims under 37 C.F.R. § 42.73. Any and all estoppels, including the prohibition to pursue any patentably indistinct claims, therefore apply.

**III.  Natarajan teaches or suggests a server transmitter operating in "low duty cycle RF bursts," as recited in claim 9 of the '290 patent.**

The vague term "low duty cycle RF bursts" is not defined in the '290 patent. As the Board correctly recognized in the Institution Decision, under the broadest reasonable interpretation of this term, Natarajan's "scheduled multi-access protocol in which time is divided into fixed-length frames, along with Natarajan's description of frames being divided into slots and multiple subframes" demonstrates that

Natarajan discloses "said server and peripheral transmitters being energized in low duty cycle RF bursts." (Institution Decision, pp. 16-17; Hu Dec. ¶ 43.) Indeed, like the '290 patent, Natarajan discloses that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)…the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." (Natarajan, 3:59-4:6.) This type of communication operates in "low duty cycle RF bursts." (Grimes Dec. ¶ 118; Hu Dec. ¶ 43.)

DSS argues that Natarajan only describes that the mobile units operate in this manner. (POR, p. 17.) But a POSA would have understood that, similarly, when the base station is not transmitting, its transmitter is powered off. (Grimes Dec. ¶¶ 29, 118; Grimes Depo. (DSS 2015), 68:5-12, 74:7-19, 75:21-76:3; Hu Dec. ¶ 44.) In Natarajan, "*[m]ost users are very likely to be inactive* (both Transmit-Inactive and Receive-Inactive) *most of the time* for most applications. This is primarily due to the *bursty nature* of data communication traffic." (Natarajan, 6:41-44 (emphasis added).) A POSA would have understood this to mean that Natarajan's base station and mobile units operate in low duty cycle RF bursts. (Hu Dec. ¶ 45.)

Moreover, DSS acknowledges that Natarajan explicitly discloses that the mobile unit transmitters operate in "low duty cycle RF bursts." (POR, p. 17; Dezmelyk Dec. ¶ 31.) So even if not expressly taught by Natarajan, it would have been plainly obvious to a POSA to have the base station operate in an analogous manner. (Hu Dec. ¶ 45.) Because the base and mobile stations have the same physical structure, this would have been no more than using a known technique to improve similar devices in the same way. (Natarajan, 3:7-8; Hu Dec. ¶ 45.) The "low duty cycle RF bursts" limitation of claim 9 is not novel. (Hu Dec. ¶ 45.)

## IV.    HDLC is consistent with low duty cycle RF bursts.

DSS alleges that the High-Level Data Link Control (HDLC) packet structure disclosed in Natarajan is inconsistent with a server transmitter being energized in low duty cycle RF bursts. (POR, pp. 20-23.) This is false. First, the '290 patent's preferred embodiment uses HDLC. Second, DSS relies on testimony from Mr. Dezmelyk, who admits he is not an expert in HDLC. Third, a POSA would have been directed to Schwartz for information on Natarajan's HDLC protocol and understood that HDLC is consistent with low duty cycle RF bursts. Fourth, DSS concocts inaccurate, piecemeal arguments that are inconsistent with the HDLC protocol. And fifth, Natarajan's HDLC protocol does not use idle words.

**A.    The preferred embodiment in the '290 patent uses HDLC.**

DSS's argument that HDLC is inconsistent with low duty cycle RF bursts is meritless because the preferred embodiment of the '290 patent itself discloses using HDLC for communication between the PDA and PEAs. If DSS's argument is believed, then the '290 patent's preferred embodiment would not be enabled.

The "basic scheme" of the '290 patent's frame structure is "a form of time division multiple access (TDMA)." ('290 patent, 5:45-50.) The '290 patent states that "[a]s will be ***understood by those skilled in the art***, the TDMA system is greatly facilitated by the establishment of a common frame time base between PEA and PDA." (*Id.* at 7:63-65 (emphasis added).) This is accomplished using synchronization beacons (SBs). (*Id.* at 7:65-67.) Before receiving the SBs, a PEA is associated with the PDA using a succession of Attachment Beacons (ABs), which are "composed of RF bursts," broadcast from the PDA to the PEAs. (*Id.* at 9:8-16, 9:66-10:2.) "This succession of ABs ***forms an <u>HDLC</u> channel*** using bit-stuffing to delineate the beginning and end of a packet." (*Id.* at 10:2-4 (emphasis added).)

So, the '290 patent uses HDLC to transmit and receive RF bursts. (Hu Dec. ¶¶ 48-49.) Thus, the '290 patent itself shows that DSS's argument is fallacious.

**B.    DSS relies on the testimony of Mr. Dezmelyk, who admits he is not an expert in HDLC.**

DSS relies on Mr. Dezmelyk's testimony to support its argument that HDLC is inconsistent with a server transmitter operating in low duty cycle RF bursts. (*See*

*e.g.,* POR, pp. 21-23 (citing Dezmelyk Dec. ¶ 34.).) But Mr. Dezmelyk **admits he is <u>not</u> an expert in HDLC**.

> Q.  Are you an expert in the HDLC protocol?

> A.  No. I would not say I am an expert in that area.

(Dezmelyk Depo., 26:15-16.)

Mr. Dezmelyk is not an inventor on any patents related to HDLC protocol; he has not received any industry awards related to HDLC protocol; and he has never lectured on HDLC protocol. (*Id.* at 19:10-20:4.) In fact, this IPR and the related district court case are the only matters he recollects working on that are even related more generally to wireless communication (*id.* at 21:1-22), which he asserts is "a hugely broad topic area" (*id.* at 26:1-2). Although his standard practice is to attach his *Curriculum Vitae* with a declaration, he did not here. (*Id.* at 16:5-7.) There is no evidence that Mr. Dezmelyk is qualified to opine on HDLC. To the contrary, by his own admission, Mr. Dezmelyk is not an expert in HDLC. And his understanding of the HDLC protocol is factually inaccurate. (Hu Dec. ¶ 50.) Accordingly, DSS's reliance on his testimony on HDLC must be disregarded.

**C.    A POSA would have looked to Schwartz for information on Nata-rajan's HDLC protocol and understood that it is consistent with low duty cycle RF bursts.**

**1.    Mr. Dezmelyk did not consider Schwartz–the most logical ref-erence for information on Natarajan's HDLC protocol–when forming his opinions.**

A POSA need not look any further than Natarajan itself for direction on more specifics about Natarajan's HDLC protocol. Natarajan describes that infor-mation packets are transmitted between the base station and mobile stations:

> Packets received or to be sent are held in data storage 68 and commu-nicated to or from the RF transceiver 54 via interface 58 under control of serial channels…. The function of these serial channels is to encap-sulate data and control information in an HDLC (high-level data link control) packet structure and provide the packet in serial form to the RF transceiver 54. ***For more information on the HDLC packet struc-ture, see, for example, Mischa Schwartz, Telecommunication Net-works: Protocols, Modeling and Analysis, Addison-Wesley (1988).***
>
> (Natarajan at 3:28-40 (emphasis added).)

So, the Schwartz book (APL 1012) is the most logical resource for a POSA to consult for information on Natarajan's HDLC packet structure. (Hu Dec. ¶ 51.) Indeed, Mr. Dezmelyk acknowledged that a POSA would have access to Schwartz. (Dezmelyk Depo., 72:12-22.) Yet Mr. Dezmelyk never looked at Schwartz when considering how Natarajan's HDLC packet structure operates. (*Id.* at 71:11-73:13.) Nor does DSS reference Schwartz. Instead, DSS forgoes logic, formulating a con-voluted argument that defies technical accuracy. (*See infra*, Section IV.D.)

- 7 -

### 2. Natarajan's HDLC protocol is consistent with low duty cycle RF burst communication.

Schwartz provides a concise summary of the HDLC frame format:

The standard frame format for HDLC (ADCCP and SDLC have the same format) appears in Fig. 4-9. Note that the number of overhead (control) bits is $\ell' = 48$, just the number used earlier for calculations. The *eight-bit flag sequence* 01111110 that appears at the beginning and end of a frame *is used to establish and maintain synchronization*. Because the flag appears at the beginning and end of the frame there is no need to prescribe an information field structure. The *information field (packet)* delivered from the network layer above *can be any desired number of bits*. Extended versions of the frame structure of Fig. 4-9 are available as well: The address, control, and block-check fields can all be increased to allow additional addressing, improved error detection, and increased sequence numbers. *Since the flags* appearing at the beginning and end of a frame *contain six consecutive ones, that sequence may not appear anywhere else in the frame*. Bit stuffing is used to eliminate this possibility: a zero is inserted at the transmitter any time that five ones appear outside the F fields. The zeros are removed at the receiver. *If seven ones appear anywhere in the frame (six ones followed by an additional one), the frame is declared in error*.



**Figure 4-9** HDLC standard frame format

(Schwartz, pp. 135-136 (emphasis added), Fig. 4-9.)

- 8 -

IPR2015-00373
U.S. Pat. No. 6,128,290

Schwartz also describes that "[w]hen the transmitter reaches its maximum sequence number *it is forced to stop transmitting* until a frame in the reverse direction is received, acknowledging an outstanding packet." (*Id.* at 136 (emphasis added).) Thus, the transmitter *does **not** continuously transmit* under HDLC protocol. (Hu Dec. ¶ 53.) The discontinuous transmission of the HDLC protocol is also shown in Schwartz's throughput calculation illustrated in Figure 4-13, showing periods (e.g., between I10 and I30) where the transmitter is idle (i.e., not transmitting). (*Id.*) Figure 4-13 illustrates the *maximum* throughput, so the amount of time the transmitter is not transmitting is at a minimum. (Schwartz, p. 142 ("This station is assumed in addition to be in a saturated state: It *always* has frames to send. As noted earlier, this provides the maximum possible throughput." (emphasis original)); Hu Dec. ¶ 53.) When the primary station is not saturated, there will be additional periods where the transmitter is not transmitting. (Hu Dec. ¶ 53.)



**Figure 4–13** Example of error-recovery procedures, version of HDLC, $M = 4$
**Annotated Figure 4-13 of Schwartz**

Thus, the HDLC protocol described in Schwartz is consistent with low duty cycle communication. (Hu Dec. ¶ 54.) Moreover, as illustrated, for example by the I-frames I00-I30 in Figure 4-13, the transmissions occur in "bursts." (*Id*.)

Schwartz also describes the three modes of operation for the HDLC protocol. (Schwartz, pp. 137-138.) The asynchronous balanced mode (ABM) is for point-to-point transmission only, and therefore inapplicable to Natarajan, which is point-to-multipoint communication. (*Id.*; Hu Dec. ¶ 55.) The normal response mode (NRM) and asynchronous response mode (ARM) are used for point-to-multipoint operation. (Schwartz, p. 137; Hu Dec. ¶ 55.)

A POSA would have understood that Natarajan operates using the ARM. (Hu Dec. ¶ 55.) ARM provides that "the secondary station does not need permission from the primary station to initiate transmission." (Schwartz, p. 137.) This occurs in Period C in Natarajan, which allows for "bursty data traffic *in a contention mode from mobile units* to base station." (Natarajan, 4:36-37 (emphasis added); Hu Dec. ¶ 55.) In Period C, the mobile units initiate transmission without permission from the base station. (Hu Dec. ¶ 55.)

### D. DSS and Mr. Dezmelyk concoct inaccurate piecemeal arguments from excerpts of unrelated references that are inconsistent with each other and inconsistent with the operation of HDLC.

DSS and Mr. Dezmelyk did not consider the most logical reference–Schwartz–for information on Natarajan's HDLC protocol. Instead, they piece to-

- 10 -

gether a patchwork of references in an ill-fated effort alleging that Natarajan does

not teach low duty cycle RF bursts because it employs HDLC. (POR, pp. 20-23;

Dezmelyk Dec. ¶¶ 34-35.) This argument is meritless because the disparate refer-

ences do not support the asserted premise. (Hu Dec. ¶ 56.)

First, DSS's reliance on the excerpt from DSS 2010 is misplaced. DSS as-

serts that the cited definition of "bit-oriented framing" shows that HDLC "involves

continuous outbound transmission." (POR, pp. 21-22.) But DSS neglects to

acknowledge the very first sentence of the cited section, stating that "[a] ***point-to-

point connection*** between two computers or devices consists of ***a wire*** in which

data is transmitted as a stream of bits." (DSS 2010, p. 549 (emphasis added).) DSS

2010 refers to point-to-point wired communication, not to a ***point-to-multipoint

wireless*** system as taught in Natarajan. (Hu Dec. ¶ 56.) There are fundamental dif-

ferences and unique challenges between point-to-point wired systems and point-to-

multipoint wireless systems–the features are not simply interchangeable. (*Id.* at 57-

60.) For example, a continuous transmission of so-called "idle words" to maintain

synchronization when there is no data to transmit–suitable for an isolated point-to-

point wired connection for design simplicity and reliability–would be detrimental

to a point-to-multipoint wireless connection because it would interfere with the

carefully designed scheduling, waste power, decrease the system data rate, and pol-

lute the wireless channel potentially shared by many devices. (*Id.* at 59.)

- 11 -

DSS also asserts that the "HLDC [*sic*] packet structure is used to transmit '***long*** strings of data at one time,'" and therefore is inconsistent with "small" RF bursts. (POR, p. 22 (emphasis original).) DSS misquotes this passage, which actually states: "[t]his type of framing ***allows*** the sender to transmit ***a long string of bits at one time***." (DSS 2010, p. 549 (emphasis added).) A POSA would have understood that this does not mean that HDLC only sends a long string of bits; nor does it suggest that transmitting a string of bits is not a "burst." (Hu Dec. ¶ 61.) Rather, a sender with data bits to transmit "at one time" does not have to break the string into smaller packets before the string of bits reach the data link layer. (*Id*.)

Moreover, this same reference discloses that the number of bits in the Information Field of an HDLC frame is "variable." (APL 1013, p. 582, Figure H-2.) Mr. Dezmelyk, however, did not consider any portion of this reference other than what DSS provided to him.[1] (Dezmelyk Depo., 101:4-102:7.)



**Annotated Figure H-2 of APL 1013**

---

[1] Regarding DSS 2010, Mr. Dezmelyk asserts he was "trying to get [a reference] in the right time frame" (Dezmelyk Depo., 101:18-19), but the copyright date for this reference is 2001–well after the '290 patent's filing date.

- 12 -

This portion of DSS 2010 (APL 1013)–uncited by DSS–corroborates Schwartz. (Schwartz, p. 135 ("The *information field (packet)* delivered from the network layer above *can be any desired number of bits*.") (emphasis added).) So, the HDLC frame format is compatible with a "burst" transmission. (Hu Dec. ¶ 62.)

Next, Mr. Dezmelyk tries to tie the excerpt from DSS 2010 with an excerpt from DSS 2013, proposing that Natarajan teaches continuous transmission, which it does not. Mr. Dezmelyk notes that Natarajan's HDLC packets are in "serial form." (Dezmelyk Dec. ¶ 35 (citing APL 1003 at 3:36-37).) He alleges that serial communication systems "include a server transmitter transmitting idle words when no useful data is being transmitted." (Dezmelyk Dec. ¶ 35.) But nowhere does DSS 2013 use the term "idle words."[2] Mr. Dezmelyk instead provides a quote: "In *synchronous transmission*, groups of bits are combined into frames and frames are sent continuously with or without data to be transmitted." (*Id.* (quoting DSS 2013, p. 2 (emphasis added)).) But this does not describe Natarajan's HDLC protocol, which is *asynchronous*. (Hu Dec. ¶ 64.) Mr. Dezmelyk is wrong that a POSA would not have known whether Natarajan operates under a synchronous or asynchronous protocol. (Dezmelyk Depo., 99:12-20; Hu Dec. ¶ 64.) His assertion underscores his misunderstanding of HDLC, a subject on which he admits he is <u>not</u>

---

[2] Importantly, Natarajan's system does not use idle words. (Section IV.E., *infra*.)

an expert. (Dezmelyk Depo., 26:15-16; Hu Dec. ¶ 50.) As discussed above in Section IV.C.2, a POSA would have understood that Natarajan operates under the asynchronous response mode (ARM) of HDLC. (Hu Dec. ¶ 64.)

The very next sentences in DSS 2013 distinguish that "[i]n *asynchronous transmission*, groups of bits are sent as independent units with *start/stop flags* and no data link synchronization, to allow for arbitrary size *gaps between frames*. However, *start/stop bits maintain* physical bit level *synchronization* once detected." (DSS 2013, p. 2 (emphasis added).) These "start/stop flags" for synchronization corroborate Schwartz, that an "eight-bit flag sequence 01111110 that appears at the beginning and end of a frame is used to establish and maintain synchronization." (Schwartz, p. 135; Hu Dec. ¶ 65.) Thus, in HDLC, transmission is <u>not</u> continuous, as DSS asserts; rather, there are *gaps between frames*. (Hu Dec. ¶ 65.)

Finally, Mr. Dezmelyk pieces an excerpt from DSS 2014 together with the excerpts from DSS 2010 and DSS 2013. (Dezmelyk Dec. ¶ 35 (quoting DSS 2014 at Section 2.5.6. ("When transmitting, the Asynchronous HDLC controller will transmit IDLE characters (characters consisting of only "1"s) when no data is available for transmission."))). This association is inapt for two reasons. First, DSS 2014 relates to point-to-point communications, not point-to-multipoint communications as in Natarajan. (DSS 2014, p. 4 ("This protocol is typically used as the physical layer for the Point-to-Point (PPP) protocol."); Hu Dec. ¶ 66.) As discussed

- 14 -

above, a point-to-point wired connection and a point-to-multipoint wireless connection are two fundamentally different types of data communication with distinct design challenges and principles. (*See supra*, Section IV.D; Hu Dec. ¶¶ 57-60, 66.) Second, DSS 2014 is a technical manual for a proprietary Motorola product, which uses a modified "HDLC-like" protocol. (Hu Dec. ¶ 66.) This is evident because it can repeatedly transmit "characters consisting of only '1's." (*Id.*) This violates the standard HDLC protocol, where "[i]f *seven ones appear anywhere* in the frame (six ones followed by an additional one), the frame is *declared in error*." (Schwartz, p. 136 (emphasis added); *see also* APL 1013, p. 582 ("If any portion of the data in the frame contains more than five 1 bits, a zero-bit insertion technique inserts a 0 bit to ensure that data is not mistaken for a flag.").)

Thus, DSS 2014 does not disclose the standard HDLC protocol and so it cannot be used to support DSS's position. (Hu Dec. ¶¶ 67-68.) Yet Mr. Dezmelyk relies on this document as supposedly disclosing "the HDLC spec," which it does not. (Dezmelyk Depo., 69:17-71:1; Hu Dec. ¶ 68.) Because Mr. Dezmelyk bases his opinions on DSS 2014, which does not disclose the standard HDLC protocol, his opinions on HDLC are unsupported. (Hu Dec. ¶ 68.)

The piecemeal argument cobbled together by DSS and Mr. Dezmelyk provides misinformation about how HDLC operates. Indeed, excluded portions of the

very references they cite belie their contentions regarding HDLC, and thus their assertions regarding Natarajan. Accordingly, DSS's arguments are baseless.

**E.     DSS's "idle words" argument is a red herring.**

**1.     Neve is cited to expressly show that synchronizing a base station and peripheral units was well-known.**

Apple's Petition includes Neve in combination with Natarajan because "Natarajan does not explicitly describe synchronizing the mobile units with the base station." (Petition, p. 28.) However, Natarajan teaches numerous reasons that "coordinated timing of transmissions is important". (*See id.* (citing Grimes Dec. ¶ 92); Hu Dec. ¶ 69.) Thus, a POSA would have been motivated to precisely synchronize the mobile units and base unit, leading a POSA to Neve–an example of a conventional synchronization technique. (Petition, pp. 29-30; Hu Dec. ¶ 69.)

Indeed, although Natarajan does not explicitly disclose synchronizing the mobile units with the base station, the HDLC protocol, for example as described in Schwartz, explains that the "standard frame format for HDLC" has an "eight-bit flag sequence 01111110 that appears at the beginning and end of a frame [that] is used *to establish and maintain synchronization*." (Schwartz, p. 135 (emphasis added).) Thus, Natarajan's HDLC protocol contemplates a synchronization mechanism. (Hu Dec. ¶ 70.) To make clear that synchronization was well-known, Neve is combined with Natarajan. As Mr. Dezmelyk acknowledges, synchronization was within the skill of a POSA. (Dezmelyk Depo., 93:6-16; Hu Dec. ¶ 70.)

- 16 -

## 2.     Natarajan's HDLC protocol does not use idle words.

Again, Apple cites Neve to make clear that synchronization was conventional in communication networks before the '290 patent's priority date. DSS uses Neve as a distraction, conjuring a theory that Natarajan uses idle words, as disclosed in Neve. DSS's theory is unfounded. (Hu Dec. ¶¶ 71-72.)

To begin with, even Neve's master station does not continuously transmit idle words. (*Id.* at 71.) The Board correctly found that Neve "***do[es] not suggest continuous transmission*** from the master station, but instead transmission of idle words in the event that there is no data required to be transmitted in the time slots specifically allocated for transmission by the server" and that "the master station performs different functions during different time slots, only certain of which involve transmission." (Institution Decision, p. 18 (emphasis added); Hu Dec. ¶ 71.) Idle words are not continuously transmitted in Neve. (Hu Dec. ¶ 71.)

DSS contorts the inclusion of Neve as somehow suggesting that Natarajan operates identically, which it does not. (*Id.* at 72.) In particular, DSS suggests that Natarajan transmits idle words (POR, pp. 31-33), which it does not. (Hu Dec. ¶ 72.) Indeed, neither Natarajan, nor Schwartz's discussion of HDLC for that matter, mention idle words. This is likely because using idle words in Natarajan would be pointless. (*Id.* at 73.) First, HDLC has a mechanism–start/stop flags–for synchronization, so idle words would be redundant. (*Id.*) Second, if Natarajan used idle

- 17 -

words, they would be transmitted "out into the air and there is ***nobody really paying attention to it***." (Dezmelyk Depo., 84:22-85:1 (emphasis added).) This is illogical. (Hu Dec. ¶ 73.) Mr. Dezmelyk tries to reconcile, asserting that when receivers turned back on, they could synchronize onto the stream of idle words. (Dezmelyk Depo., 85:2-14.) But Natarajan discloses that "each receiving mobile unit can compute ***exactly when*** it should be ready to receive packets from the base station…to wake itself up at its designated time for receiving data." (Natarajan, 4:67-5:3 (emphasis added).) Thus, a POSA would understand that Natarajan does not operate in the manner Mr. Dezmelyk suggests. (Hu Dec. ¶ 73.)

Mr. Dezmelyk even acknowledges that Natarajan does not actually disclose continuous transmission: "…using the Natarajan example, there is a period of time for outbound data traffic. There will be ***effectively, <u>if there is a lot of data sent</u>***, continuous transmission over across that interval." (Dezmelyk Depo., 62:3-6 (emphasis added).) And although he is factually inaccurate because the HDLC protocol does not use idle words, Mr. Dezmelyk asserts that HDLC only "typically" uses idle words. (*Id.* at 69:10-16.)

Moreover, Mr. Dezmelyk asserts that systems using idle words can have, for example, ten consecutive 1's. (Dezmelyk Depo., 98:1-13.) Again, Mr. Dezmelyk is wrong. (Hu Dec. ¶ 74.) HDLC cannot have more than six consecutive 1's, otherwise an error is declared. (Schwartz, p. 135-136; Hu Dec. ¶ 74.) That is why, ac-

cording to the book cited by DSS, "[i]f any portion of the data in the frame contains more than five 1 bits, a zero-bit insertion technique inserts a 0 to ensure that data is not mistaken for a flag," which is 01111110. (APL 1013, p. 582.)

Nothing in Natarajan or the HDLC protocol suggests using idle words. (Hu Dec. ¶ 75.) And, in fact, a POSA would understand that HDLC does <u>not</u> use idle words. (*Id.*) DSS's argument on this point is meritless.

## V.    DSS's "low duty cycle" argument is meritless.

### A.    Mr. Dezmelyk's definition of "duty cycle" is nonsensical.

Mr. Dezmelyk asserts in his declaration that "duty cycle" should be construed to mean "the ratio of the duration during which the server transmitter is energized to the total duration designated for outbound transmissions–from the server unit to the peripheral units." (Dezmelyk Dec. ¶ 23.) But in his deposition, he provides two different, yet equally confounding, explanations for determining duty cycle. In each case, the '290 patent would have a 100% duty cycle.

First, in his redirect testimony, Mr. Dezmelyk asserts that "duty cycle is measured based on when you are transmitting." (Dezmelyk Depo., 116:8-9.) He asserts that Natarajan has a 100% duty cycle because "if you measure during what periods of time it is transmitting it is transmitting at 100 percent duty cycle." (Dezmelyk Depo., 69:7-9.) But of course, if the only times used to calculate duty cycle are when the transmitter is actually transmitting, the duty cycle will always

be 100%. (Hu Dec. ¶ 80.) Using Mr. Dezmelyk's example from the '290 patent, if transmissions occur in 3 out of 64 slots and "if you measure during what periods of time it is transmitting" (i.e., the 3 transmissions slots), the '290 patent transmits at a 100% duty cycle. (Dezmelyk Dec. ¶¶ 24, 26; *see also* Dezmelyk Depo., 116:10-14 ("So if there was enough data to occupy two slots then the question is:  What is the duty cycle of the RF transmitter during that period of time of those two slots. Or the aggregate time of those two slots if they weren't adjacent to one another."); Hu Dec. ¶ 80.) Under Mr. Dezmelyk's interpretation, if a particular time slot is filled by a transmission, the duty cycle is 100%. (Hu Dec. ¶ 80.)

Second, Mr. Dezmelyk doubles down on this peculiar interpretation, asserting that duty cycle is calculated based on the sub-portion of a time slot taken up by a transmission. Mr. Dezmelyk asserts that:

> if you had -- you are using in essence two slots out of the 10 that are available, and particular slots have a fixed width, then that ***period of time of the two slots that you actually have something to transmit in gives you the kind of what you are dividing by, the time you are dividing by to calculate the duty cycle***. You are looking at the percentage of time that the transmitter is active during the period in time when, in essence when a transmission is called for.
>
> (Dezmelyk Depo., 116:20-117:6 (emphasis added).)

Put another way by Mr. Dezmelyk, "the question is, what ***percentage of <u>that slot time</u>*** is taken up by the transmission." (Dezmelyk Depo., 106:2-4 (emphasis

added).) So, Mr. Dezmelyk's interpretation requires determining the percentage of a single transmission slot used for transmission. (Hu Dec. ¶ 82.) Again, Mr. Dezmelyk's calculation for the '290 patent accounts for transmission during the entirety of the 3 time slots (out of the 64 total slots), which would be a 100% duty cycle under his interpretation. (*See* '290 patent at 4:2-6 ("***For each slot***, this TDMA program indicates that a PEA or host is to ***transmit, or not***, and whether it will receive, or not."); Hu Dec. ¶ 82.)

Neither of Mr. Dezmelyk's interpretations of duty cycle are consistent with the '290 patent. (Hu Dec. ¶ 82.) And only under this inaccurate interpretation of duty cycle is he able to allege that Natarajan has a 100% duty cycle. So too, however, would the '290 patent. Because Mr. Dezmelyk's interpretation is erroneous, his testimony on duty cycle and DSS's reliance thereon should be ignored.

## B. DSS's proposed claim construction that "low duty cycle" is less than 10% is arbitrary and unduly narrow.

DSS proposes that the broadest reasonable interpretation for a server transmitter energized in a "low duty cycle" is that "the server transmitter is energized for ***less than ten percent*** (10%) of the total duration designated for outbound transmissions." (POR, p. 12 (emphasis added).) But DSS's proffered evidence does not support a ceiling of 10% for a low duty cycle. (Hu Dec. ¶ 76.)

The "examples" that DSS cites in Table 1 are cherry-picked results from a search premised on finding examples by including "e.g." in the search string.

(POR, p. 13.) Yet none of these references are contemporaneous with the '290 patent's filing date. One of DSS's own examples contradicts the proposed construction of "*less than* ten percent," providing a "low duty cycle, e.g., *at* an *about* 10 percent (10%) duty cycle." (POR, p. 13 (quoting DSS 2008 at 10:5-6) (emphasis added).) So, the duty cycle could be at or even slightly above 10%, which is <u>not</u> "less than ten percent," as DSS proposes. Thus, DSS's own example demonstrates that its proposed construction is inappropriate. (Hu Dec. ¶ 77.)

DSS cites Mr. Dezmelyk's declaration in support of its interpretation (POR, pp. 11-12), but his deposition testimony undermines the proposed construction. First, Mr. Dezmelyk admits that the term "low duty cycle" itself does not require an upper bound at 10%. (Dezmelyk Depo., 78:2-6; *see* Hu Dec. ¶ 77.) While Mr. Dezmelyk asserts that "we are quibbling over whether it is 9.9 or 10.1," it is he who places a strict upper bound on a low duty cycle. (Dezmelyk Depo., 80:11-12; Dezmelyk Dec. ¶ 24.)

Second, Mr. Dezmelyk asserts for the first time that the 10% limit is actually based on claim 8 of U.S. Patent No. 5,699,357. (*See* Dezmelyk Depo., 79:12-81:3.) DSS does not cite the '357 patent in its claim construction or in Table 1. Mr. Dezmelyk states that he "probably missed the citation to it in here because I was plowing away in a hurry." (*Id.* at 80:6-7.) But claim 8 of the '357 patent is irrelevant because it does not support a 10% limit either. Claim 8 recites "…said low

duty cycle pulses comprise chips within the respective code sequences such that a transmitter is enerrgized [*sic*] less than 10% of the time during an allocated time slot." Because claim 8 depends ultimately from independent claim 6, it is ***narrower*** than the independent claim, meaning that the '357 patent contemplates a "low duty cycle" ***greater than*** 10%. (Hu Dec. ¶ 78.)

Apple does not propose a specific upper threshold for "low duty cycle;" however, it is evident that DSS's proposed upper bound of 10% is unsupported. So, under the broadest reasonable interpretation standard, a "low duty cycle" of a transmitter should simply be interpreted as the transmitter being designed to be on only to satisfy the data communication needs over the communication cycle of the system. (*See* Grimes Depo., 40:16-19; Hu Dec. ¶ 79.)

## C. DSS improperly truncates the time period for calculating Natarajan's duty cycle.

DSS focuses only on the period for "outbound transmissions" for calculating Natarajan's duty cycle. (POR, pp. 11-12; Dezmelyk Dec., ¶ 23.) This is improper. (Hu Dec. ¶ 83.) A POSA would calculate the duty cycle over the period of time that it takes a system to go through a cycle of communication. (*Id.*) DSS's methodology improperly manipulates that time period. (*Id.*)

A POSA would calculate Natarajan's duty cycle over all of Periods A, B, and C. (Hu Dec. ¶ 84.) To limit the calculation only to Period A, as Mr. Dezmelyk suggests (Dezmelyk Dec. ¶ 32), reads the word "cycle" out of the term "duty cy-

cle." (Hu Dec. ¶ 84.) The communication "cycle" in Natarajan includes all of Periods A-C. (*Id*.) Once the transmissions between the base station and mobile stations cycle through Periods A-C, the cycle begins again with Period A for the next frame. (*Id*. at 85.) Thus, Natarajan's duty cycle must be calculated over Periods A-C. (*Id*.) Indeed, Natarajan's communication cycle, where "[m]ost users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time," is a low duty cycle. (Natarajan, 6:41-44; Hu Dec. ¶ 85.) Further still, even under DSS's improper limitations for duty cycle, Natarajan's system would be capable of operating at a duty cycle less than 10% in Period A. (Hu Dec. ¶¶ 86-88.)

## VI.    The Board should not give any weight to Mr. Dezmelyk's testimony.

### A.    Mr. Dezmelyk's testimony lacks credibility.

Mr. Dezmelyk asserts that he read his declaration "[m]any, many, many times." (Dezmelyk Depo., 27:18.) And yet he did not notice that the very first page after the caption states "DECLARATION OF CHRIS A. MACK, PH.D." (*Id.* at 26:21-27:18.) Nor did he notice that there are two paragraphs numbered 15 and two paragraphs numbered 16. (*Id.* at 27:19-28:3.)

Even if the duplicative paragraph numbers resulted from "Microsoft Word at work where it has got strange issues of paragraph numbering" (*id.* at 28:5-7), this error casts doubt on how thoroughly he reviewed the statements in his declaration. More importantly, the fact that Mr. Dezmelyk did not notice someone else's name

on his sworn declaration clouds the credibility and veracity of his entire testimony. Thus, the Board should not give any weight to Mr. Dezmelyk's declaration.

### B.    Mr. Dezmelyk admits he is not an expert in HDLC.

As discussed above in Section IV.B., Mr. Dezmelyk admits he is not an expert in HDLC. At a minimum, his testimony on that topic must be discounted.

### C.    Mr. Dezmelyk bases his opinions on inaccurate assumptions.

Mr. Dezmelyk bases his opinions on the inaccurate assumption that Natarajan's system uses idle words. (*See supra*, Section IV.E.) Because Natarajan does not use idle words, Mr. Dezmelyk's opinions are meritless. Mr. Dezmelyk also bases his opinions on an arbitrary and unduly narrow construction of "low duty cycle" and improperly truncating the time period for calculating Natarajan's duty cycle. (*See supra*, Section V.) So again, Mr. Dezmelyk's opinions are meritless.

## VII.   Conclusion

Apple has demonstrated by a preponderance of the evidence that claims 6, 7, 9, and 10 of U.S. Patent No. 6,128,290 are unpatentable and respectfully requests that the Board enter judgment in accordance therewith.

- 25 -

IPR2015-00373
U.S. Pat. No. 6,128,290

Respectfully submitted,
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

/Mark W. Rygiel/

Mark W. Rygiel, Registration No. 45,871
David K.S. Cornwell, Registration No. 31,944
Robert Greene Sterne, Registration No. 28,912
Jason A. Fitzsimmons, Registration No. 65,367

Attorneys for Petitioner Apple

Date: January 22, 2016

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

IPR2015-00373
U.S. Pat. No. 6,128,290

## CERTIFICATION OF SERVICE (37 C.F.R. §§ 42.6(e))

The undersigned hereby certifies that the above-captioned **PETITIONER'S**

**REPLY TO PATENT OWNER RESPONSE** and all associated exhibits were

served in their entirety via e-mail on January 22, 2016, upon the following counsel

of record for the Patent Owner:

Andriy Lytvyn (Lead Counsel)
Anton J. Hopen (Back-up Counsel)
Nicholas Pfeifer (Back-up Counsel)

SMITH & HOPEN, P.A.
180 Pine Avenue North
Oldsmar, FL 34677

andriy.lytvyn@smithhopen.com
anton.hopen@smithhopen.com
nicholas.pfeifer@smithhopen.com

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

/Mark W. Rygiel/

Mark W. Rygiel
Attorney for Petitioner Apple Inc.
Date: January 22, 2016        Registration No. 45,871

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

US005241542A

# United States Patent [19]

## Natarajan et al.

[11] **Patent Number:** **5,241,542**

[45] **Date of Patent:** **Aug. 31, 1993**

[54] **BATTERY EFFICIENT OPERATION OF SCHEDULED ACCESS PROTOCOL**

[75] Inventors: **Kadathur S. Natarajan**, Millwood; **Chia-Chi Huang**, Yorktown Heights, both of N.Y.

[73] Assignee: **International Business Machines Corporation**, Armonk, N.Y.

[21] Appl. No.: **749,234**

[22] Filed: **Aug. 23, 1991**

[51] Int. Cl.⁵ ........................ H04B 7/212; H04B 7/26

[52] U.S. Cl. .................................. 370/95.3; 370/85.2; 455/38.3; 455/54.1; 455/343

[58] Field of Search .................. 370/95.1, 95.3, 104.1, 370/29, 85.2, 85.7, 94.1; 455/53.1, 54.1, 343, 38.3; 340/825.44, 311.1; 379/58

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,794,649 | 12/1988 | Fujiwara | 455/343 |
| 4,897,835 | 1/1990 | Gaskill et al. | 370/94.1 |
| 4,995,099 | 2/1991 | Davis | 340/825.44 |
| 5,095,308 | 3/1992 | Hewitt | 455/343 |
| 5,144,296 | 9/1992 | DeLuca et al. | 455/343 |
| 5,150,361 | 9/1992 | Wieczorek et al. | 370/95.1 |

### FOREIGN PATENT DOCUMENTS

2232326 12/1990 United Kingdom ................. 370/29

### OTHER PUBLICATIONS

William Stallings, "Data and Computer Communications", Macmillan Publishing Company, 1985, pp. 312–315.

*Primary Examiner*—Douglas W. Olms
*Assistant Examiner*—Hassan Kizou
*Attorney, Agent, or Firm*—Jack M. Arnold

[57] **ABSTRACT**

A method and apparatus for conserving battery power in a wireless link adapter of a battery operated computer such as a portable laptop computer, as controlled by a scheduled multiaccess protocol. The portable computer is operable as a mobile unit in a multi-cell wireless network. The scheduled access multiaccess protocol is implemented to effectively conserve battery power by suitable control of the state of the controller, the transmitter and receiver units at the wireless link adapter by scheduling when the adapter is in a normal running mode, or a standby mode in which power is conserved.

**7 Claims, 9 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3

```
         | G |AH|      A       |BH|    B   |CH|    C      |FT|
         |...|.||||||||||||||||..||||||||||||..|||||||||||||||  |
         |...|..|<------------>|  |<-------->|..|<----------->|..|
                | Base to      |  | Mobile to|  | Contention |  |
                | Mobiles      |  |  Base    |  | from Mobiles|  |
           ->| FH|  |<-----TA----->|  |<---TB---->|  |<---TC------>|  |
```

**FIG.4**

**FIG. 5**

```
         | 00010001100000 ********************* 1000000 |
         |<---------------------- 64 bits --------------------->|
```

```
         |...|..|<------------>|   |<----------->|..|<-----------`|..|
                | Base to      |   | Mobile to   |  | Contention |  |
                | Mobiles      |   |   Base      |  | from Mobiles|  |
         | G |AH|      A       |BH|      B      |CH|     C      |FT|
         |...|.||||||||||||||||..||||||||||||||..|||||||||||||||  |
         |  |  |S1| S2 |S3|S4| |                |  |            |  |
         |  |  |ON| ON |ON|ON| |                |  |            |  |
                RECEIVER ALLOCATIONS S1=3, S2=5, S3=3, S4=4
           ->| FH|  |<-- TA = 15 ->|  |<--TB = 14-->|  |<---TC ------>|  |
```

**FIG.6**

```
         | G |AH|      A       |BH|     B      |CH|           |FT|
         |...|.|||||||||||||||||..|||||||||||||||..|||||||||||||  |
         |  |  |                  |  |R1 |R2|   R3  |  |       |  |
         |  |  |                  |  |ON |ON|   ON   |  |       |  |
           TRANSMITTER ALLOCATIONS    R1=4, R2=3, R3=7
```

**FIG.7**



FIG. 8A

FIG. 8



FIG. 8B

95

TURN RECEIVER OFF;
ENTER SLEEP MODE;
WAKE UP AFTER
SLEEP_DURATION
SLOTS HAVE ELAPSED

96

RECEIVE HEADER BH FOR PERIOD B
TURN RECEIVER OFF FOR DURATION TB

98

AM I IN
THE LIST OF MOBILE
UNITS ALLOWED TO TRANSMIT IN THIS
FRAME ? TLIST=〈V1,V2,...,Vn〉

100

NO

YES

$i \leftarrow$ MY POSITION IN TLIST;

$$SLEEP\_DURATION \leftarrow \sum_{j=1}^{i-1} + j$$

104

SLEEP_DURATION ◄— TB

102

TURN TRANSMITTER OFF;
ENTER SLEEP MODE

106

WAKE UP AFTER
SLEEP_DURATION
SLOTS HAVE ELAPSED

108

TURN TRANSMITTER ON;
TRANSMIT FOR $t_i$ SLOTS

$$SLEEP\_DURATION \leftarrow TB - \sum_{j=1}^{i} + j$$

110

111



FIG. 8C

ENTER SLEEP MODE FOR TRANSMITTER FOR SLEEP_DURATION
WAKE UP RECEIVER AFTER PERIOD B HAS ELAPSED — 112

RECEIVE HEADER CH FOR PERIOD C AND TURN RECEIVER OFF — 114

DO I HAVE ANY PACKET TO TRANSMIT IN RANDOM ACCESS MODE (PERIOD C ) ? — 116

NO

118 (FIG.8D)

132 (FIG.8D)

YES

FOLLOW SLOTTED PROTOCOL AND SCHEDULE TRANSMISSION IN SLOT T INTO THE FUTURE
SLEEP_DURATION ← T-1 — 120

TURN TRANSMITTER OFF, ENTER SLEEP MODE, — 122

WAKE UP TRANSMITTER SLEEP_DURATION HAS ELAPSED AND TRANSMIT AT SLOT T & THEN GO TO SLEEP (TRANSMITTER) — 124

WAKE UP RECEIVER AND RECEIVE ACK/NAK MESSAGE AT SLOT
T + Δ ( Δ = DELAY FOR GENERATING THE ACK/NAK MESSAGE) &
GO TO SLEEP RECEIVER — 126

128



FIG. 8D

128

130

132 YES
(FIG.8C)

ANY MORE PACKET
TO TRANSMIT IN RANDOM
ACCESS MODE ?

118
(FIG.8C)

NO

SLEEP_DURATION ← REMAINING
TIME IN PERIOD C          134

TURN TRANSMITTER AND RECEIVER OFF;
ENTER SLEEP MODE          136

WAKE UP AFTER
SLEEP_DURATION
HAS ELAPSED          138

CHANGE CARRIER FREQUENCY
(IN A FREQUENCY HOPPING SYSTEM)          140

80
(FIG.8A)



FIG. 9

5,241,542

1

# BATTERY EFFICIENT OPERATION OF SCHEDULED ACCESS PROTOCOL

## FIELD OF THE INVENTION

The invention is in the field of wireless communications, and in particular is directed to power conservation due to wireless communication. Specifically, the invention is directed to battery efficient operation of wireless link adapters of mobile computers as controlled by multiaccess protocols used in wireless communication.

## BACKGROUND OF THE INVENTION

In order to obtain true portability in micro-computers and workstations, battery powered operation is essential. Moreover, given the capacity versus size limitations of known batteries, it is essential to minimize total power consumption in order to extend the operating life of the batteries.

It is relatively easy to reduce battery consumption by an initial 60 to 70 percent in the computer portion of a mobile station. This initial savings can be accomplished by simply turning selected pieces of hardware in the computer portion off when they are not being used. The last 30 to 40 percent savings in the computer portion becomes increasingly more difficult to achieve, while simultaneously becoming increasingly more valuable in terms of extending battery life. This is due to the inverse relationship between battery life and battery load. Accordingly, savings that would seem trivial in off-line applications, might be momentous in a battery powered environment.

While the above is directed to the computer portion, to date no work has been done relative to the wireless link adapter portion of the mobile station.

There has been recent work directed to the design of multiaccess protocols for portable mobile computer users, as well as movable boundary protocols for supporting integrated voice/data users in mobile indoor radio networks. The schemes proposed to date do not take into explicit account the effective conservation of battery power used by the multiaccess scheme relative to the wireless link adapter.

Since portable laptop computers run on battery power, the implementation of a multiaccess protocol described in this invention attempts to minimize the consumption of battery power in a wireless link adapter to the minimum amount required, as a function of the protocol.

According to this invention, several techniques are disclosed for minimizing the battery power wasted at the wireless link adapters of mobile units, as controlled by a multiaccess protocol for wireless communication.

## DISCLOSURE OF THE INVENTION

Method and apparatus is described for the battery efficient operation of wireless link adapters of mobile computers as controlled by scheduled multiaccess protocols for wireless communication.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a pictorial diagram showing an indoor digital data communication system of the type in which the invention is implemented;

2

FIG. 2 is a block diagram of the system shown in FIG. 1 illustrating the basic components of a mobile station and a base station;

FIG. 3 is a block diagram of the radio system used in the implementation of a preferred embodiment of the invention;

FIG. 4 is a diagram of the frame structure of a multiaccess protocol for describing the battery efficient operation of a wireless link adapter according to the invention;

FIG. 5 is a diagram of a Receiving Users Index message as a bit-vector 64 bits long;

FIG. 6 is a diagram of receiver allocations for the multiaccess protocol;

FIG. 7 is a diagram of transmitter allocations for the multiaccess protocol;

FIG. 8A–8D, when taken together as shown in FIG. 8, are block diagram representations of how the battery efficient operation of the wireless link adapter is controlled by the multiaccess protocol, as implemented according to the invention;

FIG. 9 is a block diagram of how a controller in the wireless link adapter sets a time to accomplish the implementation set forth in FIGS. 8A–8D.

## DETAILED DESCRIPTION OF THE INVENTION

The invention is described relative to operation in a wireless radio communications link. It is to be appreciated that the invention is also applicable to other wireless communication links such as infrared links as well as microwave links. FIG. 1 depicts mobile stations 10, 12, 14, and 16 that communicate via wireless links. Gateways, referred to as base stations, are augmented according to the invention to provide certain radio system management functions which coordinate the mobile stations' access to the common radio channel. Communications between mobile stations is supported via relay through the base stations 26 and 28.

As shown in more detail in FIG. 2, a base station 26 or 28, which may be conventional microcomputer, has a LAN adapter 30 inserted in a bus slot and connected to LAN cabling 32. A server 18, typically also a conventional microcomputer and including one or more direct access storage devices (DASDs) such as hard disks (not shown), also has a LAN adapter 34 inserted in a bus slot and connected to LAN cabling 32. The LAN adapters 30 and 34 and the LAN cabling 32 together with LAN software constitute the LAN 24. The LAN 24 is of conventional design and does not form part of the invention. The base station 26 or 28 also has an RF transceiver adapter 36 implemented as a printed circuit card which is inserted in a bus slot of the base station. The transceiver adapter 36 includes a spread spectrum transceiver of conventional design. The transceiver adapter 36 has an antenna 38 by which a radio link 40 is established with one or more remote or mobile stations, 10, 12, 14, or 16. The mobile station may itself be a hand held or laptop computer such as an IBM PS/2 Model L40 SX laptop computer as described in Technical Reference Manual, Order Number: S/5F-2270, Part No. 15F2270, which may be ordered from an IBM Authorized Dealer.

IBM and PS/2 are registered Trademarks of International Business Machines Corporation. The laptop computer like the base station, is provided with an antenna 42 and a transceiver adapter 44, also implemented as a printed circuit card which is inserted in a bus slot of the computer. The

3

transceiver adapter 44, like transceiver adapter 36, includes a spread spectrum transceiver of similar design. The base station and the mobile stations are further provided with software, generally indicated by reference numerals 46 and 48, respectively, which support their respective transceiver adapters.

FIG. 3 shows the radio system common to both the mobile stations and the base stations of FIG. 1. The radio system includes a transceiver adapter 36 or 44 connected to a computer 50 via a computer's bus interface 52. The transceiver adapter 36 section is itself divided into an RF transceiver 54, which may be commercially available spread spectrum transceiver, and a dedicated microprocessor system 56 which controls the transceiver via an interface 58. The microprocessor system 56 further includes a system interface 60 which interfaces the transceiver adapter 36 section to the computer section 50. The microprocessor system includes a dedicated microprocessor 62 containing high-resolution time interval determination hardware or "timers" typical of real-time microprocessor systems.

Microprocessor 62 is connected by a memory bus 64 to program storage 66 and data storage 68 as well as to interfaces 60 and 58 providing attachment to bus interface 52 and RF transceiver 54, respectively. Program storage 66 is typically read only memory (ROM), while data storage 68 is static or dynamic random access memory (SRAM or DRAM). Packets received or to be sent are held in data storage 68 and communicated to or from the RF transceiver 54 via interface 58 under control of serial channels and a direct memory access (DMA) controller (not shown) which is part of the microprocessor 62. The function of these serial channels is to encapsulate data and control information in an HDLC (high-level data link control) packet structure and provide the packet in serial form to the RF transceiver 54. For more information on the HDLC packet structure, see, for example, Mischa Schwartz, Telecommunication Networks: Protocols, Modeling and Analysis, Addison-Wesley (1988).

When a packet is received through the RF transceiver 54, the serial channels check the packet destination address, check for errors, and deserialize the packet to data storage 68. The serial channels must have the capability to recognize a specific adaptor address as well as a broadcast address. Specific microprocessors with appropriate serial channel and timer facilities include the Motorola 68302 and the National Semiconductor HPC46400E microprocessors.

The computer 50 runs an operating system 70 which supports one or more user application programs 72. The operating system 70 may include a communications manager 74, or the communications manager 74 may itself be an application program installed on the computer. In either case, the communications manager 74 controls a device driver 76 via the operating system 70. The device driver 76, in turn, communicates with the transceiver adapter 36 or 44 via bus interface 52.

In general, the main idea for minimizing battery power consumed by wireless link adapters at the mobile units is as follows. The transmitter and receiver units at the communication adapter(s) of a portable terminal expend some power that depend on their states (OFF state/ON state/ACTIVE ON). The ratio of transmit-to-receive power depends also on the type of wireless link adapter used (radio or infrared). Scheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state

4

of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF). A desirable solution is one in which the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message). Traditional multiaccess protocols do not have the above desirable characteristics because:

A receiver may consume power while waiting to receive a packet. Some examples are as follows:

A mobile station may be waiting to hear a polling message from the base station station before it can transmit a packet.

Outbound messages are broadcast from the base station. Mobiles keep their receiver ON in order to receive packets that may be addressed to them. Battery power is wasted in receiving packets that are addressed to others.

A transmitter may consume power while waiting to transmit a packet.

In the scheme described here, a scheduled multiaccess protocol is used in which time is divided into fixed-length frames, and frames are divided into slots as shown in FIG. 4. It is to be appreciated that different frame divisions and header lengths and content may be utilized in the practice of the invention, and the scheme set forth here is merely exemplary.

The beginning of the frame is a header G of fixed length FH. The frame is divided into multiple subframes as described below.

Period A for broadcast of packets from base station to mobile units (outbound traffic), with a header AH for period A.

Period B for the contention-free transfer of all traffic from mobile units to base station (inbound traffic), with a header BH for period B.

Period C for the transfer of all bursty data traffic in a contention mode from mobile units to base station (inbound traffic), with a header CH.

Referring to FIG. 1, in conjunction with FIG. 4, in interval A the base station 26 or 28 controls the transmissions outbound to the mobile units 14. The corresponding header (AH) control information for this interval is broadcast reliably by the base station, and is assumed to be received correctly by relevant mobile stations. The header includes:

A list of mobile users ($U_1$, $U_2$, . . . , $U_n$), that will be receiving data from the base station in the current frame and the order in which they will receive packets.

Bandwidth allocated to users in this frame ($S_1$, $S_2$, . . . , $S_n$), where $S_i$ is the number of packets that will be directed to User $U_i$ from the base station in the current frame.

In the description that follows, a transmitter or receiver is considered ON or awake when it is in a normal running mode. A transmitter or receiver is considered OFF or asleep when it is in an idle or standby mode.

The following is a general description of the method of battery efficient control of a wireless link adapter as controlled by a scheduled multiaccess protocol for wireless communication as shown in FIG. 4, a more detailed description is set forth relative to FIGS. 8A–8D. On correct reception of the above broadcast information as shown in FIG. 4, a mobile unit that is not included in Header AH can turn its receiver OFF for a time duration TA (total number of slots allocated to interval A). The adapter of each receiving mobile unit can compute exactly when it should be ready to receive

5,241,542

5

packets from the base station (add up the slots allocated to all receiving units that precede it). Each receiving mobile unit goes to sleep after scheduling to wake itself up at its designated time for receiving data. After receiving its packets, the mobile unit goes to sleep for the remainder of period A. At the end of the A interval, all mobile units turn their receiver ON and receive Header BH corresponding to the B interval.

Header BH contains an ordered list of users that will be allowed to transmit to the base station in the current frame.

A list of mobile stations $(V_1, V_2, \ldots, V_n)$ that are allowed to transmit packets to the base station in the current frame and the order in which they should transmit.

Bandwidth allocated to mobile stations in this frame $(t_1, t_2, \ldots, t_n)$, where $t_i$ is the number of packets that the mobile station $V_i$ can transmit in the current frame.

Using the information regarding the number of packets that each user can transmit, each mobile unit can compute exactly when it should begin its transmission. Once each mobile station computes its exact time for transmission, it can schedule to wake up its transmitter at its designated time and then go to sleep (i.e., shut both it s transmitter and receiver OFF). At its designated time, the transmitter at a mobile station can turn ON and transmit for a fixed period of time whose duration depends on the number of slots allocated to it.

It is pointed out that explicit polling messages are not used to address users individually. The advantage of avoiding explicit polling on a peruser basis is the following. Each polling message spacing incurs a fixed overhead time per station that is polled. The overhead is independent of whether the station has anything to transmit or not. The polling overhead is the sum of the following components:

Time to transmit a polling message.

Effective propagation time for the polling message (this includes the delay due electromagnetic radiation plus the radio turnaround time from receive-to-transmit mode at the mobile unit that responds to a poll message and radio turnaround time at the base station itself) could significantly impair performance in radio-based networks.

The execution of scheduled access in the manner described here has the following advantages over explicit polling schemes. They are summarized below:

Effective elimination of the polling overhead for all inbound traffic from mobile users.

More importantly, the mobile stations economize the use of battery power by utilizing the control information contained in the AH (Outbound) and BH (Inbound) headers and scheduling their transmitters/receivers to be turned ON just in time and turned OFF at the earliest opportunity.

In interval C (Random Access or Contention Mode), only those mobile units that do not wish to transmit go to sleep (by turning both their transmitter and receiver OFF) till the end of the current frame. The inbound traffic from remaining mobile units may include: registration requests (that enable mobile stations to request the services of the base station), bandwidth reservation requests for use in interval B, single packet messages etc. A mobile unit executing a random access protocol wakes up its transmitter at its designated time and transmits and then goes to sleep. The receiver at the mobile unit can wake itself up to receive acknowledgement

6

messages at the correct time and then go to sleep. It is likely that battery power savings resulting from efficient operation of interval C may be significantly less compared to those realized in the contention-free intervals A and B.

Next a brief outline of a scheme for implementing battery efficient execution of a simple version of the Scheduled Access Protocol for wireless communication is described. The implementation is based on the concept of broadcasting short user activity (in transmit and receive modes) indexing messages in the header sections of a frame. For purpose of description, assume that in each frame a mobile unit is allocated at least one slot for receiving traffic and at least one slot for transmitting traffic.

In Period A, before the base station broadcasts messages to receivers, it includes a Receiving Users Index in the Header AH section of the frame. The Receiving Users Index is a coded description of mobile users that will receive data in the current frame. That is, it is a designation of which mobile users are to communicate with the base station during this frame. All the mobiles listen to this designation or indexing message and all Receive-Inactive users (i.e., users who do not have a message coming in from the base station in the current frame) can simply turn their receiver power OFF until the beginning of Header BH for Period B. At that time all the mobiles turn their receivers ON and listen to Transmitting Users Index in the Header BH section of the frame. The receivers are turned OFF until the beginning of Header CH for Period C. The Transmitting Users Index is a coded designation or description of mobile users that can transmit data in the current frame. Transmit-Inactive users (i.e., users who do not have a slot designated or allocated to them for transmission) can simply continue to keep their transmitters powered OFF until the beginning of Header CH for Period C.

Significant power savings can be achieved due to the following two observations:

Most users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time for most applications. This is primarily due to the bursty nature of data communication traffic.

The designation or indexing messages in the header sections (AH and BH) represent a small fraction of the whole frame length.

A method of implementation of the multiaccess protocol is described below. Here, assume that there are N users in the system, say, N=64. Then the users can be indexed from 1 to 64 by the base station in each user's initial registration period. The registration is needed to associate each mobile unit in the network with the intended base station.

In the initial portion of the header section AH, the base station sends out the Receiving Users designation or Index message portion of the header as a bit-vector, 64 bits long as shown in FIG. 5.

The content of each bit location signals the receiver activity of the user designated or indexed by the bit location. For example, reading left to right, a "1" in the 4'th, 8'th, 9'th, etc. bit location can be used to signal that the 4'th, 8'th, 9'th, etc. mobile unit is designated to receive one message in the current frame period. "0" in the 1'st, 2'nd, 3'rd, etc. bit location signals that the 1'th, 2'nd, 3'rd, etc. mobile unit is inactive (is not designated to receive any data) and can turn its receiver power OFF until the beginning of Header BH.

5,241,542

7

Optimization of transmit power is done in an analogous manner. In the initial portion of the Header BH, the base station sends out another 64 bit-vector representing the Transmitting Users designation or Index. Mobile user i turns its transmitter ON only if the $i^{th}$ bit in the bit-vector is 1.

The methods described above are simple and effective in reducing power consumption in any frame based Scheduled Access Protocol scheme for sharing wireless communications channels (radio and infrared) among portable mobile users. The techniques for battery efficient operation of the protocol rely on implementation of timers that do not consume significant battery power when compared with transmitter, receiver, microprocessor or logic in the wireless adapter cards. A detailed description of an exemplary wireless link adapter is set forth shortly relative to FIG. 9. The adapter described, utilizes the components described below. The following data taken from manufacturer's manuals indicate that timers can be implemented with relatively low power consumption. The example is representative of what can be saved in a realistic system. As an example, a HPC microcontroller 46400E consumes 385 mW in Normal running mode and 55 mW in Idle mode (i.e, with internal timer and oscillator running). The Proxim transceiver (RDA-100/2) consumes 325 mW in Transmitter ON mode, 400 mW in Receiver ON mode and 1 mW in Standby mode. When the timer is used to put the transmitter and receiver into sleep mode, the HPC microcontroller can be put into Idle mode (55 mW) and the Proxim radio can be put in Standby mode (1 mW). Thus the minimum power consumed is 56 mW in sleep mode. When the transmitter is ON, the power consumed is the sum of HPC running in normal mode (385 mW) and the transmitter in ON mode (325 mW). Similarly, when the receiver is ON, the power consumed is the sum of HPC running in normal mode (385 mW) and the receiver in ON mode (400 mW).

Suppose $f_1$ is the fraction of the time a user is actively transmitting (i.e., user is allocated $(TA+TB)$ $f_t$ slots in Period B) packets to the base station. Suppose $f_r$ is the fraction of the time the user is actively receiving packets addressed to him (i.e., user is allocated $(TA+TB)$ $f_r$ slots in Period A). The power consumed using the current invention is:

$$(385+325)f_t+(385+400)f_r+(55+1)$$
$$(1-f_t-f_r)=710f_t+785f_r+56(1-f_t-f_r) \text{ mW}$$

The power consumed without the techniques of this invention is:

$$400(1-f_t)+325f_t+385=(785-75f_t) \text{ mW}$$

If $f_t=0.1$, $f_r=0.1$ power consumption with this invention is 194.3 mW. Otherwise the power consumed would have been 777.5 mW. Significant power savings can be realized with this invention, especially as $f_r\rightarrow0$, $f_t\rightarrow0$.

FIG. 6 is a diagram of receiver allocation of the multiaccess protocol. If there are 64 mobile units as shown in FIG. 5, four (4) of these units are designated to receive information from the base station. It is seen that there are 15 slots allocated, 3 in time period S1 for the first unit, 5 in time period S2 for the second unit, 3 in time period S3 for the third unit, and 4 in time period S5 for the fourth unit.

FIG. 7 is a diagram of transmitter allocations for the multiaccess protocol. Three mobile units are designated

8

to transmit information to the base station. It is seen that there are 14 slots allocated, 4 in time period R1 for the first unit, 3 in time period R2 for the second unit and 7 in time period R3 for the third unit.

Refer now to FIGS. 8A–8D which constitute a flow chart of a program operable in controller 152 of the wireless link adapter of FIG. 9 for controlling the battery efficient operation of a wireless link adapter as controlled by the multiaccess protocol as illustrated in FIGS. 4, 6 and 7. In the following description, it is to be appreciated that any reference to a transmitter or receiver, is to the transmitter or receiver of the wireless link adapter.

In FIG. 8A at input 80 the header AH (FIG. 4) is received for period A at block 82. At decision block 84 a determination is made by a given mobile unit, such as unit 10 (FIG. 1) if it is designated in the RLIST of receiving mobile units (FIG. 5). If the determination NO is indicated, at block 86 the adapter of the given mobile station 10 sets the variable sleep duration (indicates how long it can sleep) to TA. At block 86, the receiver is turned off for the duration TA (FIG. 4) of the broadcast of the base station such as base station 26 to the given mobile station 10, resulting in a conservation of power at the mobile station 10 for the period TA. If the determination at block 84 is YES that the given mobile station 10 is designated in the RLIST, a determination is made at block 88 what the position of the given mobile station is in the RLIST. User ui must wait until all preceding users (U1, U2, . . . , $U_{i-1}$) have received their packets. The length of the wait equals the sum of receiver slot allocations as computed at block 88. The receiver of the mobile station 10 is turned OFF at block 90, and turned back ON at block 92 when the time slots allocated in the RLIST for the mobile station 10 is reached. After receiving the packets addressed to it, mobile station 10 at block 94 computes the remaining time in period A that it should sleep.

The sleep duration as computed in blocks 86 and 94 is provided at point 95 to block 96 of FIG. 8B. The receiver for the mobile station is once again turned off as indicated at block 96 after its allotted time slots have passed. Since the receiver for the mobile station 10 is on only during allotted time slots, once again battery conservation during the receive mode has been achieved.

During the transmission cycle for mobile unit to base station transmission, the header BH (FIGS. 4,6 and 7) for period B is received by the given mobile station 10 at block 98, as previously explained, and the receiver is turned off for entire duration of period B. A determination is then made at decision block 100 whether or not the given mobile station is designated to transmit in this frame. If the determination is NO, the adapter of the given mobile station 10 sets variable sleep-duration (indicates how long the transmitter is off) to TB, as indicated at block 102. The transmitter of the mobile station 10 is turned off at block 102 (FIG. 8C) for the duration TB of the period B (FIG. 4), resulting in a conservation of power at the mobile station 10 for the period TB. If the determination at block 100 is YES that the given mobile station 10 is designated in the TLIST a determination is made at block 104 what the position of the given mobile station is in the TLIST. User Vi must wait until all preceding users $V_1, V_2, \ldots, V_{i-1}$ have transmitted their packets in their allocated slots. The length of the wait equals the sum of transmitter slot allocations as computed in block 104. The transmitter of

9

the mobile station 10 is turned off at block 106, and turned back on at block 108 when the time slots allocated in the TLIST for the given mobile station 10 is reached. After transmitting its packets, mobile station 10 computes at block 110 the remaining length of period B.

The sleep duration as computed in blocks 102 and 110 is provided at point 111 to block 112 of FIG. 8C. The transmitter for the given mobile station 10 is once again turned off as indicated at block 112 after its allotted time slots have passed. Since the transmitter for the mobile station 10 is on only during its allotted time slots, once again battery conservation during the transmit mode has been achieved.

During the contention cycles for mobile stations relative to transmission to the base station station, the header CH for period TC (FIGS. 4,6 and 7) is received by the given mobile station 10 at block 114 and the receiver is turned off for the duration of perion C. A determination is made at decision block 116 whether or not the given mobile station 10 has any packets to transmit in the random access mode (period C). If the answer is NO as indicated at point 118 proceed to block 134 of FIG. 8D. The function of the block 134 is explained shortly. If the determination at block 116 is YES, proceed to block 120 where transmission is scheduled in a slot T. The transmitter is turned off for the times other than the slot T, as indicated at block 122. The transmitter is then turned on at slot T as indicated at block 124. The receiver is turned on at block 126 to receive a ACK/NAK message at slot T+Δ from the base station. The Δ is equal to a delay sufficient for the base station to send, and the mobile station to receive the ACK-/NAK message. If a NAK message is received, packet is rescheduled for repeat transmission. The receiver is then put back to sleep.

The indication of the receiver being turned off at point 128 is provided to decision block 130 of FIG. 8D, where a determination is made if there are any more packets to transmit in the random access mode. If the determination is YES, as indicated at point 132, the logic returns to block 120 of FIG. 8C to proceed as previously explained. If the determination is NO, the sleep duration is set to the remaining length of period C, and the battery power for the transmitter and receiver are turned off for the remaining duration of the period C. Accordingly, the transmitter and receiver are turned off at block 136. The receiver is turned back on at block 138 after period C has elapsed. If this is a frequency hopping system, the carrier frequency is changed at block 140 and a return is made via point 80 to block 82 of FIG. 8A to repeat the transmission of the multiaccess protocol from the base station 26 to the mobile station 10.

FIG. 9 is an exemplary block diagram of wireless link adapter hardware which may be used to implement battery power control of the adapter in accord with the flow charts of FIGS. 8A–8D. The components used in the adapter and the power consumption characteristics were described earlier. A radio controller 150 includes a HPC controller 152, a timer 154 and memory and logic 156 for controlling the battery efficient operation of a Proxim radio transmitter/receiver 158. That is, controlling the normal running mode and idle mode of the radio transmitter/receiver 158 as controlled by the scheduled multiaccess protocol. Transmit and receive signals are via lines 160 and 162 respectively. Sleep and wakeup signals are via lines 164 and 166 respectively.

10

The controller 152 sets the timer 154 for desired periods of time as explained relative to FIGS. 8A–8D. When the timer 154 elapses, it sends a wakeup signal to the controller 152, and to the radio 158 via line 166. The radio receiver 158 is put to sleep by the controller 152 via the line 164.

In summary, a method has been set forth for the battery efficient operation of a wireless link adapter of a mobile computer as controlled by a scheduled multiaccess protocol.

Industrial Applicability

It is an object of the invention to provide a method and apparatus for conserving battery power in a wireless link adapter of a mobile computer.

It is another object of the invention to provide a method and apparatus for conserving battery power in a wireless link adapter of mobile computers as controlled by a multiaccess protocol for wireless communication between the mobile computers and a base station.

It is yet another object of the invention to provide a method and apparatus for conserving battery power in a wireless link adapter of mobile computers as controlled by a multiaccess protocol for wireless communication between the mobile computers and a base station. The multiaccess protocol is portioned into at least one frame which is divided into slots, with there being at least one slot assigned to each mobile computer designated to communicate with the base station. The battery power of the wireless link adapter for a given mobile computer designated to communicate with the base station is turned on to full power at least during said at least one slot, for running the given mobile computer in a normal running mode, with the battery power of the wireless link adapter being substantially reduced during the remaining time slots, for running the given mobile computer in an idle mode.

Having thus described our invention, what we claim as new, and desire to secure by Letters Patent is:

1. A method of conserving battery power in a wireless link adapter of battery powered computers operable in a multiaccess protocol for wireless communication between n, where n is an integer, of said battery powered computers and a base station, with said protocol including a designation of which ones of said n computers are to communicate with said base station, said method comprising the steps of:

partitioning said multiaccess protocol into at least one frame including a header AH having n bits, with each of said n bits being assigned to a corresponding one of said n battery powered computers, with a given one of said n computers being scheduled for communication with said base station during said frame when its corresponding one of said n bits is in a first state, and for not being in communication when in a second state, with the remainder of said frame being divided into a plurality of slots in a time duration TA, with there being at least one slot dynamically assigned to only the ones of said n battery powered computers scheduled to communicate with said base station;

turning ON said battery power of said wireless link adapter for each of said n battery powered computers for the duration of header AH;

turning OFF battery power for said time duration TA for each wireless link adapter of the n battery powered computers that is not scheduled to communicate with said base station; and

5,241,542

**11**

turning ON battery power only during the at least one slot time of TA scheduled, for each wireless link adapter of the n battery powered computers scheduled to communicate with said base station, and turning OFF battery power for the remaining slots of TA.

2. The method claimed in claim 1, wherein the communication scheduled is for said base station to transmit to the scheduled ones of said battery powered computers during the time duration TA.

3. The method of claim 2, including the steps of:
including a second frame in said multiaccess protocol, including a header BH having n bits, with each of said n bits being assigned to a corresponding one of said n battery powered computers, with a given one of said n computers being scheduled for transmitting information to said base station during said second frame when its corresponding one of said n bits is in a first state, and for not transmitting information when in a second state, with the remainder of said second frame being divided into a plurality of slots in a time duration TB, with there being at least one slot dynamically assigned to only the ones of said n battery powered computers scheduled to transmit to said base station;
turning on said battery power of said wireless link adapter for each of said n battery powered computers for the duration of the header BH;
turning OFF battery power for said time duration TB for each wireless link adapter of the n battery powered computers that is not scheduled to transmit to said base station; and
turning ON battery power only during the at least one slot time of TB scheduled for each wireless link adapter of the n battery powered computers scheduled to transmit to said base station, and turning OFF battery power for the remaining slots of TB.

4. The method of claim 3, including the steps of:
including a third frame in said multiaccess protocol, with said third frame including a header CH which includes a designation of the number of slots available in the remainder of said third frame in time duration TC, with said third frame being allotted to contention mode transmission from said n battery powered computers to said base station;
turning ON said battery power of said wireless link adapter of each of said n battery powered computers for the duration of the header CH;
turning OFF said battery power of the receiver of each wireless link adapter of each of said n battery power computers for the time duration TC;
turning OFF the battery power of the transmitter in said wireless link adapter of any of said battery powered computers that do not wish to transmit to said base station during said third frame; and turning ON said battery power for a transmitter of said wireless link adapter in a given battery powered computer for at least one slot in said third frame for transmitting from said given battery powered computer to said base station, with said battery power for said transmitter of said wireless adapter link being turned OFF for the remaining time slots of said third frame.

5. A method of conserving battery power in a wireless link adapter of battery powered computers operable in a multiaccess protocol for wireless communication between n, where n is an integer, of said battery powered computers and a base station, with said protocol

**12**

including a designation of which ones of said computer are to communicate with said base station, said method comprising the steps of:
partitioning said multiaccess protocol into at least one frame including a header AH having n bits, with each of said n bits being assigned to a corresponding one of said n battery powered computers, with a given one of said n battery powered computers being scheduled for communication with said base station during said at least one frame, when its corresponding one of said n bits is in a first state, and for not being in communication when in a second state, with the remainder of said at least one frame being divided into a plurality of slots in a time duration TA, with there being at least one slot dynamically assigned to only the ones of said n computers scheduled to communicate with said base station;
running said wireless link adapter of each of said n battery powered computers in a normal running mode for the duration of header AH;
running in an idle mode for said time duration TA, said wireless link adapter of each of the n battery powered computers that is not scheduled to communicate with said base station; and
running said wireless link adapter in a normal mode only during the at least one slot time of TA scheduled for each of the n battery powered computers that is scheduled to communicate with said base station, and running it in an idle mode for the remaining slots of TA.

6. A method of conserving battery power in a wireless link adapter of battery powered computers operable in a multiaccess protocol for wireless communication between n, where n is an integer, of said battery powered computers and a base station, with said protocol including a designation of which ones of said n computers are to communicate with said base station, said method comprising the steps of:
partitioning said multiaccess protocol into at least first and second frames;
including in said first frame a header AH having n bits, with each of said n bits being assigned to a corresponding one of said n battery powered computers, with a given one of said n computers being scheduled for receiving information from said base station during said first frame when its corresponding one of said n bits is in a first state, and for not receiving information when in a second state, with the remainder of said first frame being divided into a plurality of slots in a time duration TA, with there being at least one slot dynamically assigned to only the ones of said n battery powered computers scheduled to receive information from said base station;
running said wireless link adapter for each of said n battery powered computers in a normal running mode for the duration of header AH;
running said wireless link adapter in an idle mode for said time duration TA for each of the n battery powered computers that is not scheduled to receive information from said base station;
running said wireless link adapter in a normal running mode only during the at least one slot time of TA scheduled for each of the n battery powered computers scheduled to receive information from said base station;

5,241,542

**13**

including in said second frame a header BH having n bits, with each of said n bits being assigned to a corresponding one of said n battery powered computers, with a given one of said n computers being scheduled for transmitting information to said base station during said second frame when its corresponding one of said n bits is in a first state, and for not transmitting information when in a second state, with the remainder of said second frame being divided into a plurality of slots in a time duration TB, with there being at least one slot dynamically assigned to only the ones of said n battery powered computers scheduled to transmit to said base station;

running said wireless link adapter for each of said n battery powered computers in a normal running mode for the duration of the header BH;

running said wireless link adapter in an idle mode for said time duration TB for each of the n battery powered computers that is not scheduled to transmit to said base station; and

running said wireless link adapter in a normal running mode only during the at least one slot time of TB scheduled for each of the n battery powered computers scheduled to transmit to said base station,

**14**

and running it in an idle mode for the remaining slots of TB.

7. The method of claim **6**, including the step of:

including a third frame in said multiaccess protocol, with said third frame including a header CH which includes a designation of the number of slots available in the remainder of said third frame in a time duration TC, with said third frame being allotted to contention mode transmission from said n battery powered computers to said base station;

running in the normal running mode the receiver in the wireless link adapter of each of said n battery powered computers for the duration of the header HC;

running in the idle mode the transmitter in said wireless link adapter of any of said n battery powered computers that do not wish to transmit to said base station during said third frame; and

running the transmitter in said wireless link adapter in a given one of said n battery powered computers in a normal running mode at least during one slot in said third frame for transmitting communications from said given one of said n battery powered computer to said base station, with said transmitter in said wireless link adapter running in an idle mode for the remaining time slots of said third frame.

* * * * *

# United States Patent [19]

## Neve et al.

[11] **Patent Number:** **4,887,266**

[45] **Date of Patent:** **Dec. 12, 1989**

[54] **COMMUNICATION SYSTEM**

[75] Inventors: **Brian D. Neve**, Exbury; **Peter J. Lawrence**, Fareham; **Lyndon N. Owen**, Blackfield, all of England

[73] Assignee: **Process Automation & Computer Systems Ltd.**, London, England

[21] Appl. No.: **2,763**

[22] PCT Filed: **Apr. 29, 1986**

[86] PCT No.: **PCT/GB86/00230**

§ 371 Date: **Dec. 29, 1986**

§ 102(e) Date: **Dec. 29, 1986**

[87] PCT Pub. No.: **WO86/06571**

PCT Pub. Date: **Nov. 6, 1986**

[30] **Foreign Application Priority Data**

Apr. 29, 1985 [GB] United Kingdom ............... 8510808

[51] Int. Cl.⁴ ............................................. H04J 3/16
[52] U.S. Cl. .................................................... 370/95.1
[58] Field of Search .................... 370/95, 96, 89, 90; 340/825.08

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,755,786 | 8/1973 | Dixon et al. | 370/89 |
| 4,078,228 | 3/1978 | Miyazaki | 370/89 |
| 4,129,749 | 12/1978 | Goldman | 370/50 |
| 4,161,718 | 7/1979 | Cohen et al. | 371/71 |
| 4,270,185 | 5/1981 | Cohen et al. | 364/900 |
| 4,326,265 | 4/1982 | Cohen et al. | 364/900 |
| 4,466,001 | 8/1984 | Moore et al. | 340/825.08 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2024571 | 1/1980 | United Kingdom . |
| 2035641 | 6/1980 | United Kingdom . |

OTHER PUBLICATIONS

I. Kong et al, "CableNet: A Local Area Network Reservation Scheme", 24th IEEE COMPUTER SOCIETY INTERNATIONAL Conf. Feb. 22–25, 1982, N.Y.

L. C. Chien, "Short–Range Radio Transmission of Sensor Data", National Telecommunications Conf. V4, Nov. 30–Dec. 4, 1980, N.Y.

*Primary Examiner*—Joseph A. Orsino
*Assistant Examiner*—Frank M. Scutch, III
*Attorney, Agent, or Firm*—Bacon & Thomas

[57]     **ABSTRACT**

A communication system able to provide multiple path communication between a plurality of stations operating on a single channel. The stations are synchronized and a cyclically repeating series of time slots is defined. One time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for reception by the other stations, designated slave stations, and maintaining synchronization therein. Another time slot is reserved for any slave station to transmit a message that it requires to communicate to another station, such indication preferably being by transmitting its own pre-assigned address code. The remaining time slots are used for transmitting address information and data. The slave stations operate in a low power condition except during one of the other time slots when they may receive their own address, or except when they need to transmit data.

**12 Claims, 9 Drawing Sheets**







DATA WORD FORMAT

18 BIT ADDRESS/DATA    2 BIT LINK CONTROL    10 BIT BCH ENCODE

ADDRESS/DATA FLAG BIT

PARITY

DATA BATCH FORMAT

| S | I | 15 WORDS |
| S | I | 15 WORDS |
| S | I | 15 WORDS |

S : SYNCHRONISATION WORD
I : INTERRUPT WORD

FIG. 2



FIG. 3

FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG.9

4,887,266

1

## COMMUNICATION SYSTEM

### BACKGROUND OF THE INVENTION

This invention relates to a communication system and in particular to a radio communication system capable of supporting a network of intercommunicating points with a variety of communication paths therebetween. The invention has particular utility in applications where a relatively large number of devices are required to intercommmunicate, such as in industrial plant and process monitoring and control, but the benefits and advantages of the invention are by no means restricted to such applications.

Communication networks employing cable (electrical and optical) connections and radio links are of course well known. Cable systems have the disadvantage that the capital cost of the equipment and the installation costs are relatively high. Whilst switched systems can provide great flexibility in the communication paths which are established, the provision of communications to a point not served by the original network may involve considerable difficulty and expense. Radio systems have the advantage that a transmitting and/or receiving station can normally be set up relatively easily in any location but there may be difficulty in providing a power supply to the station and often a radio station is relatively large and in particular may require a large antenna. There are many applications where it is desirable to provide a communications system in which the transmitting and receiving apparatus is small, may be easily installed in any location, and is of very low power consumption so as to mitigate the problem of power supplies. For example, on a site such as a refinery there may typically be of the order of 4000 points between which it is desired to provide data communication for process control purposes. There may, for example, be 3000 sensors at various points in the plant and perhaps 1000 receiving devices, such as data recording devices or actuators, such as valves. Data integrity and security are of course of great importance in such an application and this factor, together with the need to avoid any danger of electromagnetic interference, etc., has led to the use of complex cable systems often employing protected cables laid underground. Such installations are extremely costly (typically several millions of pounds for an oil refinery) and further high costs arise when it is desired to alter the system, for example when adding or moving a sensor.

### SUMMARY OF THE INVENTION

Viewed from one aspect the invention provides a communication system operating on a single channel including a device at each of a plurality of nodes between which it is desired to establish communication, one device including means for transmitting synchronisation information and each other device having means for providing a synchronisation signal in synchrony with said synchronisation information, said one device being capable of transmitting an address of another device in one of a cyclically repeating series of consecutive time slots, at least one of said time slots in each cycle being reserved so that no such address may be transmitted, whereby any of said other devices may transmit in such a reserved time slot to request communication on said channel. Preferably, each said other device has a pre-assigned address and operates to decode transmitted information on said channel only in a

2

particular time slot dependent on said address. Said other device is preferably arranged to transmit its address in said reserved time slot when it requests communication.

Viewed from another aspect, the invention provides a radio transmitter and receiver apparatus for providing data communication with an electrical device, comprising a transmitter circuit, a receiver circuit and an interface circuit, said interface circuit including a processor controlled by a stored program and being arranged to control the transfer of data from said device to the transmitter circuit and/or from the receiver circuit to the device, and said interface circuit being operable in a condition in which data transfer can take place or in a lower power consumption condition in which data transfer cannot take place, the interface circuit being operable automatically to enter the lower power consumption when a communication operation has been completed and automatically to re-enter the data transfer condition when either a signal is received from the device indicative of the need to transmit data or a predetermined code signal is received by the receiver circuit indicative of the need to receive data.

Such apparatus enables a very low power consumption to be achieved in the cases where the device requires to transmit data only rarely or the receiver receives the predetermined code signal only rarely. In process monitoring applications, for example, a device may need to transmit data for only a fraction of a second in many hours. A further advantage of the invention is that it enables the use of a receiver system similar to known radio paging systems in which the address of an individual receiver is only transmitted when communication to that receiver is required and further can only occur in a predetermined time slot in a cyclically repeating series of time slots. This means that the receiver circuit itself can have very low power consumption because it needs only to energise internal timing circuitry continuously and to energise the rest of the receiving circuit when its assigned time slot occurs.

Preferably the interface circuit includes a microprocessor which is operable in a low power condition. Further preferably, the power supply to the transmitter circuit may be controlled by the interface circuit, the interface circuit being arranged to energise the transmitter circuit only when transmission is required.

Thus it may be seen that a very low power transmitter and receiver apparatus may be provided. A practical example of the invention provided with a small primary battery may operate for in excess of five years Because of the use of radio paging circuits which are available in the form of compact integrated circuits a very small communication device may be provided. A complete self-contained data transmitting and receiving device may be made in a package only a few centimeters in each dimension, allowing it to be mounted almost anywhere that communication is required, such as directly on a sensor or actuator.

Viewed from another aspect, the invention provides a communication system comprising a plurality of stations each having a transmitter, a receiver, a control processor and a buffer store for data to be transmitted, the control processor being responsive to the state of fullness of the buffer and arranged in dependence thereon to cause an alteration in the rate of data flow through the system. Preferably every word of data which passes through the system is accompanied by at

3

least one bit of link control information, and each control processor includes a register for holding information indicative of the current mode of operation of the station and is arranged to combine the link control information with the contents of the register to control the subsequent operation, and in particular to provide a mode of increased rate of data throughput when the state of fullness of the buffer so dictates.

Preferably the system is a synchronous communication system with one station designated the master station providing system synchronisation signals, and defining a cyclic sequence of time slots comprising at least one synchronisation time slot, at least one interrupt time slot, and a plurality of address or data time slots, wherein any other station can transmit a message to the master station during an interrupt time slot to indicate a request to communicate. Such a system provides great flexibility in the communication paths which can be established, allows stations to remain in an inactive condition when they are not communicating, and can readily and efficiently adapt to the transmission of large or small quantities of data. In a preferred arrangement, after the master station has acknowledged the request to communicate a station may transmit to the master station the address of the destination station if this is not known to the master station. The master station may then broadcast a signal to the source and destination stations allocating them a time slot for communication. Preferably a fixed time later the data transfer takes place and if the accompanying link control information indicates that the buffer of the source station is not empty, the master station may automatically allocate further time on the transmission channel.

## BRIEF DESCRIPTION OF THE DRAWINGS

An embodiment of the invention will now be described by way of example and with reference to the accompanying drawings, in which:

FIG. 1 is an overall block diagram of a transmitter and receiver, apparatus according to the invention;

FIG. 2 is a diagram showing the data transmission format used by the apparatus of FIG. 1;

FIG. 3 is a functional block diagram of the transmitter and receiver circuits of the apparatus of FIG. 1;

FIG. 4 is a functional block diagram of the interface circuit of the apparatus of FIG. 1;

FIG. 5 is a circuit diagram of the interface circuit; ·

FIG. 6 is a state diagram of the function of a master station;

FIG. 7 is a state diagram of the function of a slave station;

FIG. 8 is a state diagram illustrating the establishment of a communication path; and

FIG. 9 is a schematic illustration of a number of data communication paths in a network.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to the drawings, a radio transmitter and receiver apparatus for providing data communication with an electrical device 6 comprises a transmitter and receiver device (transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5. The transceiver 2 is connected to an interface circuit 7 which includes a digital control processor 8 controlled by a stored program in memory 9 and is arranged to control the transfer of data from the device 6 to the transmitter circuit 4 and/or from the receiver circuit 5

4

to the device 6. A connection interface 10 provides any necessary electrical and protocol conversion between the device 6 and interface circuit 7, for example the provision of input or output signals in accordance with a standard interface bus.

A large number of communication stations each comprising a transceiver 2 and interface circuit 7 and any necessary interface 10 may be provided in a communication network operating on the same radio frequency. One station, which is physically similar to the others but operates a different stored program, may be designated the master station and provides synchronisation signals for all of the other stations (referred to hereinafter as "slave" stations) and controls access of the stations to the single radio channel.

Referring to FIG. 2, which shows the data transmission format, it may be seen that digital signals are transmitted in cyclically repeating series or batches of seventeen 32-bit words. The first word in each batch is reserved for synchronisation information transmitted by the master station. The second word (referred to as an "interrupt time slot") is reserved for any slave station to transmit a request for communication service. Any device with synchronisation can attempt to transmit within this word in order to attract attention. The remaining fifteen tie slots are used for address or data words of the format shown at the top of FIG. 2. Each word contains an address/data flag bit which indicates whether the following information is an address or data. Eighteen bits of address or data then follow, followed by two bits of link control information. Bits 21 to 31 are BCH cyclic error checking bits and the final bit provides a parity check.

Considerable similarity will be noted with the data format employed in the POCSAG code used for digital radio paging receivers, in particular the use of synchronous communication using batches of transmission time slots beginning with synchronisation information. The receiver 5 may be generally similar to a known paging receiver and holds a pre-assigned address which as well as uniquely identifying the device indicates in which of the fifteen address/data time slots the address of the receiver will be transmitted. The receiver circuit 5 includes a low power timing circuit which operates to energise the rest of the receiver circuit only for the time slot in which its address may occur and for the synchronisation time slot thereby enabling it to maintain synchronisation with low power consumption. If no data is currently required to be transmitted, the master station transmits idle words.

Referring to FIG. 3, the transmitter circuit 4 includes a radio frequency amplifier 12 and a modulator 13 for providing FSK (frequency shift keying) signals to antenna 3 via diode switch 14. The diode switch operates to connect the amplifier 12 to the antenna 3 when the transmitter is operational but otherwise connects the antenna to the receiver circuit 5. The transmitter is brought to its active state only when data is being transmitted. This is achieved by including a 'transmitter enable' line from the controller. Inputs and outputs to the interface circuit 7 of FIG. 4 are shown at the right-hand side of FIG. 3. The receiver circuit 5 comprises two integrated circuits, a receiver 15 and a decoder 16. The decoder 16 includes low power timing circuits and a comparator for comparing a received address with an address stored in an address matrix 17. In operation, the decoder 16 provides a 'battery save' signal on line 18 to cause the receiver 15 to operate during each synchroni-

4,887,266

**5**

sation time slot and each pre-assigned address time slot. If the correct address is received a series of square waves known as a cadence is produced and this together with the signal on line 18 causes the interface circuit 7 to process the data provided on line 19. The receiver 15 may be additionally energised by a signal on line 20 when the interface circuit 7 determines that signals should be received in a time slot other than the pre-assigned time slot. The output of the decoder can be terminated by a 'Decoder Reset' signal from the controller.

FIG. 4 shows functionally (the signal flow paths) the interface circuit 7 and FIG. 5 is a circuit diagram thereof. The interface circuit 7 controls the transfer of data between the transceiver 2 of FIG. 3 and the interface 10 provided at the right-hand side of FIGS. 4 and 5. Control processor 8 is connected to program memory 9 and the other components by control, interrupt, data and address buses 22, 23, 24 and 25 respectively. The control processor 8 is preferably a microprocessor, e.g. Hitachi 6300 series, with the facility to enter a standby mode with a signal on line 26 (FIG. 5) in which condition the program halts and the power consumption of the microprocessor is very low. In FIG. 5 the address, data and control buses are shown in solid line; the other components are a crystal oscillator 27, a divider 28, a bistable latch 29, a chip select decoder 32, memories 33, 9, data buffers 34 and associated logic gates 35.

After a communication operation has been completed, the microprocessor 8 automatically enters the low power standby condition by outputting a signal to line 26 and it remains in this condition until the station address is detected by the receiver circuit 5 or until the device 6 indicates via an interrupt request from the interface 10 that action is required. The signals which cause normal operation of the microprocessor 8 to recommence enter at the interrupt line 30 and standby line 31.

The 'Cadence' is a series of bursts of square waves at audio frequency (corresponding to th pager's bleep pattern). When received the envelope of bursts are extracted by the microprocessor. The 'Cadence Envelope' and 'Battery Save' signals are logically ANDed and if true cause the rest of the controller to become active. If not, the microprocessor is returned to the standby condition.

Cadence type is detected by comparisons with a programmable timer under the control of the CPU. Trailing or falling edges of the cadence envelope are discernable via software. From this, a 2-bit secondary address is determined. When sufficient synchronisation and cadence information has been gathered the decoder is reset by the controller. The cadence edge is not sufficiently precisely defined to allow this to be used for transferring bit and frame synchronisation to the microprocessor from the decoder. Therefore the start up sequence sets up an interrupt occurring on the leading edge of the battery save signal. This is the signal generated in the decoder that controls the low power duty cycle.

The decoder derives the timing of this battery save signal from the synchronisation signal transmitted from the aster station. On receipt of this interrupt the first action of the microprocessor 8 is to cause further interrupts from this source to be ignored. An internal timer is then initialised to divide down the system clock to create the transmission bit rate clock.

**6**

A background task in the control processor can now hold a reference point from which frame and batch edges can be accurately defined in time. Internal interrupts can be assigned to a particular frame or batch edge so that predefined events, e.g. data transmission, can occur exactly at a frame or batch edge.

Control of the transceiver involves managing reception and transmission. The reception task requires four functions of the controller: power up, capture of cadence, bit synchronisation, and provision of a bit synchronisation clock. The clock is always active and is provided via a divider chain. The fundamental frequency of the oscillator is used as the system clock for the CPU.

Using the timing gained from the 'Battery Save' signals the CPU can adjust the phase of the clock used for synchronous communication for correct reception of the incoming synchronous data.

It may be seen further that a signal line 37 is extended from the microprocessor 8 to the transmitter amplifier 12; this enables the interface circuit 7 to energise the transmitter circuit only when a transmission is required, further reducing the power requirements of the apparatus.

A multifunction interface comprising latches 34 and logic 35, 32 is provided to suit various applications. The microprocessor can address external devices as part of its own memory map, communicate via a general purpose I/O port, or load and read data via a bi-directional buffer. This latter feature allows interfacing to other processors' memory maps without need for direct memory access. The buffer can also generate interrupts on reception of data.

If the peripheral device requires communication outside of its own normal call-up time, then the controller can be powered up by means of a specific interrupt into pin 1 of port A.

A peripheral device could be a transducer, a processor or other piece of equipment, which would have a detrimental effect on the remote station battery life. To mitigate this effect, a power enable line, 38, under control of the microprocessor is also provided.. This allows further intelligent use to be made of battery power to external devices by gating it as required.

Turning now to the manner in which the master station controls access to the communication channel to provide data flow paths between the various stations, the master station maintains a list of "virtual circuits" i.e. a list of which stations require to intercommunicate. Each slave station also keeps a list of the virtual circuits in which it takes part. Each virtual circuit may be permanently operative or may be transient, i.e. only set up when required. Further, a number of default circuits may be permanently listed for use between stations which often need to intercommunicate and this reduces the housekeeping operations the master station needs to perform in that the destination station can be assumed for these frequently-used data paths rather than having to be set up each time information is being transmitted. Generally speaking, the master station listens during the interrupt time slot for a request for communication from a slave station. The slave station transmits its own address and if this is properly received by the master station an acknowledgement of interrupt signal is transmitted in the next batch. If the interrupt is unsuccessful, e.g. because a number of stations are attempting to interrupt simultaneously, each slave station attempts to interrupt a random number of batches later. On receiving an

4,887,266

7

acknowledgement of the interrupt, the slave station responds in the next time slot but one (giving time to decode the data) with a message indicating the address of the other station with which it wishes to communicate. The master station then adds this link to its table of virtual circuits and transmits the address of the destination station in its appropriate address time slot. This causes the destination station to switch into the full receiving condition and the master station then indicates that the virtual circuit is open. Subsequently, e.g. a fixed time later, the data is transmitted by the first slave station and received by the other. Equally, the operation could be one of calling for information from another station. Clearly the master station has to allocate the various virtual circuits to the time slots in a manner avoiding interference between the data paths whilst utilising the available time slots efficiently. An idle word is transmitted if no other transmission is needed.

When a station interface circuit 7 is first energised it is initialised if a master station by setting up the virtual circuit tables and other variables. If it is a new slave station it first logs on to the network by transmitting to the master station details as to the address and type of slave station. FIGS. 6 and 7 are state diagrams showing in high level form the steps followed by the programs in the master and slave stations respectively. After the master station is powered up it scans its table of time slot allocations. If the interface 10 demands attention, this is dealt with by inputting or outputting data from the appropriate virtual circuit register. If the time slot is a synchronisation time slot the synchronisation word is transmitted. If it is an interrupt time slot the master station receives. If a valid address is received this is entered into the table of active slave stations requiring communication. During the other time slots either a housekeeping operation is performed as previously described or the master station takes part in a communication operation or the master station monitors the channel if the time slot has been allocated to communication between two slave stations. If the time slot is unassigned the idle word is transmitted.

The slave station normally remains dormant except for the synchronisation and pre-assigned address slots in which the receiver is energised under the action of the receiver internal timer. If the receiver receives a valid address the slave station becomes operational, responds to commands on the channel and takes part in transmission and reception. If an external interrupt is received from interface 10 data is input to or output from the appropriate virtual circuit register and if the data is required to be sent to another station the slave station sends an interrupt signal requesting communication attention.

An important feature of the present invention is the ability of the system to alter the rate of data flow through the system in accordance with the amount of data awaiting transmission. In the normal operation of a virtual circuit as described above transmission of data takes place at a time dictated by the master station and for a limited time only, e.g. one time slot. In the preferred arrangement, the link control bits which are transmitted with each data word are used to indicate to the master station which is receiving or monitoring the transmission whether the data buffer which holds the information for transmission (e.g. in RAM 33) is empty. If it is, the virtual circuit is terminated. If, however, more data is required to be transmitted, the master sta-

8

tion automatically operates to allocate further time slots to the virtual circuit. The further allocation need not be only a single time slot but may be a series of successive time slots. In a further development, the link control bits could indicate the level of fullness of the buffer, e.g. more or less than half full, which can be used by the master station for prioritising the allocation of further channel time to the virtual circuits requiring it.

FIG. 8 illustrates this operation. If, for example, a source slave station wishes to communicate with a destination slave station it first sends an interrupt signal as described above and then indicates to the master station the address of the destination station. The master station transmits to the destination station the virtual circuit number and both the source and destination stations monitor the channel. When the master station allocates the channel to the virtual circuit the source and destination stations communicate. The link control bits indicate the state of fullness of the buffer and if it is not empty after a transmission the master station allocates further channel time. When the data buffers are empty the virtual circuit is terminated (if it were a transient circuit) or the stations revert to the dormant state with the virtual circuit still in the tables (if it were a default virtual circuit).

The resulting system is now seen from the user's viewpoint to be an array of virtual circuits via which communication can be made to a remote point through a system of hardware ports which are described to the master station by a logical port address map. Each port may have an associated buffer so that the system can be conceptualised as each virtual circuit consisting of a simple USART. Clearly the operation of the system should be totally transparent to the user and this is achieved by using the method as described.

Referring to FIG. 9, we can now build up a complete system to monitor and control. The example given is for a data logger with pens d1d4 having master to slave, slave to master and slave to slave virtual circuits. Data is simply obtained from the various field stations d8, d9 and logged on the data logger. Communication is also set up between slaves 1 and 2, i.e. devices d10 and d7. Each data logger has its own virtual circuit and is effectively connected directly to its own data source in the field. Similarly, device d10 is effectively connected directly to d7.

We claim:

1. A communication system operating on a single channel including a device at each of a plurality of nodes between which it is desired to establish communication, one device including means for transmitting synchronization information to each other device simultaneously and each other device having means for providing a synchronization signal in synchrony with said synchronization information, said one device being capable of transmitting to each other device simultaneously an address of another device in one of a cyclically repeating series of consecutive time slots, said one time slot being preassigned for transmission of said address and said other device being arranged to communicate upon receipt and recognition of its address, and at least one other of said time slots in each cycle being reserved so that no such said address may be transmitted therein, whereby any of said other devices may transmit in such a reserved time slot to request communication on said channel, the remaining time slots of said series being usable for the transmission of address information and data.

4,887,266

**9**

2. A communication system as claimed in claim 1 wherein each said other device has a pre-assigned address and operates to decode transmitted information on said channel only in a particular time slot dependent on said address.

3. A communication system as claimed in claim 2 wherein a said other device is arranged to transmit its address in said reserved time slot when it requests communication.

4. A communication system as claimed in claim 1 wherein every word of data which passes between said devices is accompanied by at least one bit of link control information, and each device includes a register for holding information indicative of the current mode of operation of the device and is arranged to combine the link control information with the contents of the register to control the subsequent operation.

5. A communication system as claimed in claim 1 including radio transmitter and receiver apparatus for providing data communication with an electrical apparatus, comprising a transmitter circuit, a receiver circuit and an interface circuit, said interface circuit including a processor controlled by a stored program and being arranged to control the transfer of data from said electrical apparatus to the transmitter circuit and/or from the receiver circuit to the electrical apparatus, and said interface circuit being operable in a condition in which data transfer can take place or in a lower power consumption condition in which data transfer cannot take place, the interface circuit being operable automatically to enter the lower power condition when a communication operation has been completed and automatically to re-enter the data transfer condition when a signal is received from the electrical apparatus indicative of the need to transmit data and when a predetermined code signal is received by the receiver circuit indicative of the need to receive data.

6. A communication system as claimed in claim 5 wherein the interface circuit includes a microprocessor which is operable in a lower power condition.

7. A communication system as claimed in claim 5 wherein the power supply to the transmitter circuit may be controlled by the interface circuit, the interface circuit being arranged to energize the transmitter circuit only when transmission is required.

**10**

cuit being arranged to energize the transmitter circuit only when transmission is required.

8. A communication system as claimed in claim 1 comprising a plurality of stations each having a transmitter, a receiver, a control processor and a buffer store for data to be transmitted, the control processor being responsive to the state of fullness of the buffer and arranged in dependence thereon to cause an alteration in the rate of data flow through the system.

9. A communication system as claimed in claim 8 wherein every word of data which passes through the system is accompanied by at least one bit of link control information, and each control processor includes a register for holding information indicative of the current mode of operation of the station and is arranged to combine the link control information with the contents of the register to control the subsequent operation, to provide at least a mode of increased rate of data throughput when the state of fullness of the buffer so dictates.

10. A communication system as claimed in claim 8 wherein the system is a synchronous communication system with one station designated the master station providing system synchronization signals, and defining a cyclic sequence of time slots comprising at least one synchronization time slot, at least one interrupt time slot, and a plurality of address or data time slots, wherein any other station can transmit a message to the master station during an interrupt time slot to indicate a request to communicate.

11. A communication system as claimed in claim 10 wherein after the master station has acknowledged the request to communicate a station may transmit to the master station the address of the destination station if this is not known to the master station, the master station being arranged then to broadcast a signal to the source and destination stations allocating them a time slot for communication.

12. A communication system as claimed in claim 11 wherein after the allocation of the time slot data transfer takes place and if the accompanying link control information indicates that the buffer of the source station is not empty, the master station automatically allocates further time on the transmission channel.

*  *  *  *  *

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.
Petitioner

v.

DSS TECHNOLOGY MANAGEMENT, INC.
Patent Owner

U.S. Patent No. 6,128,290

———————————

*Inter Partes* Review Case No. <u>Unassigned</u>

———————————

**DECLARATION OF JACK D. GRIMES, PH.D.**

APL 1008
IPR of U.S. Pat. No. 6,128,290

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

# TABLE OF CONTENTS

I.      Introduction ........................................................................... 4

II.     My Background and Qualifications ...................................... 5

III.    List of Documents Considered in Formulating My Opinion ....................... 6

IV.     Person of Ordinary Skill in the Art .................................... 7

V.      My Understanding of Claim Construction ................................... 7

VI.     The Basis of my Analysis with Respect to Obviousness ............................ 8

VII.    The '290 Patent Specification ............................................ 9

VIII.   Terminology of the Claims of the '290 patent ........................... 13

        A.    "local oscillator" ................................................ 13

IX.     State of the Art Before October 14, 1997 and Summary of References ..... 16

        A.    Barber ........................................................... 17
        B.    Natarajan ........................................................ 21
        C.    Neve ............................................................. 26
        D.    Mahany ........................................................... 28

X.      Summary Chart of Analysis Over the Art .................................. 29

XI.     Ground 1:  Claims 9 and 10 would have been obvious in view of
        Barber. ............................................................... 30

        A.    Independent claim 9 would have been obvious in view of
              Barber. ......................................................... 30
        B.    Claim 10 would have been obvious in view of Barber. ............. 46

XII.    Ground 2: Claims 6, 7, 9, and 10 would have been obvious over
        Natarajan in view of Neve. ............................................ 47

        A.    Overview of the Combination of Natarajan and Neve ............... 47
        B.    Independent claim 6 would have been obvious over
              Natarajan in view of Neve. ...................................... 51
        C.    Claim 7 would have been obvious over Natarajan in view of
              Neve. ........................................................... 69
        D.    Independent claim 9 would have been obvious over
              Natarajan in view of Neve. ...................................... 70
        E.    Claim 10 would have been obvious over Natarajan in view
              of Neve. ........................................................ 89

XIII.   Ground 3: Claims 6 and 7 would have been obvious over Mahany. .......... 90

2

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

A.    Independent claim 6 would have been obvious over Mahany. .......... 90

B.    Claim 7 would have been obvious over Mahany. ........................... 103

XIV.   Objective Indicia of Nonobviousness ....................................... 104

XV.    Conclusion ................................................................................ 105

3

I, Jack D. Grimes, Ph.D., hereby declare as follows:

## I.      Introduction

1.      I am over the age of eighteen (18) and otherwise competent to make this declaration.

2.      I have been retained as an expert witness on behalf of APPLE INC. for the above-captioned *inter partes* review (IPR). I am being compensated for my time in connection with this IPR at my standard legal consulting rate, which is $500 per hour. I understand that the petition for *inter partes* review involves U.S. Patent No. 6,128,290 ("the '290 patent"), APL 1001, which issued from U.S. Patent Application No. 08/949,999 ("the '999 application"), filed on October 14, 1997. The '290 patent is a continuation-in-part of U.S. Patent Application No. 08/611,695, filed on March 6, 1996. The '290 patent names Phillip P. Carvey as the sole inventor. The '290 patent issued on October 3, 2000, from the '999 application. It is my understanding that the '290 patent is currently owned by DSS Technology Management, Inc.

3.      In preparing this Declaration, I have reviewed the '290 patent and considered each of the documents cited herein in light of the general knowledge in the art at the time of the alleged inventions. In formulating my opinions, I have relied upon my experience, education and knowledge in the relevant art. I have also considered the viewpoint of a person of ordinary skill in the art ("POSA")

(*i.e.*, a person of ordinary skill in the field of wireless network technology, defined further below) prior to October 14, 1997, the proper priority date for the claims of the '290 patent.

## II.    My Background and Qualifications

4.    I am currently an independent consultant. Since 1989, I have provided studies, strategies and opinions to industry and the legal profession, with particular emphasis on topics including: PDAs, Wireless data systems, Security, Engineering development practices, Microprocessor technology and Computer system architecture. Prior to and during my work as an independent consultant, I worked at senior levels of management for various large and small high technology companies and have over twenty years of management experience at those companies.

5.    I received my Doctor of Philosophy degree in Electrical Engineering with a minor in Computer Science from Iowa State University in 1970. I received a Master of Science degree in Electrical Engineering from Iowa State University in 1968 and a Bachelor of Science degree in Electrical Engineering from Iowa State University in 1965. I also received a Master of Science Degree in Experimental Psychology from the University of Oregon in 1981 with an emphasis on user interface design.

6.   I have taught courses at the graduate level in computer science for Oregon State University. I have also taught courses at the graduate and undergraduate level in Electrical Engineering at Iowa State University.

7.   Additional information concerning my work experience, professional publications, and presentations in the field of computer science, and cases in which I have testified as an expert at trial or deposition are set forth in my current Curriculum Vitae, a copy of which is attached hereto as Exhibit APL 1009.

## III.   List of Documents Considered in Formulating My Opinion

8.   In formulating my opinion, I have considered the following documents and any other documents cited herein:

| Apple Exhibit # | Description |
|---|---|
| 1001 | Carvey, U.S. Patent No. 6,128,290, "Personal Data Network," (filed October 14, 1997; issued October 3, 2000) ("the '290 patent"). |
| 1002 | Barber, Thomas J., "BodyLAN™: A Low-Power Communications System," Massachusetts Institute of Technology, submitted January 30, 1996, archived in Massachusetts Institute of Technology Libraries April 11, 1996 ("Barber"). |
| 1003 | Natarajan *et al.*, U.S. Patent No. 5,241,542, "Battery Efficient Operation of Scheduled Access Protocol," (filed August 23, 1991; issued August 31, 1993) ("Natarajan"). |
| 1004 | Neve *et al.*, U.S. Patent No. 4,887,266, "Communication System," (filed April 29, 1986; issued December 12, 1989) ("Neve"). |
| 1005 | File history of U.S. Patent No. 6,128,290 |
| 1006 | Application No. 08/611,695 (as-filed) |

6

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

| Apple Exhibit # | Description |
|---|---|
| 1007 | Apple's Claim Construction Brief in Case No. 6:13-cv-00919-JDL (EDTX) |
| 1010 | Mahany, U.S. Patent No. 5,696,903, "Hierarchical Communications System Using Microlink, Data Rate Switching, Frequency Hopping and Vehicular Local Area Networking," (filed April 29, 1994; issued December 9, 1997) ("Mahany") |

## IV.    Person of Ordinary Skill in the Art

9.    I understand that a person of ordinary skill in the art is one who is presumed to be aware of pertinent art, thinks along conventional wisdom in the art, and is a person of ordinary creativity. A person of ordinary skill in the art ("POSA") of wireless network technology would have typically had an undergraduate degree in Electrical Engineering and 1-2 years of experience working with wireless network technology, or equivalent education and/or work experience, as of the priority date.

## V.    My Understanding of Claim Construction

10.    I understand that, during an *inter partes* review, claims are to be given their broadest reasonable construction in light of the specification as would be understood by a person of ordinary skill in the relevant art.

## VI.    The Basis of my Analysis with Respect to Obviousness

11.    I understand that an obviousness analysis involves comparing a claim to the prior art to determine whether the claimed invention would have been obvious to a person of ordinary skill in the art in view of the prior art, and in light of the general knowledge in the art. I also understand when a person of ordinary skill in the art would have reached the claimed invention through routine experimentation, the invention may be deemed obvious.

12.    I also understand that obviousness can be established by combining or modifying the teachings of the prior art to achieve the claimed invention. It is also my understanding that where there is a reason to modify or combine the prior art to arrive at the claimed invention, there must also be a reasonable expectation of success in so doing. I understand that the reason to combine prior art references can come from a variety of sources, not just the prior art itself or the specific problem the patentee was trying to solve. And I understand that the references themselves need not provide a specific hint or suggestion of the alteration needed to arrive at the claimed invention; the analysis may include recourse to logic, judgment, and common sense available to a person of ordinary skill that does not necessarily require explanation in any reference.

13.    I understand that when considering the obviousness of an invention, one should also consider whether there are any secondary considerations that

8

support the nonobviousness of the invention. I understand that secondary considerations of nonobviousness include failure of others, copying, unexpectedly superior results, perception in the industry, commercial success, and a long-felt but unmet need.

## VII.    The '290 Patent Specification

14.    This declaration is being submitted together with a petition for *inter partes* review of claims 6, 7, 9, and 10 of the '290 patent.

15.    I have considered the disclosure and file history of the '290 patent in light of general knowledge in the art before the earliest proper priority date of the '290 patent, October 14, 1997.

16.    The '290 patent is directed to a data network for "bidirectional wireless data communications between a microcomputer unit and a plurality of peripheral units." ('290 patent, 1:12-14.) The '290 patent describes that the "server microcomputer" can be a personal digital assistant ("PDA"). (*Id.* at 2:66-67.) The "peripheral units" are referred to generally as "personal electronic accessories" or "PEAs". (*Id.* at 2:15-18.) The PEAs include input devices such as a keyboard, mouse, body-mounted accessories such as displays "mounted on a headband or eyeglasses", and "physiological sensors". (*Id.* at 1:62-2:18.) These "physiological sensors" can be, for example, temperature, heartbeat, and respiration sensors for patient monitoring and fitness training. (*Id.* at 2:10-15.) FIG. 1 of the '290 patent,

9

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

reproduced below, illustrates the server microcomputer (11) and associated PEAs

(21, 29). The '290 patent describes that the server microcomputer and peripherals

are linked "in close physical proximity, e.g., within twenty meters," to establish a

common time base or synchronization. (*Id.* at 1:50-55.)



FIG. 1

17.    FIGS. 2 and 3, reproduced below, illustrate the PEA modem and PDA

modem, respectively.   The '290 patent describes that the PEA modem has five

major components: a transmitter (40), a receiver (41), a local oscillator (42) shared

by the transmitter and the receiver, a controller (43) which times and coordinates

the operations of other components, and a voltage controlled crystal oscillator (44)

for maintaining a common time base with the host microcomputer. (*Id.* at 3:30-39.)

Similarly, the PDA modem has five major components: a transmitter (15), a

receiver (17), a local oscillator (16) shared by the transmitter and the receiver, a

controller (14), and a crystal oscillator (18) for maintaining the network time base.

(*Id.* at 4:9-15.) The '290 patent describes that "[t]here are no differences between

the receiver, local oscillator, and transmitter in both the PEA and PDA modems."

10

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

(*Id.* at 4:16-18.) The '290 patent describes with respect to FIG. 4 that "transmission is effected using the local oscillator 45 to drive the transmit antenna amplifier 50 whose output drives transmit antenna 51." (*Id.* at 4:25-27.)



FIG. 2                                                                FIG. 3

18. The '290 patent's goal is to "provide wireless communication between a host or server microcomputer unit and a plurality of peripheral units" that is "reliable", "low power", "avoids interference from nearby similar systems", and is "relatively simple". (*Id.* at 1:33-46.) The '290 patent describes that its "general scheme of data transmission and reception is a form of time division multiple access (TDMA)" where transmissions occur "in only those slots indicated by a TDMA program." (*Id.* at 3:57-59, 4:1-2.) The '290 patent further describes that:

> Both the host and all PEAs share a common TDMA program at one
>
> time. For each slot, this TDMA program indicates that a PEA or host
>
> is to transmit, or not, and whether it will receive, or not. In the

11

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

intervals between slots in which a PEA is to transmit or receive, all

receive and transmit circuits are powered down. (*Id.* at 4:2-8.)

19.    The '290 patent describes that "code sequences" are generated, which

control the operation of the transmitters in a low duty cycle pulsed mode of

operation. (*Id.* at 1:57-61, 2:35-39.) This causes the peripheral units' transmitters to

only be active for short durations of time, which the '290 patent asserts

"substantially reduces power consumption and facilitates the rejection of

interfering signals." (*Id.* at 1:59-61.)

20.    The '290 patent describes that "[t]he codes are mostly zeros with

three scattered ones representing the locations of the slots in which RF bursts are to

be transmitted or received." (*Id.* at 7:27-29.) "The position of each burst is dictated

by a one" in a code word. (*Id.* at 7:23-24.) So what the '290 patent describes is

using a code word consisting of zeros and ones to determine when transmissions

are to occur.

21.    The '290 patent also states that it would "be understood by those

skilled in the art, [that] the TDMA system is greatly facilitated by the

establishment of a common frame time base between PEA and PDA." (7:63-65.) I

agree that a POSA would have understood that establishing a common time base in

a system like the one described in the '290 patent would have been advantageous.

12

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

communications link and are synchronized, the devices can regularly transmit and

receive according to the TDMA plan. (Barber, p. 30.)

### B. Natarajan

40.    Natarajan is directed to battery power conservation in wireless

communications of mobile computers controlled by multi-access protocols.

(Natarajan, 1:6-12.) Figure 1 shows that multiple mobile units (10, 12, 14, 16)



communicate with base stations (26, 28) via wireless radio links. (Natarajan, 2:28-

39, Figure 1.) Natarajan describes that the base stations can be a "conventional

microcomputer" and that the mobile units can be a "hand held or laptop computer".

(Natarajan, 2:40-41, 2:58-59.) Both the base stations and mobile units have an RF

transceiver for establishing a radio link. (Natarajan, 2:51-56, 2:65-67.) A system

schematic common to both the base stations and mobile stations is illustrated in

FIG. 3. (Natarajan, 3:7-8.) Each device includes, for example, a microprocessor

system (56) that controls the transceiver via interface (58). (Natarajan, 3:14-15.)

The microprocessor system also includes a dedicated microprocessor (62) with

high-resolution time interval determination hardware or "timers". (Natarajan, 3:18-

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

21.) An interface connects the microprocessor system with computer (50), which includes user application programs (72). (Natarajan, 3:50-52.)

41.    Natarajan describes that its system is intended "for minimizing battery power consumed by wireless link adapters at the mobile units". To do so, Natarajan describes turning off the transmitter and receivers when not in use. (Natarajan, 4:2-5.) More specifically, Natarajan describes that:

> [s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF). A desirable solution is one in which the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message).

(Natarajan, 3:59-4:6.)

42.    Natarajan further describes that the scheduled multiaccess protocol divides time into "fixed-length frames, and frames are divided into slots", as shown, for example, in FIG. 4. (Natarajan, 4:20-23, FIG. 4.) The frames are divided into subframes where, for example with respect to FIG. 4, one subframe is for transmitting data packets from the base station to mobile units (Period A), a second subframe is for contention-free transmission from mobile units to the base

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

station (Period B), and third subframe is for "bursty data traffic" in a contention

mode from mobile units to the base station (Period C). (Natarajan, 4:27-38.)

```
      | G |AH|        A        |BH|    B    |CH|    C      |FT|
      |...|..||||||||||||||||||..||||||||||||..|||||||||||||| |
      |...|..|<------------>|  |<--------->|..|<----------->|..|
FIG.4         | Base to     |  | Mobile to|  | Contention   |  |
              | Mobiles     |  |  Base    |  | from Mobiles |  |
        ->| FH|  |<-----TA----->|  |<---TB---->|  |<---TC------>|  |
```

43.    Natarajan describes that in Period A, the base station controls the

outbound transmissions to the mobile units. (Natarajan, 4:40-41.) Prior to Period

A, the base station broadcasts a header (AH) to the mobile units that includes: a list

of mobile units that will be receiving data packets from the base station, the order

in which the mobile units will receive the data packets, and the number of data

packets that will be transmitted to each mobile unit. (Natarajan, 4:45-53.) If a

mobile unit is not included in header (AH), it will not be receiving data from the

base station, and can turn off its receiver for Period A. (Natarajan, 4:63-67.)

Because the mobile units know the order and number of data packets to be

transmitted, mobile units that will be receiving data can compute when its

designated transmission slot will be, go to sleep until that time, and wake itself up

in its designated time slot to receive data. (Natarajan, 4:67-5:4.) After receiving its

data, the receiver can go back to sleep for the remainder of Period A. (Natarajan,

5:4-6.)

23

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

44.    Natarajan similarly discloses broadcasting another header (BH) for scheduling which mobile units will be allowed to transmit to the base station and the order they will transmit. (Natarajan, 5:9-29.) Flow charts of these processes are shown, for example, in FIGS. 8A-8D and described in Natarajan at 8:14-9:53. Using this scheme, the mobile units save power by powering up only during their designated reception or transmission time slot.

45.    Natarajan more specifically describes that header (AH) includes "a coded description of mobile users that will receive data in the current frame. That is, it is a designation of which mobile users are to communicate with the base station during this frame." (Natarajan, 6:19-22.) Header (BH) similarly includes "a coded designation or description of mobile users that can transmit data in the current frame." (Natarajan, 6:31-33.) Natarajan describes assigning each mobile unit an index number during a "registration period" which is "needed to associate each mobile unit in the network with the intended base station." (Natarajan, 6:48-54.)

46.    The header (AH) transmitted from the base station includes a "Receiving Users designation or Index message portion" that is a bit-vector sequence with a bit for each of the registered mobile units. (Natarajan, 6:55-58.) FIG. 5 illustrates an example of this sequence.

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

# FIG. 5

```
| 0001000110000 ••••••••••••••••••••••• 1000000 |
| < --------------------- 64 bits ------------------------- > |
```

47.    Natarajan specifically describes that the "coded description" designates whether or not each mobile unit will communicate with the base station during a particular time frame:

> The content of each bit location signals the receiver activity of the user designated or indexed by the bit location. For example, reading left to right, a "1" in the 4'th, 8'th, 9'th, etc. bit location can be used to signal that the 4'th, 8'th, 9'th, etc. mobile unit is designated to receive one message in the current frame period. "0" in the 1'st, 2'nd, 3'rd, etc. bit location signals that the 1'th, 2'nd, 3'rd, etc. mobile unit is inactive (is not designated to receive any data) and can turn its receiver power OFF until the beginning of Header BH.

(Natarajan, 6:59-68.)

An analogous scheme is used in the header (BH) for transmission from the mobile units to the base station. (Natarajan, 7:1-6.) This scheduled communication scheme reduces power consumption by requiring that the mobile units only be

25

powered on during time slots where they will be receiving or transmitting data. (Natarajan, 7:6-15.)

### C. Neve

48.    Neve is directed to "[a] communication system able to provide multiple path communication between a plurality of stations operating on a single channel. The stations are synchronized and a cyclically repeating series of time slots is defined." (Neve, Abstract.) In order to provide radio data communication, Neve discloses that each device includes "a transmitter and receiver device (transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-63.) The transceiver is connected to a digital control processor, which controls data transfer to and from the transmitter and receiver. (Neve, 3:64-68.)

49.    Neve describes that it is "desirable to provide a communications system in which the transmitting and receiving apparatus is small, may be easily installed in any location, and is of very low power consumption." (Neve, 1:31-34.) Thus, Neve's system "enables a very low power consumption to be achieved in the cases where the device requires to transmit data only rarely or the receiver receives the predetermined code signal only rarely…a device may need to transmit data for only a fraction of a second in many hours." (Neve, 2:25-31.)

26

50.    Neve describes that when data transfer is not taking place, the device can enter a lower power consumption state. (Neve, 2:13-16.) The system is designed "automatically to re-enter the data transfer condition when either a signal is received from the device indicative of the need to transmit data or a predetermined code signal is received by the receiver circuit indicative of the need to receive data." (Neve, 2:19-24.) So, the receiver has very low power consumption because only the internal timing circuitry is energized continuously, whereas the rest of the receiving circuit is energized only when its assigned time slot occurs. (Neve, 2:39-41.) Similarly, the transmitter only needs to be energized when transmission is required. (Neve, 2:45-47.)

51.    Neve further describes "the system is a synchronous communication system with one station designated the master station providing system synchronisation signals, and defining a cyclic sequence of time slots." (Neve, 3:9-12.) The time slots include "at least one synchronisation time slot, at least one interrupt time slot, and a plurality of address or data time slots, wherein any other station can transmit a message to the master station during an interrupt time slot to indicate a request to communicate." (Neve, 3:12-17.) Neve describes that the receiver circuit "includes a low power timing circuit which operates to energise the rest of the receiver circuit only for the time slot in which its address may occur and

27

for the synchronisation time slot thereby enabling it to maintain synchronisation with low power consumption." (Neve, 4:43-48.)

52.    Neve further describes that controlling the transceiver includes power up, cadence capture, bit synchronization, and a bit synchronization clock. (Neve, 6:7-11.) The clock is always active and the fundamental frequency of the oscillator is used as the system clock for the CPU. (Neve, 6:11-14.)

### D. Mahany

53.    Mahany is directed to a "local area network [that] allows for radio communication between a portable computer device and peripheral devices with built-in transceivers utilized by the portable computer device" where communication is "controlled by a reservation access communication protocol." (Mahany, Abstract, FIGS. 1b and 1c.)



54.    Mahany describes that the devices include "a voltage controlled oscillator (VCO) (3601)" and that "because typical VCO's are subject to drift, the VCO is stabilized by connecting it in a phase locked loop to a narrowband

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

reference, such as a crystal reference oscillator (3603)." (Mahany, 55:11-17, FIG. 38.) Mahany further describes correcting this "drift" where "[t]he oscillator (3603) outputs a signal of a fixed or reference frequency $F_{REF}$" and that "if the output of the VCO (3601) begins to drift out of phase of the reference frequency, the phase detector (3609) responds with a corrective output so as to adjust the center frequency of the VCO (3601) back in phase." (Mahany, 55:17-33.)

55.   The process described above is used in synchronizing devices that communicate with each other. More specifically, Mahany describes an "Access Interval" having a "SYNC header" that is generated by a base device. (Mahany, 15:53-57, FIG. 2.) The SYNC header includes "[a] timing character for synchronization of device local clocks to the NET clock contained within the Control Point device." (Mahany, 15:57-67.) This Access Interval can also have a portion that is reserved for TDMA communications. (Mahany, 13:17-19; FIG. 2.) The Access Intervals are used to synchronize communications between the mobile computing devices and peripheral devices. (Mahany, 40:26-28.)

## X.    Summary Chart of Analysis Over the Art

| Ground | References | Claims |
|--------|------------|--------|
| 1 | Barber | 9 and 10 |
| 2 | Natarajan and Neve | 6, 7, 9, and 10 |
| 3 | Mahany | 6 and 7 |

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

divided by time, Time Division Multiple Access (TDMA), each node has a scheduled time to use the channel and is inactive during all other times." (Barber, p. 11) More specifically, Barber discloses that "[d]uring the TDMA mode the PEA and the Hub have an established communications link and are both transmitting and receiving regularly according to the TDMA plan stored in the memory." (Barber, pp. 29-30.) Under the TDMA plan, the Hub and PEA would each be allocated time slots within which to transmit.

87.    Accordingly, it is my opinion that Barber discloses "wherein said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting" as recited in claim 10.

## XII.    *Ground 2: Claims 6, 7, 9, and 10 would have been obvious over Natarajan in view of Neve.*

88.    Each and every limitation of claims 6, 7, 9, and 10 is disclosed by the combination of Natarajan and Neve, or, would have been obvious to a POSA in view thereof. Therefore, it is my opinion that Natarajan and Neve render obvious claims 6, 7, 9, and 10 of the '290 patent.

### A. *Overview of the Combination of Natarajan and Neve*

89.    It is my opinion that a POSA would have sought to combine the teachings of Natarajan and Neve. Both Natarajan and Neve are directed to wireless network communication systems. And both references are concerned with conserving battery power of wireless devices. (*See e.g.*, Natarajan, Abstract, 1:16-

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

21; Neve, 1:29-34, 2:48-51.) The '290 patent addresses this same issue. ('290 patent, Abstract, 1:59-61.) Further, Natarajan and Neve reduce power consumption in similar ways, by scheduling transmission time slots and having the devices operate in a low power mode when they are not transmitting or receiving data. (*See e.g.*, Natarajan, Abstract, 3:66-4:7; Neve, Abstract, 2:35-41.) The '290 patent uses a similar technique. ('290 patent, 2:35-40.)

90.    As is evident from Natarajan and Neve, many of the claimed elements in the '290 patent are merely standard components of wireless communications systems and are disclosed by both Natarajan and Neve. For example, both Natarajan and Neve disclose a "server microcomputer" base unit that communicates with a plurality of "peripheral units", where each device has an RF transmitter and receiver. (*See e.g.*, Natarajan, Abstract, FIGS. 1-2; Neve, Abstract, FIG. 1.)

91.    Natarajan also discloses that the purported point of novelty of the '290 patent, a "code sequence" for determining transmission intervals, was well known. As discussed above, Natarajan discloses a coded description of mobile units that will receive and/or transmit data in a given time frame. (Natarajan, 6:15-33.) Natarajan further describes that a sequence of ones and zeros indicates whether or not a mobile unit is designated to receive (or transmit) data during a specified time

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

slot. (Natarajan, 6:59-68.) And, for example, a mobile unit that will not be receiving data can turn its receiver power off. (Natarajan, 6:66-68.)

92. Although Natarajan does not explicitly describe synchronizing the mobile units with the base station, Natarajan teaches that coordinated timing of transmissions is important. A POSA would have understood this to be the case because of Natarajan's time slotted transmission scheme. First, Natarajan describes a "registration period" where the base station indexes each of the mobile units. (Natarajan, 6:48-53.) For example, if there are 64 mobile units, each unit is indexed from 1 to 64. (Natarajan, 6:48-53.) Natarajan describes that "[t]he *registration is needed to associate each mobile unit* in the network *with the intended base station*." (Natarajan, 6:53-54 (emphasis added).) So, Natarajan teaches "associating" each of the mobile units with a base station. Then, in order to carry out its scheduled access protocol, Natarajan teaches that the mobile units and base stations each have "a dedicated microprocessor 62 containing *high-resolution time interval determination hardware or "timers"* typical of real-time microprocessor systems." (Natarajan, 3:18-21, FIG 3 (emphasis added).) The timers provide that "each receiving mobile unit can compute exactly when it should be ready to receive packets from the base station (add up the slots allocated to all receiving units that precede it). Each receiving mobile unit goes to sleep after scheduling to wake itself up at its designated time for receiving data." (Natarajan,

4:67-5:4.) As described in Natarajan, this facilitates reduced power consumption because the devices can determine when to power on and off the transmitter and receiver, thereby consuming power only when necessary. (Natarajan, 7:7-38.) A POSA would have understood that when executing the coordinated data transmission plan described in Natarajan, it would have been beneficial to have the timers in the mobile units precisely synchronized with the base station. Thus, a POSA would have been motivated to synchronize the mobile units with the base unit.

93.    This would have led a POSA to Neve, which comes from the same field as Natarajan and describes a well known method in wireless communication systems for synchronizing multiple peripheral devices with a base station. More specifically, Neve discloses "a synchronous communication system with one station designated the master station providing system synchronisation signals, and defining a cyclic sequence of time slots." (Neve, 3:9-12.) Neve describes that during a dedicated "synchronization time slot", a "synchronization word" is transmitted by the master station. (Neve, 7:31-33.) Neve also teaches that the CPU is able to "adjust the phase of the clock used for synchronous communication for correct reception of the incoming synchronous data." (Neve, 6:16-18.) Neve further describes that the receivers are energized "only for the time slot in which its address may occur and for the synchronisation time slot thereby enabling it to

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

maintain synchronisation with low power consumption." (Neve, 4:43-48.) As in Natarajan, this reduces power consumption by the devices.

94.    A POSA would have combined the synchronization technique described in Neve with the communication system of Natarajan because Neve is an example of a conventional synchronization technique for a time scheduled data communication system and Natarajan teaches that timing is important for data transmissions in its similar time scheduled communication system. The combination of Natarajan and Neve would have been merely combining known elements in the prior art according to known methods to yield predictable results and using a known technique to improve similar devices in the same way.

**B. Independent claim 6 would have been obvious over Natarajan in view of Neve.**

**1.    Natarajan and Neve each disclose "[a] data network system for effecting coordinated operation of a plurality of electronic devices," as recited in claim 6.**

95.    It is my opinion that Natarajan and Neve each disclose "[a] data network system for effecting coordinated operation of a plurality of electronic devices". Natarajan discloses a multiaccess protocol for a plurality of mobile electronic devices in "an indoor digital data communication system" where "registration is needed to associate each mobile unit in the network with the intended base station." (Natarajan, 1:67-68, 6:48-54, FIG. 1.) Neve similarly discloses "[a] communication system able to provide multiple path communication

51

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

transmit, it is "controlled by" the oscillator under DSS' interpretation. Therefore, the RF transmitter of the peripheral unit is "controlled by" the oscillator as recited in claim 6.

113.   Accordingly, it is my opinion that Natarajan and Neve in combination discloses "said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also a local oscillator which can be synchronized to said server unit oscillator using said synchronizing information and an RF transmitter controlled by said local oscillator for sending input information from the user to said server microcomputer" as recited in claim 6.

> **6.    Natarajan and Neve in combination disclose "said server microcomputer including a receiver controlled by said server unit oscillator for receiving input information transmitted from said peripheral units" as recited in claim 6.**

114.   It is my opinion that the combination of Natarajan and Neve discloses "said server microcomputer including a receiver controlled by said server unit oscillator for receiving input information transmitted from said peripheral units". Natarajan discloses that the base station has an RF transceiver, that is, both an RF transmitter and an RF receiver. (Natarajan, 2:51-58, FIGS. 2 and 3.) Neve similarly discloses "a radio transmitter and receiver apparatus" which has "a transmitter and receiver device (transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-3, FIGS. 1 and 3.)

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

115.   Natarajan discloses that "[h]eader BH contains an ordered list of users that will be allowed to transmit to the base station in the current frame." (Natarajan, 5:9-15.) Neve similarly discloses that there is a designated time slot where "the master station receives" from the slave stations. (Neve, 7:31-34.) Therefore, Natarajan and Neve each disclose that the "server microcomputer" receives information from the peripheral units. A POSA would have understood that since the mobile units in Natarajan can be a "hand held or laptop computer" (Natarajan, 2:58-29), the data transferred from the mobile units to the base station would have been "input information" and that the receivers in the base/master stations of Natarajan and Neve would have been the component responsible for receiving the "input information". For example, a user would have been able to input information into the mobile unit of Natarajan via the "user application programs" and transmit that information to the base station, where it would have been received by the receiver of the base station.

116.   Further, as discussed above, Natarajan and Neve each disclose that the server microcomputer includes an oscillator. (Natarajan, 7:17-25; Neve, 5:24-28, 6:7-14, FIGS. 4 and 5.) An oscillator's standard function is to control the transmitter and receiver. For example, the transmitter and receiver frequency (i.e. carrier frequency) is controlled by the oscillator frequency. Therefore, the transmitter and receiver are "controlled by" the oscillator. I understand that DSS

proposes that "controlled by" should be construed to include a timing aspect. Natarajan and Neve disclose this as well. Natarajan describes in detail "control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)." (Natarajan, 3:66-4:6; *see also* 8:40-9:14.) It would have been obvious to a POSA to similarly power on and off the transmitter and receiver of the base station to conserve power. Similarly, Neve describes that all units are designed to "energise internal timing circuitry continuously and to energise the rest of the receiving circuit when its assigned time slot occurs." (Neve, 2:39-41.) Proper timing—"controlled by" the device clock under DSS' interpretation, and hence its associated oscillator—of the powering on and off of the receiver is important for the data transmission. Because the receiver relies on the oscillator as the time base to determine when to turn the receiver on or off and when to receive, it is "controlled by" the oscillator under DSS' interpretation. Therefore, the receiver of the server microcomputer is "controlled by" the oscillator.

117.   Accordingly, it is my opinion that Natarajan and Neve in combination disclose "said server microcomputer including a receiver controlled by said server unit oscillator for receiving input information transmitted from said peripheral units" as recited in claim 6.

*Inter Partes Review of USPN 6,128,290*
*Declaration of Jack D. Grimes, Ph.D. (APL 1008)*

> **7.    Natarajan and Neve in combination disclose "said server and peripheral transmitters being energized in low duty cycle RF bursts which are timed in relation to said synchronizing information" as recited in claim 6.**

118.   It is my opinion that the combination of Natarajan and Neve discloses "said server and peripheral transmitters being energized in low duty cycle RF bursts which are timed in relation to said synchronizing information". Natarajan describes that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)…the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." (Natarajan, 3:66-4:6.) Turning on the transmitters for only the time necessary to transmit information, as described in Natarajan, is analogous to the claimed "low duty cycle RF bursts". For example, Natarajan also describes that there is a period "for the transfer of all ***bursty*** data traffic in a contention mode from mobile units to base station (inbound traffic), with a header CH." (Natarajan, 4:36-38 (emphasis added).) Neve similarly discloses a "low power duty cycle". (Neve, 5:60-61.) Neve describes that "[t]he slave stations operate in a low power condition except during one of the other time slots when they may receive their own address, or except when they need to transmit data" (Neve, Abstract) and that the interface circuit of each device is "arranged to energise the transmitter circuit only when transmission

is required" (Neve, 2:42-47). Therefore, it is my opinion that Natarajan and Neve each disclose that the transmitters are "energized in low duty cycle RF bursts".

119.   As discussed above, Natarajan also teaches the need for a "registration period" to associate the mobile units with the base station (Natarajan, 6:48-54), "high-resolution time interval determination hardware" and "timers" (Natarajan, 3:18-21, FIG 3), and that the transmitters can turn on only when it is their turn to transmit (Natarajan, 3:66-4:6). So, as discussed above, although Natarajan does not explicitly disclose that the base station transmitter sends "synchronizing information" to the mobile units, this feature would have been obvious to a POSA in view of the transmission of synchronizing information disclosed in Neve. In particular, a POSA would have found the "registration period" to be a logical time to transmit synchronization information, so that the timers were synchronized before the data transmission schedule began.

120.   The combination of Natarajan and Neve teaches that the "RF bursts" are "timed in relation to said synchronizing information". A POSA would have understood this broad term to mean that the "synchronizing information" is transmitted either before or after the "RF bursts". Neve discloses that the master station "provides synchronisation signals for all of the other stations". (Neve, 4:10-13, FIG. 2.) Indeed, "[o]ne time slot in each cycle is reserved for the transmission of synchronization information by a station designated the master station for

68

reception by the other stations, designated slave stations, and maintaining synchronization therein." (Neve, Abstract.) A POSA would have thought to transmit synchronization information as taught in Neve during the registration period disclosed in Natarajan in order to accurately coordinate and carry out the data transmission schedule disclosed in Natarajan. The "RF bursts" of the transmitters would have been transmitted in their designated time slots after the timers were synchronized and therefore "timed in relation to said synchronizing information".

121.    Accordingly, it is my opinion that Natarajan and Neve in combination disclose "said server and peripheral transmitters being energized in low duty cycle RF bursts which are timed in relation to said synchronizing information" as recited in claim 6.

### C. Claim 7 would have been obvious over Natarajan in view of Neve.

122.    It is my opinion that Natarajan and Neve each disclose the limitation of claim 7: "wherein said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting." Natarajan discloses "a scheduled multiaccess protocol is used in which time is divided into fixed-length frames, and frames are divided into slots" with "Period A for broadcast of packets from base station to mobile units (outbound traffic)" and "Period B for the contention-free transfer of all traffic from mobile units to base station (inbound

149.  Accordingly, it is my opinion that the combination of Natarajan and Neve discloses "said server microcomputer including a receiver for receiving input information transmitted from said peripheral units" as recited in claim 9.

### 7. *Natarajan and Neve in combination disclose "said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals with said receivers being controlled by the respective oscillators" as recited in claim 9.*

150.  It is my opinion that the combination of Natarajan and Neve discloses "said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals with said receivers being controlled by the respective oscillators". Natarajan describes that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)…the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." (Natarajan, 3:66-4:6.) Turning on the transmitters for only the time necessary to transmit information, as described in Natarajan, is analogous to the claimed "low duty cycle RF bursts". For example, Natarajan also describes that there is a period "for the transfer of all *bursty* data traffic in a contention mode from mobile units to base station (inbound traffic), with a header CH." (Natarajan, 4:36-38 (emphasis added).) Neve similarly discloses a "low power duty cycle". (Neve, 5:60-61.) Neve describes that "[t]he slave stations operate in a low power condition except during

87

one of the other time slots when they may receive their own address, or except when they need to transmit data" (Neve, Abstract) and that the interface circuit of each device is "arranged to energise the transmitter circuit only when transmission is required" (Neve, 2:42-47). Therefore, it is my opinion that Natarajan and Neve each disclose that the transmitters are "energized in low duty cycle RF bursts at intervals".

151.   Further, as discussed above, Neve and Natarajan disclose that each device includes an oscillator. (Natarajan, 7:17-25; Neve, 5:24-28, 6:7-14, FIGS. 4 and 5.) An oscillator's standard function is to control the transmitter and receiver. For example, the transmitter and receiver frequency (i.e. carrier frequency) is controlled by the oscillator frequency. Therefore, the transmitter and receiver are "controlled by" the oscillator. I understand that DSS proposes that "controlled by" should be construed to include a timing aspect. Natarajan and Neve disclose this as well. Natarajan describes in detail "control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)." (Natarajan, 3:66-4:6; *see also* 8:40-9:14.) It would have been obvious to a POSA to similarly power on and off the transmitter and receiver of the base station to conserve power. For example, Neve describes that all units are designed to "energise internal timing circuitry continuously and to energise the rest of the receiving circuit when its assigned time slot occurs." (Neve, 2:39-41.) A POSA

would have understood that to accomplish this, the base unit receiver relies on the device clock, and its associated oscillator, for precise reception timing. Therefore, the receiver is "controlled by" the oscillator.

152.  Accordingly, the combination of Natarajan and Neve discloses "said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals with said receivers being controlled by the respective oscillators" as recited in claim 9.

### E. Claim 10 would have been obvious over Natarajan in view of Neve.

153.  The prior art discloses the limitation of claim 10: "wherein said server and peripheral units are allocated respective time slots within a predetermined frame interval for transmitting." Natarajan discloses "a scheduled multiaccess protocol is used in which time is divided into fixed-length frames, and frames are divided into slots" with "Period A for broadcast of packets from base station to mobile units (outbound traffic)" and "Period B for the contention-free transfer of all traffic from mobile units to base station (inbound traffic)". (Natarajan, 4:20-38, FIG. 4.) Therefore, time slots are allocated to the server and peripheral units for transmitting. Neve similarly discloses that the master station defines "a cyclic sequence of time slots" where the master station transmits a synchronization word to the slave stations during a synchronization time slot and the slave stations transmit to the master station in an interrupt time slot. (Neve, 3:9-17, 7:27:33.)

154.    Accordingly, it is my opinion that Natarajan and Neve each disclose the limitation recited in claim 10.

### XIII.    Ground 3: Claims 6 and 7 would have been obvious over Mahany.

155.    Each and every limitation of claims 6 and 7 is disclosed by Mahany or would have been obvious to a POSA in view of Mahany. Therefore, it is my opinion that Mahany renders obvious claims 6 and 7 of the '290 patent.

#### A.    Independent claim 6 would have been obvious over Mahany.

#### 1.    Mahany discloses "[a] data network system for effecting coordinated operation of a plurality of electronic devices," as recited in claim 6.

156.    It is my opinion that Mahany discloses "[a] data network system for effecting coordinated operation of a plurality of electronic devices". Mahany discloses a "local area network [that] allows for radio communication between a portable computer device and peripheral devices with built-in transceivers utilized by the portable computer device" where communication "is controlled by a reservation access communication protocol." (Mahany, Abstract.) Mahany also discloses that "[t]he hierarchical network of the present invention provides wireless peripheralization of mobile computer devices and data collection devices." (Mahany, 5:4-6.) FIGS. 1B and 1C, shown below, illustrate exemplary systems disclosed by Mahany.

## XV.    Conclusion

182.  In signing this declaration, I recognize that the declaration will be filed as evidence in a contested case before the Patent Trial and Appeal Board of the United States Patent and Trademark Office. I also recognize that I may be subject to cross-examination in the case and that cross-examination will take place within the United States. If cross-examination is required of me, I will appear for cross-examination within the United States during the time allotted for cross-examination.

183.  I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Respectfully submitted,

Jack D. Grimes, Ph.D.

Date: Dec. 4, 2014

1936646.DOC

105

In the Matter Of:

*APPLE, INC.*

*v.*

*DSS TECHNOLOGY MANAGEMENT, INC.*

---

*ROBERT DEZMELYK*

*December 15, 2015*

---

APL 1011

IPR2015-00373

DTI Court Reporting Solutions - Washington, DC

1-800-292-4789        www.deposition.com/washington-dc.htm

1        UNITED STATES PATENT AND TRADEMARK OFFICE

2                -------------------

3        BEFORE THE PATENT TRIAL AND APPEAL BOARD

4                -------------------

5                    APPLE, INC.,

6                    Petitioners,

7                        V.

8            DSS TECHNOLOGY MANAGEMENT, INC.

9                  Patent Owner,

10               -------------------

11               Case: IPR2015-00369

12                    IPR2015-00373

13            U.S. Patent No. 6,128,290

14               -------------------

15      VIDEOTAPED DEPOSITION OF: ROBERT DEZMELYK

16           Taken on Tuesday, December 15, 2015

17              AT: Foley & Lardner

18                 111 Huntington Avenue

19                 Boston, Massachusetts

20

21      Job No. WDC-066577  Pages: 1 - 122

22      Reporter: Katherine A. Tevnan, RPR/CSR

```
 1   APPEARANCES:

 2

 3       STERNE KESSLER GOLDSTEIN FOX

 4           (By David K.S. Cornwell, Esq.,

 5           and Jason A. Fitzsimmons, Esq.)

 6           1100 New York Avenue, NW

 7           Washington, DC 20005

 8           202-371-2600

 9           davidc@skgf.com

10           jfitzsimmons@skgf.com

11           for Apple, Inc.

12

13       FEINBERG DAY ALBERTI & THOMPSON LLP

14           (By David Alberti, Esq.)

15           1600 El Camino Real, Suite 280

16           Menlo Park, California 94025

17           650-384-9869

18           dalberti@feinday.com

19           for Apple, Inc.

20

21

22
```

```
 1      SMITH HOPEN, PA

 2          (By Anton J. Hopen, Esq.,

 3          Nicholas R. Pfeifer, Esq.,

 4          and Andriy Lytvyn, Esq.)

 5          180 Pine Avenue North

 6          Oldsmar, Florida 34677

 7          813-925-8505

 8          anton.hopen@smithhopen.com

 9          nicholas.pfeifer@smithhopen.com

10          andrey.lytvyn@smithhopen.com

11          for DSS Technology Management, Inc.

12

13      BUETHER JOE & CARPENTER, LLC

14          (By Mark Perantie, Esq.)

15          1700 Pacific Avenue

16          Suite 4750

17          Dallas, Texas 75201

18          214-466-1279

19          mark.perantie@bjciplaw.com

20          for DSS Technology Management, Inc.

21

22   ALSO PRESENT:  Shawn Budd, Videographer
```

```
 1                     I N D E X

 2    Deposition of:    Direct  Cross  Redirect Recross

 3    ROBERT DEZMELYK

 4       By Mr. Cornwell          6                120

 5          Mr. Lytvyn                    113

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

1   typically done in HDLC.  That's what it describes.

2     Q.  I would like to show you the, a copy of the

3   Natarajan patent.  The bottom of this copy it says APL

4   1003 which I will represent is Apple's Exhibit 1003 from

5   the IPR, from both IPR's.  Do you recognize this

6   document?

7     A.  Yes.

8     Q.  And this is the Natarajan patent that you and I

9   have been talking about?

10    A.  Yes, this is the Natarajan patent.

11    Q.  Can you take a look at column 3 starting at about

12  line 33.  Do you see where it says "For more information

13  on the HDLC packet structure, see, for example, Mischa

14  Schwartz Telecommunication Networks: Protocols, Modeling

15  and Analysis, Addison-Wesley (1998)"(sic)?

16    A.  Um-hmm.  I see that.

17    Q.  Are you familiar with that document?

18    A.  No, I haven't read that book.

19    Q.  Did you look at that book with respect to your

20  work in this case?

21    A.  No.

22    Q.  That's not a book you have ever looked at?

1           MR. HOPEN:  Objection to form.

2      A.  No, I have not read that book.

3      Q.  Do you know Mischa Schwartz?

4      A.  No.

5      Q.  Just to clarify, my colleague says that I said

6  that it was 1998.  But it is 1988?

7      A.  Right.  Your colleague is paying closer attention

8  than I to your reading.  It is actually a 1988

9  publication apparently.

10     Q.  Just to be clear, that's not a document that you,

11  or a book you have read?

12     A.  I did not rely upon that, no.

13     Q.  Would you agree that a person of ordinary skill

14  in the art reading Natarajan would have the ability to

15  get that book and to look at that book?

16          MR. HOPEN:  Objection to form.  Objection,

17  foundation.

18     A.  Well, of curse in the hypothetical sense the

19  person of ordinary skill in the art has access to all

20  the publications that are in the, dated in prior art.

21  So in that sense the person could look at that book or

22  they could look at some other documents on HDLC.

1    Q.  But this particular book is not a book you looked

2    at?

3    A.  Right.

4         MR. HOPEN:  Objection.

5    A.  I did not buy that book and use it to rely on for

6    this.

7    Q.  Did anybody at DSS summarize portions of that

8    book for you?

9         MR. HOPEN:  Objection to form.

10   A.  I don't think so.  Let me look.  Whether it is

11   related to any of these documents.  No, I don't think

12   so.  I don't recall reading any sections out of that

13   personally.

14   Q.  I would like to go back to your Declaration.  In

15   your Declaration I believe you stated that you reviewed

16   the Board's institution decision; is that correct?

17   A.  Yes.

18   Q.  It is also my understanding that you state in

19   your Declaration that you have applied the claim

20   construction established by the Board in this opinion;

21   is that correct?

22   A.  Yes.

# Mischa Schwartz

## Telecommunication
# Networks
### Protocols, Modeling and Analysis



APL 1012
IPR2015-00373



Guttenin Library
Liberty University
Lynchburg, VA 2____

# Telecommunication Networks: Protocols, Modeling and Analysis

**MISCHA SCHWARTZ**

Department of Electrical Engineering and
Center for Telecommunications Research
Columbia University

▲▼ Addison-Wesley Publishing Company

Reading, Massachusetts
Menlo Park, California • Don Mills, Ontario
Wokingham, England • Amsterdam
Sydney • Singapore • Tokyo • Madrid
Bogotá • Santiago • San Juan

This book is in the **Addison-Wesley Series in Electrical and Computer Engineering**

Sponsoring Editor ▪ *Tom Robbins*
Production Supervisor ▪ *Bette J. Aaronson*
Copy Editor ▪ *Stephanie Kaylin*
Text Designer ▪ *Herb Caswell*
Illustrator ▪ *George Nichols*
Technical Art Consultant ▪ *Joseph Vetere*
Production Coordinator ▪ *Ezra C. Holston*
Manufacturing Supervisor ▪ *Hugh Crawford*
Cover Designer ▪ *Marshall Henrichs*

Library of Congress Cataloging-in-Publication Data

Schwartz, Mischa.
    Telecommunication networks.

    Bibliography: p.
    Includes index.
    1. Data transmission systems.   2. Packet switching
(Data transmission)  3. Telecommunication—Switching
systems.  I. Title.
TK5105.S385  1987      004.6      85-30639
ISBN 0-201-16423-X

Reprinted with corrections November, 1988

Copyright © 1987 by Addison-Wesley Publishing Company

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Printed in the United States of America.

14 15 MA 969594

# 4−3 High-level Data Link Control (HDLC)

We now focus more specifically on the HDLC protocol, which as already noted has fast become an international standard. This protocol followed, and in many respects is based on, the IBM SDLC (synchronous data link control). American standards activities, paralleling the ISO work and interacting with it, resulted in the American National Standards Institute (ANSI) data-link control procedure standard ADCCP (advanced data communication control procedure). HDLC and ADCCP are closely related and will not be distinguished specifically in this discussion [CARLD]. The CCITT X-25-recommended data-link procedures, LAPB (balanced link access procedures), a subset of HDLC, will be described in some detail later. All these protocols and others like them are examples of bit-oriented protocols, in which the frame structure used eliminates a specific dependence on byte or character formatting [SCHW 1977].

In this section we first describe the basic philosophy and operation of HDLC, with reference made to the tutorial paper by Carlson [CARLD]. We then outline a throughput performance analysis of one common mode of operation of HDLC, following the work of Bux, Kummerle, and Truong [BUX 1980]. The analysis is similar to that carried out in the last section for the idealized go-back-$N$ protocol, but because it focuses on a model of a real protocol, it captures the effect of finite sequence numbering and a specific error-control procedure. This enables us to compare the idealized throughput analysis with the analysis for a real protocol.

The standard frame format for HDLC (ADCCP and SDLC have the same format) appears in Fig. 4−9. Note that the number of overhead (control) bits is $\ell' = 48$, just the number used earlier for calculations. The eight-bit flag sequence 01111110 that appears at the beginning and end of a frame is used to establish and maintain synchronization. Because the flag appears at the beginning and end of the frame there is no need to prescribe an information field structure. The information field (packet) delivered from the network layer above can be any desired number of bits. Extended versions of the frame structure of Fig. 4−9 are available as well: The address, control, and block-check fields can all be increased to allow additional addressing, improved error detection, and increased sequence numbers. Since the flags appearing at the

[CARLD] D. E. Carlson, "Bit-oriented Data Link Control Procedures," *IEEE Trans. on Comm.*, vol. COM-28, no. 4, April 1980, 455−467; reprinted in [GREE].

[BUX 1980] W. Bux, K. Kummerle, and H. L. Truong, "Balanced HDLC Procedures: A Performance Analysis," *IEEE Trans. on Comm.*, vol. COM-28, no. 11, Nov. 1980, 1889−1898.

| F | Address | Control | Information (packet, if transmitted) | Block check | F |
|---|---------|---------|--------------------------------------|-------------|---|
| (flag) 01111110 | 8 bits | 8 bits | | 16 bits | (flag) 01111110 |

**Figure 4 – 9**  HDLC standard frame format

beginning and end of a frame contain six consecutive ones, that sequence may not appear anywhere else in the frame. Bit stuffing is used to eliminate this possibility: a zero is inserted at the transmitter any time that five ones appear outside the $F$ fields. The zeros are removed at the receiver. If seven ones appear anywhere in the frame (six ones followed by an additional one), the frame is declared in error.

Three types of frames are defined to handle information flow, supervisory and control signals, and responses to all of these:

- I (information transfer) format

- S (supervisory) format

- U (unnumbered) format

S- and U-frames carry no information field. They are used strictly for supervisory and control purposes. The eight-bit control field in the frame determines which type of frame is being transmitted, and, for the S- and U- frames, which specific control signal is being transmitted. Figure 4 – 10 breaks the eight-bit control field down for the three types of frame. A zero in the first bit of the control field corresponds to an I-frame. The bit pairs 10 and 11 appearing as the first two bits indicate S-frame and U-frame, respectively, as shown. The two $S$ bits in bit positions 3 and 4 of the S-frame allow four different S-frames to be transmitted. The five $M$ bits in the U-frame allow 32 different U-frames to be transmitted. The three-bit number $N(S)$ in the I-frame represents the sequence number of the I-frame. Mod-8 sequence numbering is thus standard with normal HDLC. Each successive I-frame has its sequence number incremented by one. When the transmitter reaches its maximum sequence number it is forced to stop transmitting until a frame in the reverse direction is received, acknowledging an outstanding packet. The $N(R)$ bits in the I- and S-frames are used to acknowledge I-frames received. The number $N(R)$ acknowledges the receipt of $N(R)$-1 and any frames preceding that number not already acknowledged. $N(R)$ indicates that the receiver is *expecting* I-frame number $N(R)$. Thus $N(R) = 5$ (bit



**Figure 4–10** Control field for the three types of frames

pattern 101) acknowledges the receipt of I-frame number four (and any preceding frames not yet acknowledged) and indicates that I-frame number five is expected. The $N(S)$ and $N(R)$ fields can be extended to seven bits to allow mod-128 sequence numbering. The transmitter buffers all frames not yet acked positively. Once acked positively the frame can be purged and its sequence number used again.

Three modes of operation are defined for the HDLC protocol [CARLD]:

1. *Normal response mode* (NRM). This mode of operation is used in a centralized control environment. It is suited for polled multipoint operation, in which a single primary station communicates with one or more subservient secondary stations, the latter being allowed to initiate transmission only in response to the primary command. (Polling is described in more detail in Chapter 8.)

2. *Asynchronous response mode* (ARM). This mode is similar to NRM except that the secondary station does not need permission from the primary station to initiate transmission.

3. *Asynchronous balanced mode* (ABM). This mode is for point-to-point link transmission only, with both stations serving as equal partners. A class of procedures for this mode forms the basis for the link level of the X.25

protocol. It is identified there as LAPB [RYBC], which we describe briefly in the following paragraphs. Our discussion focuses exclusively on the asynchronous balanced mode of operation of HDLC (or ADCCP).

In HDLC data transmission and error detection and recovery are handled through the use of the I-frames and S-frames; we discuss only these here. U-frames are used in the connect/disconnect phases of the data link procedure, as well as to provide extended sequence numbering if desired [CARLD]. As noted earlier, there are four possible S-frames, of which only three are used in ABM. These three control frames, with their corresponding pair of $S$ bits and the functions for which they are prescribed, are tabulated as follows:

| NAME | $S$ | $S$ | FUNCTION |
|------|-----|-----|----------|
| Ready to receive (RR) | 0 | 0 | $N(R)$ acks all frames received up to and including $N(R) - 1$. |
| Not ready to receive (RNR) | 1 | 0 | This provides a flow control for a temporarily busy condition. $N(R)$ also acks all frames up to and including $N(R) - 1$. |
| Reject (REJ) | 0 | 1 | $N(R)$ *rejects* all frames from $N(R)$ on. It positively acknowledges all frames up to and including $N(R) - 1$. |

Recall that the I-frame also carries an $N(R)$ field that is used for acknowledging frames up to and including $N(R) - 1$. HDLC thus provides both a "piggyback" feature, with the ack function embedded in an I-frame transmitted in the reverse direction, and a separate acknowledgement, called the RR (ready to receive) frame, that can be used to signal a positive ack in the absence of an I-frame or to expedite the delivery of an ack if so desired. The REJ (reject) frame provides a negative ack (nak) feature if so desired. Note that the ABM subset of HDLC uses the go-back-$N$ feature: The REJ-frame rejects *all* I-frames from $N(R)$ on. Hence they must *all* be retransmitted. (The unbalanced modes of HDLC also provide for selective reject if desired. The fourth S-frame, labeled SREJ for selective reject, calls for retransmission of a particular I-frame.)

Corresponding to each of the three modes of operation just noted are classes of procedure with defined functions and options. For the ABM mode these are called balanced asynchronous class (BAC) procedures. The defined functions recognize the use of I, RR, and RNR (not ready to receive) frames, as

---

[RYBC] Antony Rybczynski, "X.25 Interface and End-to-End Virtual Circuit Service Characteristics," *IEEE Trans on Comm.*, vol. COM-28, no. 4, April 1980, 500–510; reprinted in [GREE].

well as certain prescribed U-frames used to set up and disconnect the link. Two options are added: the use of REJ (option 2) and the restriction that I-frames be *commands* only (option 8). The composite class of procedures is called the BAC 2,8 class and corresponds to the X.25 link-level LAPB class of procedures. [CARLD], [RYBC].

The concept of *command* appears in the use of the address field (Fig. 4–9) and the $P/F$ bit (Fig. 4–10). In the unbalanced modes of HDLC, with their recognition specifically of one primary station and one or more secondary stations, the address is always that of the secondary station. In the balanced (ABM) mode the address is always that of the *responding* station. Since an I-frame is always a *command* in option 8, the address must be that of the receiving station. RR and RNR frames may be either commands or responses. If the former, the address is that of the receiving station. If the latter, the frames carry their own address. REJ frames are always considered *responses* and carry their own addresses. The $P/F$ bit enables the command-response mechanism to be carried out. A 1 set in a command is defined to be a P. The response to a $P = 1$ must carry $F = 1$. In the normal response mode the $P/F$ bit is used for polling. In the ABM mode, with the BAC 2,8 class of procedures, an I-frame sent with the P bit set equal to 1 requires an S-frame response (RR, REJ, RNR) with $F = 1$, since the I-frame cannot be a response. An RR with the P bit set will force an S-frame with $F = 1$ to be sent in reply. This $P/F$ procedure is called a *checkpointing* procedure. One example of its use is to force an immediate ack. On receipt of an I-frame with $P = 1$, an RR with $F = 1$ will be sent by the recipient immediately, ahead of any I-frames waiting to be transmitted. (This thus induces a nonpreemptive priority.) Details appear in [CARLD].

What are some reasons for invoking the $P/F$ checkpointing procedure, in addition to expediting error detection? The procedure can be used to check whether an operational data link is present; it can be used to force an early acknowledgement of a particular I-frame, rather than having it indirectly acked later by a higher-numbered $N(R)$; it can be used to force transmission of an REJ (i.e., a nak) in case of an error, rather than relying on a timeout mechanism. (This might in certain circumstances speed up error recovery and reduce the number of frames that might have to be retransmitted in the event of an error.) Finally, the procedure could be used for preparing to take a link down (disconnect). In this case it could be used to clean up outstanding acks or other control signals. It is important to note that the $P/F$ checkpointing procedure, like others in the HDLC repertoire, is optional. Although various procedures are defined specifically, others are left undefined, allowing flexibility in the use of the data link control.

To provide a better understanding of the use of the various S-frames in the ABM mode of HDLC, we first follow the typical flow of frames back and forth between two stations A and B. An example appears in Fig. 4–11, which shows



**Figure 4–11**  Example of HDLC (ABM) error-free transmission

only the data transfer mode. (See [CARLD, p. 461] for other examples, including the use of U-frames for setting up the link connection.) Error-free transmission is assumed. (The error case is treated later, in connection with the throughput analysis of HDLC.)

The notation used, adapted from [CARLD], is as follows:

1. *I-frames.* Address, I, $N(S)$, $N(R)$, P (optional; 1 if used, 0 otherwise)

    Thus A110P refers to an I-frame from station B addressed to station A, with $N(S) = 1$, $N(R) = 0$ (i.e., B is *expecting* frame 0 from A), and the $P/F$ bit set to 1. (A reply with $F = 1$ is thus expected.)

2. *S-frames.* Address, id, $N(R)$, $P/F$

    The address, as just noted, is that of the receiver if a command; itself, if a response. The id is RR, RNR, or REJ for each of the three S-frames used. $N(R)$ again acks all frames up to and including $N(R) - 1$. $P/F$ is written as $P$ if the frame is a command and as $F$ if a response to a $P$. (In either case the $P/F$ bit is set to 1.)

Station A initiates transmission to station B in the example of Fig. 4–11 by sending an I-frame numbered 0. Station A requests an immediate ack by setting $P = 1$. Since A has not as yet received any I-frames from B, $N(R)$ is set at 0, indicating that I-frame 0 is expected from B. In the meantime station B independently sends two I-frames in succession, AI00 and AI10. (Station B is also expecting I-frame number 0.) On receiving BI00P, station B immediately sends an ack BRR1F. This acknowledges receipt of I-frame 0 from A and indicates that frame 1 is expected. Station B later receives I-frame BI10 from A and then acknowledges this frame with its own I-frame AI22. B follows this frame with

AI32. Both frames are later acked by station A with an RR-frame BRR4*P*. This frame might be used, for example, if station A were now preparing to disconnect. Station B replies with BRR3*F*.

### 4–3–1 Throughput Analysis, Balanced HDLC Procedure

Following this introduction to some of the aspects of the HDLC protocol, we now proceed to a throughput analysis of the procedure. We follow Bux et al. [BUX 1980], but for a simplified case only, noted later. Bux et al. also provide a time-delay analysis. The reader is referred to their paper, and other papers referenced there, for details of both the throughput and the time-delay analyses.

The basic differences between this analysis and that of the idealized go-back-$N$ analysis carried out earlier are that finite sequence numbering is included here and that specific error-control features are modeled as well. This analysis serves two purposes: It enables us to compare the idealized infinite sequence number throughput result with the finite number case, and it provides an exercise in modeling a real rather than an idealized protocol.

It was noted earlier, in discussing some aspects of the HDLC protocol, that certain features are not explicitly defined but are left to the implementor to allow flexibility in use. This is true specifically of the error-control mechanism. Although the S-frames REJ, RR, RNR, and the checkpointing ($P/F$ bit) mechanism are all available for use in error control, specific roles for their use are left to the implementor. For example, although receipt of REJ rejects I-frame $N(R)$ and all I-frames following, this nak feature does not necessarily have to be used. One could choose to implement only the positive ack (either RR or an I-frame) with the timeout feature. However, only an analysis of a specific implementation can be carried out. For this reason Bux et al. provide some specific rules for the use of error control. These involve the use of the REJ frame, the timeout mechanism, and the use of checkpointing (the $P/F$ bit). Specifically, the following stipulations are made:

1. *REJ recovery.* This is assumed to be always used where possible to speed up system recovery. However, it can be used only once for a given frame. It cannot be invoked on repeats of that frame.

2. *Timeout recovery.* This must *always* be used, in addition to REJ recovery; without this feature an isolated I-frame or the last in a sequence of I-frames could not be recovered if garbled. (Why not?) In addition, since an REJ frame may be used only once per I-frame, multiple losses of a given frame must be handled through a timeout.

3. *Checkpoint (P/F) use.* At the end of a timeout the transmitter sends RR*P*.

With this assumption, a reply from the receiver is required after the expiration of each timeout interval.

Using these three rules, we are in a position to calculate the link throughput. Following the procedure adopted in our earlier analyses of the stop-and-wait and go-back-$N$ protocols, we consider the case where one station only, station A, is transmitting. This station is assumed in addition to be in a saturated state: It *always* has frames to send. As noted earlier, this provides the maximum possible throughput. The receiving station B then acks with RR or acknowledges negatively with REJ.

Let the sequence number modulus be M. The condition on the sequence number $N(S)$ is then

$$0 \le N(S) \le M - 1 \qquad (4-13)$$

As noted earlier, for normal HDLC $M = 8$; the extended version has $M = 128$. At most $M - 1$ frames can then be outstanding. (Consider the case in which all $M$ frames, 0 through $M - 1$, are outstanding and hence unacknowledged. Since $N(R)$ acks all frames up to and including $N(R) - 1$ and indicates that $N(R)$ is expected, a difficulty arises immediately.) As lower-number frames are acked, their numbers may be used again. This mod-$M$ sequence-numbering mechanism with acknowledgement thus establishes a variable *window* of sequence numbers that can be used. An example appears in Fig. $4-12$ for $M = 8$. Initially it is assumed that frames $1-5$ are outstanding and unacknowledged. A window of two frames, 6, 7, remains (recall that $M - 1$ frames at most may be outstanding). In part (b) of Fig. $4-12$ an ack bearing $N(R) = 3$ is assumed to have arrived. This acks frames 1 and 2, allowing a window of frames 6, 7, 0, 1 to be used.

In carrying out the analysis we again assume that all frames are of *fixed* length. I-frames are of length $t_f$ sec, $t_f = (\ell + \ell')/C$, with $\ell$ the packet (information field) length, $\ell'$ the control bits in the frame, and $C$ the link capacity in bps. All S-frames are of length $t_s = \ell'/C$, with $\ell' = 48$ bits for the HDLC protocol. The one-way propagation delay is again taken to be $t_p$ sec, with processing time included. The round-trip acknowledgement time is then

$$t_{ack} = 2t_p + t_s \qquad (4-14)$$

and we again take

$$t_{out} = 2t_p + 2t_f > t_{ack} \qquad (4-15)$$

(The acknowledgement time is defined to be the time between transmission of a frame and receipt of an ack.) We take the case $t_{ack} \le (M - 2)t_f$. This simplifies the analysis considerably and is not unduly limiting. This case covers such examples as both terrestrial and satellite transmission with 1000-bit frames transmitted at 48-kbps link speed, using $M = 8$ for the terrestrial case and

Case: 16-2523    Document: 32    Page: 616    Filed: 03/01/2017

$M = 128$ for the satellite case. For smaller frame lengths (or lower transmission speeds) or smaller sequence numbers, such that $t_{ack} > (M - 2)t_I$, one must, of course, use the analysis covering that case as presented in [BUX 1980].

Before proceeding with the analysis we provide a simple example of frame transmission in the presence of errors to show how the three error-control rules stipulated by Bux et al. are used (see Fig. 4–13). The maximum sequence number $M$ is taken to be four for simplicity. At most three I-frames can then be outstanding at any time. Since station A *always* has I-frames waiting, they are transmitted consecutively, one after the other, until either $M - 1 = 3$ frames are outstanding, a timeout has occurred with no ack or nak, or a go-back-$N$ repeat of frames is required due to an error. The notation used in Fig. 4–13 is the same as in Fig. 4–11 except that addresses are dropped. Addresses need not be included since *all* I-frames emanate from station A by hypothesis. Frames 0–2 are shown proceeding uneventfully from station A to station B, each one being individually acknowledged by an appropriately numbered RR-frame. I-frame 3 is shown being hit by an error during transmission. The receiver in this example ignores the faulty frame. When frame 0 arrives it is out of sequence, however (station B is expecting frame 3), and REJ3 is returned to A. In



**Figure 4–12**  Sequence number and window concept
a.  Prior to ack arrival
b.  Ack with $N(R) = 3$ arrives

Figure 4–13  Example of error-recovery procedures, version of HDLC, $M = 4$

144

the meantime, station A transmits frame 1 and then stops transmitting. (Why?) When it receives REJ3 it repeats frame 3, and again follows this with frames 0 and 1 (not shown here to avoid cluttering the figure). In this example frame 3 is again hit by an error during transmission. Station B does nothing since it has already sent REJ3 once. The timeout at A then runs out. Using the Bux et al. rule, RR0$P$ is sent from A to B to force an ack. (Why is there a 0 in this frame as well as in all other frames from A to B?) B replies with RR3$F$ and, on receipt at A, I30, I00, . . . are again sent. (In other versions of HDLC one might simply repeat the faulty frame and all frames following on expiration of the timeout.)

The approach adopted to calculate the throughput for this model of the HDLC protocol is the same as the one used earlier to analyze the stop-and-wait and go-back-$N$ protocols. One calculates $t_V$, the virtual transmission time of a typical frame, and then inverts this to find the maximum frame (packet) throughput. The essential difference here is that either REJ $or$ timeout recovery may have to be evoked on an error occurrence, and one must distinguish between the two. Note again that with the implementation rules assumed here, $either$ REJ $or$ timeout recovery will take place after an initial frame error, but $only$ timeout recovery can be used during subsequent errors on retransmissions of the same frame.

Again letting $p$ be the probability that a frame is received in error, the virtual transmission time, or the average time required to transmit a frame of length $t_I$, may be written as

$$t_V = t_I + pE(T_1) + \sum_{n=2}^{\infty} (1 - p)p^n(n - 1)T_2$$
$$= t_I + pE(T_1) + \frac{p^2 T_2}{(1 - p)} \qquad (4-16)$$

Here $T_1$ represents the random time required to transmit the first repeat, $E(T_1)$ is its average value, and $T_2$ is the average time required for transmission on subsequent retransmissions. Since the recovery mechanism (timeout recovery) will always be the same on retransmissions beyond the first, because of the rule used here, $T_2$ will be the same on each retransmission. $T_1$ will differ, however, depending on which recovery mechanism (REJ or timeout) happens to be invoked.

Note that Eq. (4–16) is very similar to Eq. (4–5), the equation for virtual transmission time in the (idealized) go-back-$N$ protocol. In fact, it is apparent that if $E(T_1) = T_2 = t_T$, one gets precisely Eq. (4–5).

As just stated, $T_1$, the time required to transmit the first repeat of a faulty frame, depends on the error-recovery procedure invoked. One must thus determine the condition for each to occur and average accordingly. In addition, in both cases $T_1$ is found to depend on a parameter $L$, defined to be the *maximum*

number of I-frames following the one that is disturbed before recovery is started. This will be $M - 2$ if the sequence space (window) has expired (recall that $M - 1$ frames at most can be outstanding at any one time) *or* the number of frames transmitted during a timeout interval, whichever is less. In the latter case a frame undergoing transmission at the transmitter when the timeout interval runs out is allowed to complete transmission. (The timeout counter thus invokes a nonpreemptive interrupt on I-frames awaiting transmission.) $L$ may thus be written in the form

$$L = \inf \{M - 2, \lfloor t_{out}/t_I \rfloor + 1\} \qquad (4\text{--}17)$$

with inf (inferior) meaning the "lesser of" and $\lfloor a \rfloor$ representing the largest integer not exceeding $a$.

As an example, consider a satellite link with $2t_p = 700$ msec, 1000-bit frames, and $C = 48$-kbps transmission rate. Using $t_{out} = 2t_p + 2t_I$, $\lfloor t_{out}/t_I \rfloor + 1 = 36$. For $M = 8$, $L = 6$; for $M = 128$, $L = 36$. Clearly "sequence number starvation" can occur on a satellite link with a sequence number space of $M = 8$.

1. *Recovery via REJ.* Consider now the calculation of $T_1$ in the case where error recovery is invoked via the REJ mechanism. Clearly this will occur if the REJ mechanism comes into play *before* the effect of the timeout expiration is felt. As will be seen from studying some typical examples, the condition for this to happen is that *not all L I-frames following the one under consideration are disturbed.* (If *all* $L$ frames following *are* disturbed timeout recovery will be invoked.)

   The detailed calculations depend in turn on two ranges of values for $L$.

   a. $L$ small (for example, $t_{out}$ is relatively small)

   An example appears in Fig. 4–14(a). An error occurs during transmission of frame 1. We then calculate the time $T_1$ required to complete the first retransmission of this frame. In this example frame 2 is also shown disturbed during transmission. The timeout for frame 1 expires before any frame from B arrives. Frame 3, in the process of being transmitted during the expiration of the timeout, is allowed to complete, and the S-frame RR0P is then transmitted to force an ack from station B. But B receives frame I30 out of order (it is expecting I10) and immediately generates REJ1. This causes I10 to be retransmitted by A. The S-frame response RR1F to station A's RR0P after expiration of the timeout arrives later and is ignored. The REJ mechanism thus is invoked before the timeout mechanism, due to receipt of the undisturbed I30 by B. Had I30 been disturbed, REJ1 would *not* have been sent by B, and the timeout mechanism would have taken over (RR1F in reply to RR0P from A). Hence the condition for REJ to take precedence is that noted earlier: Not all $L$ frames following the one under consideration (frame 1



Figure 4-14  Example of REJ recovery
a. $Lt_I < (x + 1)t_I + t_{ack}$
b. $Lt_I \geq (x + 1)t_I + t_{ack}$

in this example) are disturbed. Note that in this case channel A to B is idle on receipt of the REJ frame. (This is due either to expiration of a time-out, as in this example, or because the sequence window is closed. $M - 1$ unacknowledged frames are then outstanding in this case.)

There are in general $x \leq L - 1$ frames disturbed *after* the one under consideration. In the example of Fig. 4–14(a), $x = 1$. As indicated in the figure, in general

$$T_1 \equiv \tau(x) = (x + 1)t_I + t_{ack} + t_I \qquad (4–18)$$

The probability of this event happening is just $p^x(1 - p)$ ($x$ disturbed frames and one frame received correctly). This case corresponds to $L$ small enough so that

$$Lt_I < (x + 1)t_I + t_{ack} \qquad (4–19)$$

**b.** $L$ large (for example, say that $t_{out}$ is now larger)
  Specifically, let

$$Lt_I \geq (x + 1)t_I + t_{ack} \qquad (4–20)$$

Referring to Fig. 4–14(b), it is apparent that REJ recovery is now invoked simply because the timeout on frame 1 is so long as to expire after the REJ frame asking for a repeat of the frame has been received from station B. In this example the numbers have been chosen to have the sequence number space in I-frame units, $(M - 2)t_I$, longer than the timeout interval. Had we chosen $(M - 2) < \lfloor t_{out}/t_I \rfloor + 1$, we would have obtained the same result, with the condition that $Lt_I = (M - 2)t_I \geq (x + 1)t_I + t_{ack}$.

From Fig. 4–14(b) it is apparent that for this case we have

$$T_1 \equiv \tau(x) = (x + 1)t_I + [\lfloor t_{ack}/t_I \rfloor + 1]t_I + t_I \qquad (4–21)$$

again with probability $(1 - p)p^x$. Comparing with Eq. (4–18), we note that Eqs. (4–21) and (4–18) are very similar, the only difference being that the quantity in brackets in Eq. (4–21) is replaced by $t_{ack}$ in Eq. (4–18). Here a frame is in the process of being transmitted on receipt of the REJ and it is allowed to go to completion, lengthening the effective time $T_1$, as contrasted with the case of Fig. 4–14(a). There the REJ arrived with the channel from A to B empty.

2. *Timeout recovery.* This recovery mechanism is invoked if *all L* I-frames following the one initiating the error-recovery procedure are disturbed. This happens with probability $p^L$. Then either the timeout runs out or the sequence window is exhausted ($M - 1$ frames are oustanding), whichever comes first. Thus there are again two cases to consider. An example of each appears in Fig. 4–15. Since all frames sent from A are disturbed, no REJ frame can be sent from B, and timeout alone controls the recovery.





**Figure 4–15** Timeout recovery

a. $t_{out} \leq Lt_I$

b. $t_{out} > Lt_I$

**a.** $t_{out} \leq Lt_I$

Then $L = \lfloor t_{out}/t_I \rfloor + 1 < M - 2$ in this case. As is apparent from Fig. 4-15(a),

$$T_1 = Lt_I + t_s + t_{ack} + t_I \equiv \tau(L) \qquad (4-22)$$

**b.** $t_{out} > Lt_I$

Then clearly $L = M - 2$, the sequence window is exhausted before the timeout expires, and there is an interval between the two events during which the channel from A to B is idle. This case appears in Fig. 4-15(b). It is apparent that for this case

$$T_1 = t_{out} + t_s + t_{ack} + t_I \equiv \tau(L) \qquad (4-23)$$

almost the result of Eq. (4-22) except for the slight difference in the first term.

Combining the results of the REJ and timeout recovery cases, by weighting each with the respective probability of occurrence, we get

$$E(T_1) = \sum_{x=0}^{L-1} (1-p)p^x \tau(x) + p^L \tau(L) \qquad (4-24)$$

The functions $\tau(x)$ and $\tau(L)$ depend on the two cases just considered.

Finally we must calculate $T_2$, the average transmission time for each repeat of a frame beyond the first retransmission. (See Eq. (4-16).) Clearly $T_2$ must be the function $\tau(L)$ defined in either Eq. (4-22) or Eq. (4-23), since timeout recovery only can be invoked for retransmissions beyond the first. (This was one of the rules assumed here in defining the error-recovery procedure.) Thus

$$T_2 = \tau(L) \qquad (4-25)$$

Summarizing the analysis carried out above in step-by-step fashion, we have as the average virtual transmission time for the balanced HDLC procedure

$$t_V = t_I + pE(T_1) + \frac{p^2}{(1-p)} T_2 \qquad t_{ack} \leq (M-2)t_I \qquad (4-16)$$

Here

$$E(T_1) = \sum_{x=0}^{L-1} (1-p)p^x \tau(x) + p^L \tau(L) \qquad (4-24)$$

and

$$T_2 = \tau(L) \qquad (4-25)$$

The functions $\tau(x)$ and $\tau(L)$ are in turn given by

$$\tau(x) = (x+1)t_I + t_{ack} + t_I \qquad Lt_I < (x+1)t_I + t_{ack} \qquad (4-18)$$

otherwise

$$= (x+1)t_I + [\lfloor t_{ack}/t_I \rfloor + 1]t_I + t_I \tag{4-21}$$

and

$$\tau(L) = Lt_I + t_s + t_{ack} + t_I \qquad t_{out} \le Lt_I \tag{4-22}$$

otherwise

$$= t_{out} + t_s + t_{ack} + t_I \tag{4-23}$$

The coefficient $L$ is again defined as

$$L = \inf \{M-2, \lfloor t_{out}/t_I \rfloor + 1\} \tag{4-17}$$

The maximum frame (packet) throughput rate is in turn given by

$$\lambda_{max} = 1/t_V \tag{4-26}$$

The relative data throughput $D/C$ is finally found as in the case of the idealized go-back-$N$ protocol, as

$$D/C = \lambda_{max}\ell/C = \ell/t_V C \tag{4-27}$$

We reproduce in Figs. 4–16 and 4–17 the results of calculations using these equations as well as equations obtained in [BUX 1980] for the condition $t_{ack} > (M-2)t_I$. (These curves appear as Figs. 4–8 and 4–9, respectively, in [BUX 1980].) Figure 4–16 plots the relative throughput $D/C$ versus packet length $\ell$, in bits, for a terrestrial link using a sequence number space of $M = 8$, assuming $p_b = 10^{-5}$ and taking $t_p = 50$ msec. The control field size is $\ell' = 48$ bits, as appropriate for HDLC. Two curves appear, one for a link capacity $C = 4800$ bps, the other for $C = 48$ kbps. Figure 4–17 is for a satellite link, with a number of cases shown plotted. Curves for $M = 8$ and 128 appear, showing the effect of changing sequence number size on throughput. Two bit-error probabilities, $p_b = 10^{-5}$ and $10^{-7}$, have been included as well. The link capacity used is $C = 48$ kbps, and $t_p$ has been taken equal to 350 msec. Note that these numbers are precisely those used in Fig. 4–8 for the idealized go-back-$N$ protocol, enabling comparisons to be made. Discontinuities appearing in the curves of Figs. 4–16 and 4–17 are due to the $\lfloor t_{ack}/t_I \rfloor$ terms appearing in the analysis and to the assumptions of the model.

Note first how closely the curve for 4800 bps in the terrestrial case (Fig. 4–16) agrees with the comparable curve in Fig. 4–8 for the idealized go-back-$N$ strategy. It is apparent that the finite sequence number field of $M = 8$ is ample in this case. The curve for $C = 48$ kbps in Fig. 4–16, however, shows a sharp dropoff at the small packet end. This is obviously due to sequence-number starvation in this case. As long as packet lengths are kept above 500 bits in length, however, there appears to be no problem.



**Figure 4–16** Throughput efficiency $D/C$ versus message length $\ell$ (terrestrial links) (from [BUX 1980, Fig. 8, © 1980 IEEE, with permission])

'The satellite case is drastically different. It is apparent from Fig. 4–17 that the sequence-number field *must* be extended to $M = 128$ to provide appropriate throughput over a broad range of packet sizes. The $M = 128, p_b = 10^{-5}$ curve is in substantial agreement with the comparable curve of Fig. 4–8 for the idealized go-back-$N$ protocol with no limit on sequence-number size. The primary factor limiting throughput in this case is the noise characteristic assumed for this channel. Reducing the bit error probability to $p_b = 10^{-7}$ improves the performance considerably. However, this implies substantially higher costs: higher power transmitters, lower temperature receivers, larger antennas, and so on [SCHW 1989, pp. 432, 433]. Alternatively, as noted earlier in this chapter, selective repeat strategies could be used to enhance the performance of a satellite link for data transmission [LINS, Chapter 15 and references therein]. This requires reordering packets at the receiver since there is no longer any guarantee that frames transmitted or retransmitted will be received in order. A reordering buffer obviously is required at the receiver for this purpose.



**Figure 4−17** Throughput efficiency $D/C$ versus message length $\ell$ (satellite links) (from [BUX 1980, Fig. 9, © 1980 IEEE, with permission])

A simple throughput analysis of an idealized selective-repeat scheme, with no limit on the number of retransmissions of a given frame, shows the maximum throughput improvement possible through the use of this strategy. This idealized scheme requires the use of an infinite reordering buffer at the receiver. Since individual frames only must be retransmitted, frames transmitted and received correctly after one is found to be in error need not be retransmitted. The only reduction in throughput is thus that due to the need to retransmit a *given* frame detected to be in error. Reduction in throughput is given precisely by the average number of retransmissions required. This differs specifically from the go-back-*N* case, where transmission of subsequent frames (packets) was held up until a particular frame had cleared the system. Again letting $p$ be the probability of receiving a frame in error, the average number of transmissions required to get a frame through the link successfully is just

$$E(n) = (1 - p) \sum_{i=1}^{\infty} i p^{i-1} = 1/(1 - p) \qquad (4-28)$$

The normalized data rate is then

$$\frac{D}{C} = \frac{1}{E(n)} \left( \frac{\ell}{\ell + \ell'} \right) = \frac{(1-p)\ell}{(\ell + \ell')} \qquad (4-29)$$

Here as earlier $p = 1 - (1 - p_b)^{\ell + \ell'}$, with $p_b$ the bit error rate. Note by comparison with Eq. (4 – 10) for the go-back-$N$ case that the reduction in throughput due to retransmission of subsequent frames given by the $(a - 1)p$ term in the denominator there has been eliminated. The throughput should thus be considerably enhanced over the go-back-$N$ ack when the probability $p$ of a frame error becomes significant.

Equation (4 – 29) is precisely the special case of Eq. (4 – 10) when $a = 1$, i.e., when the round-trip propagation delay in the go-back-$N$ case is negligible. This was the case that was assumed in deriving Eq. (4 – 11) for the optimum packet length. Hence the optimum choice of packet length, $\ell$, is the same as that found earlier: in the vicinity of 1000 bits for $p_b = 10^{-5}$ and 10,000 bits for $p_b = 10^{-7}$. The data throughput for these probabilities of bit error will be higher than for the go-back-$N$ scheme because the dependence on $a$ has been eliminated; for small $p_b$ the optimum throughput region will be quite broad as well. This is shown in Fig. 4 – 18, a plot of the relative data throughput for the selective repeat case versus packet length $\ell$. The same frame and channel characteristics as in Fig. 4 – 8 have been assumed: $\ell' = 48$ bits, $p_b = 10^{-5}$. The 48-kbps, satellite, go-back-$N$ curve of Fig. 4 – 8 has been repeated in Fig. 4 – 18 so that comparisons can be made. Note the improved throughput *theoretically* possible using the selective repeat strategy. A finite buffer for the selective repeat case will reduce this idealized throughput [LINS, pp. 464 – 474].

The relative dependence of the go-back-$N$ and selective repeat strategies on the bit-error probability is shown in Fig. 4 – 19. Here a fixed packet length of $\ell = 1000$ bits has been chosen, and the relative data throughput (throughput efficiency) of the two schemes plotted as a function of $p_b$. Equations (4 – 10) and (4 – 29) have been used for this purpose. (Actually, $(\ell + \ell'/\ell)D/C$ has been plotted for simplicity.) The only difference between the two curves is then the factor $[1 + (a - 1)p]$ in the denominator of Eq. (4 – 10) for the go-back-$N$ scheme, which is due to the forced retransmission of all frames following the one received in error. A satellite channel has again been assumed, with $2t_p + t_s = 700$ msec and $C = 48$ kbps to allow comparison with previous curves. For these values the parameter $a = 35.1$. It is apparent from these curves that the efficiency of the go-back-$N$ scheme in the vicinity of $p_b = 10^{-5}$ is quite sensitive to error probability. If $p_b$ drops to $10^{-4}$, for example, the throughput decreases by a factor of 3.6. The throughput of the selective repeat scheme is constant in the vicinity of $p_b = 10^{-5}$ and begins to show sensitivity to increased error probability only in the vicinity of $p_b = 10^{-3}$. These results are, of course, illustrative. The specific values of $p_b$ at which the throughput begins to drop rapidly for the



**Figure 4–18** Selective repeat and go-back-$N$ procedures

$$C = 48 \text{ kbps}$$
$$2t_p = 700 \text{ msec}$$
$$p_b = 10^{-5} \quad \ell' = 48 \text{ bits}$$

two schemes depend on the packet length $\ell$ and the parameter $a$, in the case of go-back-$N$. The performance of the selective repeat strategy deteriorates because of the finite buffers required. Still, similar results are obtained for other choices of packet length, and an order-of-magnitude increase in the bit-error probability at which the throughput begins to drop appears to be obtainable through the use of the selective-repeat scheme [LINS, pp. 464, 465].



**Figure 4–19** Relative data throughout versus bit error probability, satellite channel

$$\ell = 1000 \text{ bits}$$
$$\ell' = 48 \text{ bits}$$

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.
Petitioner

v.

DSS TECHNOLOGY MANAGEMENT, INC.
Patent Owner

_____

Case IPR2015-00373
Patent 6,128,290

_____

**DECLARATION OF DR. JING HU**

APL 1014
IPR2015-00373

IPR2015-00373
U.S. Pat. No. 6,128,290

## TABLE OF CONTENTS

I.    Introduction ......................................................................................... 1

II.   My Background and Qualifications ............................................... 2

III.  List of Documents Considered in Formulating My Opinions....................... 4

IV.   Legal Principles ................................................................................ 6

V.    Person of Ordinary Skill in the Art ................................................ 9

VI.   State of the Art and Summary of References ................................ 9

      A.    Natarajan......................................................................................10
      B.    Neve..............................................................................................15

VII.  Claims 9 and 10 would have been obvious to a POSA over Natarajan
      in view of Neve. ................................................................... 17

VIII. HDLC is consistent with low duty cycle RF burst communications. ......... 20

      A.    The preferred embodiment disclosed in the '290 patent uses
            HDLC. ....................................................................................20
      B.    Mr. Dezmelyk's understanding of HDLC is incorrect.......................21
      C.    Natarajan and the HDLC protocol do not use "idle words." .............33

IX.   DSS's interpretation of "low duty cycle" is incorrect................................. 36

X.    Conclusion.................................................................................. 42

I, Dr. Jing Hu, hereby declare as follows:

## I.  Introduction

1.    I am over the age of eighteen (18) and otherwise competent to make this declaration.

2.    I have been retained as an expert witness on behalf of APPLE INC. for the above-captioned *inter partes* review (IPR). I am being compensated for my time in connection with this IPR at my standard legal consulting rate, which is $250 per hour.

3.    I understand that this *inter partes* review involves U.S. Patent No. 6,128,290 ("the '290 patent"), APL 1001, which issued from U.S. Patent Application No. 08/949,999 ("the '999 application"), filed on October 14, 1997. The '290 patent names Phillip P. Carvey as the sole inventor. The '290 patent issued on October 3, 2000, from the '999 application. It is my understanding that the '290 patent is currently owned by DSS Technology Management, Inc.

4.    In preparing this Declaration, I have reviewed the '290 patent and considered each of the documents cited herein in light of the general knowledge in the art at the time of the alleged inventions. In formulating my opinions, I have relied upon my experience, education, and knowledge in the relevant art(s). I have also considered the viewpoint of a person of ordinary skill in the art ("POSA") at the relevant time period.

## II.    My Background and Qualifications

5.    I hold a doctoral degree (PhD) in Electrical and Computer Engineering, granted by University of California, Santa Barbara in 2007, as well as a Master's degree in Electrical and Computer Engineering from Rice University in 2003, and a Bachelor's degree in Precision Instruments from Tsinghua University, Beijing, China in 2001.

6.    I worked as a research scientist and embedded software engineer at Cisco Systems, Inc. between the years of 2007 and 2012. At Cisco Systems, I worked on a series of projects that included wide area network optimization, video quality monitoring, and multimedia conferencing systems on digital signal processing parts of enterprise network routers. I designed algorithms, wrote production source code and conducted unit testing on these projects.

7.    I have conducted research in both academia and industry for over ten years. My research topics include wireless network optimization, information theory, video compression, and communication over wireless networks. I have published numerous peer-reviewed research papers on these topics. My research paper "Video capacity of Wireless LANs with a multiuser perceptual quality constraint" won Best Paper Award of IEEE Transactions on Multimedia over the years of 2007 to 2009. Please see my *Curriculum Vitae* (CV) for the list of my

- 2 -

other published research papers. I have been a visiting researcher at University of California, Santa Barbara since early 2013.

8.    I am an inventor of four awarded or pending U.S. patents, on topics ranging from wide area network optimization to video quality monitoring in the network and in the endpoints. Please see my CV for the list of my patents and patent applications.

9.    I have co-authored a book titled "Rate Distortion Bounds for Voice and Video," published in the prestigious Foundations and Trends in Communications and Information Theory Series, in February 2014. In this book, my co-author and I teach the current best-performing voice and video codecs for communication over wired, wireless, and cellular networks and present the first rate distortion bounds for voice and video that lower bound the operational rate distortion performance of these codecs.

10.    In the course of my research and product development related to data communication over wireless and wired networks, I worked extensively with communication protocols across various layers of the networks, including, for example, IEEE 802.11, Asynchronous Transfer Mode (ATM), Ethernet, and High-Level Data Link Control (HDLC) on the data link layer. I have both designed data communication algorithms and developed relevant products that function over and/or interoperate with the networks governed by these protocols.

- 3 -

11.    I have been engaged as an expert consultant in many technology-based matters for the past three years, with a focus on patent infringement and patent portfolio evaluation. My cases have covered diverse areas such as Bluetooth technologies, cellular networks, smart handheld devices, banking and security related software, video compression related software, and television systems.

12.    Additional information concerning my qualifications are set forth in my current CV, a copy of which is attached hereto as Exhibit APL 1015.

## III.    List of Documents Considered in Formulating My Opinions

13.    In formulating my opinions, I have considered the following documents and any other documents cited herein:

| Exhibit / Paper # | Description |
|---|---|
| 2 | Apple's Petition for *Inter Partes* Review of U.S Patent No. 6,128,290 |
| 8 | Institution Decision by Patent Trial and Appeal Board |
| 15 | Patent Owner DSS Technology, Inc.'s Response to Petition |
| APL 1001 | Carvey, U.S. Patent No. 6,128,290, "Personal Data Network," (filed October 14, 1997; issued October 3, 2000) ("the '290 patent"). |
| APL 1003 | Natarajan *et al.*, U.S. Patent No. 5,241,542, "Battery Efficient Operation of Scheduled Access Protocol," (filed August 23, 1991; issued August 31, 1993) ("Natarajan"). |
| APL 1004 | Neve *et al.*, U.S. Patent No. 4,887,266, "Communication System," (filed April 29, 1986; issued December 12, 1989) ("Neve"). |
| APL 1005 | File history of U.S. Patent No. 6,128,290 |

- 4 -

| Exhibit / Paper # | Description |
|---|---|
| APL 1006 | Application No. 08/611,695 (as-filed) |
| APL 1007 | Apple's Claim Construction Brief in Case No. 6:13-cv-00919-JDL (EDTX) |
| APL 1011 | Deposition Transcript of Robert Dezmelyk, IPR2015-00369 and IPR2015-00373, December 15, 2015 ("Dezmelyk Depo.") |
| APL 1012 | Mischa Schwartz, Telecommunications Networks: Protocols, Modeling and Analysis, Addison-Wesley, 1988 ("Schwartz") |
| APL 1013 | Tom Sheldon, Encyclopedia of Networking & Telecommunications, Lisa Wolters-Broder ed., McGraw Hill, 2001 (other excerpts submitted as DSS 2010) |
| DSS 2001 | U.S. Patent No. 5,699,357 |
| DSS 2002 | Definition of "*e.g.*," Black's Law Dictionary (9th ed. 2009) |
| DSS 2003 | Myk Dormer, *Low Duty Cycle?*, Electronics World Magazine, Dec. 2008, *available at* http://www.radiometrix.com/files/additional/Low-Duty-Cycle.pdf |
| DSS 2004 | U.S. Pat. No. 7,558,232 |
| DSS 2005 | U.S. Pat. No. 7,092,762 |
| DSS 2006 | U.S. Pat. No. 7,049,620 |
| DSS 2007 | U.S. Pat. No. 8,837,653 |
| DSS 2008 | U.S. Pat. No. 8,727,561 |
| DSS 2009 | Definition of "burst," Chambers Dictionary of Science and Technology (1st ed. 1999) |
| DSS 2010 | Tom Sheldon, *Encyclopedia of Networking & telecommunications*, 549, (Lisa Wolters-Broder ed., McGraw Hill 2001) |
| DSS 2011 | U.S. Pat. No. 3,598,914 |
| DSS 2012 | U.S. Pat. No. 6,983,031 |
| DSS 2013 | Yurcik, William J., *Serial and Parallel Transmission*. Computer Sciences. 2002. Encyclopedia.com, *available at* http://www.encyclopedia.com |
| DSS 2014 | *Asynchronous HDLC MC68360 ASYNC HDLC Protocol Microcode User's Manual*, 8, (Freescale Semiconductor, Inc. 1996) |

| Exhibit / Paper # | Description |
|---|---|
| **DSS 2016** | Declaration of Mr. Robert Dezmelyk |
| **DSS 2017** | Wmat Auppu, *AIF Inter DSP Communication*, 1, *available at* http://processors.wiki.ti.com/index.php/AIF_Inter_DSP_Communication |

## IV.    Legal Principles

14.    I understand that, during an *inter partes* review, claims are to be given their broadest reasonable construction in light of the specification as would be understood by a person of ordinary skill in the relevant art.

15.    I understand that to determine how a person of ordinary skill would understand a claim term, one should look to those sources available that show what a person of skill in the art would have understood disputed claim language to mean. Such sources include the words of the claims themselves, the remainder of the patent's specification, the prosecution history of the patent (all considered "intrinsic" evidence), and "extrinsic" evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

16.    I understand that words or terms should be given their ordinary and accepted meaning unless it appears that the inventors were using them to mean something else. I understand that a person of ordinary skill in the art is deemed to read a claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the

- 6 -

specification. For this reason, the words of the claim must be interpreted in view of the entire specification. Put another way, claim terms are given their broadest reasonable interpretation that is consistent with the specification and the prosecution history.

17.    In addition to consulting the specification, one should also consider the patent's prosecution history. The prosecution history provides evidence of how both the Patent Office and the inventor(s) understood the terms of the patent, particularly in light of what was known in the prior art. Furthermore, where the specification describes a claim term broadly, arguments and amendments made during prosecution may require a more narrow interpretation.

18.    I understand that while intrinsic evidence is of primary importance, extrinsic evidence, e.g., all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises, can also be considered. For example, technical dictionaries may help one better understand the underlying technology and the way in which one of skill in the art might use the claim terms. Extrinsic evidence should not be considered, however, divorced from the context of the intrinsic evidence.

19.    I understand that an obviousness analysis involves comparing a claim to the prior art to determine whether the claimed invention would have been obvious to a person of ordinary skill in the art in view of the prior art, and in light

of the general knowledge in the art. I also understand when a person of ordinary skill in the art would have reached the claimed invention through routine experimentation, the invention may be deemed obvious.

20.    I also understand that obviousness can be established by combining or modifying the teachings of the prior art to achieve the claimed invention. It is also my understanding that where there is a reason to modify or combine the prior art to arrive at the claimed invention, there must also be a reasonable expectation of success in so doing. I understand that the reason to combine prior art references can come from a variety of sources, not just the prior art itself or the specific problem the patentee was trying to solve. And I understand that the references themselves need not provide a specific hint or suggestion of the alteration needed to arrive at the claimed invention; the analysis may include recourse to logic, judgment, and common sense available to a person of ordinary skill that does not necessarily require explanation in any reference.

21.    I understand that when considering the obviousness of an invention, one should also consider whether there are any secondary considerations that support the nonobviousness of the invention. I understand that secondary considerations of nonobviousness include failure of others, copying, unexpectedly superior results, perception in the industry, commercial success, and a long-felt but unmet need.

- 8 -

## V.    Person of Ordinary Skill in the Art

22.    I understand that a person of ordinary skill in the art ("POSA") is one who is presumed to be aware of pertinent art, thinks along conventional wisdom in the art, and is a person of ordinary creativity. In my opinion, a person of ordinary skill in the art at the time of the priority date of the '290 patent would be a person with an undergraduate degree in Electrical Engineering and 1-2 years of experience working with wireless network technology, or equivalent education and/or work experience. I am familiar with what a POSA would have known at the time of the priority date of the '290 patent.

## VI.    State of the Art and Summary of References

23.    In my opinion, the references asserted against the '290 patent claims and discussed herein clearly show that the features recited in the '290 patent claims were well known in the prior art. To the extent that a particular feature is not explicitly described in one of the asserted references, it is my opinion that these features would have been obvious to a POSA.

24.    Many of the claimed limitations are simply well known components of wireless communication systems performing their standard functions. For example, the claims recite basic features such as a "server microcomputer unit" communicating with multiple "peripheral units," where these components each have a transmitter and receiver. Energizing the transmitters and receivers only

during designated transmission slots was also well known. So too was synchronizing devices so that they could rely on timed communication plans.

25.     It is my opinion that the '290 patent claims merely recite a collection of well known components performing their standard function according to well known techniques. In my opinion, the '290 patent claims do not recite any features that were not previously known in the art or would not have been obvious to a POSA.

26.     It is my understanding from reviewing DSS's Patent Owner Response to Petition that DSS only contends that one feature–the server transmitter being "energized in low duty cycle RF bursts"–is not taught or suggested by the combination of prior art references. Therefore, my opinions and analysis herein focus on this claim element.

27.     Exemplary relevant art that was published before October 14, 1997 includes the references described below.

**A. Natarajan**

28.     Natarajan is directed to battery power conservation in wireless communications of mobile computers controlled by multi-access protocols. (Natarajan, 1:6-12.) Figure 1 shows that multiple mobile units (10, 12, 14, 16) communicate with base stations (26, 28) via wireless radio links. (Natarajan, 2:28-39, Figure 1.) Natarajan describes that the base stations can be a "conventional

- 10 -

microcomputer" and that the mobile units can be a "hand held or laptop computer."

(Natarajan, 2:40-41, 2:58-59.) Both the base stations and mobile units have an RF

transceiver for establishing a radio link. (Natarajan, 2:51-56, 2:65-67.) A system



schematic common to both the base station and mobile stations is illustrated in

FIG. 3. (Natarajan, 3:7-8.) Each device includes, for example, a microprocessor

system (56) that controls the transceiver via an interface (58). (Natarajan, 3:14-15.)

The microprocessor system also includes a dedicated microprocessor (62) with

high-resolution time interval determination hardware or "timers." (Natarajan, 3:18-

21.)

29.     Natarajan describes that its system is intended "for minimizing battery

power consumed by wireless link adapters at the mobile units." To do so,

Natarajan describes turning off the transmitter and receivers when not in use.

(Natarajan, 4:2-5.) More specifically, Natarajan describes that:

> [s]cheduled access multiaccess protocols can be implemented to
> effectively conserve battery power by suitable control of the state of
> transmitter and receiver units at the portable units (i.e., by scheduling

when they should be turned ON or OFF). A desirable solution is one in which the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message). (Natarajan, 3:59-4:6.)

30.    Natarajan further describes that the scheduled multiaccess protocol divides time into "fixed-length frames, and frames are divided into slots," as shown, for example, in FIG. 4. (Natarajan, 4:20-23, FIG. 4.) The frames are divided into subframes where, for example with respect to FIG. 4, one subframe is for transmitting data packets from the base station to mobile units (Period A), a second subframe is for contention-free transmission from mobile units to the base station (Period B), and a third subframe is for "bursty data traffic" in a contention mode from mobile units to the base station (Period C). (Natarajan, 4:27-38.)

```
          | G |AH|       A       |BH|     B     |CH|     C      |FT|
          |···|··|IIIIIIIIIIIIII|··|IIIIIIIIIII|··|IIIIIIIIIIII|  |
          |···|··|<------------>|  |<--------->|··|<---------->|··|
FIG.4             | Base to     |  | Mobile to|  | Contention  |  |
                  | Mobiles     |  |   Base    |  | from Mobiles|  |
           ->| FH|  |<-----TA----->|   |<---TB--->|   |<---TC------>|  |
```

31.    Natarajan describes that in Period A, the base station controls the outbound transmissions to the mobile units. (Natarajan, 4:40-41.) Prior to Period A, the base station broadcasts a header (AH) to the mobile units that includes: a list of mobile units that will be receiving data packets from the base station, the order in which the mobile units will receive the data packets, and the number of data

packets that will be transmitted to each mobile unit. (Natarajan, 4:45-53.) If a mobile unit is not included in header (AH), it will not be receiving data from the base station, and can turn off its receiver for Period A. (Natarajan, 4:63-67.) Because the mobile units know the order and number of data packets to be transmitted, each mobile unit that will be receiving data can compute when its designated transmission slot will be, go to sleep until that time, and wake itself up in its designated time slot to receive data. (Natarajan, 4:67-5:4.) After receiving its data, the receiver can go back to sleep for the remainder of Period A. (Natarajan, 5:4-6.)

32.     Natarajan similarly discloses broadcasting another header (BH) for scheduling which mobile units will be allowed to transmit to the base station and the order they will transmit. (Natarajan, 5:9-29.) Flow charts of these processes are shown, for example, in FIGS. 8A-8D and described in Natarajan at 8:14-9:54. Using this scheme, the mobile units save power by powering up only during their designated reception or transmission time slot.

33.     Natarajan also describes that header (AH) includes "a coded description of mobile users that will receive data in the current frame. That is, it is a designation of which mobile users are to communicate with the base station during this frame." (Natarajan, 6:19-22.) Header (BH) similarly includes "a coded designation or description of mobile users that can transmit data in the current

- 13 -

frame." (Natarajan, 6:31-33.) Natarajan describes assigning each mobile unit an index number during a "registration period" which is "needed to associate each mobile unit in the network with the intended base station." (Natarajan, 6:48-54.)

34.    The header (AH) transmitted from the base station includes a "Receiving Users designation or Index message portion" that is a bit-vector sequence with a bit for each of the registered mobile units. (Natarajan, 6:55-58.) FIG. 5 illustrates an example of this sequence.

## FIG. 5

| 0001000110000 •••••••••••••••••••••• 1000000 |

| < ------------------------- 64 bits ------------------------- > |

35.    Natarajan specifically describes that the "coded description" designates whether or not each mobile unit will communicate with the base station during a particular time frame:

> The content of each bit location signals the receiver activity of the user designated or indexed by the bit location. For example, reading left to right, a "1" in the 4'th, 8'th, 9'th, etc. bit location can be used to signal that the 4'th, 8'th, 9'th, etc. mobile unit is designated to receive one message in the current frame period. "0" in the 1'st, 2'nd, 3'rd, etc. bit location signals that the 1'th, 2'nd, 3'rd, etc. mobile unit is inactive (is not designated to receive any data) and can turn its receiver power OFF until the beginning of Header BH.

- 14 -

(Natarajan, 6:59-68.)

An analogous scheme is used in the header (BH) for transmission from the mobile units to the base station. (Natarajan, 7:1-6.) This scheduled communication scheme reduces power consumption by requiring that the mobile units only be powered on during time slots where they will be receiving or transmitting data. (Natarajan, 7:6-15.)

**B. Neve**

36.    Neve is directed to "[a] communication system able to provide multiple path communication between a plurality of stations operating on a single channel. The stations are synchronized and a cyclically repeating series of time slots is defined." (Neve, Abstract.) In order to provide radio data communication, Neve discloses that each device includes "a transmitter and receiver device (transceiver) 2 which includes an antenna 3, a transmitter circuit 4 and a receiver circuit 5." (Neve, 3:59-63.) The transceiver is connected to a digital control processor, which controls data transfer to and from the transmitter and receiver. (Neve, 3:64-68.)

37.    Neve describes that it is "desirable to provide a communications system in which the transmitting and receiving apparatus is small, may be easily installed in any location, and is of very low power consumption." (Neve, 1:31-34.) Thus, Neve's system "enables a very low power consumption to be achieved in the

cases where the device requires to transmit data only rarely or the receiver receives the predetermined code signal only rarely…a device may need to transmit data for only a fraction of a second in many hours." (Neve, 2:25-31.)

38.    Neve describes that when data transfer is not taking place, the device can enter a lower power consumption state. (Neve, 2:13-16.) The system is designed "automatically to re-enter the data transfer condition when either a signal is received from the device indicative of the need to transmit data or a predetermined code signal is received by the receiver circuit indicative of the need to receive data." (Neve, 2:19-24.) So, the receiver has very low power consumption because only the internal timing circuitry is energized continuously, whereas the rest of the receiving circuit is energized only when its assigned time slot occurs. (Neve, 2:39-41.) Similarly, the transmitter only needs to be energized when transmission is required. (Neve, 2:45-47.)

39.    The time slots include "at least one synchronisation time slot, at least one interrupt time slot, and a plurality of address or data time slots, wherein any other station can transmit a message to the master station during an interrupt time slot to indicate a request to communicate." (Neve, 3:12-17.) Neve describes that the receiver circuit "includes a low power timing circuit which operates to energise the rest of the receiver circuit only for the time slot in which its address may occur

- 16 -

and for the synchronisation time slot thereby enabling it to maintain synchronisation with low power consumption." (Neve, 4:43-48.)

40.    Neve further describes that controlling the transceiver includes power up, cadence capture, bit synchronization, and a bit synchronization clock. (Neve, 6:7-11.) The clock is always active and the fundamental frequency of the oscillator is used as the system clock for the CPU. (Neve, 6:11-14.)

## VII.    Claims 9 and 10 would have been obvious to a POSA over Natarajan in view of Neve.

41.    Having reviewed claims 9 and 10 of the '290 patent and the prior art of record, it is my opinion that each and every limitation of claims 9 and 10 is disclosed by Natarajan and/or Neve or would have been obvious to a POSA in view of the combination of Natarajan and Neve. Therefore, it is my opinion that claims 9 and 10 of the '290 patent would have been obvious in view of Natarajan and Neve.

42.    Having reviewed Patent Owner DSS Technology Inc.'s Response to Petition, it appears that DSS's only contention is that the combination of Natarajan and Neve does not teach or suggest a server transmitter "energized in low duty cycle RF bursts," as recited in independent claim 9. It is my opinion that this feature *is*, in fact, taught by the combination of Natarajan and Neve. At the very least, should the Board find, wrongly in my opinion, that this feature is not

- 17 -

expressly taught by the prior art, this feature would have been obvious to a POSA in view of Natarajan and Neve.

43.    The general term "low duty cycle RF bursts" is not expressly defined in the '290 patent. I agree with the Board's position in the Institution Decision that, under the broadest reasonable interpretation of this term, Natarajan's "scheduled multi-access protocol in which time is divided into fixed-length frames, along with Natarajan's description of frames being divided into slots and multiple subframes" demonstrates that Natarajan discloses "said server and peripheral transmitters being energized in low duty cycle RF bursts." (Institution Decision, pp. 16-17.) This is because, like the '290 patent, Natarajan discloses that "[s]cheduled access multiaccess protocols can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)…the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." (Natarajan, 3:59-4:6.) Under the broadest reasonable interpretation of this term, a POSA would consider a system operating in this manner to operate in "low duty cycle RF bursts."

44.    DSS asserts that Natarajan only describes that the mobile units operate in the manner described above. (POR, p. 17.) However, it is my opinion that a POSA would have understood that the base station would have operated similarly,

that is, when the base station is not transmitting, its transmitter is powered off. As described in Natarajan, "*[m]ost users are very likely to be inactive* (both Transmit-Inactive and Receive-Inactive) *most of the time* for most applications. This is primarily due to the bursty nature of data communication traffic." (Natarajan, 6:41-44 (emphasis added).) Because most of the users are inactive most of the time, the base station will not have information to transmit most of the time. Therefore, when it is not transmitting, it will be powered off. Based on this description, a POSA would have understood Natarajan's base station and mobile units operate in "low duty cycle RF bursts."

45.    Furthermore, as described above, Natarajan explicitly discloses that the mobile unit transmitters operate in "low duty cycle RF bursts." (Natarajan, 3:59-4:6.) Therefore, it would have been obvious to a POSA to have the base station operate in an analogous manner. The RF systems of the base station and mobile stations in Natarajan have the same physical structure. (Natarajan, 3:7-8, FIG. 3.) A POSA applying the exact design disclosed in Natarajan to an application exactly as described in Natarajan where "*[m]ost users are very likely to be inactive* (both Transmit-Inactive and Receive-Inactive) *most of the time*,"(Natarajan, 6:41-44 (emphasis added)) would have conceived a system in which both the transmitter and the receiver of both the base station and the mobile stations operate in "low duty cycle RF bursts." Therefore, it is my opinion that a

POSA would not have found the "low duty cycle RF bursts" recited in claim 9 of the '290 patent to be novel.

## VIII.    HDLC is consistent with low duty cycle RF burst communications.

46.    DSS asserts that the High-Level Data Link Control (HDLC) packet structure disclosed in Natarajan is inconsistent with a server transmitter being energized in low duty cycle RF bursts. (POR, pp. 20-23.) For the reasons below, it is my opinion that DSS's position is wrong. To the contrary, HDLC is consistent with low duty cycle RF burst communications.

### A. *The preferred embodiment disclosed in the '290 patent uses HDLC.*

47.    The preferred embodiment of the '290 patent discloses using HDLC for communication between the PDA and PEAs. Therefore, if HDLC is not compatible with low duty cycle RF burst communications, then the preferred embodiment in the '290 patent would not work.

48.    The basic scheme of the '290 patent's frame structure is "a form of time division multiple access (TDMA)." ('290 patent, 5:45-50.) The '290 patent states that "[a]s will be understood by those skilled in the art, the TDMA system is greatly facilitated by the establishment of a common frame time base between PEA and PDA." ('290 patent, 7:63-65.) I agree this was well-known in the art. The '290 patent describes that establishment of a common frame time base is accomplished using synchronization beacons (SBs). ('290 patent, 7:65-67.) Before receiving the

SBs, a PEA is associated with the PDA using a succession of Attachment Beacons (ABs), which are "***composed of RF bursts*** having the same interval spacings as Synchronization Beacons," broadcast from the PDA to the PEAs. ('290 patent, 9:13-16 (emphasis added), 9:66-10:2.) The '290 patent states that "[t]his succession of ABs ***forms an <u>HDLC</u> channel*** using bit-stuffing to delineate the beginning and end of a packet." ('290 patent, 10:2-4 (emphasis added).)

49.    In view of this disclosure in the '290 patent, a POSA would have understood that the preferred embodiment of the '290 patent discloses using HDLC to transmit and receive RF bursts of relatively small number of bits in a non-continuous fashion, due to the small size of the Attachment Beacons (ABs) and the interval spacings between the ABs. Furthermore, in view of my own understanding of HDLC, it is my opinion that HDLC is compatible with low duty cycle RF burst communications and a POSA would have understood the same.

### B. Mr. Dezmelyk's understanding of HDLC is incorrect.

50.    Mr. Dezmelyk admits he is not an expert in HDLC. (Dezmelyk Depo., 26:15-16.) This is clear, in my opinion, because his explanations of the HDLC protocol are factually inaccurate.

51.    Based on my knowledge and experience, an accurate description of the HDLC protocol is found in *Telecommunication Networks: Protocols, Modeling and Analysis*, Addison-Wesley (1988) by Mischa Schwartz (APL 1012), which is

- 21 -

specifically referred to in Natarajan. (Natarajan, 3:28-40.) Because the Schwartz

book is specifically referenced in Natarajan, this would have been the most logical

resource for a POSA to consult for information on Natarajan's HDLC packet

structure. I found it surprising that neither DSS nor Mr. Dezmelyk looked to the

Schwartz book for information on HDLC.

52.    Pages 135-136 of Schwartz and Figure 4-9, reproduced below,

provide a concise summary of the HDLC frame format as it would have been

understood by a POSA:

The standard frame format for HDLC (ADCCP and SDLC have the

same format) appears in Fig. 4-9. Note that the number of overhead

(control) bits is $\ell' = 48$, just the number used earlier for calculations.

The eight-bit flag sequence 01111110 that appears at the beginning

and end of a frame is used to establish and maintain synchronization.

Because the flag appears at the beginning and end of the frame there

is no need to prescribe an information field structure. The information

field (packet) delivered from the network layer above can be any

desired number of bits. Extended versions of the frame structure of

Fig. 4-9 are available as well: The address, control, and block-check

fields can all be increased to allow additional addressing, improved

error detection, and increased sequence numbers. Since the flags

appearing at the beginning and end of a frame contain six consecutive

ones, that sequence may not appear anywhere else in the frame. Bit

stuffing is used to eliminate this possibility: a zero is inserted at the

transmitter any time that five ones appear outside the F fields. The

- 22 -

IPR2015-00373
U.S. Pat. No. 6,128,290

zeros are removed at the receiver. If seven ones appear anywhere in the frame (six ones followed by an additional one), the frame is declared in error.



**Figure 4–9** HDLC standard frame format

53.    Schwartz also describes that "[w]hen the transmitter reaches its maximum sequence number *it is forced to stop transmitting* until a frame in the reverse direction is received, acknowledging an outstanding packet." (Schwartz, p. 136 (emphasis added).) Thus, the transmitter does not continuously transmit under HDLC protocol. This is also shown in the throughput calculation analysis illustrated in Figure 4-13, reproduced below, which indicates periods (e.g., between I10 and I30) where the transmitter is idle (i.e., not transmitting). As described in Schwartz, Figure 4-13 illustrates the maximum throughput, so the amount of time the transmitter is not transmitting is at a minimum. (*See* Schwartz, p. 142 ("This station is assumed in addition to be in a saturated state: It *always* has frames to send. As noted earlier, this provides the maximum possible throughput." (emphasis original).) A POSA would understand that, in cases where the primary station is not saturated, there will be additional periods where the transmitter is not transmitting.

IPR2015-00373
U.S. Pat. No. 6,128,290



Annotated Figure 4-13 of Schwartz

54. Thus, as would have been understood by a POSA, the HDLC protocol, for example as described in Schwartz, does not require continuous transmission as asserted by DSS, and can be deployed in a low duty cycle communication. And, as illustrated, for example, in Figure 4-13, the transmissions occur in "bursts."

55. Schwartz also describes the three modes of operation for the HDLC protocol. (Schwartz, pp. 137-138.) The third mode listed, the asynchronous balanced mode (ABM), is for point-to-point transmission only. Therefore, ABM is inapplicable to Natarajan, which discloses point-to-multipoint communication. The normal response mode (NRM) and asynchronous response mode (ARM) are used for point-to-multipoint operation. (Schwartz, p. 137.) A POSA would have understood that Natarajan operates using the ARM because it provides that "the secondary station does not need permission from the primary station to initiate transmission." (Schwartz, p. 137.) This type of communication occurs in Period C

- 24 -

in Natarajan, which allows for "bursty data traffic in a contention mode from mobile units to base station." (Natarajan, 4:36-37.) In Period C, the mobile units initiate transmission without permission from the base station.

56.    In my opinion, DSS's arguments are flawed that Natarajan does not teach low duty cycle RF bursts because it employs HDLC protocol. To begin with, DSS's reliance on the excerpt from DSS 2010 is misguided. DSS asserts that the cited definition for "bit-oriented framing" shows that HDLC "involves continuous outbound transmission." (POR, pp. 21-22.) However, as indicated in the first sentence of the section cited by DSS, it states that it pertains to "[a] *point-to-point connection* between two computers or devices consists of *a wire* in which data is transmitted as a stream of bits." (DSS 2010, p. 549 (emphasis added).) Thus, the description cited by DSS only applies to a point-to-point wired communication, not a point-to-multipoint wireless system, as taught in Natarajan.

57.    A point-to-point connection between two computers or devices that consists of a wire is the simplest form of data communication. Firstly, the connection is dedicated to the two computers or devices communicating exclusively to each other, and hence no scheduling mechanism is required beyond specifying the direction of data transmission over the dedicated connection, i.e., which of the two peer computers or devices is transmitting (and the other peer computer or device would be receiving) at any given time. Secondly, the

- 25 -

connection consists of a wire, in which data travels at a high speed within the isolation provided by the wire, and hence the transmission bit rate, transmission delay, and interference with nearby devices and systems–the three major issues faced when designing a wireless connection–are of little relevance to the design of a point-to-point wired connection.

58.    A wireless point-to-multipoint system, on the contrary, allows data communication over an open channel among more than two devices. When a base station transmits, there are multiple peripheral devices capable of receiving at the same time; similarly, when a base station receives, multiple peripheral devices can compete to transmit to the base station. Therefore, a sophisticated scheduling mechanism needs to be established to achieve the point-to-multipoint communication. Unlike a point-to-point wired connection in which simplicity and reliability are usually the only design goals, a point-to-multipoint wireless connection often needs to prioritize the system data rate, interference avoidance, delay management, and power management.

59.    Recognizing these fundamental differences between a point-to-point wired connection and a point-to-multipoint wireless connection is important because ignoring them and applying a design suited for one type of connection to the other type of connection will result in underutilization of system resources at best and system failure at worst. For example, applying the frame structure

- 26 -

disclosed in Natarajan to a point-to-point wired connection will result in almost all time slots in subframe C (the designated contention subframe) being wasted as there is only one peripheral device in the point-to-point connection. Similarly, enforcing a continuous transmission of so called "idle words" to maintain synchronization whenever there is no data being transmitted–a scheme suitable for an isolated point-to-point wired connection to achieve design simplicity and reliability–is detrimental to a point-to-multipoint wireless connection because it interferes with the carefully designed scheduling and synchronization mechanism, wastes power, decreases the system data rate, and pollutes the wireless channel potentially shared by many devices and systems.

60.    For these reasons I disagree with Mr. Dezmelyk's assertion that a point-to-point connection and a point-to-multipoint connection are the same "in particular [when] the question is what the channel looks like." (Dezmelyk Depo., 102:19-103:2.) I also disagree with Mr. Dezmelyk's assertion that the quoted passage in DSS 2010 is applicable to the wireless communication protocols. (Dezmelyk Depo., 113:15-114:3.) In his deposition, Mr. Dezmelyk references a sentence in the quoted passage in DSS 2010: "[i]t provides a way for a sender to transmit a set of bits that are meaningful to the receiver," as evidence that this passage also applies to wireless communication. (Dezmelyk Depo., 113:15-114:3 (referencing DSS 2010, p. 549.) This is incorrect. This sentence describes a generic

function of all data communication, and is not proof that the two distinct types of data communication–a point-to-point wired data communication and a point-to-multipoint wireless data communication–are the same. Nor does this sentence show that the quoted passage, specified by the author to refer to a point-to-point wired communication, is also applicable to a point-to-multipoint wireless communication.

61.    DSS also asserts that the quoted passage in DSS 2010 indicates that the "HLDC [*sic*] packet structure is used to transmit '***long*** strings of data at one time,'" alleging that this is inconsistent with "small" RF bursts. (POR, p. 22 (emphasis original).) I note that the actual quote in DSS 2010 is: "[t]his type of framing allows the sender to transmit ***a long string of bits _at one time_***." (DSS 2010, p. 549 (emphasis added).) A POSA would have understood that within the context of framing, bit-oriented protocols such as HDLC add special bit sequences to the beginning and end of a string of bits to be transmitted, and hence the upper layers of the sender that has data bits to transmit "at one time" don't have to break the string of bits into smaller frames or packets before the string of bits reach the data link layer. This clearly does not mean that HDLC can only handle a long string of bits; nor does it suggest that the transmission of a string of bits of any length is not a "burst."

62.    Furthermore, another portion of DSS 2010 describing Figure H-2, shown below, discloses that the number of bits in the Information Field of an HDLC frame is "variable." (APL 1013, p. 582, Figure H-2.) This corroborates Schwartz, which discloses that "[t]he information field (packet) delivered from the network layer above can be ***any desired number of bits***." (Schwartz, p. 135 (emphasis added).) An information field that "can be any desired number of bits" supports that the HDLC frame format is compatible with a "burst" transmission.



**Figure H-2.**   *HDLC frame definition*

63.    Mr. Dezmelyk combines the excerpt from DSS 2010 with an excerpt from DSS 2013 to suggest that Natarajan teaches continuous transmission by the base station. But Natarajan does not teach continuous transmission by the base station. Mr. Dezmelyk notes that Natarajan's HDLC packets are provided in "serial form." (Dezmelyk Dec. ¶ 35 (citing APL 1003 at 3:36-37).) Pointing to DSS 2013, he then alleges that serial communication systems "include a server transmitter transmitting idle words when no useful data is being transmitted." (Dezmelyk Dec. ¶ 35.) First, I note that DSS 2013 does not use the term "idle words." And second, idle words are not used in Natarajan.

Appx2004

64.    Mr. Dezmelyk provides a quote: "In *synchronous transmission*, groups of bits are combined into frames and frames are sent continuously with or without data to be transmitted." (Dezmelyk Dec. ¶ 35 (quoting DSS 2013, p. 2 (emphasis added)).) But this quote does not describe the HDLC protocol in Natarajan, which is *asynchronous*. Mr. Dezmelyk is wrong that a POSA would not have known whether Natarajan operates under a synchronous or asynchronous protocol. (*See* Dezmelyk Depo., 99:12-20.) In my opinion, this illustrates his lack of understanding of HDLC. As discussed above, a POSA would have understood that Natarajan specifically operates under the asynchronous response mode (ARM) of HDLC.

65.    In fact, the very next sentences in DSS 2013 after the sentence quoted by Mr. Dezmelyk describe that "[i]n asynchronous transmission, groups of bits are sent as independent units with start/stop flags and no data link synchronization, to allow for arbitrary size gaps between frames. However, start/stop bits maintain physical bit level synchronization once detected." (DSS 2013, p. 2.) These "start/stop flags" that are used to maintain synchronization corroborate Schwartz's disclosure of HDLC that an "eight-bit flag sequence 01111110 that appears at the beginning and end of a frame is used to establish and maintain synchronization." (Schwartz, p. 135.) A POSA would have understood that, in HDLC, transmission is <u>not</u> continuous, but rather there are gaps between frames.

66.    Mr. Dezmelyk adds an excerpt from DSS 2014 together with the excerpts from DSS 2010 and DSS 2013. (Dezmelyk Dec. ¶ 35 (quoting DSS 2014 at Section 2.5.6. ("When transmitting, the Asynchronous HDLC controller will transmit IDLE characters (characters consisting of only "1"s) when no data is available for transmission.")).) In my opinion, this association is inappropriate for two reasons. First, DSS 2014 is related to point-to-point communications, not point-to-multipoint communications as described in Natarajan. DSS 2014 states that "[t]his protocol is typically used as the physical layer for the Point-to-Point (PPP) protocol." (DSS 2014, p. 4.) As discussed above, a point-to-point wired connection and a point-to-multipoint wireless connection are two fundamentally different types of data communication with distinct design challenges and principles. (*See* ¶¶ 57-60.) Second, DSS 2014 is a technical manual for a proprietary Motorola product, which uses a modified "HDLC-like" protocol. This is evident from its description of repeatedly transmitting "characters consisting of only '1's" when no data is available for transmission. Therefore, during an extended period when no data is available for transmission, there would be many 1's transmitted. A POSA would have understood that these repeated 1's would violate the standard HDLC protocol, where "[i]f seven ones appear anywhere in the frame (six ones followed by an additional one), the frame is declared in error." (Schwartz, p. 136.) This point is reaffirmed on page 582 of APL 1013 (DSS 2010),

- 31 -

which states that "[i]f any portion of the data in the frame contains more than five

1 bits, a zero-bit insertion technique inserts a 0 bit to ensure that data is not

mistaken for a flag."

67.    The incompatibility of a continuous transmission of the idle words, as

described on page 549 of DSS 2010 and in DSS 2014, with the standard HDLC

protocol, as described by pages 581-583 of APL 1013 (DSS 2010) and by

Schwartz, can also be explained on page 1006 of APL 1013 (DSS 2010). In the

section describing "PPP (Point-to-Point Protocol)," it states that "[m]ost PPP

implementations use framing *derived from* HDLC (High-level Data Link Protocol)

as described in RFC 1662 (PPP in HDLC-like Framing, July 1994)." (APL 1013

(DSS 2010), p. 1006 (emphasis added).) In other words, the HDLC protocols

referred to in both page 549 of DSS 2010 and in DSS 2014 are "HDLC-like"

protocols, *modified* to suit the specific design need of a point-to-point protocol.

68.    Because DSS 2014 does not disclose the standard HDLC protocol, it

cannot be used to support DSS's position. Mr. Dezmelyk asserts that he relies on

DSS 2014 as being analogous to "the HDLC spec," but it is not. (*See* Dezmelyk

Depo., 69:17-71:1.) Because Mr. Dezmelyk bases his opinions on DSS 2014,

which does not disclose the standard HDLC protocol, it is my position that his

opinions on HDLC are irrelevant.

### C. Natarajan and the HDLC protocol do not use "idle words."

69.    It is my understanding from reviewing Apple's Petition that Neve is included in combination with Natarajan because "Natarajan does not explicitly describe synchronizing the mobile units with the base station." (Petition, p. 28.) I agree, as explained in the Petition, that Natarajan does teach that "coordinated timing of transmissions is important" for the numerous reasons discussed in the Petition. (Petition, p. 28.) I also agree that a POSA would have been motivated to precisely synchronize the mobile units with the base unit, which would have led a POSA to a reference such as Neve, which is an example of a conventional synchronization technique.

70.    Although Natarajan does not explicitly disclose synchronizing the mobile units with the base station, the HDLC protocol, for example, as described in Schwartz, explains that the "standard frame format for HDLC" has an "eight-bit flag sequence 01111110 that appears at the beginning and end of a frame [that] is used *to establish and maintain synchronization*." (Schwartz, p. 135.) A POSA would have understood that the HDLC protocol used by Natarajan contemplates a mechanism for synchronization. Such synchronization was within the skill of a POSA.

71.    DSS's suggestion that the HDLC protocol of Natarajan uses idle words (as described in Neve) is inaccurate. I would first point out that Neve does

not disclose that idle words are continuously transmitted by the master station. I agree with the Board, which found that Neve "*do[es] not suggest continuous transmission* from the master station, but instead transmission of idle words in the event that there is no data required to be transmitted in the time slots specifically allocated for transmission by the server" and that "the master station performs different functions during different time slots, only certain of which involve transmission." (Institution Decision, p. 18 (emphasis added).)

72.    DSS suggests that the base station in Natarajan transmits idle words like in Neve, but it does not. And a POSA would have understood that HDLC does not use idle words.

73.    To be clear, neither Natarajan nor Schwartz's discussion of HDLC mention idle words. In my opinion, this is likely because the use of continuous idle words in Natarajan, which DSS asserts would assist with synchronization, would be pointless in HDLC. (*See* POR, pp. 26-27, 32; Dezmelyk Depo., 119:13-20.) First, HDLC has its own mechanism–start/stop flags–for synchronization. Second, as Mr. Dezmelyk acknowledges, if Natarajan used idle words, they would be transmitted "out into the air and there is nobody really paying attention to it." (Dezmelyk Depo., 84:22-85:1.) A POSA would have found it illogical to transmit idle words that were not received by any of the mobile devices. Mr. Dezmelyk asserts that when the receivers turned back on, they would be able to synchronize

- 34 -

onto the stream of idle words. (Dezmelyk Depo., 85:2-14.) However, Natarajan discloses that "each receiving mobile unit can compute *exactly when* it should be ready to receive packets from the base station…to wake itself up at its designated time for receiving data." (Natarajan, 4:67-5:3 (emphasis added).) Thus, a POSA would have understood that Natarajan is designed to have the mobile units turn back on precisely when needed to receive data. They would not wake up "early" to try to synchronize to a string of idle words, in the manner suggested by Mr. Dezmelyk. This would defeat the precise timing disclosed in Natarajan and is unnecessary because of the start/stop flags used in HDLC for synchronization.

74.    Mr. Dezmelyk's lack of understanding of HDLC is further highlighted by his assertion that systems using idle words can have, for example, ten consecutive 1's. (Dezmelyk Depo at 98:1-13.) HDLC cannot have more than six consecutive 1's, otherwise an error is declared. (Schwartz, p. 135-136.) That is why, "[i]f any portion of the data in the frame contains more than five 1 bits, a zero-bit insertion technique inserts a 0 to ensure that data is not mistaken for a flag," (i.e., 01111110). (APL 1013 (DSS 2010), p. 582.)

75.    In sum, nothing in Natarajan or the HDLC protocol suggests the use of idle words and a POSA would understand that HDLC does <u>not</u> use idle words.

## IX.    DSS's interpretation of "low duty cycle" is incorrect.

76.    DSS proposes that the broadest reasonable interpretation for a server transmitter energized in a "low duty cycle" is that "the server transmitter is energized for less than ten percent (10%) of the total duration designated for outbound transmissions." (POR, p. 12.) In my opinion, DSS's interpretation is not supported by the '290 patent or the evidence presented.

77.    One of DSS's own examples in Table 1 contradicts the proposed construction of "less than ten percent," because it provides for a "low duty cycle, e.g., *at* an *about* 10 percent (10%) duty cycle." (POR, p. 13 (quoting DSS 2008 at 10:5-6) (emphasis added).) This example would include a "low duty cycle" that is at or even slightly above 10%, which is <u>not</u> "less than ten percent." Furthermore, Mr. Dezmelyk acknowledges that the term "low duty cycle" does not require an upper bound at 10%. (Dezmelyk Depo., 78:2-6.) Indeed, a POSA would not have placed a strict upper limit of 10% on "low duty cycle."

78.    Mr. Dezmelyk also asserts that the 10% limit is based on claim 8 of U.S. Patent No. 5,699,357. (*See* Dezmelyk Depo., 79:12-81:3.) Claim 8 of the '357 patent recites "[a] data network system as set forth in claim 7 wherein said psuedo random codes are sparse uncorrelated codes and said low duty cycle pulses comprise chips within the respective code sequences such that a transmitter is enerrgized [*sic*] less than 10% of the time during an allocated time slot." It is my

understanding that because claim 8 depends ultimately from independent claim 6, it is narrower than the independent claim, meaning that the '357 patent contemplates a "low duty cycle" that is greater than 10%.

79.    Accordingly, it is my opinion that the term "low duty cycle" does not impose an upper limit of 10% for the duty cycle. Under the broadest reasonable interpretation standard, a "low duty cycle" of a transmitter should simply be interpreted as the transmitter being carefully designed to be on only to satisfy the data communication needs over the communication cycle of the system. Moreover, a transmitter that is off for more time than it is on over the communication cycle of the system would be an example of a low duty cycle.

80.    It is also my opinion that Mr. Dezmelyk's interpretation of "duty cycle" is not only inaccurate, it does not make sense. Mr. Dezmelyk asserts in his declaration that "duty cycle" should be construed to mean "the ratio of the duration during which the server transmitter is energized to the total duration designated for outbound transmissions–from the server unit to the peripheral units." (Dezmelyk Dec. ¶ 23.) In his deposition, Mr. Dezmelyk further explains his proposed construction. First, Mr. Dezmelyk asserts that "duty cycle is measured based on when you are transmitting." (Dezmelyk Depo., 116:8-9.) He asserts that Natarajan has a 100% duty cycle because "if you measure during what periods of time it is transmitting it is transmitting at 100 percent duty cycle." (Dezmelyk Depo., 69:7-

9.) In my opinion, this interpretation is illogical because if the only time frame used to calculate duty cycle is when the transmitter is actually transmitting, the duty cycle will always be 100%. Using Mr. Dezmelyk's example from the '290 patent, if transmissions occur in 3 out of 64 slots and "if you measure during what periods of time it is transmitting" (i.e., the 3 transmissions slots) then the '290 patent is transmitting at a 100%, not at 4.688%. (*See* Dezmelyk Dec. ¶¶ 24, 26; *see also* Dezmelyk Depo., 116:10-14 ("So if there was enough data to occupy two slots then the question is:  What is the duty cycle of the RF transmitter during that period of time of those two slots. Or the aggregate time of those two slots if they weren't adjacent to one another.").) Under Mr. Dezmelyk's interpretation, if a particular time slot is filled by a transmission, the duty cycle is 100%.

81.    Mr. Dezmelyk provides additional context to his interpretation, asserting that duty cycle is calculated based on a sub-portion of a time slot is taken up by a transmission. Mr. Dezmelyk asserts that:

> if you had -- you are using in essence two slots out of the 10 that are available, and particular slots have a fixed width, then that ***period of time of the two slots that you actually have something to transmit in gives you the kind of what you are dividing by, the time you are dividing by to calculate the duty cycle***. You are looking at the percentage of time that the transmitter is active during the period in time when, in essence when a transmission is called for. (Dezmelyk Depo., 116:20-117:6 (emphasis added).)

- 38 -

82.    Put another way by Mr. Dezmelyk, "the question is, what ***percentage of that slot time*** is taken up by the transmission." (Dezmelyk Depo., 106:2-4 (emphasis added).) Mr. Dezmelyk's interpretation thus requires determining the percentage of a single transmission slot used for transmission. Under this interpretation, Mr. Dezmelyk's calculation from the example in the '290 patent, which accounts for transmission during the entirety of the 3 time slots (out of the 64 total slots), would again be a 100% duty cycle. Thus, neither of Mr. Dezmelyk's interpretations of duty cycle are consistent with his interpretation of the '290 patent specification, which he asserts requires a duty cycle of less than 10%.

83.    Furthermore, DSS improperly focuses only on the period for "outbound transmissions" for calculating the duty cycle in Natarajan. (POR, p. 11-12; Dezmelyk Dec. ¶ 23.) A POSA would calculate the duty cycle over the period of time that it takes a system to go through a cycle of communication. DSS's methodology improperly manipulates the time period over which a POSA would determine the duty cycle.

84.    For Natarajan, a POSA would calculate the duty cycle over all of Periods A, B, and C. To limit the calculation only to Period A, as suggested by Mr. Dezmelyk (Dezmelyk Dec. ¶ 32), would read the word "cycle" out of the term "duty cycle." The communication "cycle" in Natarajan includes all of Periods A-C.

85.    Once the transmissions between the base station and mobile stations cycle through Periods A-C, the next transmission cycle begins again with Period A. Accordingly, the calculation of the duty cycle for Natarajan must include Periods A-C. Furthermore, a POSA would have understood that the communication cycle in Natarajan, where "[m]ost users are very likely to be inactive (both Transmit-Inactive and Receive-Inactive) most of the time," represents a low duty cycle.

86.    Using the proper calculation over Periods A-C for duty cycle in Natarajan, even under DSS's incorrect interpretation of "low duty cycle" being less than 10%, Natarajan can operate in a manner that satisfies the proposed interpretation. By way of example, if the base station transmits to one (1) mobile unit during Period A, thirty (30) mobile units transmit to the base station during Period B, and two (2) mobile units transmit to the base station during Period C (with two (2) ACKs transmitted from the base station to those mobile stations). Assuming all transmissions take one slot each, then the base station will have transmitted in three (3) slots out of the thirty-five (35) slots in Periods A-C. This would represent a duty cycle of 8.57%. Accordingly, even under DSS's incorrect interpretation, Natarajan is still capable of satisfying the "low duty cycle" claim element.

87.    In another example, Natarajan can operate under a low duty cycle that is less than 10% where the base station: transmits to one (1) of thirty (30) mobile units during Period A, two (2) mobile units transmit to the base station during Period B, and two (2) mobile units transmit to the base station during Period C (with two (2) ACKs transmitted from the base station to those mobile stations), where the length of Period C has enough inbound slots (i.e., twenty-eight (28) in this example) for each of the mobile stations that did not transmit in Period B to transmit in the contention mode of Period C. A POSA would have found such an arrangement for Period C to be logical because it provides the opportunity for each mobile station to transmit to the base station, but if they do not, they can still conserve power by not turning on. Assuming all transmissions take one slot each, then the base station will have transmitted in three (3) slots out of the thirty-three (33) slots in Periods A-C. This would represent a duty cycle of 9.09%.

88.    Furthermore, should the Board decide, wrongly in my opinion, only to look at Period A in Natarajan for calculating the duty cycle, it is my opinion that a POSA would understood that Period A of Natarajan could operate in a low duty cycle, even at less than 10%. For example, a POSA would have understood that Period A of Natarajan could be of fixed length, for example, having a timeslot reserved for each of thirty (30) mobile units, as was common in TDMA schemes. If the base station transmits to two (2) of the thirty (30) timeslots, this would

represent a 6.67% duty cycle. The transmitter would be off for the remainder of Period A because, as discussed above, Natarajan's HDLC protocol does not use idle words when there is no data to transmit.

## X.    Conclusion

89.    In signing this declaration, I recognize that the declaration will be filed as evidence in a contested case before the Patent Trial and Appeal Board of the United States Patent and Trademark Office. I also recognize that I may be subject to cross-examination in the case and that cross-examination will take place within the United States. If cross-examination is required of me, I will appear for cross-examination within the United States during the time allotted for cross-examination.

90.    I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Respectfully submitted,

Dr. Jing Hu

Date: 1/22/2016

2760022.DOC

- 43 -

EXHIBIT

*DSS-2009*

# CHAMBERS

## DICTIONARY OF
# SCIENCE
# AND
# TECHNOLOGY

*General Editor*
Professor Peter M B Walker, CBE, FRSE

## CHAMBERS

CHAMBERS
An imprint of Chambers Harrap Publishers Ltd
7 Hopetoun Crescent, Edinburgh, EH7 4AY
Larousse Kingfisher Chambers Inc.,
95 Madison Avenue, New York, New York 10016

This edition first published by Chambers Harrap 1999

© Chambers Harrap Publishers Ltd 1999

Previous edition published in 1995 as *Larousse Dictionary of Science and Technology*. First edition published as *Chambers's Technical Dictionary* in 1940 by W & R Chambers Ltd (revised 1958, 1971, 1974 and 1984)

ISBN 0 550 14110 3

Illustrations drawn by Peter Walker

All rights reserved. No part of this publication may be reproduced, stored or transmitted by any means, electronic, mechanical, photocopying or otherwise, without the prior permission of the publisher

British Library Cataloguing in Publication Data for this book is available from the British Library

Typeset in Great Britain by Chambers Harrap, Edinburgh
Printed in Singapore by SNP Printing Pte Ltd

Preface
Subject cate
Abbreviatio

The Diction

Appendice:

**A**
C
Pl
Pl

**Bi**
C
C

**C**
A
Pe
P

**E**
G
C

**G**
E
C
C
T
N
P
P

**F**
T
F
S
C
U
S

**Burkitt lymphoma** (*Immun, Med*) A malignant tumour of B-cells, esp affecting the jaw and the gut, common in children in hot humid regions of Africa but not confined to these regions. **Epstein–Barr virus** is present and may be responsible for malignant transformation occurring in a B-cell population subject to constant antigenic stimulation. Associated with a specific chromosomal rearrangement affecting chromosome 8q24.

**burl** (*For*) See **burr**.

**burlap** (*Textiles*) A coarse jute, hemp or flax fabric.

**Burma lancewood** (*For*) A durable wood from the genus *Homalium*, used in India for the making of agricultural implements as well as being a structural timber.

**burmite** (*Min*) An amber-like mineral occurring in the upper Hukong Valley, Burma, differing from ordinary amber by containing no succinic acid. A variety of retinite.

**burn** (*Electronics*) See **ion burn**.

**burn** (*Space*) Controlled firing of rocket engine for adjusting course and re-entry initiation.

**burnable poison** (*NucEng*) Neutron absorber introduced into a reactor system to reduce initial reactivity but becoming progressively less effective as burn-up proceeds. This helps to counteract the fall in reactivity as the fuel is used up. Boron-10, which is transmuted into helium by neutron capture, has been used in the form of borosilicate glass placed in empty control-rod guides.

**burner firing block** (*Eng*) Unit made from refractory material that fits into a furnace wall at the burner position, having a nozzle-protecting recess at back and a tunnel on the firing side. It is called *quarl* in oil-firing practice.

**burner loading** (*Eng*) Potential heat that can be liberated efficiently from a burner. Expressed in kilowatts or Btu h⁻¹.

**burner turndown factor** (*Eng*) Minimum gas rate at which a burner is capable of stable flame propagation without the flame flashing back to the air-gas mixing point or blowing off from the burner nozzle or head.

**burning** (*Eng*) The heating of an alloy to too high a temperature, causing local fusion or excessive penetration of oxide, and rendering the alloy weak and brittle.

**burning** (*MinExt*) Changing the colour of certain precious stones by exposing them to heat.

**burning-in kiln** (*Glass*) A kiln in which stain or enamel colour painted on glass-ware or sheet-glass is fired to cause it to adhere more or less permanently; usually of muffle type.

**burnishing** (*Print*) The operation of applying a brilliant finish to gilt or coloured edges by means of a burnishing tool, which is applied under great pressure.

**burn mark** (*Eng*) Moulding defect found on polymer surfaces caused by adiabatic compression of gas trapped in mould cavity by advancing melt front.

**burnout** (*Electronics*) Sudden failure of any device, caused by excessive current, leading in turn to overheating; may also be due to failure of artificial cooling in any electronic assembly or sub-assembly.

**burnout mask** (*Print*) See **print-out mask**.

**burnout velocity** (*Space*) The maximum velocity achieved by a rocket when all the propellant has been consumed.

**burnt coal** (*Min*) Sooty product of weathering of a coal outcrop.

**burnt lime** (*Build, Chem*) See **lime**.

**burnt metal** (*Eng*) Metal which has become oxidized by overheating, and so is rendered useless for engineering purposes.

**burn-up** (*NucEng*) (1) In nuclear fuel, amount of fissile material burned up as a percentage of total fissile material originally present. (2) Of fuel element performance, the amount of heat released from a given amount of fuel, expressed as megawatt- or gigawatt-days per tonne.

**burr** (*Bot*) A fruit covered with hooks to aid in dispersal by animals.

**burr** (*Eng*) (1) The rough edge or ridge on a material resulting from various operations like punching and cutting. (2) A rotary tool with cutting teeth like a file.

**burr** (*For*) A knob or knot in a tree which, when sliced, produces strong contrasts in the form and colour of the markings which are prized for their decorative effect in edge veneers. Also *bur, burl*.

**burr mill** (*MinExt*) See **buhr mill**.

**burrs** (*Build*) Lumps of brick, often mis-shapen, which have fused together in burning.

**bursa** (*Med*) A synovial sac located at points of friction in the body.

**bursa** (*Zool*) Any sac-like cavity; particularly, in vertebrates, a sac of connective tissue containing a viscid, lubricating fluid, and interposed at points of friction between skin and bone and between muscle, ligament and bone.

**bursa copulatrix** (*Zool*) A special genital pouch of various animals acting generally as a female copulatory organ.

**bursa inguinalis** (*Zool*) The cavity of the scrotal sac in mammals.

**bursa of Fabricius** (*Immun*) A sac-like structure arising as a diverticulum from the cloaca of young birds, composed of primary follicles containing B lymphocyte precursors. The bursa is the only source of these cells in birds and removal of the bursa at hatching (or by certain viral infections) results in a severe B-cell deficiency.

**bursa omentalis** (*Zool*) In mammals, a sac formed by the **epiploon** or great omentum.

**bursattee, bursati** (*Vet*) *Cutaneous habronemiasis*. A disease of the skin of horses caused by nematode larvae of the genus *Habronema*; characterized by granulomatous nodules in the skin.

**bursicon** (*Zool*) In insects, a hormone produced by neurosecretory cells of the brain and released by neurochaemal organs in the thoracic and abdominal ganglia. It affects many post-ecdysal processes such as cuticular tanning.

**bursiform** (*Bot*) Resembling a bag or pouch.

**bursitis** (*Med*) An inflammation of a bursa.

**burst** (*ImageTech*) See **colour burst**.

**burst** (*NucEng*) A defect, often very small, in fuel cladding or sheathing which allows fission products to escape.

**burst** (*Phys*) Unusually large pulse arising in an ionization chamber caused by a cosmic-ray shower.

**burst** (*Telecomm*) (1) Short period of intense activity on an otherwise quiet data channel. (2) Sudden increase in strength of received radio signals caused by sudden changes in the ionosphere.

**burst binding** (*Print*) Unsewn binding where the spine of the section is 'burst', or slit, at intervals, during the folding or web printing operation to allow adhesive to reach all the pages without trimming off the back. See **notch binding**.

**burst-can detector** (*NucEng*) An instrument for the early detection of ruptures of the sheaths of fuel elements inside a reactor. Also *burst-cartridge detector, leak detector*.

**burst cartridge** (*NucEng*) Fuel element with a small leak, emitting fission products. Also *burst slug*.

**burst-cartridge detector** (*NucEng*) See **burst-can detector**.

**burstiness** (*Telecomm*) A measure used to characterize traffic for planning purposes. It indicates the extent to which a given level of traffic occurs as short periods at a high data rate separated by longer periods at a lower rate.

**bursting** (*Comp*) Separating continuous stationery.

**bursting disk** (*ChemEng*) A protective device for process vessels in which hazardous operations are performed, consisting of a thin disk of noble or corrosion resisting metal, carefully controlled as to thickness, and designed to burst in event of excess internal pressure, giving a large opening for rapid release of the pressure.

**burst slug** (*NucEng*) See **burst cartridge**.

**burst test** (*Paper*) A physical test method to determine the limiting pressure (applied normally to the paper surface) by means of a rubber diaphragm) that a test piece will withstand when fixed horizontally between two clamps, under the prescribed conditions of test. The Mullen burst tester is frequently used for this purpose.

EXHIBIT

*DSS-2015*

Capital Reporting Company
Grimes, Ph.D., Jack Duane 08-27-2015

1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD


```
----------------------------:
APPLE, INC.,                 :  Case No.:
          Petitioner         :
          VS.                :  IPR2015-00373
DSS TECHNOLOGY MANAGEMENT,    :
INC.,                        :  Patent 6,128,290
          Patent Owner       :
----------------------------:
                             :
APPLE, INC.,                 :  Case No.:
          Petitioner         :
          VS.                :  IPR2015-00369
DSS TECHNOLOGY MANAGEMENT,    :
INC.,                        :  Patent 6,128,290
          Patent Owner       :
----------------------------:  Pages 1-81
```

Washington, DC

Thursday, August 27, 2015

Deposition of:

JACK DUANE GRIMES, PH.D.,

called for oral examination by counsel for Patent

Owner, pursuant to notice, Sterne, Kessler, Goldstein

& Fox, 1100 New York Avenue, NW, Washington, DC,

before Sherry L. Brooks, CLR, of Capital Reporting

Company, a Notary Public in and for the District of

Columbia, beginning at 9:00 a.m., when were present

on behalf of the respective parties:

Capital Reporting Company
Grimes, Ph.D., Jack Duane 08-27-2015

2

```
 1           A P P E A R A N C E S

 2  On behalf of the Witness:

 3       DAVID K.S. CORNWELL, ESQUIRE
         JASON A. FITZSIMMONS, ESQUIRE
 4       MARK W. RYGIEL, ESQUIRE
         STERNE, KESSLER, GOLDSTEIN & FOX
 5       1100 New York Avenue, NW
         Washington, DC  20005
 6       (202) 772-8580
         (202) 772-8701
 7       (202) 772-8510
         (202) 371-2540 (Fax)
 8       E-mail:  Davidc@skgf.com
         E-mail:  Jfitzsimmons@skgf.com
 9       E-mail:  Mrygiel@skgf.com

10

11  On behalf of the Petitioner:

12       DAVID L. ALBERTI, ESQUIRE
         FEINBERG DAY ALBERTI & THOMPSON, LLP
13       1600 El Camino Real, Suite 280
         Menlo Park, CA  94025
14       (650) 618-4361
         E-mail:  Dalberti@feinday.com
15

16

17

18

19

20

21

22
```

Capital Reporting Company
Grimes, Ph.D., Jack Duane 08-27-2015

```
                                                              3
 1  APPEARANCES CONTINUED:


 2


 3  On behalf of the Patent Owner:

 4       ANDRIY LYTVYN, ESQUIRE
         ANTON J. HOPEN, ESQUIRE
 5       NICHOLAS R. PFEIFER, ESQUIRE
         SMITH & HOPEN
 6       180 Pine Avenue North
         Oldsmar, FL  34677
 7       (800) 807-3531
         (813) 925-8525 (Fax)
 8       E-mail:  Andriy.lytvyn@smithhopen.com
         E-mail:  Anton.hopen@smithhopen.com
 9       E-mail:  Nicholas.pfeifer@smithhopen.com

10            and

11       MARK PERANTIE, ESQUIRE
         BUETHER, JOE & CARPENTER, LLC
12       1700 Pacific Avenue, Suite 4750
         Dallas, TX  75201
13       (214) 466-1279
         (214) 635-1830 (Fax)
14       E-mail:  Mark.perantie@bjciplaw.com

15

16

17

18

19

20

21

22
```

Capital Reporting Company
Grimes, Ph.D., Jack Duane 08-27-2015

4

1                    C O N T E N T S

2   EXAMINATION BY:                              PAGE

3         Counsel for Patent Owner                5

4         Counsel for the Witness                73

5

6

7   GRIMES DEPOSITION EXHIBITS:                  PAGE

8   1001       U.S. Patent 6,128,290 Carvey       15

9   1003       U.S. Patent 5,241,542 Natarajan, et al. 47

10  1008       Declaration of Jack D. Grimes, Ph.D.   17

11

12

13

14          (Exhibits attached to transcript.)

15

16

17

18

19

20

21

22

Capital Reporting Company
Grimes, Ph.D., Jack Duane 08-27-2015

34

1  approach.

2         In fact, there's a Figure 6 in the

3  specification that shows how these bursts occur and

4  gives you kind of a spatial image of the -- of these

5  bursts.

6         And you can see from looking at the

7  picture that most of the time nothing is being

8  transmitted, nothing is being received.

9         So then that tells you that when you are

10 transmitting, the receiver has to know when the

11 transmission occurs.  And so that is done with a code

12 sequence, and the code sequence is based on a TDMA

13 structure.

14        BY MR. LYTVYN:

15    Q.    Could you talk a little bit about TDMA

16 structure?  What is your understanding?

17        MR. CORNWELL:  Objection.  Form.

18    A.    TDMA is something that's well-understood

19 in the industry.  And it refers to a particular

20 mechanism for being able to communicate -- the best

21 example would be in the cellular industry where you

22 have a transmitter and all kinds of cell phones.

Capital Reporting Company
Grimes, Ph.D., Jack Duane 08-27-2015

35

1           And you have to be able to communicate

2    from the cell station to all of the handsets and be

3    able to separate the information from one handset

4    from another handset.

5           So TDMA is -- the way it does that is it

6    uses a time division multiple access.  Multiple

7    access simply means that it's multiple cell phones,

8    to use that example.

9           And the time division means that there are

10   slots assigned to each one of the cell phones where

11   that cell phone can transmit and receive information

12   back to the cell tower.

13          So the time division refers to the

14   allocation of the slots of time to, in the case of

15   the patent, a peripheral device.  And that's

16   illustrated in Figure 6.

17          BY MR. LYTVYN:

18   Q.    And in 1997, a person of ordinary skill in

19   the art would understand what TDMA means?

20          MR. CORNWELL:  Objection.  Form.

21   A.    I would say yes, certainly, if they're at

22   all familiar with the RF communications in the

36

1    cellular system.   The cellular industry was using

2    TDMA at the time.   That would be the best example.

3            BY MR. LYTVYN:

4       Q.    And would a person of ordinary skill in

5    the art be familiar with those systems?

6            MR. CORNWELL:  Objection.  Foundation.

7    And objection.  Form.

8       A.    I don't necessarily know they'd be

9    familiar with those systems, but they would be

10   familiar with TDMA because it was -- it was a

11   well-understood protocol.

12           BY MR. LYTVYN:

13      Q.    And would they be familiar with code

14   sequence as used in the TDMA schemes?

15           MR. CORNWELL:  Objection.  Form.

16      A.    I would say yes.

17           BY MR. LYTVYN:

18      Q.    So code sequences are something that would

19   be understood by a person of ordinary skill in the

20   art in 1997 --

21           MR. CORNWELL:  Objection.  Form.

22   Objection.  Foundation.

46

1  on RF bursts.

2            BY MR. LYTVYN:

3      Q.    So how did you interpret the claim without

4  imposing a limit on the limitation that implies the

5  duration?

6            MR. CORNWELL:  Objection.  Foundation.

7      A.    That utilizes the low-duty cycle aspect of

8  the claim limitation.  In other words, it doesn't

9  really matter how long the RF burst is.  It just

10  simply has to be long enough to convey whatever data

11  is required.

12           But the key thing is that the burst is

13  small -- the time it takes is small relative to the

14  overall time that the transmitter could have been

15  transmitting.

16           So that's -- the low-duty cycle aspect

17  turns out to be important.  So it just -- the RF

18  burst is simply small relative to the rest of the

19  time.

20           But the actual percentage, if you will, of

21  time spent during the RF burst is not important to

22  the patent and it's not important to the claim, as I

Capital Reporting Company
Grimes, Ph.D., Jack Duane 08-27-2015

47

1  understand it.

2          BY MR. LYTVYN:

3      Q.    Okay.  Thank you.

4      A.    The key is -- the low-duty cycle is

5  actually very important because that's where the

6  power savings comes from.

7          So the low-duty cycle is the key thing

8  really, not the length of the RF burst.

9          MR. LYTVYN:  Okay.  I think we've been

10  going for about an hour.  Let's take a ten-minute

11  break.

12          MR. CORNWELL:  That's fine.

13          (A break was taken.)

14          BY MR. LYTVYN:

15     Q.    Let's take a look at the Natarajan

16  reference.  It's U.S. Patent Number 6,128 -- sorry.

17  It's 5,241,542.  And this is Exhibit Apple 1003.

18          MR. CORNWELL:  Are you going to make that

19  an exhibit?

20          MR. LYTVYN:  Sure.  Yes.

21          (Grimes Exhibit Number 1003 was

22            marked for identification.)

Capital Reporting Company
Grimes, Ph.D., Jack Duane 08-27-2015

59

1          BY MR. LYTVYN:

2      Q.    Thank you.  Does Natarajan, in your

3  opinion, disclose any specifics about operation of

4  the base unit?

5          MR. CORNWELL:  Objection.  Form.

6      A.    Yes, it does.

7          BY MR. LYTVYN:

8      Q.    Could you point them out, please, and

9  explain?  Stated earlier the Figures 8A through

10  Figure 8D outlined the flow of the logic for

11  operation of peripheral or mobile units.

12          Does Natarajan explain how the base unit

13  operates?

14          MR. CORNWELL:  Objection.  Form.

15      A.    I think that Natarajan actually spends

16  much more of the detailed information on the

17  peripheral units in terms of their power saving.

18          But you have to remember that this is a

19  symmetric system.  In other words, the peripheral

20  units just don't receive information from anywhere.

21  It comes from the master unit or the server.

22          Therefore, the -- when the server is

60

1  transmitting information, Figures 4 and 5, as well as

2  Figure 8, describe what happens on the peripheral

3  side.

4          But by implication, it also has to also

5  refer to what happens on the server side since that's

6  where the information comes from.

7          That's important because when the receiver

8  -- the peripheral units are receiving information,

9  obviously, that's being sent by the server.

10         Now, when the peripheral units are

11  transmitting information during this Section B

12  following the header BH, as illustrated in Figure 4,

13  that's the mobile-to-base transmission.

14         During that situation, the transmitter in

15  the base unit has to be powered down.  So there's a

16  conservation of power in terms of the base station

17  transmitter, which is analogous to the conservation

18  of power in the peripheral unit transmitter.

19         In other words, when the units are

20  receiving information, their respective transmitters

21  can't be operating.  If they were, they would not be

22  able to receive information.

# EXHIBIT

*DSS-2016*

UNITED STATES PATENT AND TRADEMARK OFFICE
———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————

APPLE, INC.,
Petitioners,

v.

DSS TECHNOLOGY MANAGEMENT, INC.,
Patent Owner.

———————

Case: IPR2015-00369
IPR2015-00373
U.S. Patent No. 6,128,290

———————

**DECLARATION OF ROBERT DEZMELYK**

TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     QUALIFICATIONS .................................................................................... 1

III.    INDEPENDENT EXPERT .......................................................................... 3

IV.     MATERIALS CONSIDERED ..................................................................... 3

V.      APPLICABLE STANDARDS ..................................................................... 3

VI.     THE CLAIMED INVENTION..................................................................... 5

VII.    CLAIM CONSTRUCTION......................................................................... 7

VIII.   DIFFERENCES BETWEEN THE '290 PATENT AND THE PRIOR ART ................... 9

        A.  Natarajan in view of Neve does NOT Teach a Server Transmitter Energized in Low
        Duty Cycle RF Bursts ....................................................................... 11

IX.     CONCLUSION.......................................................................................... 19

DECLARATION OF CHRIS A. MACK, PH.D.

## VI.    THE CLAIMED INVENTION

16.    The '290 Patent discloses and claims a data network system utilizing "low duty cycle pulsed radio frequency energy to effect bidirectional wireless data communications between a server microcomputer unit and a plurality of peripheral units." *See* APL-1001 at Abstract.

17.    The '290 Patent discloses and claims a wireless data network system, wherein the transmitters in both the server and peripheral units are energized in low duty cycle RF bursts. *See id*. at claim 1. Because the server and peripheral units are energized in low duty cycle RF bursts, the system significantly reduces power dissipation for both the server and the peripheral units. In addition, the likelihood of interference from nearby wireless ensembles is significantly reduced because the server transmits only during scheduled communications with a peripheral unit and remains powered down during the remaining time slots. *See id*. at 1:59-61.

18.    "The principle behind a low duty cycle system is very simple: by restricting the duration and rate of repetition of any one user's transmissions it becomes statistically unlikely that they will coincide (collide) with those of other, similarly limited systems. In practice, the actual restriction is specified as a 'duty cycle', usually between 0.1% and 10%, depending on the band and the intended usage." DSS-2003 at pg. 1.

19.    A data network system operating in a high duty cycle or in a continuous duty cycle is more susceptible to transmission interferences/collisions from nearby systems. For example, two server-PEA ensembles, in which the server transmitters are transmitting a

Page 5 of 19

_____

continuous data stream during timeslots designated for outbound data traffic, such as the system in Natarajan, operating within close proximity to one another, will likely suffer from transmission interferences because at any time during periods A-C, a server or PEA in one system will likely be transmitting a signal at the same time as a server or PEA in another system. Furthermore, a server transmitting for an extended period of time is likely to "talk over" a primary server-PEA system causing significant errors in the operation of the primary system. The longer a nearby system is transmitting, the higher the likelihood that the primary system will encounter transmission interferences.

20.    The invention claimed in the '290 Patent addressed this problem by using a protocol, according to which both the server and PEA transmitters operate in low duty cycle RF bursts. *See* APL-1001 at 3:15-19 ("The present invention allows the creation of a data network linking such an ensemble [a server unit with a collection of PEAs] with minimal likelihood of interference from similar ensembles located nearby").

21.    The '290 Patent uses a common time base and code sequences to control the operation and synchronization of the server and PEAs. *See id*. at 1:57-59. The code sequence determines the intervals during which the server and PEAs are operational in the low duty cycle RF bursts; and the code sequence is timed in relation to the synchronization information initially transmitted by the server. *See id*. at 2:35-39. The "low duty cycle RF bursts" limitation requires that the transmitters and receivers of both the server and PEAs be powered down during time slots when there is no data transmission scheduled. *See id*. at 4:6-8.

Page 6 of 19

Patent No. 6,128,290
IPR2015-00369
IPR2015-00373

22.    Claims 1, 6, and 9 explicitly require that the server transmitter be energized in low duty cycle RF bursts.

### VII.    CLAIM CONSTRUCTION

23.    "Duty cycle" is a term of art in wireless communication technologies. Under broadest reasonable interpretation, a POSITA would have understood the "duty cycle" of the server transmitter to mean "the ratio of the duration during which the server transmitter is energized to the total duration designated for outbound transmissions—from the server unit to the peripheral units." In considering the duty cycle ratio of the server transmitter, the period designated for inbound transmissions—from a peripheral unit to the server, is excluded because the server is receiving information during that time period, and therefore, not transmitting.

24.    A POSITA would have understood that the limitation "server and peripheral transmitters being energized in low duty cycle RF bursts" to impose a requirement that a server transmitter be powered ON for a total duration that equates to no more than ten percent (10%) of the total duration designated for outbound transmissions. For example, in the embodiment involving Optically Orthogonal Codes, the '290 patent discloses that "a maximum of three RF bursts can occur in each section," wherein each section comprises sixty-four (64) slots. This scheme results in the server transmitter being powered on for 4.688% of the transmission period, which falls within the low-duty cycle range. *See* APL-1001 at 7:22-32. Another example disclosed in the '290 Patent, involves transmission of synchronization beacons (SBs): "[e]ach SB consists of eight RF bursts spread out over 252 slots." Accordingly, during the

Page 7 of 19

1

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE PATENT TRIAL AND APPEAL BOARD

```
------------------------------:
APPLE, INC.,                  :
                              :
          Petitioner,         :
                              :
      vs.                     :  Case IPR2015-00369
                              :  Patent 6,128,290
DSS TECHNOLOGY MANAGEMENT,    :
INC.,                         :
                              :
          Patent Owner.       :
------------------------------:
```

Washington, D.C.

Wednesday, February 17, 2016

Deposition of:

JING HU, PH.D.

called for oral examination by counsel for

Patent Owner, pursuant to notice, at Sterne

Kessler Goldstein Fox, 1100 New York Avenue,

Northwest, Washington, D.C., before Shari R.

Broussard, RPR, CSR, of Capital Reporting Company,

a Notary Public in and for the District of

Columbia, beginning at 10:02 a.m., when were

present on behalf of the respective parties:

Capital Reporting Company
Hu, Jing  02-17-2016

```
 1              A P P E A R A N C E S

 2  On behalf of Petitioner:

 3       DAVID K.S. CORNWELL, ESQUIRE
         JASON A. FITZSIMMONS, ESQUIRE
 4       MARK W. RYGIEL, ESQUIRE
         Sterne Kessler Goldstein Fox
 5       1100 New York Avenue, Northwest
         Washington, D.C. 20005
 6       (202) 371-2600
         davidc@skgf.com
 7       jfitzsimmons@skgf.com
         mrygiel@skgf.com
 8            - and -
         DAVID ALBERTI, ESQUIRE
 9       Feinberg Day Alberti & Thompson, L.L.P.
         1600 El Camino Real, Suite 280
10       Menlo Park, California 94025
         (650) 384-9869
11       dalberti@feinday.com

12


13


14  On behalf of Patent Owner:

15       ANDRIY LYTVYN, ESQUIRE
         ANTON HOPEN, ESQUIRE
16       NICHOLAS PFEIFER, ESQUIRE
         Smith & Hopen
17       180 Pine Avenue North
         Oldsmar, Florida 34677
18       (800) 807-3531
         andriy.lytvyn@smithhopen.com
19            - and -
         MARK PERANTIE, ESQUIRE
20       Buether Joe & Carpenter, L.L.C.
         1700 Pacific Avenue, Suite 4750
21       Dallas, Texas 75201
         (214) 466-1279
22       mark.perantie@bjciplaw.com
```

Capital Reporting Company
Hu, Jing  02-17-2016

3

1                    C O N T E N T S

2  EXAMINATION BY:                          PAGE

3     Counsel for Patent Owner              4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18  (*No Exhibits were marked.)

19

20

21

22

23

1  the art at the time frame of 1996 and 1997, while

2  reading the Natarajan reference, would understand

3  that the base station is a conventional

4  microcomputer and also it is the inventor's

5  intention to obtain true portability in

6  microcomputers and workstations, and

7  battery-powered operation is essential for those

8  conventional microcomputers.

9  BY MR. LYTVYN:

10     Q    So it is your opinion that conventional

11  microcomputer is battery operated?

12     A    It is my opinion that a person of

13  ordinary skill in the art at the time frame of '96

14  and '97, reading the Natarajan reference, will

15  consider the base station, described as a

16  conventional microcomputer, can be battery powered

17  and a portable -- true portability is a goal

18  for -- in the design of such conventional

19  microcomputers.

20     Q    In your opinion, what's the reason why

21  Natarajan uses different nomenclature to

22  distinguish between the base stations and the

Capital Reporting Company
Hu, Jing  02-17-2016

76

1     Q    When you were considering the Natarajan

2   reference, did you consider the possibility that

3   the system disclosed therein operates under a

4   protocol using idle words?

5     A    When I reviewed the reference Natarajan,

6   I myself, and I mentioned a person of ordinary

7   skill in the art at the time frame of '96 and '97,

8   would understand that the headers A subframe-- for

9   subframe A, subframe B and subframe C, as well as

10   the overall header for the entire cycle act not

11   only as allocating of the time slots but

12   effectively will maintain or be part of the

13   mechanism that help the devices in the network to

14   maintain synchronization.  So there is no need to

15   transmit idle words in the preferred embodiment of

16   Natarajan.

17     Q    Yet, is it possible that Natarajan would

18   employ idle words?

19          MR. CORNWELL:  Objection, form.

20          THE WITNESS:  Natarajan discloses a

21   carefully designed TDMA scheme so that the

22   transmitter and receiver of both the base station

Capital Reporting Company
Hu, Jing  02-17-2016

77

1  and the peripheral devices can operate under

2  low-duty cycle and there is no -- there is no need

3  for sending idle words to maintain

4  synchronization.

5  BY MR. LYTVYN:

6      Q    Would transmitting idle words in the

7  system in Natarajan provide any benefit?

8      A    A person of ordinary skill in the art at

9  the time frame of '96 and '97 reading Natarajan

10 would understand that the synchronization is

11 maintained by the headers that are sent by the

12 base station periodically and received by all of

13 the mobile units and, hence, the synchronization

14 is maintained.

15         When the person of ordinary skill in the

16 art wants to find explicit ways of

17 synchronization, he or she would naturally arrive

18 at the other reference, Neve, and he or she would

19 understand that idle words are transmitted

20 sporadically when there is no data communication

21 in that time slot and it's only transmitted in the

22 synchronization slot of that time frame.  But this

128

1 slot defined by the one bit of the code value?

2          MR. CORNWELL:  Objection, form.

3 Objection, foundation.

4          THE WITNESS:  Are we talking strictly

5 the '290 patent?

6 BY MR. LYTVYN:

7      Q    Yes.

8          In the context of Claim 1 of the '290

9 patent, would you agree that transceiver elements

10 are energized for a small fraction of any

11 particular time slot?

12          MR. CORNWELL:  Objection, form.

13 Objection, foundation.

14          THE WITNESS:  I would characterize that

15 as the transceiver being the transmitters and the

16 receivers being energized in low-duty cycle RF

17 bursts at intervals determined by code sequence

18 which is timed in relation to said synchronizing

19 information exactly as how the claim describes.

20 BY MR. LYTVYN:

21      Q    With respect to the time slot, is a

22 server transmitter energized for the entire

129

1  duration of the time slot?

2          MR. CORNWELL:  Objection, form.

3          THE WITNESS:  A person of ordinary skill

4  in the art reading, at the time frame of '96 to

5  '97, reading the '290 patent would understand that

6  a time frame is divided in two different time

7  slots.  Some time slots are used for transmission

8  and other time slots -- during other time slots

9  there is no transmission goes on for those time

10  slots.

11  BY MR. LYTVYN:

12      Q    When there is a transmission, is the

13  transmitter energized the duration of the time

14  slot?

15      A    When it is -- when it is transmitted,

16  the transmitter and receiver will stay on for the

17  duration of the transmission in that time slot.

18      Q    Is that a fraction of a time slot or the

19  entire time slot?

20          MR. CORNWELL:  Objection, form.

21          THE WITNESS:  The transceiver will stay

22  on for that time slot.

Capital Reporting Company
Hu, Jing  02-17-2016

144

1  you have some context for Figure 6.

2      A    Sure.

3      Q    So now referring back to Figure 6, in

4  this embodiment on Natarajan in -- during

5  transmission period A, are there any empty slots

6  during which transmission does not appear?

7      A    Can you repeat your question?

8      Q    Sure.

9          Referring to Figure 6 on Natarajan,

10 during time period A, are there any empty slots

11 during which transmission does not occur?

12         MR. CORNWELL:  Objection, form.

13         THE WITNESS:  In this particular example

14 of an example embodiment in Natarajan at this

15 particular instance in time there is no slot left

16 after they are -- in period A, subframe A, after

17 they are allocated to the four receivers.

18 BY MR. LYTVYN:

19     Q    So in this embodiment, is the

20 transmitter of the base unit energized for the

21 entire duration of time period A?

22     A    In this particular example at this

Capital Reporting Company
Hu, Jing  02-17-2016

145

1 particular instance of time, the transmitter of

2 the base station is on for the subframe A.

3     Q    Doesn't Natarajan disclose any other

4 exemplary embodiment?

5         MR. CORNWELL:  I'm going to object on

6 the form.

7         THE WITNESS:  In column four of

8 Natarajan, the inventor specifically explained

9 that it is to be appreciated that different frame

10 divisions and header lens and content may be

11 utilized in the practice of the invention, and the

12 scheme set forth here is merely exemplary.

13         So the inventors of Natarajan are very

14 specific about this particular example being

15 exemplary in terms of how the subframe A, B and C

16 are divided within the whole cycle.

17         And the particular figure that we are

18 looking at is a particular instance in time, as

19 Natarajan is also specific about most of the

20 mobile units being inactive most of the time.

21 When we calculate the duty cycle, we should

22 calculate based on the entirety of the operation,

Capital Reporting Company
Hu, Jing  02-17-2016

149

1  the low-duty cycle operation.  The timer and the

2  oscillator in the base station transceiver will

3  stay on during the cycle.

4  BY MR. LYTVYN:

5      Q    Okay.  Thank you.

6      A    You're welcome.

7      Q    Would a person of ordinary skill in the

8  art alter the length of the frames depending on

9  the number of mobile units?

10         MR. CORNWELL:  Objection, form.

11  Objection, foundation.  Objection, relevance.

12         THE WITNESS:  A person of ordinary skill

13  in the art reading the Natarajan patent will

14  understand, as the inventors clearly state, that

15  the different frame divisions and header lens and

16  content may be utilized in the practice of

17  invention.

18         So the person of ordinary skill in the

19  art at the time frame of '96 and '97 would

20  understand the division of subframes within the

21  communication cycle could be a design trade-off

22  between simplicity and adaptability.

Capital Reporting Company
Hu, Jing  02-17-2016

150

1          This person of ordinary skill can design

2    a system to dynamically adjust the subframe lens

3    according to communication needs, or this person

4    of ordinary skill can choose this based on the

5    application to design for, to have a static

6    configuration of the lens of the subframes so that

7    the transceiver circuits, as well as the rest of

8    the system on the device, have a good expectation

9    of when the transceivers -- the transmitter and

10   receiver potentially is used during different time

11   of the cycle.

12   BY MR. LYTVYN:

13      Q    Okay.  And one more question pertaining

14   to Figure 6.

15          You stated the transceiver, whether the

16   transmitter portion or the receiver portion, is --

17   the transceiver itself is active for the duration

18   of the cycle.

19          Then how is battery power conserved in

20   the system of Natarajan if the transceiver is

21   energized during the entire cycle?

22          MR. CORNWELL:  Objection, form.

2016 WL 4729510
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. Fed. Cir. Rule 32.1.
United States Court of Appeals,
Federal Circuit.

LaRay J. Benton, Petitioner

v.

Merit Systems Protection Board, Respondent
Nuclear Regulatory Commission, Intervenor

2015–3004
|
Decided: September 12, 2016

Petition for review of the Merit Systems Protection Board
in No. DC–1221–13–0508–W–1.

### Attorneys and Law Firms

LARAY J. BENTON, Mitchellville, MD, pro se.

KATHERINE MICHELLE SMITH, Office of the
General Counsel, Merit Systems Protection Board,
Washington, DC, for respondent. Also represented by
BRYAN G. POLISUK.

JESSICA COLE, Commercial Litigation Branch,
Civil Division, United States Department of Justice,
Washington, DC, for intervenor. Also represented by
BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN,
JR., PATRICIA M. MCCARTHY.

Before Newman, Reyna, and Stoll, Circuit Judges.

### Opinion

Per Curiam.

**\*1** Mr. LaRay J. Benton appeals the judgment of the
Merit Systems Protection Board, dismissing his Individual
Right of Action (IRA) appeal.[1] The Board now states,
in its Respondent's brief on this appeal, that "the
administrative judge and the full Board erred in analyzing
Mr. Benton's 11 alleged personnel actions as protected

disclosures." MSPB Br. 11. The Board also states that
it erred in holding that Mr. Benton had not exhausted
his administrative remedies as to disclosures 4 and 10 of
the eleven actions. The Board nonetheless argues that this
court on appeal should decide the issues of actions 4 and
10; the Board states that we should decide in favor of the
position as argued in the Board's Respondent's brief on
this appeal, without opportunity for Mr. Benton to be
heard by the Board on this new analysis.

The Board's proposal is inappropriate not only as a matter
of due process, but also because a court generally may
review an agency's decision only on the grounds "upon
which the record discloses that its action was based."
*Securities & Exchange Comm'n v. Chenery Corp.*, 318 U.S.
80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *see Ward v.
Merit Sys. Prot. Bd.*, 981 F.2d 521, 527–28 (Fed. Cir.
1992) (*Chenery* doctrine prohibits affirming the Board on
"a wholly different theory" or "entirely different ground
from the one it gave in its opinion").

We salute the Board's action in correcting its errors.
However, with the concession that for disclosures 4 and
10 Mr. Benton had exhausted the OSC administrative
remedy, the Board's judgment on this Individual Right
of Action appeal is no longer final. 28 U.S.C. § 1295(a)
(9) (2006) (conferring jurisdiction over "an appeal from
a final order or final decision of the Merit Systems
Protection Board, pursuant to sections 7703(b)(1) and
7703(d) of title 5"); *see, e.g. Rockwell v. Dep't of Transp.,
F.A.A.*, 789 F.2d 908, 913 (Fed. Cir. 1986) ("Congress
expressly limited our appellate review, 5 U.S.C. § 7703(c),
to final orders and decisions of the board on the record.");
*Johnson v. U.S.P.S.*, 527 Fed.Appx. 868, 871 (Fed. Cir.
2013) (remanding when agency conceded that controlling
standard was not considered by the Board).

As the Board's order is no longer final, we dismiss this
appeal for lack of jurisdiction. The case is remanded to the
Board for further proceedings.

### DISMISSED AND REMANDED

### COSTS

Costs to Mr. Benton.

Appx2555

2016 WL 4729510

**All Citations**

--- Fed.Appx. ----, 2016 WL 4729510 (Mem)

Footnotes

1    *Benton v. Nuclear Regulatory Com'n*, DC–1221–13–0508–W–1, 2014 WL 5358394 (M.S.P.B. July 29, 2014) (Final Decision).

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

636 Fed.Appx. 575
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. Fed. Cir. Rule 32.1.
United States Court of Appeals,
Federal Circuit.

CUTSFORTH, INC., Appellant,

v.

MOTIVEPOWER, INC., Appellee.

No. 2015–1316.
|
Jan. 22, 2016.

**Synopsis**
**Background:** Challenger filed petition for inter partes
review of patent directed to a removable brush holder
that could be used to pass electrical current in electrical
devices or slip ring assemblies. The United States
Patent and Trademark Office, Patent Trial and Appeal
Board (PTAB), 2014 WL 5661374, found patent was
unpatentable as obvious over combination of prior art.
Patent owner appealed.

**Holding:** The Court of Appeals, Clevenger, Circuit Judge,
held that PTAB was required to articulate reasoning for
decision that patent was obvious over combination of
prior art.

Vacated and remanded.

**\*575** Appeal from the United States Patent and
Trademark Office, Patent Trial and Appeal Board in No.
IPR2013–00274.

**Attorneys and Law Firms**

Mathias Wetzstein Samuel, Fish & Richardson P.C.,
Minneapolis, MN, argued for appellant. Also represented
by Robert P. Courtney, Conrad Gosen.

Jason Alexander Engel, K & L Gates LLP, Chicago,
IL, argued for appellee. Also represented by Benjamin
Edward Weed, Alan L. Barry, Robert J. Barz.

Before PROST, Chief Judge, CLEVENGER, and
MOORE, Circuit Judges.

**Opinion**

CLEVENGER, Circuit Judge.

This appeal arises from the *inter partes* review ("IPR") of
U.S. Patent No. 7,990,018 ("the #018 patent") owned by
Cutsforth, Inc. ("Cutsforth"). The United States Patent
and Trademark Office, Patent Trial and Appeal Board
("the Board") held that claims 1–24 of the #018 patent are
unpatentable as obvious under 35 U.S.C. § 103. *Motive-
Power, Inc. v. Cutsforth, Inc.*, IPR2013–00274, Paper No.
31 (PTAB Oct. 30, 2014). Cutsforth appeals the Board's
decision. Because the Board did not adequately describe
its reasoning for finding the claims obvious, we vacate and
remand for further proceedings.

I

The #018 patent is directed to a removable brush holder
that can be used to pass electrical current in electrical
devices or slip ring assemblies, such as electric generators
and motors. The patent generally describes a brush holder
assembly that allows a current to pass from a stationary
device (such as a brush) to a moving contact, or vice versa.
The brush is made of a **\*576** conductive material and is
held in place by a brush holder to remain in continuous
contact with a moving conductive surface to generate an
electrical current. The invention makes it easier to remove
and replace brushes during operation as the brushes wear
down, which allows for safer and more cost effective
maintenance.

Independent claim 1 is representative of the claimed
invention and reads as follows:

1. A brush holder assembly for holding a brush having
   a conductive element, the brush holder assembly
   comprising:

   an elongated mounting block having a major axis, an
   upper end and a lower end, and a first and second outer
   side surfaces substantially parallel to said major axis,

and including a stationary brush release proximate said lower end; and

a brush holder component adapted for removably mounting to the mounting block, the brush holder component comprising a brush box and a channel for receiving a portion of the mounting block therein, the channel including first and second inner side surfaces;

the brush holder component further comprising a brush catch having a first position and a second position, the brush catch preventing sliding movement of a brush within the brush box in the first position, and the brush catch permitting sliding movement of a brush within the brush box in the second position;

wherein the stationary brush release is positioned on the mounting block so that when the brush holder component is mounted on the mounting block, the stationary brush release engages with the brush catch, moving the brush catch into the second position.

U.S. Patent No. 7,990,018 col. 17 l. 64–col. 18 l. 20 (filed Sept. 21, 2010).

On May 8, 2013, MotivePower, Inc. ("MotivePower") petitioned for IPR, challenging all claims of the #018 patent.[1] The Board instituted review of all claims (1–24) based on the ground that all asserted claims would have been obvious in light of U.S. Patent No. 3,432,708 ("Bissett"), U.S. Patent No. 5,043,619 ("Kartman"), and U.S. Patent No. 3,864,803 ("Ohmstedt"). The Board issued its Final Written Decision on October 30, 2014. The Board first construed "mounting block" to mean "a base for affixing to another structure," and "removably mounting" to mean "mounting in a manner that is not permanent." In light of these constructions, the Board determined that all claims were obvious over Bissett, Kartman, and Ohmstedt, which also disclose various brush holder assemblies.

Cutsforth timely appealed the Board's decision to this Court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A). In addition to its challenge to the Board's obviousness conclusions, Cutsforth also challenges the Board's interpretation of the "mounting block" limitation. As noted, the Board concluded that "mounting block" means "a base for affixing to another structure," and need not be fixed to another structure, as Cutsforth argues. We see no error in the Board's interpretation of

"mounting block," and thus reject Cutsforth's argument, as we also did in Appeal No. 2015–1315, *Cutsforth, Inc. v. Motivepower, Inc.,* 626 Fed.Appx. 1011 (Fed.Cir.2015).

**\*577  II**

Under 35 U.S.C. § 103, an invention is unpatentable if the differences between the invention and the prior art are such that a person of ordinary skill in the art would have found the claimed invention obvious. The Board's ultimate determination of obviousness is a legal question, which we review de novo. *In re Kotzab,* 217 F.3d 1365, 1369 (Fed.Cir.2000). However, we review the underlying factual findings for substantial evidence. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside,* 203 F.3d 1305, 1312 (Fed.Cir.2000) (citation omitted).

The issue in this case is whether the Board correctly determined that the # 018 patent is obvious over Bissett, Ohmstedt, and Kartman. While we review this question de novo, we first consider the findings made by the Board to reach its conclusion.

First, regarding independent claim 1, the Board's analysis begins by summarizing MotivePower's arguments for why claim 1 is obvious over Bissett, Ohmstedt, and Kartman. The Board briefly describes MotivePower's belief that Bissett discloses several limitations of claim 1 and that it would have been obvious to adapt the brush holder of Bissett and combine it with key elements of Ohmstedt to produce the remaining limitations from claim 1. The Board also includes MotivePower's argument that it would be obvious to adapt the mounting block of Bissett (i.e., dovetails 18) with the mounting block of Kartman (i.e., detachable connecting means 42). This adaptation is referred to as the Bissett/Kartman mounting block. However, the Board stated no independent reasons for why claim 1 is obvious nor did it formally adopt MotivePower's arguments as its own reasoning.

Second, the Board found that dependent claim 5 is obvious in light of the prior art. Claim 5 reads "The brushholder holder assembly of claim 1, wherein the mounting block includes a spring that applies spring force against at least a portion of the brush holder component when the brush holder component is mounted

to the mounting block." The Board recites MotivePower's argument that the adapted Bissett/Kartman mounting block does include a spring (i.e., spring lead receptacle 32 of Bissett). The Board then determined "that positioning spring lead receptacle 32 on the Bissett/ Kartman mounting block is a matter of design choice because its placement there would not alter the operation of the modified mounting block."

Third, the Board found that dependent claim 8 is obvious. Claim 8 reads "The brush holder assembly of claim 1, wherein the mounting block includes a portion that is moveable relative to the remainder of the mounting block and operable to engage with the removable brush holder component to secure the removable brush holder component to the mounting block." The Board again recited MotivePower's argument that one of ordinary skill in the art would know to move crosspiece 40 of Bissett to the mounting block, thereby incorporating a moveable portion on the mounting block. However, the Board gave no other reason for why this modification is obvious.

As we held in *In re Sang–Su Lee,* 277 F.3d 1338 (Fed.Cir.2002), the Board must articulate its reasoning for making its decision. The Board must develop and explain the basis for its findings. This enables the reviewing court to conduct meaningful review of the proceedings. Broad, conclusory statements are not enough to satisfy the Board's obligation to provide reasoned explanation for its decision. *In re Sang–Su Lee,* 277 F.3d at 1343–45. In a case of **\*578** obviousness, the Board must explain why a person of ordinary skill in the art would modify the prior art references to create the claimed invention. *See In re Kotzab,* 217 F.3d at 1371; *In re Rouffet,* 149 F.3d 1350, 1359 (Fed.Cir.1998).

In this case, the Board made broad, conclusory statements in its analysis to determine that the claims of the #018 patent are obvious. The majority of the Board's Final Written Decision is spent summarizing the parties' arguments and offers only conclusory analysis of its own. While the decision does specify when it is rejecting a party's argument, the Board does not explain why it accepts the remaining arguments as its own analysis. This leaves little explanation for why the Board found the claimed invention obvious.

The first basis for the Board's obviousness conclusion is that it would have been obvious to modify elements

from the Bissett and Kartman references to get the Bissett/Kartman mounting block. The Board's decision appears to assume this combination is obvious. It offers no explanation for why a person of ordinary skill in the art would adjust Bissett and Kartman to create the claimed mounting block of the #018 patent. The Board only states that MotivePower argued it was obvious to do so. Merely reciting MotivePower's argument does not satisfy the Board's responsibility to explain its own reasoning. The decision must explain why a person of ordinary skill in the art would find it obvious. The Board gives no such explanation.

For claim 5, which requires that the mounting block include a spring, the Board explains that the placement of the spring on the mounting block is simply a design choice. In Bissett, lead receptacle 32 is located on a stationary brush frame, not the mounting block. Yet, the Board determined that lead receptacle 32 could be positioned on the modified Bissett/Kartman mounting block and the elements would function as disclosed in the #018 patent. Thus, the Board found that the location of the spring is a design choice and is obvious. This statement alone is not enough to explain why the Board found claim 5 obvious. Merely stating that a particular placement of an element is a design choice does not make it obvious. The Board must offer a reason for why a person of ordinary skill in the art would have made the specific design choice to locate the spring on the mounting block. Here, it does not.

For claim 8, the Board's explanation is nominal. Claim 8 requires that the mounting block include a movable portion. The Board recited MotivePower's argument that a person of ordinary skill in the art could modify and relocate an element of Bissett to the mounting block and this claim would be satisfied. There is no further explanation. Again, conclusory statements do not give adequate justification for why a claim is obvious. The Board does not give any reasons for how a person of ordinary skill would find this modification obvious.

### III

For the foregoing reasons, we hold that the Board's Final Written Decision does not provide enough explanation to support its finding of obviousness. Therefore, this Court cannot properly review whether there is substantial evidence to support the underlying factual findings of

the Board's determination. When the Board determines that modifications and combinations of the prior art render a claimed invention obvious, the Board must fully explain why a person of ordinary skill in the art would **\*579** find such changes obvious. We vacate the Board's decision and remand "for proceedings appropriate to the administrative process." *In re Sang–Su Lee,* 277 F.3d at 1346.

**VACATED AND REMANDED**

**All Citations**

636 Fed.Appx. 575

Footnotes

1    MotivePower petitioned for IPR of five related patents, including the #018 patent. The Board instituted all five IPRs and every challenged claim was either cancelled by Cutsforth or found to be unpatentable by the Board. Cutsforth appealed three of the five decisions, including this one and Appeal No. 2015–1314 and Appeal No. 2015–1315, which were consolidated for oral argument before this Court.

---

**End of Document**
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

660 Fed.Appx. 919
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. Fed. Cir. Rule 32.1.
United States Court of Appeals,
Federal Circuit.

In re: Stephen O. Lemay, Michael Matas, Timothy
P. Omernick, Richard Williamson, Imran Chaudhri,
Charles J. Pisula, Marcel Van Os, Appellants

2015–1973
|
Decided: September 19, 2016

### Synopsis

**Background:** Named inventors in applied-for patent
generally directed to method of streaming online videos
to portable device appealed Patent Trial and Appeal Board's
(PTAB) decision rejecting certain claims as obvious.

**Holdings:** The Court of Appeals, Wallach, Circuit Judge,
held that:

[1] PTAB's finding that claims relating to clicking icon to
produce "corresponding list of information" were obvious
was not supported by substantial evidence;

[2] PTAB's finding that claims relating to "displaying a
first list of information about online video items in a
plurality of lists of information about online video items"
were obvious was not supported by substantial evidence;
and

[3] inventors waived argument that claim limitations
established "dual functionality" element.

Reversed.

Moore, Circuit Judge, filed dissenting opinion.

**\*920** Appeal from the United States Patent and
Trademark Office, Patent Trial and Appeal Board in No.
11/968,067.

### Attorneys and Law Firms

MARK S. DAVIES, Orrick, Herrington & Sutcliffe LLP,
Washington, DC, argued for appellants. Also represented
by E. JOSHUA ROSENKRANZ, MARC SHAPIRO,
SARAH M. STERNLIEB, New York, NY; DONALD E.
DAYBELL, Irvine, CA; CATHY C. SHYONG, Menlo
Park, CA; BRIAN B. HO, PETER J. YIM, Morrison &
Foerster LLP, San Francisco, CA.

PHILIP J. WARRICK, Office of the Solicitor, United
States Patent and Trademark Office, Alexandria, VA,
argued for appellee Michelle K. Lee. Also represented by
THOMAS W. KRAUSE, BRIAN RACILLA.

Before Newman, Moore, and Wallach, Circuit Judges.

### Opinion

Dissenting opinion filed by Circuit Judge Moore.

Wallach, Circuit Judge.

Appellants Stephen O. Lemay and others (collectively,
"Lemay" or "Appellants"), inventors at Apple Inc.,[1]
appeal the Final Written Decision of the United States
Patent and Trademark Office's ("USPTO") Patent Trial
and Appeal Board ("PTAB"), which affirmed in part
an examiner's rejection of all claims of U.S. Patent
Application Publication No. 2008/0320391 (the "Lemay
application"). We reverse.

### BACKGROUND

Appellants are the named inventors of the Lemay
application, which is generally directed to a method
of streaming online videos to a portable device. The
application contains six independent claims (1, 2, 29, and
31–33) that each recite, among other things, a touch screen
and a graphical user interface that displays "a first list of
information about online video items." *See, e.g.*, **\*921**
J.A. 985 (claim 1). Representative[2] claim 1 recites:

A method, comprising:

Appx2561

at a portable electronic device with a touch screen display:

displaying, on the *touch screen display* of the portable electronic device, a *first list of information about online video items* in a *plurality of lists* of information about online video items;

displaying, on the touch screen display of the portable electronic device, a *plurality of icons* corresponding to at least some of the plurality of lists of information about online video items;

in response to detecting a *moving finger gesture* on the first list of information about online video items, scrolling the first list of information about online video items on the touch screen display of the portable electronic device;

in response to detecting a *tap gesture* on a *first portion of a row* in the first list of information about online video items, wherein the row contains information about a particular online video item:

initiating a request for the particular online video item from a remote computer, receiving the particular online video item, and playing the particular online video item;

in response to detecting a finger gesture on a *second portion of the row* in the first list of information about online video items, wherein the second portion of the row is different from the first portion of the row, displaying, on the touch screen display of the portable electronic device, *additional information* about the particular online video item; and

in response to detecting a *finger gesture on a respective icon* in the plurality of icons, displaying, on the touch screen display of the portable electronic device, a *corresponding list of information* about online video items.

J.A. 15–16 (emphases added).[3]

A USPTO examiner rejected claims 1–33 as obvious over various combinations of U.S. Patent No. 7,739,271 ("Cook") and U.S. Patent Application Publication No. 2007/0024646 ("Saarinen").[4] The PTAB affirmed the rejections of claims 1–9 and 12–33, but reversed the rejections of claims 10–11. Lemay appeals the PTAB's

decision as to claims 1–9 and 12–33. This court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) (2012).

DISCUSSION

I. Standard of Review and
Legal Standard for Obviousness

The USPTO may not issue a patent "if the differences between the subject matter **\*922** sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the [relevant] art...." 35 U.S.C. § 103(a) (2006).[5] "The [USPTO] bears the initial burden of showing a prima facie case of obviousness." *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014) (citation omitted). The ultimate determination of obviousness is a question of law, but that determination is based on underlying factual findings. *See In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). The underlying factual findings include (1) "the scope and content of the prior art," (2) "differences between the prior art and the claims at issue," (3) "the level of ordinary skill in the pertinent art," and (4) the presence of secondary considerations of nonobviousness, such as "commercial success, long felt but unsolved needs, [and] failure of others." *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). If "a prima facie case of obviousness is made, the burden then shifts to the applicant to come forward with evidence and/or argument supporting patentability." *Giannelli*, 739 F.3d at 1379 (citation omitted).

We review the PTAB's factual determinations for substantial evidence and its legal determinations de novo. *Gartside*, 203 F.3d at 1316. "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence." *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000) (citation omitted). It is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

Appx2562

## II. No Substantial Evidence Supports the PTAB's Determination that Cook and Saarinen Teach the Subject Elements of Claim 1

The PTAB found that certain elements of claim 1 of the Lemay application would have been obvious over Cook and Saarinen. *See* J.A. 5–6. When no substantial evidence supports the PTAB's findings, we may reverse its findings without remanding the matter. *See, e.g., Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1366–67 (Fed. Cir. 2016) (reversing the PTAB's determination that adding a search for phone numbers to a text recognition program would have been obvious because the PTAB's decision was "conclusory and unsupported by substantial evidence"); *Giannelli*, 739 F.3d at 1380 (reversing affirmance of examiner's rejection where the PTAB's analysis "contained no explanation why or how a person having ordinary skill in the art would modify" the prior art to arrive at the claimed invention). The instant appeal warrants reversal.

Lemay argues that no evidence demonstrates that Cook and Saarinen teach the three disputed elements of claim 1. Although the USPTO attempts to identify record evidence in support of the PTAB's findings,[6] its arguments are unpersuasive. We agree with Lemay that no substantial **\*923** evidence supports the PTAB's findings as to two of these three elements in claim 1, but we find that Lemay waived its arguments as to the third. We discuss each in turn.

### A. No Substantial Evidence Supports the PTAB's Finding that Cook and Saarinen Teach an Icon and "A Corresponding List of Information"

**[1]** First, Lemay asserts that Cook does not teach the element recited in the final clause of claim 1, which requires that "in response to detecting a *finger gesture on a respective icon* in the plurality of icons, displaying, on the touch screen display of the portable electronic device, *a corresponding list of information* about online video items." J.A. 16 (emphases added). Lemay explains that this clause can be understood by reference to Figure 5A of the Lemay application, which is reproduced below:



Figure 5A

J.A. 959 (Lemay application fig.5A). Figure 5A illustrates a touch screen display that allows users to click on the bottom row of icons to generate a list of "featured," "most viewed," or "bookmark[ed]" video titles. J.A. 959.

According to Lemay, those categories (i.e., "featured," "most viewed," "bookmark[ed]," **\*924** etc.) represent the "plurality of icons" recited in claim 1 of the Lemay application. J.A. 16. For example, when a user taps a finger on the "most viewed" category, the screen will display "a list of 'most viewed' video titles along with other information about each online video item." Appellants' Br. 23. The resulting list of video items can be seen in Figure 5A as "Pokemon theme music," "SNL–Digital Short," etc. *See* J.A. 959 (Lemay application fig.5A). The tapping of the user's finger and the resulting display of video titles and associated information illustrate, according to Lemay, the two elements of (1) "a finger gesture on a respective icon in the plurality of icons" and (2) "a corresponding list of information about online video items," respectively. J.A. 16, 959.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  3

The USPTO argues that substantial evidence supports the PTAB's finding that Cook teaches these elements (in combination with Saarinen, which teaches a touch screen and finger gestures). The PTAB adopted the examiner's finding that Cook teaches user queries entered into an Internet search engine, J.A. 671, which generates "a listing of album covers and links to listen to a music sample from three different albums," J.A. 874. In support, the USPTO contends that a user may click any of Cook's "Listen!" icons (i.e., "links to listen," J.A. 874), which it says correspond to Lemay application claim 1's "plurality of icons." Upon clicking one of these icons (i.e., "a finger gesture on a respective icon in the plurality of icons," J.A. 959), a media player appears that "displays various lists of information corresponding to the selected media sample," J.A. 959). Appellee's Br. 25–26; *see* J.A. 671–72, 676 (examiner's findings that the media samples are "a corresponding list of information"). According to the USPTO, the "list of information about online video items" corresponds to the icon clicked by the user and comprises the album "tracks," along with other information. *See* Appellee's Br. 26; *see also* J.A. 672 (examiner's finding that songs can be "video items").

The USPTO's reasoning is flawed. The final clause of claim 1 in the Lemay application recites "in response to detecting a finger contact on a respective icon in *the* plurality of icons, displaying ... a *corresponding list of information* about online video items." J.A. 16 (emphases added). The claim earlier provides the antecedent basis for "*the* plurality of icons" and their corresponding lists of information when it recites (1) "displaying ... a first list of information about online video items in *a plurality of lists* of information about online video items" and (2) "displaying ... *a plurality of icons corresponding to at least some of the plurality of lists* of information about online video items." J.A. 15 (emphases added). The USPTO argues that

> each of the three album covers and "Listen!" links represent icons, and each *list of information* about the online media sample—album title (*e.g.*[,] "I Wanna Be With You"), artist name (*e.g.*, "Mandy Moore"), release date (*e.g.*, "May 9, 2000"), and price (*e.g.*, "$12.99") —*corresponds* to those icons.

Appellee's Br. 22 (emphases added). However, if the "list of information" corresponding to an icon is represented by album titles, artist names, and release dates generated as the results of the search query, the same list cannot also be represented elsewhere as a list of track titles. These are different lists.

For these reasons, we conclude that no substantial evidence supports the PTAB's finding that Cook, in combination with Saarinen, discloses clicking an icon to produce the recited "corresponding" list of information.

### *925 B. No Substantial Evidence Supports the PTAB's Finding that Cook and Saarinen Teach a "First List of Information About Online Video Items"

 **[2]**   The first clause of claim 1 recites "displaying ... a first list of information about online video items in a plurality of lists of information about online video *items*." J.A. 15 (emphasis added). Lemay asserts that the use of the word "items" indicates that "the first list of information must be about *multiple* online video items." Appellants' Br. 25. The USPTO states that Lemay's argument "misses the mark" because the "sample(s)" illustrated in Cook Figure 3B are the "items" referred to in claim 1, and the "list of information" corresponding to these items is the list of search results illustrated in Figure 3B. Appellee's Br. 32 (emphasis omitted).

The USPTO's position regarding "items" contradicts its position regarding "lists of information." Earlier in its brief, the USPTO contends that each of the three sets of title, artist, and price information identified in Cook Figure 3B is one of the "lists of information." *See, e.g.*, Appellee's Br. 22–23 (where the USPTO "borrow[s] the annotations from [Lemay's] brief," but omits the rectangular annotation boxes surrounding the names of the "items"). Comparing Lemay's brief to the USPTO's reveals this discrepancy:



*Compare* Appellants' Br. 20 (left, reproducing and annotating a portion of J.A. 867 (Cook fig.3B)), *with* Appellee's Br. 23 (right, reproducing and annotating a portion of J.A. 867 (Cook fig.3B)). As can be seen from these illustrations, Lemay's annotated version of Cook Figure 3B contains rectangles around "Mandy More," "I Wanna Be With You," and "Now That's What I Call Music! 4," i.e., around the "items" referred to in the claim. Appellants' Br. 20. In contrast, the USPTO's version omits these rectangles, noting that "the green boxes [i.e., the larger rectangles surrounding the title, artist, and price information] indicate the 'plurality of lists of information.' " Appellee's Br. 23. According to the USPTO, each of the three sets of title, artist, and price information is one of the "lists of information." *Id.* at 22–23. The USPTO confirms this understanding when it states that "Cook ... explains that the results display includes a *listing* of information that correlates to *each* album cover: the price of the album and **\*926** 'other purchasing information.' " *Id.* at 24 (emphases added) (quoting J.A. 874).

The USPTO's reasoning is internally inconsistent. If each of the three sets of title, artist, and price information constitutes one of the "lists of information," it cannot also be correct that the search results as a whole (i.e., "Mandy More," "I Wanna Be With You," and "Now That's What I Call Music! 4") constitute one of the lists. And, if each of the three sets of title, artist, and price information constitutes one of the lists of information, then each such list corresponds only to a single item (i.e., the "particular online video item," J.A. 15, that is played when a user clicks the "Listen!" link), rather than multiple "online video items." J.A. 15 (emphasis added).

For these reasons, the court concludes that no substantial evidence supports the PTAB's conclusion that Cook Figure 3B discloses "displaying ... a first list of information about online video *items* in a plurality of lists of information about online video items." J.A. 15 (emphasis added).

## C. Lemay Waived its Arguments as to Dual Functionality

 **[3]** Although the term "dual functionality" does not appear anywhere in the Lemay application, claim 1 recites the following two steps:

[ (1) ] in response to detecting a *tap gesture* on a *first portion of a row* in the first list of information about online video items, wherein the row contains information about a particular online video item:

...

playing the particular online video item;

[ (2) ] in response to detecting a finger gesture on a *second portion of the row* in the first list of information about online video items, wherein the second portion of the row is different from the first portion of the row, displaying, on the touch screen display of the portable electronic device, *additional information* about the particular online video item....

J.A. 15 (emphases added). Lemay contends that these limitations establish the dual functionality element, which is illustrated in Figure 5A of the Lemay application. Appellants' Br. 28 (reproducing and annotating a portion of J.A. 959 (Lemay application fig.5A)).

However, the court need not address these arguments. Because Lemay did not raise this issue before the PTAB, the PTAB did not make any findings on this issue. The court cannot decide questions of fact in the first instance when reviewing the PTAB's decisions. Therefore, Lemay's arguments as to claim 1 are waived. *See, e.g.*, *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1261 (Fed. Cir. 2010) (declining to consider new anticipation argument not raised before the PTAB); *In re Watts*, 354 F.3d 1362, 1367–68 (Fed. Cir. 2004) (holding patent holder waived new argument on the scope of the prior art never raised to the PTAB). Therefore, the court need not consider whether Cook discloses the dual functionality element of claim 1 of the Lemay application.

### III. No Substantial Evidence Supports the PTAB's Obviousness Determination as to Claims 2–3, 5–8, 12–22, and 24–33

As to claims 2–3, 5–8, 12–22, and 24–33,[7] claim 1 is representative. A claim is considered representative when it is not separately argued before the PTAB, *see* 37 C.F.R. § 41.37(c)(1)(iv) ("For each ground **\*927** of rejection applying to two or more claims, the claims may be argued ... as a group (*all claims subject to the ground of rejection rise and fall together*)...." (emphasis added)), and claims that "are not separately argued ... all stand or fall together," *In re Kaslow*, 707 F.2d 1366, 1376 (Fed. Cir. 1983).

In their opening brief before the PTAB, Lemay grouped claims 2–3, 5–8, 12–22, and 24–33 together and presented arguments applicable to this group. *See* J.A. 711–20 (Appellants' Brief to the PTAB); *see also* J.A. 760–67 (Appellants' Reply Brief to the PTAB grouping claims in the same manner, with the exception of including claim 4 in the sections on claims 1–3, 5–8, 12–22, and 24–33). As a result, the PTAB determined that "Appellants have not presented separate patentability arguments for pending claims 2–3, 5–8, 12–22, and 24–33 or have reiterated substantially the same patentability arguments as those previously discussed for claim 1," and thus sustained the examiner's rejection of these claims on the same grounds as claim 1. J.A. 7 (citing 37 C.F.R. § 41.37(c)(1)(iv)).

In the present appeal, the parties continue to agree that claim 1 is representative. *See* Appellants' Br. 7 n.6 ("Because the parties and the PTAB treated claim 1 as a representative claim, this brief does so as well."); Appellee's Br. 1, 3, 5, 18–19, 21, 40 (repeatedly referring to "representative claim 1"). Therefore, claims 2–3, 5–8, 12–22, and 24–33 stand or fall with claim 1. *See* 37 C.F.R. § 41.37(c)(1)(iv); *Kaslow*, 707 F.2d at 1376. Because claim 1 would not have been obvious, we reverse as to claims 2–3, 5–8, 12–22, and 24–33 as well.

### IV. No Substantial Evidence Supports the PTAB's Obviousness Determinations as to Dependent Claims 4, 9, and 23

Lemay provided separate arguments for dependent claims 4, 9, and 23 before the PTAB, *see* J.A. 720–22 (claims

4 and 9), 768–71 (claim 9), 773–74 (claim 23), and the PTAB provided separate reasoning for its affirmance of the examiner's rejection of these claims, *see* J.A. 7–9. Before this court, Lemay continues to separately argue these claims. *See* Appellants' Br. 48–54. However, the court need not address these separate arguments because these claims depend from nonobvious claims.

It is true that dependent claims may either stand or fall when the associated independent claim is invalidated as obvious. *See* 35 U.S.C. § 282(a) ( "[D]ependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim."); *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N. V.*, 528 F.3d 1365, 1383 (Fed. Cir. 2008) (noting the "black letter law that a finding of invalidity of an independent claim does not determine the validity of claims that depend from it" (citation omitted)). But this does not mean that dependent claims that are not themselves inherently nonobvious may either stand or fall when, as here, the associated independent claim is determined to be *nonobvious*. To the contrary, "dependent claims are nonobvious if the independent claims from which they depend are nonobvious...." *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992); *see Ortho– McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) ("[I]f claim 1 is not obvious then claims 6–8 also cannot be obvious because they all depend from a nonobvious claim." (citation omitted)); *In re Fine*, 837 F.2d 1071, 1076 (Fed. Cir. 1988) ("Dependent claims are nonobvious under section 103 if the independent claim from which they depend are nonobvious." (citations omitted)); Manual of Patent Examining Procedure § 2143.03 (9th ed. Rev. 7, Nov. 2015) ("If an independent claim is nonobvious **\*928** under 35 U.S.C. [§ ] 103, then any claim depending therefrom is nonobvious." (citation omitted)).

Claims 4, 9, and 23 depend from claims that this court determined to be nonobvious, i.e., claims 2 and 3. *See* J.A. 17 (where claims 4 and 9 depend from "[t]he method of claim 2"), 19 (where claim 23 depends from "[t]he method of claim 3"). Therefore, claims 4, 9, and 23 also are nonobvious. *See Ortho–McNeil*, 520 F.3d at 1365.

### CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. For these reasons, the decision of

the United States Patent and Trademark Office's Patent Trial and Appeal Board is

**REVERSED**


Moore, Circuit Judge, dissenting.

The majority holds that the Patent Trial and Appeal Board's ("Board") findings regarding the scope and content of the prior art are not supported by substantial evidence and reverses the Board's obviousness determination as to every disputed claim. I would affirm the Board's rejection of claims 1–8 and 12–33, but would reverse on claim 9.


## I. Claim 1

Respectfully, substantial evidence supports the Board's finding that Cook and Saarinen disclose the disputed limitations of claim 1.

The majority opinion concludes that there is not substantial evidence to support the Board's finding that Cook discloses an "icon" and "a corresponding list of information." *See* Majority Op. at 6–10. This implicates two of the three limitations disputed by Lemay:

> displaying, on the touch screen display of the portable electronic device, *a plurality of icons corresponding to at least some of the plurality of lists of information* about online video items;
>
> ...
>
> in response to detecting a *finger gesture on a respective icon in the plurality of icons*, displaying, on the touch screen display of the portable electronic device, *a corresponding list of information* about online video items.

J.A. 15–16 (emphases added).

For the first limitation, "a plurality of icons corresponding to at least some of the plurality of lists of information," the examiner cited Cook's disclosure at column 6 lines 33–39, which describes a search result display depicted in Figure 3B of Cook. J.A. 626. For the second limitation, displaying "a corresponding list of information" after detecting "a finger gesture on a respective icon in the

plurality of icons," the examiner cited a different portion of Cook at column 8 lines 37–49, which describes the branded player depicted in Figure 5 of Cook. J.A. 627.

The majority states, and I agree, that "a plurality of icons" recited in the first limitation provides antecedent basis for and thus must be the same as "the plurality of icons" recited in the second limitation. Majority Op. at 9–10. And I do not read the PTO's brief to dispute this issue. What the PTO does argue is that the first limitation's "plurality of lists of information" does not provide antecedent basis for "a corresponding list of information." Appellee's Br. 29–30. I agree and therefore cannot join the majority's opinion holding that the Board's findings are not supported by substantial evidence because the Board relies on "different lists" disclosed in Cook to satisfy each limitation. *See* Majority Op. at 10.

The first limitation recites "at least some of the plurality of lists of information **\*929** about online video items." The second limitation recites "a corresponding list of information about online video items." I cannot agree with the majority that these must be the same lists of information for three reasons. First, there is no antecedent basis to support limiting "a corresponding list" to one of the "plurality of lists." Second, the limitations themselves use different words to describe the two different lists of information. *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) (holding there is a presumption that when different words are used to describe different elements they have different meanings). That both limitations refer to lists of information "about online video items" does not mean the limitations are referring to the same lists. Finally, during prosecution, the PTO gives terms their broadest reasonable construction. Viewing these terms under the broadest reasonable interpretation, I cannot say that "a corresponding list" must be identical to "the plurality of lists."

In short, the claim's "plurality of lists of information about online video items" is a different element from the same claim's "a corresponding list of information about online video items." The majority errs when it requires them to be "the same list." Majority Op. at 10. Understanding claim 1 in this way, I would hold there is substantial evidence to support the examiner's finding, adopted by the Board, that these limitations are disclosed in Cook. *See* J.A. 626–27.

For similar reasons, I would also hold that substantial evidence supports the Board's finding that the third limitation, "a first list of information about online video items in a plurality of lists of information about online video items," is disclosed in Cook. Under the broadest reasonable interpretation, I think the majority is again mistaken in requiring that "a first list of information" look the same as "a plurality of lists of information."

## II. Claim 9

While I disagree with the majority regarding claim 1, which is representative of claims 2–8 and 12–33, I would not affirm the Board on claim 9. Claim 9 recites "a configuration icon that when activated initiates the display of a user interface for configuring which icons ... are displayed with the first list of information." J.A. 17. In its rejection, the examiner cited Cook at column 8 lines 37–60, which describes Cook's branded player depicted in Figure 5 and a "call-to-action" function. J.A. 629. The Board adopted the examiner's finding that

"Cook describes editing operations for a playlist, as well as a function with an interface that directs the user to take actions." J.A. 8. The portion of Cook disclosing customizing *playlists* does not involve customizing or configuring the display of *icons* in any way. *See* J.A. 875 (Cook at 8:37–49). Even if the "call-to-action" function could be interpreted to reconfigure the display of media product icons, as the PTO argues, Appellee's Br. 54–55, this function occurs within the branded player, apart from the "icons ... displayed with the first list of information." *See* J.A. 869 (Cook at Fig. 5); 875 (Cook at 8:50–60). Because the Board's finding that Cook discloses claim 9's "a configuration *icon* that when activated initiates the display of a user interface for configuring [ ] *icons*" is not supported by substantial evidence, I would reverse the Board's decision that claim 9 would have been obvious over Cook.

### All Citations

660 Fed.Appx. 919

### Footnotes

1    Apple Inc. is the real party in interest.

2    As will be explained more fully below, a claim is considered representative when the arguments presented in support of that claim before the PTAB apply to other claims grouped with the representative claim, and all claims argued with a representative claim rise and fall based on the representative claim. *See* 37 C.F.R. § 41.37(c)(1)(iv) (2012) ("For each ground of rejection applying to two or more claims, the claims may be argued ... as a group (*all claims subject to the ground of rejection rise and fall together*)...." (emphasis added)).

3    Since filing the Lemay application in December 2008, claims 1–33 have been amended on multiple occasions. *See* J.A. 11–14 (PTAB Docket Sheet listing the parties' filings, including those related to amendments), 500, 510–11 (Lemay's comments regarding amendments). For ease of reference, the court refers to the amended claims as argued before the PTAB. *See* J.A. 15–23 (Appendix providing amended claims that "will replace all prior versions, and listings, of claims in the application").

4    The USPTO also referenced U.S. Patent Application Publication Nos. 2007/0229465 ("Sakai") and 2007/0064619 ("Bettis") as prior art, but Sakai and Bettis are not central to this appeal.

5    Congress amended § 103 when it enacted the Leahy–Smith America Invents Act ("AIA"). Pub. L. No. 112–29, § 3(c), 125 Stat. 284, 287 (2011). However, because the Lemay application was filed before March 16, 2013, the pre-AIA § 103 applies. *See id.* § 3(n)(1), 125 Stat. at 293.

6    In its Final Written Decision, the PTAB adopted the examiner's findings as to claim 1, *see* J.A. 6–7 ("We find that the evidence of record supports the [e]xaminer's finding th[at] Saarinen's touch screen and finger gestures (*see, e.g.*, Saarinen ¶¶ 37, 43), combined with Cook's icons and plurality of lists of information (*see* [J.A. 867 (Cook fig.3B) ] ), renders obvious the disputed [elements] of claim 1."), and the USPTO has overstated the examiner's findings in its brief. Although we refer to the USPTO's supporting arguments, we review the examiner's findings as adopted by the PTAB.

7    Because the PTAB reversed the examiner's rejections of claims 10 and 11, they are not at issue in this appeal. *See generally* Appellants' Br. 41–56.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above-

captioned JOINT APPENDIX is being filed electronically with the Clerk of Court using

the CM/ECF the electronic filing system which will serve vie e-mail notice of such filing

to all counsel registered as CMF/ECF users, including any of the following counsel

registered as CM/ECF users:

> David K. S. Cornwell
> Mark W. Rygiel
> Robert Greene Sterne
> Jason A. Fitzsimmons
> STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
> davidc-PTAB@skgf.com
> mrygiel-PTAB@skgf.com
> rsterne-PTAB@skgf.com
> jfitzsimmons-PTAB@skgf.com

Upon acceptance by the Court of the e-filed document, six paper copies will

be filed with the Court within the time provided in the Court's rules.


Date: March 1, 2017

/s/ andriy lytvyn/
Andriy Lytvyn
Lead Counsel for Appellant

SMITH & HOPEN, P.A.
180 Pine Avenue
North Oldsmar, FL 34677
(813) 925-8505